**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
388 Market Street, Suite 1300
San Francisco, CA 94111
Telephone: (415) 373-1671
Email: aapton@zlk.com

*Attorneys for Lead Plaintiffs Mariusz J. Klin and*
*the Mariusz J. Klin MD PA 401K Profit Sharing*
*Plan, Cade Jones, Larry Lenick, and Lead Counsel*
*for the Class*

[Additional counsel on signature blocks]

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE CLOUDERA, INC. SECURITIES LITIGATION | Case No. 5:19-cv-03221-LHK |
| | Hon. Lucy H. Koh |
| | **CLASS ACTION** |
| | **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| | <u>Demand for Jury Trial</u> |

Lead Plaintiffs Mariusz J. Klin and the Mariusz J. Klin MD PA 401K Profit Sharing Plan, Plaintiff Cade Jones, and Plaintiff Larry Lenick (collectively, "Plaintiffs"), by and through undersigned counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, the investigation made by and through Plaintiff's attorneys, which includes without limitation: (a) review and analysis of regulatory filings made by Cloudera, Inc. ("Cloudera") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued and disseminated by Cloudera; (c) review of other publicly available information concerning Cloudera.

Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# I.   **NATURE OF THE CLAIMS**

1.      Plaintiffs bring this federal securities class action on behalf of a class consisting of all persons who purchased and/or otherwise acquired Cloudera common stock: (i) pursuant or traceable to the Registration Statement[1] filed in connection with Cloudera's merger with Hortonworks, Inc. that closed on January 3, 2019 ("Merger"); and/or (ii) between April 28, 2017 and June 5, 2019, inclusive (the "Class Period").

2.      In this action, Plaintiffs assert strict liability claims under §§11, 12 and 15 of the Securities Act of 1933 (the "Securities Act") against Cloudera, Intel Corporation ("Intel"), a controlling shareholder, and certain current and former officers and directors of Cloudera and Hortonworks who signed the signed the Form S-4 registration statement (the "Securities Act Claims").

3.      Plaintiffs also assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder (the "Exchange Act Claims"), against Cloudera, its former chief executive officer, Thomas J. Reilly, its Chief Financial Officer, Jim Frankola, and its founder and former Chairman, Michael Olson.

4.      As alleged in detail below, Plaintiffs' claims concern Defendants' statements about Cloudera's (*i*) cash flow operating margins following the company's merger with Hortonworks and (*ii*) ability to compete within the cloud industry given the material features of its core products and/or services. Plaintiffs allege that these statements contained untrue statements of material facts or omitted to state material facts required to be stated therein to make the statements not misleading. Plaintiffs suffered damages as a result and, therefore, bring this lawsuit to recover their losses.

---

[1] "Registration Statement" refers to the Form S-4 registration statement and the amendment thereto; Form 425 prospectuses issued by Cloudera as part of its offer to sell the Cloudera shares; the final joint proxy/prospectus (the "Prospectus"); and all documents incorporated therein.

**II.      BACKGROUND ALLEGATIONS**

> *i.     **Cloudera's Business and Operations***

5.      Cloudera is a software company whose strategy is to the be the "modern platform for machine learning and analytics optimized for the cloud."

6.      Cloudera used its hybrid open source software (HOSS) model to incorporate open source coding with its proprietary software with the goal of creating and selling enterprise-grade platforms to customers. The platforms that Cloudera sought to sell to customers included integrated products that could be used for data management, machine learning and advanced analytics.

7.      Cloudera relied upon distributed architecture to provide expandable scale through inexpensive industry-standard hardware or cloud infrastructure. Their products were focused at enterprises with the goals of allowing these enterprises to "operate, manage and move workloads across multiple architectures, mixing on-premises and cloud environments, including all major public cloud infrastructure providers – Amazon Web Services, Microsoft Azure and Google Cloud Platform – as well as managed service providers (MSPs)." In other words, Cloudera represents that its offerings provided enterprises and its customers with "multi-cloud" strategies, that would permit their customers to increase their scale and also move workloads "from the data center to the public cloud, among public cloud vendors, and back again" Cloudera further stated its platform allowed customers to configure and monitor all their workloads across multiple environments its "single pane of glass" interface.

8.      Cloudera primarily offers its platform and offerings on a subscription basis with its main focus being large corporate enterprises and public sector organizations. For the year ended January 31, 2019, fiscal year 2019, 85% of Cloudera's revenue came from its subscriptions while the remainder originated from services. Cloudera's sales cycle ranges generally range from four to eighteen months, with the typical range being four to nine months.

9.      Cloudera offers subscriptions of up to three years in length, but most customers opt to purchase one-year subscriptions that do not provide for automatic renewal or a right to terminate the subscription early. Cloudera's price for its subscription offerings is based on a number of

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:19-cv-03221-LHK

factors, including the number of servers (i.e. nodes) in a cluster, core or edge devices, data under management and the level support it is to provide.

10.   Cloudera recognizes its subscription revenue ratably over the term of the subscription period. As such, most of the revenue that Cloudera reports during each fiscal quarter originates from deferred revenue from subscription contracts entered in previous periods. Thus, Cloudera's deferred revenue consists of amounts that Cloudera has invoiced but has not yet been recognized as revenue as of the end of a reporting period.

11.   Cloudera's annual or multiple-year subscription contracts usually include an initial signing amount with additional annual invoices issued over the contract's term. The amounts under a contract that are not invoices are not recorded in Cloudera's revenues, deferred revenues, or accounts receivables. Cloudera refers to these amounts as "unbilled deferred revenue."

### ii.   *Hortonworks's Business and Operations*

12.   Hortonworks states that it is an "100 percent open-source global data management solutions so that customers can deploy modern data architectures and realize the full value of their data. Our enterprise-ready solutions enable organizations to govern, secure and manage data of any kind, wherever it is located, and turn it into actionable intelligence that will help them transform their businesses."

13.   Within the enterprise Hadoop market, Hortonworks competes against a variety of large software and infrastructure vendors, smaller specialized companies and custom development efforts. Hortonworks principal competitor in this market include pure play Hadoop distribution vendors such as Cloudera.

14.   Hortonworks offers customers support subscription offerings and professional services for its Connected Data Platforms. Hortonworks provides these Connected Data Platforms free of charge and earns its revenues primary from the customer fees for support subscription offerings and professional services.

15.   Hortonworks revenue and cash flows are almost all are derived from its customer fees for support subscription offerings and professional services in support of its Connected Data Platforms. At the end of 2017, Hortonworks had over 1,300 support subscription customers. For

the year ended December 31, 2017, 76% of Cloudera's revenue came from its supports subscriptions while the remainder originated from its professional services. Hortonworks sales cycle ranges generally range from six to nine months, with some sales extending more than a year.

16.    Hortonworks recognizes its subscription revenue from its support subscription customers ratably over the term of the subscription period which are generally 12 months, but does have multi-year terms. As such, most of the revenue Hortonworks reports, like Cloudera, during each fiscal quarter originates from deferred revenue from subscription contracts entered into previous quarters.

17.    According to the following Hortonworks filings with the SEC that were also incorporated by reference into the Registration Statement, Hortonworks had sizeable amounts of deferred revenues. In Hortonworks Form 10-Q filed with the SEC on November 8, 2018 for the quarter ended September 30, 2018, it had deferred revenue in the amount of approximately $163.1 million. According to Hortonworks Form 10-Q filed with the SEC on August 9, 2018 for the quarter ended June 30, 2018, it had deferred revenue in the amount of approximately $167.5 million. Hortonworks also publicly disclosed its "total backlog" which it defines to include both cancelable and non-cancelable portions of our support subscription customer agreements that it has not yet billed. As stated in Hortonworks Form 10-K filed with the SEC on March 15, 2018 for the year ended December 31, 2017:

> Our deferred revenue, which consists of billed but unrecognized revenue, was $275.2 million and $185.4 million as of December 31, 2017 and 2016, respectively.
>
> Our total backlog, which we define as including both cancelable and non-cancelable portions of our support subscription customer agreements that we have not yet billed, was $27.7 million and $23.2 million as of December 31, 2017 and 2016, respectively. ***The timing of our invoices to our customers is a negotiated term and thus varies among our support subscription agreements. For multi-year agreements, it is common for us to invoice an initial amount at contract signing followed by subsequent annual invoices.*** At any point in the contract term, there can be amounts that we have not yet been contractually able to invoice. Until such time as these amounts are invoiced, we do not recognize them as revenue, deferred revenue or elsewhere in our consolidated financial statements.

### iii.     *The Background of Cloudera's Merger with Hortonworks*

18.     Cloudera and Hortonworks first started to have preliminary discussions concerning a potential business combination as early as June 2015.

19.     With the help of a financial advisor, between November 2016 and August 2017, Hortonworks explored seven different parties' interest in potentially acquiring Hortonworks, that did not result in with any proposals. As a result, Hortonworks halted further contact with third parties concerning a potential acquisition of Hortonworks.

20.     In mid-April 2018, a private equity firm approached Hortonworks Chief Operations Officer and Chief Financial Officer, Scott Davidson ("Davidson"), about their interest in facilitating a potential business combination with between Cloudera and Hortonworks, whereby a potential private investor would provide liquidity to certain of Cloudera's existing stockholders via a convertible preferred investment in Cloudera immediately prior to a merger between Hortonworks and Cloudera (based on an at-market exchange ratio). This proposed transaction which would result in the private investor owning approximately 21% of the combined company on a pro forma basis. Following weeks of further discussions, on May 25, 2018 the Strategic Transactions Committee of the Hortonworks board determined that the private investors proposed terms were not acceptable and authorized Hortonworks CEO, Robert Bearden to open a direct discussion with Cloudera concerning a potential strategic transaction.

21.     Following some initial discussions in early to mid-June 2018, on June 14, 2018 Cloudera and Hortonworks entered into a reciprocal confidentiality agreement and Cloudera sent a list of initial information requests largely focused on high-level employee matters, material contract summaries, aggregated customer data and historical financial information. This information was made available in an electronic data room on June 19, 2018, along with some additional agreed upon information.

22.     On June 27, 2018, Cloudera formed an M&A Committee consisting of Defendants Cole, Hammonds, Sordello, and Stankey ("Cloudera M&A Committee"). From an independent director meeting consisting of the same members of Cloudera M&A Committee, management was

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:19-cv-03221-LHK

instructed to retain a financial advisor. On July 2, 2018, Cloudera's Board and management representatives met with its financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley").

23.     In early July 2018, potential exchange ratios and corporate governance structures were discussed between the parties. On July 9-10, 2018, Defendant Frankola and Davidson met to discuss certain assumptions that may be used when forecasting their respective businesses.

24.     Throughout the remainder of July 2018, discussions between Cloudera and Hortonworks continued negotiating exchange ratios for a potential merger, with negotiations breaking down. The parties ultimately agreed to revive discussions after Hortonworks announced its financial results for the second quarter 2018 on August 7, 2019.

25.     On August 8-9, discussions were undertaken between Frankola and Davidson, along with representatives of Cloudera's and Hortonworks financial advisors for the potential strategic combination. Thereafter, negotiations reopened. Throughout August, negotiations and discussions continued between Cloudera, Hortonworks, their financial advisors.

26.     Cloudera announced its financial results for the second quarter of fiscal year 2019 on September 5, 2018. Thereafter, Reilly requested, and the Cloudera M&A Committee received, an updated financial analysis of the proposed strategic combination in light that included the positive financial information reported as well as the 13% increase in Cloudera's stock price from the news.

27.     A few days later, the Cloudera M&A Committee authorized its counsel to prepare a draft merger agreement in line with a revised non-binding term sheet sent on behalf of Cloudera to Hortonworks reflecting an "at market" exchange ratio that would not be greater than 1.30 and no less than 1.20 shares of Cloudera common stock per Hortonworks share. Additional negotiations amongst the parties concerning the exchange ratio ensued.

28.     On September 20, 2018, Cloudera and Hortonworks entered into an agreement providing for exclusive negotiations in order to begin mutual due diligence and negotiate the definitive terms of the transaction. Between September 21, 2018 and October 3, 2018, the parties conducted mutual due diligence.

29.     According to the Registration Statement, on September 25, 2018, Cloudera's Board reviewed and approved, with certain modifications discussed by the Cloudera Board, "the long-term financial model prepared by management reflecting certain financial forecasts for Cloudera as a stand-alone company" contained in the Prospectus' section titled *Certain Financial Projections Utilized in Connection with the Merger*. These financial forecasts were then shared with Hortonworks.

30.     The next day, Hortonworks Board reviewed and approved, with certain modifications discussed by the Hortonworks Board, the long-term financial model prepared by management reflecting certain financial forecasts for Cloudera as a stand-alone company" contained in the Prospectus' section titled *Certain Financial Projections Utilized in Connection with the Merger*. These financials were then shared with Cloudera.

31.     Thereafter, on September 27, 2018, Davidson and Frankola, together with representatives of their financial advisors in the transaction, met to discuss the long-term financial models exchanged between the companies and to discuss a framework for a long-term financial model for the combined company based on the combined company's projections (the "Combined Company Financial Forecasts"). As stated in the Registration Statement, the Combined Company Financials listed in the Registration Statement in the section titled *Certain Financial Projections Utilized in Connection with the Merger* were prepared by Hortonworks management with input from Cloudera management.

32.     On September 30, 2018, Hortonworks and Cloudera management engaged in a technical discussion regarding each company's product offerings and the potential compatibility of the companies' products.

33.     On October 1, 2018, representatives of Hortonworks management reviewed with the Hortonworks board the Combined Company Financial Forecasts with Hortonworks' financial advisor also presenting preliminary financial analyses on the proposed business combination with Cloudera based on Hortonworks' financial forecasts and the Combined Company Financial Forecasts provided by Hortonworks management.

34.     That same day at a meeting of Cloudera's Board, Morgan Stanly presented its preliminary financial analysis with respect to the proposed merger with Hortonworks based on the Cloudera Financial Forecasts, the Hortonworks financial forecasts, and the Combined Company Financial Forecasts provided by Cloudera management. Cloudera's management also updated the Board on Cloudera's due diligence investigation of Hortonworks.

35.     Two days later on October 3, 2018, Cloudera's Board and Hortonworks' Board each held separate meetings where their respective financial advisers during which the financial advisors provided their respective financial analyses concerning the proposed business combination and their oral opinions that the merger was fair from a financial point of view to their respective clients.

36.     In issuing its oral opinion and later its written opinion as to the financial fairness of the transaction for Cloudera, the Registration Statement stated in rendering its opinion, Morgan Stanley:

- reviewed certain internal financial statements and other financial and operating data concerning Hortonworks and Cloudera, respectively;

- reviewed certain financial projections prepared by the managements of Hortonworks and Cloudera, respectively;

- reviewed information relating to certain strategic, financial and operational benefits anticipated from the merger, prepared by the managements of Hortonworks and Cloudera, respectively;

- discussed the past and current operations and financial condition and the prospects of Hortonworks, including information relating to certain strategic, financial and operational benefits anticipated from the merger, with senior executives of Hortonworks;

- discussed the past and current operations and financial condition and the prospects of Cloudera, including information relating to certain strategic, financial and operational benefits anticipated from the merger, with senior executives of Cloudera; and

- reviewed the pro forma impact of the merger on Cloudera's cash flow, consolidated capitalization and certain financial ratios.

37.     During these meetings, Cloudera's Board and Hortonworks' Board also each reviewed the final terms of the proposed merger agreement before approving it and found the

proposed merger was fair and in the best interests of their respective companies and their shareholders.

38.    Cloudera's Board also unanimously approved that the proposal for Cloudera's authority to issue of shares in connection with the merger be submitted to the Cloudera stockholders at the Cloudera stockholder meeting and recommended that Cloudera stockholders approve the proposal.

### iv.    *Cloudera Announces and Closes its Merger with Hortonworks*

39.    On October 3, 2018 after market close, Cloudera announced that it had entered into a merger agreement in an all stock merger with Hortonworks. Pursuant to the terms of the Merger, each Hortonworks shareholder would receive 1.305 shares of Cloudera common stock for each share of Hortonworks common stock held at the at the effective time of the Merger, On the day the Merger was announced, shares of Cloudera common stock closed at $17.08 per share and shares of Hortonworks common stock closed at $21.88 per share.

40.    In support of the Merger, Cloudera filed with the SEC draft S-4 registration form on November 5, 2018. This Form S-4 was subsequently amended by Amendment No. 1 filed with the SEC on November 16, 2018. The Form S-4 registration statement, as amended, was declared effective by the SEC on November 20, 2018. Upon its effectiveness, 174,508,291 shares of Cloudera common stock par value $0.00005 per share were registered.

41.    The amended Form S-4 incorporated multiple documents by reference into the Form S-4/A including filings by Cloudera with the SEC. The amended Form S-4 incorporated documents and was accompanied by a final joint proxy/prospectus, the Prospectus, that was filed with the SEC on November 27, 2018. The Form S-4 was also accompanied by multiple prospectuses filed on Forms 425 before and after its filing (collectively, the "Forms 425 Prospectuses")

42.    The Registration Statement explicitly incorporated by reference certain of Cloudera's filings with the SEC, including: the 2018 Form 10-K; 1Q 2019 Form 10-Q; the 2Q2019 Form 10-Q. In addition, the Registration Statement incorporated by reference "all documents filed by Cloudera and Hortonworks pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act . .

1   . after the date of this joint proxy statement/prospectus and before the date of the Cloudera and

2   Hortonworks special meetings[.]"

3   43.   In the Registration Statements and Forms 425 Prospectuses, Cloudera, its

4   executives, and the Board discussed various topics relevant to the Merger, including the background

5   of the Merger, Cloudera's and its Board's reasoning for entering into the Merger agreement, and

6   the benefits of the Merger. Additionally, these documents also provided investors with

7   representations concerning the resulting combined company, including its strategy, future product

8   offerings, financials, and future outlook,

9   44.   The Registration Statement and the Prospectus also included a proposal seeking

10   Cloudera's stockholder approval for the issuance of Cloudera common stock shares in connection

11   with the Merger which pursuant to the Merger agreement, the approval of this proposal was a

12   condition to the consummation of the Merger. Cloudera's Board "unanimously" recommended that

13   Cloudera stockholders vote in favor of the stock issuance proposal.

14   45.   The Registration Statement and the Prospectus also included a proposal seeking to

15   Hortonworks' stockholder approval to adopt the Merger agreement and approve the necessary

16   transactions contemplated by it. Hortonworks Board "unanimously" recommended that

17   Hortonworks stockholders vote in favor of this proposal.

18   46.   On December 28, 2018 Cloudera held its special meeting of stockholders to vote on

19   the approval of issuing the shares of Cloudera common stock necessary to consummate the Merger.

20   Based on the statements concerning the Merger in the Registration Statement, Cloudera

21   shareholders voted over 112.7 million shares in favor of the issuance of the shares necessary to

22   consummate the Merger with a mere 133,726 votes against it. On that same day, Hortonworks also

23   held its special meeting of stockholders who also overwhelmingly approved the Merger with

24   Cloudera. On December 28, 2018, Cloudera common stock closed at $10.88 per share and

25   Hortonworks closed at $14.16 per share.

26   47.   On January 3, 2019, Cloudera announced that it closed the Merger with

27   Hortonworks. Pursuant to the Registration Statement, "upon completion of the merger, the

28   stockholders of Hortonworks will become stockholders of Cloudera." Thus, as described in detail

in the Registration Statement, "at the effective time of the merger, Hortonworks stockholders will be entitled to receive 1.305 shares of Cloudera common stock for each share of Hortonworks common stock that they own" and "upon the closing of the Merger, each issued and outstanding share of Hortonworks Common Stock, par value $0.0001 per share will automatically be converted into the right to receive 1.305 shares of common stock, par value $0.00005 per share." As such, each share of Hortonworks common stock was used to purchase 1.305 shares of Cloudera's common stock upon the closing of the Merger.

48.     At the close of trading on January 2, 2019, Cloudera common stock closed at $11.25 per share and Hortonworks closed at $14.68 per share.

49.     The Registration Statement registered 174,508,291 shares of Cloudera common stock to be issued by Cloudera to the holders of Hortonworks shares at the effective time of the Merger. As a result of the Merger, over 111.738 million shares were sold to Hortonworks stockholders in exchange for their Hortonworks shares. The Cloudera common stock shares as of January 8, 2019 that were registered under the Registration Statement were later deregistered by Cloudera.

## III.     THE SECURITIES ACT CLAIMS AND ALLEGATIONS

### A.     Nature of the Securities Act Claims

50.     Plaintiffs bring this federal securities class action on behalf of a class consisting of all persons who purchased and/or otherwise acquired Cloudera common stock: (i) pursuant or traceable to the Registration Statement[2] filed in connection with Cloudera's Merger with Hortonworks, Inc. that closed on January 3, 2019.

51.     In this action, Plaintiffs assert strict liability claims under §§11, 12 and 15 of the Securities Act against Cloudera, Intel ("Intel"), a controlling shareholder, and certain current and former officers and directors of Cloudera and Hortonworks who signed the signed the Form S-4 registration statement.

---

[2] "Registration Statement" refers to the Form S-4 registration statement and the amendment thereto; Form 425 prospectuses issued by Cloudera as part of its offer to sell the Cloudera shares; the final joint proxy/prospectus (the "Prospectus"); and all documents incorporated therein.

52.     In the allegations and claims set forth in this part of the Complaint, Plaintiffs assert a series of strict liability and negligence claims against the Securities Act Defendants pursuant to the Securities Act on behalf of themselves and the Securities Act Class (as defined in ¶356). Plaintiffs' Securities Act claims are not based on any allegations of knowing or reckless misconduct by Defendants. Plaintiffs' Securities Act claims do not allege, and do not sound in, fraud and Plaintiffs specifically disclaim any reference to or reliance upon allegations of fraud in these non-fraud claims and allegations.

53.     As alleged in detail below, Plaintiffs' claims concern Defendants' statements about Cloudera's (*i*) cash flow operating margins following the company's merger with Hortonworks and (*ii*) ability to compete within the cloud industry given the material features of its core products and/or services. Plaintiffs allege that these statements contained untrue statements of material facts or omitted to state material facts required to be stated therein to make the statements not misleading. Plaintiffs suffered damages as a result and, therefore, bring this lawsuit to recover their losses.

54.     On October 13, 2018, Cloudera announced that it had enter into an agreement to merger with its largest competitor in the traditional-Hadoop-based open source market, Hortonworks. Pursuant to the merger agreement, each shareholder of Hortonworks would receive 1.305 shares of Cloudera common stock in the all stock merger. On December 28, 2018, the shareholders of Cloudera and Hortonworks each voted overwhelmingly in favor of the necessary proposal to consummate the Merger.

55.     Through the Registration Statement, Cloudera issued and registered 174,508,291 shares of Cloudera common stock. Pursuant to the Prospectus and the Form 425 prospectuses, Cloudera offered and sold over 111.7 million shares of Cloudera common stock to Hortonworks' shareholders in exchange for their Hortonworks shares held at the effective of the Merger that they received at the closing of Merger.

56.     The Registration Statement and certain of the Form 425 prospectuses, however, were negligently prepared and contained numerous false statements and omitted material information required to be disclosed to investors. Notably, the Registration Statement contained

numerous statements concerning the combined company's cash flows, including its Unleveraged Free Cash Flow and operating cash flow margin.

57.     During after-market hours on March 13, 2019, Cloudera announced its first quarterly report as a combined company. During a conference call later that day to discuss Cloudera's earnings and the progress of the post-Merger combination of the two companies, Cloudera announced that it was supplanting Hortonworks billing practices with Cloudera's pre-merger billing practices. As a result thereof, Cloudera announced a $125 million reduction of Cloudera's operating cash flow in fiscal year 2020, a $75 million reduction in operating cash flow in fiscal year 2021, and that as a result would not achieve a 15% operating cash flow margin in calendar year 2020 or fiscal year 2021.

58.     After the announcement of this news, Cloudera's stock price fell by $2.90 per share, or 19.85%, from its previous closing price of $14.61 per share on March 13, 2019 to close at $11.71 per share on extremely high trading volume that was in excess of 37.7 million shares.

**B.      Jurisdiction and Venue**

59.     The claims asserted herein arise under and pursuant to Sections 11, 12, and 15 of the Securities Act, 15 U.S.C. §§ 77k(a), 77l(a), and 77o(a).

60.     This Court has jurisdiction over the subject matter of this action pursuant to: Section 22 of the Securities Act, 15 U.S.C. §77v; and 28 U.S.C. §1331.

61.     Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v; and 28 U.S.C. §1391(b) because certain of the acts alleged herein, including the preparation and dissemination of material false and/or misleading information, occurred in this District. Further, Cloudera's principal executive offices are located within this District.

62.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**C.**     **Securities Act Parties**

*i.*     ***Plaintiffs***

63.     Lead Plaintiffs Mariusz J. Klin and the Mariusz J. Klin MD PA 401K Profit Sharing Plan purchased common stock during the Class Period and was damaged thereby. Lead Plaintiffs' certification evidencing their transactions in Cloudera's securities during the Class Period, previously filed with the Court in connection with his motion for appointment as lead plaintiff, is incorporated herein by reference (ECF No. 34-2).

64.     Plaintiff Cade Jones owned shares of Hortonworks at the time of the Merger. Upon the closing of the Merger, Plaintiff Jones was sold, in exchange for his shares of Hortonworks common stock that he held at the effective time of the Merger, shares of Cloudera's common stock that were registered pursuant to and traceable to the Registration Statement and sold by Cloudera pursuant to the Prospectus and the Forms 425 prospectuses. As a result of purchasing and/or acquiring Cloudera shares traceable to Cloudera's Registration Statement, Plaintiff Jones was damaged thereby. Plaintiff Jones' certification evidencing his transactions in Cloudera shares is attached hereto and is hereby incorporated by reference.

65.     Plaintiff Larry Lenick owned shares of Hortonworks at the time of the Merger. Upon the closing of the Merger, Plaintiff Lenick was sold, in exchange for his shares of Hortonworks common stock that he held at the at the effective time of the Merger, shares of Cloudera's common stock that were registered pursuant to and traceable to the Registration Statement and sold by Cloudera pursuant to the Prospectus and the Forms 425 prospectuses. As a result of purchasing and/or acquiring Cloudera shares traceable to Cloudera's Registration Statement, Plaintiff Lenick was damaged thereby. Plaintiff Lenick's certification evidencing his transactions in Cloudera shares is attached hereto and is hereby incorporated by reference.

*ii.*     ***The Securities Act Defendants***

*a.*     ***Cloudera and the Securities Act Executive Defendants***

66.     Defendant Cloudera, Inc. is a Delaware corporation with its principal executive offices located at 395 Page Mill Road Palo Alto, CA 94306. Cloudera is United States-based software company that relies heavily on opensource software called Hadoop to provide software

platforms to businesses for data engineering, data warehousing, machine learning and analytics. The company's stock is listed on the New York Stock Exchange ("NYSE") under the ticker symbol "CLDR."

67.     Defendant Thomas J. Reilly ("Reilly") served as Cloudera's Chief Executive Officer ("CEO") and as a member of Cloudera's Board of Directors (the "Board") from June 2013 until July 31, 2019. At the time of the Merger, Reilly served as the Company's CEO and a director on the Board. Defendant Reilly signed or authorized the signing of the false and misleading Registration Statement and made certain of the statements in the Form 425 prospectus on behalf of Cloudera. As one of Cloudera's executives in the Merger working group, Reilly reviewed, approved, and participated in making statements in the Registration Statement and those statements that were incorporated by reference thereto.

68.     Jim Frankola ("Frankola") has served as Cloudera's Chief Financial Officer ("CFO") since October 2012. Frankola at the time of the Merger served as the Company's CFO. Defendant Frankola signed or authorized the signing of the false and misleading Registration Statement. As one of Cloudera's executives in the Merger working group, Reilly reviewed, approved, and participated in making statements in the Registration Statement in making statements in the Registration Statement and those statements that were incorporated by reference thereto.

69.     Defendant Michael A. Olson ("Olson") is a co-founder of Cloudera, served as the Chairman of our board of directors from April 2009 until his resignation as part of the Merger, and served as Cloudera's Chief Strategy Officer from June 2013 until his announced retirement in the summer of 2019 following the news announced on June 5, 2019. Defendant Olson signed or authorized the signing of the false and misleading Registration Statement. As one of Cloudera's executives in the Merger working group, Reilly reviewed, approved, and participated in making statements in the Registration Statement in making statements in the Registration Statement and those statements that were incorporated by reference thereto.

70.     Defendant Priya Jain ("Jain") served, at the time of the Merger, as the Company's Vice President, Corporate Controller and Principal Accounting Officer participated in the preparation of and signed the Registration Statement. On January 3, 2019, as part of the Merger

Defendant Jain resigned from her position as Cloudera's Principal Accounting Officer, a position she held since February 1, 2018.

71.     Defendants Reilly, Frankola, and Olson are collectively referred to as the "Securities Act Executive Defendants." The Securities Act Executive Defendants, at the behest of Cloudera and Intel, solicited the purchase and/or acquisition of the Cloudera shares that were registered pursuant to the Registration Statement and issued to Hortonworks shareholders at the at the effective time of the Merger by seeking shareholder approval of the Merger.

### b.     The Securities Act Board Defendants

72.     Defendant Martin I. Cole ("Cole") served as a director of Cloudera's Board from September 2014 until January 13, 2020. Defendant Cole served in this capacity at the time of the filing of the Registration Statement and at the close of the Merger. Defendant Cole served as part of Cloudera's Board's M&A Committee to consider the potential strategic transaction with Hortonworks. As a member of Cloudera's Board, Cole participated in the preparation of and signed the Registration Statement. Following the resignation of Defendant Reilly from his roles at Cloudera, Defendant Cole served as Cloudera's Interim CEO and Chairman from August 1, 2019 until his resignation became effective on January 13, 2020.

73.     Defendant Kimberly L. Hammonds ("Hammonds") served as a director of Cloudera's Board from March 2017 until her resignation became effective on January 13, 2020. Defendant Hammonds served in this capacity at the time of the filing of the Registration Statement until the Effective Time of the Merger. Defendant Hammonds served as part of Cloudera's Board's M&A Committee to consider the potential strategic transaction with Hortonworks. As a member of Cloudera's Board, Hammonds participated in the preparation of and signed the Registration Statement.

74.     Defendant Rosemary Schooler ("Schooler") served as a director of Cloudera's Board since December 2017 when Cloudera increased the size of the Board for her appointment and she served in this capacity at the time of the filing of the Registration Statement and at the close of the Merger. Defendant Schooler is Corporate Vice President and General Manager of Data Center Sales for Intel. As a member of Cloudera's Board, Cole participated in the preparation of

1   and signed the Registration Statement. At the time of the Merger, Schooler beneficially owned over

2   26 million shares of Cloudera common stock that were also held by Intel, giving Schooler 17.6%

3   ownership and voting control in Cloudera, at the behest of Intel.

4          75.    Defendant Steve J. Sordello ("Sordello") served as a director of Cloudera's Board

5   from September 2014, including at the time of the filing of the Registration Statement, and until he

6   resigned on January 3, 2019 as part of the Merger. Defendant Sordello served as part of Cloudera's

7   Board's M&A Committee to consider the potential strategic transaction with Hortonworks. As a

8   member of Cloudera's Board, Cole participated in the preparation of and signed the Registration

9   Statement.

10         76.    Defendant Michael A. Stankey ("Stankey") has served as a director of Cloudera's

11   Board since February 2017 and served in this capacity at the time of the filing of the Registration

12   Statement and at the close of the Merger. Defendant Stankey also served as part of Cloudera's

13   Board's M&A Committee to consider the potential strategic transaction with Hortonworks. As a

14   member of Cloudera's Board, Hammonds participated in the preparation of and signed the

15   Registration Statement.

16         77.    Defendant Robert Bearden ("Bearden") served, at the time of the Merger, as

17   President and CEO of Hortonworks. Defendant Bearden participated in the preparation of the

18   Registration Statement as an incoming Cloudera Board member upon the close of the Merger.

19   Following the departure of Defendant Reilly, Defendant Bearden was appointed as the CEO and

20   President of Cloudera on January 12, 2020.

21         78.    Defendant Paul Cormier ("Cormier") served, at the time of the Merger, as a director

22   on the Hortonworks's Board of Directors (the "Hortonworks Board"). Defendant Cormier

23   participated in the preparation of the Registration Statement as an incoming Cloudera Board

24   member upon the close of the Merger.

25         79.    Defendant Peter Fenton ("Fenton") served, at the time of the Merger, as a director

26   on the Hortonworks Board. Defendant Fenton participated in the preparation of the Registration

27   Statement as an incoming Cloudera Board member upon the close of the Merger.

28

80.     Defendant Kevin Klausmeyer ("Klausmeyer") served, at the time of the Merger, as a director on the Hortonworks Board. Defendant Klausmeyer participated in the preparation of the Registration Statement as an incoming Cloudera Board member upon the close of the Merger.

81.     The Securities Act Executive Defendants, Jain, Cole, Hammonds, Schooler, Sordello, Stankey, Bearden, Cormier, Fenton and Klausmeyer are collectively referred to herein as the "Individual Securities Act Defendants." Each of the Individual Securities Act Defendants each signed and were identified as officers or directors or incoming directors in the Registration Statement.

### c.     The Controlling Shareholder Defendant

82.     Defendant Intel Corporation is a semiconductor technology company headquartered in Santa Clara, California. At the time of the Merger, Intel was a large controlling shareholder of Cloudera. According to Intel's filings with the SEC, at the time of the Merger Intel held 26,065,287 shares of Cloudera's common stock, or approximately 17.7% of Cloudera's common stock as of the time of the shareholder vote on the Merger. Cloudera had noted in its periodic filings with the SEC that the ownership stake "could have considerable influence over matters" including potential strategic transactions. As part of the Merger, "each of the executive officers and directors of Cloudera" along with their "affiliate" Intel, entered into support agreements with Hortonworks, agree to vote their shares of common stock in favor of the "Cloudera Common Stock Issuance Proposal" and against any counterproposal. Prior to the Merger, Intel had "the right to designate a person that [Cloudera's] board of directors must nominate for election, or nominate for re-election." As a result of their control, Intel control enabled Intel appointed an Intel employee. Defendant Schooler to Cloudera's Board.

83.     Cloudera, Intel, and the Individual Securities Act Defendants, are collectively referred to herein as the "Securities Act Defendants."

### D.     <u>False Statements Contained in the Registration Statement and Prospectuses</u>

84.     The Registration Statement and certain of Cloudera's Forms 425 prospectuses contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading.

85.     On October 4, 2018, Cloudera filed with the SEC a Form 425 prospectus that included a transcript of a joint conference call on October 3, 2018 with certain officers of Cloudera and Hortonworks regarding the proposed merger. During this call, Frankola stated on behalf of Cloudera that:

> Calendar year '20 or fiscal year '21 shows what the new company is expected to look like once we have achieved most of the savings. At that time, we expect to be more than $1 billion in revenue, growing at more than 20% per year and ***generating more than 15% operating cash flow margin.***

Emphasis added.

86.     The statement identified in emphasis in the preceding paragraph was untrue and/or omitted material facts necessary to make the statements made therein not misleading. Cloudera's true operating cashflow margin for calendar year 2020 was 10% and not 15%. Alternatively, the statement omits that the margin figure of 15% is based upon Hortonworks' pre-merger billing and cash flows.

87.     As of October 3, 2018, both Cloudera and Hortonworks realized the majority of their revenue from subscription payments which provided each company with specified amounts of deferred revenue. However, whereas Cloudera billed its customers annually regardless of contract duration, Hortonworks billed its customers upfront.

88.     Following the merger, Cloudera adopted its own pre-merger billing practices for the combined company. This altered Hortonworks' historical billings and cashflows which, in turn, reduced billings and cashflows for the combined company by material amounts, *i.e.*, reductions of $125 million for fiscal year 2020 and $75 million for fiscal year 2021. Importantly, the change in billing practices materially impacted Cloudera's operating cashflow margin, resulting in a decrease from 15% to 10% in fiscal year 2021 and only reaching 15% in fiscal year 2022.

89.     Cloudera's operating cashflow margin decreased as a result of applying Cloudera's billing practices to Hortonworks' pre-merger multi-year contracts/billings (i.e. deferred revenue). Accordingly, the above statement should have either reflected the correct 10% operating cashflow margin or confirmed that it was based in material part on Hortonworks' historic billing practices which differed from Cloudera's pre-merger billing practices. Had Frankola properly accounted for

Hortonworks' billing practices post-merger by recognizing billings annually instead of upfront, he would have provided an accurate operating cashflow margin to investors instead of one that was materially incorrect.

90.     The amount of the Hortonworks' deferred billings, total backlog, and billing practices were disclosed in quarterly and annual filings by Hortonworks with the SEC. Notably, these documents were explicitly incorporated by reference into the Registration Statement.

91.     On October 9, 2018, Cloudera filed with the SEC a Form 425 prospectus that included a transcript of a television interview of Reilly with Jim Cramer for Mad Money CNBC on October 5, 2018. During this call, Reilly stated on behalf of Cloudera that:

> Well, this is a wonderful merger. Basically, bringing these two companies together, we are creating immense shareholder value. ***So our plans are that, by 2020***, just around the corner, our combined company, Cloudera plus Hortonworks, our new company, Cloudera, will be greater than $1 billion in annual revenues, will be greater than 20% year-over-year growth, and ***will have greater than 15% operating cash flow margins.*** The amount of shareholder value it'll create by bringing us together is immense.

Emphasis added.

92.     The statement identified in emphasis in the preceding paragraph was untrue and/or omitted material facts necessary to make the statements made therein not misleading. Cloudera's true operating cashflow margin for calendar year 2020 was 10% and not 15%. Had Reilly properly accounted for Hortonworks' billing practices post-merger by recognizing billings annually instead of upfront, he would have provided an accurate operating cashflow margin to investors instead of one that was materially incorrect. Alternatively, Reilly should have disclosed that the operating cashflow margin figure was based in material part on Hortonworks' historic billing practices which differed from Cloudera's pre-merger billing practices.

93.     On October 11, 2018, Cloudera filed with the SEC a Form 425 prospectus that included the "Master Talking Points & FAQs" document that was sent by Cloudera executive leadership to Cloudera sales and marketing employees on October 11, 2018. In this document, Cloudera stated through its executive leadership "[i]n CY20 or FY21 we expect to be more than

$1B in revenue, growing at more than 20% per year, **and generating more than 15% operating cash flow margins**." Emphasis added.

94.     The statement identified in emphasis in the preceding paragraph was untrue and/or omitted material facts necessary to make the statements made therein not misleading. Cloudera's true operating cashflow margin for calendar year 2020 was 10% and not 15%. Cloudera failed to properly account for Hortonworks' billing practices post-merger and, as a result, provided an inaccurate operating cashflow margin to investors. Alternatively, Cloudera should have disclosed that the operating cashflow margin figure was based in material part on Hortonworks' historic billing practices which differed from Cloudera's pre-merger billing practices.

95.     On December 6, 2018, Cloudera filed with the SEC a Form 425 prospectus that contained the transcript of Cloudera's conference call held on December 5, 2018 for its third quarter fiscal year 2019 financial results." During this call, Frankola stated on behalf of Cloudera that:

> Yeah. So-- so let-- let me start with that and then I'll let Tom take over. When we announced the deal, what I'll say is we didn't issue guidance or targets. We wanted to describe what the profile of the company would look like. And as a combined entity in fiscal year 21, or calendar year 20, we said that we would be more than a $1 billion of revenue, growing faster than 20% a year, **with more than a 15% operating cash flow margin**.

Emphasis added.

96.     The statement identified in emphasis in the preceding paragraph was untrue and/or omitted material facts necessary to make the statements made therein not misleading. Cloudera's true operating cashflow margin for calendar year 2020 was 10% and not 15%. Cloudera should have properly accounted for Hortonworks' billing practices post-merger before making the above statement, *i.e.*, converted Hortonworks' billings practices to conform with Cloudera's billings practices. Had it done so, Cloudera would have provided an accurate operating cashflow margin to investors. Alternatively, Cloudera should have disclosed that the operating cashflow margin figure was based in material part on Hortonworks' historic billing practices which differed from Cloudera's pre-merger billing practices.

97.     The Registration Statement included the following chart containing forecasts for the combined companies:

| Combined Company Financial Forecasts | | CY2019E | | CY2020E | | CY2021E | | CY2022E | | CY2023E |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (in millions) | | | | | |
| Revenue[1] | $ | 966 | $ | 1,212 | $ | 1,521 | $ | 1,843 | $ | 2,227 |
| Revenue Synergies | $ | 21 | $ | 53 | $ | 96 | $ | 115 | $ | 138 |
| Non-GAAP Operating Income (Loss)[2] | $ | 27 | $ | 167 | $ | 302 | $ | 437 | $ | 617 |
| Unlevered Free Cash Flow[3] | $ | 7 | $ | 225 | $ | 336 | $ | 502 | $ | 538 [4] |

(1)  Revenue is inclusive of revenue synergies.
(2)  "Non-GAAP Operating Income" is a non-GAAP financial measure calculated to exclude share-based compensation, amortization of intangibles and other non-recurring items. Non-GAAP Operating Income is based on the Revenue (as shown in the table above), inclusive of revenue synergies.
(3)  "Unlevered Free Cash Flow" is a non-GAAP financial measure calculated by starting with Non-GAAP Operating Income (as shown in the table above) and subtracting cash taxes paid and capital expenditures, and then adding back depreciation expense and decrease in net working capital.
(4)  The Unlevered Free Cash Flow for CY2023E was based on a long-term effective tax rate of 25%.

98.     The figures in the chart in the preceding paragraph were materially incorrect. The Unlevered Fee Cash Flow amounts listed for calendar years 2019, 2020, and 2021 included Hortonworks' billing practices of billing multi-year deals upfront. As a result, these figures were materially overstated due to the fact that Cloudera's operating cash flow was reduced by $125 million lower in fiscal year 2020 and $75 million lower in fiscal year 2021.

**E.  Additional Information Supporting the Materiality of the False Statements in the Registration Statement and Prospectuses**

99.     Cloudera regularly reported its operating cash flow in its press releases announcing it periodic results and discussed the same in Cloudera's quarterly earnings conference calls.

100.    Analysts following Cloudera also closely followed Cloudera's operating cash flow and operating cash flow margins. In part, on March 13, 2019, Cloudera reported that its "change in billings practices means that [Cloudera] do[es] not expect to achieve 15% operating cash flow margin until fiscal year '22" and that "[i]n fiscal year '21, the OCF margin is projected to be roughly 10%." In response to the news, numerous analysts reported how the change in billing impacted Cloudera and especially its operating cash flow and operating cash flow margin:

     a.  J.P Morgan:

          On the negative side: 1) ***Cloudera is reducing its FY21 OCF margin target from 15% to 10%, and guiding to cash burn for FY20***, primarily driven by shortening billings duration for the combined company (taking HDP from multiyear invoicing to annual), apart from some merger related payments

*          *          *

*Risks to Downside*

Outsized operating losses. While it is typical for software companies to be in operating loss mode at IPO given their heavy investments in their market opportunity, Cloudera is among the highest spenders in customer acquisition. Cloudera posted a -54% PF operating margin in CY2016, and we are modeling operating losses and negative OCF at least through FY19. We think the investments are a function of the current stage of the Big Data platform market and a factor of the unusually large investment from Intel that led Cloudera to accelerate its investment cadence. Should the company's investment fail to result in corresponding customer acquisition and revenue, losses could be greater than we are modeling and endure for longer than we expect.

b. Craig Hallum:

Management expects OCF to be between ($30M)-($40M) for FY'20. Expectations for FY'20 come despite headwinds from one-time costs related to the merger ($66M) and a haircut to billings ($125M). Without these headwinds, CLDR would generate ~$156M in OCF throughout FY'20.

c. Northland Capital:

**Billings Convergence Effect:** A large impact on billings/cash flows will result from transitioning Hortonworks customer base/sales efforts over to Cloudera's/industry practice of annual billing. As a reference, HDP's duration was 19 months while CLDR was 13 months. This will cause a drag on cash flows of roughly $125mn for this year and will bleed into next year as well, but we think is better for the company in the long run as the disconnect in billing terms would add friction to the sales process and the company is not cash poor (as HDP was when it started this practice).

d. Raymond James:

- The other negative in the quarter was the merger impact to F20 CFFO of a) $66M in one-time merger cash payments; and b) $125M in negative impact from taking HDP's 19-month billings duration down to Cloudera's 13 months. Management guided to F20 CFFO loss of $(40)-$(30)M, but what would have been $156M or about an 18% CFFO margin excluding the merger impacts.

- Management reiterated its F21 targets of >$1B in revenue, but with another $75M of impact on billings and cash flow, with a CFFO margin of 10% rather than the prior 15%.

*     *     *

F1Q& F2020 Guide Below. F1Q20 revenue guidance $187-190 million is below combined HDP and CLDR consensus estimates of $223 million. Subscription revenue guide $154-156 million is below combined consensus estimates $184 million. EPS loss guide $(0.22) to $(0.25). F2020 revenue guide $835-855 million is well below combined consensus estimates $968 million. The company bridged the shortfall as the sum of $(62)M in purchase accounting write-owns, $(13)M in less services revenue, a $7m benefit from 606, and $(52)M in merger "dis-synergies." Subscription revenue guide $695-705M also well below consensus $801 million. Management introduced Annual Recurring Revenue (ARR) guidance of $800-$825M (18-21% y/y). EPS loss guide ($0.32) to ($0.40). CFFO loss guidance of $40-30 million is below consensus of positive $86 million, however included $66M in one-time merger costs and a $125M headwind from change of billings to annually upfront from multi-year upfront as historically done by HDP. F2021 CFFO margin guidance also reduced to 10% from 15% after factoring in $75M in billings duration headwinds, or about 17% normalized.

e.    <u>Deutsche Bank</u>:

For FY21, Cloudera reaffirmed its outlook for $1+ billion in revs and 20% growth but lowered its OCF margin guidance to 10% from 15% (although FY21 OCF margins would be 17% ex the hit from shorter HDP invoicing durations).

f.    <u>D.A. Davidson</u>:

*CLDR reported its long-awaited F4Q19 results, providing the first real glimpse the new CLDR, post-HDP acquisition. While the reported outlook on revs and guidance is weaker-than-expected, leading shares down 14% AMC, we attribute this to three factors, none of which are fundamental: 1) purchase price accounting, 2) CLDR modeling revenue dyssnergies (not related to churn), and 3) shortening HDP's billings duration, creating a cash flow headwind.*

*     *     *

The key points from these moving parts are:

2) Cloudera's lowered FY21 OCF outlook is due entirely to shortening billings duration for Hortonworks customers (average billings duration for Hortonworks was 19 months vs. 13 months for Cloudera), which creates a short-term headwind, but is the right business decision, in our view, as it

leads to less discounting. Importantly, Cloudera's target for cost synergies remains $125M+ in FY21.

\*       \*       \*

Shares were down 14% in the aftermarket, due primarily to an FY20 outlook that suggested a significant deceleration and was likely below merger models, as well as Cloudera lowering its expectation on OCF in FY21 to 10% from 15%.

\*       \*       \*

Figure 2 shows the billings duration impact from the merger.



Figure 2: Billings Duration Impact

BILLINGS DURATION IMPACT

Hortonworks typically billed multi-year deals upfront. Cloudera's typical practice is to bill annually regardless of contract duration (average billings duration for Hortonworks was 19 months; average billings duration for Cloudera is 13 months)

Given Cloudera's sizable post-merger cash balance and strong expected future cash flow, we have adopted Cloudera's pre-merger billings practices, which we estimate will have a billings duration of 13 months

The adoption of Cloudera's billing practices will reduce billings and cash flow by $125M as compared to each company's standalone practices:

| | Q1 FY20 | Q2 FY20 | Q3 FY20 | Q4 FY20 | FY20 |
|---|---|---|---|---|---|
| Billings duration change impact to billings and cash flow | $20M | $25M | $30M | $50M | $125M |

101.    The materiality of operating cash flow is further substantiated by Cloudera determining that it is important metric to measure executive performance. Pursuant to the *Cloudera Bonus Plan – Executive Officers and Leadership Team* for fiscal year 2019 each participant in Bonus Plan had "the opportunity to earn an annual cash bonus that is paid based on the achievement of the performance level for each of bookings, revenue and operating cash flow for fiscal year 2019." In determining the actual bonus amount earned by each participant, Cloudera weighted the "operating cash flow metric" at 30% whereas revenue was only weighted at 20%.

## F.    Safe Harbor Does Not Apply

102.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the untrue statements of a material fact or omissions of material fact required to be stated therein or necessary to make the statements therein not misleading as alleged in this Complaint. None of the untrue statements or omissions by the Securities Act Defendants involved forward-looking statements nor were they accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in any

1    purportedly forward-looking statements.

2        103.    The safe harbor does not apply to the alleged untrue statements of fact and omissions of

3    material fact necessary in order to make the statements, in the light of the circumstances under which

4    they were made, not misleading concerning Cloudera's cash flow and cash flow margins. These alleged

5    untrue statements and omissions of material facts concern information that existed at the time they were

6    made regarding Cloudera's and Hortonworks then-existing deferred revenues, unbilled deferred

7    revenues, and backlogs. These alleged untrue statements and omissions of material facts do not concern

8    Cloudera's expectations for revenue or cash flow in the future.

9        104.    To the extent that any of the false and misleading statements alleged herein can be

10   construed as forward-looking, those statements were not accompanied by meaningful cautionary

11   language identifying important facts that could cause actual results to differ materially from those in the

12   statements.

13       105.    To the extent that any of the false and misleading statements alleged herein can be

14   construed as forward-looking, the Securities Act Defendants are liable for those false or misleading

15   statements because, at the time each such statement was made, the speaker knew the forward-looking

16   statement was false or misleading, and the forward-looking statement was authorized and/or approved

17   by an executive officer of Cloudera who knew that the forward-looking statement was false. None of

18   the historic or present tense statements made by the Securities Act Defendants were assumptions

19   underlying or relating to any plan, projection, or statement of future economic performance, as they

20   were not stated to be such assumptions underlying or relating to any projection or statement of future

21   economic performance when made, nor were any of the projections or forecasts made by Securities Act

22   Defendants expressly related to, or stated to be dependent on, those historic or present tense statements

23   when made.

24       106.    By virtue of the foregoing, Cloudera and the Individual Exchange Act Defendants have

25   violated Sections 11, 12, 15 of the Securities Act, 15 U.S.C. §§ 77k(a), 77l(a), and 77o(a).

26

27

28

G. **COUNT I: Violation of Section 11 of the Securities Act against the Securities Act Defendants**

107.    Plaintiffs repeat and reallege each and every allegation in Sections II and III above as if fully set forth herein. For the purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

108.    This claim is brought against Cloudera and the Individual Securities Act Defendants on behalf of Plaintiffs and other members of the Securities Act Class who purchased or acquired Cloudera common stock pursuant and/or traceable to the Registration Statement (and the offering documents incorporated by reference therein), and were damaged by the acts alleged herein.

109.    As part of the Merger through the Registration Statement, Cloudera registered and offered up to the aggregate of 174,508,291 shares of its common stock, and sold to Hortonworks shareholders approximately 111.7 million of these shares as a result of the closing of the Merger. Cloudera was the issuer of its common stock pursuant to the Registration Statement within the meaning of Section 11 of the Securities Act.

110.    The Individual Securities Act Defendants each signed the Registration Statement.

111.    Shares of Cloudera common stock were issued and sold pursuant to the Registration Statement (and the documents incorporated by reference thereto). All purchases or acquisitions of Cloudera common stock by the shareholders of Hortonworks in the Merger were a result of the issuance of the Registration Statement and the shares registered thereunder. As a result thereof, each share sold to Hortonwork's shareholders by Cloudera at the time of the closing of the Merger is traceable to the Registration Statement.

112.    The Registration Statement contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement.

113.    As the issuer and registrant of the common stock, Cloudera is strictly liable for the untrue statements of material fact. The Individual Securities Act Defendants owed to Plaintiffs and the Securities Act Class the duty to make a reasonable and diligent investigation of the statements

contained in the Registration Statement, to ensure that the statements contained or incorporated by reference therein were true, and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. None of the Individual Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

114.    Plaintiffs and the members of the Securities Act Class purchased and/or acquired Cloudera common stock pursuant or traceable to the Registration Statement (and the documents incorporated by reference therein) and were damaged thereby.

115.    Plaintiffs and the members of the Securities Act Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material facts or omissions of material facts in the Registration Statement when they purchased or acquired their Cloudera common stock.

116.    This claim is brought within one year after the discovery of the untrue statements and omissions and within three years after the issuance of the Registration Statement.

117.    By reason of the foregoing, Cloudera and the Individual Securities Act Defendants are liable to Plaintiffs and the members of the Securities Act Class for violations of Section 11 of the Securities Act.

**H.  <u>COUNT II: Violation of Section 12(a)(2) of the Securities Act Against Cloudera</u>**

118.    Plaintiffs repeat and reallege each and every allegation in Sections II and III  above as if fully set forth herein. For the purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

119.    This claim is brought against Cloudera on behalf of Plaintiffs and other members of the Securities Act Class who purchased or acquired Cloudera common stock pursuant and/or traceable to a false and/or misleading prospectuses issued by Cloudera as part of an offer and sale of Cloudera common stock in the Merger and were damaged by the acts alleged herein.

120.    Cloudera offered and/or sold Cloudera common stock by the use of means or instruments of transportation or communication in interstate commerce or the mails.

121.    As part of the Merger through the Registration Statement, Cloudera registered and offered up to the aggregate of 174,508,291 shares of its common stock, and thereafter sold to investors at least 111.7 million of these shares as part of the Merger to the shareholders of Hortonworks at the closing of the Merger. Cloudera was the issuer, offeror, and seller of these shares of common stock and did such through prospectuses that included untrue statements of a material fact or omits to state a material fact or facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

122.    Shares of Cloudera common stock were issued and sold pursuant to the Registration Statement (and the documents incorporated by reference thereto). All purchases or acquisitions of Cloudera common stock by the shareholders of Hortonworks in the Merger were a result of the issuance of the Registration Statement and the shares registered thereunder. As a result thereof, each share sold to Hortonwork's shareholders by Cloudera at the time of the closing of the Merger is traceable to the Registration Statement and the prospectuses issued as part of the Merger.

123.    As the offeror and seller of the Cloudera common stock issued by Cloudera, registered by Cloudera under the Registration Statement, and then sold to each Hortonworks shareholder at the time the Merger was completed, Cloudera is strictly liable for the untrue statements of material fact in the prospectuses issued in support of the Registration Statement. The Individual Securities Act Defendants owed to Plaintiffs and the Securities Act Class the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement, to ensure that the statements contained or incorporated by reference therein were true, and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Cloudera never made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the prospectuses were accurate and complete in all material respects. Had it exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:19-cv-03221-LHK

124.     Plaintiffs and the members of the Securities Act Class were offered and sold Cloudera common stock in the Merger that is pursuant or traceable to the Registration Statement by the means of prospectuses that contained untrue statements of material facts or omissions of material facts therein and were damaged thereby.

125.     Plaintiffs and members of the Securities Act Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material facts or omissions of material facts in the Registration Statement when they purchased or acquired their Cloudera common stock.

126.     Plaintiffs and the other members of the Securities Act Class who purchased Cloudera common stock in the Merger from Cloudera have sustained damages as a result of the untrue statements of material facts and omissions in the Registration Statement.

127.     This claim is brought within one year after the discovery of the untrue statements and omissions and within three years after the sale.

128.     By reason of the foregoing, Cloudera is liable to Plaintiffs and the members of the Securities Act Class for violations of Section 12(a)(2) of the Securities Act.

## I.   **COUNT III: Violation of Section 15 of the Securities Act Against Intel and the Individual Securities Act Defendants**

129.     Plaintiffs repeat and reallege each and every allegation in Sections II and III above as if fully set forth herein. For the purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

130.     This claim is brought pursuant to Section 15 of the Securities Act against the Individual Securities Act Defendants on behalf of Plaintiffs and the other members of the Securities Act Class who, during the Class Period, purchased or acquired Cloudera common stock pursuant and/or traceable to the Registration Statement (and the documents incorporated by reference therein), and were damaged by the acts alleged herein.

131.     As alleged herein, Cloudera and the Individual Securities Act Defendants violated Section 11 of the Securities Act by issuing the Registration Statement which included materially untrue statements of fact and omitted to state material facts required to be stated therein or necessary

to make the statements therein not misleading. The Individual Securities Act Defendants were controlling persons of Cloudera when the Registration was filed and became effective due to their senior executive positions, their positions on Cloudera's Board, their direct involvement in Cloudera's day-to-day operations and in the review and approval of the proposed Merger; their solicitation of Cloudera's stockholders votes in favor of the issuance of Cloudera's common stock as part of the Prospectus; and their participation in, and preparation of, the Registration Statement.

132.    This claim is further brought pursuant to Section 15 of the Securities Act against the Individual Securities Act Defendants on behalf of Plaintiffs and the other members of the Securities Act Class who purchased Cloudera common stock issued by Cloudera that was registered by Cloudera through the Registration Statement, and then was sold by Cloudera as part of Merger to the stockholders of Hortonworks at the close of the Merger by the means of Cloudera's prospectuses issued in the Merger which included untrue statements of a material fact or omit to state a material fact or facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading, and were damaged by the acts alleged herein.

133.    As alleged herein, Cloudera violated Section 12(a)(2) of the Securities Act by issuing the Forms 425 prospectuses which included materially untrue statements of fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. The Individual Securities Act Defendants were controlling persons of Cloudera when these Forms 425 prospectuses were filed with the SEC due to their senior executive positions, their positions on Cloudera's Board, their direct involvement in Cloudera's day-to-day operations and in the review and approval of the proposed Merger; their solicitation of Cloudera's stockholders votes for the issuance of Cloudera's common stock in furtherance of the Merger; and their participation in, and preparation of, the Registration Statement. As senior executives of Cloudera, Reilly and Frankola made certain of the statements included in the relevant Form 425 prospectuses on behalf of Cloudera and were thereby able to control Cloudera's statements contained therein

134.    By virtue of their exercise of control over Cloudera, the Individual Securities Act Defendants had the power to influence and control, and did influence and control, directly or

indirectly, the decision-making of Cloudera, including the content of Cloudera's prospectuses and the Registration Statement.

135.    The Individual Securities Act Defendants did not make a reasonable investigation or possess reasonable grounds for the belief that the Registration Statement was accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

136.    This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the sale of Cloudera's common stock to Plaintiffs.

137.    By reason of the foregoing, the Individual Securities Act Defendants are liable to Plaintiffs and the members of the Securities Act Class for violations of Section 15 of the Securities Act.

## IV.    THE EXCHANGE ACT CLAIMS AND ALLEGATIONS

### A.  Nature of the Exchange Act Claims

138.    Plaintiffs bring this federal securities class action on behalf of a class consisting of all persons who purchased and/or otherwise acquired Cloudera common stock during the Class Period.

139.    Plaintiffs assert claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j, 15 U.S.C. §78t  and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, against Cloudera, its former chief executive officer, Thomas J. Reilly, its Chief Financial Officer, Jim Frankola, and its co-founder and former Chairman, Michael Olson.

140.    Throughout the Class Period, Cloudera made misleading representations about the current capabilities and performance of its products. Specifically, it claimed that its platforms and product offerings were "cloud-native" and based on "cloud infrastructure." This, however, was false and created a materially misleading impression of Cloudera's business and its products. During the Class Period, Cloudera did not have a "cloud native" product and its products were unable to offer the same cloud performance offered by its competitors. Describing their offerings to investors in this manner deceived investors to believe that Cloudera's products had these capabilities. As a result, Defendants materially misrepresented Cloudera's ability to compete in the cloud market.

141.    On April 3, 2018, Cloudera announced its results for the year ended January 31, 2018. In Cloudera's press release and during the conference call to discuss its results, Cloudera announced disappointing guidance for the next quarter and year based on a purported misfocusing of sales resources. Moreover, it announced its new marketing and sales strategy, including a focus on public cloud adoption. An analyst questioned whether the poor guidance was as result not from sales efforts, but rather potential competition issues. In response to this news on April 3, 2018, Cloudera's stock price fell by $8.95 per share, or 40.25%, on extremely high trading volume that was in excess of 27.9 million shares.

142.    On March 13, 2019, Cloudera announced its fourth quarter and fiscal year 2019 results for the periods ended January 31, 2019. In this press release and during the conference call that followed to discuss the results, Cloudera reported disappointing revenue guidance for the first fiscal quarter 2020 and disappointing revenue guidance of $835 million to $855 million or FY2020. This was vastly lower than the consensus of $968 million for total revenue and $801 million of subscription revenue. Moreover, Cloudera announced that it would be launching its new cloud-native platform in the next two quarters, call Cloudera Data Platform.

143.    On June 5, 2019, Reilly admitted that Cloudera's products during the Class Period were uncompetitive and substandard. Reilly admitted that Cloudera's poor performance during the first quarter of FY2020 and the reduction of FY2020 revenue guidance was due to Cloudera's products not being "competitive against what the public cloud guys are offering" as the customers moved their workloads to "public cloud vendor's native house offerings." Reilly further explained that Cloudera's inability to compete stemmed from the lack of cloud native/architecture and it was only starting to "address[]" customer non-renewals by launching "CDP as a PaaS native cloud architecture offering" ("CDP" refers to the Cloudera Data Platform).

144.    Analyst reaction was quick and severe in their reports. Raymond James stated the earnings miss and guidance cut was "primarily to customers moving workloads to cloud where they are choosing **cloud native** data management solutions (EMR, RedShift, Athena) absent the availability of Cloudera's new cloud focused CDP platform." As such, "CDP will provide benefits over Cloudera Altus including a cloud-native experience.'" Barclays aptly concluded that

"***Cloudera does not have a cloud solution***, which . . . means that the company suffers from weak renewals as customers move to cloud native providers."

145.    D.A. Davidson conceded that it was duped by Cloudera because it "relied too heavily on taking management at its word" and found it "truly difficult to believe" that Cloudera's reasons for the billings miss and *reduced* guidance, namely "that customers delaying deployment until CDP, increased churn, merger disruption, and competitive headwinds – all legitimate concerns continually brought up by investors – were not properly factored into guidance provided 90 days ago." J.P. Morgan mirrored this sentiment by highlighting that "[t]he narrative surrounding Cloudera's Q1 is the company's material revenue guide down for FQ2 and FY20" was "unusual for a recurring revenue model[.]"

146.    From Cloudera's announcements on June 5, 2019 and the June 5 and 6, 2019 analyst reports, the market's reaction was swift and severe. Cloudera's stock price fell by $3.59 per share, or 40.8%, from its previous closing price of $8.80 per share on June 5, 2019 to close at $5.21 per share on June 6, 2019 on extremely high trading volume that was in excess of 57.9 million shares.

### B.    Jurisdiction and Venue

147.    The claims asserted herein arise under and pursuant to: Sections 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j, and SEC Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5); and Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78t.

148.    This Court has jurisdiction over the subject matter of this action pursuant to: Section 27 of the Exchange Act, 15 U.S.C. §78aa; and 28 U.S.C. §1331.,

149.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa; and 28 U.S.C. §1391(b) because certain of the acts alleged herein, including the preparation and dissemination of material false and/or misleading information, occurred in this District. Further, Cloudera's principal executive offices are located within this District.

150.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**C.     Exchange Act Parties**

*i.     Plaintiffs*

151.    Lead Plaintiffs Mariusz J. Klin and the Mariusz J. Klin MD PA 401K Profit Sharing Plan purchased common stock during the Class Period and was damaged thereby. Lead Plaintiffs' certification evidencing their transactions in Cloudera's securities during the Class Period, previously filed with the Court in connection with his motion for appointment as lead plaintiff, is incorporated herein by reference (ECF No. 34-2).

152.    Plaintiff Cade Jones purchased common stock during the Class Period and was damaged thereby. Plaintiff Jones owned shares of Hortonworks at the time of the Merger. Upon the closing of the Merger, Plaintiff Jones was sold, in exchange for his shares of Hortonworks common stock that he held at the effective time of the Merger, shares of Cloudera's common stock that were registered pursuant to and traceable to the Registration Statement and sold by Cloudera pursuant to the Prospectus and the Forms 425 prospectuses. As a result of purchasing and/or acquiring Cloudera shares traceable to Cloudera's Registration Statement, Plaintiff Jones was damaged thereby. Plaintiff Jones' certification evidencing his transactions in Cloudera shares is attached hereto and is hereby incorporated by reference.

153.    Plaintiff Larry Lenick purchased common stock during the Class Period and was damaged thereby. Plaintiff Jones owned shares of Hortonworks at the time of the Merger. Upon the closing of the Merger, Plaintiff Lenick was sold, in exchange for his shares of Hortonworks common stock that he held at the at the effective time of the Merger, shares of Cloudera's common stock that were registered pursuant to and traceable to the Registration Statement and sold by Cloudera pursuant to the Prospectus and the Forms 425 prospectuses. As a result of purchasing and/or acquiring Cloudera shares traceable to Cloudera's Registration Statement, Plaintiff Lenick was damaged thereby. Plaintiff Lenick's certification evidencing his transactions in Cloudera shares is attached hereto and is hereby incorporated by reference.

ii.     **_The Exchange Act Defendants_**

154.    Defendant Cloudera, Inc. is a Delaware corporation with its principal executive offices located at 395 Page Mill Road Palo Alto, CA 94306.

155.    Defendant Reilly served as Cloudera's CEO and as a member of the Board June 2013 until July 31, 2019.

156.    Defendant Frankola has served as Cloudera's Chief Financial Officer ("CFO") since October 2012.

157.    Defendant Michael A. Olson ("Olson") is a co-founder of Cloudera, served as the Chairman of our board of directors from April 2009 until his resignation as part of the Merger, and served as Cloudera's Chief Strategy Officer from June 2013 until his announced retirement in the summer of 2019 following the news announced on June 5, 2019.

158.    Defendants Reilly, Frankola, and Olson are collectively referred to as the "Individual Exchange Act Defendants."

159.    Cloudera and the Individual Exchange Act Defendants are collectively referred to as the "Exchange Act Defendants."

**D.     Background Allegations Applicable to the Exchange Act Claims**

i.     **_Overview of Cloudera's Products_**

160.    Cloudera summarized its main product offerings as follows:

**Platform Editions**

Cloudera Enterprise is our machine learning and analytics platform with enterprise-scale data processing and multi-function analytics optimized for the cloud. We primarily offer subscriptions for the following five editions of our software platform to address the most common and critical data challenges enterprises face, including:

- **Cloudera Enterprise Data Hub.** The Enterprise Data Hub combines our Analytic DB, Operational DB, and Data Science and Engineering products with our shared data experience (SDX) technology. It allows companies to execute multiple analytic functions against a shared set of governed and secure data in public clouds, private clouds and data centers in bare metal configurations.

- **Cloudera Data Science and Engineering.** Cloudera Data Science and Engineering enables users to streamline, simplify, and scale big data processing

(ETL) regardless of where data is stored - on-premises, across public clouds, or both. It accelerates exploratory data science and machine learning models at scale by taking advantage of massive parallel compute and expanded data streams.

- **Cloudera Operational DB.** Cloudera Operational DB enables stream processing and real-time analytics on continuously changing data. It delivers a secure low latency, high-concurrency experience that processes more data, from more sources (including IoT), powered by HBase, a column-based NoSQL store for unstructured data, and Kudu, a relational store for structured data.

- **Cloudera Analytic DB.** Cloudera Analytic DB brings high performance SQL analytics to big data, powered by Apache Impala. It optimizes enterprise data warehouses, decreasing storage costs and eliminating access contention, by enabling self-service access for more users, while integrating with leading business intelligence tools.

- **Cloudera Essentials.** Cloudera Essentials is our "data lake" offering combining CDH - our market-leading open source distribution - with Cloudera support.

**Other Technologies and Solutions**

We continue to innovate and develop new technologies and solutions to extend our market leadership and enhance our platform for machine learning and analytics optimized for the cloud. Other notable additions to our offerings include:

- **Cloudera Altus.** Cloudera Altus is our platform-as-a-service (PaaS) offering. Altus is a cloud service that simplifies the use of our platform by eliminating the need to install, manage and update our software. With Altus, we enable customers to address a new set of elastic and transient workloads that would otherwise be impractical to run in the datacenter.

- **Cloudera Data Science Workbench.** Cloudera Data Science Workbench enables self-service data science for the enterprise. Data Science Workbench is a multi-user, multi-language development environment for data science and machine learning applications. It manages the various steps of the model development lifecycle including versioning, dependency management, scheduling, multi-user collaboration and training models on disparate types of compute.

- **Cloudera Fast Forward Labs.** Cloudera Fast Forward Labs delivers applied research in machine learning and artificial intelligence to our customers. Fast Forward Labs surveys academic and industrial research for developments in the field, enabling customers to benefit from advances in applied machine learning and artificial intelligence and is designed primarily to drive increased consumption of our software.

- **Cloudera SDX.** Cloudera SDX is a modular software framework that enables our customers to have a "shared data experience." By applying a centralized, consistent framework for schema, security, governance, data ingest and more, SDX enables multiple analytic applications to run against shared or overlapping sets of data. SDX supports multiple public cloud, private cloud and bare metal configurations and deployment options.

161.    On August 28, 2018, Cloudera Data Warehouse was announced as a "modern data warehouse for self-service analytics, built with a hybrid cloud-native architecture that handles 50PB data workloads and enables hybrid compute, storage, and control for workload portability across public clouds and enterprise data centers."

162.    Thorough the Class Period, Cloudera claimed in its statements that its products and platforms were "cloud native" and/or on "cloud architecture." In SEC filings, Cloudera stated it competed with "public cloud providers who include proprietary data management, machine learning and analytics offerings, such as Amazon Web Services, Google Cloud Platform and Microsoft Azure."

### ii.      _Cloud-Native Products and Cloud Architecture_

163.    Cloud native software has been growing quickly given the benefits that it provides it has been reported that the use of cloud native technologies in production grew more than 200% in a nine-month period starting in December 2017. A survey from Capsule8, Signal Sciences, and Duo reported that "cloud native adoption is on the rise" with 62 percent of companies relying on cloud native for over half of their new applications with the expectation that this figure will be over 80% by 2021.

164.    On February 6, 2020, Arun Murthy, Cloudera's Chief Product Officer, posted an article on Medium titled _Hadoop: Decade Two, Day Zero_. Murthy's article distinguished Cloudera's products during the Class Period (Decade 1) from Cloudera's "cloud-native" products (including CDP) launched after the Class Period (Decade 2).

165.    During the Class Period, Cloudera's products fell within Decade 1 and were not "cloud-native." As described by Murthy, products in Decade 1 was merely "Hadoop in the public cloud" and was characterized as slow and expensive to operate:

## Decade 1 — Hadoop in the Public Cloud

What was then state-of-the-art got adopted to the public cloud (Amazon EMR, Microsoft HDInsight etc.) in the following manner for a first-generation architecture:



**Public Cloud**

Disaggregated Storage/Compute
Multiple Clusters
(EMR/ HDInsight)

*gen-2*

- Leveraged cloud object stores were decoupled from compute. The community built connectors to S3, WASB etc. using the Hadoop Compatible FileSystem (HCFS) APIs.

- Used VMs to spin up compute-only Hadoop clusters which were largely ephemeral; however, the relatively high overhead of spinning up VMs themselves (nearly 10 mins) led to the need to keep clusters up-and-running — an expensive proposition.

- With the ephemerality of compute clusters, there wasn't a good way to manage long-lived metadata, security policies etc. which also led to expensive long-running clusters.

166.    Cloudera's products in Decade 2, unlike the products in Decade 1, were "cloud-native." Murthy details that at the end of Decade 1, Cloudera "needed a fundamental rethink" to capture the technological forces of Decade 2 which Murthy highlights – on-demand, elastic consumption of software and apps as services – are just certain of the attributes and benefits of a true cloud-native software:

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:19-cv-03221-LHK

## Decade 2 — Hadoop Powered Data Clouds

By the end of the first decade, we needed a fundamental rethink — not just for the public cloud, but also for on-premises. It's also helpful to cast an eye on the various technological forces driving Hadoop's evolution over the next decade:

- Cloud experiences fundamentally changed expectations for easy to use, self-service, on-demand, elastic consumption of software and apps as services.

- Separation of compute and storage is now practical in both public and private clouds, significantly increasing workload performance.

- Containers and kubernetes are ubiquitous as a standard operating environment that is more flexible and agile.

- The integration of streaming, analytics and machine learning — the data lifecycle — is recognized as a prerequisite for nearly every data-driven business use case.

167.     Notably, Murthy referred to Decade 1 as "Hadoop on the cloud" and Decade 2 as "Hadoop powered data clouds." This distinction is important because merely putting software on the cloud or using a cloud-based server does not make something "cloud native." Within the cloud industry, and as described by Murthy in the Decade 2 framework, the terms "cloud native" and "cloud architecture" mean that an offering has specific material attributes such as the use of containers and Kubernetes as a ubiquitous standard, seamless scalability, elasticity, and being on demand.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:19-cv-03221-LHK

168.    Murthy also provided the following chart which further distinguishes Cloudera's products between Decade 1 and Decade 2, and confirms that Cloudera did not have a "cloud native" product with cloud architecture during the Class Period until the launch of its CDP:

| Architecture | Decade 1<br>Hadoop on-prem and on the cloud | Decade 2<br>Hadoop powered data clouds |
|---|---|---|
| Use-Cases | • Data growing faster than ever<br>• Need a cost effective way to store and process data<br>• Open source to avoid lock-in<br>• Businesses use "big data" a competitive advantage | • Data continues to grow exponentially<br>• Need a cost effective way to integrate the data lifecycle<br>• Open source for continuous innovation<br>• Businesses master the data lifecycle to fundamentally change their business |
| Technology Infrastructure | • Magnetic hard drives getting cheaper and cheaper<br>• Networking is expensive and the public cloud is not always a cost effective option<br>• Hadoop co-locates compute and storage to leverage commodity hardware and avoid costly network transfers | • Object stores like S3 are cost effective for storing large volumes of data<br>• Buying compute on-demand can be more effective than purchasing datacenter capacity<br>• Hadoop enables high performance analytics with remote disaggregated storage, sometimes using locally-attached SSDs for cost-effective caching |
| User Experience | • Software is sold, downloaded, installed, and upgraded on a periodic basis by centralized IT teams<br>• Capacity expansion requires planning and funding over a multiple quarter time horizon<br>• Deployment time is measured in months and quarters | • Large-scale shift from shrink-wrapped downloadable artifacts to SaaS with consumption-based pricing has changed customer expectations<br>• Business users won't wait months to provision capacity, install software, or upgrade to the latest features<br>• Public clouds and Kubernetes spin up workloads in minutes |
| Privacy & Security | • Network perimeter security and physical access controls<br>• Simplistic enforcement was often sufficient<br>• Deployment simplicity favored over more robust mechanisms | • Security at the workload, data and metadata layer becomes the norm<br>• All data access is secured, encrypted, and audited by default<br>• Businesses have viable options to comply with new compliance regulations such as GDPR |

## E.  False and Materially Misleading Statements

### i.  *April 27, 2017: The Class Period Begins Cloudera's Misstatements in its Initial Public Offering Documents*

169.    On March 31, 2017, Cloudera filed a registration statement on a Form S-1 seeking to register 15,000,000 shares of stock an initial public offering. These shares were later priced to

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:19-cv-03221-LHK

be offered at $15.00 per share. The Form S-1 as amended was signed by each of the Individual Exchange Act Defendants. The Class Period begins on April 28, 2017. On that date, Cloudera filed its prospectus on Form 424B4 for the IPO (the "IPO Prospectus").

170.    In the IPO Prospectus, Cloudera represented stated it had a "cloud-native" platform:

Building on the approach of web-scale consumer internet companies, we have collaborated with the global open source community **to innovate and deliver our cloud-native platform.**

171.    When discussing its business strategy in the IPO Prospectus, Cloudera further stated: **Our Strategy**

Key elements of our strategy include:

- leading    cloud    innovation    for    big    data,    extending    our **original cloud-native architecture**;

172.    The statements in emphasis in paragraphs 170-171 were materially false and misleading because: (i) Cloudera did not have a "cloud native" product and its products were unable to offer the same cloud performance offered by its competitors; (ii) by describing its offerings to investors in this manner Cloudera deceived investors to believe that Cloudera's products had these capabilities; and (iii) as a result, the Exchange Act Defendants materially misrepresented Cloudera's ability to compete in the cloud market.

173.    As later admitted to by the Exchange Act Defendants, Cloudera's products were not "cloud native" and launched the CDP product to address this "competitive disadvantage." After the Class Period, Cloudera's interim CEO also admitted that Cloudera's products during the Class Period lacked "pure public cloud capability." Given Cloudera's lack of "cloud native" offerings, Cloudera and Reilly admitted that Cloudera was "not really competitive against what the public cloud guys [were] offering."

### ii.    *June 8, 2017: Cloudera Reports its First Quarter 2018 Results*

174.    After the market closed on June 8, 2017, Cloudera issued a press release, also filed with the SEC as an attachment to a Form 8-K, that announced Cloudera's financial results for the first quarter fiscal year 2018 for the period ended April 30, 2017 ("1Q2018 Press Release").

175.    In the 1Q2018 Press Release, Cloudera and Defendant Reilly detailed the "strong first quarter" with subscription revenue up 59% year-over-year and comprised 81% of total revenues as compared to 72% in same period during the previous year. The press release also announced Cloudera's net expansion rate for the first quarter was 142%.

176.    Moreover, the 1Q2018 Press Release recapped that Cloudera had announced Altus during the quarter. Specifically, the press release highlighted that by stating that Altus is "our first Platform-as-a-Service offering – designed to deliver the speed, convenience and elasticity of public cloud infrastructure, easing the creation for Cloudera customers of new cloud workloads and accelerating the migration of existing workloads to Cloudera's platform running in the cloud."

177.    Later that same day, Cloudera held its earnings conference call to discuss its quarterly results with the analysts ("1Q2018 Conference Call"). During the call, Reilly stated "Cloudera offers the ***leading cloud native software platform*** for machine learning and advanced analytics. "

178.    The statement in emphasis in paragraphs 177 was materially false and misleading because: (i) Cloudera did not have a "cloud native" product and its products were unable to offer the same cloud performance offered by its competitors; (ii) by describing its offerings to investors in this manner Cloudera deceived investors to believe that Cloudera's products had these capabilities; and (iii) as a result, the Exchange Act Defendants materially misrepresented Cloudera's ability to compete in the cloud market.

179.    As later admitted to by the Exchange Act Defendants, Cloudera's products were not "cloud native" and launched the CDP product to address this "competitive disadvantage." After the Class Period, Cloudera's interim CEO also admitted that Cloudera's products during the Class Period lacked "pure public cloud capability." Given Cloudera's lack of "cloud native" offerings, Cloudera and Reilly admitted that Cloudera was "not really competitive against what the public cloud guys [were] offering."

### iii. September 7-12, 2017: Cloudera Reports its Second Quarter 2018 Results

180.   After the market closed on September 7, 2017, Cloudera issued a press release, also filed with the SEC as an exhibit to a Form 8-K, that announced Cloudera's financial results for the second quarter fiscal year 2018 for the period ended July 31, 2017 ("2Q2018 Press Release").

181.   In the 2Q2018 Press Release, Cloudera discussed the financial results with Defendant Reilly stating that "[i]n our fiscal second quarter, we outperformed on sales, customer acquisition, customer expansion and cash flow objectives[.]" The press release reported Cloudera's total revenue for the quarter as $89.8 million with subscription revenue being $74 million, a 39% and 46% increase respectively, over the same period in the previous fiscal year. The press release further announced that subscription revenue was up to 82% of total revenues from 79% during the same period and that Cloudera's net expansion rate for the first quarter was 140%.

182.   Moreover, in the 2Q2018 Press Release Cloudera noted that it added 45 net new Global 8,000 customers for the period. The press release Defendant Reilly stating that "[i]n Q2, we exhibited strong momentum in the areas that drive sustained growth for Cloudera: machine learning, analytics and the cloud."

183.   Later that same day, Cloudera held its earnings conference call to discuss its quarterly results with analysts ("2Q2018 Conference Call"). During the call, Reilly stated:

> Our modern platform for machine learning and analytics is optimized for the cloud. We've invested substantially to allow customers to run on-premises or in the public cloud of their choice. Amazon, Microsoft and Google are all important platforms and partners. **Having a cloud-native platform** fits nicely with enterprises' desire to shift data and workloads to the cloud, particularly analytic workloads because those workloads are elastic and transient in nature and because much of the new data that enterprises want to analyze is increasingly generated in the cloud.
>
> The second quarter also saw growth in **the adoption of Cloudera Altus, our Platform-as-a-Service offering that enables data engineering and data science workloads to run natively and easily in the public cloud**. We handle deployment, management and operations. Customers concentrate on their data processing and analytic work. With Altus managed service and our unique cloud orchestration and operation software, we're now addressing a new set of elastic and transient jobs that would otherwise be impractical to run in the data center. We plan to grow the Altus family over time, giving enterprises more flexibility than ever before to run workloads anywhere that they prefer.

184.    The statements in emphasis in paragraph 183 were materially false and misleading because: (i) Cloudera did not have a "cloud native" product and its products were unable to offer the same cloud performance offered by its competitors; (ii) by describing its offerings to investors in this manner Cloudera deceived investors to believe that Cloudera's products had these capabilities; (iii) Altus was not a true cloud-native product as it lacked the capabilities of "cloud-native architecture" as detailed by a ZD Net article; and (iv) as a result, the Exchange Act Defendants materially misrepresented Cloudera's ability to compete in the cloud market.

185.    As later admitted to by the Exchange Act Defendants, Cloudera's products were not "cloud native" and launched the CDP product to address this "competitive disadvantage." After the Class Period, Cloudera's interim CEO also admitted that Cloudera's products during the Class Period lacked "pure public cloud capability." Given Cloudera's lack of "cloud native" offerings, Cloudera and Reilly admitted that Cloudera was "not really competitive against what the public cloud guys [were] offering."

### iv.    September 28, 2017: Cloudera and Insiders Sell Additional Shares to the Public in a Secondary Offering

186.    On September 15, 2017, Cloudera filed a registration statement on a Form S-1 seeking to register 3,000,000 shares of its stock and 10,432,114 shares of its selling in a secondary offering. The Form S-1 registration statement, as amended was signed by each of the Individual Exchange Act Defendants.

187.    On September 28, 2017, Cloudera filed its prospectus on Form 424B4 for the secondary offering (the "Secondary Offering Prospectus").

188.    In the Secondary Offering Prospectus, Cloudera represented stated it had a "cloud-native" platform:

> Building on the approach of web-scale consumer internet companies, we have collaborated with the global open source community to innovate and **deliver our cloud-native platform.**

189.    When discussing its business strategy in the IPO Prospectus, Cloudera further stated:

**Our Strategy**

Key elements of our strategy include:

- leading cloud innovation for big data, extending our *original cloud-native architecture*;

190. The statements in emphasis in paragraphs 188-189 were materially false and misleading because: (i) Cloudera did not have a "cloud native" product and its products were unable to offer the same cloud performance offered by its competitors; (ii) by describing its offerings to investors in this manner Cloudera deceived investors to believe that Cloudera's products had these capabilities; and (iii) as a result, the Exchange Act Defendants materially misrepresented Cloudera's ability to compete in the cloud market.

191. As later admitted to by the Exchange Act Defendants, Cloudera's products were not "cloud native" and launched the CDP product to address this "competitive disadvantage." After the Class Period, Cloudera's interim CEO also admitted that Cloudera's products during the Class Period lacked "pure public cloud capability." Given Cloudera's lack of "cloud native" offerings, Cloudera and Reilly admitted that Cloudera was "not really competitive against what the public cloud guys [were] offering."

> ### v.   *December 7, 2017: Cloudera Reports its Third Quarter 2018 Results*

192. On December 7, 2017, Cloudera issued a press release, also filed with the SEC as an exhibit to a Form 8-K, that announced Cloudera's financial results for the third quarter fiscal year 2018 for the period ended October 31, 2017 ("3Q2018 Press Release").

193. Later that same day, Cloudera held its earnings conference call to discuss its quarterly results with analysts ("3Q2018 Conference Call"). During the call, Defendants Reilly and Olson discussed the strength and success of their claimed cloud native platform, Altus. During the call, Reilly and Olson made the following statements:

**Thomas J. Reilly** Cloudera, Inc. – CEO

Cloudera on AWS is instrumental in helping Celgene effectively target research and bring new therapies to market faster. Our *cloud-native platform* enabled Celgene to cut process run times by 99% for patient data analysis and reduce operating costs by 70%.

*          *          *

**Michael A. Olson** Cloudera, Inc. – Founder, Chief Strategy Officer

And I'm excited to share that just last week at the Amazon re:Invent Conference, we announced that Altus is multi-function with the introduction of Cloudera Altus Analytic DB for data analytics, which will be available in beta next month. This second member of the Altus family allows enterprises to quickly perform self-service business intelligence and SQL analytic workloads in the cloud with the high-performance Apache Impala SQL engine against data stored natively in S3. Cloudera Altus Analytic DB is the first data warehouse cloud service that brings the warehouse to the data through *a unique cloud-scale architecture* that eliminates complex and costly data movement.

194.    The statements in emphasis in paragraph 193 were materially false and misleading because: (i) Cloudera did not have a "cloud native" product and its products were unable to offer the same cloud performance offered by its competitors; (ii) by describing its offerings to investors in this manner Cloudera deceived investors to believe that Cloudera's products had these capabilities; and (iii) as a result, the Exchange Act Defendants materially misrepresented Cloudera's ability to compete in the cloud market.

195.    As later admitted to by the Exchange Act Defendants, Cloudera's products were not "cloud native" and launched the CDP product to address this "competitive disadvantage." After the Class Period, Cloudera's interim CEO also admitted that Cloudera's products during the Class Period lacked "pure public cloud capability." Given Cloudera's lack of "cloud native" offerings, Cloudera and Reilly admitted that Cloudera was "not really competitive against what the public cloud guys [were] offering."

vi.    ***April 3, 2018: The Truth Begins to Trickle Out with Cloudera's FY2018 Results***

196.    After the market closed on April 3, 2018, Cloudera issued a press release, also filed with the SEC via a Form 8-K, announcing the its fourth quarter and fiscal year 2018 results for the periods ended January 31, 2018 ("2018 FY Press Release").

197.    In the 2018 FY Press Release, Cloudera announced for the year it had achieved total revenues of $367.4 million (a 41% year-over-year increase) of which $301 million originated from subscriptions (a 50% year-over-year increase). It also stated operating cash flow for fiscal year 2018 was negative $42.3 million.

198.    The 2018 FY Press Release also announced disappointing revenue guidance for the first fiscal quarter of 2019 as it was well below the consensus. Specifically, it provided that Cloudera was forecasting total revenue in the range of $101 million to $102 million, $85 million to $86 million in subscription revenue, and a non-GAAP net loss per share in the range of $0.19 to $0.17 per share.

199.    The 2018 FY Press Release further announced revenue guidance for fiscal year 2019. Specifically, it provided that Cloudera was forecasting total revenue in the range of $435 million to $445 million, $370 million to $375 million in subscription revenue, and negative $40 million to $35 million in operating cash flow. This was materially less than FY 2019 total revenue consensus of $460 million (27% year-over-year) and $388 million of subscription revenue (30% year-over-year).

200.    During after-market hours on April 3, 2018, Cloudera held a conference call to discuss its fourth quarter and full-year 2018 fiscal year results. During this call, Cloudera's executives restated and reaffirmed Cloudera's fiscal performance during these periods and also discussed their outlook for the first quarter and full fiscal year 2019.

201.    Defendant Olson went on to discuss the public's adoption of the cloud and how Cloudera was approaching it:

**Michael A. Olson** Cloudera, Inc. – Founder, Chief Strategy Officer & Chairman

Thanks, Tom. In a digital and hyper-connected world, data has become the world's most valuable resource. Enterprises in every industry are going through a digital transformation. There are 3 fundamental trends that underpin this change. The first is rearchitecting all legacy platforms, moving beyond cumbersome and expensive technologies like traditional data warehouse, which simply can't capture and analyze the vast amounts of types of data generated by our increasingly connected world. The second is machine learning and AI, applying powerful new techniques to that data to get insights never before possible and then acting on those insights. The third is the adoption of the public cloud, taking advantage of the agility and flexibility that it offers. Against this backdrop, Cloudera is positioned to be the partner of choice for enterprises in pursuit of digital transformation. Let's go through each of these 3 trends and our differentiation in a bit more detail.

\*      \*      \*

The third trend for digital transformation is the embrace of public cloud. Our customers want to take advantage of the flexibility that public cloud infrastructure provides. They benefit from large-scale storage and compute. They're able to run transient or bursty workloads without buying lots of hardware. Cloudera is capitalizing on cloud adoption by allowing large enterprises to run analytic workloads anywhere they choose. Our large enterprise clients typically maintain a hybrid approach. They operate their own data centers and want to run applications on more than one public cloud. We allow them to move workloads among the major public clouds to private clouds and to and from their own data centers to meet their business needs, enabling any analytic workload on any cloud in any location.

In fiscal year 2018, we made significant advancements in our cloud capabilities with the introduction of the Cloudera Altus family, our Platform-as-a-Service offering. **_Altus delivers the speed, convenience, elasticity and ease-of-use expected in native public cloud services._** Altus is uniquely multicloud and multifunction, running on both AWS and Azure for data engineering and analytics. We continue to innovate in cloud, and we expect to introduce new Altus offerings in the future. For these Platform-as-a-Service offerings, we handle deployment, management and operations, allowing customers to concentrate on their data processing and analytic work.

Emphasis added.

202.    The statement in emphasis in paragraphs 201 was materially false and misleading because: (i) Cloudera did not have a "cloud native" product and its products were unable to offer the same cloud performance offered by its competitors; (ii) by describing its offerings to investors in this manner Cloudera deceived investors to believe that Cloudera's products had these capabilities; ; (iii) Altus was not a true cloud-native product as it lacked the capabilities of "cloud-native architecture" as detailed by a ZD Net article; and (iii) as a result, the Exchange Act Defendants materially misrepresented Cloudera's ability to compete in the cloud market.

203.    As later admitted to by the Exchange Act Defendants, Cloudera's products were not "cloud native" and launched the CDP product to address this "competitive disadvantage." After the Class Period, Cloudera's interim CEO also admitted that Cloudera's products during the Class Period lacked "pure public cloud capability." Given Cloudera's lack of "cloud native" offerings, Cloudera and Reilly admitted that Cloudera was "not really competitive against what the public cloud guys [were] offering."

204.     Defendant Reilly went on to discuss Cloudera's marketing focus, its past effects, and the future direction for increasing its number of Global 8000 customers. Notably, Reilly announced a refocusing of its sales team to the Global 8000 segment:

As demonstrated by these use cases, we understand that the greatest opportunity exists in the large enterprise segment of the market, what we've labeled the Global 8000. While we surpassed our objectives for net new Global 8000 customer additions this past fiscal year, we still expended too much of our valuable selling resources pursuing customers outside that market. I know because we use our own technology to analyze sales activity. Gaining customers outside our target market hurts our initial deal sizes, expansion rates and, ultimately, annual recurring revenue. Recognizing enterprises in various industries are commencing their digital transformation journeys at different times and adopting the technology at different rates, it is important that we focus resources on the right entities at the right time.

As we enter fiscal 2019, we take stock of all that we've learned the past few quarters, and we're making strategic changes to position us for greater success. For example, customer size, as in the case of the Global 8000, is only one factor in determining our most attractive customers. Our ideal target customer is defined by many attributes, including propensity to buy, propensity to expand, industry vertical, use case, number of data scientists, IT spend, legacy data spend and so on. As a result, using our technology, we have refined our near-term target market to a subset of the Global 8000, which allows us to optimize our go-to-market efforts for the greatest return. This will enable us to grow faster and generate cash sooner.

In addition to improved customer segmentation, we've implemented a number of go-to-market and field organizational changes to support our new customer acquisition goals and our existing customer expansion objectives. These refinements are an excellent example of how insight gained from data can make an organization more effective. Constant refinement and focus on high-quality customers fuels our land-and-expand model as evidenced by our 136% net expansion rate.

*I'd now like to shift to important corporate changes we are also making to align our organization and priorities with the 3 market trends that Mike described: disrupting the legacy analytics market; leading the machine learning revolution; and capitalizing on public cloud adoption*. To drive these initiatives and our sheer focus, we have added 3 general managers in a – and a number of targeted resources for each of these areas. Our GMs report to a newly appointed Senior Vice President who will oversee these high-growth businesses. In addition to work on the product, we are making field investments in analytic database skills, adding specialists in machine learning and introducing dedicated cloud computing experts. Furthermore, as part of the field reorganization and new go-to-market initiatives, we have commenced a formal search for a new global sales leader to drive these changes in segmentation and specialization.

Emphasis added.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:19-cv-03221-LHK

205.   During the 2018 FY Conference Call, Defendant Frankola reiterated Cloudera's performance of the last quarter and full fiscal year. In discussing Cloudera's outlook, Frankola discussed the derivation of Cloudera's first quarter and full-year 2019 guidance:

> I will conclude by providing initial guidance for fiscal Q1 and for fiscal 2019. As we offer guidance, it is important to understand that we take into account the transition in field leadership and our refined go-to-market strategy to ensure focus on those customers and prospects with the highest propensity to buy and consume our software. Although potentially producing uneven results in the short run, we've initiated these changes to enhance the company's posture for sustained long-term growth.
>
> We expect Q1 total revenue to be between $101 million and $102 million, representing approximately 28% growth compared to Q1 of last year, with subscription software revenue in the range of $85 million to $86 million, up approximately 32% year-over-year. Non-GAAP net loss per share is projected to be $0.19 to $0.17 based on approximately 147 million weighted average shares outstanding. For fiscal year 2019, we expect total revenue to be between $435 million and $445 million, representing approximately 20% growth, with subscription software revenue in the range of $370 million to $375 million, up approximately 24% year-over-year. We expect gross margin for the year to expand by 150 basis points driven by the same factors as in fiscal '18.
>
> Non-GAAP net loss per share is projected to be $0.62 to $0.59 based on approximately 152 million weighted average shares outstanding. We expect operating cash flow for the year to be negative $40 million to $35 million. Seasonally, we expect operating cash flow to be positive in the current quarter fiscal Q1 '19 and approximately breakeven in Q4, with most of the year's losses occurring in Q2 and Q3 of fiscal '19. Consistent with the objectives we established at the time of the IPO, we expect operating cash flow to be positive in fiscal Q1 2020 and for the full year fiscal 2020. Capital expenditures for fiscal '19 should be around $12 million driven by leasehold improvements occurring primarily in the first half of the year. Finally, we expect deferred revenue to grow at roughly 21% for the year, with short-term deferred revenue growing at roughly 23%.

206.   During the question and answer portion of the call, analysts inquired about Cloudera's disappointing guidance and changes in sales and marketing. Sanjit Singh from Morgan Stanley inquired:

> *Sanjit Kumar Singh* Morgan Stanley, Research Division – VP
>
> So I guess I wanted to dig into the fiscal year '19 guidance and specifically the assumptions in terms of the assumptions that we're used to talking about when we talk about the model. So subscription revenue is essentially being cut in half. And so what I want to understand, Jim, is, is the net expansion rate, that likely takes the hit in the near term? And then it also seems like current billings growth also was pretty strong in fiscal year '18. I'm just trying

to get to understand what are the dynamics that would cause such a rapid slowdown in the subscription revenue growth line.

**James W. Frankola** Cloudera, Inc. – CFO

Yes, let me break that in 2 pieces. When we look at growth in a fiscal year, the vast majority of the software growth comes from the expansion piece. Several percentage points will come from new customers that we pick up from the year. So most of the change is due to net expansion rate. What is factoring into that perspective is the transitions that we're making in the field. We do expect them to produce some uneven results in the first part of fiscal year '19, and that is reflected in the guidance.

**Sanjit Kumar Singh** Morgan Stanley, Research Division – VP

Got it. And just in terms of like the timing of the changes, was there certain – when you look at some of your customer cohorts, was there a larger mix of the customer base that wasn't expanding at the rate that you projected? Or was there any sort of other metrics that came out that is causing the sort of toggle in terms of the go-to-market approach*?*

**James W. Frankola** Cloudera, Inc. – CFO

***Yes, the business is fundamentally healthy***. Our net expansion rate for Q4 was 136%. And as we drilled down into that, our oldest cohorts and the cohorts that represent our largest customers are still growing at roughly that 136%. So the land-and-expand model is really working. ***What we saw is, in late Q4, some softness in expansion bookings as well as, as we look at the changes that we're putting in for the first half of next year, we expect that to impact our bookings for the first half, which will eventually reflect in billings and revenue for the year.***

Emphasis added.

207.   Building on Morgan Stanley's questions concerning the disappointing guidance, Mark Murphy of JP Morgan Chase & Co. inquired about the reconciliation of Cloudera's net expansion rate and the lowered revenue guidance touching upon their knowledge of large customer and optimism for the future:

**Mark Ronald Murphy** JP Morgan Chase & Co, Research Division – MD

So Jim, as you pointed out, the net expansion rate remains very healthy at 136%. And then as we look to the revenue guidance for fiscal '19, it's well below that level, at closer to 20%. And that is what I'm trying to reconcile. I'm curious, do you think that the expansion rate is going to end up substantially lower by the time we're at the end of fiscal '19? For instance, do you think it would be sub-120%? Because I actually would not think that changes in the go-to-market strategy would have a material effect on the net expansion rate, like that just seems to be more the natural cadence or the natural trajectory that your larger customers are on and have been on for quite some time. I could see – I would think that, that could have some

effect on new bookings, but that doesn't seem to be the primary driver of your total revenue growth rate. So that's the main kind of discrepancy in the guidance that I'm trying to reconcile.

**James W. Frankola** Cloudera, Inc. – CFO

Yes. So there's a couple of different pieces. If I don't cover all of them, pull me back. So our revenue guidance for the year is up roughly about 20%. The software revenue guidance is up about 24% year-over-year. And the way you can bifurcate that is when we have looked at our net expansion rate over the past 4 years now, it has ranged between 120% and 150%. We have traditionally built our longer-term models at the lower end of the range. And as we are looking forward into fiscal year '19, looking at the changes we're making in the field, we are modeling literally at that low end of that range. It's close – very close to the 120%, and then we're adding some degree of revenue associated with new customers, that's where you get that 124%. Regarding our ability to sell into large accounts, we are looking at the behavior of our larger customers and are still internally working to drive that net expansion rate to 130%, 135%, 140% or more. So we are optimistic on the long run of the market, but we want to be prudent and reflect the potential disruption associated with the field changes.

208.    Mark Murphy further inquired about Cloudera's shift in sales in marketing:

**Mark Ronald Murphy** JP Morgan Chase & Co, Research Division – MD

Okay. I wanted to ask as well, Tom, you made a comment something to the effect of you expended too much in terms of sales resources pursuing customers outside the Global 8000, something along those lines. And I'm just wondering if you could shed more light on what it was that you experienced and maybe when did that become apparent and how did it manifest.

**Thomas J. Reilly** Cloudera, Inc. – CEO & Director

Yes, Mark, I'll provide a little more color, and I'll use our Q4 results to be more specific on that. As you know we're a land-and-expand. Our lands are an investment; our opportunities, an expand. And what we want to do is we want to land the right customers that will show the best expansion attributes for our model to work. The way we've been organized, each of our salespersons has a mixed territory of new and existing customers. And therefore, they're always challenged where to spend their time going for new versus expansions. So if you look at Q4, we did well in landing. We were very pleased with the G8K customers we landed. It exceeded our annual target. But what we noticed was our reps didn't spend enough time on their expansion opportunities, focused in on land, which is the investment for the long term. And then I'll go one step further, which we don't disclose, we like to talk about our best customers, the G8K, but opportunistically, we always have other customers outside that market. And frankly, in Q4, we pursued too many of those new customers outside that target market, and I think these new customers aren't going to reflect those expansion opportunities. So what we're doing going forward – and some of the changes, when we talk about

resegmentation, I'll take a moment to share with you what we're doing. Within the Global 8000, which is defined by revenue size, customer revenue size or their total revenues, we are even further segmenting to who are the best of that Global 8000, and we're going to be much more disciplined in selling just to them and not rewarding sellers for being outside that market. Second, we're introducing 2 new roles. We are introducing a new logo hunter. These individuals are solely rewarded on pursuing new customers in our target market, and we're very disciplined. These guys should increase the quality of our customers, improve our acquisition cost and increase our competitive win rate. We're also introducing new dedicated expansion reps who are solely working with our largest customers that would drive expansions. ***And then finally, around our focus on these high-growth areas, we're introducing new specialists in the field around machine learning, analytics and cloud specialists.*** So hopefully, that gives you a little more color on that dynamic of when I mentioned new customers kind of outside our target market. We probably expended too much effort landing some new customers that probably don't fit our long-term profile.

Emphasis added.

209.    In response to Defendants allocation of the poor guidance on a misalignment of sales resources and strategy, Karl Keirstead of Deutsche Bank inquired whether it was actually an end market demand deterioration that was the cause of the issues, including those that stem from the type and foundations of Cloudera's offerings. Reilly quickly dismissed this by explaining that Cloudera's strength in winning against the cloud was via a differentiation strategy based on a hybrid approach and that there was "[n]o changes in the competitive landscape nor end market demand":

**Karl Emil Keirstead** Deutsche Bank AG, Research Division – Director and Senior Equity Research Analyst

***Maybe one for Tom and one for Jim. So Tom, I think one question that some on the line might have is, what if this actually isn't a sales issue? What if this isn't about a lack of focus but your end market demand deteriorated? So I'm wondering if you could address that. Are there emergence of any new rivals? Are old Cloudera use cases becoming less relevant?*** Maybe you could just talk about maybe the end market shifts that prompted this beyond your own sales focus. And then maybe for Jim, maybe one of the things I don't quite understand is, on your guidance, you're assuming that subscription revenue growth goes from 50% in fiscal '18 to 24% in fiscal '19, but the DR growth, the deceleration is much less severe, where it's 34% growth in fiscal '18 to 23% in fiscal '19. So why would the DR only come down slightly but we would get a significant decel on the subscription revenue growth?

**Thomas J. Reilly** Cloudera, Inc. – CEO & Director

I'm glad you didn't address that latter question to me. So Karl, thanks for the question about the broad market, the reason in our prepared remarks we focus so much on the opportunity ahead, we fundamentally believe that this market is happening, and every enterprise is going through the digital transformation at some point in the future. Here's our proof points, in our focus on executing against it. By introducing these new general managers into the growth areas of analytics, that is the re-platforming of legacy technologies like data warehouses. That is happening. Data lakes has now become a project of every IT shop in a large enterprise, and we're well positioned to do that. Machine learning, as evidenced by our – a rapid adoption of Cloudera Data Science Workbench, while we're not disclosing the actual numbers for that product, it is the fastest-growing product that we have ever introduced. And the appetite for machine learning and artificial intelligence in large enterprises is very large. The challenge here is it's very early. They are trying to learn what it means, they're trying to understand what their options are, they're trying to understand what all these open-source algorithms, how they bridge between IT and data scientists who happen to be in a line of business. And so when we talk about our strategy in machine learning, we want to lead that industry. And we're in a unique position not only from a technology but a thought leadership. The acquisition of Fast Forward Labs, now Cloudera Fast Forward Labs, gives us the preeminent applied research team on the planet to help our customers there. So that is a big growth area. ***And then finally, the cloud is turning out to be a tremendous tailwind for us. While it introduces new competitors because each of the cloud guys has their own house offering, we have figured out how to win in that market and then stay focused on large enterprises who value our enterprise features around security, governance, (inaudible) you can't find in the public cloud house offerings who value our hybrid approach, our multi-cloud and, more importantly, our multi-function integrated capability.*** What I like to say to customers all the time is we are better than Amazon on Amazon. Our products on Amazon are integrated better and operate better than Amazon's own offerings. So – and we're seeing the move to the cloud take shape unlike it did 2 years ago. ***So I see nothing that gives me concern about the market.*** I just think we need – there's high expectations for us to be a high-growth company. And for us, we just had to be very facile on how we attack that market. ***No changes in the competitive landscape nor end market demand.***

Emphasis added.

210.   Reilly's statements in emphasis in paragraph 209 were materially false and misleading because: (i) Cloudera did not have a "cloud native" product and its products were unable to offer the same cloud performance offered by its competitors; (ii) by describing its offerings to investors in this manner Cloudera deceived investors to believe that Cloudera's products had these capabilities; (iii) this lack of capabilities in turn caused Cloudera to seek to merge with Cloudera to launch CDP to compete with these public cloud vendors' native cloud products, and (iv) as a result,

the Exchange Act Defendants materially misrepresented Cloudera's ability to compete in the cloud market.

211.    As later admitted to by the Exchange Act Defendants, Cloudera's products were not "cloud native" and launched the CDP product to address this "competitive disadvantage." After the Class Period, Cloudera's interim CEO also admitted that Cloudera's products during the Class Period lacked "pure public cloud capability." Given Cloudera's lack of "cloud native" offerings, Cloudera and Reilly admitted that Cloudera was "not really competitive against what the public cloud guys [were] offering."

212.    Thereafter, Gregory McDowell of JMP Securities LLC sought further clarification about whether Cloudera's model has changed since its IPO in light of the announced resegmentation of the sales team. In response, Defendant Reilly affirmed that the model had not changed, excepting the sales direction:

**Gregory Ryan McDowell** JMP Securities LLC, Research Division – MD and Senior Research Analyst

Jim, one quick question for you, and I'm sure we'll discuss this more next week at the Analyst Day. But I wanted to hear a little bit about the puts and takes of the long-term model and, with the changes we've discussed in the last hour, how we should maybe think differently about the long-term model and if the time frame for the long-term model is effectively the same as it was at the time of IPO. And I think you alluded to turning cash flow positive in FY '20, so that sounds consistent. But I was wondering if we can talk about maybe some of the puts and takes with other components of the long-term model in light of the changes.

**James W. Frankola** Cloudera, Inc. – CFO

Yes, Greg, for sure. And what I'll do is I'll just cover it at a very high level right now because we will be spending a lot more time on this at our Analyst Day. So in this past year, Tom alluded to we've been using our own data to better understand the selling behavior of our sales reps, our cost of selling, the path of our customers through various stages of their journey through acquisition, through just getting that first use case, second use case. Where I'd say we are doing really, really well on the expansion side, is that we are still very effective, quite frankly, even more effective than we had expected in terms of our ability to invest sales resources and drive expansion even in customers that had been with us for 4, 5, 6 years or at a $0.5 million, $1 million or more. On the other hand, we have found that our cost-to-acquire customers, quite frankly, was even higher than we thought it was last year. And that understanding of how different the sales motion is for expanding customers and acquiring customers is one of the factors that led us to this change in the field where

we really wanted to make sure that we were optimizing each of these sales motions, the expansion one, which we're doing really well but, obviously, we can do even better, and then the acquisition one, which we need to make more substantial improvements. So to highlight that, that's the new news in the model over the past year.

Emphasis added.

213.     When Reilly was later confronted by Abhey Lamba from Mizuho Securities USA LLC with questions as to Cloudera's performance despite the purportedly positive yet same competitive and end market environment, Reilly again blamed such underperformance on a mere sales strategy issue and not Cloudera's products' positioning and competitive position in the marketplace:

**Abhey Rattan Lamba** Mizuho Securities USA LLC, Research Division – MD of Americas Research

Tom, I'm trying to reconcile your commentary to Karl's question with what happened in Q4 and your guidance. Lastly, you laid out all the positive drivers, the secular tailwinds helping your end markets but, at the same time, clearly, there are pockets where the market is not performing as you expected maybe 6 months ago or so. So what is happening in the markets that have underperformed versus your expectations? The companies where expansion activity was lighter, what happened? Why did that happen? And is the market narrower than what you thought 6 months ago?

**Thomas J. Reilly** Cloudera, Inc. – CEO & Director

Abhey, I want to give – I want to answer your question directly and using Q4. And this was really where I think we made mistakes from where we directed our sales resources. So in Q4, to peel back, we fell short of our overall bookings goal. However, if you now peel that, we were satisfied with our new customer acquisition. It was in the expansion number where we fell short. And expansion is the larger part of our business because new customers start small, our expansion deals are more sizable. ***So we were just over-rotated.*** And I can even be more specific, that was really in our Americas theater. So these are things that we can correct and impact. Now that bookings list in a subscription business is what rolls over into our guidance for the Q1, Q2 here and so forth. Hopefully, Abhey, that gives you a little more transparency into what happened and how that affects our guidance.

Emphasis added.

214.     The statement in emphasis in paragraphs 213 was materially false and misleading because: (i) Cloudera did not have a "cloud native" product and its products were unable to offer

the same cloud performance offered by its competitors; (ii) by describing its offerings to investors in this manner Cloudera deceived investors to believe that Cloudera's products had these capabilities; (iii) the disappointing guidance was not the result of "over rotating" on the sales focus, but rather stemmed from Cloudera's products competitive position against the public cloud vendors; and (iii) as a result, the Exchange Act Defendants materially misrepresented Cloudera's ability to compete in the cloud market.

215.    As later admitted to by the Exchange Act Defendants, Cloudera's products were not "cloud native" and launched the CDP product to address this "competitive disadvantage." After the Class Period, Cloudera's interim CEO also admitted that Cloudera's products during the Class Period lacked "pure public cloud capability." Given Cloudera's lack of "cloud native" offerings, Cloudera and Reilly admitted that Cloudera was "not really competitive against what the public cloud guys [were] offering."

216.    In response to this news on April 4, 2018, Cloudera's stock price fell by $8.95 per share, or 40.25%, from its previous closing price of $22.24 per share on April 3, 2018 to close at $13.29 per share on extremely high trading volume that was in excess of 27.9 million shares.

217.    Analysts who follow Cloudera likewise responded swiftly and decisively with multiple analysts downgrading Cloudera and lowering their price targets.

218.    In its report, Deutsche Bank downgraded Cloudera to a "Hold" and lowering its price target from $23 to $18 citing that "a bookings miss in 4QF18 and pending field sales changes resulted in FY19 guidance set well below our/Street estimates and the stock indicated down 20%+." Deutsche Bank expounded that the "missed this one" and were downgrading "on the risk that the culprit is not in fact sales focus (as Cloudera explained, that reps were too focused on new logos and not expansion opportunities) but rather an end market or demand shift that will take more time to recover from." Deutsche Bank indicated that downside risks "include share losses to cloud vendors and other technologies and price pressure" while also stating that:

> ***Cloudera blamed "mistakes in directing sales resources" to new logo adds rather than expansions of existing deals (Cloudera gave added new logo incentives and reps over-rotated) and to opportunities outside their target accounts. This has been brewing for a few quarters but we assumed Cloudera had it under control. This explanation seems reasonable, but the severity of the impact (the global***

*Sales Head Vishal Rao is leaving, new ML/Cloud expertise to be added, FY19 deceleration to 24% subscription revs growth and just 14% billings growth) hints at something bigger than sales rep focus. We wonder if "traditional" use case demand is flattening out or seeing price pressure and analytics workloads are moving to cheap AWS/Cloud options as new workload types such as machine learning (ML) take time to ramp.* We'd rather not bank on a 2HF19 recovery until we get over these concerns. Near-term, note that the lockup on the next/last tranche of VC share distributions comes off in a few days (releasing 16m shares).

Emphasis added.

219.    J.P. Morgan also downgraded Cloudera to a "Neutral" rating while also reducing its price target from $23 to $16. In its report titled *More Questions than Answers as FY19 Guidance Weighs; Moving to Neutral*, J.P Morgan reported that Cloudera's 2019 FY guidance was "disappointing" and that "the changes Cloudera plans to implement in its go-to-market approach will take some time to bear fruit, while the slowdown in its Expansion bookings will impact the narrative against a backdrop of solid recent results from software peers including MuleSoft and Red Hat." Moreover, J.P. noted that Cloudera had increased downside risk due it being "among the highest spenders in customer acquisition." J.P Morgan continued with its "Key Takeaways" from the news:

*Key Takeaways: 1) P&L Results and Billings Fine in FQ4, But Expansion Bookings Softened.* FQ4 revenue of $103.5M exceeded consensus of $98.7M; Subscription revenue growth actually accelerated 2 points to 50% y/y while 10c PF LPS exceeded consensus of 23c PF LPS; additionally, billings of $163.4M exceeded consensus of $157.3M and Net Dollar Retention of 136% actually improved by a point sequentially. However, Net Dollar Retention is an LTM revenue measure and as such, does not reflect bookings results in real-time; and the company stated that Expansion bookings softened toward the end of Q4. *2) Sales Execution Cited as the Issue, Rather than Competition or Technological Change*. Cloudera noted that it had expended too many sales resources pursuing customers outside the Global 8K market, hurting initial deal sizes, expansion rates, and ARR; the company did fine with landing new logos but didn't invest enough in stimulating Expansions. 3) *FY19 Revenue Guidance Below Consensus as Planned Go-to-Market Changes are Expected to Produce Uneven 1H:19 Bookings.* Management noted that it has commenced a search for a new global sales leader, and GTM changes include focusing direct reps on the G8K and introducing 2 new roles dedicated each to new logos vs. expansions. Cloudera will also introduce field specialists in ML, analytics, and cloud. *4) Questions that may Linger Include: How Quickly is the Hadoop market moving to public clouds such as Amazon AWS? Are CLDR deployments reaching a new level of size & complexity (large-scale AI/ML etc) which is bogging down renewals? And Has the IBM-HortonWorks agreement caused competitive ripples in the landscape? Bottom Line:* After a period of YTD outperformance, we

think CLDR shares will head back toward where they entered the year, and that it will take time for the investment narrative and sales execution to regain its footing. Neutral, $16 PT.

Emphasis in original.

220.     Thereafter on April 4, 2018, Cloudera filed its Form 10-K for the fourth quarter and full-fiscal year 2018 ("2018 Form 10-K"). The 2018 Form 10-K was signed by Defendants Reilly and Frankola and also included certifications signed by them pursuant to SOX attesting to the accuracy of its contents.

221.     The 2018 Form 10-K described the "Key elements" of Cloudera's strategy, including: "**Leading cloud innovation for big data. *Our original architecture was designed for the cloud. Our software platform runs natively on public cloud infrastructure*** or is available as a Platform-as-a-Service.

222.     The statements in emphasis in paragraph 221 were materially false and misleading because: (i) Cloudera did not have a "cloud native" product and its products were unable to offer the same cloud performance offered by its competitors; (ii) by describing its offerings to investors in this manner Cloudera deceived investors to believe that Cloudera's products had these capabilities; and (iii) as a result, the Exchange Act Defendants materially misrepresented Cloudera's ability to compete in the cloud market.

223.     As later admitted to by the Exchange Act Defendants, Cloudera's products were not "cloud native" and launched the CDP product to address this "competitive disadvantage." After the Class Period, Cloudera's interim CEO also admitted that Cloudera's products during the Class Period lacked "pure public cloud capability." Given Cloudera's lack of "cloud native" offerings, Cloudera and Reilly admitted that Cloudera was "not really competitive against what the public cloud guys [were] offering."

### *vii.     June 6, 2018: Cloudera Reports its First Quarter 2019 Results*

224.     After the market closed on June 6, 2018, Cloudera issued a press release, also filed with the SEC as an exhibit to a Form 8-K, that announced Cloudera's financial results for the first quarter fiscal year 2019 for the period ended April 30, 2018 ("1Q2019 Press Release").

225.   In the 1Q2019 Press Release, Cloudera announced for the quarter it had achieved total revenues of $102.7 million (a 29% year-over-year increase) of which $85.9 million originated from subscriptions (a 33% year-over-year increase).

226.   The 1Q2019 Press Release also announced disappointing revenue guidance for the second quarter of fiscal 2019. Specifically, it stated Cloudera was forecasting total revenue in the range of $107 million to $108 million, $90 million to $91 million in subscription revenue, and a non-GAAP net loss per share in the range of $0.15 to $0.13 per share.

227.   Later that same day, Cloudera held its earnings conference call to discuss its quarterly results with analysts ("1Q2019 Conference Call"). During the call, Reilly discussed with an analyst from Deutsche Bank Cloudera's ability to compete with the public cloud vendors. During the call Reilly stated:

**Karl Emil Keirstead** Deutsche Bank AG, Research Division – Director and Senior Equity Research Analyst

Yes, okay, great. And then maybe Tom, you mentioned that you'd like to improve your win rates against the house offerings of the cloud vendors. I presume you're referring to services like EMR and Redshift on AWS and maybe BigQuery on GCP. I'm just wondering if you could summarize -- maybe this is partly a question for Mike as well. What are the functionality gaps against -- that those house offerings have that Cloudera can sort of take advantage of and move up the stack and improve your win rates over time?

**Thomas J. Reilly** Cloudera, Inc. – CEO & Director

Yes, this is where I get really excited. So -- and I'll use the -- I had a customer sales call with a large financial bank yesterday, the CIO and the whole executive team in Silicon Valley for their tech roadshow, and we meet with them every year. Last year and the years before, we weren't discussing cloud. It's all they wanted to discuss this time, and our pitch went as follows: Right, do you want to take advantage of your data center and take advantage of public cloud with a hybrid offering? Yes, that's required. Do you need all those enterprise features that you have available today in your data center to be the same in the public cloud? Yes. Do you know which public cloud you want to use? No. Do you want a multi-cloud offering? Yes. Do you want that portability? Are you into taking advantage of your private cloud in the future? Yes. And I go, Okay. You have a few choices when it comes down to that. Amazon is not going to offer you on-premise capabilities nor are they going to run on GCP or Azure. The same thing for Google. And Microsoft, while they might offer you on-prem, are not going to give you the capabilities on Azure and GCP. And many of these players are lacking the enterprise security features. ***When we are competing in the cloud, we have so many advantages. Our #1 disadvantage is awareness of our***

*capabilities, and that's what we're ramping up with our general manager machine learning, our marketing team to create awareness. And we think we'll compete very effectively.*

228.    The statements in emphasis in paragraph 227 were materially false and misleading because: (i) Cloudera did not have a "cloud native" product and its products were unable to offer the same cloud performance offered by its competitors; (ii) Cloudera describing their offerings to investors in this manner deceived investors to believe that Cloudera's products had these capabilities; (iii) Cloudera did not have an advantage over the public cloud vendors' offerings and failed to disclose that its largest disadvantage was the lack capabilities from not being true cloud-native product offering; (iv) Reilly knew that Cloudera's products lacked the capabilities of true cloud native products as he was already in Merger negotiations with Hortonworks regarding a potential combination to gain the scale and resources to launch a cloud-native product that could effectively compete with the public cloud vendors; (v) as a result, the Exchange Act Defendants materially misrepresented Cloudera's ability to compete in the cloud market.

229.    As later admitted to by the Exchange Act Defendants, Cloudera's products were not "cloud native" and sought to and merged with Hortonworks to launch the CDP product to address this "competitive disadvantage." After the Class Period, Cloudera's interim CEO also admitted that Cloudera's products during the Class Period lacked "pure public cloud capability." Given Cloudera's lack of "cloud native" offerings, Cloudera and Reilly admitted that Cloudera was "not really competitive against what the public cloud guys [were] offering."

230.    Analysts noted that the stock traded down 5% in aftermarket hours as a result of subscription growth decelerating significantly to 33% year-over-year down from 50% in the previous quarter. As well as unchanged fiscal year 2019 guidance, and second quarter guidance that bracketed consensus.

231.    In their report issued after the news of June 6, 2018, Deutsche Bank reported:

*After the big guidance reset last quarter that weighed on the stock, expectations were low heading into this print as most investors concluded that the culprit was not a short-term sales issue but rather an end market shift that will take time to recover from This print reinforced that view, as Cloudera focused less on sales execution and more on the demand shifts (primarily customer interest in analytics alternatives from AWS and other cloud vendors), admitted that it is in the "peak disruption" phase of its transition, elected not to reaffirm its DR guide, reaffirmed*

plans to hire a new Sales Head and posted in-line numbers with no increase to the FY19 guide (the guide wasn't as conservative as some thought). Most investors will likely take a "wait and see" approach to this transition story.

Emphasis added.

### *viii.* *August 28, 2018: Cloudera Announcement of Cloudera Data Warehouse*

232.    On August 28, 2019, Cloudera announced its Cloudera Data Warehouse. In this press release, Cloudera claimed that it had "cloud-native architecture." The press release stated:

> Hybrid, ***cloud-native architecture*** delivers self-service analytic experiences with optimized control, compute and storage, across public clouds and enterprise data centers
>
> PALO ALTO, Calif., August 28, 2018 — Cloudera, Inc. (NYSE: CLDR), the modern platform for machine learning and analytics optimized for the cloud, announced the general availability of Cloudera Data Warehouse. Cloudera Data Warehouse is a modern hybrid cloud data warehouse, trusted by nearly 800 large enterprises to store, analyze and manage data in public clouds and on-premises. ***Its hybrid, cloud-native architecture*** routinely handles 50 PB data workloads, delivers sub-microsecond query performance and serves clusters with hundreds of compute nodes.

233.    The statements in emphasis in paragraph 232 were materially false and misleading because: (i) Cloudera did not have a "cloud native" product and its products were unable to offer the same cloud performance offered by its competitors; (ii) by describing its offerings to investors in this manner Cloudera deceived investors to believe that Cloudera's products had these capabilities; and (iii) as a result, the Exchange Act Defendants materially misrepresented Cloudera's ability to compete in the cloud market.

234.    As later admitted to by the Exchange Act Defendants, Cloudera's products were not "cloud native" and launched the CDP product to address this "competitive disadvantage." After the Class Period, Cloudera's interim CEO also admitted that Cloudera's products during the Class Period lacked "pure public cloud capability." Given Cloudera's lack of "cloud native" offerings, Cloudera and Reilly admitted that Cloudera was "not really competitive against what the public cloud guys [were] offering."

ix. **_September 5, 2018: Cloudera Reports its Second Fiscal Quarter 2019_**
**_Results_**

235.    After the market closed on September 5, 2018, Cloudera issued a press release, also filed with the SEC as an exhibit to a Form 8-K, that announced Cloudera's financial results for the second quarter fiscal year 2019 for the period ended July 31, 2018 ("2Q2019 Press Release").

236.    In the 2Q2019 Press Release, Cloudera announced for the quarter it had achieved total revenues of $110.3 million (a 23% year-over-year increase) of which $93.1 million originated from subscriptions (a 26% year-over-year increase). Also in this press release, Cloudera announced that had introduced Cloudera Data Warehouse stated to be "a modern data warehouse for self-service analytics, built with a hybrid **_cloud-native architecture_** that handles 50PB data workloads and enables hybrid compute, storage, and control for workload portability across public clouds and enterprise data centers."

237.    The statement in emphasis in paragraph 236 was materially false and misleading because: (i) Cloudera did not have a "cloud native" product and its products were unable to offer the same cloud performance offered by its competitors; (ii) by describing its offerings to investors in this manner Cloudera deceived investors to believe that Cloudera's products had these capabilities; and (iii) as a result, the Exchange Act Defendants materially misrepresented Cloudera's ability to compete in the cloud market.

238.    As later admitted to by the Exchange Act Defendants, Cloudera's products were not "cloud native" and launched the CDP product to address this "competitive disadvantage." After the Class Period, Cloudera's interim CEO also admitted that Cloudera's products during the Class Period lacked "pure public cloud capability" and did not have the ability to compete with public cloud vendors' native-cloud data analytic offerings. Given Cloudera's lack of "cloud native" offerings, Cloudera and Reilly admitted that Cloudera was "not really competitive against what the public cloud guys [were] offering."

239.    Later that same day, Cloudera held its earnings conference call to discuss its quarterly results with analysts ("2Q2019 Conference Call"). During the call, Olson stated

Cloudera's products were "tailored to compete directly in this major market shift" in data warehousing. Specifically, Olson stated:

> Here's what we're introducing. Cloudera Data Warehouse is a modern data warehouse for self-service analytics. Let me define modern data warehouse and why it's important in this world of exploding data and the Internet of Things. ***It's a cloud-native architecture.*** It can manage 50 petabyte workloads, deliver sub-second query performance on hundreds of thousands of daily reports and scale to hundreds of compute nodes. On each of these metrics, it beats legacy systems by at least an order of magnitude.

240. The statement in emphasis in paragraphs 239 were materially false and misleading because: (i) Cloudera did not have a "cloud native" product and its products were unable to offer the same cloud performance offered by its competitors; (ii) by describing its offerings to investors in this manner Cloudera deceived investors to believe that Cloudera's products had these capabilities; and (iii) as a result, the Exchange Act Defendants materially misrepresented Cloudera's ability to compete in the cloud market.

241. As later admitted to by the Exchange Act Defendants, Cloudera's products were not "cloud native" and launched the CDP product to address this "competitive disadvantage." After the Class Period, Cloudera's interim CEO also admitted that Cloudera's products during the Class Period lacked "pure public cloud capability." Given Cloudera's lack of "cloud native" offerings, Cloudera and Reilly admitted that Cloudera was "not really competitive against what the public cloud guys [were] offering."

242. Also during the call, Reilly further supported that Cloudera's cloud native data warehousing products that Cloudera was set to be competitive in that sphere against the public cloud vendors. Specifically, Reilly stated:

> As Q2's performance indicates, with proper focus and continued product innovation, we're doing just that. The potential of our 3 new data warehouse offerings is particularly exciting. With a modern architecture for on-premises deployments and ***being cloud-native for public cloud infrastructure*** and Platform-as-a-Service implementations, we believe we have the right set of solutions for the next phase of the data warehouse industry. What's more, with Workload XM, we are further differentiating our offering by ensuring optimal performance, reducing downtime and improving utilization across the complete life cycle of analytic workloads.

243. The statement in emphasis in paragraph 242 was materially false and misleading because: (i) Cloudera did not have a "cloud native" product and its products were unable to offer

the same cloud performance offered by its competitors; (ii) by describing its offerings to investors in this manner Cloudera deceived investors to believe that Cloudera's products had these capabilities; and (iii) as a result, the Exchange Act Defendants materially misrepresented Cloudera's ability to compete in the cloud market.

244.   As later admitted to by the Exchange Act Defendants, Cloudera's products were not "cloud native" and launched the CDP product to address this "competitive disadvantage." After the Class Period, Cloudera's interim CEO also admitted that Cloudera's products during the Class Period lacked "pure public cloud capability." Given Cloudera's lack of "cloud native" offerings, Cloudera and Reilly admitted that Cloudera was "not really competitive against what the public cloud guys [were] offering."

*x.*      *<u>October 3, 2018 – Cloudera Conference Call to Announce the Merger</u>*

245.   On March 3, 2018, Cloudera and Hortonworks held a conference call to discuss the announcement of the Merger. During the call, Reilly attributed that the value of its products come from them being cloud-native. Specifically, Reilly stated:

**Sanjit Kumar** Singh Morgan Stanley, Research Division – VP

That makes a lot of sense. I appreciate it, Rob. And maybe, Tom, for you, going back a couple of quarters to your Analyst Day, that's at the beginning of the year, I think one of the initiatives that you spelled out for your team was to sort of accelerate your penetration in the cloud. And so I was wondering if you could talk to us about what your mix of cloud penetration might look like with the combined company?

**Thomas J. Reilly** Cloudera, Inc. – CEO & Director

Thank you, Sanjit. So first off, following up on Rob's questions about partnerships, we also believe that we are in a much greater position to be a significant partner to each of the public cloud providers. We both have tremendous relationships. We expect Amazon, Microsoft and Google to be very receptive to this partnership, and we are going to invest heavily to help our customers bring more workloads there. Our strategy, though, is to deliver the enterprise cloud. And what the enterprise wants is to be able to take advantage of the multiple public cloud providers as well as private cloud. And together, we're going to accelerate our capabilities for our customers to be able to move workloads between those environments, with one common platform that has a shared set of services for security and data governance and make that what we call the enterprise data cloud. We expect and I expect 100% of our customers to take advantage of cloud technology, both on-prem and in the public cloud. Today, Cloudera has 26% of our customers who are already working in that hybrid-type environment, and we expect that to go to 100% of our combined entity. A cloud

technology brings significant advantages. ***Our underlying platform, both what Hortonworks is delivering and ours is cloud native technology,*** and it flourishes in cloud compute environments so we're very excited about accelerating our capabilities there.

246.     The statement in emphasis in paragraph 245 was materially false and misleading because: (i) Cloudera did not have a "cloud native" product and its products were unable to offer the same cloud performance offered by its competitors; (ii) by describing its offerings to investors in this manner Cloudera deceived investors to believe that Cloudera's products had these capabilities; and (iii) as a result, the Exchange Act Defendants materially misrepresented Cloudera's ability to compete in the cloud market.

247.     As later admitted to by the Exchange Act Defendants, Cloudera's products were not "cloud native" and launched the CDP product to address this "competitive disadvantage." After the Class Period, Cloudera's interim CEO also admitted that Cloudera's products during the Class Period lacked "pure public cloud capability." Given Cloudera's lack of "cloud native" offerings, Cloudera and Reilly admitted that Cloudera was "not really competitive against what the public cloud guys [were] offering."

**xi.     *December 5, 2018: Cloudera Reports its Third Fiscal Quarter 2019 Results***

248.     After the market closed on December 5, 2018, Cloudera issued a press release, also filed with the SEC via a Form 8-K, announcing the its third quarter fiscal year results for the period ended October 31, 2018. During after-market hours the same day, Cloudera held a conference call to discuss its financial results. During this call question and answer portion of the call, an analyst from Needham & Company inquired how Cloudera's data warehouse strategy was going.

**Jon Philip Andrews** Needham & Company, LLC, Research Division – Senior Analyst

Okay. I really appreciate that detail. If I could just ask a quick follow-up, Tom. I was wondering if you could drill down on the impact of this merger as it relates to the strategy you outlined at your Analyst Day, which was specifically around taking market share in the data warehouse segment. Whether that kind of strategy is still intact in terms of the combined company or how you're thinking about that particular initiative that you'd outlined several months ago.

**Thomas J. Reilly** Cloudera, Inc. – CEO & Director

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:19-cv-03221-LHK

Thank you, Jack. ***That strategy and initiative is alive, well and growing extremely well.*** So basically, SQL capabilities on our platform are maturing very rapidly, and customers are moving increasingly more workloads from traditional data warehouses to this platform. ***Our Altus Data Warehouse is particularly designed to capture these migrations that want to move to the cloud, where you see a company like Snowflake or Amazon's Redshift traditionally serving those cloud markets, but we have strong competitive advantages in data warehousing***. So first and foremost, we offer the only data warehouse that combines both SQL and machine learning against a shared data experience. None of the other players are doing that today. Secondly, we offer it in a hybrid fashion so you can do it both on-premise or in the public cloud. And increasingly, you want to do both if you're managing a migration. So that's very powerful. And then we can get technical, but we have years and years of experience of doing this at great scale. And so we're bringing those years of experience to bear. ***We believe data warehouse workloads are naturally going to land on our platform, and we're well positioned to capture those.***

249.    The statements in emphasis in paragraphs 248 were materially false and misleading because: (i) Cloudera did not have a "cloud native" product and its products were unable to offer the same cloud performance offered by its competitors; (ii) by describing its offerings to investors in this manner Cloudera deceived investors to believe that Cloudera's products had these capabilities; (iii) as Cloudera's interim CEO disclosed after the Class Period, Cloudera's analytic products lacked the capabilities to compete with the public cloud vendors' cloud native products; and (iii) as a result, the Exchange Act Defendants materially misrepresented Cloudera's ability to compete in the cloud market.

250.    As later admitted to by the Exchange Act Defendants, Cloudera's products were not "cloud native" and launched the CDP product to address this "competitive disadvantage." After the Class Period, Cloudera's interim CEO also admitted that Cloudera's products during the Class Period lacked "pure public cloud capability." Given Cloudera's lack of "cloud native" offerings, Cloudera and Reilly admitted that Cloudera was "not really competitive against what the public cloud guys [were] offering."

251.    Later during the same call, an analyst from Craig Hallum Capital Group inquired about Cloudera's competitive position against the public cloud vendors. In response, Reilly explained that Cloudera's cloud offerings were winning contracts and that its capabilities allowed customers to where and when they wanted. Reilly stated:

**Chad Michael Bennett** Craig-Hallum Capital Group LLC, Research Division – Senior Research Analyst

Okay. And then just maybe one real quick, if I could. Tom, I believe you mentioned, in the net new customer adds in the quarter, how well the hybrid architecture or pitch is going. Can you just provide more color on how -- I think the big trepidation here is net new is going to kind of fall off a map because they're just going to bypass you and move straight to the cloud guys. Just kind of any color on how you're winning deals and how the hybrid pitch is resonating, more detail?

**Thomas J. Reilly** Cloudera, Inc. – CEO & Director

Yes, Chad, I'll be -- let me just -- let me get specific to help you here. So what I said in my prepared remarks is the market is moving in our direction. If you look 2 years ago, enterprises were trying to figure out what this public cloud thing was, and they were spending time with the AWS' of the world, understanding those platforms and going right to public cloud. Large enterprises that moved to the public cloud just 2 years ago are wanting to move off public cloud. They do not like the cost. They do not like the lock-in that it poses. They suddenly are stuck with one public cloud provider, and all it has to offer. And so they're moving workloads back into private cloud or across multiple clouds to avoid that lock-in and have leverage over those infrastructure costs. What we hear from customers, public cloud is just the new hardware for them. If a complete stack was going to win the market, then Oracle plus Sun would have won a long time ago in the data center. It's not what customers want. They want the flexibility and they want this hybrid enterprise cloud capability. Now I'll talk -- in the quarter, we won 63 new customers. ***Customers are coming to our platform, all of them are evaluating cloud,*** and it's our hybrid cloud capabilities are winning*.* Here's -- now I'll give you the caliber of some names I'm allowed to share. Indonesia's largest motorcycle manufacturer, Astra's Honda Motor okay, selected us for our cloud capabilities. Tufts Health Plan selected us in a competitive battle for our cloud capabilities. Mizuho Securities here in the U.S.A., a very conservative company, selected us for our cloud capabilities. In Michigan, one of their largest utilities, DTE Energy, selected us for our cloud capabilities. These are new wins. I've got an equally long list of existing large enterprise customers that move workloads to the cloud with Cloudera. ***And so it is -- we are uniquely positioned to run where our customers want to run and give them a lot of flexibility.***

252.    The statements in emphasis in paragraph 251 were materially false and misleading because: (i) Cloudera did not have a "cloud native" product and its products were unable to offer the same cloud performance offered by its competitors; (ii) by describing its offerings to investors in this manner Cloudera deceived investors to believe that Cloudera's products had these capabilities; (iii) as Cloudera's interim CEO disclosed after the Class Period, Cloudera's analytic products lacked the capabilities to compete with the public cloud vendors' cloud native products; and (iii) as a result, the Exchange Act Defendants materially misrepresented Cloudera's ability to compete in the cloud market.

253.     As later admitted to by the Exchange Act Defendants, Cloudera's products were not "cloud native" and launched the CDP product to address this "competitive disadvantage." After the Class Period, Cloudera's interim CEO also admitted that Cloudera's products during the Class Period lacked "pure public cloud capability." Given Cloudera's lack of "cloud native" offerings, Cloudera and Reilly admitted that Cloudera was "not really competitive against what the public cloud guys [were] offering."

254.     On December 6, 2018, Cloudera participated in Barclays Global Technology, Media and Telecommunications Conference. During the conference, Reilly explained that momentum for Cloudera's offerings had shifted towards Cloudera:

> **Unidentified Analyst**
>
> Can you talk on that note, so we had Elastic and MongoDB on stage earlier, and they would -- both of them also have to deal with the cloud in a way, the Elastic message was very large like look, it's not about that core product, it's about it only adds on to the extra features, and that kind of is something that only I can do. It kind of feels a little bit similar for you guys.
>
> **Thomas J. Reilly** Cloudera, Inc. – CEO & Director
>
> Of course, there is a piece there, but I want to use play -- I want to play a bigger picture. This is a 10-year story, so Cloudera is 10 years old. We're called Cloudera because when we started, we started with the original Hadoop project, we offered it as a cloud service on Amazon Web Services in 2008 and software, okay? That's why we're called Cloudera. In 2008, there was no buyers in the cloud. And so we spent the next few years making this cloud software fit into data centers, okay? Along comes Amazon and takes our open-source bids and offers a thing called Elastic MapReduce, and that was the public cloud in our space. And they were just cheaper, faster, but they weren't innovating. They were just offering it cheaper and pre-provisioned. So that was a tough battle for us, right, because we had to, kind, of cover that flank off. The market has now moved to us because we offer a hybrid capability, right, so we run on-prem, bare metal, we run increasingly on private cloud, which we think customers are really driving and we're hybrid and multi-cloud, okay? Now what's the proof? What did Amazon announce this week? Amazon Outpost. Amazon is now offering its on-premise capability to close off their weakness in hybrid, and it's a validation of our strategy. And we already have hybrid capabilities that they have to develop, they've never really innovated in their space. And then, we're going to have multi-cloud. ***So we're taking it to them, momentum has shifted in our favor and increasingly will go that way.***

255.     The statement in emphasis in paragraph 254 was materially false and misleading because: (i) Cloudera did not have a "cloud native" product and its products were unable to offer

the same cloud performance offered by its competitors; (ii) momentum had not shifted to Cloudera's favor at this time because its purported cloud native product could not compete with the public cloud vendors' offerings; and (iii) as a result, the Exchange Act Defendants materially misrepresented Cloudera's ability to compete in the cloud market.

256.    As later admitted to by the Exchange Act Defendants, Cloudera's products were not "cloud native." At the time of this statement, Cloudera was only a month away from achieving its goal of merging with Cloudera to launch the CDP product to cut off its "competitive disadvantage" against the public cloud vendors' native cloud offerings. After the Class Period, Cloudera's interim CEO also admitted that Cloudera's products during the Class Period lacked "pure public cloud capability." Given Cloudera's lack of "cloud native" offerings, Cloudera and Reilly admitted that Cloudera was "not really competitive against what the public cloud guys [were] offering."

> ### xii.    _March 13, 2019: Cloudera Reports its Fourth Fiscal Quarter and Full Year 2019 Results_

257.    After the market closed on March 13, 2019, Cloudera issued a press release, also filed with the SEC via a Form 8-K, announcing the its fourth quarter and fiscal year 2019 results for the periods ended January 31, 2019 ("2019 FY Press Release").

258.    In the 2019 FY Press Release, Cloudera announced for the year it had achieved total revenues of $479.9 million (a 29% year-over-year increase) of which $406 million originated from subscriptions. It also stated operating cash flow for fiscal year 2019 was $34.3 million. For the fourth quarter 2019, Cloudera announced revenues of $144.5 million of which $123 million originated from subscriptions.

259.    The 2019 FY Press Release also announced revenue guidance for the first quarter 2020. Specifically, it provided Cloudera was forecasting total revenue in the range of $187 million to $190 million, $154 million to $156 million in subscription revenue, and a non-GAAP net loss per share in the range of $0.25 to $0.22 per share. This was significantly lower than the first quarter 2020 consensus of $223 million for total revenue and $184 million of subscription revenue

260.    The 2019 FY Press Release further announced revenue guidance for fiscal year 2020. Specifically, it stated Cloudera was forecasting total revenue in the range of $835 million to

$855 million, $695 million to $705 million in subscription revenue, and negative $40 million to $30 million in operating cash flow. This was vastly lower than the consensus of $968 million for total revenue and $801 million of subscription revenue. Specifically, the 2019 FY Press stated:

> The outlook for fiscal 2020, ending January 31, 2020, is:
>
> - ***Total revenue in the range of $835 million to $855 million, representing approximately 76% year-over-year growth***
>
> - ***Subscription revenue in the range of $695 million to $705 million, representing approximately 72% year-over-year growth***

261.    The statements in emphasis in paragraph 260 were materially false and misleading because: (i) Cloudera did not have a "cloud native" product and its products were unable to offer the same cloud performance offered by its competitors; (ii) the lack of a competing cloud-native product had already resulted in Cloudera having reduced billings and renewals; and (iii) as a result, in fiscal year 2020 Cloudera's true revenue ranges were less than $835 million for total revenue and $695 million for subscription revenue.

262.    As later admitted to by the Exchange Act Defendants, Cloudera's products were not "cloud native." At the time of this statement, Cloudera had completed its Merger and recently announced the CDP product to cut off its "competitive disadvantage" against the public cloud vendors' native cloud offerings. After the Class Period, Cloudera's interim CEO admitted that Cloudera's products during the Class Period lacked "pure public cloud capability." Given Cloudera's lack of "cloud native" offerings, Cloudera and Reilly further admitted that Cloudera was "not really competitive against what the public cloud guys [were] offering." As a result thereof, Cloudera's customers had already not renewed and/or entered into new contracts with Cloudera.

263.    During after-market hours on March 13, 2019, Cloudera held a conference call to discuss its fourth quarter and full-year 2019 fiscal year results ("2019 FY Conference Call"). During this call, Cloudera's executives reaffirmed Cloudera's fiscal performance during these periods and discussed their outlook for the first quarter and full fiscal year 2020.

264.    During the 2019 FY Conference Call, Cloudera announced its new hybrid product, the "Cloudera data platform" or "CDP." CDP was reported to be Cloudera's foray into the "enterprise data cloud" or "EDC" that was discussed in the Registration Statement and other Merger

related filings. On this call, Reilly explained that an EDC must be: (1) "hybrid and multi-cloud" allowing an entity to function both on and off premises; (2) be "multi-function" to solve an entities data analytic challenges by working applying multiple analytic function on the same date, for instance the application of both real-time data streaming and machine learning algorithms; (3) "secured and governed" to ensure data privacy, migration, and management; and (4) open sourced and open compute architectures and open data stores (like Amazon S3 and Azure Data Lake Storage) to ensure that the system can be cloud every (private, hybrid, multi-cloud). Reilly explained that CDP was announced to first be launched for the public cloud service before later expanding into the private cloud arena.

265.    Defendant Frankola further announced Cloudera's disappointing guidance for the merged company for the first-fiscal quarter and full-year 2020:

> I will conclude by providing initial guidance for fiscal Q1 and for fiscal 2020 as well as an update on our near-term model. Before getting into numbers, I want to share some longer-term perspective on how the merger is incorporated in our projections and how we are handling merger-related uncertainty. As reflected in our strong results, the merger did not significantly impact Hortonworks or Cloudera businesses in the fourth quarter. However, as expected, we do see the merger impacting the first half of fiscal year '20, as we integrate the field and roll out new products. We are pleased that despite the effects of this merger, we believe that ***adjusted ARR growth for Q4 2020 will be in the range of 18% to 21%.*** ARR growth in Q2 and Q3 may be slightly lower due to the actions we are taking in the first half of the year to integrate the 2 companies.
>
> We expect Q1 total revenue to be between $187 million and $190 million and subscription revenue to be between $154 million and $156 million. Net loss per share is projected to be $0.25 to $0.22 based on 271 million weighted average shares outstanding.
>
> ***For fiscal year 2020, we expect total revenue to be between $835 million and $855 million, representing approximately 76% growth, with subscription software revenue in the range of $695 million to $705 million, up approximately 72% year-over-year. Again, we expect Q4 fiscal year '20 ARR growth of 18% to 21%.***

Emphasis added.

266.    The statements in emphasis in paragraphs 265 were materially false and misleading because: (i) Cloudera did not have a "cloud native" product and its products were unable to offer the same cloud performance offered by its competitors; (ii) competition from public cloud vendors

and the lack of a competing cloud-native product had already resulted in Cloudera having reduced billings and renewals; and (iii) as a result, in fiscal year 2020 Cloudera's true revenue ranges were less than $745 million for total revenue and 695 million for subscription revenue, and Cloudera's true ARR growth range for the fourth fiscal quarter of 2020 was less than 18%.

267.   As later admitted to by the Exchange Act Defendants, Cloudera's products were not "cloud native." At the time of this statement, Cloudera had completed its Merger and recently announced the CDP product to cut off its "competitive disadvantage" against the public cloud vendors' native cloud offerings. After the Class Period, Cloudera's interim CEO admitted that Cloudera's products during the Class Period lacked "pure public cloud capability." Given Cloudera's lack of "cloud native" offerings, Cloudera and Reilly further admitted that Cloudera was "not really competitive against what the public cloud guys [were] offering." As a result thereof, Cloudera's customers had already not renewed and/or entered into new contracts with Cloudera.

268.   During the 2019 FY Conference Call, Cloudera also announced its new hybrid product, the "Cloudera data platform" or "CDP." CDP was reported to be Cloudera's foray into the "enterprise data cloud" or "EDC" that was discussed in the Registration Statement and Forms 425 Prospectuses. On this call, Reilly explained that an EDC must be: (1) "hybrid and multi-cloud" allowing an entity to function both on and off premises; (2) be "multi-function" to solve an entities data analytic challenges by working applying multiple analytic function on the same date, for instance the application of both real-time data streaming and machine learning algorithms; (3) "secured and governed" to ensure data privacy, migration, and management; and (4) open sourced and open compute architectures and open data stores (like Amazon S3 and Azure Data Lake Storage) to ensure that the system can be cloud every (private, hybrid, multi-cloud). Reilly explained that CDP was announced to first be launched for the public cloud service before later expanding into the private cloud arena.

269.   As part of the questions and answers segment of the 2019 FY Conference Call, an analyst from Wells Fargo Securities, LLC inquired about the shift into the "hybrid cloud" and the launch of CDP:

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:19-cv-03221-LHK

**Philip Alan Winslow** Wells Fargo Securities, LLC, Research Division – Senior Analyst

Congrats on a great Q4 and on closing the merger. Really just 2 questions here. I guess for the first one for Mike and Arun. It was great to hear about the impending data cloud service that's coming out at some point this year where they're across 2 different clouds, obviously, going down to sort of the multi-cloud path here. What do you think about your ability to hybrid cloud, both multi-cloud, how are you thinking about sort of positioning this within customers? And maybe if you could think about how we kind of roll this out going forward with the second release of CDP and then just one follow-up for – on the financials.

**Arun C. Murthy** Cloudera, Inc. – Chief Product Officer

We absolutely believe that going in the public cloud and offering CDP as a hybrid cloud service is key for the enterprise. It really delivers on our vision of the enterprise data cloud and allows our customers to leverage data and applications regardless of where they will choose to run this, and this will be available as a native hybrid service both on the public cloud, Amazon and Azure, as we discussed, and they will be able to bring it back on-prem for the private cloud offering.

270.    Jon Andrews of Needham & Company, LLC followed up with Reilly about Cloudera's move into the enterprise data cloud and inquired about actual and potential customers' reactions.

**Jon Philip Andrews** Needham & Company, LLC, Research Division – Senior Analyst

Tom, I was wondering if we could get maybe some feedback on the vision of – that you've outlined, of this enterprise data cloud. You mentioned that this is a new market category. It's perhaps different than what most enterprises have been experiencing. So are you spending time sort of evangelizing this vision to customers? Or is this exactly the vision that they've been looking for? Could you help clarify what the feedback has been around this?

**Thomas J. Reilly** Cloudera, Inc. – CEO & Director

***Yes. So here's what we have heard as the biggest demands from our enterprise customers. First and foremost, they want to take advantage of public cloud and have the ability to extend their workloads into the public cloud in a bursting capacity, and there's huge pressure for us to deliver our software in a private cloud environment with the same ease of use, elasticity, separation of computing storage that they experienced in the public cloud.*** So – and then increasingly, we're hearing that they don't want vendor lock-in or cloud lock-in, and so they want multi-cloud hybrid experience. When you're continually saying hybrid multi-cloud experience, the industry, and we're not alone, is terming this an enterprise cloud. What enterprise want is the ability to take advantage of multiple cloud environments both on-prem and in the public environment and other large vendors that are on that path. I mean,

that's what IBM's acquisition of Red Hat's all about is to drive an enterprise cloud strategy. So the market is moving from a public cloud versus on-prem debate to a hybrid and multi-cloud expectation. And this is where we're uniquely – when we say we're the enterprise data cloud, we're the only ones delivering this capability at the data layer that allow our customers to migrate data with the security context, all the privacy controls and take advantage of all the native cloud offerings whether on-prem or across public cloud environments.

271.    David Rainville of Barclays Bank PLC further inquired who Reilly and Cloudera saw as their main competitors and the status of the competitive landscape in the post-Merger environment. Defendant Reilly highlighted that with Cloudera now being merged with Hortonworks, its historic "#1 competitor," that the main threat to Cloudera was Amazon's offerings in the data management analytics space:

**David Rainville** Barclays Bank PLC, Research Division – Research Analyst

Understood. And quickly a follow-up on the competitive front for Tom here. With the merger, you're really [deal] elephant in the room in the Hadoop market now and the Big Data market going forward. Curious to hear what has changed in terms of pricing dynamics and competitive landscape since you announced the merger? And who do you see as your main competitor going forward? And how is that evolving over the next 18 to 24 months?

**Thomas J. Reilly** Cloudera, Inc. – CEO & Director

Yes, David. So last year, our #1 competitor was always Hortonworks, and the inverse for Hortonworks, it was Cloudera. And now that we are one combined company, it will do – many benefits. We believe that we don't have to discount as aggressively because we're not as directly competitive. We believe that we'll shorten sales cycles. A lot of companies are already – if you even just look at the number of new customers we added this last quarter, there's an acceleration because we're viewed as kind of the standard. And now, who's our #1 competitor? It's Amazon. And we quickly – just even in Q1 as we look at our competitive road map, it's – not Amazon the company. ***Amazon is a partner, but it's Amazon's house offerings in the data management analytics space. And we believe we are well positioned to compete against them because our value proposition is to be a enterprise data cloud company, giving our customers a multi-cloud, hybrid cloud fashion is one enduring differentiator and then our capabilities from Edge – our capabilities – our integrated capabilities from the Edge to AI, we're the only company that's offering that today, and so we feel very strong that market is moving in our direction around the hybrid multi-cloud, and then our functionality is best-in-class.***

Emphasis added.

272.    Cloudera also revised downward its prior revenue guidance associated with the Merger below analyst consensus expectations and notably the $945 million in projected revenue

for calendar year 2019 provided by Defendants in the Registration Statement. Multiple analyst firms highlighted Cloudera's negative guidance, unexpected write-downs and expenses, and slower than expected growth:

    a.   Wedbush Securities Inc.

Last night Cloudera delivered good FY4Q results but gave disappointing guidance for FY20 in its first quarter as a combined company with the Hortonworks deal now consummated. While there is clearly a lot of moving parts with deferred revenue write-downs and one-time expenses from every angle making this model a mathematical gymnastics exercise, ***the narrative around near-term disruption in the field and a slower growth trajectory will be digested negatively by the Street this morning in our opinion as investors are already very cautious about this acquisition to begin with.***

    b.   Raymond James

While F4Q revenue was solid, the F20 revenue guide of $835-$855M came in well below the combined CLDR and HDP consensus estimate of $968M (21% y/y). The company bridged the shortfall as the sum of $(62)M in purchase accounting write-downs, $(13)M in less services revenue, a $7m benefit from 606, and $(52)M in merger "dis-synergies."

*     *     *

**F1Q& F2020 Guide Below.** ***F1Q20 revenue guidance $187-190 million is below combined HDP and CLDR consensus estimates of $223 million. Subscription revenue guide $154-156 million is below combined consensus estimates $184 million.*** EPS loss guide $(0.22) to $(0.25). ***F2020 revenue guide $835-855 million is well below combined consensus estimates $968 million***. The company bridged the shortfall as the sum of $(62)M in purchase accounting write-downs, $(13)M in less services revenue, a $7m benefit from 606, and $(52)M in merger "dis-synergies." Subscription revenue guide $695-705M also well below consensus $801 million. Management introduced Annual Recurring Revenue (ARR) guidance of $800-$825M (18-21% y/y). EPS loss guide ($0.32) to ($0.40). CFFO loss guidance of $40-$30 million is below consensus of positive $86 million, however included $66M in one-time merger costs and a $125M headwind from change of billings to annually upfront from multi-year upfront as historically done by HDP. F2021 CFFO margin guidance also reduced to 10% from 15% after factoring in $75M in billings duration headwinds, or about 17% normalized.

    c.   Deutsche Bank

The FY20 and FY21 Guidance

We'd highlight: 1. We and most investors expected Cloudera's initial FY20 pro forma revs guidance to come in well below the projection (of $945m) in the S-4 given the need to adjust for merger integration risks, an HDP DR writedown, 606 accounting and changes in HDP invoicing terms. The actual revs guidance of $835-$855m was about in-line with our expectation, while the ARR growth guidance of 18%-21% was solid. 2. *In our view, the FY20 revs guide does NOT look particularly conservative. Assuming lower-than-historical sequential revs growth in 2QF20/3QF20 to account for merger disruption risk, 4QF20 revs needs to accelerate meaningfully to enable Cloudera to meet its FY20 guide*. 3. The guidance for a FY20 OCF loss of $30-$40m initially looked far worse than expected, but adjusted for a $125m hit from shorter HDP invoicing durations and a $66m hit from merger-related payments, "normalized" OCF guidance of $156m (18% margins) was actually solid. 4. For FY21, Cloudera reaffirmed its outlook for $1+ billion in revs and 20% growth but lowered its OCF margin guidance to 10% from 15% (although FY21 OCF margins would be 17% ex the hit from shorter HDP invoicing durations).

Tone Downtick on Merger Risks

We conclude that the "normalized" 4QF19 results and FY20 outlook were actually solid. That said, one key variable that did downtick was the outlook for merger-related disruption. While Cloudera seemed to downplay any pending merger disruption risk on the 3QF19 call, the tone changed on this call as Cloudera said that merger disruption was "expected" and will impact bookings (especially expansions) in 1HF20 and revs/ARR in 2QF20/3QF20. Cloudera cited "short-term pain" from higher sales rep turnover and lower productivity in 1HF20 as the businesses are combined. While our cautious near-term view on the stock already reflected this very issue, Cloudera's acknowledgement of this risk might serve to hold back some potential investors and could weigh on the stock.

d.   D.A. Davidson & Co.

While the reported outlook on revs and guidance is weaker-than-expected, leading shares down 14% AMC, we attribute this to three factors, none of which are fundamental: 1) purchase price accounting, 2) CLDR modeling revenue dyssnergies (not related to churn), and 3) shortening HDP's billings duration, creating a cash flow headwind. Normalizing for these factors, business and outlook both remain solid and we would use the pullback as a buying opportunity

\*       \*       \*

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:19-cv-03221-LHK

- **Shares were down 14% in the aftermarket**, due primarily to an FY20 outlook that suggested a significant deceleration and was likely below merger models, as well as Cloudera lowering its expectation on OCF in FY21 to 10% from 15%.

\*       \*       \*

- *Importantly, Cloudera has not seen any major changes in the competitive environment, which we know remains a concern for investors.*

Emphasis added with bold and italics.

**F.**   **The Truth Concerning Cloudera's Lack of a "Cloud Native" Product and Inability to Compete with Public Cloud Vendors Emerges When Cloudera Reports its First Quarter 2020 Results**

273.   After the market closed on June 5, 2019, Cloudera issued a press release, also filed with the SEC as part of a Form 8-K, announcing the its first quarter fiscal year 2020 results for the period ended April 30, 2020 ("1Q2020 Press Release").

274.   In the 1Q2020 Press Release, Cloudera announced for first fiscal quarter 2020 it had achieved total revenues of $187.5 million of which $154.8 million originated from subscriptions. The total revenue for the quarter was below the street's consensus of 188.3 million. Annualized recurring revenue was $672 million at the conclusion of the quarter, representing 21% year-over-year growth.

275.   The 1Q2020 Press Release also announced reduced guidance for fiscal year 2020. Specifically, it provided Cloudera was forecasting total revenue in the range of $745 million to $765 million, $635 million to $645 million in subscription revenue, and ARR to 0% to 10% for the fourth fiscal quarter 2020. This was significantly lower the previous guidance of total revenue in the range of $835 million to $855 million, $695 million to $705 million in subscription revenue, and ARR of 18% to 21% for the fourth fiscal quarter 2020. Moreover, this was also vastly lower than the street's consensus of $844 million in total revenue, the $700 million in subscription revenue, and the $945 million for calendar year 2019 (which includes 11 months of Cloudera's 2020 fiscal year).

276.     The 1Q2020 Press Release further announced disappointing revenue guidance for the second fiscal year 2020. Specifically, it stated Cloudera was forecasting total revenue in the range of $180 million to $183 million, $155 million to $157 million in subscription revenue. Again, this was vastly lower than the consensus of $203 million for total revenue and $167 million for subscription revenue.

277.     The 1Q2020 Press Release further introduced the purported issues that Cloudera faced that caused the quarterly miss and the materially reduced guidance:

> "We continue to make substantial progress toward our goal of delivering the industry's first enterprise data cloud, designed for powerful analytics across hybrid and multi-cloud environments with common security and governance," said Tom Reilly, chief executive officer, Cloudera. "Our enterprise customers are excited about extending their analytic workloads to the public cloud through Cloudera Data Platform, which will be available this summer. While some customers in the first quarter elected to postpone renewal and expansion of their agreements in anticipation of the new platform's release, affecting our full year outlook, this customer feedback and enthusiasm validates demand for enterprise data cloud solutions in our target market. Customers are benefiting from our offerings today, solving complex data management and analytic use cases spanning the Edge to AI, and we look forward to helping them accelerate their journey to the cloud with Cloudera Data Platform."

278.     Moreover, the 1Q2020 Press Release discussed the purported "planned retirement of Chief Executive Officer, Tom Reilly, and the appointment of Martin Cole, Chairman of the Board, as interim Chief Executive Officer." Reilly's purported "planned retirement" was also announced that same day and after-market hours in a more substantial separate press release issued by Cloudera, that was also filed as part of a Form 8-K, that announced Defendant Reilly would be retiring as Cloudera's CEO and as a director effective July 31, 2019.

279.     During after-market hours on June 5, 2019, Cloudera held a conference call to discuss its first quarter fiscal year 2020 results ("1Q2020 Conference Call"). During this call, Cloudera discussed the first quarter 39% billings miss, the reduced guidance for the second quarter and full fiscal year 2020, and the claimed "retirements" of Defendants Reilly and co-founder and Chief Strategy Officer, Olson.

280.     During the scripted portion of the Conference Call, Reilly explained what did not go right in the 1Q2020 claiming that the causes were "***headwinds in bookings from existing customers***" who represent over 90% of Cloudera's growth. Reilly stated blamed the bookings miss

on "uncertainty" in the combined company's road map which he stated was released in March 2019 and "***increased competition from public cloud vendors.***" Reilly further attributed the billings miss and slashed guidance because Cloudera announced that CDP, Cloudera' announced ECP "***cloud-native platform has caused some customers to wait until its release to renew and expand their agreements.***" Reilly continued to state that "our rapid execution ***on a cloud-native platform*** has caused some customers to wait until its release to renew and expand their agreements." Reilly blamed the billings miss and reduced guidance, on shifts in "customer buying behavior" and discussed some benefits of CDP stating:

> All right. Let's turn to a discussion of our first quarter fiscal year 2020 results. With respect to Q1, we'll cover 3 topics in addition to providing detailed financial information: First, we'll offer a quick update on the merger with Hortonworks; second, ***we'll discuss the factors that are affecting customer buying behavior and its impact on our full year outlook***; and lastly, we'll update our progress in delivering the Cloudera Data Platform, CDP, our next-generation cloud offering.
>
> \*   \*   \*
>
> Now let me share what did not go well in Q1 and what our plans are for addressing it. In our first quarter as a merged company, ***we experienced headwinds in bookings from existing customers. These customers generally represent more than 90% of our growth and were the focus of the quarter's activities.*** We've analyzed the challenges we encountered in the quarter and believe that 2 factors primarily contributed to the bookings impact. ***First, the announcement of our merger in October 2018 created uncertainty, particularly regarding the combined company road map, which we rolled out in March of this year. During this period of uncertainty, we saw increased competition from the public cloud vendors***.
>
> Second, the announcement in March of Cloudera Data Platform, our new hybrid and multi-cloud offering, created significant excitement within our customer base. CDP is compelling as it addresses many of our customers' most pressing needs. ***However, our rapid execution on a cloud-native platform has caused some customers to wait until its release to renew and expand their agreements.***
>
> Our conviction about the company's market opportunity and customer demand for hybrid and multi-cloud solutions remain strong. Customer feedback on CDP and its differentiating features validates our belief in Cloudera's competitive position as well as our ability to innovate in our target market. Indeed, now that we have trained our sales reps and clearly articulated our detailed product road map, we are seeing significant pipeline growth.
>
> Fundamentally, we believe that our vision for an enterprise data cloud that extends from the Edge to AI is spot on. Large global enterprises have complex business use cases requiring multiple analytic functions. These enterprises require hybrid cloud

services that have data and workloads in both their data centers and in the public cloud. What they're asking for is the ability to seamlessly move their data workloads to the optimal location, to minimize cost and maximize efficiency. They also want one consistent model for security, governance, compliance and management.

Finally, they plan to use multiple public clouds and open-source software to avoid vendor lock-in. We believe that CDP uniquely addresses all of these customer requirements in an elegant and differentiated way. CDP development is on plan, and timing for its release this summer has not changed.

Emphasis added.

281.    During the scripted portion of the 1Q2020 Conference Call, Defendant Frankola discussed the reduced guidance and the effects going forward:

We concluded Q1 with 929 customers who started at or have grown to more than $100,000 of ARR. The number of customers spending more than $1 million is in excess of 140. ***Both of these numbers are roughly flat with Q4 and are reflective of the customer wait-and-see attitude that Tom described***. It is important to note that our largest customers continue to bring workloads to the platform. Annualized Q1 dollar-based churn for this cohort is substantially better than average at approximately 6%, and these customers continue to expand.

\*        \*        \*

I will conclude by providing initial guidance for fiscal Q2 and updated guidance for fiscal year 2020. We expect Q2 total revenue to be between $180 million and $183 million and subscription revenue in the range of $155 million to $157 million. Net loss per share is projected to be $0.11 to $0.08 based on 274 million weighted average shares outstanding. For fiscal year 2020, we expect total revenue to be between $745 million and $765 million and subscription revenue in the range of $635 million to $645 million.

As you will recall from our discussion last quarter, our intention is to show Cloudera's organic quarterly performance and top line momentum in the most transparent way possible. Annualized recurring revenue based on the book of business at the end of the quarter removes the effects of the merger, including accounting changes, billings duration and licensing convention and is the best representation of underlying economic activity.

Based on our sales pipeline and the typical lift of an enterprise software sales cycle, we believe that Q2 will be the trough for bookings growth. Coupled with soft Q1 bookings, first half bookings performance will weigh on growth rates through the balance of the year. ***We expect ARR growth in Q2 to be between 10% and 12%, declining to 0% to 10% in Q4.*** We continue to believe that modest improvements in subscription gross margin can be achieved by Q4 as we integrate customer support. Services margins will trend down over the next couple of quarters as we apply more technical resources to support customer success.

Total operating expenses will continue to decline over the course of the year as merger-related expenses moderate. Non-merger-related operating expenses will be roughly flat. Our investments are in place, allowing us to deliver on the CDP road map and position us for sustained growth.

For fiscal year 2020, net loss per share is projected to be $0.32 to $0.28 based on 280 million weighted average shares outstanding. We expect operating cash flow for fiscal year 2020 to be negative $95 million to negative $75 million. While merger cost synergies are coming in greater than planned, operating cash flow will be impacted by the booking softness that we are now forecasting for the first half.

I would like to note 2 factors that impact cash flow this year. Projected OCF includes approximately $59 million of merger-related payments. Additionally, as discussed on last quarter's call, billings and cash flow will continue to be impacted by the adoption of Cloudera's annual billings convention for the former Hortonworks business. Bookings growth is expected to accelerate in the second half this year. This will be evident in the sequential ARR growth in Q3 and Q4. Although CDP will be available in the second half, we do not have adequate data or pipeline to model its rate of adoption. And given the nature of the subscription business, we believe that the revenue impact from CDP bookings and deferred customers' expansions will take several quarters to appear in GAAP revenue. Until the trajectory of that growth and the investment levels necessary to support it become clearer, we will not attempt to project an intermediate-term operating model for the combined company.

Emphasis added.

282.    Moving into the questions and answers portion of the 1Q2020 Conference Call, analyst s further inquired about the earnings miss and reduced guidance. Philp Winslow of Wells Fargo lead off with asking about Cloudera's slower expansion:

**Philip Alan Winslow** Wells Fargo Securities, LLC, Research Division – Senior Analyst

Actually, just 2 questions. First, you mentioned a slower expansion than you've been anticipating. I wonder if you can comment on just renewal rates though. What do you see during the quarter? And what are you kind of thinking about them going forward? And then the second question, just in terms of reaccelerating net expansion, what are the key milestones that you're looking forward or that you're hearing from customers that you think would -- that they believe would reaccelerate that?

**James W. Frankola** Cloudera, Inc. – CFO

This is Jim. I'll take the first part of that question. I'll let Tom handle the reacceleration. ***So dollar churn in the quarter spiked for us, it's about 16%. Typically, it averages about 10% or slightly above that.*** If we decompose that, we see relative strength with our large customers. Million-dollar-plus customers have a churn rate that is close to historical average and substantially less than 16%. Most of the churn occurred in our customers at the earlier stages of their journey. We expect

to see that sort of rough dynamic into Q2. Once we get beyond Q2, we expect renewal rates and churn rates to return to approximately where they have been historically.

283.    Chad Bennett of Craig-Hallum Capital Group LLC then inquired about Cloudera's claims that the missed billings and guidance reduction was a result of customers waiting for CPD and the increased competition by public cloud vendors:

**Chad Michael Bennett** Craig-Hallum Capital Group LLC, Research Division – Senior Research Analyst

So I'm just trying to understand, I guess, the logic behind customers effectively waiting, and maybe it ties into, Tom, your comment about the public cloud vendors being more competitive. If you could define that, that would be great – after you guys made the merger announcement. I can't imagine their data growth is slowing, their workload expansion is slowing, their analytics investment is slowing. How can they afford to wait? Or are they actually – and maybe it's evident in the churn dollar rate you just gave. Are they just shifting those workloads off your platform? Is that what's really going on?

**Thomas J. Reilly** Cloudera, Inc. – CEO & Director

Chad, well, you've covered quite a bit there. So let me just break it down a bit. From the time we announced the merger to where we got our road map out, it was about a 5-month period. In that period, our sales force was a bit handicapped without giving clarity of what the road map would be. And without that clarity, we were at a competitive disadvantage, and **_we saw a number of opportunities get taken by the public cloud guys._** We're already turning that around because we've trained on our road map but now – let's say now the customer sees our road map, what causes them to pause yet again? They're trying to understand how they will take advantage of CDP, both public and private. They're trying to understand how we're going to move those workloads. It's just a different motion than traditionally, just buying more of what they had on-prem. We're trying to encourage all of our customers to move to a cloud architecture, both in the data center and public cloud, and so that's just an education process.

**Chad Michael Bennett** Craig-Hallum Capital Group LLC, Research Division – Senior Research Analyst

And just maybe a quick follow-up if I may. So I know you don't want to touch on the longer-term model, but if our growth expectations have changed in terms of long-term growth, in Chad's words, maybe not yours, shouldn't the operating model or level of investment change especially considering – I know you're seeing some synergies from the merger, but your sales and marketing as a percent of revenue is still fairly high for a company that, well, effectively is not growing this year. But even if you were to grow, let's just say, 10% to 20%, I would say that line item is still egregiously high. Just care to comment on that?

**James W. Frankola** Cloudera, Inc. – CFO

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:19-cv-03221-LHK

Yes. So this is Jim. From our perspective, we believe that the long-term growth model of seeing sustained software growth in excess of 20% is still there. All the secular trends support it. Our product strategy of multi-cloud hybrid, we believe is the right answer for our target customer set. The growth that is happening this year is not what we initially anticipated. We have curtailed the rate of future expense growth in the short run through the balance of the year, and the guidance that we put in front of you reflects a lower level of spending than 90 days ago.

So we do understand the top line dynamic and how it will impact expenses. With that said though, we believe that it is critical to get CDP out and we've retained the level of investment that would allow us to develop CDP, public cloud, private cloud and be able to sell it and build pipeline over the course of this year. We think the benefits of that will start accruing in bookings later this year, and you'll start seeing it in accelerated revenue growth next year.

Emphasis added.

284.    Analyst Tyler Radke of Citigroup Inc. sought further clarification concerning the reasoning for Cloudera's 39% billings miss and the significantly reduced guidance. In response, Defendant Reilly again blamed it on the purported "increased competition from public cloud vendors,", "uncertainty" stemming from the Merger, and customers waiting to renew based on the Cloudera's forthcoming CDP cloud product. Reilly also disclosed that this included increased demand for cloud native products by customers. Specifically, Tyler Radke asked, and Reilly responded:

**Tyler Maverick Radke** Citigroup Inc, Research Division – Senior Associate

Okay. And then maybe you could just reflect on the quarter. Obviously, the outlook for the rest of the year is coming down pretty substantially but maybe just order of magnitude, what surprised you more? Was it the weakness in bookings? Was it the higher churn rate? Was it the competitive environment? Maybe just talk about those 3 dynamics independently.

**Thomas J. Reilly** Cloudera, Inc. – CEO & Director

I'll talk about it and then Jim may have some specifics. ***We saw increased competition from the public cloud vendors and so just increased desire for customers to understand how they can move workloads into the public cloud environment.*** And during that period of uncertainty, we weren't very competitive with that, during that period.

Secondly, and we – with respect to the merger, we got on things like pursuing our renewals later in the quarter than we traditionally would. But that was just the complexities of bringing together 2 sales force systems, pursuing hundreds of

renewals. And so some of those slipped out of the quarter. And then our customers that would normally expand would ask us many questions around CDP. And if they expand now, what does it mean to migrate later? And so some of those caused some of the challenges in the quarter. All of those things, we think we have addressed and we resolved and we're seeing the improvements. So – but that's I think the best assessment I have for you, Tyler.

Emphasis added.

285.   Building on Reilly's response, Preetam Gadey of Barclays Bank PLC requested additional information concerning the purported increased competition from cloud companies. Murthy highlighted cloud native technology's bursting and adaptive scaling capabilities. Capabilities that Cloudera's products lacked. Specifically, Murthy stated:

**Preetam Gadey** Barclays Bank PLC, Research Division – Research Analyst

This is Pree Gadey for Raimo Lenschow. I want to ask you about the competition with the cloud companies. We've seen AWS and Azure move more onto on-prem and provide hybrid capabilities and we saw today that Azure and Oracle providing interoperability. Do you think the competitive environment with cloud companies is changing going forward?

**Arun C. Murthy** Cloudera, Inc. – Chief Product Officer

This is Arun. I'm happy to take your question. A great question and sort of we've seen Google and Amazon sort of get into this model, the hybrid message, which frankly is very encouraging for us because that's sort of our main plan for our strategy. When we look at some of the offerings, the hybrid offerings we get from Google and Amazon and Microsoft, a lot of that is focused on the infrastructure layer, whether it's Azure Stack, whether it's Anthos from Google, AWS Outposts and so on. Where we differentiate is at the data layer, right? So having a hybrid, multi-cloud approach at the data layer puts us in a unique position, and that's really why, as you kind of heard from me in the prepared remarks, ***things like bursting workloads to the cloud, our adaptive scaling and so on are the key features you need to be able to leverage that world in a hybrid fashion.***

So in a nutshell, it's very complementary to the approach we're taking and we really, really welcome the fact that now you're going to have consistent sort of infrastructure layers, which makes our job easier at the data layer.

**Thomas J. Reilly** Cloudera, Inc. – CEO & Director

And I'll pile on, too. Here's the other thing we're noticing. The cloud vendors are all trying to close off their kind of challenge in not having hybrid offering. You see them entering the market, but frankly, when they put something on-prem, it's really more of an on-ramp to the public cloud versus trying to give customers the flexibility to move workloads between clouds where they get the lowest cost and best

performance. And so our strategy is an enduring differentiator. We really don't care where workloads run, right? ***We want them to run at a cloud architecture and allow customers to have flexibility***.

Emphasis added.

286.    Preetam Gadey then inquired about rumors that another Hadoop company, like Cloudera, was closing its doors. In responding Reilly admitted that the Merger was to "replatform" Cloudera's existing product platforms, such as Altus, into "cloud architecture" so that Cloudera would have a "competitive cloud offering." Specifically, Reilly stated:

**Preetam Gadey** Barclays Bank PLC, Research Division – Research Analyst

Okay. Great. And I want to ask you about a private company, some rumblings around private Hadoop company kind of close to shutting its doors. I want to ask if you saw any additional opportunities come to you from customer of this company.

**Thomas J. Reilly** Cloudera, Inc. – CEO & Director

Yes. So basically, here's the backdrop. ***We saw the need to get more resources, more scale so that we can deliver a competitive cloud offering and replatform into cloud architecture, and that's why we did the merger. And so Cloudera now has the resources, the scale, the employees, the engineers to very quickly replatform our business***. Our competitor, in this case, it's MapR, could not match the resources or the scale to make a similar transition, and I think they have some challenges. We view their customer base as an opportunity for us, and it is part of our growing pipeline.

Emphasis added.

287.    Rishi Jaluria of D.A. Davidson & Co. sought clarification as to Cloudera's guidance assumptions that resulted in such a large reduction moving forward:

**Rishi Nitya Jaluria** D.A. Davidson & Co., Research Division – Senior VP & Senior Research Analyst

Let me start, Jim, with you, 2 quick ones, and I'll have a follow-up for Arun. But just thinking about 90 days or so ago, when you provided guidance and for simplicity, let's look at ARR. I mean at least it seemed to a lot of us that you had made some very conservative assumptions, especially when it came to revenue dis-synergies and kind of delays in bookings. ***Just help me understand what was it that you did not anticipate in that and putting aside the competition from cloud vendors? But besides that, what was it that you didn't anticipate***? Because it seemed like you understood and acknowledged that there was going to be a potential wait-and-see dynamic from customers. Was it just more intense than you expected or what?

And then maybe kind of a housekeeping one. On the $100,000 customers metric, it actually looks like it declined sequentially, which I don't think I've seen in the model before, going from 943 last quarter to 929 this quarter. And it looks like the definitions of that maybe have changed. So maybe just walk through both of those, and I've got a product question for Arun.

**James W. Frankola** Cloudera, Inc. – CFO

Yes. There's a lot there, so hopefully, I can unpack it. So relative to expectations 90 days ago, first of all, that was shortly after the 2 companies had merged. We were still operating somewhat blind in terms of pulling in pipeline from both sides, scrubbing the numbers, putting together predictive models. ***So you had a general level of uncertainty. And then the new news in the quarter, certainly what Tom described in terms of cloud, certainly the fact that our customers are taking a wait-and-see attitude, we did not anticipate that to the level of extent that it was. The fact that our churn rate increased, that was certainly unanticipated. And those 3 things are all interrelated.***

Now very specifically, the way a subscription model works is that resulted in bookings that were very light for Q1 relative to expectations. We now have much greater confidence in our pipeline and visibility, and that pipeline for Q2 is pointing to another soft quarter. So essentially, we're factoring in 2 quarters in a row of soft bookings. Now we are seeing pipeline growth that is – has resumed, several weeks' worth, a couple of months' worth. We hope that remains a good trend, but the pipeline that we're building today isn't going to be delivered in Q2. It's going to be delivered in Q3, Q4 and a little bit in Q1. So the nature of the subscription model means that we're going to have a trough in bookings in the first half of the year; that will show up as a trough in ARR growth rates in Q4 and then acceleration beyond.

You'll see the resumption of underlying bookings growth most clearly in sequential dollar ARR growth. That's one reason why we're disclosing ARR. So as we execute in Q3 and especially Q4, we hope to put a lot of ARR dollars on the books, and that will be reflective of the success of this strategy.

Your second question, customer count less than $100,000 – or over $100,000, that is all part and parcel of the same thing. So where we saw relative weakness was in our customers that caught $100,000 of revenue up to $500,000 or so. So post-merger, as you'd expect, we put our resources, first and foremost, on our large accounts. That was a little bit softer than we would like, but we still saw really good expansion rates, pretty good churn rates in our largest accounts. We saw a relative weakness in our smaller accounts, and unfortunately, more of them churned out this quarter than we brought on. ***So that's the other artifact of the cloud competition, high churn*** and merger execution.

Emphasis added.

288.     Sane Chrane of Sanford inquired where the cost of operating Cloudera's platforms was cheaper than cloud vendors' offerings. Murthy stated it was, except he later clarified that this only applied to the to-be-released CDP cloud-native product which had the ability scale up and burst workloads:"

> **Zane Brandon Chrane** Sanford C. Bernstein & Co., LLC., Research Division – Senior Analyst
>
> Just to make sure I understand, you're saying that the Cloudera platform is lower total cost of ownership than the cloud vendors?
>
> Arun C. Murthy Cloudera, Inc. – Chief Product Officer
>
> ***Exactly, because of the fact that we have a PaaS offering, which automatically scales the cost up and down based on loads.***
>
> **Zane Brandon Chrane** Sanford C. Bernstein & Co., LLC., Research Division – Senior Analyst
>
> And is that true now? Or are you saying that will be true for the CDP offering coming out in the summer?
>
> Arun C. Murthy Cloudera, Inc. – Chief Product Officer
>
> ***This is part of CDP***.

Emphasis added.

289.     Michael Turits further inquired about the customer churn that Cloudera was experiencing, including whether this churn was the result of customers moving their workloads on-premise or because customers have moved away from the Hadoop ecosystem. In response, Reilly explained that Cloudera was not "***really competitive against what the public cloud guys are offering***" and because customers paused their renewals based on CDP being launched in the foreseeable future because they wanted the capabilities of a true cloud native product. Reilly further admitted that Cloudera lacked a cloud architecture product and that they "***are addressing [it] with CDP as a PaaS native cloud architecture offering***." Specifically, Reilly stated:

> **Michael Turits** Raymond James & Associates, Inc., Research Division – MD of Equity Research & Infrastructure Software Analyst

I just want to make sure that I understand the churn well enough. The customers who did not renew, did they take their on-premise workloads and move those workloads to cloud? Or did they move to a community, nonpaid version? Or did they simply move off of, let's just broadly call it, the Hadoop ecosystem?

**Thomas J. Reilly** Cloudera, Inc. – CEO & Director

Michael, this is Tom and I'll answer some of them. I'm pretty familiar with all those scenarios. A combination of the first 2. ***So we do see a class of customers that want to move workloads to take them into a public cloud, and so that's where we saw some of the churn because we weren't really competitive against what the public cloud guys are offering,*** and we had this period of uncertainty. So that's one scenario. And that renewal – the whole renewal will not go away but a portion of that renewal will go away. And then we saw some workload go to self-support predominantly in the tech industry, and that's the combination. And then we had a number of renewals that just didn't close in the quarter because of the merger execution and our kind of delays in getting to that.

And then finally, the CDP cloud, some people just took pause and whether – especially if we have a renewal that we're working on, an expansion and they were just asking questions about do they make that investment and how does it migrate to CDP; that caused some delays.

**Michael Turits** Raymond James & Associates, Inc., Research Division – MD of Equity Research & Infrastructure Software Analyst

So you think it's not the last thing that I asked? And obviously, I ask it also because of the troubles that MapR had versus the similar types of solutions to yours, let's broadly call it Hadoop. So is there any sense that the customers are simply migrating to a different form of data architecture?

**Thomas J. Reilly** Cloudera, Inc. – CEO & Director

No. The ***only different architecture is the cloud architecture, which we are addressing with CDP as a PaaS native cloud architecture offering***, but there's no other analytic platform out there that we find challenging us.
Emphasis added.

290.    As Reilly admitted earlier in the call, Cloudera's reason for the merger was to get the scale and resources to launch Cloudera's "enterprise data cloud", in other words CDP, and to "replatform into cloud architecture." In Reilly's further exchange with Michael Turits, however, Reilly admitted that he knew of Cloudera's competitive disadvantage prior to the Merger when he stated "***the reason we prioritized CDP public cloud first is we want to close off that competitive disadvantage with our public cloud hybrid offering.***" Reilly stated:

**Michael Turits** Raymond James & Associates, Inc., Research Division – MD of Equity Research & Infrastructure Software Analyst

And is the bulk of it that movement to the cloud? Or is it – how do you split it between – you're basically saying it's movement to cloud or just most are nonrenewals around going to sell support or just delays, which essentially is self-support (inaudible)?

**Thomas J. Reilly** Cloudera, Inc. – CEO & Director

So the bulk of it is delays – so the bulk of it is the delays, ***followed by workloads moving to public cloud vendors' native house offerings. And that's why we also – we didn't share earlier, but the reason we prioritized CDP public cloud first is we want to close off that competitive disadvantage with our public cloud hybrid offering.*** CDP private cloud is what our largest customers are most demanding, but we wanted to close off those workloads that are moving to public cloud. So we want to control that with our customers.

**Michael Turits** Raymond James & Associates, Inc., Research Division – MD of Equity Research & Infrastructure Software Analyst

But sorry, I'll try to just squeeze this last clarification in. But if they're delaying, but they're PaaS renewal, are they – is that just saying they're simply willing to go unsupported whether – whatever the reason, whether it's because of the CDP or whatever – or missed execution on your part?

**Thomas J. Reilly** Cloudera, Inc. – CEO & Director

Yes. So we have a number of renewals that we didn't include in the quarter because we didn't execute against them. And that was just we got a late start due to the merger. Secondly, when a renewal has an expansion, we are better off closing them together, and we'll let a customer slip while we're answering their questions or addressing their concerns versus trying to do 2 transactions.

Emphasis added.

291.    The answers provided during the 1Q2020 Press Release and the 1Q2020 Conference Call concerning the earnings miss and the future guidance did not resonate with analysts. The analysts that have closely followed Cloudera found that these purported reasons were disingenuous.

292.    Deutsche Bank was extremely skeptical of Cloudera's stated reasons for the missed quarter and slashing of guidance. In its note, *Now THAT Was a Rough Quarter*, Deutsche Bank concluded from its "field checks" that the real undisclosed culprit was "that Cloudera hasn't managed the architectural transition well from on-premise Hadoop-focused data analytics projects to cloud/AWS-hosted workloads and that it has fallen behind AWS, Snowflake, Google and

Microsoft in the analytics space." Diving in further into the true causes of the disappointing June 5, 2019 news, Deutsche Bank reported:

> 1QF20 Results, Weak Guidance
>
> Cloudera shares are indicated down 30%+ off a quarter in which the company reset guidance well below our estimates (to ARR growth of 0-10% compared with our 17% estimate, and to revs of $755m at the midpoint compared with our $835m estimate), and disclosed higher customer churn, postponed renewals and expansions, share losses to public cloud alternatives and the departure of the CEO. While Cloudera attributed this in large part to hesitation ahead of the late-summer launch of its new CDP (Cloudera Data Platform) product, ***we conclude based on our field checks that Cloudera hasn't managed the architectural transition well from on-premise Hadoop-focused data analytics projects to cloud/AWS-hosted workloads and that it has fallen behind AWS, Snowflake, Google and Microsoft in the analytics space.*** We reaffirm our cautious call.
>
> What Happened?
>
> Cloudera argues that new bookings in the 1QF20/April quarter were quite soft and that this will extend into the 2QF20/July quarter. One can see this in the RPO figure of $720m, down a full 10% sequentially. Cloudera cited sales disruption from the Cloudera-HDP merger and a "wait and see" attitude ahead of the new CDP product that left Cloudera vulnerable to share losses to the public cloud analytics rivals. ***Based on our checks, we believe that demand for on-premise Hadoop-focused technology has completely stalled (rival MapR is also very challenged) and Cloudera was late to launch a competitive cloud-hosted product as AWS has made improvements to Redshift/EMR, as Google refines its world-class data analytics services and as privately-held and AWS-hosted Snowflake has taken share (we heard late last year that Snowflake was specifically targeting Hadoop/Cloudera customers coming up for renewals).*** We simply have no visibility into whether the new CDP product will be competitive and the CEO departure and stock fall could trigger employee turnover. In a nutshell, the risk profile (including the potential for further cuts to Street numbers) still seems too high.

Emphasis added.

293.    D.A. Davidson & Co. echoed its brethren in its report titled *We Were Wrong: Few Silver Linings in this Disastrous Quarter*. Notably, D.A. Davison stated it was "very wrong" because it "***relied too heavily on taking management at its word[.]***" As it explained:

> **We have stubbornly stuck with Cloudera**, as we felt concerns around competition were too severe. In retrospect, we were very wrong, and perhaps ***relied too heavily on taking management at its word***, especially since Cloudera has had sales execution issues in the past. ***It's truly difficult to believe that customers delaying deployment until CDP, increased churn, merger disruption, and competitive headwinds – all***

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*legitimate concerns continually brought up by investors – were not properly factored into guidance provided 90 days ago.*

Emphasis added in bold with italics. Davidson continued to state that: "CDP is the silver lining – the strategy communicated (fully-managed, cloud-native capabilities) seems in line with what customers want, based on our checks."

294.     Wedbush Securities, Inc. was equally disenfranchised by the negative news of June 5, 2019, when it stated "[l]ast night will be the straw that broke the camel's back for many investors and core believers in the Cloudera story, as the company delivered the dreaded trifecta of bad news: soft April results, a jaw dropping weak guidance, and a CEO departure." Wedbush found with this news that "'wheels came off the bus this quarter with sales execution issues, secular headwinds on the Hadoop market, and cultural challenges creating a very difficult environment for the Cloudera team." According to Wedbush, "it's clear the story is broken" leaving only questions as to Cloudera's valuation and their "next strategic move." As a result, Wedbush slashed its price target to $7 from $16.

295.     Barclays mirrored the sentiment of these analysts in its report titled *A Long & Painful Wait for CDP*. In lowering their price target by 50% to $7 from $14, Barclays noted that the Cloudera's "***main issues is that Cloudera currently does not have a cloud solution, which seems the favorite deployment mode for most customers***" and as such it "suffers from weak renewals as customers move to cloud native providers." Barclays noted that the only apparent parachute for Cloudera is CDP – which was only moving into *Beta* in July 2019 – and thus investors would not have any real visibility into Cloudera until later in 2019 at earliest. Barclays noted that Cloudera's lack of a viable cloud product was causing "a pause in spending" with "a majority of the churned customers … adopting public cloud products."

296.     Furthermore, in its report titled, *Downgrade to Market Perform; F1Q Bookings Miss, Big FY20 Guide Down, CEO Out*, Raymond James was decisive in its findings that the news of June 5, 2019 that Cloudera "lost" its "business momentum" to cloud migration as customers were moving workloads to the cloud and choosing cloud native data management solutions. As a result of the significant quarterly miss, the slashing of its FY 2020 guidance, and the pulling of its

guidance for fiscal year 2021, Raymond James downgraded Cloudera to "market perform." In its report, Raymond James stated:

- ***We are downgrading CLDR to Market Perform from Outperform following a 39% F1Q billings miss and a 12% FY20 revenue guide down. Churn was up, particularly among small- to midsized customers, and both land and expand bookings missed. Cloudera also announced its CEO, Tom Reilly, will retire 7/31/19,*** with board chair Martin Cole interim CEO during the search for a replacement.

- ***Cloudera attributed the miss primarily to customers moving workloads to cloud where they are choosing cloud native data management solutions (EMR, RedShift, Athena) absent the availability of Cloudera's new cloud focused CDP platform to be generally available (GA) this summer,*** which they believe will allow them to better compete for cloud workloads, as well as to poor execution around the merger.

- ***Cloudera lowered FY20 ARR growth guidance to 0-5% from 17-21%, revenue growth to 5% pro forma by our calculation, and CFFO guide to a range of $(95)-(75)M from $(40)-(30)M. No impact from CDP anticipated until FY21.***

*   *   *

- That said, there could be considerable time before Cloudera regains the business momentum it has lost to cloud migration and gives investors sufficient visibility into reacceleration from 5% PF growth in FY20. Absent a sense for that timeframe, and with Cloudera having withdrawn its FY21 targets, we are stepping aside from recommending the stock.

**Big F1Q Billings Miss.** Revenue $187M (+14% y/y on a proforma basis by our calculation) was about in-line with consensus $188M; however, billings of $98M missed consensus by $63M or 39%. Subscription revenue $155M (+18% y/y proforma) was in-line with consensus. EBIT loss of $35 million (-19% margin) beat consensus loss of $62 million (-33% margin) on faster realization of cost synergies and leverage since the merger. EPS of $(0.11) beat consensus $(0.23). Customers with >$100K ARR declined sequentially to 929 from 943 given the uptick in churn, while the >$1M ARR customers was flat sequentially at ~145 as this cohort experienced a more muted uptick in churn.

**F2Q & FY20 Significant Guide Below.** ***F2Q revenue guidance $180-183 million is below consensus estimates of $203 million. Subscription revenue guide $155-157 million is below consensus estimates $167 million.*** EPS guide of $(0.11) to $(0.08) was in-line with consensus $(0.10) at the midpoint. ***FY20 revenue guide of $745-765 million (+5% y/y at the midpoint on a pro forma basis by our calculation) was lowered $90M at the midpoint and is well below consensus estimates $844 million.*** The shortfall comes on higher than expected churn, customers pausing before the release of CDP, and increased competition from public cloud vendors. ***Subscription revenue guide of $635-645M was well below consensus $700 million. Management also lowered its FY20 Annual Recurring Revenue (ARR) guidance to 0-10% ($659-***

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:19-cv-03221-LHK

***725M) from 18-21% ($800-825M)***. EPS guide of $(0.32) to $(0.28) was ahead of consensus $(0.35). CFFO loss guidance of $75-95 million was increased by $50M from a loss of $40-30M and is greater than consensus loss of $33 million. Additionally, management pulled its guidance for FY21, which was >$1B in revenue, >20% revenue growth, and 17% Adjusted CFFO margin.

*       *       *

**CDP release this summer.** Management expects CDP to reaccelerate revenue growth in the second half and FY21. ***CDP will provide benefits over Cloudera Altus including a cloud-native experience for ease of use, improved security, managing workloads over multi-cloud, hybrid and on-premise environments***. Relative to public cloud offerings, CDP will have native security/governance, multi-cloud/hybrid/on-premise, and data migration. Although the first iteration of CDP is for public cloud and should improve its competitive position vs. the public cloud vendors, Cloudera's largest customers are demanding CDP for the private cloud, which is to be released towards the end of the year.

Emphasis added**.**

297.    In a follow-up note, Raymond James stated "Cloudera attributed the miss primarily to customers moving workloads to cloud, where they are choosing cloud native data management solutions (EMR, RedShift, Athena) absent the availability of Cloudera's new cloud-focused CDP platform to be generally available 2H19[.]"

298.    Finally, in its analyst report following the news of June 5, 2019, J.P. Morgan noted the peculiarity and timing of Cloudera's slashed guidance given that Cloudera utilized a recurring revenue model based on its subscription services. In its report, J.P. Morgan stated "[t]he narrative surrounding Cloudera's Q1 is the company's material revenue guide down for FQ2 and FY20" was "unusual for a recurring revenue model[.]"

299.    In response to this news on June 5, 2019 and in the June 5 and 6, 2019 analyst reports, Cloudera's stock price fell by $3.59 per share, or 40.8%, from its previous closing price of $8.80 per share on June 5, 2019 to close at $5.21 per share on June 6, 2019 on extremely high trading volume that was in excess of 57.9 million shares. On the following day, June 7, 2019, Cloudera's stock fell an additional $0.11 to close at $5.10 per share on higher than normal value that was in excess of 22.74 million shares.

### G.    Relevant After-Class Period Events

300.    An October 13, 2019 article posted on ZD Net titled *Where does Cloudera go from here?* summarized the transformation and events on June 5, 2019 and what followed thereafter. The

article's author highlighted that CDP was "complete rethinking from the ground up," the vast improvements in speed that the redesigned product created over Cloudera's purported cloud-native product Altus, and that fact that Cloudera "did not adequately warn Wall Street." The article reported that:

> Cloudera has been through an eventful, some might say turbulent year, to say the least. While its been awhile since Cloudera branded itself as Hadoop, its fortunes have nonetheless been tied to the open source platform first codified by Doug Cutting and Mike Cafarella well over a decade ago. In our recent post about Strata, we referred to midlife crisis, and that's a metaphor that could also apply to Cloudera, the prime sponsor of the event. In a recent post in Medium, Cloudera chief product officer Arun Murthy best summed the whole 2019 saga in one elegant title, Hadoop is Dead. Long Live Hadoop. According to Murthy, this post evidently struck a chord, getting roughly 10x the number of reads of most Cloudera blogs.

> Last week, Big on Data bro Andrew Brust provided an exhaustive account of Cloudera's new generational product change, Cloudera Data Platform (CDP). To its credit, Cloudera didn't simply do a cut and paste job with the new offering, which was the long-awaited converged platform coming out of its merger with Hortonworks. **_It was a complete rethinking from the ground up, starting with refactoring of storage and compute that severed the ironclad connection between Cloudera's platform and [Hadoop Distributed File System]._**

> **_In an era where the cloud in Cloudera is finally emerging as the future path for Hadoop, the company made the shrewd choice to go all in on cloud-native architecture._** On the storage side, it makes S3-style cloud object storage a first-class citizen on par with HDFS, and on the compute side, it clears the path for Kubernetes to supplant YARN for commandeering resources in the cloud.

> **_What does that mean? Beyond elasticity, it means on the fly deployment. If you look at Cloudera's first attempt at a cloud offering, Altus, it was based on deployment via virtual machines (VMs), a process that typically took about 8 minutes to spin up clusters. With Docker and Kubernetes on CDP, that goes down to 30 seconds. 'Nuff said?_**

> In his piece, Andrew also recounted the trajectory of the company this year. After a disastrous Q1, and with MapR on the ropes, the conventional wisdom was that Hadoop was dead, and with it, Cloudera and MapR becoming roadkill. Enter Carl Icahn.

> Now let's put this saga in perspective. First off, at Strata we saw Ted Dunning, who still lists himself as MapR's chief technology officer, where he assured us that the product engineering team made the move to HPE and is still largely intact. MapR's flavor of Hadoop may not be quite so dead.

Back to our originally scheduled program, ***Cloudera was going through the familiar story of a company on the cusp of platform change (as Andrew termed it, the Osborne effect); of course, customers are going to hold back until they know what's coming. As noted, Cloudera didn't adequately warn Wall Street.*** The good news is that it had a better than expected Q2, which was enough to put Icahn's forces on standstill, for now.

*       *       *

***It's a fact that in the cloud, Cloudera starts as the challenger to cloud provider Hadoop offerings including AWS EMR; Azure HDInsight (although rooted in the Hortonworks, it's very much a Microsoft product now); and Google Cloud Dataproc. . . So, the good news on the technology front is that Cloudera is on the right track.***

Emphasis added.

301.   At the September 10, 2019 Deutsche Bank Technology Conference, Cloudera's CEO Martin Cole presented. During the conference, Cole confirmed that the end demand market had previously shifted to the cloud native and cloud infrastructure. In his new role as CEO, Cole was tasked to pivot Cloudera to compete in the market with its CDP product. Karl Keirstead, an analyst at Deutsche Bank inquired about how Cloudera had been and is competing. Cole responded that Cloudera was simply not competitive at all against the public cloud vendors stating as soon as Cloudera disclosed that it had had good position in its historic on-premise infrastructure but that the cloud customers just went straight to Cloudera's competition. Cole explained that the reason Hortonworks and Cloudera did the Merger was because ***"neither company was in a very strong position in the cloud." We both had offerings but they weren't easy to use. They didn't have that same take-up as a pure public cloud capability."*** During the call, Cole stated:

Karl Emil Keirstead Deutsche Bank AG, Research Division – Director and Senior Equity Research Analyst

Okay. Now I know -- again, just to cut you some slack. It's only been sort of 3 or 4 months since you've been on the seat. But even as a board member, you have some visibility, I guess, into the broader demand shifts affecting Cloudera. So can we talk a little bit about end market demand changes? The one that Cloudera seems to talk the most about, which, no surprise, is the movement of data storage and data analytics to the cloud. So we're definitely going to talk about that. Are there others, Marty, that you would flag as ***significant end market shifts that you're trying to pivot Cloudera towards that you picked up since your time in the seat***?

Martin I. Cole Cloudera, Inc. – Interim CEO, Chairman & Lead Director

Well, thank you for the consideration. I'm the new guy here but appreciate that. No, the -- I mean I think the -- *some of our challenges were self-inflicted.* . . .As it relates to sort of the competitive pressures, the merger was very powerful to create the market leader on-premise, right? There really isn't a player who could do what we do on-premise, which is a good market. *Where we see challenges would be for those customers who are moving workloads to the cloud where there's never even a competition. Where we compete, we've got a good game. Where they just move because a line of business says, "Okay, I want to spin up an analytic workload," we may never see that.* IT may never see that.

Karl Emil Keirstead Deutsche Bank AG, Research Division – Director and Senior Equity Research Analyst

That stuff might go direct AWS or Azure...

Martin I. Cole Cloudera, Inc. – Interim CEO, Chairman & Lead Director

*Yes. AWS, Azure and even on increasing basis now, GCP. They may go direct to -- a Databricks or Snowflake, thus with an Azure or AWS.* So that is a threat in terms of impacting growth rates versus an absolute impact on the business per se. So if you look at our view and the data we've seen from industry analysts is on-premise workloads will continue to increase in low double digits, 10%, 12% range, which is a nice market in an area we're in a very strong position. Workloads to the cloud are more likely to increase in the high 20s, maybe even as high as 30. *And so our view is we want to capture a greater percentage of that than we have historically, and one of the reasons we needed to do this merger is neither company was in a very strong position in the cloud.* We both had offerings but they weren't easy to use. *They didn't have that same take-up as a pure public cloud capability. And so we came together, developed -- we're developing a product, releasing it into the marketplace and our goal now is to compete more effectively with some of the public cloud capabilities.* The thing is that we're going to differentiate is for those customers who want to be in the cloud, across clouds, hybrid -- as well hybrid that is in on-prem and in public. So multi-cloud, hybrid cloud and on-prem. We're -- our view is that what we're building will be one-of-a-kind and it will enable us to compete there.

Emphasis added.

302.    On December 5, 2019, Cloudera held a conference call to discuss their results for the third fiscal quarter 2020 for the period ended October 31, 2019. During the question portion of the call Cole responded to a question concerning Cloudera's ability to compete with public cloud vendors. In his response, Cole explained how Cloudera's product offerings were not competitive with these public cloud vendors because its products were not "cloud native" and were unable to

offer the same cloud performance offered by its competitors until it introduced its truly cloud native product CDP.

> Mark Ronald Murphy JP Morgan Chase & Co, Research Division – MD
>
> Marty, with CDP Data Warehouse and CDP Machine Learning in the marketplace now, are you finding that you're being pulled into the discussions that might have previously gone directly over to companies like -- or products like Redshift and Snowflake and Databricks? Or is it too early to make that kind of a judgment yet.
>
> Martin I. Cole Cloudera, Inc. – Interim CEO, Chairman & Lead Director
>
> The quick answer and well-informed answer is yes. ***We now have a competing product***. The competitive dynamic has improved certainly with CDP Public Cloud. Previously, customers were bifurcating workloads and say, "Okay, we've got to find another product to go into the public cloud. ***We like where you guys are on-prem, but you don't have the offering that we're looking for in terms of ease of use, consistency, security, governance, et cetera." That's no longer the conversation. The conversation has changed dramatically, and they're like, wow, we really like what you guys have here.*** We've enjoyed the experience on-prem. Now we can take that same experience and actually an easier, better experience and move it to the public cloud. That's been very powerful. And as I referenced in my prepared remarks, the shared data experience, SDX, enables that to occur.

Emphasis added.

### H.     Additional Allegations that the Exchange Act Defendants Acted with Scienter

### *i.     The Individual Exchange Act Defendants knew that that their Statements were False and Misleading or Acted with Deliberate Recklessness*

303.   The misrepresentations alleged herein were made by the Individual Exchange Act Defendants in possession of material, non-public information that contradicted their public statements and/or rendered them materially false and misleading. The Individual Exchange Act Defendants knew that Cloudera's products were not "cloud native" and its products were unable to offer the same cloud performance offered by its competitors. Describing its offerings to investors in this manner deceived investors to believe that Cloudera's products had these capabilities.

304.   First, Defendant Reilly during the admitted at the end of the Class Period during the 1Q2020 Conference Call that they "weren't really competitive against what the public cloud guys are offering" and that they lacked the "cloud architecture, which we are addressing with CDP as a

PaaS native cloud architecture offering." Moreover, Reilly informed that market that the Exchange Act Defendants "didn't share earlier" that the prioritization of CDP which was officially announced on March 13, 2019 during the 2018 FY Conference Call but was discussed as the then unnamed "enterprise data cloud" and/or enterprise data platform" as "to close off that competitive disadvantage with our public cloud hybrid offering."

305.   On that same call, Reilly disclosed that the real reason that Cloudera did the Merger was because it needed the scale and resources to launch and compete with the public cloud vendors with cloud-native architecture because its own products lacked it. As the initial conversations and negotiations concerning the Merger were underway per the Registration Statement as least as early as June 2, 2018, the Exchange Act Defendants knew that they did not have the "cloud-native" products they represented and that the competitive landscape was not as they were represented. As stated by Reilly during the 1Q2020 Conference Call:

> We saw the need to get more resources, more scale so that we can deliver a competitive cloud offering and replatform into cloud architecture, and that's why we did the merger. And so Cloudera now has the resources, the scale, the employees, the engineers to very quickly replatform our business.

306.   On October 8, 2018, Olson sent an email to Cloudera employees. Speaking about the Merger, Olson stated "what drives this transaction more than anything else - is that our main competition to displace legacy solutions has shifted to the cloud vendors." Olson detailed that Amazon, Microsoft, and Google are all increasing their "aim to win business from large enterprise buyers" and the level of competition had already increased as other vendors such as Snowflake and Databricks "are also increasingly important in our competitive battles." This fact further substantiates that Cloudera was already under increased competition by public cloud vendors as early as October 8, 2018, and the reason for 1Q2020 billings miss and reduction in FY2020 guidance was in fact that Cloudera not have a "cloud native" product and its products were unable to offer the same cloud performance offered by its competitors. Olson's knowledge is further supported by the fact that this letter indicates that as of October 8, 2018 the public cloud vendors had already increased their pressure against Cloudera's public cloud offerings.

307.     The Individual Exchange Act Defendants had knowledge and access to Cloudera's internal analytics were they closely tracked each sale and lost opportunity. During the Class Period, the Individual Exchange Act Defendants attributed the refinement of their marketing and sales strategy to their reliance on internal data and analytics.

308.     During the 2Q2018 Conference Call on September 7, 2017, Reilly highlighted what Cloudera did internally when he stated "[w]e analyze -- we use big data ourselves to understand what drives expansions. We know which partners have the greatest impact. We know which applications drive the greatest use in key verticals. We train and go after those use cases."

309.     During the same call, Defendant Frankola expounded on Cloudera's data, stating: I'll reemphasize, one of the big things that we have been focusing on at Cloudera is Cloudera-on-Cloudera, using our own technology. So we have an internal data hub that is approaching a petabyte in size. We bring in all sorts of internal and external information, which gives us insight in terms of what drives customer expansion. We use the information literally to understand our cost of sales at an opportunity level. Therefore, it allows us to focus our energies in the right place, and where there are inefficiencies in our business, try to modify them pretty quickly.

310.     During the 1Q2019 Conference Call on June 6, 2018, Reilly reaffirmed "We track every compete, and then we evaluate win-loss, no-decision type things. So we're tracking our cloud win rates relative to our on-prem traditional win rates."

311.     Notably, based on this data and analytics Cloudera instituted multiple changes to its marketing and sales strategy based on the data it collected and analyzed internally. Using this data Cloudera sought to fulfill the demands of the market and to focus their efforts on the segments of the markets were the best opportunities for Cloudera to land and expand. In making each of these decisions, Defendants credited the refinement of their marketing and sales practices to using their own data analytics.

312.     Specifically, concerning Cloudera realignment announced on April 3, 2018, Defendant Reilly stated their focus on the Global 8000 that they "still expended too much of our valuable selling resources pursuing customers outside that market. I know because we use our own technology to analyze sales activity." Reilly expounded "[a]s a result, using our technology, we have refined our near-term target market to a subset of the Global 8000."

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:19-cv-03221-LHK

313.   On September 9, 2018 during the Citi Global Technology Conference Reilly further noted the extent to which they track, map, and analyze their clients and potential clients to focus on their targeted markets and know their client churn and graduation rates:

> We refined our target market to roughly 5,000 enterprises that we want to sell and service. We introduced 2 new roles into our selling organization. We introduced new sales reps that are just focused on new logos, and had this hunting mentality to not only close new logos but close the right ones at higher price points. And we introduced the new role of what we call customer account managers. A number of our reps are just dedicated to our largest customers, focused on driving their success. Two very different skills, two very different selling motions.
>
> So we refined our target markets, we introduced these 2 new roles and then we map our existing customers into a 6-phase journey. And we're able now to track all of our customers through these phases, what our churn rates are, what our graduation rates are, what our average tenures are. And we are introducing outcome-based relationships to accelerate customers through the journey. So that's the backdrop of the changes that we've made.

314.   The degree to which Cloudera and the Individual Exchange Act Defendants reviewed and analyzed the data they collected to refine their sales and marketing strategies was detailed by Defendant Reilly during the January 10, 2018 Citi Global TMT West Conference in response to an analyst question:

> **Walter H Pritchard** Citigroup Inc, Research Division – MD and U.S. Software Analyst
>
> And as you look at -- you mentioned kind of every year, there may be sort of tweaks you make here. As you think about -- you haven't given guidance for next year per se, but as you think about kind of the future here, is it sort of more the same in terms of how you're balancing this new and expansion? Are there any sort of optimizations you need to make there or changes around how you're -- in setting the organization to push that?
>
> **Thomas J. Reilly** Cloudera, Inc. – CEO & Director
>
> Yes. So I would say, Walter, every year, we refine our go-to-market and where we apply our resources based on data. We, in a machine learning company and a data company, we instrument everything. I want to instrument my sales reps to the endless degree to understand selling activity. But today -- so here's a perfect example of what we've done. We're now in our sixth year of snapshot-ing our Salesforce.com implementation every 15 seconds. *So for every 15 seconds for 16 years, I've got a snapshot of Salesforce. I can actually determine or predict how much time we're spending on pursuing new opportunities versus expansions*. And our understanding of our customer acquisition costs going after new opportunity is unlike anyone else because I can just look at how they're spending time in Salesforce and where they're

updating records versus new versus expansion, the level of activity. So we then look at our customers by industry, by title, by location to understand what drives them to grow faster. ***And in so doing, going to the next year, we are becoming very laser-focused on who are the new customers that we want to capture that have the greatest propensity not only to buy but to expand, and who are existing customers we want to apply our resources against because they should expand because we've seen other customers like them expand in the past. And so we're doing that refinement.*** We talked about the Global 8000. Internally, we are much more narrowly focused within that of where we spend our time.

Emphasis added.

315.     Moreover, Reilly explained during the September 7, 2018, Citi Global Technology Conference that Cloudera' and the Individual Exchange Act Defendant had knowledge as to Cloudera's cloud vendor competition because Cloudera "put[s] in place cloud specialists, who solely focus on competing on the cloud" and through this that that "[they] are learning how to go up against the cloud vendors head on against their house offerings."

316.     The Individual Exchange Act Defendants also knew or where reckless when making issuing the materially false/and or misleading fiscal year 2020 guidance issued on March 13, 2019. As repeatedly stated by the Exchange Act Defendants through the risk factors contained in each of the Forms 10-Q and Forms 10-K during the Class Period, Cloudera's subscription revenues were recognized over the duration of the subscription terms and as such "downturns or upturns in new sales and renewals will not be immediately reflected in our operating results." Thus, each of these risk factors represented materially similar/identical risk warnings stating:

> ***Because we recognize subscription revenue from our platform over the subscription term, downturns or upturns in new sales and renewals will not be immediately reflected in our operating results.***
>
> We generally recognize subscription revenue ratably over the term of the subscription period. As a result, most of the revenue we report in each quarter are derived from the recognition of deferred revenue relating to subscriptions entered into during previous quarters. Consequently, a decline in new or renewed subscriptions, or a reduction in expansion rates, in any single quarter could have only a small impact on our revenue results during that quarter or subsequent period. Such a decline or deceleration, however, will negatively affect our revenue or revenue growth rates in future quarters. Accordingly, the effect of these changes or events may not be fully reflected in our results of operations until future periods. Given the ratable nature of our revenue recognition, our subscription model also makes it difficult for us to rapidly increase our revenue through additional sales in any period. We may be unable to adjust our cost structure to reflect the changes in revenue. In addition, a

significant majority of our costs are expensed as incurred, while revenue is generally recognized over the life of the customer agreement. As a result, increased growth in the number of our customers could result in our recognition of more costs than revenue in the earlier periods of the terms of our agreements.

317.   The Individual Exchange Act Defendants' conduct represented an extreme departure from the standards of ordinary care, and presented a danger of misleading purchasers or acquirers of Cloudera securities that was either known to the Individual Exchange Act Defendants or else was so obvious that the Individual Exchange Act Defendants must have been aware of it.

### ii.   *The Other Indicia of Scienter Support a Cogent and Compelling Inference of Fraudulent Intent*

318.   With the issuance of the news on June 5, 2020, Cloudera announced the "retirement" of Defendant Reilly claiming that May 31, 2019 that Cloudera "mutually agreed with Tom that this is the right time for a leadership transition."

319.   Notably, this agreement was not even five months after the closing of the Merger whereby Reilly remained as the CEO of Cloudera. The Executive Transition Agreement notably contained a clause that stated the agreement "is not and shall not be construed or contended by [Reilly] to be an admission or evidence of any wrongdoing" and contained a statement that it "shall be afforded the maximum protection allowable under Federal Rule of Evidence 408 and/or any other state or federal provisions of similar effect." The inclusion of this clause implicates that there was a claim of liability that was being released as part of this agreement.

320.   As part of the 1Q2020 Conference Call, it was also announced that Cloudera's co-founder and Chief Strategy Officer, Olson would also be retiring. Analyst attributed this the

321.   The fact that both Reilly and Olson both retired upon announcement of the fraud with no previous murmurs of doing and so shortly after completing the Merger is further indicative of a cogent and compelling inference of fraudulent intent.

### iii.   *The Individual Exchange Act Defendants had a Motive to Commit Fraud*

322.   Pursuant to a Form 4 filed with the SEC, on October 2, 2017, Defendant Olson sold 587,288 Cloudera shares at a price of $15.792 per share not pursuant to a 10b5-1 plan. These shares were sold on behalf of the Michael and Teresa Olson Revocable Trust dated May 24, 2001 for proceeds of $9.27 million.

#### iv.     *Corporate Scienter*

323.     The falsity of the statements identified herein is so egregious that Cloudera would have been deliberately reckless had it not known that its main product platform for the public cloud was not "cloud native" and that its products were unable to offer the same cloud performance offered by its competitors, and as such had materially misrepresented Cloudera's ability to compete against public cloud vendors. Accordingly, Cloudera acted with scienter under the corporate scienter doctrine.

324.     Aphria is liable for the acts of the Individual Exchange Act Defendants and its other employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

325.     The scienter of the Individual Exchange Act Defendants and other employees and agents of Cloudera is similarly imputed to Aphria under *respondeat superior* and common law agency principles

### I.     Loss Causation and Economic Loss

326.     By continuing to make misrepresentations regarding Cloudera's public cloud offerings as being "cloud native" the Exchange Act Defendants deceived investors to believe that its products had certain capabilities. As a result, the Exchange Act Defendants materially misrepresented Cloudera's ability to compete against public cloud vendors. As such, the Exchange Act Defendants fraudulently injured investors who purchase or acquired trading Cloudera securities during the Class Period.

327.     As detailed above, when the truth began to emerge throughout the Class Period and finally emerged on June 5, 2019 the value of Cloudera securities declined precipitously as the prior artificial inflation no longer propped up Cloudera's securities prices. The decline in Cloudera's securities price was a direct result of the nature and extent of the Exchange Act Defendants' fraud finally being revealed to investors and the market. Throughout the Class Period, the Exchange Act Defendants concealed material information about the capabilities and designs of Cloudera's products which in turn directly caused for weak demand for their product and poor sales. The truth of these materially concealed facts resulted in the issuance of weak guidance and expectations for

1   the Cloudera finances and prospects in the market. This, in turn, caused Cloudera's stock price to

2   fall and cause damages to Plaintiffs and the Exchange Act Class.

3         328.    The timing and magnitude of the common stock price decline negates any inference

4   that the loss suffered by the Plaintiffs and other members of the Class was caused by changed

5   market conditions, macroeconomic or industry factors or Cloudera-specific facts unrelated to the

6   Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiffs and other

7   Class members was a direct result of Defendants' fraudulent statements and the corresponding

8   artificial inflation in Cloudera's securities prices and the subsequent significant decline in the value

9   of Cloudera's securities prices when Defendants' prior misrepresentations and other fraudulent

10  conduct was revealed.

11        329.    At all relevant times, Defendants' materially false and misleading statements or

12  omissions alleged herein directly or proximately caused the damages suffered by the Plaintiffs and

13  other Class members. Those statements were materially false and misleading through their failure

14  to disclose a true and accurate picture of Cloudera's products, their capabilities, and the ability to

15  compete against public cloud vendors, as alleged herein. Throughout the Class Period, Defendants

16  publicly issued materially false and misleading statements and omitted material facts necessary to

17  make Defendants' statements not false or misleading, causing Cloudera securities to be artificially

18  inflated. Plaintiffs and other Class members purchased or acquired Cloudera securities at those

19  artificially inflated prices, causing them to suffer the damages complained of herein.

20        330.    Cloudera's stock price fell in response to the corrective news issued on April 3,

21  2018, as alleged *supra*. After the market closed on April 3, 2018, Cloudera issued the 2018 FY

22  Press Release and held the 2018 FY Conference Call disclosing information that was directly

23  related to and partially correcting Defendants' prior misrepresentations and material omissions

24  concerning Cloudera's products, their capabilities, and the ability to compete against public cloud

25  vendors by announcing significantly and materially lowering guidance for the first quarter 2019

26  and full-fiscal year 2019.

27        331.    In response, Cloudera's stock price declined significantly. In response, on April 4,

28  2018, Cloudera Aphria's securities prices decreased as investors and the market considered the

information contained in the 2018 FY Press Release, the 2018 FY Conference Call, and various analyst reports issued in response thereto. The market responded quickly and decisively in response to this news entering the market and partially correcting Defendants misstatements and omissions. The information disclosed in the in the 2018 FY Press Release and the 2018 FY Conference Call caused the price of Cloudera stock to decrease significantly. From a closing price $22.24 per share on April 3, 2018, Cloudera's stock price plummeted $8.95 per share, or 40.25%, to close at $13.29 per share on April 4, 2019. Volume for Cloudera stock was unusually heavy on March 14, 2019 with over 27.9 million shares being traded.

332.     Cloudera's stock price also fell in response to the corrective news issued on March 13, 2019, as alleged *supra*. After the market closed on March 13, 2019, Cloudera issued the 2019 FY Press Release and held the 2019 FY Conference Call disclosing information that was directly related to and partially correcting Defendants' prior misrepresentations and material omissions concerning Cloudera's products, their capabilities, and the ability to compete against public cloud vendors by announcing significantly and materially lower than expected guidance for the first quarter 2020 and full-fiscal year 2020.

333.     In response, Cloudera's stock price declined significantly. In response, on March 14, 2019, Cloudera Aphria's securities prices decreased as investors and the market considered the information contained in the 2019 FY Press Release, the 2019 FY Conference Call, and various analyst reports issued in response thereto. The market responded quickly and decisively in response to this news entering the market and partially correcting Defendants misstatements and omissions. The information disclosed in the in the 2019 FY Press Release and the 2019 FY Conference Call caused the price of Cloudera stock to decrease significantly. From a closing price of $14.61 per share on March 13, 2019, Cloudera's stock price plummeted $2.90 per share, or 19.85%, to close at $11.71 per share on March 14, 2019. Volume for Cloudera stock was unusually heavy on March 14, 2019 with over 37.7 million shares being traded.

334.     Cloudera's stock price further fell in response to the corrective news issued at the end of the Class Period on June 5, 2019 and in the analyst reports issued on June 5 and June 6, 2019, as alleged *supra*. After the market closed on June 5, 2019, Cloudera issued the 1Q2020 Press

Release and held the 1Q2020 Conference Call disclosing information that was directly related to and partially correcting Defendants' prior misrepresentations and material omissions concerning Cloudera's products, their capabilities, and the ability to compete against public cloud vendors.

335.    In response, Cloudera's stock price declined significantly. In response, on June 6, 2019, Cloudera Aphria's securities prices decreased as investors and the market considered the information contained in the 1Q2020 Press Release, the 1Q2020 Conference Call, and various analyst reports issued in response thereto. The market responded quickly and decisively in response to this news entering the market and correcting Defendants' misstatements and omissions. The information disclosed in the in the 1Q2020 Press Release and the 1Q2020 Conference Call along with the analyst reports issued on June 5-6, 2019 caused the price of Cloudera stock to decrease significantly. From a closing price of $8.80 per share on Jun 5, 2019, Cloudera's stock price plummeted $3.59 per share, or 40.80%, to close at $5.21 per share on June 6, 2019. Volume for Cloudera stock was unusually heavy on March 14, 2019 with over 57.9 million shares being traded.

336.    As a result of their purchases and sales of Cloudera securities during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. The Exchange Act Defendants' false and misleading statements caused Cloudera's stock, options, and other securities to trade at artificial levels throughout the Class Period. By misleading investors about Cloudera's products, their capabilities, and their ability to compete against public cloud vendors' product offerings, the Exchange Act Defendants deceived investors. As the truth was revealed to investors, the prices of Cloudera securities were affected significantly, causing economic loss to investors who had purchased Cloudera securities during the Class Period.

337.    As described above, the changes in the price of Cloudera's securities after the truth about Cloudera's products, their capabilities, and the lack of their ability to compete against public cloud vendors' products were disclosed the direct result of the nature and extent of the Exchange Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price changes in Cloudera's securities negate any inference that the losses suffered by Plaintiffs and the other Class members were caused by changed market conditions,

1   macroeconomic or industry factors, or company-specific facts unrelated to the Exchange

2   Defendants' fraudulent conduct.

3       **J.      <u>Presumption of Reliance; Fraud-On-The-Market</u>**

4       338.    At all relevant times, the market for Cloudera's securities was an efficient market

5   for the following reasons, among others:

6           (a)     Cloudera's common stock met the requirements for listing, and were listed and

7                   actively traded on the NYSE, a highly efficient market;

8           (b)     During the Class Period, Cloudera's securities were actively traded,

9                   demonstrating a strong presumption of an efficient market;

10          (c)     As a regulated issuer, Cloudera filed with the SEC periodic public reports;

11          (d)     Cloudera regularly communicated with public investors via established market

12                  communication mechanisms, including regular disseminations of press releases

13                  on the national circuits of major newswire services and other wide-ranging

14                  public disclosures, such as communications with the financial press and other

15                  similar reporting services;

16          (e)     Cloudera was followed by securities analysts employed by major brokerage

17                  firms who wrote reports that were distributed to the sales force and certain

18                  customers of brokerage firms during the Class Period. Each of these reports was

19                  publicly available and entered the public marketplace; and

20          (f)     Unexpected material news about Cloudera was rapidly reflected in and

21                  incorporated into Cloudera's stock and option prices during the Class Period.

22      339.    The market for Cloudera securities was open, well developed and efficient at all

23  relevant times. As a result of Defendants' materially false and misleading statements, Cloudera

24  securities traded at artificial prices during the Class Period. Plaintiff and other Class members

25  purchased Cloudera securities relying upon the integrity of the market prices of Cloudera securities

26  and market information relating to Cloudera, and were damaged as a result.

27      340.    As a result of the foregoing, the market for Cloudera's securities promptly digested

28  current information regarding Cloudera from all publicly available sources and reflected such

information in the price. Under these circumstances, all purchasers and sellers of Cloudera's securities during the Class Period relied on Defendants' material misrepresentations and omissions when making their purchases or sales of Cloudera's securities at market prices.

341.    At the time of Defendants' misrepresentations and omissions, Plaintiffs and other Class members were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other Class members and the marketplace known the truth regarding the proposed going-private transaction and its funding, which were not disclosed by Defendants, Plaintiffs and other Class members would not have purchased or sold their Cloudera securities, or, if they had purchased or sold such securities during the Class Period, they would not have done so at the artificial prices that they paid or received.

342.    In the alternative, Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

**K.    Safe Harbor Does Not Apply**

343.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. None of the misrepresentations or omissions by Cloudera or the Individual Exchange Act Defendants involved forward-looking statements nor were they accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in any purportedly forward-looking statements.

344.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

345.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, Cloudera and the Individual Exchange Act Defendants are liable for those false or misleading statements because, at the time each such statement was made, the speaker knew the forward-looking statement was false or misleading, and the forward-looking statement was

authorized and/or approved by an executive officer of Cloudera who knew that the forward-looking statement was false. None of the historic or present tense statements made by Cloudera and the Individual Exchange Act Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Cloudera and the Individual Exchange Act Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

346.     By virtue of the foregoing, Cloudera and the Individual Exchange Act Defendants have violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

## L.     COUNT IV: VIOLATION OF SECTION 10(B) AND RULE 10B-5(B) PROMULGATED THEREUNDER AGAINST THE EXCHANGE ACT DEFENDANTS

347.     Plaintiffs repeat and reallege each and every allegation contained above in Sections II and IV as if fully set forth herein.

348.     During the Class Period, the Exchange Act Defendants made, had authority over, or controlled the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading, in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

349.     Plaintiffs and the Exchange Act Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Cloudera Securities. Plaintiffs and the Exchange Act Class would not have purchased Cloudera securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements.

350.     As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Exchange Act Class suffered damages in connection with their purchases of Cloudera securities during the Class Period.

**M.**  **COUNT V: VIOLATION OF SECTION 20(a) AGAINST THE INDIVIDUAL EXCHANGE ACT DEFENDANTS**

351.  Plaintiffs repeat and reallege each and every allegation contained in Sections II and IV as if fully set forth herein.

352.  As members of Cloudera's executive team and/or board members the Individual Exchange Act Defendants acted as controlling persons of Cloudera within the meaning of Section 20(a) of the Securities Exchange Act of 1934.

353.  By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of Cloudera's operations and/or intimate knowledge of the false information and disseminated to the investing public, the Individual Exchange Act Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Cloudera, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. The Individual Exchange Act Defendants were provided with or had unlimited access to Cloudera's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

354.  As set forth above, Cloudera and the Individual Exchange Act Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint and the Class was damaged thereby.

355.  By virtue of their positions as controlling persons, the Individual Exchange Act Defendants are liable pursuant to Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78t.

**V.**  **CLASS ACTION ALLEGATIONS**

356.  Plaintiffs bring this action on behalf of all persons who purchased and/or otherwise acquired Cloudera common stock: (i) pursuant or traceable to the Form S-4 registration statement and prospectuses filed in connection with the Merger (the "Securities Act Class"); and/or (ii) during the Class Period (the "Exchange Act Class"). The Securities Act Class and the Exchange Act Class

both exclude Cloudera, Intel, the Individual Securities Act Defendants, the Individual Exchange Act Defendants, and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which they have or had a controlling interest.

357. The Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, Cloudera's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are thousands if not hundreds of thousands of Class members. Record owners and other Class members may be identified from records maintained by Cloudera or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

358. The number of Cloudera common stock shares that were registered and sold pursuant to and/or traceable to the Registration Statement was at least 111.7 million. Upon information and belief, these shares were held by hundreds if not thousands of individuals located geographically throughout the country and the world. Joinder would be highly impracticable

359. During the Exchange Act Class Period, the number of Cloudera's common stock outstanding ranged from at least 131.1 million shares to over 274.2 million shares. Upon information and belief, these shares were held by hundreds if not thousands of individuals located geographically throughout the country and the world. Joinder would be highly impracticable.

360. Plaintiffs' claims are typical of the claims of the Class members as all Class members were similarly affected by the Defendants' wrongful conduct in violation of the federal securities laws complained of herein. Plaintiffs purchased and/or acquired common stock during the Class Period, pursuant to or traceable to the Registration Statement, or purchased shares of Cloudera's common stock registered pursuant to the Registration Statement and sold by Cloudera by the means of the prospectuses issued by Cloudera concerning its offer to sale its common stock as part of the Merger. The manner in which Plaintiffs sustained damages in connection with each security that they held was similar, if not identical, to other Class members who purchased or acquired Cloudera securities.

361. Plaintiffs have and will continue to fairly and adequately protect the interests of the

1  Class members.

2      362.    Plaintiffs have retained counsel competent and experienced in class and securities

3  litigation.

4      363.    Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

5      364.    Common questions of law and fact exist as to all Class members and predominate

6  over any questions solely affecting individual Class members. Among the questions of law and fact

7  common to the Class are:

8      (a)    whether the federal securities laws were violated by Defendants' respective

9         acts as alleged herein;

10     (b)    whether as to the Securities Act Claims only, the Securities Act Defendants

11        acted negligently in issuing the false statements in the Registration Statement

12        as alleged herein;

13     (c)    whether as to the Securities Act Claims only, the Cloudera offered or sold

14        by means of a prospectus issued by Cloudera, which includes an untrue

15        statement of a material fact or omits to state a material fact necessary in order

16        to make the statements, in the light of the circumstances under which they

17        were made, not misleading as alleged herein;

18     (d)    whether as to the Exchange Act Claims only, the Exchange Act Defendants

19        acted knowingly or with deliberate recklessness in issuing false and

20        misleading statements as alleged herein;

21     (e)    whether the price of Cloudera's securities during the Exchange Act Class

22        Period were affected by Defendants' conduct complained of herein; and

23     (f)    whether the Class members have sustained damages and, if so, what is the

24        proper measure of damages.

25     365.    A class action is superior to all other available methods for the fair and efficient

26  adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

27  damages suffered by individual Class members may be relatively small, the expense and burden of

28  individual litigation make it impossible for Class members to individually redress the wrongs done

to them.

366.    There will be no difficulty in the management of this action as a class action.

## VI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(a)    Determining that this action is a proper class action, certifying Plaintiffs as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)    Granting extraordinary equitable and/or injunctive relief as permitted by law; and

(e)    Such other and further relief as the Court may deem just and proper.

## VII.    **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a jury trial.

Dated: February 14, 2020                    Respectfully submitted,

                                            **LEVI & KORSINSKY, LLP**

                                            /s/ Adam M. Apton
                                            Adam M. Apton (SBN 316506)
                                            388 Market Street, Suite 1300
                                            San Francisco, CA 94111
                                            Telephone: (415) 373-1671
                                            Facsimile: (415) 484-1294
                                            Email: aapton@zlk.com

                                            -and-

                                            Nicholas I. Porritt (*to be admitted pro hac vice*)
                                            Alexander A. Krot, III (*to be admitted pro hac vice*)
                                            **LEVI & KORSINSKY, LLP**
                                            1101 30th Street N.W., Suite 115

116

Washington, D.C. 20007
Tel:    (202) 524-4290
Fax:    (212) 363-7171
Email: nporritt@zlk.com
Email: akrot@zlk.com

*Attorneys for Attorneys for Lead Plaintiffs Mariusz J. Klin and the Mariusz J. Klin MD PA 401K Profit Sharing Plan, Cade Jones, Larry Lenick, and Lead Counsel for the Class*

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 5:19-cv-03221-LHK