1  Ramzi Abadou (SBN 222567)
2  **KAHN SWICK & FOTI, LLP**
   912 Cole Street, # 251
3  San Francisco, California 94117
   Telephone: (415) 459-6900
4  Facsimile: (504) 455-1498
   ramzi.abadou@ksfcounsel.com
5
6  *Counsel for Lead Plaintiff Mariusz J. Klin &*
   *The Mariusz J. Klin MD PA 401K Profit*
7  *Sharing Plan and Plaintiffs Robert*
   *Boguslawski and Arthur P. Hoffman*
8
   *[Additional counsel on signature page]*
9

10              **UNITED STATES DISTRICT COURT**
            **NORTHERN DISTRICT OF CALIFORNIA**
11                    **SAN JOSE DIVISION**

12                        )
13                        )      Case No. 19-CV-3221-LHK-SVK
                          )
14                        )
                          )
15                        )      **CONSOLIDATED AMENDED CLASS**
                          )      **ACTION COMPLAINT FOR VIOLATIONS**
16  IN RE CLOUDERA, INC.  )      **OF THE FEDERAL SECURITIES LAWS**
    SECURITIES LITIGATION )
17                        )      **CLASS ACTION**
                          )
18                        )
                          )      **JURY TRIAL DEMANDED**
19                        )
                          )
20

21

22

23

24

25

26

27

28

*"[W]e ... perhaps relied too heavily on taking*
*management at its word."*[1]

## I.   PRELIMINARY STATEMENT

1.     Lead Plaintiff Mariusz J. Klin & The Mariusz J. Klin MD PA 401K Profit Sharing Plan ("Lead Plaintiff"), and named plaintiffs Robert Boguslawski and Arthur P. Hoffman (together, "Plaintiffs") allege the following based upon personal knowledge with respect to themselves and, with respect to all other matters, the investigation of Lead Counsel. Lead Counsel's investigation included a review and analysis of, *inter alia*: (a) regulatory filings by Cloudera, Inc. ("Cloudera" or the "Company") and Hortonworks, Inc. ("Hortonworks") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, media statements and marketing presentations issued and disseminated by Defendants; (c) Defendants' statements to analysts and the Company's investors during earnings conference calls, investor conferences and television interviews; (d) analyst and industry reports concerning Cloudera and Hortonworks; (e) internal Cloudera emails and communications; and (f) other industry-specific information related to Cloudera and Hortonworks. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.     This is a putative class action for violations of the federal securities laws. Plaintiffs bring this federal securities action on behalf of all persons who purchased and/or otherwise acquired shares of Cloudera common stock between April 28, 2017 and June 5, 2019, inclusive (the "Class Period") and were damaged by the conduct asserted herein (the "Class").

3.     Plaintiffs assert claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. In addition to Cloudera, the Defendants named under the 1934 Act are: (i) *former* Cloudera Chief Executive Officer ("CEO") Thomas J. Reilly; (ii) Cloudera Chief Financial Officer ("CFO") Jim Frankola; (iii) *former*

---

[1]     D.A. Davidson Institution Equity Research, Rishi Jaluria: *We Were Wrong: Few Silver Linings in this Disastrous Quarter* (June 6, 2019).

1

Cloudera Chairman of the Board, Michael Olson; and (iv) *former* Cloudera director Ping Li (together, the "Insider Defendants").

4.  Lead Plaintiffs' 1934 Act claims arise out of a fraudulent or deliberately reckless course of business conduct whereby, throughout the Class Period, Cloudera and the Insider Defendants either knew or recklessly disregarded that: (i) the statements and omissions they made alleged herein were materially false and misleading; (ii) their statements would adversely affect the integrity of the market for Cloudera common stock; and (iii) their statements would deceive investors into purchasing shares of Cloudera common stock at artificially inflated prices, including in the Company's initial public offering ("IPO") which closed on April 28, 2017, and Secondary Public Offering ("SPO"), which closed shortly thereafter on October 2, 2017.

5.  Specifically, Cloudera and the Insider Defendants either knowingly or recklessly made materially false and misleading public statements and omissions that: (i) exaggerated the Company's technological capabilities while materially understating the negative impact public cloud vendors were then having on the Company's operations; (ii) materially overstated the benefits of, and materially downplayed the reasons for, the Company's merger with and acquisition of Hortonworks; (iii) concealed Cloudera's diminishing sales opportunities due to competitive pressure from public cloud vendors like Microsoft, Amazon and Google; (iv) obscured Cloudera's increasing expenditures on sales and marketing activities to generate new revenues as new revenue opportunities were diminishing due to customers' transition away from its Hadoop-focused platform to cloud offerings; and (v) overstated the viability of the Company's "land and expand" sales strategy.

6.  When the full truth was revealed about the Company's profound Class Period technological and competitive disadvantages, Cloudera's share price fell approximately 40.8% on unusually massive volume of 57.9 million shares traded between June 5 and 6, 2019.  On June 5, 2019, the Company disclosed profoundly negative first quarter results for the period ended April 30, 2019, and drastically reduced fiscal year 2020 guidance. The Company's prospects had been so hampered during the Class Period that Defendants altogether pulled Cloudera's fiscal year 2021 guidance. On

June 5, 2019, the Company also announced Defendant Reilly's removal as CEO who, in turn, subsequently announced Defendant Olson's unexpected departure that day.

7. In response to the news, D.A. Davidson analyst Rishi Jaluria suggested that he had effectively been misled during the Class Period, stating that he "relied too heavily on taking management at its word," and characterized Cloudera's explanations for the disastrous results as "*truly difficult to believe.*" Famed Wedbush technology analyst Daniel Ives commented that, with Defendants' June 5, 2019 disclosures, the: "wheels came off the bus," adding that the Company's disclosures "will be the straw that broke the camel's back for many investors and core believers in the Cloudera story, as the company delivered the dreaded trifecta of bad news: soft April results, a jaw dropping weak guidance, and a CEO departure."

8. Separately, Plaintiffs assert strict liability, non-fraud claims under §§11(a), 12(a)(2) and 15 of the Securities Act of 1933 (the "1933 Act") on behalf of all persons who acquired Cloudera common stock pursuant or traceable to the Form S-4 registration statement and prospectus ("Merger Registration Statement") issued in connection with Cloudera's acquisition of and merger with Hortonworks, which closed on January 3, 2019 (the "Merger").[2] The Defendants named under the 1933 Act are: (i) Cloudera: (ii) Intel Corporation ("Intel"); and (iii) certain current former officers and directors of Cloudera and Hortonworks as alleged in ¶¶ 57-66, 74-84, *infra*. Plaintiffs' 1933 Act claims arise out of negligently made materially false and misleading statements and omissions in the Merger Registration Statement. Plaintiffs' 1933 Act claims are not based on any allegation of deliberate or

---

[2]     On November 5, 2018, Cloudera filed a registration statement with the SEC on Form S-4 for the Cloudera common stock to be issued in the Merger. On November 16, 2018, an amendment to the registration statement was filed with the SEC, which directed investors to "rely only on the information contained in [the S-4 registration statement] and in the documents … incorporated by reference" therein, including Cloudera's annual report on Form 10-K for the fiscal year ended January 31, 2018 ("2018 Annual Report"), and Cloudera's quarterly report on Form 10-Q for the period ended July 31, 2018. The SEC later declared the Form S-4 Registration Statement effective on November 20, 2018. On November 27, 2018, Cloudera filed a prospectus for the common stock to be issued in the Merger with the SEC on Form 424B3, which incorporated and formed a part of the Registration Statement (the "Prospectus"). The Prospectus and Registration Statement (including the documents incorporated by reference therein) are collectively referred to herein as the "Merger Registration Statement."

intential misconduct, and Plaintiffs expressly disclaim, reference, or rely upon any fraud allegations for such claims.

9.      As set forth herein, each of the Defendants named under the 1933 Act negligently made materially false and misleading public statements and omissions in the Merger Registration Statement that: (i) overstated the Company's technological capabilities and competitive position in the cloud market; (ii) inaccurately described the benefits of, and reasons for, the Merger; (iii) negligently promoted the viability of the Company's "land and expand" sales strategy; and (iv) failed to adequately warn investors that the "Risk Factors" listed in the Merger Registration Statement had already materialized well before, and at the time of, the Merger.

## II.     BACKGROUND & OVERVIEW OF THE ACTION

### Relevant Industry Background

10.     Data itself is now considered a valuable resource as the world continues to become increasingly interconnected. Business enterprises and other large organizations seek to collect and monetize real-time and streaming data on events and transactions, social and interaction data about their customers, news and market data about themselves and their competition. They venture to do so quickly and efficiently to successfully advance their business objectives. Web-scale internet companies like Google, Facebook, Yahoo and Amazon were some of the first entities most driven to confront these challenges. Presently, business enterprises and other large organizations remain increasingly focused on developing the capability to manage vast amounts of data from a variety of rapidly developing sources to better serve their customers, design products and services and manage risk.

11.     Cloudera is a software company that purports to "empower[] organizations to become data-driven enterprises in the newly hyperconnected world." Cloudera was co-founded by Doug Cutting, Defendant Olson and others in 2008. Mr. Cutting built upon Google's seminal October 2003 "Google File System" research paper and subsequent MapReduce innovation to create his own version

of these technological data-crunching marvels, which he called "Hadoop."[3] At introduction in 2005, the Hadoop Distributed File System ("HDFS") was considered revolutionary. As described at various times by Cloudera, Hadoop was designed to be the singular data storage and processing platform – an "operating system for big data." Hadoop was officially released in approximately 2007, and quickly became an important technological tool for analyzing enormous amounts of unstructured data (*i.e.*, (information not organized in a pre-defined manner). Hadoop remains to this day a free, open-source software project that enables the distributed processing of large data sets across clusters of computers using simple programming models. Hadoop's open-source data processing framework is still housed at the Apache Software Foundation where developers can freely use, modify and distribute Hadoop.

12.     In 2009, soon after the Company was founded as a tech start-up, the *New York Times* reported that Cloudera had "just released its own version of Hadoop. The software remains free, but Cloudera hopes to make money selling support and consulting services for the software."[4] Cloudera's two main revenue segments are subscriptions and services, and the primary source of the Company's revenue is generated by subscriptions, which are typically one to three years in duration. Revenues from services are acquired from services that Cloudera provides to assist their customers in operating the Company's products. In fiscal year 2019, subscriptions accounted for approximately 85% of the Company's total revenue. Since its founding, the biggest obstacle to Cloudera's prospects has been generating growth based on Hadoop's free open-source software. As one industry observer noted, "selling support around open source just isn't a very good business … Open source is a development model, not a business model."[5]

13.     Hadoop's popularity reached its peak in roughly the 2013-2015 period. During that time, Hadoop-focused technologies like those that Cloudera was founded to develop were still

---

[3]     Mr. Cutting named his innovation after his son's yellow elephant stuffy that his son called "Hadoop." Mr. Cutting is not a named Defendant herein.

[4]     *Hadoop, a Free Software Program, Finds Uses Beyond Search* by Ashlee Vance (March 16, 2009).

[5]     *Cloudera and the Problem with Open Source: Cloudera is for sale but is anyone buying?* by Dana Blankenhorn, Investorplace.com (July 21, 2020).

considered the epicenter of big data analytics. By approximately 2016-2017, however, big data enterprise spending began rapidly shifting away from Hadoop-based offerings to cloud platforms. Unlike Hadoop, cloud services provide on-demand, elastic, scalable and adaptable service models where processing and storage resources can be accessed from any location *via* the internet. With cloud computing, companies can now avoid the upfront cost and complexity of owning and maintaining their own "on-premise" IT infrastructure, and simply pay for what they use and when they use it. Some of the largest publicly traded cloud vendors have benefitted from massive scale and a significant developer ecosystem which has invariably led to faster innovation. The cloud is even more viable for a range of data tasks Hadoop was itself once employed for, like maintenance tasks of server scheduling and administrating tasks like file systems and file storage. Companies can now effectively use the cloud as a database that is more efficient, secure and less expensive than Hadoop such that Hadoop's industry influence has been rendered virtually obsolete, both in terms of cost and ease of use.

14.     The advent of commercially viable cloud offerings quickly began undermining the quantitative value of Hadoop-focused software vendors like Cloudera. In 2014, for instance, Cloudera had a $4.1 billion valuation after Intel invested approximately $740 million in the Company when Hadoop's hype had reached its apex. By the time of its IPO in April 2017, Cloudera was valued at $2.3 billion. After Cloudera announced its merger with and acquisition of Hortonworks (also a Hadoop-focused company) in early October 2018, the **combined** Company claimed a market capitalization of approximately **$5.2 billion**. By the end of the Class Period in June 2019, however, the **combined** Cloudera's market capitalization fell to approximately **$1.4 billion**.

15.     The fluid manner by which Cloudera has publicly marketed itself, too, corresponds with the rise of cloud computing, artificial intelligence ("AI") and machine learning. In 2015, for instance, Cloudera described itself as "the leader in enterprise analytic data management powered by Apache Hadoop." By 2016, Cloudera began shedding its Hadoop identity, instead calling itself a "global provider of the fastest, easiest, and most secure data management and analytics platform built on the latest open source technologies." By 2017, Cloudera dropped its reference to open source technologies and Hadoop altogether, again rebranding itself as a "leading modern platform for data

management, machine learning and advanced analytics." Since 2018, Cloudera has represented that it "deliver[s] the industry's first enterprise data cloud from the Edge to AI."

16.     The Company's Class Period SEC filings similarly reflect the rapid industry transformation Cloudera was then trying to keep pace with. The Company's April 2017 IPO Prospectus "Overview", for instance, stated that the Company had "developed the leading modern platform for data management, machine learning and advanced analytics." A year later, the "Overview" section of the Company's 2018 Annual Report, represented that Cloudera had "developed the modern platform for machine learning and analytics, *optimized for the cloud*." The "Overview" section of the Company's Annual Report on Form 10-K filed with the SEC on March 29, 2019, simply called Cloudera an "enterprise data *cloud company*." Indeed, just before announcing its planned IPO, Cloudera even changed the name of its popular annual user conference from "Strata+Hadoop World" to "Strata Data." While Cloudera actively sought to rebrand itself, cloud giants like Amazon, Google and Microsoft were simultaneously employing armies of engineers and unleashing their almost unlimited resources to dominate and revolutionize cloud computing.

17.     After the Company announced its planned IPO, one industry observer questioned whether the Company's IPO rebranding efforts were, in actuality, a "bait and switch" designed to exploit the public capital markets since private Silicon Valley venture capital had begun to redirect their investments away from Hadoop-focused companies like Cloudera to cloud start-ups like Snowflake.[6,7] In an article posted by the Company's own Chief Technology Officer on September 10, 2020, Arun Murthy acknowledged this changed reality, writing that: "[f]or *several years now*, Cloudera has stopped *marketing* itself as a Hadoop company, but instead as a data enterprise company."[8] In the same post-Class Period article, Mr. Murthy also acknowledged "how hard it is" for

---

[6]     *Risky Business? Cloudera's Forthcoming IPO through a Wider Lens* by Virginia Backaitis (April 5, 2017), *SeekingAlpha.com*.

[7]     Snowflake, a genuine cloud computing company, consummated its IPO this month, with an opening share price of $245 per share and a market capitalization of approximately *$70 billion*.

[8]     *Hadoop is Dead. Long live Hadoop* by Arun C. Murthy (September 10, 2020) Medium.com. Mr. Murthy is not a named Defendant herein.

Cloudera's legacy Hadoop architecture to "work '**natively**' in the public cloud." Unbeknownst to investors, however, while Cloudera may have stopped **marketing** itself as Hadoop-focused, it remained throughout the entirety of the Class Period a Hadoop company but misrepresented itself as one that offered viable cloud-native offerings.  Ultimately, the Company did not **announce** its first viable cloud-native offering – the Cloudera Data Platform ("CDP") – until March 2019. CDP was **released** for the public cloud in late September 2019 – three months **after** the Class Period.

**Cloudera's "Down-Round IPO"**[9] (April 28, 2017)

18.     Shares of Cloudera's common stock began trading on the NYSE on April 28, 2017 – the first day of the Class Period. A "down round" in Silicon Valley venture capital jargon refers to a private company offering additional shares for sale at a price lower than it had been sold for in a previous private financing round. A company forced to seek additional funding by tapping the public capital markets at a value **below** its private valuation, as Cloudera did, now even has a nickname – a "down-round IPO." Nevertheless, whatever Silicon Valley's tightly-knit venture capital networks may have known or suspected about Cloudera's prospects, the Company's materially misleading IPO roadshow presentations, marketing materials and SEC filings led the Company's new **public** investors to rely on Cloudera's bait-and-switch. On its first day of trading, the Company's share price closed above its $15 offering price at **$18.10**. On June 6, 2019—the day after the Company's corrective disclosures—the stock price closed at **$5.21** per share. Over the course of the next several days as investors had fully digested the Company's Class Period-ending corrective disclosures of June 5, 2019, however, the Company's share price hit lows of **$4.89** per share in the few days that followed, severely damaging investors.

19.     Starting with the Company's IPO Prospectus, and continuing throughout the Class Period, the Company repeatedly and misleadingly assured investors that it possessed an "**original cloud native architecture**" and "**cloud-native platform**" that was then "[d]eployable on-premises or in the public cloud – or both," and was then "[l]eading cloud innovation for big data." The Company's

---

[9]     *Are IPOs the New Down Round?* by Katie Roof (November 22, 2015). Techcrunch.com.

June 8, 2017 press release announcing its first quarter 2018 results went ever further, misleadingly representing that "Cloudera offers the **leading cloud-native software platform** for machine learning and advanced analytics." By April 2018, Defendant Reilly, who was being specifically pressured by analysts about the competitive viability of Cloudera's platforms against legitimate cloud providers, stated that he saw: "[n]o changes in the competitive landscape nor end market demand," adding that the "cloud is turning out to be a **tremendous tailwind** for us." Not only were these and other similar Class Period statements materially misleading, Cloudera and the Insider Defendants made them either knowingly or with deliberate recklessness as to their truth. Indeed, as alleged in ¶ 171, *infra*, Defendant Reilly subsequently admitted on June 5, 2019 that the Company had suffered from "**headwinds in bookings** from existing customers" due to its competitors' cloud offerings during the Class Period. In other words, cloud had not been a "**tremendous tailwind**" as Defendant Reilly represented during the Class Period.

20.    By June 6, 2019, the day after the Class Period, Barclays analyst Raimo Lenschow concluded that: "Cloudera **currently does not** have a cloud solution, which seems the favorite deployment mode for most customers. This means that the company suffers from weak renewals as **customers move to cloud native providers**." At roughly the same time, Deutsche Bank analyst Karl Keirsted noted that "Cloudera hasn't managed the architectural transition well from on-premise Hadoop-focused data analytics projects to cloud … and [ ] has fallen behind AWS [Amazon Web Services], Snowflake, Google and Microsoft in the analytics space." He also (correctly) added that "Cloudera was late to launch a competitive cloud-hosted product …."

21.    A few months later in September 2019, interim Cloudera CEO Martin I. Cole acknowledged, contrary to Defendant Reilly's Class Period representations, that the Company's Class Period offerings lacked "pure public cloud capability," and that Cloudera's "goal **now** is to compete more effectively with some of the public cloud capabilities" offered by "AWS [Amazon Web Services], [Microsoft] Azure and even on an increasing basis now, GCP [Google Cloud Platform]. They [*i.e.*, Cloudera's customers] may go direct to – a Databricks or Snowflake, thus with an Azure or AWS. **So that is a threat in terms of impacting growth rates** …."

22.     Prior to releasing CDP in September 2019, the Company's previous purported cloud offering, Altus (announced in mid-2017), was widely panned by Cloudera's existing and potential customers for lacking the key attributes of cloud products like elasticity and the data lifecycle, which integrates streaming, analytics and machine learning. Cloudera hustled Altus to market as, in effect, a crude ploy to enable the Insider Defendants to misleadingly *claim* a competitive cloud offering to buy time to eventually perhaps compete against legitimate public cloud vendors like Amazon, Google and Microsoft. Indeed, on May 4, 2017, industry website *ZDNet* noted the irony that Altus, in addition to not being "terribly fancy," "in many ways [ ] sounds like AWS' [Amazon Web Services] own *Hadoop* service, Elastic MapReduce (EMR)." Altus, in other words, was not a cloud-native offering.

23.     While the Company misleadingly touted Altus as cloud-native throughout the Class Period, it lacked any of the key features of effective cloud computing. The Company's attempts to even *release* Altus repeatedly failed, and even when it was finally released, its known technological infirmities rendered it obsolete. On March 22, 2019, during the DataWorks Summit in Barcelona, the Company's Chief Marketing Officer, Mick Hollison, implicitly acknowledged Altus' commercial failure when he stated that the Company, with the announcement of CDP, had harvested some of the functionality "that *was* offered by the Altus platform." In September 2019, interim Cloudera CEO Martin Cole acknowledged that "neither company [*i.e.*, Cloudera and Hortonworks] was in a very strong position in the cloud." He added that Altus was not "easy to use [because it] *didn't have that same take-up as a pure public cloud capability*." By the filing of the Company's post-Class Period Annual Report on Form 10-K for its fiscal year ended January 31, 2020 ("2019 Annual Report"), Cloudera had scrubbed any reference to its failed "Altus" product from the 2019 Annual Report altogether.

**Company Insiders Unload Shares in the SPO** (October 2, 2017)

24.     On September 27, 2017, Cloudera announced an unexpected SPO of its common stock pursuant to a registration statement on Form S-1, under which the public would be able to purchase some 13,432,114 shares of Cloudera common stock at an artificially inflated price of *$16.45* per share. The Company itself offered 3,000,000 shares of Cloudera common stock in the SPO, while the

remainder would come from selling stockholders (*i.e.* Company insiders) identified in the prospectus. Notably, while the Company's IPO offering materials contained a 180-day lock-up provision prohibiting Company insiders from selling any shares until October 25, 2017, they obtained an early release from IPO underwriter Morgan Stanley to sell their shares at both artificially inflated prices, and on the basis of negative non-public material information. The SPO closed on October 2, 2017 and Cloudera did not retain ***any*** of the much-needed proceeds from the SPO. To the contrary, the SPO was designed to (and did) exclusively enable the Company's insiders, as the selling stockholders of approximately 10.4 million shares, to pocket proceeds of nearly ***$165 million***.

25.    The largest SPO seller was Cloudera's earliest venture capital backer – Defendant Ping Li and his venture capital firm, Accel – who initially invested $5 million when Cloudera first launched as a tech start-up. Defendant Li sold 6,528,862 Cloudera shares in the SPO at $15.79 per share for proceeds of over ***$103 million***.[10] Together, Defendants Li and Olson alone sold over ***$112 million*** of Cloudera stock in the Company's SPO. Defendant Li abandoned his Board seat at the Company a short time later in July 2018. Defendant Olson's "retirement" from Cloudera was announced on June 5, 2019. That Defendants Li and Olson sold their artificially inflated Cloudera shares to unsuspecting public investors in the SPO before the truth about Cloudera's true prospects was disclosed, is strong (and unseemly) evidence of wrongdoing.[11]

26.    Further, Cloudera used the SPO's net proceeds exclusively to fund the "tax withholding obligations [Cloudera] incurred upon the net settlement of certain ***equity awards***, the settlement and withholding of which was concurrent with the pricing" of the SPO at $16.45 per share. The Company

---

[10]    Defendant Li and his venture capital firm Accel later sold an additional 2,675,710 shares of Cloudera common stock on December 12, 2017 for an additional $44.1 million in proceeds. *See* ¶¶ 65, 114, *infra*.

[11]    Had Defendant Li waited to sell the 6.5 million shares which he disgorged in the October 2017 SPO until after the truth was revealed after market close on June 5, 2019, he would have pocketed approximately $38.7 million (assuming an average sales price equivalent to the 90-day lookback value of $5.94 per share) – ***or $64.3 million less*** than he took home in the SPO. Had he sold his shares after the truth about the Company's operations was disclosed on June 5, 2019, Defendant Olson would have made ***$5.8 million less***.

somehow apparently neglected to address these routine executive compensation awards in connection with the IPO when the Company's shares were priced at $15 per share. Further, and like its prior SEC filings, the Company's September 28, 2017 SPO prospectus on Form 424B4 misleadingly represented, *inter alia*, that Cloudera possessed a "cloud-native" platform, and was "leading cloud innovation for big data, ***extending our original cloud-native architecture***." By misleadingly describing its platform and competitive position to investors in this manner, Cloudera again misrepresented its products' capabilities and, hence, ability to compete against legitimate cloud vendors. Even as late as March 2019, Defendant Reilly (who was unceremoniously removed as the Company's CEO in June 2019), continued to tout the Company's competitive market position, stating: "who's our #1 competitor? ***It's Amazon***." By September 2019, Defendant Reilly's replacement (interim CEO Cole) was forced to admit that, while Cloudera had strong on-premise Hadoop offerings during the Class Period: "[w]here we see challenges would be for those customers who are moving workloads to the ***cloud where there's never even a competition.***"

27.     Defendant Cole further acknowledged after the Class Period that, throughout the Class Period, the Company had been unable to credibly compete in cloud, explaining how: "[w]e ***now*** have a competing [cloud] product …. Previously, customers were bifurcating workloads and say, 'Okay, we've got to find another product to go into the public cloud. We like where you [Cloudera] guys are on-prem[ise], but you don't have the [public cloud] offering that we're looking for in terms of ease of use, consistency, security, governance, *et. cetera*.'" He further offered that, at the time of the Merger, "neither company [*i.e.*, Cloudera or Hortonworks] was in a very strong position in the cloud. We both had offerings [*i.e.*, Altus] but they ***weren't easy to use***. They didn't have that same take-up as a pure public cloud capability." A year earlier in September 2018, by contrast, Defendant Reilly publicly misrepresented that "Altus … enables data engineering and data science workloads to ***run natively and easily in the public cloud***."

1

**"A Match Made Underwater"**[12] (January 3, 2019)

2

28.    Due to the undisclosed competitive pressure Cloudera was facing from legitimate cloud

3

vendors, the Company announced in early October 2018 that it was merging with and acquiring its

4

main Hadoop-focused rival – Hortonworks. Unbeknownst to investors, the Merger was consummated

5

because the Company's highest-ranking insiders knew, but failed to disclose, that Cloudera was then

6

facing competitive industry forces so severe that they were simply incapable of achieving organic

7

growth. The Merger Registration Statement materially downplayed the time and expense necessary

8

for the combined Company to make its Hadoop-focused offerings cloud-native. Ultimately, as alleged

9

herein, Cloudera failed to disclose that, to **survive** as a publicly traded Company, it **needed** to

10

consummate the Merger. The problem was that the Company merged with and acquired its main

11

**Hadoop**-focused competitor.

12

29.    Morgan Stanley served as the primary financial advisor for Cloudera, and Frank

13

Quattrone's Qatalyst Partners was Hortonworks' lead financial advisor.[13] Defendant Reilly became

14

CEO of the combined Cloudera in January 2019. To promote the Merger, Defendants Reilly and

15

Frankola hosted an October 3, 2018 investor conference call where Defendant Reilly stated that the

16

"primary motivation for this combination is to accelerate innovation" and "create a larger, more

17

competitive, more efficient entity." Defendant Reilly added: "[b]eyond accelerating innovation in

18

cloud technology, the transaction also produces significant financial benefits, including large cost

19

synergies." The same day, Defendant Frankola claimed the Merger would result in "**scale and growth**

20

**on day one**." He added that the "**important point** is that the day the merger closes[,] we will have

21

significant scale and **growth**. This combination will unlock powerful synergies."

22

23

24

---

25

[12]    *Cloudera and Hortonworks Are a Match Made Underwater* by Shira Ovide (October 4, 2018)

26

Bloomberg.com.

27

[13]    Mr. Quattrone was previously a prominent Morgan Stanley investment banker during the internet dot.com bubble of the late 1990's. In 2006, Mr. Quattrone reached a deferred prosecution agreement with New York federal prosecutors on witness tampering and obstruction of justice charges.

28

30.     Asked whether the combined Company expected to lose any customers as a result of the Merger, Defendant Frankola assured investors that: "in terms of looking at our customers and anticipating that we will lose them because of the merger itself, *no, we don't anticipate that will occur*." The Merger closed on January 3, 2019. Just five months later, on June 5, 2019, the combined Company reported, *inter alia*, a first-quarter *loss* of $103.1 million and drastically slashed fiscal year 2020 guidance. The same day, Defendant Frankola (who had previously assured investors of Merger "growth on day one" and "*powerful synergies*") explained that the Company was "still operating somewhat blind" due to the Merger, and blamed the Company's poor results and deep guidance cut on the "*uncertainty*" it created. The same day, Defendant Frankola also suggested that the Company's massive customer churn rate was "*certainly unanticipated*."

31.     Previously, however, during a September 9, 2018 Citi Global Technology Conference, Defendant Reilly highlighted to investors the extent to which he and the Company's other executives closely monitored customer churn stating: "we're able now to *track all of our customers* through these phases, *what our churn rates are*, what our graduation rates are, what our average tenures are." Defendant Frankola's subsequent June 5, 2019 suggestion that the Company's massive customer churn rate was "unanticipated" strains credulity. Indeed, on June 6, 2019, D.A. Davidson analyst Rishi Jaluria aptly noted: "[i]ts *truly difficult to believe* that customers delaying deployment until CDP, *increased churn*, merger disruption, and competitive headwinds – all legitimate concerns continually brough up by investors – *were not properly factored into guidance provided* [by Cloudera] *90 days ago*."

32.     The Merger Registration Statement also misrepresented that Cloudera's "original architecture was designed for the cloud," "runs natively on public cloud infrastructure" and is "*[l]eading cloud innovation for big data*." It further claimed Cloudera's purported "Cloud Everywhere" expertise buttressed its "land and expand" growth strategy such that Cloudera "use[d] the initial sale as a foothold to increase revenue per customer by increasing the amount of data and number of use cases each customer runs through our platform." The Merger Registration Statement also portrayed Cloudera as a story of growing revenue and profitability that would continue and benefit

14

1    from the synergies presented by Hortonworks' complementary business. The Merger Registration

2    Statement also again specifically and misleadingly touted Altus as providing cloud-native services.

3        33.    One savvy industry observer presciently characterized the business combination as a

4    "perfect seafaring union of two underwater companies." Another industry expert and technologist

5    compared the Merger to "Sears-K-Mart merger," adding that the combination "is the *only way for*

6    *them to survive this*. *Hadoop in itself has become irrelevant*."[14] In connection with the Merger,

7    however, Cloudera and the Insider Defendants exaggerated the Company's then-existing product

8    offerings, causing the two companies' respective share prices to rise dramatically. Cloudera's share

9    price jumped by as much as 11.53% immediately after it announced the Merger on October 3, 2018,

10   and shares of Hortonworks stock rose by as much as 11.88% the following day.

11       34.    When Defendants' Class Period material misrepresentations were corrected during the

12   Company's first quarter as a combined entity, the price of Cloudera's common stock plummeted as

13   Cloudera and the Insider Defendants acknowledged that prospective and existing customers had been

14   rejecting Cloudera's Hadoop-focused platforms. Cloudera and the Insider Defendants also either knew

15   or deliberately disregarded that their "land and expand" growth strategy had faltered due to the Merger

16   and competitive disadvantages. In mid-March 2019, just two months after the Merger closed, Deutsche

17   Bank analysts attended Gartner's annual analytics/BI event where customers and partners met to

18   discuss their technology/choices for data analytics. The Deutsche Bank report issued following that

19   event included comments from several Cloudera customers that concluded: "[t]he *feedback on*

20   *Cloudera was negative…*" A former Cloudera employee relayed to Deutsche Bank that "*Cloudera*

21   *had to rush the launch of Altus to market* and as a result, it lacked a lot of features which hurt them

22   even more." In an article called "Hold Off on Cloudera and Hortonworks" by Virginia Backaitis dated

23   October 15, 2018, she noted that the "next generation data platform that Cloudera wants investors and

24   customers to bank on *is not yet built*," adding that "Arun Murthy announced that his company

25

26

---

27   [14]    *Is Hadoop Officially Dead*? by Alex Woodie (October 18, 2018). The combined Sears-K-Mart
         filed for Chapter 11 bankruptcy on October 15, 2018.

28

[Hortonworks] was embarking on the ***creation*** of a cloud-native data platform in September 2018." Ms. Bakaitis also noted that, in the meantime, Cloudera's "customers' eyes may wander."

35.     Shortly after the Merger closed on January 3, 2019, Cloudera announced CDP in March 2019, which generated the long and well-established "Osborne Effect," where existing customers cancel or defer orders for a current soon-to-be-obsolete product as an unexpected drawback of announcing a future product prematurely.[15] Defendants therefore either knew or turned a blind eye to the obvious fact that Cloudera's customers would find other alternatives while Cloudera developed CDP, or wait for CDP to be released prior to initiating or renewing their subscriptions with Cloudera. The combined Cloudera did not release CDP for the public cloud until after the Class Period in September 2019, and for the private cloud until ***June 2020***. As noted in an article appearing on *Venture Beat*, at all relevant times: "[i]ronically, there has been no Cloud Era for Cloudera."

**The "Wheels Came Off the Bus"**[16] (June 5, 2019)

36.     On June 5, 2019 – the last day of the Class Period – the Company disclosed profoundly negative first quarter results for the period ended April 30, 2019, and drastically reduced fiscal year 2020 guidance. The Company's outlook and prospects had become so murky during the Class Period that it also altogether pulled its fiscal year 2021 guidance. The same day, the Company announced Defendant Reilly's removal as CEO who, in turn, subsequently announced Defendant Olson's unexpected departure during the Company's June 5, 2019 earnings conference call. Only months earlier, in connection with the Merger, Cloudera assured investors that Defendants Olson and Reilly were part of forming the "best go-forward management team" for the combined Cloudera. So much

---

[15]     The Osborne Effect is named after the planned replacement of the Osborne 1, an early personal computer first sold by the Osborne Computer Corp. in 1981. Sales of the Osborne 1 fell sharply as customers anticipated the more advanced Osborne 2 systems that Osborne pre-announced, leading to a sales decline from which Osborne Computer never recovered.

[16]     Wedbush Securities analyst Daniel Ives, *The Clock Strikes Twelve for Cloudera; CEO Departure and Slash Guidance* (June 6, 2019).

16

for that assurance.[17] The following day, on June 6, 2019, the Company's share price closed at $5.21 per share, a single day drop of approximately 40.8% on unusually massive volume of 57.9 million shares traded.

37.    Cloudera also announced that: (i) it had lost customers to *bona fide* public cloud vendors like Microsoft, Google and Amazon, and tech start-ups like Snowflake; (ii) its highly touted "land and expand" growth strategy had stalled as existing and prospective customers took their business elsewhere; and (iii) the Company spent an astounding ***$119 million*** in marketing and sales expenditures during the quarter to salvage the Company's prospects; and (iv) Cloudera generated, essentially, no growth in the Company's customer base.  Defendant Reilly further revealed that, contrary to his prior Class Period statements, Cloudera's platform was not "competitive against what the public cloud guys are offering," which caused its customers to move their workloads to "public cloud vendor's ***native*** house offerings." Defendant Reilly further explained that Cloudera's competitive failures stemmed from its lack of cloud-native architecture, and that the Company was only starting to address customer non-renewals by launching "CDP as a PaaS ***native*** cloud architecture offering…."

38.    During the Company's June 5, 2019 earnings conference call, Defendants Reilly and Frankola provided, *inter alia*, the following justifications for their disastrous disclosures, many of which squarely contradicted their prior Class Period statements: (i) "the announcement of our merger in October 2018 created ***uncertainty***…. During this period of ***uncertainty,*** we saw ***increased competition*** from the public cloud vendors." [Defendant Reilly]; (ii) "our sales force was a bit handicap[ped] without giving clarity of what the road map would be. And without that clarity, ***we were at a competitive disadvantage,*** and we saw a number of opportunities get ***taken by the public cloud guys***. [*id*.]; (iii) "we saw ***increased competition from the public cloud vendors*** …. And during that period of ***uncertainty*** we weren't very competitive with that during that period." [*id*.]; (iv) "we saw the need to get more resources, more scale so that we can deliver a competitive cloud offering and

---

[17]    The Company later unceremoniously stated that it had: "mutually agreed with Tom [Reilly] that this is the right time for a leadership transition."

1    *replatform into cloud architecture,* and that's why we did the merger. And so Cloudera **now** has the

2    resources, the scale, the employees, the engineers to very quickly replatform our business." [*id*.]; (v)

3    "in the first half of the quarter, we were not generating much pipeline because we hadn't trained the

4    sales force. We didn't have our strategy aligned…." [*id*.]; (vi) "after the two companies had merged…

5    we were still *operating somewhat blind* …. So you had a general level of *uncertainty* … we *did not*

6    *anticipate* that to the level extent that it was, the fact that our churn rate increased, that was certainly

7    *unanticipated* …" [Defendant Frankola].

8        39.    Defendant Reilly's and Frankola's *mea culpa* that Cloudera's customer churn was

9    "unanticipated" was poorly received by analysts given Defendant Reilly's prior September 2018

10   boasts about the extent to which he and Defendant Frankola were hands-on managers that: "*track all*

11   *of our customers through these phases*, *what our churn rates are*, what our graduation rates are,

12   what our average tenures are." Not surprisingly, market reaction to the Company's June 5, 2019

13   disclosures was scathing.

14       40.    Deutsche Bank downgraded the Company and lowered its price target from $13 per

15   share to $7 per share in an analyst note called "Now THAT was a Rough Quarter." There, Deutsche

16   Bank analyst Karl Keirstead, *inter alia*, questioned the veracity of Defendants' explanation for

17   Cloudera's June 5, 2019 disclosures, stating that Cloudera: "disclosed higher customer churn,

18   postponed renewals and expansions, share losses to public cloud alternatives and the departure of the

19   CEO. *While Cloudera attributed* this in large part to hesitation ahead of the late-summer launch of its

20   new CDP (Cloudera Data Platform) product, *we conclude* based on our field checks that Cloudera

21   hasn't managed the architectural transition well from on-premise Hadoop-focused data analytics

22   projects to cloud/AWS-hosted workloads and that it has fallen behind AWS, Snowflake, Google and

23   Microsoft in the analytics space." He added that: "[b]ased on our checks, we believe that demand for

24   on-premise *Hadoop-focused technology has completely stalled* (rival MapR is also very challenged)

25   and Cloudera was *late to launch a competitive cloud-hosted product* as AWS has made improvements

26   to Redshift/EMR, as Google refines its world-class data analytics services and as privately-held and

27

28

AWS-hosted Snowflake has taken share (we heard late last year that Snowflake was specifically targeting Hadoop/Cloudera customers coming up for renewals)."

41.    Raymond James analyst Michael Turits explained that Cloudera's earnings miss and deep guidance cut was due "primarily to customers moving workloads to cloud where they are choosing **cloud native** data management solutions (EMR, RedShift, Athena) absent the availability of Cloudera's new cloud focused CDP platform." He added, "CDP will provide benefits over Cloudera Altus **including a cloud-native experience**.'" Barclays analyst Raimo Lenschow more bluntly concluded that: "**Cloudera currently does not have a cloud solution**, which ... means that the company suffers from weak renewals as customers move to cloud native providers."

42.    D.A. Davidson analyst Rishi Jaluria went even further, suggesting that he had been misled during the Class Period by "rel[ying] too heavily on taking management at its word," and finding it "**truly difficult to believe**" that Cloudera's reasons for the billings miss and reduced guidance, namely "that customers delaying deployment until CDP, increased churn, merger disruption, and competitive headwinds – **all legitimate concerns continually brought up by investors** – were not properly factored into guidance provided 90 days ago." Stifel analyst Brad Reback described the Company's June 5, 2019 disclosures as "'one of 'the deepest cuts we can remember in the software space **since the dot.com meltdown**.'" Wedbush analyst Daniel Ives aptly described the Company's June 5, 2019 disclosures as a "**Nightmare on Elm Street situation**" during a live television interview with *Bloomberg*.

### Cloudera is Forced to Explore Going Private

43.    On June 9, 2020, *Bloomberg* reported that Cloudera "is exploring a potential sale after receiving takeover interest [and] is working with a financial adviser to evaluate its options, the people said, asking not to be identified because the matter is private. If Cloudera is sold, it would be the latest chapter for the once high-growth company that has long struggled to make money on products related to open-source software, which is usually free to use."[18] The Company's largest shareholder –

---

[18]    *Cloudera Said to Explore Sale After Receiving Interest* by Liana Baker (June 9, 2020).

corporate raider Carl Icahn *via* his company, Icahn Enterprises – is reportedly behind the effort to sell Cloudera. It wouldn't be the first time a Hadoop-based big data vendor faced financial difficulties so severe that it ended up being sold. MapR Technologies, Inc. announced in May 2019 that it could have to shut down its operations and was later sold to Hewlett Packard in August 2019. Finally, after each of the Insider Defendants had either left or been removed, on September 2, 2020, the Company finally fairly represented that: "[w]ith CDP, we are ***participating*** in the fastest growing segment of the market through cloud-native services." Long gone were Defendant Reilly's Class Period boasts of Cloudera "leading" the cloud market.

44.     A post-Class Period article published by *ZDNet* on October 3, 2019 summed up many of the industry forces that Cloudera and the Insider Defendants either knew or deliberately disregarded had negatively impacted Cloudera's operations during the Class Period as follows:

> Cloudera has been through an eventful, some might say turbulent year, to say the least. While its been awhile since Cloudera branded itself as Hadoop, its fortunes have nonetheless been tied to the open source platform first codified by Doug Cutting and Mike Cafarella well over a decade ago.

> \*     \*     \*

> After a disastrous Q1, and with MapR on the ropes, the conventional wisdom was that Hadoop was dead, and with it, Cloudera and MapR becoming roadkill …. Back to our originally scheduled program, Cloudera was going through the familiar story of a company on the cusp of platform change (as Andrew [Brust] termed it, the Osborne effect); ***of course, customers are going to hold back until they know what's coming***. As noted, ***Cloudera didn't adequately warn Wall Street.***[19]

45.     Similarly, and at all relevant times, Cloudera failed to adequately warn, and affirmatively misled, shareholders about the Company's almost existential competitive industry challenges during the Class Period. And while the Company's highest-ranking insiders profited before the "wheels came off," with their impeccably timed exchange and sales of stock in the SPO and Merger, the Company's shareholders, who suffered substantial damages as a result of the conduct alleged herein, were not nearly as fortunate.

---

[19]     *Where Does Cloudera Go from Here?* by Tony Baer (October 3, 2019).

1

### III.   JURISDICTION AND VENUE

2

46.   The claims asserted herein arise under §§ 11(a), 12(a)(2), and 15 of the 1933 Act, 15

3

U.S.C. §§ 77k(a), 77l(a), and 77o(a) and §§ 10(b), 20(a) of the 1934 Act, 15 U.S.C. § 78j(b), § 78t(a)

4

and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

5

47.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

6

§1331, Section 22 of the 1933 Act, 15 U.S.C. §77v, and Section 27 of the 1934 Act, 15 U.S.C. § 78aa,

7

because this is a civil action arising under the laws of the United States.

8

48.   Venue is proper in this District pursuant to Section 22 of the 1933 Act, 15 U.S.C. §

9

77v, Section 27 of the 1934 Act, 15 U.S.C. § 78aa, and 28 U.S.C. §1391(b). Many of the acts alleged

10

herein, including the preparation and dissemination of materially false and/or misleading information,

11

were made or issued from this District. Further, Cloudera's principal executive offices are in this

12

District.

13

49.   In connection with the acts, conduct and other wrongs alleged herein, Defendants,

14

directly and/or indirectly, used the means and instrumentalities of interstate commerce, including but

15

not limited to, the United States mail, interstate telephone communications and the facilities of the

16

national securities exchanges.

17

### IV.   PARTIES

18

**Plaintiffs**

19

50.   Lead Plaintiffs Mariusz J. Klin and the Mariusz J. Klin MD PA 401K Profit Sharing

20

Plan purchased shares of Cloudera common stock during the Class Period and were damaged thereby.

21

Lead Plaintiffs' certification evidencing their transactions in Cloudera's securities during the Class

22

Period is attached hereto as Exhibit A and incorporated by reference herein.

23

51.   Plaintiff Robert Boguslawski owned shares of Hortonworks common stock at the time

24

of the Merger. Upon the closing of the Merger, and pursuant to the Merger Registration Statement,

25

Plaintiff Boguslawski's shares were exchanged for new Cloudera shares. Plaintiff Boguslawski was

26

damaged thereby. Plaintiff's certification evidencing the exchange of his Hortonworks shares for

27

Cloudera shares in the Merger is attached hereto as Exhibit B and incorporated by reference herein.

28

52.     Plaintiff Arthur P. Hoffman owned shares of Hortonworks common stock at the time of the Merger. Upon the closing of the Merger, and pursuant to the Merger Registration Statement, Plaintiff Hoffman's shares were exchanged for new Cloudera shares. Plaintiff Hoffman was damaged thereby. Plaintiff's certification evidencing the exchange of his Hortonworks shares for Cloudera shares in the Merger is attached hereto as Exhibit C and incorporated by reference herein.

**Corporate Defendants**

53.     Defendant Cloudera, Inc. is a Delaware corporation with its principal executive offices located at 395 Page Mill Road Palo Alto, CA 94306. Cloudera's shares trade on the NYSE under the ticker symbol "CLDR." Cloudera has recently described itself in varying ways to the market. Prior to the IPO, the Company's original start-up company pitch deck described it in September 2008 as "Hadoop for the Enterprise." For the IPO, the Company's registration statement filed with the SEC on Form S-1 on March 31, 2017 stated that the Company had "developed the leading modern platform for data management, machine learning and advanced analytics." For the SPO, the Company's registration statement filed with the SEC on Form S-1 on September 15, 2017, stated that the Company had "developed the modern platform for machine learning and analytics, optimized for the cloud." Its 2018 Annual Report filed with the SEC on Form 10-K on March 29, 2019 now simply provides that Cloudera is an "enterprise data cloud company." Cloudera is named as a Defendant herein under the 1933 and 1934 Acts.

54.     Defendant Intel is a semiconductor technology company headquartered in Santa Clara, California. At the time of the Merger, Intel was a large controlling shareholder of Cloudera which held approximately 17.6% of Cloudera's outstanding common stock as of March 31, 2018. According to Cloudera's 2018 Proxy Statement filed with the SEC on Form 14A on May 16, 2018, Intel held, through Defendant Schooler, 26,065,827 shares of Cloudera common stock. Cloudera's public SEC filings acknowledged Intel's controlling position afforded it "considerable influence" over Cloudera. Intel exercised this control, participating as an "affiliate" of the "directors and executive officers of Cloudera" at "the Cloudera special meeting" during which Intel, along with Cloudera's executives and directors: (i) voted to execute the Merger agreement; (ii) "entered into support agreements," pursuant

1   to which they; (iii) "agreed, among other things, to vote their respective shares of common stock of

2   Cloudera in favor" of the Merger, as well as "against any [countervailing] acquisition proposal and

3   against any action or agreement that would reasonably be expected to impede, interfere with, postpone,

4   prevent or delay the consummation of, the transactions contemplated by the merger agreement."

5       55.   Prior to the Merger, Intel had "the right to designate a person that [Cloudera's] board

6   of directors must nominate for election, or nominate for re-election, to [Cloudera's] board of

7   directors." This control enabled Intel to appoint an Intel employee, Defendant Rosemary Schooler

8   ("Schooler"), to Cloudera's Board of Directors (the "Board"). The Merger Prospectus further

9   highlighted Intel's influence over Cloudera's affairs. During the Merger negotiations between

10  Cloudera and Hortonworks in July 2018, Cloudera consistently raised the issue of Intel having a seat

11  on the combined company's Board. Following the Merger, Intel continued to have an employee on

12  the Board.

13      56.   Defendant Intel is named as a Defendant exclusively under the 1933 Act. None of the

14  claims against Intel include any allegations of fraud or scienter, and Plaintiffs disclaim any such

15  allegations herein against it.

16  **Insider Defendants**

17      57.   Defendant Reilly was Cloudera's CEO and Chairman of the Board of Directors at the

18  time of Cloudera's IPO. Defendant Reilly subsequently became CEO of the combined Cloudera on

19  January 3, 2019. Defendant Reilly announced his own abrupt and unexpected resignation during the

20  Company's June 5, 2019 investor call, which resignation became effective July 31, 2019.

21      58.   During the Class Period, Defendant Reilly signed and/or had ultimate authority over

22  the Company's: (i) IPO Registration Statement filed with the SEC on Form S-1 on March 31, 2017

23  and Prospectus filed with the SEC on Form 424B on April 28, 2017 (together, "IPO Prospectus"); (ii)

24  SPO Registration Statement filed with the SEC on Form S-1 on September 15, 2017 and Prospectus

25  filed with the SEC on Form 424B on September 28, 2017 (together, "SPO Registration Statement");

26  (iii) June 9, 2017 quarterly report filed with the SEC on Form 10-Q ("1Q18 Quarterly Report"); (iv)

27  September 12, 2017 quarterly report filed with the SEC on Form 10-Q ("2Q18 Quarterly Report"); (v)

28

Merger Registration Statement filed with the SEC on Form S-4 on November 5, 2018 and Prospectus filed with the SEC on Form 424B3 on November 27, 2018 (together, "Merger Registration Statement"); (vi) December 8, 2017 quarterly report filed with the SEC on Form 10-Q ("3Q18 Quarterly Report"); (vii) April 4, 2018 annual report filed with the SEC on Form 10-K ("2018 Annual Report"); (viii) June 6, 2018 quarterly report filed with the SEC on Form 10-Q ("1Q19 Quarterly Report"); (ix) September 6, 2018 quarterly Report on Form 10-Q ("2Q19 Quarterly Report"); (x) December 6, 2018 Quarterly Report on From 10-Q ("3Q19 Quarterly Report"); and (xi) June 5, 2019 Quarterly Report filed with the SEC on Form 10-Q ("1Q20 Quarterly Report").

59.     Defendant Reilly participated in and made statements during all the Company's Class Period earnings conference calls, as well as the Company's October 3, 2018 conference call with investors announcing the Merger. Because of his senior position with the Company, Defendant Reilly possessed the power and authority to control the contents of the Company's press releases, investor and media presentations, and all filings Cloudera made with the SEC during the Class Period. Defendant Reilly is named as a Defendant under the 1933 and 1934 Acts. Defendant Reilly ***did not purchase a single share*** of Cloudera common stock on the open market during the Class Period.

60.     Defendant Frankola has served as Cloudera's Chief Financial Officer ("CFO") since October 2012. During the Class Period, Defendant Frankola signed and/or had ultimate authority over the Company's: (i) IPO Prospectus; (ii) SPO Registration Statement; (iii) 1Q18 Quarterly Report; (iv) 2Q18 Quarterly Report; (v) Merger Registration Statement; (vi) 3Q18 Quarterly Report; (vii) 2018 Annual Report; (viii) 1Q19 Quarterly Report; (ix) 2Q19 Quarterly Report; (x) 3Q19 Quarterly Report; and (xi) 1Q20 Quarterly Report.

61.     Defendant Frankola participated on and made statements during all the Company's Class Period earnings conference calls, as well as the Company's October 3, 2018 conference call with investors announcing the Merger. Because of his senior position with the Company, Defendant Frankola possessed the power and authority to control the contents of the Company's press releases, investor and media presentations, and all filings Cloudera made with the SEC during the Class Period.

Defendant Frankola is a named Defendant under the 1933 and 1934 Acts. Defendant Frankola *did not purchase a single share* of Cloudera common stock on the open market during the Class Period.

62.     Defendant Michael A. Olson ("Olson") was a co-founder of Cloudera and served as Cloudera's Chief Strategy Officer from June 2013 until Defendant Reilly announced Defendant Olson's resignation during the Company's June 5, 2019 earnings investor conference call. Defendant Olson signed and had ultimate authority over the Company's: (i) IPO Registration Statement; (ii) SPO Registration Statement; (iii) Merger Registration Statement; and (iv) 2018 Annual Report. Defendant Olson participated on and made statements during the Company's 3Q18, 4Q18 and 2Q19 earnings conference calls with investors.

63.     On October 2, 2017, Defendant Olson sold 587,288 Cloudera shares at a price of $15.792 per share in the SPO for proceeds of $9.27 million. Because of his senior position with the Company, Defendant Olson possessed the power and authority to control the contents of the Company's press releases, investor and media presentations, and all filings Cloudera made with the SEC during the Class Period. Defendant Olson is a named Defendant under the 1933 and 1934 Acts. Defendant Olson *did not purchase a single share* of Cloudera common stock on the open market during the Class Period.

64.     Prior to leaving Cloudera, Defendant Ping Li ("Li") served as a member of Cloudera's board of directors since October 2008. Defendant Li is a Partner at Accel, a Silicon Valley venture capital firm, where he has worked since 2004. Defendant Li was an early venture capital investor in Cloudera. During the Class Period, Defendant Li signed and/or had ultimate authority over the Company's: (i) IPO Registration Statement: (ii) SPO Registration Statement; and (iii) the Company's 2018 Annual Report, which was incorporated by reference into the Merger Registration Statement.

65.     Defendant Li sold 6,528,862 shares of Cloudera common stock in the SPO at $15.79 per share pocketing nearly $103 million. On December 12, 2017, Defendant Li sold an additional 2,675,710 shares of Cloudera common stock on the open market at an average price of $16.50 per share, yielding proceeds exceeding $44.1 million. Defendant Li left the Company shortly thereafter in July 2018. Because of his senior position with the Company, Li possessed the power and authority to

control the contents of the Company's press releases, investor and media presentations, and all filings Cloudera made with the SEC during the Class Period. In addition, at all relevant times, Defendant Li served as a member of the Board's compensation committee. The Company's filings with the SEC, including the SPO Prospectus, defined Defendant Li as a member of "Management." Defendant Li is a named Defendant under the 1933 and 1934 Acts. Defendant Li *did not purchase a single share* of Cloudera stock on the open market during the Class Period.

66.     Defendants Reilly, Frankola, Li and Olson are collectively referred to as the "Insider Defendants."

67.     Given the Insider Defendants' positions within the Company, they each had access to the adverse undisclosed information about Cloudera's business, operations, and practices through access to internal corporate documents, conversations, and contact with other corporate officers and employees, attendance at meetings, and through reports and other information provided to them.

68.     Each of the Insider Defendants solicited the purchase of the common stock issued pursuant to the Merger Registration Statement, planned and participated in the preparation of the statements contained in the Merger Registration Statement and promoted the Merger to investors, including to Cloudera's and Hortonworks' shareholders.

69.     By virtue of their high-level positions, the Insider Defendants were each directly involved in Cloudera's day-to-day operations and were each privy to confidential information concerning the Company, its business, operations, and practices, including the misstatements alleged herein. Their positions of control and authority as officers or directors enabled the Insider Defendants to control the contents of the Company's SEC filings, press releases, presentations to securities analysts, and other public statements made to Cloudera shareholders during the Class Period. Accordingly, each of the Insider Defendants bear responsibility for the accuracy of the public reports and press releases detailed herein, and are therefore primarily liable for the material misrepresentations and omissions contained therein.

70.     During the Class Period, each of the Insider Defendants substantially participated in the creation of and had exclusive authority and control over the content of Cloudera's materially false

and misleading statements and omissions, and how they were communicated to investors. The Insider Defendants also engaged in conduct, alleged solely under the 1934 Act herein, in furtherance of a fraudulent scheme and course of business, and were involved in the preparation and dissemination of Cloudera's misleading statements, all of which made it necessary or inevitable that material misrepresentations would be communicated to, and mislead, investors.

71.     The Insider Defendants were obliged to refrain from falsifying Cloudera's books and were prohibited from using the instrumentalities of interstate commerce or the mails and, as alleged under the 1934 Act, to: (i) employ any device, scheme, or artifice to defraud; (ii) knowingly or with deliberate recklessness make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engage in any act, practice, or course of business which operates or would operate as a fraud upon any person. The Insider Defendants' conduct in this regard violated the federal securities laws and SEC regulations promulgated thereunder in connection with the purchase or sale of Cloudera's common stock.

72.     Each of the Insider Defendants is liable under the 1934 Act as a participant in a fraudulent scheme and course of business whose primary purpose and effect was to operate as a fraud and deceit on purchases of Cloudera securities by disseminating materially false and misleading statements and/or concealing material adverse facts about Cloudera's operations. The Insider Defendants' scheme deceived the investing public regarding Cloudera's operations and the intrinsic value of Cloudera's common stock, and damaged Plaintiffs and other members of the Class as a result of their purchases of Cloudera common stock at artificially inflated prices.

73.     The Company's press releases, and SEC filings were group-published documents, representing the collective actions of the Company management. The Insider Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein under the 1934 Act and were aware, or recklessly disregarded, with respect to the statements at issue herein, that false and misleading statements were being issued

1   regarding the Company. The Insider Defendants also approved or ratified these statements in violation

2   of the 1934 Act.

3   **Director Defendants**

4   74.     Defendant Martin I. Cole ("Cole") served as a director on Cloudera's Board at the time

5   of the Merger. Defendant Cole participated in the preparation of and signed the Merger Registration

6   Statement. Defendant Cole is named exclusively as a Defendant under the 1933 Act, and none of the

7   claims against him include allegations of fraud or scienter. Because of his senior position at the

8   Company, he possessed the power and authority to control the contents of the Merger Registration

9   Statement. Defendant Cole became Cloudera's interim CEO in August 2019 after Defendant Reilly

10  was removed from that position effective July 31, 2019.

11  75.     Defendant Kimberly L. Hammonds ("Hammonds") served as a director on Cloudera's

12  Board at the time of the Merger. Defendant Hammonds participated in the preparation of and signed

13  the Merger Registration Statement. Defendant Hammonds is named exclusively as a Defendant under

14  the 1933 Act, and none of the claims against her include allegations of fraud or scienter. Because of

15  her senior position at the Company, she possessed the power and authority to control the contents of

16  the Merger Registration Statement.

17  76.     Defendant Schooler served as an employee of Defendant Intel and a director on

18  Cloudera's Board at the time of the Merger. Defendant Schooler participated in the preparation of and

19  signed the Merger Registration Statement. Defendant Schooler is named exclusively as a Defendant

20  under the 1933 Act, and none of the claims against her include allegations of fraud or scienter. Because

21  of her senior position at the Company, she possessed the power and authority to control the contents

22  of the Merger Registration Statement.

23  77.     Defendant Steve J. Sordello ("Sordello") served as a director on Cloudera's Board at

24  the time of the Merger. Defendant Sordello participated in the preparation of and signed the Merger

25  Registration Statement. Defendant Sordello is named exclusively as a Defendant under the 1933 Act,

26  and none of the claims against him include allegations of fraud or scienter. Because of his senior

27

28

position at the Company, he possessed the power and authority to control the contents of the Merger Registration Statement.

78.     Defendant Michael A. Stankey ("Stankey") served as a director on Cloudera's Board at the time of the Merger. Defendant Stankey participated in the preparation of and signed the Merger Registration Statement. Defendant Stankey is named exclusively as a Defendant under the 1933 Act, and none of the claims against him include allegations of fraud or scienter. Because of his senior position at the Company, he possessed the power and authority to control the contents of the Merger Registration Statement.

79.     Defendant Priya Jain ("Jain") served, at the time of the Merger, as the Company's Vice President, Corporate Controller and Principal Accounting Officer. Defendant Jain participated in the preparation of and signed the Registration Statement. Defendant Jain is named exclusively as a Defendant under the 1933 Act, and none of the claims against her include allegations of fraud or scienter. Because of her senior position at the Company, she possessed the power and authority to control the contents of the Merger Registration Statement.

80.     Defendant Robert Bearden ("Bearden") served as President and CEO of Hortonworks at the time of the Merger. Defendant Bearden participated in the preparation of the Merger Registration Statement as an incoming Cloudera Board member upon the close of the Merger. Defendant Bearden is named exclusively as a Defendant under the 1933 Act, and none of the claims against him include allegations of fraud or scienter. Because of his senior position at the Company, he possessed the power and authority to control the contents of the Merger Registration Statement. Defendant Bearden replaced Defendant Cole as Cloudera's CEO in January 2020.

81.     Defendant Paul Cormier ("Cormier") served as a director on the Hortonworks Board of Directors (the "Hortonworks Board") at the time of the Merger. Defendant Cormier participated in the preparation of the Merger Registration Statement as an incoming Cloudera Board member upon the close of the Merger. Defendant Cormier is named exclusively as a Defendant under the 1933 Act and none of the claims against him include allegations of fraud or scienter. Because of his senior

position at the Company, he possessed the power and authority to control the contents of the Merger Registration Statement.

82.     Defendant Peter Fenton ("Fenton") served as a director on the Hortonworks Board at the time of the Merger. Defendant Fenton participated in the preparation of the Merger Registration Statement as an incoming Cloudera Board member upon the close of the Merger. Defendant Fenton is named exclusively as a Defendant under the 1933 Act, and none of the claims against him include allegations of fraud or scienter.  Because of his senior position at the Company, he possessed the power and authority to control the contents of the Merger Registration Statement.

83.     Defendant Kevin Klausmeyer ("Klausmeyer") served as a director on the Hortonworks Board at the time of the Merger. Defendant Klausmeyer participated in the preparation of the Merger Registration Statement as an incoming Cloudera Board member upon the close of the Merger. Defendant Klausmeyer is named exclusively as a Defendant under the 1933 Act, and none of the claims against him include allegations of fraud or scienter. Because of his senior position at the Company, he possessed the power and authority to control the contents of the Merger Registration Statement.

84.     Defendants Reilly, Frankola, Olson, Cole, Hammonds, Schooler, Sordello, Stankey, Jain, Bearden, Cormier, Fenton and Klausmeyer are collectively referred to in §VI *infra* as the "Director Defendants." The Director Defendants each solicited the purchase of the common stock issued pursuant to the Merger Registration Statement, planned and participated in the preparation of the statements contained in the Merger Registration Statement, and promoted the Merger to investors, including to Cloudera's and Hortonworks' shareholders.

## V.     PLAINTIFFS' 1934 ACT CLAIMS ARE ACTIONABLE

85.     Throughout the Class Period, Cloudera and the Insider Defendants either knowingly or with deliberate recklessness made materially false and misleading statements and/or omissions that: (i) concealed that Cloudera's competitors' cloud services were vastly outperforming the Company's Hadoop-based platforms; (ii) as a result, Cloudera was having difficulty landing new, and expanding with current customers; (iii) the Company's "land and expand" growth strategy was therefore an

unsuccessful attempt to generate profits since Cloudera's existing customers were interested in Cloudera's Hadoop-focused platform; (iv) consequently, the Company's sales and marketing expenditures to attract new and keep current customers were ballooning; (v) the Merger's primary purpose was to try to generate organic growth by developing a cloud-native platform; and (6) the touted benefits of the Merger were materially overstated.

86.     In sum, Defendants misleadingly claimed that Cloudera's platforms and product offerings were "cloud-native" and grounded in "cloud infrastructure." Starting with its IPO Prospectus and continuing throughout the Class Period, Cloudera went so far as to suggest that its "competition" included "public cloud providers who include proprietary data management, machine learning and analytics offerings, such as Amazon Web Services, Google Cloud Platform and Microsoft Azure." These and other related such statements created a materially misleading impression of Cloudera's business and prospects. Throughout the entirety of the Class Period, Cloudera lacked a viable "cloud native" product and its Hadoop-focused offerings were incapable of offering even remotely the same cloud performance that its competitors offered. Consequently, Cloudera and the Insider Defendants materially misrepresented the Company's technological capabilities and ability to compete in the cloud market.

87.     Following the Class Period, interim CEO Defendant Cole admitted the existential Class Period issues that Cloudera faced during a September 10, 2019 Deutsche Bank Technology Conference. There, in response to an analyst question from Deutsche Bank analyst Karl Keirstead about the market shift away from Hadoop to cloud platforms, Defendant Cole stated, *inter alia*, that: "I'm the new guy here but appreciate that. No, the – I mean I think the – some of our challenges were self-inflicted …. As it relates to sort of the competitive pressures, the merger was very powerful to create the [Hadoop] market leader on-premise, right? There really isn't a player who could do what we do on-premise, which is a good market. Where we see challenges would be for those customers who are moving workloads to the cloud where ***there's never even a competition***. Where we compete [*i.e.*, on-premise], we've got a good game. Where they just move because a line of business says, 'Okay, I want to spin up an analytic workload,' ***we may never see that.***"

88.     Mr. Keirstead then followed up, asking whether: "[t]hat stuff might go direct [Amazon] AWS or [Microsoft] Azure …" and Defendant Cole conceded that: "[y]es. AWS, Azure and even on increasing basis now, GCP. They may go direct to – a Databricks or Snowflake, thus with an Azure or AWS. So *that is a threat in terms of impacting growth* rates versus an absolute impact on the business *per se* … and one of the reasons we *needed to do this merger* is neither company was in a very strong position in the cloud. We both had offerings but they weren't easy to use. *They didn't have that same take-up as a pure public cloud capability*."

89.     Then, on December 5, 2019, Cloudera held a conference call to discuss the Company's results for the third fiscal quarter 2020 for the period ended October 31, 2019. During the call, Defendant Cole responded to an analyst question concerning Cloudera's Class Period inability to compete with cloud vendors, stating, *inter alia*, that with CDP: "*[w]e now have a competing product* …. Previously, customers were bifurcating workloads and say, 'Okay, *we've got to find another product to go into the public cloud*. We like where you guys are on-prem, but you don't have the offering that we're looking for in terms of ease of use, consistency, security, governance, *et cetera*.'" Because Cloudera and the Insider Defendants made their materially false and misleading statements either knowingly or with deliberate recklessness, the Insider Defendants' scienter, which Defendant Cole's concessions above in ¶¶ 21-23, 26-27, *supra* acknowledge, an inference of corporate scienter against Cloudera is also adequately alleged.

**Materially False and Misleading Class Period Statements and Omissions[20, 21]**

**April 28, 2017 (IPO Prospectus)**

90.     The Class Period commences on April 28, 2017 with the filing of Cloudera's IPO Prospectus. The IPO Prospectus touted Cloudera's purported competitive advantages and growth opportunities in the cloud market by focusing primarily on the largest businesses in the world, which

---

[20]     The "Background & Overview of the Action" alleged in § II, *supra*, is incorporated by reference in throughout herein in § V.

[21]     Attached hereto as Exhibit D is a summary chart that complies with the Court's "Guidelines for Securities Class Action Cases."

the Company described as the "Global-8000." The IPO Prospectus represented that the Company: "will further expand our customer opportunity through the continued growth in use cases and packaged solutions, the expansion of our partner ecosystem and the proliferation of skills, driven by ease of use and accelerating adoption of the cloud" and that the Company was "only beginning to penetrate market opportunity with Global 8000 companies …."

91.     The IPO Prospectus emphasized the Company's "land and expand" sales strategy, which Cloudera claimed enabled it to "use the initial sale as a foothold to increase revenue per customer by increasing the amount of data and number of use cases each customer runs through our platform." Then, "[a]fter an initial purchase of our platform, we work with our customers to identify new use cases that can be developed on or moved to our platform, ultimately increasing the amount of data managed on our platform as well as the number and size of our platform deployments." The Company explained that: "[w]e believe that, *over time*, as our customer base grows and a relatively higher percentage of [Cloudera's] subscription revenue is attributable to renewals or greater usage among existing customers relative to new customers, *associated sales and marketing expenses and other allocated upfront costs as a percentage of revenue will decrease*…."

92.     The highlighted statements in ¶¶ 90-91 *supra* were materially false and misleading when made because the Company's "land and expand" strategy was an ineffective attempt to grow profits when, in reality, Cloudera and the Insider Defendants either knew or recklessly disregarded that they had to expend egregiously high sales and marketing funds to promote its Hadoop-focused platform and, later, to promote CDP. Indeed, "over time," the Company was later forced to acknowledge on June 5, 2019, that it spent an astonishing $119 million on sales and marketing in 1Q20 which analysts called unexpected, unusual and "egregiously high" given the Company's prior representations.

93.     The IPO Prospectus also misrepresented that Cloudera possessed a "cloud-native" platform, stating that: "[b]uilding on the approach of web-scale consumer internet companies, we have collaborated with the global open source community to innovate and *deliver our cloud-native platform.*" The IPO Prospectus added that a key element of its strategy was "extending our *original*

*cloud-native architecture*." In addition, the IPO Prospectus misleadingly claimed that Cloudera's "*competition*" included "*public cloud providers who include proprietary data management, machine learning and analytics offerings, such as Amazon Web Services, Google Cloud Platform and Microsoft Azure*."

94.     The highlighted statements in ¶¶ 90-91, 93 *supra* were materially false and misleading when made because: (i) Cloudera did not possess a "cloud native platform" or "cloud-native architecture" until the Company launched CDP for the public cloud in September 2019; (ii) Cloudera and the Insider Defendants concealed that Cloudera's competitors' cloud technologies were vastly outperforming the Company's Hadoop platform; and (iii) as a result, Cloudera and the Insider Defendants materially misrepresented not only the Company's offerings, but its ability to compete against large public cloud vendors like Microsoft, Google and Amazon. As Cloudera and the Insider Defendants were later forced to acknowledge after the Class Period, Cloudera's products were not "cloud native" and they launched the CDP product to address this "competitive disadvantage."

95.     More specifically, after the Class Period, Defendants Reilly, Frankola and Cole conceded that the materially false and misleading Class Period statements alleged herein were made with, at a minimum, deliberate recklessness because: (i) Cloudera had to completely "*replatform*" its operations in the Merger to address its "competitive disadvantage" against cloud providers like Microsoft, Amazon and Google, which "replatforming" Defendant Reilly admitted on June 5, 2019 the Company "*didn't share earlier*"; (ii) given Cloudera's lack of "cloud native" offerings, Defendant Reilly admitted on June 5, 2019 that Cloudera was "[not] really competitive against what the public cloud guys [were] offering" during the Class Period; (iii) in September 2019, Defendant Cole acknowledged that the Merger was consummated because "neither company was in a very strong position in the cloud. We both had offerings *but they weren't easy to use*. They didn't have that same take-up as a *pure public cloud capability*," and that the Company's Class Period "challenges were self-inflicted"; (iv) in December 2019, Defendant Cole similarly conceded that, with CDP, "we *now* have a competing cloud product" and that, during the Class Period, there was "never even a competition" against Amazon's and Microsoft's cloud offerings; and (v) Mr. Murthy's two post-Class

Period articles on Cloudera admitted that the Company lacked viable cloud-native products until the release of CDP in September 2019.

**June 8, 2017 (1Q18)[22]**

96.     After market close on June 8, 2017, Cloudera filed a press release on Form 8-K with the SEC announcing Cloudera's financial results for the first quarter fiscal year 2018 for the period ended April 30, 2017. The following day, on June 9, 2017, the Company filed its 1Q18 results with the SEC on Form 10-Q, which Defendants Reilly and Frankola signed.

97.     The 1Q18 Quarterly Report represented that the Company's "*competition*" included "*public cloud providers who include proprietary data management, machine learning and analytics offerings, such as Amazon Web Services, Google Cloud Platform and Microsoft Azure*." The 1Q18 press release also announced Altus during the quarter, highlighting that it is "our first Platform-as-a-Service offering – designed to deliver the speed, convenience and *elasticity of public cloud infrastructure*, easing the creation for Cloudera customers of new cloud workloads and accelerating the migration of existing workloads to Cloudera's platform *running in the cloud*." Later that same day, Cloudera held its earnings conference call to discuss its quarterly results with the analysts during which Defendant Reilly stated that "Cloudera offers the *leading cloud native software platform* for machine learning and advanced analytics."

98.     The highlighted statements in ¶¶ 96-97 *supra* were materially false and misleading when made because: (i) customers were rejecting Altus because it did not deliver cloud computing elasticity and ease of use; (ii) Cloudera and the Insider Defendants concealed that Cloudera's competitors' cloud technologies were vastly outperforming the Company's Hadoop-focused platform; and (iii) as Defendant Cole admitted in September 2019, Altus was not "easy to use" and lacked "pure public cloud capability"; (iv) Cloudera did not possess a "cloud native software platform," let alone a "leading" one, until the Company launched CDP for the public cloud in September 2019; (v) Cloudera and the Insider Defendants materially misrepresented the Company's product offerings and, therefore,

_____

[22]     Cloudera's fiscal year ends on January 31.

35

ability to compete against the largest public cloud vendors such as Google, Amazon and Microsoft; and (vi) as a result, Cloudera and the Insider Defendants materially misrepresented Cloudera's operations and ability to compete against Amazon, Google and Microsoft.  Further, Defendants were subsequently forced to acknowledge following the Class Period that their Class Period material misstatements and omissions were made, at a minimum, with deliberate disregard for the truth as alleged in ¶ 95 *supra*.

**September 7 & 12, 2017 (2Q18)**

99.     After market close on September 7, 2017, Cloudera filed a press release with the SEC on Form 8-K announcing Cloudera's financial results for the second quarter fiscal year 2018 for the period ended July 31, 2017 ("2Q18"). On September 12, 2017, Cloudera filed its 2Q18 quarterly report on Form 10-Q with the SEC, which Defendants Reilly and Frankola signed.

100.     The 2Q18 Quarterly Report stated that its "***competition***" included "***public cloud providers who include proprietary data management, machine learning and analytics offerings, such as Amazon Web Services, Google Cloud Platform and Microsoft Azure.***" In the 2Q18 press release, Defendant Reilly stated that: "[i]n Q2, we exhibited strong momentum in the areas that drive sustained growth for Cloudera: machine learning, analytics and the cloud." Later that same day, Cloudera held its earnings conference call to discuss its quarterly results with analysts where Defendant Reilly represented in pertinent part that:

> Our modern platform for machine learning and analytics is ***optimized for the cloud***. We've invested substantially to allow customers to run on-premises or in the public cloud of their choice. Amazon, Microsoft and Google are all important platforms and partners. ***Having a cloud-native platform fits nicely with enterprises' desire to shift data and workloads to the cloud***, particularly analytic workloads because those workloads are elastic and transient in nature and because much of the new data that enterprises want to analyze is increasingly generated in the cloud.
>
> The second quarter also ***saw growth in the adoption of Cloudera Altus***, our Platform-as-a-Service offering that enables data engineering and data science workloads ***to run natively and easily in the public cloud***. We handle deployment, management and operations. Customers concentrate on their data processing and analytic work. With Altus managed service and our ***unique cloud orchestration*** and operation software, we're now addressing a new set of elastic and transient jobs that would otherwise be impractical to run in the data center.

101.    The highlighted statements in ¶ 100 *supra* were materially false and misleading when made because: (i) Cloudera lacked a "cloud native platform" and its products were not "optimized for the cloud"; (ii) Altus was not cloud-native as it lacked the capabilities of "cloud-native architecture" and did not "run natively and easily in the public cloud"; and (iii) as a result, Cloudera and the Insider Defendants materially misrepresented Cloudera's ability to compete against the largest public cloud vendors such as Microsoft, Google and Amazon.  Further, Defendants were subsequently forced to acknowledge following the Class Period that their Class Period material misstatements and omissions were made, at a minimum, with deliberate disregard for the truth as alleged in ¶ 95 *supra*.

102.    Indeed, contrary to Defendants' 2Q18 claim that Altus ran "natively and easily in the public cloud," Defendant Cole acknowledged in September 2019 that the Merger was consummated because "neither company was in a very strong position in the cloud. We both had offerings ***but they weren't easy to use***. They didn't have that same take-up as a ***pure public cloud capability***…."

103.    Defendant Reilly also touted to investors in 2Q18 the fact that "[w]e analyze – we use big data ourselves to understand what drives expansions. ***We know*** which partners have the greatest impact. ***We know*** which applications drive the greatest use in key verticals. We train and go after those use cases." During the same 2Q18 earnings call, Defendant Frankola added that:

> I'll reemphasize, one of the big things that we have been focusing on at Cloudera is Cloudera-on-Cloudera, using our own technology. So we have an internal data hub that is approaching a petabyte in size. We bring in all sorts of internal and external information, ***which gives us insight in terms of what drives customer expansion***. We use the information literally to understand our cost of sales at an opportunity level. Therefore, it allows us to focus our energies in the right place, and where there are inefficiencies in our business, try to modify them pretty quickly.

104.    Given this insight, Cloudera and the Insider Defendants made their materially false and misleading Class Period statements and omissions in ¶ 100, *supra*, either knowingly or with deliberate recklessness as to the truth.

**September 15 & 28, 2017 (SPO)**

105.    On September 28, 2017, Cloudera filed its prospectus on Form 424B4 for the SPO, which represented that Cloudera possessed a "***cloud-native***" platform, stating in pertinent part: "[b]uilding on the approach of web-scale consumer internet companies, we have collaborated with the

global open source community to innovate and ***deliver our cloud-native platform."*** In discussing, its business strategy in the SPO Prospectus, Cloudera further stated that a key element of its strategy included "***extending our original cloud-native architecture***…." The SPO Prospectus also stated that "[s]ince our initial public offering, we have continued to innovate and develop new technologies and solutions to extend our market leadership and enhance our platform for machine learning and analytics, optimized for the cloud …. Cloudera Altus is our platform-as-a-service (PaaS) offering. ***Altus is a cloud service*** …."

106.    The statements highlighted in ¶ 105 *supra* were materially false and misleading because: (i) Cloudera lacked a "cloud native platform" or "cloud native architecture"; (ii) Cloudera and the Insider Defendants concealed that Cloudera's competitors' cloud technologies were vastly outperforming the Company's Hadoop-based products; (iii) Altus was not a legitimate "cloud service"; and (iv) as a result, Cloudera and the Insider Defendants materially misrepresented Cloudera's product offerings and ability to compete against the largest public cloud vendors such as Microsoft, Google and Amazon. Further, Defendants were subsequently forced to acknowledge following the Class Period that their Class Period material misstatements and omissions were made, at a minimum, with deliberate disregard for the truth as alleged in ¶ 95 *supra*.

107.    The SPO was also suspiciously timed. The lock-up agreement in the IPO offering materials stated that: "[o]ur directors, executive officers, the holders of substantially all of our common stock and securities convertible into or exchangeable for our common stock have entered into lock-up agreements with the underwriters prior to the commencement of this offering pursuant to which each of these persons or entities, with limited exceptions, for a period of ***180*** days after the date of this prospectus, may not, without the prior written consent of Morgan Stanley & Co. LLC, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend or otherwise transfer or dispose of, directly or

1   indirectly, any shares of our common stock or any securities convertible into or exercisable or

2   exchangeable for our common stock."[23]

3        108.   The SPO offering materials further revealed that: "[i]n connection with our initial

4   public offering, we, all of our directors and officers, and the holders of substantially all of our

5   outstanding equity securities have agreed that, subject to certain exceptions, without the prior written

6   notice of Morgan Stanley & Co. LLC on behalf of the underwriters, we and they will not offer, sell,

7   or agree to sell, transfer or dispose of, directly or indirectly, any shares of common stock without the

8   permission of Morgan Stanley & Co. LLC until ***October 25, 2017***. Morgan Stanley & Co. LLC, on

9   behalf of the underwriters, has consented to the release of these lock-up restrictions with respect to

10   12,446,930 shares of common stock to be sold by the selling stockholders …."

11        109.   The justification Cloudera provided for the early lock-up release was also suspicious –

12   namely, that the Company wanted to use the proceeds from the SPO to pay taxes on employee stock

13   incentive payments. As one industry observer aptly noted at the time, "[c]ouldn't they have anticipated

14   the need for this when they filed for their IPO five months ago?" The answer is yes. The same article,

15   titled "Cloudera stock drops as it files for follow-on offering and unveils new product" by Virginia

16   Backaitis dated September 18, 2017, added that "[i]nvestors aren't keen on the news, ***Cloudera's stock***

17   ***price [ ] dropped below its IPO level***, despite the fact that its quarterly report indicated better than

18   anticipated earnings …."

19        110.   The SPO closed on October 2, 2017. In a press release that same day, the Company

20   stated that "Cloudera sold 3,000,000 shares of common stock and the selling stockholders sold

21   12,446,930 shares of common stock upon full exercise of the underwriters' option to purchase

22   additional shares of common stock. ***Cloudera did not receive any proceeds*** from the shares sold by

23   existing stockholders." The same press release added that "Cloudera intends to use the net proceeds

---

[23]    Lock-up agreements are designed to prevent company insiders from dumping their shares in the weeks and months following an IPO. Early investors, like Defendant LI, who bought into the Company early have a particularly strong incentive to sell their shares and realize a gain on their initial investment as quickly as possible after a "down round IPO" like Cloudera's.

from its sale in this offering to replace funds used to pay the tax withholding obligations Cloudera incurred upon the net settlement of certain equity awards, the settlement of which was concurrent with the pricing of this offering. In addition, this offering was intended to facilitate an orderly distribution of shares for the selling stockholders in this offering, including certain employees and investors."

111.    In the SPO, Defendant Li sold a total of 6,528,862 shares of Company common stock for proceeds of approximately ***$103.1 million***. Defendant Li left the Company the following year. The SPO was designed to, and did, give the Company's insider a quick way to cash out before the bottom fell out. Defendant Olson sold 587,288 shares at $15.79 per share in the SPO, pocketing over ***$9.2 million***. Defendants did not have any prior trading history because Cloudera had only just gone public in April 2017.

**December 7, 2017 (3Q18)**

112.    On December 7, 2017, Cloudera filed a press release with the SEC on Form 8-K announcing Cloudera's financial results for the third quarter fiscal year 2018 for the period ended October 31, 2017 ("3Q18"). On December 8, 2017, the Company filed its quarterly report on Form 10-Q with the SEC, which was signed by Defendants Reilly and Frankola.

113.    The 3Q18 Quarterly Report stated that Cloudera's "***competition***" included "***public cloud providers who include proprietary data management, machine learning and analytics offerings, such as Amazon Web Services, Google Cloud Platform and Microsoft Azure***." During the Company's December 7, 2017 earnings conference call, Defendants Reilly and Olson discussed the strength and success of their claimed cloud native platform, Altus. During the call, Defendant Reilly touted the Company's "***cloud-native platform***" which Defendant Olson reiterated, stating in relevant part: "Cloudera Altus Analytic DB is the first data warehouse cloud service that brings the warehouse to the data through ***a unique cloud-scale architecture*** that eliminates complex and costly data movement."

114.    In the days following the Company's 3Q2018 earnings announcements of December 7, 2017—during which Defendant Reilly touted, *inter alia*, its "cloud native platform", Cloudera's share price rose 4.3% between December 6 and December 12, 2017. On December 6, 2017, the stock

closed at $15.73, but buoyed by the earnings announcements reached highs of $17.25 before December 12, 2017. On December 12, 2017, Defendant Li and his venture capital firm Accel sold an additional **2,675,710** shares of Cloudera common stock on the open market at an average price of ***$16.50 per share***, for proceeds exceeding ***$44.1 million***.

115.     The statements highlighted in ¶ 113 *supra* were materially false and misleading because: (i) Cloudera lacked a "cloud native platform" or "cloud architecture" and its products could not provide public cloud performance comparable to its competitors' offerings; (ii) Cloudera and the Insider Defendants concealed that Cloudera's competitors' cloud technologies were vastly outperforming the Company's Hadoop-focused platform; and (iii) as a result, Cloudera and the Insider Defendants materially misrepresented Cloudera's ability to compete against the largest public cloud vendors such as Microsoft, Google and Amazon. Further, Defendants were subsequently forced to acknowledge following the Class Period that their Class Period material misstatements and omissions were made, at a minimum, with deliberate disregard for the truth as alleged in ¶ 95 *supra*.

116.     A short time later during the January 10, 2018 Citi Global TMT West Conference, Defendant Reilly again confirmed the extent to which he was a hands on manager, stating: (i) "I can actually determine or predict how much time we're spending on pursuing new opportunities versus expansions"; and (ii) "we are becoming very laser-focused on who are the new customers that we want to capture that have the greatest propensity not only to buy but to expand, and who are existing customers we want to apply our resources against because they should expand because we've seen other customers like them expand in the past." Given these assurances, Defendant Reilly's materially false and misleading Class Period statements and omissions were made either knowingly or with deliberate recklessness as to the truth.

**April 3, 2018 (4Q18 and Fiscal Year 2018)**

117.     After market close on April 3, 2018, Cloudera filed a press release with the SEC on Form 8-K announcing its fourth quarter and fiscal year 2018 results for the periods ended January 31, 2018. The FY 2018 press release announced disappointing revenue guidance for the first fiscal quarter of 2019 that was well below the consensus. Specifically, Cloudera forecasted total revenue in the range

of $101 million to $102 million, $85 million to $86 million in subscription revenue, and a non-GAAP net loss per share in the range of $0.19 to $0.17 per share.

118.     On this news, the price of Cloudera's common stock fell $8.95 on unusually high trading volume from a closing price on April 3, 2018 of $22.24 to close on April 4, 2018 at $13.29 as the truth about the Company's competitive disadvantages in cloud began to emerge. The fiscal year 2018 press release further announced revenue guidance for fiscal year 2019. Specifically, Cloudera was forecasting total revenue in the range of $435 million to $445 million, $370 million to $375 million in subscription revenue, and negative $40 million to $35 million in operating cash flow. This was materially less than FY 2019 total revenue consensus of $460 million (27% year-over-year) and $388 million of subscription revenue (30% year-over-year).

119.     Cloudera held a conference call that same day to discuss its fourth quarter and full-year 2018 fiscal year results, during which Defendants Reilly and Olson reaffirmed Cloudera's fiscal performance and provided their outlook for the first quarter and full fiscal year 2019.  Defendant Olson went on to suggest that the Company's Altus offering "*delivers the speed, convenience, elasticity and ease-of-use expected in native public cloud services. Altus is uniquely multicloud* and multifunction, running on both AWS and Azure for data engineering and analytics." In addition, Defendant Reilly suggested that the Company's weak guidance and results were due to "mistakes from where we directed our sales resources" and being "over-rotated."

120.     In an effort to seek clarity about Defendant Reilly's attribution of Cloudera's poor guidance on sales resources "mistakes," Deutsche Bank analyst Karl Keirstead asked whether it was actually the result of end-market demand deterioration: "[a]re there emergence of any new rivals? Are old Cloudera use cases becoming less relevant?" Defendant Reilly quickly dismissed the questions, stating that: "the cloud is turning out to be a *tremendous tailwind* for us. While it introduces new competitors because each of the cloud guys has their own house offering, we have figured out how to win in that market and then stay focused on large enterprises who value our enterprise features around security, governance, [inaudible] you can't find in the public cloud house offerings who value our hybrid approach, our multi-cloud and, more importantly, our multi-function integrated capability.

What I like to say to customers all the time is *we are better than Amazon on Amazon*. Our products on Amazon are integrated better and operate better than Amazon's own offerings. So – and we're seeing the move to the cloud take shape unlike it did 2 years ago. *So I see nothing that gives me concern about the market.* I just think we need – there's high expectations for us to be a high-growth company. And for us, we just had to be very facile on how we attack that market. *No changes in the competitive landscape nor end market demand.*" By attributing the Company's poor quarterly results to a simple misalignment of sales resources, as opposed to the market's movement towards cloud offerings, which the Company then lacked, Defendant Reilly's statements maintained the artificial inflation in the Company's share price.

121.    Mizuho Securities analyst Abhey Lamba then asked Defendant Reilly about Cloudera's poor financial results who again blamed the Company's performance on sales strategy rather than Cloudera's products' positioning and competitive position in the marketplace, stating in relevant part that: "in Q4, to peel back, we fell short of our overall bookings goal. However, if you now peel that, we were satisfied with our new customer acquisition. It was in the expansion number where we fell short. And expansion is the larger part of our business because new customers start small, our expansion deals are more sizable. *So we were just over-rotated.*" By attributing the Company's lackluster results to being "over-rotated," as opposed to the market's shift to cloud offerings which the Company then lacked, Defendant Reilly's statements maintained the artificial inflation in the Company's share price.

122.    Defendant Reilly's and Olson's statements highlighted in ¶¶ 119-121 *supra* were materially false and misleading because: (i) Cloudera lacked "native cloud services" and its platform could not provide public cloud performance comparable to its competitors' offerings; (ii) Cloudera and the Insider Defendants concealed that Cloudera's competitors' cloud technologies were vastly outperforming the Company's Hadoop-focused platform; (iii) Cloudera "replatformed" to launch CDP in September 2019 to compete with public cloud vendors' cloud-native products because there had been "changes in the competitive landscape [and] end market demand"; (iv) the Company's disappointing guidance was not due to Cloudera being "over-rotated," but rather stemmed from

Cloudera's products' weak competitive position against public cloud vendors; (v) Cloudera was not "better than Amazon on Amazon"; and (vi) as a result, Cloudera and Defendants Reilly and Olson materially misrepresented Cloudera's ability to compete in the cloud market, including by claiming that "cloud is turning out to be a tremendous tailwind for us." Further, Defendants were subsequently forced to acknowledge following the Class Period that their Class Period material misstatements and omissions were made, at a minimum, with deliberate disregard for the truth as alleged in ¶ 95 *supra*.

123.    Analysts subsequently downgraded Cloudera and lowered their price targets. In a published report titled, *More Questions than Answers as FY19 Guidance Weighs; Moving to Neutral*, J.P Morgan explained that Cloudera's FY 2019 guidance was "disappointing" and that "the changes Cloudera plans to implement in its go-to-market approach will take some time to bear fruit, while the slowdown in its expansion bookings will impact the narrative against a backdrop of solid recent results from software peers including MuleSoft and Red Hat." Moreover, J.P. highlighted its "Key Takeaways" from the Company's announcements, including, *inter alia*: "1) P&L Results and Billings Fine in FQ4, But Expansion Bookings Softened … 2) *Sales Execution Cited as the Issue, Rather than Competition or Technological Change* … 3) FY19 Revenue Guidance Below Consensus as Planned Go-to-Market Changes are Expected to Produce Uneven 1H:19 Bookings … 4) *Questions that may Linger Include: How Quickly is the Hadoop market moving to public clouds such as Amazon AWS?* Are CLDR deployments reaching a new level of size & complexity (large-scale AI/ML etc) which is bogging down renewals? And Has the IBM-HortonWorks agreement caused competitive ripples in the landscape? Bottom Line: After a period of YTD outperformance, we think CLDR shares will head back toward where they entered the year, and that it will take time for the investment narrative and sales execution to regain its footing. Neutral, $16 PT."[24]

124.    Deutsche Bank similarly downgraded Cloudera and lowered its price target from $23 to $18: "*on the risk that the culprit is not in fact sales focus* (*as Cloudera explained*, that reps were too focused on new logos and not expansion opportunities) *but rather an end market or demand shift*

---

[24]    Emphasis removed.

1    *that will take more time to recover from*." Deutsche Bank explained that downside risks for Cloudera

2    "include share losses to cloud vendors and other technologies and price pressure," noting that:

> Cloudera blamed 'mistakes in directing sales resources' to new logo adds rather than
> expansions of existing deals (Cloudera gave added new logo incentives and reps over-
> rotated) and to opportunities outside their target accounts. This has been brewing for a
> few quarters but we assumed Cloudera had it under control. This explanation seems
> reasonable, *but the severity of the impact* (the global Sales Head Vishal Rao is leaving,
> new ML/Cloud expertise to be added, FY19 deceleration to 24% subscription revs
> growth and just 14% billings growth) *hints at something bigger than sales rep focus*.
> We wonder if 'traditional' use case demand is flattening out or seeing price pressure
> and analytics workloads are moving to cheap AWS/Cloud options as new workload
> types such as machine learning (ML) take time to ramp. We'd rather not bank on a
> 2HF19 recovery until we get over these concerns. Near-term, note that the lockup on
> the next/last tranche of VC share distributions comes off in a few days (releasing 16m
> shares).

11          125.    In response to this news, and despite Defendants' misrepresentations which maintained

12   the artificial inflation in the Company's share price, on April 4, 2018, Cloudera's stock price fell by

13   $8.95 per share, or 40.24%, from its previous closing price of $22.24 per share on April 3, 2018 to

14   close at $13.29 per share on extremely high trading volume that was in excess of 27.9 million shares.

15          **April 4, 2018 (2018 Annual Report)**

16          126.    On April 4, 2018, Cloudera filed its 2018 Annual Report, which each of the Insider

17   Defendants signed. The 2018 Annual Report represented that the Company has "developed the modern

18   platform for machine learning and analytics, optimized for the cloud" and touted the Company's

19   ability to: "continuously innovate in data management technologies and leverage the latest advances

20   in infrastructure including the public cloud for 'big data' applications." The Company also touted its

21   ability to "enable enterprises' 'multi-cloud' strategies, allowing them to move workloads from the data

22   center to the public cloud, among public cloud vendors, and back again, thus avoiding cloud lock-in.

23   This flexibility allows customers to continually determine and implement the most cost-efficient

24   strategies."

25          127.    The 2018 Annual Report also described the "Key elements" of Cloudera's strategy,

26   including that the Company's "*original architecture was designed for the cloud. Our software

27   platform runs natively on public cloud infrastructure* ..." and that the Company's "*competition*"

28

1  included "***public cloud providers who include proprietary data management, machine learning and***

2  ***analytics offerings, such as Amazon Web Services, Google Cloud Platform and Microsoft Azure***."

3  The 2018 Annual Report also stated that: "[w]e continue to innovate and develop new technologies

4  and solutions to extend our market leadership and enhance our platform for machine learning and

5  analytics optimized for the cloud. Cloudera Altus is our platform-as-a-service (PaaS) offering. ***Altus***

6  ***is a cloud service* …**."

7        128.    The 2018 Annual Report made numerous other misstatements about the Company's

8  offerings, including that: (i) Cloudera is "***[l]eading cloud innovation*** for big data"; and (ii) could

9  "leverage the latest advances in infrastructure including the public cloud for 'big data' applications."

10  It also represented that Cloudera's offerings: (i) provided "***[c]loud and*** on-premises deployment at

11  scale and ***across hybrid cloud environments***"; (ii) "allow[ed] enterprises to manage both long-lived

12  and transient workloads across environments, mixing on-premises ***and public cloud infrastructure***,

13  including all of the major public cloud vendors – Amazon Web Services, Microsoft Azure and Google

14  Cloud Platform"; and (iii) permitted customers to "deploy, configure and monitor their clusters and

15  workloads at scale from a centralized interface across any mix of ***public cloud*** or on-premises

16  environments." It further touted that Cloudera's product "***Altus is a cloud service*** that … ***enable[s]***

17  ***customers to address a new set of elastic and transient workloads that would otherwise be***

18  ***impractical to run in the datacenter***," and highlighted its purportedly "ongoing performance in the

19  areas of cloud," and commitment to "deliver the industry's first enterprise data cloud" and

20  "[c]loud…deployment at scale."

21        129.    The statements highlighted in ¶¶ 126-128 *supra* were materially false and misleading

22  because: (i) Cloudera lacked "public cloud infrastructure" and its products could not provide public

23  cloud performance comparable to its competitors' offerings; (ii) Cloudera and the Insider Defendants

24  concealed that Cloudera's competitors' cloud technologies were vastly outperforming the Company's

25  Hadoop-focused platforms; (iii) Altus was not a legitimate "cloud service"; and (iv) as a result,

26  Cloudera and the Insider Defendants materially misrepresented Cloudera's ability to compete against

27  public cloud vendors such as Microsoft, Google and Amazon. As the Insider Defendants were later

28

forced to acknowledge on June 5, 2019, Cloudera's products were not "cloud native" and they launched CDP to address this "competitive disadvantage." After the Class Period, Defendant Cole also admitted that Cloudera's Class Period offerings lacked "pure public cloud capability." Further, Defendants were subsequently forced to acknowledge following the Class Period that its Class Period material misstatements and omissions were made, at a minimum, with deliberate disregard for the truth for the reasons set forth in ¶ 95 *supra*.

**June 6, 2018 (1Q19)**

130.    After market close on June 6, 2018, Cloudera filed a press release on Form 8-K with the SEC announcing Cloudera's financial results for the first quarter fiscal year 2019 for the period ended April 30, 2018, and its quarterly report filed with the SEC on Form 10-Q, which Defendants Reilly and Frankola signed.

131.    The 1Q19 Quarterly Report identified Cloudera's "competition" as including "public cloud providers who include proprietary data management, machine learning and analytics such as Amazon Web Services, Google Cloud Platform and Microsoft Azure." The 1Q19 press release announced disappointing revenue guidance for the second quarter of fiscal 2019. Specifically, Cloudera forecasted total revenue in the range of $107 million to $108 million, $90 million to $91 million in subscription revenue, and a non-GAAP net loss per share in the range of $0.15 to $0.13 per share.

132.    Later that same day, Cloudera held its earnings conference call to discuss its quarterly results with analysts. During the call, Defendant Reilly fielded a question from Deutsche Bank analyst Karl Keirstead regarding Cloudera's ability to compete with public cloud vendors: "you mentioned that you'd like to improve your win rates against the house offerings of the cloud vendors. I presume you're referring to services like EMR and Redshift on AWS and maybe BigQuery on GCP. I'm just wondering if you could summarize – maybe this is partly a question for Mike as well. What are the *functionality gaps* against – that those house offerings have that Cloudera can sort of take advantage of and move up the stack and improve your win rates over time?" Defendant Reilly misleadingly responded that: "*[w]hen we are competing in the cloud, we have so many advantages. Our #1*

1   ***disadvantage is awareness of our capabilities, and that's what we're ramping up with our general***

2   ***manager machine learning, our marketing team to create awareness. And we think we'll compete***

3   ***very effectively.***"

4       133.   The statements highlighted above in ¶ 132 *supra* were materially false and misleading

5   because: (i) Cloudera did not have advantages "when competing in the cloud" or over public cloud

6   vendors' offerings, and failed to disclose that its largest disadvantage was that the Company lacked

7   cloud-native capabilities; (ii) Defendant Reilly knew or was reckless in not knowing that Cloudera's

8   products lacked cloud-native capabilities as he was then leading negotiations with Hortonworks

9   regarding a potential combination to gain the scale and resources to launch a cloud-native product to

10   effectively compete with the public cloud vendors; (iii) the Company's "#1 disadvantage" was not "its

11   awareness of [its] capabilities"; and (iv) as a result, Cloudera and the Insider Defendants materially

12   misrepresented Cloudera's ability to compete against cloud vendors such as Microsoft, Google and

13   Amazon. Further, Defendants were subsequently forced to acknowledge following the Class Period

14   that their Class Period material misstatements and omissions were made, at a minimum, with

15   deliberate disregard for the truth for the reasons set forth in ¶ 95 *supra*.

16       134.   In a research report issued following the Company's June 6, 2018 announcements,

17   Deutsche Bank noted that: "[a]fter the big guidance reset last quarter that weighed on the stock,

18   expectations were low heading into this print as most investors concluded that ***the culprit was not a***

19   ***short-term sales issue but rather an end market shift that will take time to recover from***. This print

20   reinforced that view, as Cloudera focused less on sales execution and more on the demand shifts

21   (primarily customer interest in analytics alternatives from AWS and other cloud vendors) …."

22       135.   On June 6, 2018, Defendant Reilly again publicly reaffirmed that he and Cloudera

23   management: "track every compete, and then we evaluate win-loss, no-decision type things. So we're

24   tracking our cloud win rates relative to our on-prem traditional win rates." Notably, based on this

25   internal data, Cloudera altered its marketing and sales strategy to refocus their "land and expand" sales

26   strategy. Specifically, Defendant Reilly stated in April that the Company "still expended too much of

our valuable selling resources pursuing customers outside that market. ***I know*** because we use our own technology to analyze sales activity."

**September 5, 2018 (2Q19)**

136.     After market close on September 5, 2018, Cloudera filed a press release with the SEC on Form 8-K announcing Cloudera's financial results for the second quarter fiscal year 2019 for the period ended July 31, 2018 ("2Q19"). The following day, on September 6, 2018, the Company filed its quarterly report on Form 10-Q with the SEC, which Defendants Reilly and Frankola signed.

137.     The 2Q19 Quarterly Report identified Cloudera's "competition" as including "public cloud providers who include proprietary data management, machine learning and analytics offerings, such as Amazon Web Services, Google Cloud Platform and Microsoft Azure." The 2Q19 press release announced that Cloudera had introduced Cloudera Data Warehouse which it represented as "a modern data warehouse for self-service analytics, built with a hybrid ***cloud-native architecture*** that handles 50PB data workloads and enables hybrid compute, storage, and control for workload portability across public clouds and enterprise data centers." Later that same day, Cloudera held its earnings conference call to discuss its quarterly results with analysts.

138.     During the call, Defendant Olson stated that Cloudera's offerings were "tailored to compete directly in this major market shift" in data warehousing, representing: "[h]ere's what we're introducing. Cloudera Data Warehouse is a modern data warehouse for self-service analytics. Let me define modern data warehouse and why it's important in this world of exploding data and the Internet of Things. ***It's a cloud-native architecture.***" During the same call, Defendant Reilly added that Cloudera's cloud native data warehousing products were competitive against public cloud vendors like Google, Amazon and Microsoft, stating: "[w]ith a modern architecture for on-premises deployments and ***being cloud-native for public cloud infrastructure*** and Platform-as-a-Service implementations, we believe we have the right set of solutions for the next phase of the data warehouse industry."

139.     The statements highlighted in ¶¶ 137-138, *supra* were materially false and misleading because: (i) Cloudera lacked any "cloud-native architecture" or "cloud-native infrastructure" and its

products could not provide cloud performance comparable to its competitors' cloud offerings; (ii) Cloudera and the Insider Defendants concealed that Cloudera's competitors' cloud offerings were vastly outperforming the Company's Hadoop-focused platforms; and (iii) as a result, the Insider Defendants materially misrepresented Cloudera's ability to compete against the largest public cloud vendors such as Microsoft, Google and Amazon. Further, Defendants were subsequently forced to acknowledge following the Class period that their Class Period material misstatements and omissions were made, at a minimum, with deliberate disregard for the truth for the reasons set forth in ¶ 95 *supra*.

140.    During the Company's September 9, 2018 Citi Global Technology Conference, Defendant Reilly again highlighted the extent to which they closely monitored customer churn stating in relevant part that: "***we're able now to track all of our customers through these phases, what our churn rates are, what our graduation rates are, what our average tenures are***." At the same conference, Defendant Reilly added that he was deeply involved as a hands on manager in Cloudera's attempts to provide a cloud product because Cloudera: "put[s] in place cloud specialists, who solely focus on competing on the cloud" such that "[they] are learning how to go up against the cloud vendors head on against their house offerings." Given these assurances, Defendant Reilly's materially false and misleading Class Period statements and omissions were made either knowingly or with deliberate recklessness at to the truth.

**October 3, 2018 (Merger Registration Statement)**

141.    On October 3, 2018, Cloudera and Hortonworks held a joint conference call to announce the Merger, during which Defendant Reilly represented that:

> We expect and I expect 100% of our customers to take advantage of cloud technology, both on-prem and in the public cloud. Today, Cloudera has 26% of our customers who are already working in that hybrid-type environment, and we expect that to go to 100% of our combined entity. A cloud technology brings significant advantages. ***Our underlying platform, both what Hortonworks is delivering and ours is cloud native technology,*** and it flourishes in cloud compute environments so we're very excited about accelerating our capabilities there.

142.    During the same conference call, Defendant Frankola touted the business combination, stating that it would create "***sales and growth on day one***." He added that the Merger would "unlock powerful synergies," and assured investors that the "important point is that the day the merger closes,

we will have significant scale and growth." To further promote the Merger, Defendant Reilly appeared on a live interview with *CNBC's* Jim Cramer for his show "Mad Money" on October 5, 2018, where he went so far as to suggest that the Merger would transform Cloudera into the "next Oracle of the future."[25]

143.    The Merger Registration Statement similarly made numerous material misstatements about the Company's product offerings and current prospects, including that: (i) its "***original architecture was designed for the cloud***"; (ii) "***run[] natively on public cloud*** infrastructure"; (iii) are "***[l]eading cloud innovation for big data***"; and (iv) Cloudera could "leverage the latest advances in infrastructure ***including the public cloud*** for 'big data' applications." The Merger Registration Statement also represented that Cloudera's platform: (i) provided "***[c]loud and*** on-premises deployment at scale ***and across hybrid cloud environments***"; (ii) "allow[ed] enterprises to manage both long-lived and transient workloads across environments, ***mixing on-premises and public cloud infrastructure***, including all major public cloud vendors – Amazon Web Services, Microsoft Azure and Google Cloud Platform"; and (iii) permitted customers to "deploy, configure and monitor their clusters and workloads at scale from a centralized interface across any mix of public cloud or on-premises environments." The Merger Registration Statement further touted that "***Altus is a cloud service*** that … ***enable[s] customers to address a new set of elastic and transient workloads*** that would otherwise be impractical to run in the datacenter," and highlighted its purportedly "ongoing performance in the areas of cloud," and commitment to "deliver the industry's first enterprise data cloud" and "[c]loud … deployment at scale."

144.    The statements highlighted above in ¶¶ 141-143 *supra* were materially false and misleading because: (i) Cloudera lacked any viable "cloud-native technology," and its products did not provide public cloud performance comparable to its competitors' offerings; (ii) Cloudera and the Insider Defendants concealed that Cloudera's competitors' cloud offerings were vastly outperforming the Company's Hadoop-based platforms; (iii) as a result, Cloudera and the Insider Defendants

---

[25]    Oracle's market capitalization is approximately $175.5 billion.

materially misrepresented Cloudera's ability to compete against the largest public cloud vendors such as Microsoft, Google and Amazon; (iv) the primary reason for the Merger was that Cloudera was then having difficulty generating organic growth; and (v) the touted benefits of the Merger were materially overstated.

145.    As Defendants later admitted in June 2019, Cloudera's products were not "cloud native" and they launched CDP to address this "competitive disadvantage." Further, Defendants were subsequently forced to acknowledge following the Class Period that their Class Period material misstatements and omissions were made, at a minimum, with deliberate disregard for the truth as alleged in ¶ 95 *supra*.

146.    The Merger Registration Statement further asserted that Cloudera's purported cloud expertise buttressed its "land and expand" sales and growth strategy, stating: "[a]fter an initial purchase of our platform, we work with our customers to identify new use cases that can be developed on or moved to our platform, ***ultimately increasing the amount of data managed on our platform as well as the number and size of our platform deployments.***" The Merger Registration Statement claimed that the Merger would: (i) "***increase cross-sell opportunities***"; (ii) "***enlarge addressable market***"; and (iii) "***improve Cloudera's…existing ability to expand customer relationships and increase the penetration of new customer accounts***," such that Cloudera would "use the initial sale as a foothold to increase revenue per customer by increasing the amount of data and number of use cases each customer runs through our platform."

147.    The statements highlighted in ¶ 146 *supra* were materially false and misleading because: (i) the Company's platforms were technologically uncompetitive in cloud (ii) Cloudera's customers, including its largest customers, were not "expanding" but were canceling and/or delaying renewals while their in-house engineering teams independently learned to perform the same functions and provide the same services that Cloudera offered; (iii) as a result, by the time of the Merger on January 3, 2019, Cloudera's bookings were already deteriorating, and customer churn was swelling. Indeed, Cloudera revealed on June 5, 2019 that the Company was suffering from "headwinds in bookings from existing customers," "roughly flat" and "softer" bookings of "large accounts," and

"increased" churn rate with a loss of small customers and "weakness" in sales for midsize customers, as well as "slip[ing]" renewals, driving Cloudera's stock price downward by 40.8%, to less than half the Merger price.

148. The Merger Registration Statement similarly represented that Cloudera's ***existing technology*** as part of the "combined company" could "create the leading enterprise data platform built on modern open source data management, data warehousing, machine learning, advanced analytics and IoT markets across hybrid, public, private and ***multi-cloud environments."*** In an investor Power Point presentation incorporated into the Merger Registration Statement, Cloudera and characterized "Altus" as a "complementary" "Cloud" product and asserted the "complementary product[]" would create "Powerful Synergies" for "Revenue." Defendant Reilly further stated Cloudera's "cloud technology brings significant advantages," had "tremendous capabilities," and the Company's "underlying platform" consisting of "***cloud native technology*** … flourishes in cloud compute environments so we're very excited."

149. The statements highlighted in ¶ 148 *supra* were materially false and misleading because: (i) Cloudera lacked a legitimate cloud offering, and Cloudera was losing existing and prospective customers because Cloudera's Hadoop-focused platforms were neither elastic nor cost-effective; (ii) describing its offerings to investors in this manner deceived investors into believing that Cloudera's products had these capabilities; and (iii) Cloudera's customers, including its largest customers, were refusing to renew contracts because they could perform the same or superior functionality at lower prices. Finally, while the Merger Registration Statement stated that the Company's "original architecture was designed for cloud," in truth its Hadoop-focused architecture was originally designed for on-premise data warehousing and management that was not "optimized for the cloud." Further, Defendants were subsequently forced to acknowledge following the Class Period that their Class Period material misstatements and omissions were made, at a minimum, with deliberate disregard for the truth for the reasons set forth in ¶ 95 *supra*.

150. An October 6, 2018 article by Matthew Lodge on *VentureBeat.com* called "Cloudera and Hortonworks Merger Means Hadoop's influence is declining" reported that the new "megatrend

1    is the shift to public cloud" and away from Hadoop because "cloud storage economics are crushing

2    Hadoop storage costs." He added that "[c]ompanies of all sizes are increasing their adoption of AWS

3    [Amazon Web Services], [Microsoft] Azure and Google cloud services *at the expense of* on-premises

4    infrastructure and software" provided by companies like Hortonworks and Cloudera. As a result,

5    according to Mr. Lodge, "[i]ronically, there has been no Cloud Era for Cloudera."

6        151.   On October 8, 2018, before the Merger closed on January 3, 2019, Defendant Olson

7    sent Cloudera employees an internal email about the Merger where he acknowledged that: "what

8    drives this transaction more than anything else – is that our *main competition to displace legacy*

9    *solutions has shifted to the cloud vendors*." Defendant Olson also detailed how Amazon, Microsoft,

10   and Google were each then increasing their "aim to win business from large enterprise buyers," and

11   the level of competition had already increased as other vendors, such as Snowflake, "are also

12   increasingly important in our competitive battles." This fact further substantiates that Cloudera and

13   the Insider Defendants knew, or turned a blind eye to the fact, that the Company was already facing a

14   severe threat from public cloud vendors no later than October 2018 due to Cloudera's complete lack

15   of any viable cloud offerings. Just six months prior, Defendant Reilly, by contrast, had assured

16   investors on April 3, 2018, that he then saw "nothing" that gave him "concern about the market."

17       152.   On June 5, 2019, by contrast, Defendant Reilly finally disclosed that Cloudera

18   consummated the Merger because, in truth, it *needed* to, stating: "[w]e saw the need to get more

19   resources, more scale *so that we can* deliver a competitive cloud offering and *replatform* into cloud

20   architecture, and that's why we did the merger. And so Cloudera now has the resources, the scale, the

21   employees, the engineers to *very quickly replatform* our business." Further, and again, while the

22   Osborne Effect provides that prematurely discussing future, unavailable products damages sales of

23   existing products, Defendants nevertheless tried to suggest that the Company's announcement of CDP

24   in March 2019 somehow "unexpectedly" "caused some customers to wait until [CDP's] release to

25   renew and expand their agreements." An incredulous Craig-Hallum analyst then asked Defendant

26   Reilly on June 5, 2019: "I can't imagine their data growth is slowing, their workload expansion is

27   slowing, their analytics investment is slowing. How can they afford to wait [for CDP] …? Are they

28

just shifting those workloads off your platform? Is that what's *really* going on?" Defendant Reilly simply responded that: "we saw a number of opportunities get taken by the public cloud guys."

**December 5, 2018 (3Q19)**

153.    After market close on December 5, 2018, Cloudera filed a press release with the SEC on Form 8-K announcing its third quarter fiscal year results for the period ended October 31, 2018. On December 6, 2018, the Company filed its quarterly report on Form 10-Q with the SEC, which Defendants Reilly and Frankola signed.

154.    The 3Q19 quarterly report identified Cloudera's "competition" as including "public cloud providers who include proprietary data management, machine learning and analytics offerings, such as Amazon Web Services, Google Cloud Platform and Microsoft Azure." Cloudera held a conference call later that day to discuss its financial results and, during the call, Needham analyst Jon Andrews inquired whether Cloudera's data warehouse "strategy is still intact in terms of the combined company or how you're thinking about that particular initiative that you'd outlined several months ago." Defendant Reilly responded that the "strategy and initiative is alive, well and growing extremely well …. Our Altus Data Warehouse is particularly designed to capture these migrations that want to move to the cloud, where you see a company like Snowflake or Amazon's Redshift traditionally serving those cloud markets, but we have *strong competitive advantages* in data warehousing. So first and foremost, we offer the only data warehouse that combines both SQL and machine learning against a shared data experience. None of the other players are doing that today. Secondly, we offer it in a hybrid fashion so you can do it both on-premise *or in the public cloud …. We believe data warehouse workloads are naturally going to land on our platform, and we're well positioned to capture those.*"

155.    Later during the same call, Craig Hallum analyst Chad Bennett sought further clarity about Cloudera's competitive position against public cloud vendors, asking: "[c]an you just provide more color on how – *I think the big trepidation here* is net new is going to kind of fall off a map because *they're just going to bypass you and move straight to the cloud guys*. Just kind of any color on how you're winning deals and how the hybrid pitch is resonating, more detail?" Defendant Reilly responded that:

If you look 2 years ago, enterprises were trying to figure out what this public cloud thing was, and they were spending time with the AWS' of the world, understanding those platforms and going right to public cloud. Large enterprises that moved to the public cloud just 2 years ago are wanting to move off public cloud. They do not like the cost. They do not like the lock-in that it poses. They suddenly are stuck with one public cloud provider, and all it has to offer. And so they're moving workloads back into private cloud or across multiple clouds to avoid that lock-in and have leverage over those infrastructure costs. What we hear from customers, public cloud is just the new hardware for them. If a complete stack was going to win the market, then Oracle plus Sun would have won a long time ago in the data center. It's not what customers want. They want the flexibility and they want this hybrid enterprise cloud capability. Now I'll talk – in the quarter, we won 63 new customers. ***Customers are coming to our platform, all of them are evaluating cloud,*** and it's our hybrid cloud capabilities are winning .... ***And so it is – we are uniquely positioned to run where our customers want to run and give them a lot of flexibility.***

156.    The statements highlighted in ¶¶ 154-155 *supra* were materially false and misleading because: (i) Cloudera lacked any "public cloud offerings" and did not have any "strong competitive advantages" in cloud; (ii) as Defendant Cole admitted after the Class Period, Cloudera's products lacked the capability to provide legitimate cloud services; (iii) the primary reason for the Merger was that Cloudera was then having difficulty generating organic growth; (iv) the touted benefits of the Merger were materially overstated and the necessity of the Merger was concealed; and (v) as a result, the Insider Defendants materially misrepresented Cloudera's ability to viably compete in the cloud market. Further, Defendants were subsequently forced to acknowledge following the Class Period that their Class Period material misstatements and omissions were made, at a minimum, with deliberate disregard for the truth as alleged in ¶ 95 *supra*.

157.    On December 6, 2018, Cloudera participated in the Barclays Global Technology, Media and Telecommunications Conference where Defendant Reilly misleadingly explained that momentum for Cloudera's offerings had increased, and even relied on the Company's ***name*** itself to deflect criticism about the Company's offerings, stating in relevant part:

This is a 10-year story, so Cloudera is 10 years old. ***We're called Cloudera*** because when we started, we started with the original Hadoop project, we offered it as a cloud service on Amazon Web Services in 2008 and software, okay? ***That's why we're called Cloudera***. In 2008, there was no buyers in the cloud. And so we spent the next few years making this cloud software fit into data centers, okay? Along comes Amazon and takes our open-source bids and offers a thing called Elastic MapReduce, and that was the public cloud in our space. And they were just cheaper, faster, but they weren't

innovating. They were just offering it cheaper and pre-provisioned. So that was a tough battle for us, right, because we had to, kind, of cover that flank off. ***The market has now moved to us*** because we offer a hybrid capability, right, so we run on-prem, bare metal, we run increasingly on private cloud, which we think customers are really driving and we're hybrid and multi-cloud, okay? Now what's the proof? What did Amazon announce this week? Amazon Outpost. Amazon is now offering its on-premise capability to close off their weakness in hybrid, and it's a validation of our strategy. And we already have hybrid capabilities that they have to develop, they've never really innovated in their space. And then, we're going to have multi-cloud. ***So we're taking it to them, momentum has shifted in our favor and increasingly will go that way.***

158.    The statements highlighted in ¶ 157 *supra* were materially false and misleading because: (i) momentum had not shifted to Cloudera's favor at this time because Altus was uncompetitive against the public cloud vendors' offerings; (ii) the market was abandoning Cloudera due to its platform's legacy limitations; and (iii) as a result, the Insider Defendants materially misrepresented Cloudera's ability to compete against the largest public cloud vendors such as Microsoft, Google and Amazon; and (iv) Cloudera's name was ***itself*** then materially misleading. Further, Defendants were subsequently forced to acknowledge following the Class Period that their Class Period material misstatements and omissions were made, at a minimum, with deliberate disregard for the truth as alleged in ¶ 95 *supra*.

**March 13, 2019 (4Q19 and Fiscal Year 2019)**

159.    After market close on March 13, 2019, Cloudera filed a press release filed with the SEC on Form 8-K announcing its fourth quarter and fiscal year 2019 results for the periods ended January 31, 2019. The fiscal year 2019 press release announced revenue guidance for the first quarter 2020, forecasting total revenue in the range of $187 million to $190 million, $154 million to $156 million in subscription revenue, and a non-GAAP net loss per share in the range of $0.25 to $0.22 per share. This was significantly lower than the first quarter 2020 consensus of $223 million for total revenue and $184 million of subscription revenue. On this news, the price of Cloudera's common stock fell $2.90 on unusually heavy trading volume from its March 13, 2019 closing price of $14.61 to a closing price on March 14, 2019 of $11.71, as the truth about the Company's operations continued to emerge.

160.     The fiscal year 2019 press release further announced revenue guidance for fiscal year 2020, forecasting total revenue in the range of $835 million to $855 million, $695 million to $705 million in subscription revenue, and negative $40 million to negative $30 million in operating cash flow. This was vastly lower than the consensus of $968 million for total revenue and $801 million of subscription revenue. Specifically, the fiscal year 2019 press release stated:

The outlook for fiscal 2020, ending January 31, 2020, is:

- Total revenue in the range of $835 million to $855 million, representing approximately 76% year-over-year growth
- Subscription revenue in the range of $695 million to $705 million, representing approximately 72% year-over-year growth

161.     Cloudera held a conference call later that day to discuss its fourth quarter and full-year 2019 fiscal year results, during which Defendants reaffirmed Cloudera's fiscal performance during these periods, and discussed their outlook for the first quarter and full fiscal year 2020. Cloudera also announced CDP, which Defendant Reilly explained would be launched for the public cloud in the second half of 2019 and the private cloud in 2020. Defendant Frankola further announced Cloudera's disappointing guidance for the merged company for the first-fiscal quarter and full-year 2020:

I will conclude by providing initial guidance for fiscal Q1 and for fiscal 2020 as well as an update on our near-term model. Before getting into numbers, I want to share some longer-term perspective on how the merger is incorporated in our projections and how we are handling merger-related uncertainty. As reflected in our strong results, the merger did not significantly impact Hortonworks or Cloudera businesses in the fourth quarter. However, as expected, we do see the merger impacting the first half of fiscal year '20, as we integrate the field and roll out new products. We are pleased that despite the effects of this merger, we believe that adjusted ARR growth for Q4 2020 will be in the range of 18% to 21%. ARR growth in Q2 and Q3 may be slightly lower due to the actions we are taking in the first half of the year to integrate the 2 companies.

We expect Q1 total revenue to be between $187 million and $190 million and subscription revenue to be between $154 million and $156 million. Net loss per share is projected to be $0.25 to $0.22 based on 271 million weighted average shares outstanding.

For fiscal year 2020, we expect total revenue to be between $835 million and $855 million, representing approximately 76% growth, with subscription software revenue in the range of $695 million to $705 million, up approximately 72% year-over-year. Again, we expect Q4 fiscal year '20 ARR growth of 18% to 21%.

162.     In a research note issued that day, D.A. Davidson noted that, despite the negative news, it remained optimistic because: "[i]mportantly, *Cloudera has not seen any major changes in the competitive environment, which we know remains a concern for investors*." At the time, Cloudera had already consummated the Merger and announced CDP to try to limit its "competitive disadvantage" against legitimate cloud vendors' cloud-native offerings. In addition, Cloudera and the Insider Defendants either knew or were deliberately reckless in not knowing that, with the announcement of CDP, the Osborne Effect would accelerate the already negative impact the Company's operations was experiencing in its first quarter as a combined Company.

163.     During the March 13, 2019 conference call, Barclays analyst David Rainville asked who Defendant Reilly saw as Cloudera's main competitors. Defendant Reilly baselessly claimed that, as a result of the Merger, its *"#1 competitor"* was Amazon, stating:

> And now, *who's our #1 competitor? It's Amazon*. And we quickly – just even in Q1 as we look at our competitive road map, it's – not Amazon the company. Amazon is a partner, *but it's Amazon's house offerings in the data management analytics space*. And we believe we are well positioned to compete against them because our value proposition is to be a enterprise data cloud company, giving our customers a multi-cloud, hybrid cloud fashion is one enduring differentiator and then our capabilities from Edge – our capabilities – our integrated capabilities from the Edge to AI, we're the only company that's offering that today, and so *we feel very strong that market is moving in our direction around the hybrid multi-cloud, and then our functionality is best-in-class*.

164.     The statements highlighted in ¶¶ 161-163 *supra* were materially false and misleading because: (i) Cloudera's platform could not provide public cloud performance comparable to its competitors' offerings; (ii) Cloudera and the Insider Defendants concealed that Cloudera's competitors' cloud technologies were vastly outperforming the Company's Hadoop-focused platform; (iii) momentum had not shifted to Cloudera's favor at this time because CDP would not be launched until the second half of 2019; and (iv) as a result, Cloudera and the Insider Defendants materially misrepresented Cloudera's ability to compete in the cloud market, let alone accurately claim Amazon was its "#1 competitor." Further, Defendants were subsequently forced to acknowledge following the Class Period that their Class Period material misstatements and omissions were made, at a minimum, with deliberate disregard for the truth as alleged in ¶ 95 *supra*.

165.     In mid-March 2019, Deutsche Bank analysts attended Gartner's annual analytics/BI event in Orlando, Florida where customers and partners met to discuss their technology/choices for data analytics. The Deutsche Bank report issued following that event included comments from several Cloudera customers concluding that "[t]he *feedback on Cloudera was negative ....*" Specifically, the Deutsche Bank report quoted the customers they spoke to about Cloudera's products – including Altus – who stated (a) that Cloudera's products were "not useful. We call it our *data swamp*"; (b) "[w]e have a commercial distribution of Cloudera [ ] we're going to *shut it down*"; (c) "[w]e did have Cloudera on-premise. We technically still do have Cloudera. But we're doing all the net new in AWS [Amazon Web Services] EMR .... Our goal is to actually mov[e] everything *out of Cloudera* and into AWS EMR. Cloudera is expensive. Every time we added a node, our licensing costs would just go up"; (d) "[o]ur Cloudera footprint is on-premise.... We're already doing some work in other departments with Azure, so we're sort of looking at Azure and looking at AWS for alternatives right now"; (d) "[w]e had Cloudera but it just didn't turn out to be what we thought it'd be. It's expensive too...."; and (e) "I used to work at Cloudera. *They were late to come out with a cloud strategy*. That's the reason why they've been struggling.... Cloudera had to *rush the launch of Altus* to market, and as a result, it lacked a lot of features, which then hurt them more."

166.     On March 29, 2019, the Company filed its Annual Report on Form-K with the SEC for its fiscal year ended January 31, 2019 ("2019 Annual Report"), which Defendants Reilly and Frankola signed. The 2019 Annual Report represented that: "[u]nderpinning the enterprise data cloud vision is our next generation platform, Cloudera Data Platform (CDP), which once released, will combine the best of Hortonworks' and Cloudera's offerings in a public cloud, hybrid cloud service. CDP will enable customers to easily extend their datacenter implementations to the public cloud. *CDP is expected to be 'cloud-native'* with separate compute and storage and the ease-of-use, self-service and user experience typically associated with public cloud services."

**June 5, 2019 – The Class Period Ends (1Q20)**

167.     After market close on June 5, 2019, Cloudera issued a press release filed with the SEC on Form 8-K announcing its first quarter fiscal year 2020 results for the period ended April 30, 2020.

The following day, on June 6, 2019, the Company filed its quarterly report on Form 10-Q with the SEC, which Defendants Reilly and Frankola signed.

168.    The 1Q20 press release announced total revenues of $187.5 million of which $154.8 million originated from subscriptions. Cloudera's quarterly total revenue was far below analyst consensus of $188.3 million. Annualized recurring revenue was $672 million at the conclusion of the quarter, representing 21% year-over-year growth. The 1Q20 press release also announced reduced guidance for fiscal year 2020 which forecasted total revenue in the range of $745 million to $765 million, $635 million to $645 million in subscription revenue, and ARR to 0% to 10% for 4Q20, which was significantly lower than the previous guidance in the range of $835 million to $855 million, $695 million to $705 million in subscription revenue, and ARR of 18% to 21% for the fourth fiscal quarter 2020.

169.    The 1Q20 press release further disclosed profoundly meager revenue guidance for 2Q20, stating that Cloudera was forecasting total revenue in the range of $180 million to $183 million, $155 million to $157 million in subscription revenue. Again, this was vastly lower than the consensus of $203 million for total revenue and $167 million for subscription revenue. The Company's fiscal year 2021 guidance was altogether withdrawn. The 1Q20 press release further disclosed the challenges that Cloudera faced, but failed to disclose to investors, during the quarter: "[w]hile some customers in the first quarter elected to postpone renewal and expansion of their agreements in anticipation of the new platform's [CDP's] release, affecting our full year outlook, this customer feedback and enthusiasm validates demand for enterprise data cloud solutions in our target market."

170.    Moreover, the 1Q20 press release announced the purported "planned retirement of Chief Executive Officer, Tom Reilly, and the appointment of Martin Cole, Chairman of the Board, as interim Chief Executive Officer." Defendant Reilly "retired" as Cloudera's CEO effective July 31, 2019. Cloudera later held a conference call that day to discuss its first quarter fiscal year 2020 results. During the call, Cloudera addressed its first quarter 39% billings miss, reduced guidance for the second quarter and full fiscal year 2020, and Defendants Reilly's and Olson's sudden and unexpected departures.

171.     Contrary to his April 3, 2018 Class Period representation that cloud was then a "tremendous tailwind," Defendant Reilly explained during the 1Q20 investor call that the Company faced "***headwinds in bookings from existing customers***" who represented over 90% of Cloudera's growth. Defendant Reilly sought to blame the bookings miss on "uncertainty" from the combined Company's road map, which was announced in March 2019, and "***increased competition from public cloud vendors.***" Defendant Reilly further attributed the billings miss and slashed guidance to Cloudera's announcement of CDP, stating that the: "***cloud-native platform has caused some customers to wait until its release to renew and expand their agreements.***" He added that "our rapid execution ***on a cloud-native platform*** has caused some customers to wait until its release to renew and expand their agreements."

172.     Defendant Reilly also attributed the Company's billings miss and reduced guidance on "headwinds" in bookings from 90% of Cloudera's customer growth base, stating:

> All right. Let's turn to a discussion of our first quarter fiscal year 2020 results. With respect to Q1, we'll cover 3 topics in addition to providing detailed financial information: First, we'll offer a quick update on the merger with Hortonworks; second, ***we'll discuss the factors that are affecting customer buying behavior and its impact on our full year outlook***; and lastly, we'll update our progress in delivering the Cloudera Data Platform, CDP, our next-generation cloud offering.

> *     *     *

> Now let me share what did not go well in Q1 and what our plans are for addressing it. In our first quarter as a merged company, ***we experienced headwinds in bookings from existing customers. These customers generally represent more than 90% of our growth and were the focus of the quarter's activities.*** We've analyzed the challenges we encountered in the quarter and believe that 2 factors primarily contributed to the bookings impact. ***First, the announcement of our merger in October 2018 created uncertainty, particularly regarding the combined company road map, which we rolled out in March of this year. During this period of uncertainty, we saw increased competition from the public cloud vendors***.

> Second, the announcement in March of Cloudera Data Platform, our new hybrid and multi-cloud offering, created significant excitement within our customer base. CDP is compelling as it addresses many of our customers' most pressing needs. ***However, our rapid execution on a cloud-native platform has caused some customers to wait until its release to renew and expand their agreements.***

173.     During the same call, Defendant Frankola discussed the Company's reduced guidance and prospects, stating:

We concluded Q1 with 929 customers who started at or have grown to more than $100,000 of ARR. The number of customers spending more than $1 million is in excess of 140. ***Both of these numbers are roughly flat with Q4 and are reflective of the customer wait-and-see attitude that Tom described***. It is important to note that our largest customers continue to bring workloads to the platform. Annualized Q1 dollar-based churn for this cohort is substantially better than average at approximately 6%, and these customers continue to expand.

I will conclude by providing initial guidance for fiscal Q2 and updated guidance for fiscal year 2020. We expect Q2 total revenue to be between $180 million and $183 million and subscription revenue in the range of $155 million to $157 million. Net loss per share is projected to be $0.11 to $0.08 based on 274 million weighted average shares outstanding. For fiscal year 2020, we expect total revenue to be between $745 million and $765 million and subscription revenue in the range of $635 million to $645 million.

As you will recall from our discussion last quarter, our intention is to show Cloudera's organic quarterly performance and top line momentum in the most transparent way possible. Annualized recurring revenue based on the book of business at the end of the quarter removes the effects of the merger, including accounting changes, billings duration and licensing convention and is the best representation of underlying economic activity.

Based on our sales pipeline and the typical lift of an enterprise software sales cycle, we believe that Q2 will be the trough for bookings growth. Coupled with soft Q1 bookings, first half bookings performance will weigh on growth rates through the balance of the year. We expect ARR growth in Q2 to be between 10% and 12%, declining to 0% to 10% in Q4. We continue to believe that modest improvements in subscription gross margin can be achieved by Q4 as we integrate customer support. Services margins will trend down over the next couple of quarters as we apply more technical resources to support customer success. Total operating expenses will continue to decline over the course of the year as merger-related expenses moderate. Non-merger-related operating expenses will be roughly flat. Our investments are in place, allowing us to deliver on the CDP road map and position us for sustained growth.

For fiscal year 2020, net loss per share is projected to be $0.32 to $0.28 based on 280 million weighted average shares outstanding. We expect operating cash flow for fiscal year 2020 to be negative $95 million to negative $75 million. While merger cost synergies are coming in greater than planned, operating cash flow will be impacted by the booking softness that we are now forecasting for the first half.

\* \* \*

Although CDP will be available in the second half [of 2019], we do not have adequate data or pipeline to model its rate of adoption. And given the nature of the subscription

business, we believe that the revenue impact from CDP bookings and deferred customers' expansions will take several quarters to appear in GAAP revenue. Until the trajectory of that growth and the investment levels necessary to support it become clearer, *we will not attempt to project an intermediate-term operating model for the combined company*.

174.    Analysts then asked Defendants Reilly and Frankola pointed questions about the Company's 1Q20 corrective disclosures. Craig-Hallum analyst Chad Bennett questioned whether Cloudera's claim that the missed billings and guidance reduction was due to customers actually wanting to wait for CPD or increased competition by public cloud vendors, asking: "[s]o I'm just trying to understand, I guess, the logic behind customers effectively waiting, and maybe it ties into, Tom, your comment about the public cloud vendors being more competitive. If you could define that, that would be great – after you guys made the merger announcement. I can't imagine their data growth is slowing, their workload expansion is slowing, their analytics investment is slowing. How can they afford to wait? Or are they actually – and maybe it's evident in the churn dollar rate you just gave. ***Are they just shifting those workloads off your platform? Is that what's really going on***?" Defendant Reilly responded that:

> From the time we announced the merger to where we got our road map out, it was about a 5-month period. In that period, our sales force was a bit handicapped without giving clarity of what the road map would be. And without that clarity, we were at a competitive disadvantage, and ***we saw a number of opportunities get taken by the public cloud guys.*** We're already turning that around because we've trained on our road map but now – let's say now the customer sees our road map, what causes them to pause yet again? They're trying to understand how they will take advantage of CDP, both public and private. They're trying to understand how we're going to move those workloads. It's just a different motion than traditionally, just buying more of what they had on-prem. We're trying to encourage all of our customers to move to a cloud architecture, both in the data center and public cloud, and so that's just an education process.

175.    Mr. Bennett subsequently asked: "I know you're seeing some synergies from the merger, but your ***sales and marketing*** as a percent of revenue is still fairly high for a company that, well, effectively is not growing this year. But even if you were to grow, let's just say, 10% to 20%, I would say that line item is still ***egregiously high***. Just care to comment on that?" In response, Defendant Frankola tried to explain that: "[t]he growth that is happening this year is not what we initially anticipated. We have curtailed the rate of future expense growth in the short run through the

balance of the year, and the guidance that we put in front of you reflects a lower level of spending than 90 days ago. So we do understand the top line dynamic and how it will impact expenses. With that said though, we believe that it is critical to get CDP out and we've retained the level of investment that would allow us to develop CDP, public cloud, private cloud and be able to sell it and build pipeline over the course of this year. We think the benefits of that will start accruing in bookings later this year, and you'll start seeing it in accelerated revenue *growth next year*." So much for Defendant Frankola's previous October 3, 2018 assurance that the Merger would create "***growth on day one***."

176.    Citigroup analyst Tyler Radke sought further clarification about the Company's 1Q20 corrective disclosures and, in response, Defendant Reilly again blamed the Company's problems on "increased competition from public cloud vendors," "uncertainty" stemming from the Merger, and customers waiting to renew until CDP was released. He also disclosed that this included increased demand for cloud native products by customers. Mr. Radke then asked: "[o]bviously, the outlook for the rest of the year is coming down pretty substantially but maybe just order of magnitude, what surprised you more? Was it the weakness in bookings? Was it the higher churn rate? Was it the competitive environment? Maybe just talk about those 3 dynamics independently." In response, Defendant Reilly admitted what he either knew or deliberately disregarded throughout the Class Period:

> We saw *increased competition from the public cloud vendors* and so just increased desire for customers to understand how they can move workloads into the public cloud environment. And during that period of uncertainty, *we weren't very competitive* with that, during that period.

> Secondly, and we – with respect to the merger, we got on things like pursuing our renewals later in the quarter than we traditionally would. But that was just the complexities of bringing together 2 sales force systems, pursuing hundreds of renewals. And so some of those slipped out of the quarter. And then our customers that would normally expand would ask us many questions around CDP. And if they expand now, what does it mean to migrate later? And so some of those caused some of the challenges in the quarter. All of those things, we think we have addressed and we resolved and we're seeing the improvements. So – *but that's I think the best assessment I have for you*, Tyler.

177.    Barclays analyst Preetam Gadey then asked about another Hadoop company then facing financial difficulties. Defendant Reilly responded that he knew that the name of the company

was MapR, and admitted that the Merger was, in fact, designed to "replatform" Cloudera's existing product platforms, such as Altus, into "cloud architecture" so that Cloudera would have a "competitive cloud offering." Specifically, Defendant Reilly stated:

> Yes. So basically, here's the backdrop. We saw the need to get more resources, more scale so that we can deliver a competitive cloud offering and ***replatform into cloud architecture, and that's why we did the merger. And so Cloudera now has the resources, the scale, the employees, the engineers to very quickly replatform our business***. Our competitor, in this case, it's MapR, could not match the resources or the scale to make a similar transition, and I think they have some challenges. We view their customer base as an opportunity for us, and it is part of our growing pipeline.

178.    An earlier May 2019 report by Paul Gillin on *SiliconAngle.com* confirmed that:

> MapR was one of three well-funded startups – along with Cloudera Inc. and Hortonworks Inc. — that emerged a decade ago to commercialize products and services in the open-source ecosystem around Hadoop, a popular software framework for processing huge amounts of data. The hype peaked in early 2014 when Cloudera raised a massive $900 million funding round, valuing it at $4.1 billion.
>
> Hortonworks went public in 2014 and Cloudera followed in 2017, but both saw shares tumble as market competition intensified and ***customers began moving rapidly to the cloud***. Cloudera and Hortonworks merged last fall, but the stock of the combined entity has continued to fall, slicing market value by half over the last seven months. MapR announced its intentions to go public more than four years ago, but never followed through, opting instead to raise two more rounds of venture funding in 2016 and 2017.

179.    D.A. Davidson analyst Rishi Jaluria then sought clarification about Cloudera's large guidance reduction: "[j]ust help me understand what was it that you did not anticipate in that and putting aside the competition from cloud vendors? But besides that, ***what was it that you didn't anticipate***? Because it seemed like you understood and acknowledged that there was going to be a potential wait-and-see dynamic from customers. ***Was it just more intense than you expected or what?***" Defendant Frankola's response merits quoting at length:

> Yes. There's a lot there, so hopefully, I can unpack it. So relative to expectations 90 days ago, first of all, that was shortly after the 2 companies had merged. We were still ***operating somewhat blind*** in terms of pulling in pipeline from both sides, scrubbing the numbers, putting together predictive models. So you had a general level of ***uncertainty***. And then the new news in the quarter, certainly what Tom described in terms of cloud, certainly the fact that our customers are taking a wait-and-see attitude, ***we did not anticipate that to the level of extent that it was. The fact that our churn rate increased, that was certainly unanticipated***. And those 3 things are all interrelated.

66

Now very specifically, the way a subscription model works is that resulted in bookings that were very light for Q1 relative to expectations. ***We now have much greater confidence*** in our pipeline and visibility, and that pipeline for Q2 is pointing to another soft quarter. So essentially, we're factoring in 2 quarters in a row of soft bookings. Now we are seeing pipeline growth that is – has resumed, several weeks' worth, a couple of months' worth. We hope that remains a good trend, but the pipeline that we're building today isn't going to be delivered in Q2. It's going to be delivered in Q3, Q4 and a little bit in Q1. So the nature of the subscription model means that we're going to have a trough in bookings in the first half of the year; that will show up as a trough in ARR growth rates in Q4 and then acceleration beyond.

You'll see the resumption of underlying bookings growth most clearly in sequential dollar ARR growth. That's one reason why we're disclosing ARR. So as we execute in Q3 and especially Q4, we hope to put a lot of ARR dollars on the books, and that will be reflective of the success of this strategy.

Your second question, customer count less than $100,000 – or over $100,000, that is all part and parcel of the same thing. So where we saw relative weakness was in our customers that caught $100,000 of revenue up to $500,000 or so. So post-merger, as you'd expect, we put our resources, first and foremost, on our large accounts. That was a little bit softer than we would like, but we still saw really good expansion rates, pretty good churn rates in our largest accounts. We saw a relative weakness in our smaller accounts, and unfortunately, more of them churned out this quarter than we brought on. ***So that's the other artifact of the cloud competition, high churn and merger execution***.

180.    Raymond James analyst Michael Turits then pressed Defendants further about the Company's severe customer churn, including whether it was due to customers moving their workloads on-premise, or because they had abandoned the Hadoop ecosystem altogether, asking: "I just want to make sure that I understand the churn well enough. The customers who did not renew, did they take their on-premise workloads and move those workloads to cloud? Or did they move to a community, nonpaid version? Or did they simply move off of, let's just broadly call it, the Hadoop ecosystem?" Defendant Reilly explained that Cloudera was not "***really competitive against what the public cloud guys are offering....***"  Defendant Reilly further admitted that Cloudera lacked a cloud architecture product and that they: "***are addressing [it] with CDP as a PaaS native cloud architecture offering***," adding that:

I'm pretty familiar with all those scenarios.… So we do see a class of customers that want to move workloads to take them into a public cloud, and so ***that's where we saw some of the churn because we weren't really competitive against what the public cloud guys are offering, and we had this period of uncertainty***. So that's one scenario.

And that renewal – the whole renewal will not go away but a portion of that renewal will go away. And then we saw some workload go to self-support predominantly in the tech industry, and that's the combination. And then we had a number of renewals that just didn't close in the quarter because of the merger execution and our kind of delays in getting to that.

And then finally, the CDP cloud, some people just took pause and whether – especially if we have a renewal that we're working on, an expansion and they were just asking questions about do they make that investment and how does it migrate to CDP; that caused some delays.

181.    Mr. Turtis again pushed Defendant Reilly, asking: "[s]o you think it's not the last thing that I asked? And obviously, I ask it also because of the troubles that MapR had versus the similar types of solutions to yours, let's broadly call it Hadoop. So is there any sense that the customers are simply migrating to a different form of data architecture?" Defendant Reilly replied that: "[n]o. The only different architecture is the cloud architecture, ***which we are addressing with CDP*** as a PaaS ***native cloud*** architecture offering.…" Defendant Reilly, however, conceded earlier in the call that the Merger was consummated to enable Cloudera to "replatform into cloud architecture." In his discussion with Mr. Turits, by contrast, Defendant Reilly admitted Cloudera's competitive disadvantage prior to the Merger when he stated that: "***the reason we prioritized CDP public cloud first is we want to close off that competitive disadvantage with our public cloud hybrid offering.***"

182.    Defendant Reilly continued by acknowledging that: "[s]o the bulk of it is delays – so the bulk of it is the delays, followed by workloads moving to public cloud vendors' ***native house offerings***. And that's why we also – ***we didn't share earlier***, but the reason we prioritized CDP public cloud first is we want to close off that competitive disadvantage with our public cloud hybrid offering. CDP private cloud is what our largest customers are most demanding, but we wanted to close off those workloads that are moving to public cloud. So we want to control that with our customers." Mr. Turtis then sought further clarification from Defendant Reilly, asking: "[b]ut sorry, I'll try to just squeeze this last clarification in. But if they're delaying, but they're PaaS renewal, are they – is that just saying they're simply willing to go unsupported whether – whatever the reason, whether it's because of the CDP or whatever – or missed execution on your part?" Defendant Reilly finally admitted that: "[y]es. So we have a number of renewals that we didn't include in the quarter because we didn't execute

against them. And that was just we got a *late start due to the merger*. Secondly, when a renewal has an expansion, we are better off closing them together, and *we'll let a customer slip* while we're answering their questions or addressing their concerns versus trying to do 2 transactions."

183.    Deutsche Bank's research note about Cloudera's 1Q20 disclosures called, *Now THAT Was a Rough Quarter*, summarized that:

> Cloudera shares are indicated down 30%+ off a quarter in which the company reset guidance well below our estimates (to ARR growth of 0-10% compared with our 17% estimate, and to revs of $755m at the midpoint compared with our $835m estimate), and disclosed *higher customer churn*, *postponed renewals and expansions*, *share losses to public cloud alternatives* and the departure of the CEO. *While Cloudera attributed* this in large part to hesitation ahead of the late-summer launch of its new CDP (Cloudera Data Platform) product, *we conclude* based on our field checks that Cloudera hasn't managed the architectural transition well from on-premise Hadoop-focused data analytics projects to cloud/AWS-hosted workloads and that it has fallen behind AWS, Snowflake, Google and Microsoft in the analytics space. We reaffirm our cautious call.

> What Happened?

> *Cloudera argues* that new bookings in the 1QF20/April quarter were quite soft and that this will extend into the 2QF20/July quarter. One can see this in the RPO figure of $720m, down a full 10% sequentially. Cloudera cited sales disruption from the Cloudera-HDP merger and a 'wait and see' attitude ahead of the new CDP product that left Cloudera vulnerable to share losses to the public cloud analytics rivals. Based on our checks, *we believe that demand for on-premise Hadoop-focused technology has completely stalled* (rival MapR is also very challenged) and Cloudera was late to launch a competitive cloud-hosted product *as AWS has made improvements to Redshift/EMR, as Google refines its world-class data analytics services and as privately-held and AWS-hosted Snowflake has taken share* (we heard late last year that Snowflake was specifically targeting Hadoop/Cloudera customers coming up for renewals). We simply have no visibility into whether the new CDP product will be competitive and the CEO departure and stock fall could trigger employee turnover. In a nutshell, the risk profile (including the potential for further cuts to Street numbers) still seems too high.

184.    In a scathing note, "The Clock Strikes Twelve for Cloudera; CEO Departure and Slashed Guidance," dated June 6, 2019, Wedbush analyst Daniel Ives wrote that: "[l]ast night will be the straw that broke the camel's back for many investors and core believers in the Cloudera story, as the company delivered the dreaded trifecta of bad news: soft April results, a jaw dropping weak guidance, and a CEO departure." He added that the: "'wheels came off the bus' this quarter with sales

execution issues, secular **headwinds** on the Hadoop market, and cultural challenges creating a very difficult environment for the Cloudera team," such that, "it's clear the story is broken" leaving only questions as to Cloudera's valuation and its "next strategic move," and lowered his price target on Cloudera from $16 to $7.

185. Barclays lowered its price target to $7 from $14, noting that the "***Cloudera currently does not have a cloud solution, which seems the favorite deployment mode for most customers***" and as such it "suffers from weak renewals as customers move to cloud native providers." Barclays noted that the only apparent parachute for Cloudera is CDP – which was only moving into *Beta* in July 2019 – and thus investors would not have any real visibility into Cloudera until later in 2019 at earliest. Barclays noted that Cloudera's lack of a viable cloud product was causing "a pause in spending" with "a majority of the churned customers … adopting public cloud products." D.A. Davidson piled on, highlighting that:

> ***We have stubbornly stuck with Cloudera***, as we felt concerns around competition were too severe. In retrospect, we were very wrong, and perhaps ***relied too heavily on taking management at its word***, especially since Cloudera has had sales execution issues in the past. ***It's truly difficult to believe*** that customers delaying deployment until CDP, increased churn, merger disruption, and competitive headwinds – all legitimate concerns continually brought up by investors – were not properly factored into guidance provided 90 days ago.

186. In its report titled, *Downgrade to Market Perform; F1Q Bookings Miss, Big FY20 Guide Down, CEO Out*, Raymond James also downgraded Cloudera, noting:

> We are downgrading CLDR to Market Perform from Outperform following a 39% F1Q billings miss and a 12% FY20 revenue guide down. Churn was up, particularly among small- to midsized customers, and ***both land and expand bookings missed***. Cloudera also announced its CEO, Tom Reilly, will retire 7/31/19, with board chair Martin Cole interim CEO during the search for a replacement.

> Cloudera attributed the miss primarily to customers moving workloads to cloud where they are choosing cloud native data management solutions (EMR, RedShift, Athena) absent the availability of Cloudera's new cloud focused CDP platform to be generally available (GA) this summer, which they believe will allow them to better compete for cloud workloads, as well as to poor execution around the merger.

> Cloudera lowered FY20 ARR growth guidance to 0-5% from 17-21%, revenue growth to 5% pro forma by our calculation, and CFFO guide to a range of $(95)-(75)M from $(40)-(30)M. No impact from CDP anticipated until FY21.

*     *     *

That said, there could be considerable time before Cloudera regains the business momentum it has lost to cloud migration and gives investors sufficient visibility into reacceleration from 5% PF growth in FY20. Absent a sense for that timeframe, and with Cloudera having withdrawn its FY21 targets, we are stepping aside from recommending the stock.

Big F1Q Billings Miss. Revenue $187M (+14% y/y on a proforma basis by our calculation) was about in-line with consensus $188M; however, billings of $98M missed consensus by $63M and 39%. Subscription revenue $155M (+18% y/y proforma) was in-line with consensus. EBIT loss of $35 million (-19% margin) beat consensus loss of $62 million (-33% margin) on faster realization of cost synergies and leverage since the merger. EPS of $(0.11) beat consensus $(0.23). Customers with >$100K ARR declined sequentially to 929 from 943 given the uptick in churn, while the >$1M ARR customers was flat sequentially at ~145 as this cohort experienced a more muted uptick in churn.

F2Q & FY20 Significant Guide Below. F2Q revenue guidance $180-183 million is below consensus estimates of $203 million. Subscription revenue guide $155-157 million is below consensus estimates $167 million. EPS guide of $(0.11) to $(0.08) was in-line with consensus $(0.10) at the midpoint. FY20 revenue guide of $745-765 million (+5% y/y at the midpoint on a pro forma basis by our calculation) was lowered $90M at the midpoint and is well below consensus estimates $844 million. The shortfall comes on higher than expected churn, customers pausing before the release of CDP, and increased competition from public cloud vendors. Subscription revenue guide of $635-645M was well below consensus $700 million. Management also lowered its FY20 Annual Recurring Revenue (ARR) guidance to 0-10% ($659-725M) from 18-21% ($800-825M). EPS guide of $(0.32) to $(0.28) was ahead of consensus $(0.35). CFFO loss guidance of $75-95 million was increased by $50M from a loss of $40-30M and is greater than consensus loss of $33 million. Additionally, management pulled its guidance for FY21, which was >$1B in revenue, >20% revenue growth, and 17% Adjusted CFFO margin.

*     *     *

CDP release this summer. Management expects CDP to reaccelerate revenue growth in the second half and FY21. ***CDP will provide benefits over Cloudera Altus including a cloud-native experience*** for ease of use, improved security, managing workloads over multi-cloud, hybrid and on-premise environments. Relative to public cloud offerings, CDP will have native security/governance, multi-cloud/hybrid/on-premise, and data migration. Although the first iteration of CDP is for public cloud and should improve its competitive position vs. the public cloud vendors, Cloudera's largest customers are demanding CDP for the private cloud, which is to be released towards the end of the year.

187.    In a subsequent note, Raymond James relayed that: "Cloudera attributed the miss primarily to customers moving workloads to cloud, where they are choosing cloud native data management solutions (EMR, RedShift, Athena) absent the availability of Cloudera's new cloud-focused CDP platform to be generally available 2H19[.]" In response to this news, shares of Cloudera's common stock fell by $3.59 per share, or 40.8%, from its previous closing price of $8.80 per share on June 5, 2019 to close at $5.21 per share on June 6, 2019 on extremely high trading volume of more than 57.9 million shares traded.

**Relevant Post-Class Period Developments**

188.    On September 10, 2019, then interim CEO Defendant Cole attended the Deutsche Bank Technology Conference where he confirmed that Cloudera had not been competitive against the public cloud vendors during the Class Period. Defendant Cole explained that the reason Cloudera consummated the Merger was because "neither company was in a very strong position in the cloud. We both [*i.e.*, Cloudera and Hortonworks] had offerings but they weren't easy to use. They didn't have that same take-up as a pure public cloud capability." One of those offerings was, of course, Altus, which Defendants touted as a cloud-native product throughout the Class Period. During the call, Defendant Cole admitted that "***some of our challenges were self-inflicted*** …" and what the Insider Defendants and Cloudera knew since the IPO:

> Yes. AWS, Azure and even on increasing basis now, GCP. They may go direct to – a Databricks or Snowflake, thus with an Azure or AWS. ***So that is a threat in terms of impacting growth rates*** versus an absolute impact on the business per se …. our view is we want to capture a greater percentage of that than we have historically, and one of the reasons we needed to do this merger is ***neither company was in a very strong position in the cloud***. We both had offerings but they weren't easy to use. They didn't have that same take-up as a ***pure public cloud capability***. And so we came together, developed – we're developing a product, releasing it into the marketplace and our goal now is to compete more effectively with some of the public cloud capabilities. The thing is that we're going to differentiate is for those customers who want to be in the cloud, across clouds, hybrid -- as well hybrid that is in on-prem and in public. So multi-cloud, hybrid cloud and on-prem. We're -- our view is that what we're building will be one-of-a-kind ***and it will enable us*** to compete there.

189.    The same day, Cloudera's current Chief Technology Officer, Arun Murthy, published a Class Period article over *Medium.com* called *Hadoop is Dead. Long Live Hadoop*, which aptly

72

summarized the movement away from Hadoop to cloud, and the concomitant challenges the Company faced to keep up with these Class Period developments:

> The public cloud (along with private cloud) is clearly going to be an integral part of the deployment architecture for enterprises from this time forward.
>
> \*  \*  \*
>
> Some things have definitely changed for us [Cloudera]— things we need to heed. **_Five years ago_** [in 2014], when we were the "**_it_**" technology, we got a hall pass. All the cool kids wanted to hang with us, and brought us all the use-cases they could find, and showed us off to their friends. To some extent, _"the answer is Hadoop — what's the question?"_ was the prevailing sentiment. This led to some unreasonable expectations which were unrealistic, or **_too early in the product life-cycle_**. Now we have to work a little harder to convince customers to use what we bring to market …. We also need to convince customers to use these technologies from us such as CDP [Cloud Data Platform].

190.    On October 13, 2019, _ZD Net_ published an article by Tony Baer titled, _Where does Cloudera go from here?_ highlighting how CDP was a: "complete rethinking from the ground up," the vast improvements in speed and elasticity over Altus and that fact that Cloudera "didn't adequately warn Wall Street" about these material facts. The article commented, in relevant part, that: "Cloudera has been through an eventful, some might say turbulent year, to say the least. While its been awhile since Cloudera branded itself as Hadoop, its fortunes have nonetheless been tied to the open source platform first codified by Doug Cutting and Mike Cafarella well over a decade ago …. In a recent post in _Medium_, Cloudera chief product officer Arun Murthy best summed the whole 2019 saga in one elegant title, _Hadoop is Dead. Long Live Hadoop_ …. Last week, Big on Data bro Andrew Brust provided an exhaustive account of Cloudera's new generational product change, Cloudera Data Platform (CDP). To its credit, Cloudera didn't simply do a cut and paste job with the new offering, which was the long-awaited converged platform coming out of its merger with Hortonworks. It was a complete rethinking from the ground up, starting with refactoring of storage and compute **_that severed the ironclad connection between Cloudera's platform and HDFS [Hadoop Distributed File System]._**"

191.    On December 5, 2019, Cloudera held a conference call to discuss the Company's results for the third fiscal quarter 2020 for the period ended October 31, 2019 where Defendant Cole

addressed lingering analyst concern about Cloudera's ability to compete with public cloud vendors. Defendant Cole explained how Cloudera's product offerings were, in fact, not competitive with public cloud vendors during the Class Period because its products were not "cloud native," and couldn't offer the same cloud performance offered by its competitors until it introduced its first genuinely cloud native product, CDP. Again, Defendant Cole admitted that, prior to the Company's release of CDP after the Class Period, the Company could not legitimately compete in cloud, stating in relevant part: ***"[w]e now have a competing product**. The competitive dynamic has improved certainly with CDP Public Cloud. Previously, customers were bifurcating workloads and say, 'Okay, we've got to find another product to go into the public cloud. **We like where you guys are on-prem, but you don't have the offering that we're looking for in terms of ease of use, consistency, security, governance, et cetera.'"*

192. On February 6, 2020, Mr. Murthy, published a second article on *Medium.com* called *Hadoop: Decade Two, Day Zero*, where he distinguished Cloudera's Class Period non-cloud-native product offerings from its post-Class Period CDP offering, which he described as a genuine "data architecture for cloud." According to Mr. Murthy, Cloudera's Class Period products were not cloud-native but what he described as "Hadoop in the Public Cloud." His distinction between "Hadoop in the Public Cloud" (Class Period) and "Hadoop Powered Data Clouds" (post-Class Period) is critical because simply placing software on the cloud or using a cloud-based server does not render it "cloud native." As described by Mr. Murthy, the terms "cloud native" and "cloud architecture" mean that an offering has specific material attributes such as the use of containers and Kubernetes, seamless scalability, security and elasticity. None of the Company's Class Period offerings possessed these attributes. Cloudera did not have a "cloud native" product until Cloudera's announcement of CDP in March 2019. Even then, CDP was merely a beta product or more colloquially – vaporware – until its release for the public cloud in September 2019.

## VI.    DEFENDANTS' VIOLATIONS OF THE 1933 ACT

193. Plaintiffs assert strict liability claims under §§11, 12 and 15 of the 1933 Act against Cloudera, Intel, and each of the Insider Defendants and Director Defendants who signed and/or had

authority over the contents of the Merger Registration Statement (hereinafter, the "1933 Act Defendants"). Plaintiffs' 1933 Act claims are not based on any allegations of knowing or reckless misconduct and do not allege, and do not sound in, fraud. Plaintiffs further specifically disclaim any reference to or reliance upon allegations of fraud for these non-fraud 1933 Act allegations. Further, the 1933 Act Defendants' neglect in not disclosing the adverse information detailed in the Merger Registration Statement in ¶¶ 199-210, *infra,* also violated Item 303 of Regulation S-K (17 C.F.R. §229.303).

194.    On October 3, 2018, Cloudera issued a press release announcing the proposed Merger with Hortonworks, a competitor that also offered Hadoop-based software products. The stock-for-stock deal was then valued at $5.2 billion. At the close of trading on January 2, 2019, shares of Cloudera common stock closed at $11.25 per share and Hortonworks closed at $14.68 per share. After completion of the Merger on January 3, 2019, Hortonworks shareholders would own 40% of the combined Company and received 1.305 newly issued shares of Cloudera common stock in exchange for each Hortonworks share they held.

195.    On November 5, 2018, 1933 Act Defendants filed a Form S-4 draft registration statement with the SEC to register the Cloudera shares to be issued and exchanged in the Merger. On November 16, 2018, the 1933 Act Defendants filed a final amendment to the registration statement, which specifically instructed Cloudera and Hortonworks shareholders to "rely only on the information contained in[the Registration Statement] and in the documents … incorporated by reference," including, *inter alia*: (i) Cloudera's 2018 Annual Report; and (ii) 2Q19 Quarterly Report. On November 20, 2018, the SEC declared the Merger Registration Statement effective. On November 27, 2018, the 1933 Act Defendants filed a Prospectus on Form 424B3 with the SEC for the Cloudera shares ultimately issued and exchanged in the Merger, which Prospectus forms part of the Registration Statement. On January 3, 2019, the 1933 Act Defendants completed the Merger, issuing millions of shares of new Cloudera common stock directly to former shareholders of Hortonworks, including Plaintiffs. Each of these new shares of Cloudera common stock was issued pursuant to the Merger

1    Registration Statement. The price of Cloudera common stock closed at $10.37 per share on January 3,

2    2019, the day the Merger closed.

3        196.    Shares of Cloudera common stock closed at $17.08 per share and shares of

4    Hortonworks common stock closed at $21.88 per share the day the Merger was announced.  Cloudera's

5    share price jumped by as much as 11.53% immediately after it announced the Merger and shares of

6    Hortonworks stock rose by as much as 11.88% the following day. The Merger Registration Statement

7    provided investors with representations concerning the resulting combined Company, including its

8    strategy and outlook. The Merger Registration Statement also included a proposal seeking Cloudera's

9    and Hortonworks' stockholder approval for the issuance of Cloudera common stock shares in

10   connection with the Merger which pursuant to the Merger agreement, the approval of this proposal

11   was a condition to the consummation of the Merger. Cloudera's and Hortonworks' respective Boards

12   each "unanimously" recommended that their stockholders vote in favor of the stock issuance proposal.

13       197.    The 1933 Act Defendants highlighted the purported benefits of the Merger in an

14   October 2, 2018 press release and conference call with investors. Defendant Reilly stated that the

15   "businesses are highly complementary and strategic" and would "deliver the industry's first enterprise

16   data cloud from the Edge to AI." He also stated that the "combined company will have substantial

17   scale, resources and talent to do more faster" and that the Merger "also produces significant financial

18   benefits, including large cost synergies." Defendant Frankola echoed these claims, stating that "[t]his

19   combination will unlock powerful synergies," including "more than $125 million of cost synergies per

20   year." Defendant Frankola also represented that the Merger would generate "***sales and growth on day***

21   ***one***," and that "the day the merger closes, we will have significant scale and growth."

22       198.    At the time of the Merger, however Cloudera was suffering from material adverse facts

23   that were omitted from the Merger Registration Statement. The Company's offerings, including Altus,

24   were technologically deficient and obsolete. With no legitimate or viable cloud product to

25   "complement" Hortonworks' products, the combined Company faced significant customer churn.

26   These omitted material adverse trends in the Merger Registration Statement began to emerge almost

27   immediately after the Merger in March 2019. In sum, as alleged herein, the Merger Registration

28

Statement contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading, thereby rendering the 1933 Act Defendants liable pursuant to the federal securities laws.

**Materially False and Misleading Statements
and Omissions in the Merger Registration Statement[26]**

**Materially Misleading Product and Synergy Statements**

199.    The Merger Registration Statement contained numerous material misstatements concerning the Company's product offerings, including that: (i) its "original architecture was designed for the cloud" and "runs natively on public cloud infrastructure"; (ii) is "[l]eading cloud innovation for big data"; and (iii) Cloudera could "leverage the latest advances in infrastructure including the public cloud for 'big data' applications." The Merger Registration Statement also represented that Cloudera's offerings: (i) provided "[c]loud and on-premises deployment at scale and across hybrid cloud environments"; (ii) "allow[ed] enterprises to manage both long-lived and transient workloads across environments, mixing on-premises and public cloud infrastructure, including all major public cloud vendors – Amazon Web Services, Microsoft Azure and Google Cloud Platform"; and (iii) permitted customers to "deploy, configure and monitor their clusters and workloads at scale from a centralized interface across any mix of public cloud or on-premises environments." It further touted that Cloudera's product "Altus is a cloud service that … enable[s] customers to address a new set of elastic and transient workloads that would otherwise be impractical to run in the datacenter," highlighting its purportedly "ongoing performance in the areas of cloud," and ability to provide "[c]loud … deployment at scale."

200.    The statements above in ¶ 199 *supra* contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading because, at the time of the Merger: (i) Cloudera had no legitimate cloud offering, and the Company's products were not scalable, agile, elastic or cost-effective; and (ii) Cloudera's customers were not renewing their

---

[26]    Attached hereto as Exhibit E is a summary chart that complies with the Court's "Guidelines for Securities Class Action Cases."

contracts with the Company because they could perform the same functions that Cloudera was offering, including Altus, at lower prices. Finally, while the Merger Registration Statement stated that that its "original architecture was designed for cloud," in truth its Hadoop-focused architecture was originally designed for on-premise data warehousing and management that was never "optimized for the cloud" until the Company's release of CDP in September 2019.

201.     Deficiencies in Cloudera's platform were later publicly revealed by Cloudera's customers and a former Cloudera employee to Deutsche Bank securities analysts in March 2019 – just two months after the Merger closed. The Deutsche Bank report included comments from several Cloudera customers which concluded that "[t]he **feedback on Cloudera was negative.…"** More specifically, the Deutsche Bank report quoted the customers they spoke to about Cloudera's products – including Altus – who stated (a) that Cloudera's products were "not useful. We call it our **data swamp**"; (b) "[w]e have a commercial distribution of Cloudera [ ] we're going to **shut it down**"; (c) "[w]e did have Cloudera on-premise. We technically still do have Cloudera. But we're doing all the net new in AWS [Amazon Web Services] EMR.… Our goal is to actually mov[e] everything **out of Cloudera** and into AWS EMR. Cloudera is expensive. Every time we added a node, our licensing costs would just go up"; (d) "[o]ur Cloudera footprint is on-premise.… We're already doing some work in other departments with Azure, so we're sort of looking at Azure and looking at AWS for alternatives right now"; (e) "[w]e had Cloudera but it just didn't turn out to be what we thought it'd be. It's expensive too…."; and (f) "I used to work at Cloudera. **They were late to come out with a cloud strategy**. That's the reason why they've been struggling …. Cloudera had to **rush the launch of Altus** to market, and as a result, it lacked a lot of features, which then hurt them more."

202.     Effective cloud computing features like elasticity, security and integrated support for streams and containerized applications were not competently built into Altus, rendering it almost immediately obsolete. Cloudera's attempts to even release Altus were unsuccessful as customers found its functionality limited. Indeed, Cloudera had no viable cloud product before or after the Merger until it released CDP for the public cloud in September 2019. When, on June 5, 2019, the combined Cloudera revealed that customers that were not renewing included a significant portion of customers

1    "moving to public cloud vendors' native house offerings" in 1Q20, Cloudera's stock price fell over

2    40% the following day (June 6, 2019).

3          203.    The Merger Registration Statement further claimed that Cloudera's purported "cloud"

4    capabilities buttressed its "land and expand" strategy, stating: "[a]fter an initial purchase of our

5    platform, we work with our customers to identify new use cases that can be developed on or moved to

6    our platform, ultimately increasing the amount of data managed on our platform as well as the number

7    and size of our platform deployments." The Merger Registration Statement claimed that the Merger

8    would further this strategy and: (i) "increase cross-sell opportunities"; (ii) "enlarge addressable

9    market"; and (iii) "improve Cloudera's … existing ability to expand customer relationships and

10   increase the penetration of new customer accounts," such that Cloudera would "use the initial sale as

11   a foothold to increase revenue per customer by increasing the amount of data and number of use cases

12   each customer runs through our platform."

13         204.    The representations in ¶ 203 *supra* were materially false and misleading because the

14   Company's platforms, contrary to the representations in the Merger Registration Statement, were

15   technologically obsolete. Cloudera's current customers, including its largest customers, were not

16   "expanding" but were canceling and/or delaying renewals. Hence, at the time of the Merger,

17   Cloudera's bookings had stalled and customer churn was increasing such that Defendants' "land and

18   expand" growth prospects had diminished. Further, prior to the Merger, Cloudera's sales employees

19   were experiencing significant churn leading to customer frustration with having new sales

20   representatives that lacked the necessary experience to close sales. Indeed, Cloudera revealed on June

21   5, 2019 that the Company was suffering from "headwinds in bookings from existing customers,"

22   "roughly flat" and "softer" bookings for "***large[ ] accounts***," and "increased" churn rate with a loss of

23   small customers and "weakness" in sales for midsize customers, as well as "slip[ing]" renewals,

24   driving Cloudera's stock price downward by 45% – *i.e.*, less than half the Company's Merger share

25   price.

26         205.    Further, in an investor Power Point presentation incorporated into the Merger

27   Registration Statement, Cloudera characterized "Altus" as a "cloud" offering and asserted the

28

"complementary product[]" would create "[p]owerful [s]ynergies" for "[r]evenue." This statement was materially false and misleading and/or omitted material information to render the statements not misleading because Altus was not a viable "cloud product." The Company was thereby forced to develop CDP but, consistent with the Osborne Effect, customers waited to renew their contracts with the Company until CDP was released and/or simply moved their spending to cloud providers like Microsoft, Amazon, Snowflake and Google. When Cloudera revealed in its earnings conference call for 1Q20 that it did not yet have "pipeline" for CDP, and that customers that were not renewing included a significant portion of customers "moving to public cloud vendors' native house offerings," Cloudera's stock price fell over 40% in a single day on June 6, 2019.

**Materially Misleading Risk Factor Statements**

206. The Merger Registration Statement provided investors with generalized "possible" "Risk Factors" related to the Merger, stating that *"if"* a "risk" occurred it *"could"* or *"may"* possibly negatively impact the Company. These statements were materially false and misleading because the risks warned of had, in fact, already materialized at the time of the Merger. The Merger Registration Statement also provided that investors "should rely" on the Merger Registration Statement and on documents "incorporated by reference," including a Power Point presentation that promoted the Merger and the 2018 Annual Report, which contained additional purported "risk factors." Cloudera's lack of a viable cloud solution, the profound shortcomings of its Hadoop-focused platforms and commercial failure of its only purported "cloud" Altus product had already adversely affected Cloudera's operations and prospects at the time of the Merger.

207. The Merger Registration Statement's risk factors omitted any discussion of the key material facts related to the Merger, including that: (i) Altus was technologically obsolete; (ii) customers for Cloudera's on-premises Hadoop-focused platforms were taking their business to cloud providers like Snowflake, Google, Amazon and Microsoft; (iii) Cloudera was unable to land "cloud" customers because Altus had been rushed to market and was technologically inferior compared to legitimate cloud vendors' offerings; and (iv) churn in Cloudera's sales force was decimating the Company's ability to expand contracts with existing customers and/or acquire new customers.

208.     Further, while Microsoft, Google and Amazon had a vast commercial advantage in cloud computing, and the scale to render Cloudera's mundane Altus offering effectively irrelevant at the time of the Merger, the Company's relevant SEC filing "Risk Factors" meagerly suggested that the Company "*could* lose market share to our competitors, which *could* adversely affect our business, financial condition and results of operations." In truth, the Company's market share in cloud was virtually nonexistent at the time of the Merger, and the Company's cloud competitors had already, at the time of the Merger, adversely affected the Company's business, financial condition and operations.

209.     The risk factors listed deep in the Merger Registration Statement did not disclose the risk posed by: (i) Cloudera's lack of a viable cloud solution; (ii) the technical shortcomings of its Hadoop-focused platforms or the commercial failure of its Altus product; (iii) the adverse material impacts these deficiencies were having on the Company's then-existing operations. The highly negative response by analysts and the market generally further demonstrates the importance of these facts as the adverse information began to be revealed in March 2019 shortly after the Merger closed.

210.     During Cloudera's March 13, 2019 earnings conference call, the Insider Defendants admitted that they would be focusing its cloud product sales on CDP, thereby starting to reveal the Company's lack of any existing cloud product. Cloudera also revised its prior Merger revenue guidance well below analyst consensus expectations. Cloudera's share price fell from a closing price of $14.61 per share on March 13, 2019 to close at $11.71 per share on March 14, 2019, or nearly 20% on unusually heavy trading volume on March 14, 2019 of over 37.5 million shares traded in response to the news. On June 5, 2019, Cloudera's stock price plummeted over 40% to close at $5.10 per share on June 7, 2019, thereby demonstrating the materiality of the previously undisclosed facts in the Merger Registration Statement. By virtue of the foregoing, the 1933 Act Defendants violated §§ 11, 12, 15 of the Securities Act, 15 U.S.C. §§ 77k(a), 77l(a), and 77o(a).

## VII.     LOSS CAUSATION

211.     The three declines in Cloudera's common stock share price during the Class Period as alleged herein are actionable. The timing and magnitude of the Company's common stock price declines on each of those days negates any inference that the losses suffered by Plaintiffs and the Class

was caused by changed market conditions, macroeconomic or industry factors or Cloudera-specific facts unrelated to Cloudera and the Insider Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and other Class members was a direct result of Cloudera and the Insider Defendants' fraudulent statements and the corresponding artificial inflation in Cloudera's securities prices and the subsequent significant decline in the value of Cloudera's common stock when Cloudera and the Insider Defendants' prior acts of misconduct were revealed.

212.    At all relevant times, Cloudera and the Insider Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiffs and the putative Class. Those statements were materially false and misleading by their failure to disclose a true and accurate picture of Cloudera's products, their capabilities, and ability to compete against public cloud vendors, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Cloudera common stock to be artificially inflated. Plaintiffs and other Class members purchased and/or acquired Cloudera common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

213.    Cloudera and the Insider Defendants were deliberately reckless in not knowing or turned a blind eye to the fact that the Company was struggling to compete, let alone survive with the advent of commercially viable cloud computing services and products. Nonetheless, Cloudera and the Insider Defendants made materially false and misleading public statements that provided false information to investors about the Company's capabilities and market position. Thus, shares of the Company's common stock continued to trade at levels artificially inflated by Cloudera and the Insider Defendants' misleading justifications for the negative information they revealed on April 3, 2018 and March 13, 2019 which maintained the artificial inflation in the Company's share price until it was finally fully removed on June 6, 2019.

**Cloudera's April 3, 2018 Partial Disclosure**

214.   After market close on April 3, 2018, Cloudera disclosed information partially correcting the Insider Defendants' prior misrepresentations and material omissions concerning Cloudera's products, capabilities and ability to compete against public cloud vendors by announcing significantly and materially lowered guidance for the first quarter 2019 and full-fiscal year 2019. In response, Cloudera's s share price fell precipitously from a closing price of $22.24 per share on April 3, 2018 to close at $13.29 per share on April 4, 2019, or 40.24%, on unusually heavy trading volume of over 27.9 million shares traded. Specifically, Cloudera and the Insider Defendants represented that the Company's "land and expand" business model was working, and succeeding, and that Cloudera was on its way to consistent positive cash flow and claimed that Cloudera was a growing, successful software company that would reach a larger customer base and become more profitable. At the same time, Cloudera revealed disappointing financial results for its fourth quarter and fiscal year 2018. While Defendant Reilly claimed that "Cloudera is well positioned to continue to grow" and saw "nothing that gives us concern about the market…." the market still reacted negatively to the partial disclosures.

215.   During the 4Q18 and full year 2018 earnings call, Defendant Frankola stated that the Company was confident that it would be "cash flow positive in 2020." This suggested that Cloudera would see significant billings growth and have proportionately lower spending in the near future. Further, while analysts specifically questioned Defendants Frankola and Reilly about the real reasons for the disappointing outlook, they claimed that: "the cloud is turning out to be a tremendous tailwind for us…. So I see nothing that gives me concern about the market. I just think we need – there's high expectations for us to be a high-growth company. And for us, we just had to be very facile on how we attack that market. No changes in the competitive landscape nor end market demand."

216.   These and other related statements maintained the artificial inflation in the Company's share price.

**Cloudera's March 13, 2019 Partial Disclosure**

217.   After market close on March 13, 2019, Cloudera disclosed information partially correcting Defendants' prior misrepresentations and material omissions concerning Cloudera's product capabilities and ability to compete in cloud by announcing significantly and materially lower than expected guidance for 1Q20 and fiscal year 2020. In response, Cloudera's share price fell from a closing price of $14.61 per share on March 13, 2019 to close at $11.71 per share on March 14, 2019, or nearly 20%, on unusually heavy trading volume on March 14, 2019 of over 37.7 million shares traded.

218.   The Company filed a press release reporting Cloudera's 4Q19 and full year financial results for fiscal year 2019 for the year ended January 31, 2019, which claimed, for 4Q19, total revenues of $144.5 million and subscription revenues were $123 million. Nevertheless, the press release issued weak outlook for the first quarter of the 2020 fiscal year for the period ended April 30, 2019 (1Q20), which was the first fiscal quarter after the Merger. For 1Q20, the Company only expected total revenue in the range of $187 million to $190 million and subscription revenues in the range of $154 million to $156 million. Additionally, the Company's full year 2020 outlook was disappointing. The total revenue prediction for the full 2020 fiscal year was between $835 million and $855 million and subscription revenues to be between $695 million to $705 million. Further, the press release revealed anticipated negative operation cash flow in the range of $30 million to $40 million for the year. Nevertheless, Defendant Frankola stated that "we feel very strong the market is moving in our direction around the hybrid multi-cloud, and then our functionality is best-in-class" and Defendant Reilly disclosed CDP that day to offset any further decline on the Company's share price which remained artificially inflated until the end of the Class Period.

**Cloudera's June 5, 2019 Class Period Ending Disclosure**

219.   After market close on June 5, 2019, Cloudera disclosed information that was fully corrected Defendants' prior misrepresentations and material omissions concerning Cloudera's products capabilities and ability to compete in cloud. In response, Cloudera's share price fell dramatically from a closing price of $8.80 per share on June 5, 2019 to close at $5.21 per share on

June 6, 2019, or 40.80%, on unusually heaving trading volume on June 6, 2019 of over 57.9 million shares traded.

220.     The Insider Defendants revealed severely diminished quarterly and financial results and reduced full-year guidance for Cloudera, which they attributed to customers electing to "postpone renewal and expansion" of their subscription agreements, and increased customer churn due to Cloudera's inability to provide a viable cloud solution to the market. The Insider Defendants also announced that Cloudera's losses from operations had ballooned to $103.8 million, roughly double the year-over-year period and further revealed that Cloudera's largest customers were essentially flat for the quarter, middle-spending customers had declined sequentially, and the Company was suffering from 15% dollar churn rate.

221.     Defendants Reilly and Frankola also disclosed that Cloudera had been: (i) experiencing "***headwinds in bookings from existing customers***"; (ii) "roughly flat" and "softer" bookings of "large accounts"; (iii) an "increased" churn rate with a loss of small customers; and (iv) "weakness" in sales for midsize customers, as well as "slip[ing]" renewals. And, revealing the further materialization of the risk of the Company's lack of a viable cloud product at the time of the Merger, Cloudera admitted it did not have "data or pipeline" to show any "adoption" of its forthcoming CDP product.

222.     The Company also slashed its full-year outlook on June 5, 2019, reducing total revenue guidance by $90 million and stating that it expected recurring revenue growth of only 0% to 10% for the year (compared to 18% to 21% in the prior-issued guidance). The same day, Defendants Reilly and Olson were removed from the Company. In response to all this news, analysts thereafter downgraded Cloudera and questioned management's credibility as alleged in detail in ¶¶ 167-187, *supra.*

## VIII.     APPLICABILITY OF PRESUMPTION OF RELIANCE

223.     At all relevant times, the market for Cloudera's securities was efficient for the following reasons: (a) Cloudera's common stock met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market; (b) during the Class Period, shares of Cloudera's common stock were actively traded, demonstrating a strong presumption of efficiency; (c)

as an SEC regulated issuer, Cloudera filed with the SEC periodic public reports; (d) Cloudera regularly communicated with public investors, including through regular disseminations of press releases on the major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; (e) Cloudera was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and (f) unexpected material news about Cloudera was rapidly reflected in and incorporated into Cloudera's stock price during the Class Period.

224.    As a result of the foregoing, the market for shares of Cloudera's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of Cloudera's stock. Under these circumstances, all purchasers or acquirers of Cloudera's common stock during the Class Period suffered similar injury through their purchase or acquisition of those shares at artificially inflated prices such that the *Basic* and *Affiliated Ute* presumptions of reliance apply.

## IX.    INAPPLICABILITY OF SAFE HARBOR

225.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. All of the specific statements pleaded herein were not identified as, and/or were not "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Company and the Insider Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Cloudera named under the 1934 Act who knew that those statements were materially false and misleading when made.

X.    **CLAIMS FOR RELIEF**

**COUNT I**
**Violations of Section 11 of the 1933 Act**
**(Against Cloudera, Intel, the Director Defendants**
**and the Insider Defendants)**

226.    Plaintiffs repeat and reallege each and every allegation in § VI above as if fully set forth herein. Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct. This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. Plaintiffs do not allege that liability under this Count arises from any scienter or fraudulent intent, which are not elements of a § 11 claim. This claim is brought pursuant to §11 against Cloudera, Intel and the Insider Defendants and the Director Defendants on behalf of Plaintiffs and putative class who purchased and/or otherwise acquired Cloudera common stock pursuant and/or traceable to the Merger Registration Statement, and were damaged by the acts alleged herein.

227.    As part of the Merger Registration Statement, Cloudera registered and offered up to the aggregate of 174,508,291 shares of its common stock and sold to Hortonworks shareholders approximately 111.7 million of these shares in the closing of the Merger. Cloudera was the issuer of its common stock pursuant to the Merger Registration Statement within the meaning of § 11 of the Securities Act.

228.    The Insider Defendants and the Director Defendants each either signed and/or had ultimate control and authority over the contents of the Merger Registration Statement.

229.    Shares of Cloudera common stock were issued and sold pursuant to the Merger Registration Statement. All purchases or acquisitions of Cloudera common stock by the shareholders of Hortonworks in the Merger were a result of the issuance of the Merger Registration Statement and the shares registered thereunder. As a result, each share sold to Hortonworks' shareholders by Cloudera at the time of the closing of the Merger is traceable to the Merger Registration Statement, which contained untrue statements of material fact and omitted to state material facts required to be

stated therein or necessary to make the statements therein not misleading. The facts misstated and omitted in the Merger Registration Statement were material.

230.    As the issuer and registrant, Cloudera is strictly liable for the untrue statements of material fact. The Defendants named in this Count owed to Plaintiffs putative class members the duty to make a reasonable and diligent investigation of the statements contained in the Merger Registration Statement to ensure that the statements contained or incorporated by reference therein were true, and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. None of the Defendants named under this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Merger Registration Statement were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

231.    Plaintiffs and the class purchased and/or acquired Cloudera common stock pursuant or traceable to the Merger Registration Statement and were damaged thereby. Plaintiffs and the putative class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material facts or omissions of material facts in the Merger Registration Statement when they purchased and/or acquired their Cloudera common stock.

232.    Less than one year has elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based and the time this action was filed. Less than three years elapsed since the stock upon which this Count is brought was *bona fide* offered to Plaintiffs and the putative class. By reason of the foregoing, Cloudera, Intel, the Insider Defendants and Director Defendants are liable to Plaintiffs and the class under § 11 of the 1933 Act.

**COUNT II**
**Violations of Section 12(a)(2) of the 1933**
**(Against Cloudera)**

233.    Plaintiffs repeat and reallege each and every allegation in § VI above as if fully set forth herein. For the purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct. This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically

excluded from this Count. Plaintiffs do not allege that liability under this Count arises from any scienter or fraudulent intent, which are not elements of a § 12 claim.

234. This claim is brought against Cloudera on behalf of Plaintiffs and putative class members who purchased or acquired Cloudera common stock pursuant and/or traceable to false and/or misleading prospectuses issued by Cloudera as part of an offer and sale of Cloudera common stock in the Merger, and were damaged by the acts alleged herein.

235. Cloudera offered and/or sold Cloudera common stock using the means or instruments of transportation or communication in interstate commerce or the mails.

236. As part of the Merger, Cloudera registered and offered up to the aggregate of 174,508,291 shares of its common stock, and thereafter sold at least 111.7 million of these shares to the shareholders of Hortonworks at the closing of the Merger. Cloudera was the issuer, offeror, and seller of these shares of common stock and did such through prospectuses that included untrue statements of a material fact or omits to state a material fact or facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

237. Shares of Cloudera common stock were issued and sold pursuant to the Merger Registration Statement. All purchases and/or acquisitions of Cloudera common stock by Hortonworks shareholders in the Merger were a result of the issuance of the Merger Registration Statement and the shares registered thereunder. Each share sold to Hortonworks shareholders by Cloudera at the time of the closing of the Merger is traceable to the Merger Registration Statement.

238. As the offeror and seller of Cloudera common stock issued by Cloudera, registered by Cloudera under the Registration Statement, and then sold to each Hortonworks shareholder at the time the Merger was completed, Cloudera is strictly liable for the untrue statements of material fact in the prospectuses issued in support of the Merger Registration Statement. The Insider and Director Defendants owed to Plaintiffs and the putative class the duty to make a reasonable and diligent investigation of the statements contained in the Merger Registration Statement to ensure that the statements contained or incorporated by reference therein were true, and that there was no omission

1    to state a material fact required to be stated in order to make the statements contained therein not

2    misleading.

3         239.    Cloudera never made a reasonable investigation or possessed reasonable grounds for

4    the belief that the statements contained in the prospectuses were accurate and complete in all material

5    respects.

6         240.    Plaintiffs and putative class members who were offered and sold Cloudera common

7    stock in the Merger that is pursuant to and traceable to the Merger Registration Statement that

8    contained untrue statements of material facts or omissions of material facts therein and were damaged

9    thereby. Plaintiffs and members of the class did not know, nor in the exercise of reasonable diligence

10   could they have known, of the untrue statements of material facts or omissions of material facts in the

11   Merger Registration Statement when they purchased or acquired their Cloudera common stock.

12   Plaintiffs and the other members of the class who purchased or otherwise acquired Cloudera common

13   stock in the Merger from Cloudera have sustained damages as a result of the untrue statements of

14   material facts and omissions in the Merger Registration Statement.

15        241.    Less than one year has elapsed from the time Plaintiffs discovered or reasonably could

16   have discovered the facts upon which this Complaint is based and the time this action was filed. Less

17   than three years elapsed since the stock upon which this Count is brought was bona fide offered to

18   Plaintiffs and the class.

19        242.    By reason of the foregoing, Cloudera is liable to Plaintiffs and putative class members

20   under § 12(a)(2) of the 1933 Act.

21                                    **COUNT III**
                          **Violations of Section 15 of the 1933 Act**
22            **(Against Intel, the Director Defendants and the Insider Defendants)**

23        243.    Plaintiffs repeat and reallege each and every allegation in § VI above as if fully set

24   forth herein. For the purposes of this claim, Plaintiffs assert only strict liability and negligence claims

25   and expressly disclaim any claim of fraud or intentional misconduct. This Count does not sound in

26   fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically

27

28
                                            90

excluded from this Count. For purposes of this Count, Lead Plaintiff does not allege that liability under this Count arises from any scienter or fraudulent intent, which are not elements of a § 15 claim.

244.    At all relevant times, Defendants named under this Count were "controlling persons" of Cloudera within the meaning of § 15 of the Securities Act.

245.    This claim is brought pursuant to § 15 of the 1933 Act against Intel, the Individual Defendants and the Director Defendants on behalf of Plaintiffs and putative class members who purchased or acquired Cloudera common stock pursuant and/or traceable to the Merger Registration Statement, and were damaged by the acts alleged herein, including putative class members who purchased Cloudera common stock it issued by Cloudera that was registered through the Merger Registration Statement, and was then sold by Cloudera to Hortonworks's shareholders.

246.    The Defendants named under this Count violated § 11 by issuing the Merger Registration Statement, which included materially untrue statements of fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. Each of the Defendants named under this Count were controlling persons of Cloudera and/or Hortonworks when the Merger Registration Statement was filed and became effective due to their: (i) senior executive positions; (ii) positions on Cloudera's Board; (iii) direct involvement in Cloudera's day-to-day operations and in the review and approval of the proposed Merger; (iv) solicitation of Cloudera's stockholders' votes in favor of the issuance of Cloudera's common stock; and (v) participation in and preparation of the Merger Registration Statement.

247.    By virtue of their exercise of control over Cloudera, the Defendants named under the Count had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Cloudera, including the content of Cloudera's prospectuses and the Merger Registration Statement and did not make a reasonable investigation or possess reasonable grounds for the belief that the Merger Registration Statement was accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

248.    Less than one year has elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based and the time this action was filed. Less than three years elapsed since the stock upon which this Count is brought was bona fide offered to Plaintiffs and the Class.

249.    By reason of the foregoing, Intel, the Director and the Insider Defendants are liable to Plaintiffs and the members of the Class under § 15 of the 1933 Act.

## COUNT IV
### Violations of Section 10(b) of the 1934 Act and Rule 10b-5(b)
### Promulgated Thereunder
### (Against Cloudera and the Insider Defendants)

250.    Plaintiffs repeat and reallege each and every allegation contained above in § V as if fully set forth herein.

251.    During the Class Period, Cloudera and the Insider Defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they deliberately disregarded as or turned a blind eye to being misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Cloudera and the Insider Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

252.    Cloudera and the Insider Defendants, individually and together, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations, and future prospects of Cloudera as specified herein. Cloudera and the Insider Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded or turned a blind eye toward the true facts that were available to them. Defendants engaged in misconduct with at least reckless disregard for the truth, and for the

purpose and effect of concealing Cloudera's true prospects from the investing public and supporting the artificially inflated price of Cloudera's common stock.

253.    Cloudera and the Insider Defendants had motive and opportunity to perpetrate the fraudulent scheme and course of business described herein. The Insider Defendants were the most senior officers of Cloudera, issued statements and press releases on behalf of the Company, and each made false statements concerning the Company's abilities and had the opportunity to commit fraud alleged. Cloudera and the Insider Defendants were motivated to inflate the price of Cloudera common stock to sell those shares at inflated prices. Plaintiffs and the putative class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for shares of Cloudera's publicly traded common stock. Plaintiffs and the putative class would not have purchased or acquired shares of Cloudera's publicly traded common stock at the prices they paid, or at all, had they been aware that the market price for Cloudera's common stock had been artificially inflated by the Company's and the Insider Defendants' materially false and misleading statements.

254.    As a direct and proximate result of Cloudera and the Insider Defendants' wrongful conduct, Plaintiffs and other putative class members suffered damages in connection with their purchases of Cloudera common stock during the Class Period.

**COUNT V**
**Violations of Section 20(a) under the 1934 Act**
**(Against the Insider Defendants)**

255.    Plaintiffs repeat and reallege each and every allegation contained in § V above as if fully set forth herein. As members of Cloudera's executive team and/or the Company's Board, the Insider Defendants acted as controlling persons of Cloudera within the meaning of § 20(a) of the 1934 Act.

256.    By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of Cloudera's operations and/or intimate knowledge of the false information and disseminated to the investing public, the Insider Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Cloudera, including the content and dissemination of the various statements that Plaintiffs contend are

93

false and misleading. The Insider Defendants were provided with, or had unlimited access to Cloudera's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

257.    Cloudera and the Insider Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint and the Class was damaged thereby. By virtue of their positions as controlling persons, the Insider Defendants are liable pursuant to § 20(a) of the 1934 Act.

**XI.    CLASS ACTION ALLEGATIONS**

258.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired shares of Cloudera's publicly traded common stock during the Class Period, and were damaged by the conduct asserted herein. Defendants and their immediate families and legal representatives, heirs, successors or assigns and any entity in which the Defendants named herein have, or had, a controlling interest are excluded from the Class.

259.    The members of the class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. At all relevant times, Cloudera had between approximately 128 and 290 million shares of stock outstanding, owned by hundreds if not thousands of persons.

260.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the class that predominate over questions that may affect individual class members include whether: (a) Defendants violated the federal securities laws; (b) Defendants omitted and/or misrepresented material facts; (c) Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; (d) with respect to Plaintiffs' 1934 Act claims, the Company and the Insider Defendants with deliberate recklessness disregarded or turned a blind eye toward the fact that their Class Period statements were false and misleading; (e) the price of Cloudera

common stock was artificially inflated; and (f) the extent of damage sustained by class members and the appropriate measure of damages.

261.   Plaintiffs' claims are typical of those of the putative class because they each were similarly damaged from Defendants' statements and acts.

262.   Plaintiffs will adequately protect the interests of the class and have retained counsel who are experienced in securities class action litigation. Plaintiffs have no interests that conflict with those of the Class.

263.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulties in the management of this action that would preclude its maintenance as a class action.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.   Declaring this action to be a proper class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.   Awarding Plaintiffs and the members of the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained due to Defendants' conduct, in an amount to be proven at trial, including interest thereon;

C.   Awarding Plaintiffs and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

D.   Awarding such other equitable/injunctive or further relief as this Court may deem just and proper.

## XIII.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury in this action for all issues so triable.

Respectfully submitted,

Dated: September 22, 2020

KAHN SWICK & FOTI, LLP

By: _____

Ramzi Abadou (SBN 222567)
ramzi.abadou@ksfcounsel.com

KAHN SWICK & FOTI, LLP
912 Cole Street, # 251
San Francisco, California 94117
Telephone: (415) 459-6900
Facsimile: (504) 455-1498

-and-

Lewis S. Kahn (*pro hac vice to be submitted*)
Alexander L. Burns (*admitted pro hac*)
Alayne K. Gobeille (admitted *pro hac*)
Morgan M. Embleton (admitted *pro hac*)
KAHN SWICK & FOTI, LLC
1100 Poydras Street, Suite 3200
New Orleans, Louisiana 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
lewis.kahn@ksfcounsel.com
alexander.burns@ksfcounsel.com
alayne.gobeille@ksfcounsel.com
morgan.embleton@ksfcounsel.com

*Counsel for Mariusz J. Klin &*
*The Mariusz J. Klin MD PA 401K Profit*
*Sharing Plan and Plaintiffs Robert Boguslawski*
*and Arthur P. Hoffman*

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on September 22, 2020, I electronically filed the foregoing with the Clerk

3   of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4   addresses registered, as denoted on the attached Electronic Mail Notice List, and I hereby certify that

5   I have mailed the foregoing document or paper via the United States Postal Service to the non-

6   CM/ECF participants indicated on the attached Manual Notice List.

7

8   _____

                    RAMZI ABADOU

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Mailing Information for a Case 5:19-cv-03221-LHK In re Cloudera, Inc. Securities Litigation

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzi.abadou@ksfcounsel.com,Ashley.Errington@ksfcounsel.com

- **Marie Caroline Bafus**
  mbafus@fenwick.com,pnichols@fenwick.com,marie-bafus-3841@ecf.pacerpro.com

- **Lauren Claire Barnett**
  lauren.barnett@mto.com

- **Peter E. Borkon**
  pborkon@bfalaw.com

- **Alexander Louis Burns**
  alexander.burns@ksfcounsel.com

- **Robert Leo Dell Angelo**
  robert.dellangelo@mto.com,camille.parker@mto.com,denise.olguin@mto.com

- **Morgan Michelle Embleton**
  Morgan.Embleton@ksfcounsel.com

- **Alayne K Gobeille**
  alayne.gobeille@ksfcounsel.com

- **Robert S. Green**
  gnecf@classcounsel.com

- **Benjamin Heikali**
  Bheikali@faruqilaw.com,ealdo@faruqilaw.com,smarton@faruqilaw.com,ecf@faruqilaw.com,bgiacalone@faruqilaw.com,tpeter@faruqilaw.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,tcrockett@pomlaw.com,abarbosa@pomlaw.com

- **Alison Clare Jordan**
  ajordan@fenwick.com,alison-jordan-5300@ecf.pacerpro.com,vpieretti@fenwick.com

- **Dean S. Kristy**
  dkristy@fenwick.com,kayoung@fenwick.com,dean-kristy-2035@ecf.pacerpro.com,lkelleybourne@fenwick.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,tcrockett@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com,lpvega@pomlaw.com

- **Charles Henry Linehan**
  clinehan@glancylaw.com,charles-linehan-8383@ecf.pacerpro.com

- **Kevin Peter Muck**
  Kevin.Muck@wilmerhale.com,joann.ambrosini@wilmerhale.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,jalieberman@pomlaw.com,ahood@pomlaw.com,egoodman@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@pomla

- **Lesley F. Portnoy**
  LPortnoy@glancylaw.com,info@glancylaw.com,clinehan@glancylaw.com,lesley-portnoy-3007@ecf.pacerpro.com,charles-linehan-8383@ecf.pacerpro.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net,lrosen@ecf.courtdrive.com

- **Jonathan Daniel Uslaner**
  jonathanu@blbglaw.com,MichaelB@blbglaw.com,Rebecca.Kim@blbglaw.com,Avi@blbglaw.com,garyw@blbglaw.com

- **Anna Erickson White**
  awhite@mofo.com,anna-erickson-white-9788@ecf.pacerpro.com,andrea-vickery-5658@ecf.pacerpro.com,avickery@mofo.com

- **Jeffrey Y. Wu**
  Jeffrey.Wu@mto.com,Denise.Olguin@mto.com,Dkt-filings@mto.com,Michael.Lamb@mto.com,Lauren.Barnett@mto.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)