Ramzi Abadou (SBN 222567)
**KAHN SWICK & FOTI, LLP**
912 Cole Street, # 251
San Francisco, California 94117
Telephone: (415) 459-6900
Facsimile: (504) 455-1498
ramzi.abadou@ksfcounsel.com

*Lead Counsel for Lead Plaintiff Mariusz J. Klin &*
*The Mariusz J. Klin MD PA 401K Profit*
*Sharing Plan and Plaintiffs Robert*
*Boguslawski and Arthur P. Hoffman*

*[Additional counsel on signature page]*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

|  |  |
|---|---|
| IN RE CLOUDERA, INC. SECURITIES LITIGATION | ) <br> ) Case No. 19-CV-3221-LHK-SVK <br> ) <br> ) <br> ) **CONSOLIDATED SECOND AMENDED** <br> ) **CLASS ACTION COMPLAINT FOR** <br> ) **VIOLATIONS OF THE FEDERAL** <br> ) **SECURITIES LAWS** <br> ) <br> ) **CLASS ACTION** <br> ) <br> ) <br> ) **JURY TRIAL DEMANDED** <br> ) |

*"[W]e . . . perhaps relied too heavily on taking management at its word."*[1]

## I.    PRELIMINARY STATEMENT

1.    Lead Plaintiff Mariusz J. Klin & The Mariusz J. Klin MD PA 401K Profit Sharing Plan ("Lead Plaintiff"), and named plaintiffs Robert Boguslawski and Arthur P. Hoffman (together, "Plaintiffs") allege the following based upon personal knowledge with respect to themselves and, with respect to all other matters, the investigation of Lead Counsel. Lead Counsel's investigation included a review and analysis of, *inter alia*: (i) regulatory filings by Cloudera, Inc. ("Cloudera" or the "Company") and Hortonworks, Inc. ("Hortonworks") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, media statements and marketing presentations issued and disseminated by Defendants; (iii) Defendants' statements to analysts and the Company's investors during earnings conference calls, investor conferences and television interviews; (iv) analyst and industry reports concerning Cloudera and Hortonworks; (v) internal Cloudera emails and communications; and (vi) other industry-specific information related to Cloudera and Hortonworks. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.    This is a putative class action for violations of the federal securities laws. Plaintiffs bring this federal securities action on behalf of all persons who purchased and/or otherwise acquired shares of Cloudera common stock between April 28, 2017 and June 5, 2019, inclusive (the "Class Period") and were damaged by the conduct asserted herein (the "Class").

3.    Plaintiffs assert claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. In addition to Cloudera, the Defendants named under the 1934 Act are: (i) former Cloudera Chief Executive Officer ("CEO") Thomas J. Reilly; (ii) Cloudera Chief Financial Officer ("CFO") Jim Frankola; (iii) former

---

[1]    *See* Rishi Jaluria, *We Were Wrong: Few Silver Linings in this Disastrous Quarter*, D.A. Davidson Institution Equity Research (June 6, 2019).

1    Cloudera Chairman of the Board, Michael Olson; and (iv) former Cloudera director Ping Li (together,

2    the "Insider Defendants").

3        4.      Lead Plaintiffs' 1934 Act claims arise out of a fraudulent or deliberately reckless course

4    of business conduct whereby, throughout the Class Period, Cloudera and the Insider Defendants either

5    knew or recklessly disregarded that their: (i) statements and omissions as alleged herein were

6    materially false and misleading; (ii) material misstatements and omissions would adversely affect the

7    integrity of the market for Cloudera common stock; and (iii) material misstatements and omissions

8    would deceive investors into purchasing shares of Cloudera common stock at artificially inflated

9    prices, including in: (a) the Company's initial public offering ("IPO") which closed on April 28, 2017;

10   (b) the Company's Secondary Public Offering ("SPO"), which closed shortly thereafter on October 2,

11   2017; and (c) in connection with the Company's merger with and acquisition of Hortonworks, which

12   closed shortly after that on January 3, 2019 ("Merger").

13       5.      Specifically, Cloudera and the Insider Defendants either knowingly or recklessly made

14   materially false and misleading public statements and material omissions that: (i) materially

15   misrepresented the Company's technological capabilities and product offerings, while simultaneously

16   overstating the Company's ability to compete with actual cloud vendors; (ii) materially misrepresented

17   the reasons for the Merger; (iii) obfuscated the Company's then ongoing efforts to "replatform" its

18   legacy technology in order to eventually be able to provide its customers with cloud products; and (iv)

19   misleadingly downplayed Cloudera's operational challenges as its customers transitioned away from

20   the Company's Hadoop-focused, on-premise platform to cloud.

21       6.      When the full truth about the Company operations, prospects and technological

22   infirmities was revealed on the last day of the Class Period, Cloudera's share price fell approximately

23   40.8% on unusually massive volume of 57.9 million shares traded between June 5 and 6, 2019.

24   Specifically, on June 5, 2019, the Company disclosed profoundly negative first quarter fiscal year

25   2020 results for the period ended April 30, 2019 ("1Q20"), and drastically reduced fiscal year 2020

26   guidance. The Company's prospects had been so negatively impacted by cloud providers during the

27   Class Period that Defendants altogether pulled Cloudera's fiscal year 2021 guidance. That same day,

28

the Company also announced Defendant Reilly's removal as CEO who, in turn, subsequently announced Defendant Olson's unexpected ouster. These high-profile executive ousters came just a few months after the Company assured investors that Defendants Reilly and Olson constituted the "best go-forward management team" for the combined Company after the Merger, and after they were each awarded significant salary increases in connection with the Merger.[2]

7.    In response to the Company's disclosures, sophisticated securities analysts and industry insiders accused Defendants of misleading the market about the Company's product capabilities during the Class Period. *See, e.g.*, ¶¶ 72-73, *infra* ("Cloudera didn't adequately warn Wall Street"). On June 5, 2019, D.A. Davidson analyst Rishi Jaluria noted that he had "relied too heavily on taking management at its word," about its product capabilities and characterized Cloudera's contradictory explanations for the Company's disastrous 1Q20 results as "truly difficult to believe." Wedbush technology analyst Daniel Ives commented that, with Defendants' June 5, 2019 disclosures, the: "wheels came off the bus" for Cloudera, adding that the Company's disclosures "will be the straw that broke the camel's back for many investors and core believers in the Cloudera story, as the company delivered the dreaded trifecta of bad news: soft April results, a jaw dropping weak guidance, and a CEO departure." Defendant Reilly's replacement as CEO, Defendant Martin I. Cole, later admitted that these Class Period failures were "self-inflicted." *See* ¶ 152, *infra*.

8.    Further, on June 5, 2019, and contrary to Defendant Reilly's repeated Class Period claims that Cloudera (starting with its IPO Prospectus filed with the SEC on April 28, 2017) then possessed "***cloud native architecture***,"[3] Defendant Reilly finally acknowledged under withering analyst questioning during the Company's 1Q20 earnings call that, in truth, the Company had actually been attempting during the Class Period to "deliver a competitive cloud offering and ***replatform into***

---

[2]    Cloudera, Inc., Master Talking Points & FAQs (Form 425) (October 12, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018012509/a425101118mtpsfaqs.htm at 3.

[3]    Cloudera, Inc., IPO Prospectus (Form 424B4) (April 28, 2017), https://www.sec.gov/Archives/edgar/data/0001535379/000162828017009498/cloudera424b4.htm, at 7.; *see* ¶¶ 158, 175, 185, 209, 216, 222-223, 233, *infra*.

*cloud architecture*."[4] The Company needed to replatform into "cloud architecture" as alleged herein because its original architecture was designed exclusively for on-premise, not cloud, applications. The following day, on June 6, 2019, longtime Cloudera supporter, Barclays analyst Raimo Lenschow concluded that, despite the Insider Defendants' repeated Class Period misrepresentations starting with the IPO in April 2017 that "Cloudera offers the leading *cloud-native software platform*,"[5] "Cloudera *currently does not have a cloud solution*, which seems the favorite deployment mode for most customers. This means that the company suffers from weak renewals as *customers move to cloud native providers*."[6]

9.    As alleged herein, the Company's customers were moving their workloads to "cloud-native providers" because the Company could not and did not provide cloud-native services during the Class Period, despite the Insider Defendants' repeated Class Period representations to the contrary. Cloudera did not possess a "cloud-native" offering until its release of Cloudera Data Platform ("CDP") for the public cloud in September 2019. Indeed, unbeknownst to investors, Cloudera was forced to undertake a lengthy and costly overhaul of its entire legacy Hadoop architecture in building CDP during the Class Period. As explained in an October 4, 2019 article published by industry cloud publication Datanami, titled *How Cloudera is Battling Shadow IT with CDP*, during the Class Period: "Cloudera needed to recalibrate its bearings and adjust to the new world order – and quickly. In product terms, it meant nothing short of a *complete architectural overhaul*, replacing the guts of its Hadoop distribution, namely HDFS [Hadoop Distributive File System] and YARN, with cloud-friendly equivalents, namely an S3-compatible object store and Kubernetes."

10.    Separately, Plaintiffs assert strict liability, non-fraud claims under §§ 11(a), 12(a)(2) and 15 of the Securities Act of 1933 (the "1933 Act") on behalf of all persons who acquired Cloudera common stock pursuant or traceable to the Form S-4 registration statement and prospectus ("Merger

---

[4]    Cloudera, Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 11.

[5]    *See* Cloudera, Inc., Q1 2018 Earnings Conference Call (June 8, 2017), at 3.

[6]    *See* Raimo Lenschow, *A Long & Painful Wait for CDP*, Barclays (June 6, 2019).

Registration Statement") issued in connection with the Merger.[7] The Defendants named under the 1933 Act are: (i) Cloudera: (ii) Intel Corporation ("Intel"); and (iii) certain current former officers and directors of Cloudera and Hortonworks as alleged in ¶¶ 95-137, *infra*. Plaintiffs' 1933 Act claims arise out of negligently made materially false and misleading statements and omissions in the Merger Registration Statement. Plaintiffs' 1933 Act claims are not based on any allegation of deliberate or intentional misconduct, and Plaintiffs expressly disclaim, reference, or rely upon any fraud allegations for such claims.

11.    As set forth herein, each of the Defendants named under the 1933 Act negligently made materially false and misleading public statements and omissions in the Merger Registration Statement that: (i) materially misrepresented the Company's and Hortonworks' technological capabilities and product offerings; and (ii) materially misrepresented the reasons for the Merger. A California Superior Court sustained virtually identical claims under the 1933 Act against identical named Defendants in *In re Cloudera Sec. Litig.*, 2020 Cal. Super. LEXIS 98 (Cal. Super. Ct. July 1, 2020).

## II.    BACKGROUND & OVERVIEW OF THE ACTION

### Technology Overview

12.    Data is now itself considered a valuable resource as the world continues to become increasingly interconnected. Business enterprises and other large organizations seek to collect and monetize realtime and streaming data on events and transactions, social and interaction data about their customers, news and market data about themselves and their competition. They venture to do so

---

[7]    On November 5, 2018, Cloudera filed a registration statement with the SEC on Form S-4 for the Cloudera common stock to be issued in the Merger. On November 16, 2018, an amendment to the registration statement was filed with the SEC, which directed investors to "rely only on the information contained in [the S-4 registration statement] and in the documents . . . incorporated by reference" therein, including Cloudera's annual report on Form 10-K for the fiscal year ended January 31, 2018 ("2018 Annual Report"), and Cloudera's quarterly report on Form 10-Q for the period ended July 31, 2018. The SEC later declared the Form S-4 Registration Statement effective on November 20, 2018. On November 27, 2018, Cloudera filed a prospectus for the common stock to be issued in the Merger with the SEC on Form 424B3, which incorporated and formed a part of the Registration Statement (the "Prospectus"). The Prospectus and Registration Statement (including the documents incorporated by reference therein) are collectively referred to herein as the "Merger Registration Statement."

1   quickly and efficiently to successfully advance their business objectives. Web-scale internet

2   companies like Google, Facebook, *Yahoo!* and Amazon were some of the first entities most driven to

3   confront these challenges. Presently, business enterprises and other large organizations remain

4   increasingly focused on developing the capability to manage vast amounts of data from a variety of

5   rapidly developing sources to better serve their customers, design products and services, and manage

6   risk.

7       13.     Cloudera is a software company. Capitalizing on its name, Cloudera repeatedly

8   misrepresented throughout the Class Period that it possessed "cloud-native"[8] offerings and that its

9   "original architecture was designed for the cloud."[9] The cloud is a general term used to describe a

10  network of servers that applies massive processing and storage capabilities to business.

11      14.     As alleged herein, throughout the Class Period, the term "cloud-native" was understood

12  by reasonable investors to mean a software offering with specific core material attributes such as the

13  use of containers, seamless scalability, ease-of-use, and security and elasticity. Such platforms

14  empower organizations to build and run scalable applications in dynamic environments such as public,

15  private, and hybrid clouds over the internet. The term "cloud-native" had the same meaning in 2017

16  at the time of the IPO as it does presently.

17      15.     Further, and throughout the Class Period, "cloud architecture" was understood by

18  reasonable investors to mean the various components of cloud computing in terms of databases,

19  software capabilities and applications engineered to leverage the power of cloud resources to solve

20  business problems. "Cloud architecture" defines the components as well as the relationships between

21  them and had the same meaning in 2017 as it does presently. As used throughout herein,

22

23

24  _____

25  [8]     Cloudera, Inc., IPO Prospectus (Form 424B4) (April 28, 2017), https://www.sec.
26  gov/Archives/edgar/data/0001535379/000162828017004450/cloudera424b4.htm, at 5; Cloudera,
    Inc., Q1 2018 Earnings Conference Call (June 8, 2017), at 3.

27  [9]     Cloudera, Inc., 2018 Annual Report (Form 10-K) (April 4, 2018), https://www.secsecwww.
    sec.gov/Archives/edgar/data/0001535379/000162828018004005/fy-18cldr10k.htm, at 9.
28

"replatforming" is defined as the process of "shaping the application **towards being cloud-native**"[10] and "renovating and migrating a legacy application to take advantage of modern technologies, environments and architectures."[11]

16.    In general, cloud computing enables organizations to move compute power, data storage, and other services away from on-premises servers and onto remote servers that employees or customers can access *via* the internet. A company seeking to use cloud computing services can elect between a private cloud (where cloud services are exclusive to the company) and/or a public cloud (where cloud services are owned and managed by a provider who also hosts other tenants), or a combination of the two.

17.    Cloud computing differs from Cloudera's Class Period on-premises software in at least one critical way. In an on-premise environment, an enterprise hosts data in-house installed on its own servers. The company maintains their own hardware whereas in a cloud environment a third-party provider hosts that information.[12] In a cloud environment, a company pays on as an as-needed basis (*i.e.*, consumption based) and can efficiently scale resources up or down depending on overall usage, user requirements, and the enterprise's growth. An on-premise based software architecture cannot be transformed into a cloud product merely by placing and running it on a cloud platform because the software will not be able to take advantage of intrinsic cloud functions like dynamic scaling. Rather, a legacy software's architecture must be entirely rebuilt (*i.e.*, replatformed) into cloud architecture to provide actual cloud computing capabilities.

18.    As alleged herein, and as independently acknowledged by Defendants Reilly, Martin I. Cole, Robert Bearden, and insider Arun Murthy following the Class Period, as alleged in ¶¶ 290-301, 309, 311, *infra*, Cloudera did not possess a "cloud-native" offering until the Company released CDP

---

[10]    https://cloudsoft.io/blog/migrating-to-aws-method-3-replatforming-aka-lift-and-shape    (last accessed June 18, 2021).

[11]    https://www.intelliware.com/what-is-replatforming/ (last accessed June 18, 2021).

[12]    https://www.cleo.com/blog/knowledge-base-on-premise-vs-cloud    (last accessed June 18, 2021).

1    for the public cloud in September 2019 and for the private cloud in August 2020. In fact, it was only

2    in connection with the release of CDP that the Company had altered its pricing model to a "cloud

3    consumption-based pricing model."[13] Consumption-based pricing is a hallmark of cloud computing as

4    it would allow Cloudera's customers to **pay on an as-needed basis** and to effectively scale up or down

5    depending on overall usage, user requirements, and the growth of the enterprise.

6          19.    The Company's shift to a "cloud consumption-based pricing model" after its release of

7    CDP even caught the attention of the SEC, which, as alleged in more detail in ¶¶ 302-308, *infra*, sent

8    the Company three separate comment letters between July and September 2020. The SEC sought

9    clarification from Cloudera regarding that specific change in Cloudera's reporting for its financial

10   condition and operations in its March 27, 2020 Annual Report on Form 10-K.[14] In its last and final

11   response to the SEC, which Defendant Frankola signed on October 9, 2020, the Company relented

12   that it could not provide additional details about its cloud pricing model because: "[i]n the Company's

13   fiscal year ended January 31, 2020 and through the first six months of the Company's fiscal 2021, our

14   contracts with customers that utilize consumption-based cloud pricing as well as the amount of ARR

15   associated with consumption-based cloud pricing was **immaterial**, as this model is relatively new for

16   the Company."[15]

17         20.    As alleged herein, the Company's consumption-based cloud pricing and associated

18   ARR were immaterial at that time because CDP was the Company's first ever cloud-native product.

19       **Relevant Industry and Company Overview**

20   _____

21   [13]    While Cloudera purportedly offered consumption-based pricing as early as 2017, revenue from
     this model was not material to the Company. *See* Cloudera, Inc., Response to the SEC's September

22   28, 2020 Staff Comment Letter at (October 9, 2020), https://www.sec.gov/Archives/edgar/data/
     0001535379/000162828020014417/filename1.htm ("Once consumption-based cloud pricing

23   becomes a material portion of the Company's revenue, we will disclose the method of our calculation
     of consumption-based cloud ARR.").

24   [14]    *See* SEC Staff Comment Letter to Cloudera, Inc. (July 31, 2020),Cloudera, Inc. 10-K Letter.pdf

25   (sec.gov); SEC Staff Comment Letter to Cloudera, Inc. (August 27, 2020), Cloudera, Inc. CORRESP
     Letter.pdf (sec.gov); SEC Staff Comment Letter to Cloudera, Inc. (September 28, 2020), Cloudera,

26   Inc. CORRESP Letter.pdf (sec.gov).

27   [15]    Available at https://www.sec.gov/Archives/edgar/data/0001535379/000162828020014417/
     filename1.htm.

28

21.    Cloudera was co-founded by Doug Cutting, Defendant Olson and others in 2008. Mr. Cutting built upon Google's seminal October 2003 "Google File System" research paper and subsequent MapReduce innovation to create his own version of these technological data-crunching marvels, which he called "Hadoop."[16] At its introduction in 2005, the Hadoop Distributed File System ("HDFS") was considered revolutionary. As described at various times by Cloudera, Hadoop was designed to be the singular data storage and processing platform – an "operating system for big data."

22.    Hadoop was officially released in approximately 2007, and quickly became an important technological tool for analyzing enormous amounts of unstructured data (*i.e.*, information not organized in a pre-defined manner). To this day, Hadoop remains a free, open-source software project that enables the distributed processing of large data sets across clusters of computers using simple programming models. Hadoop's open-source data processing framework is still housed at the Apache Software Foundation where developers can freely use, modify and distribute Hadoop.

23.    Soon after the Company was founded in 2009, the *New York Times* reported that Cloudera had "just released its own version of Hadoop. The software remains free, but Cloudera hopes to make money selling support and consulting services for the software."[17] During the Class Period, Cloudera's two main revenue segments were subscriptions and services, and the primary source of the Company's revenue was generated by subscriptions, which are typically one to three years in duration. Revenues from services are acquired from services that Cloudera provides to assist their customers in operating the Company's products. In fiscal year 2019, subscriptions accounted for approximately 85% of the Company's total revenue. Since its founding, the most significant obstacle to Cloudera's prospects has been generating growth based on Hadoop's free open-source software, particularly while

---

[16]    Mr. Cutting named his innovation after his son's yellow elephant stuffy that his son called "Hadoop." Mr. Cutting is not a named Defendant herein.

[17]    Ashlee Vance, *Hadoop, a Free Software Program, Finds Uses Beyond Search*, N.Y. Times (March 16, 2009), https://www.nytimes.com/2009/03/17/technology/business-computing/17cloud.html.

1  user demand shifted to cloud. As one industry observer noted, "selling support around open source

2  just isn't a very good business . . . . Open source is a development model, not a business model."[18]

3       24.    Hadoop's popularity reached its peak between roughly 2013-2015. During that period,

4  Hadoop-focused technologies like those Cloudera was founded to develop were still considered the

5  epicenter of big data analytics. At its founding and throughout the Class Period, Cloudera was not a

6  cloud computing company; rather, it was a data analytics and management company with Hadoop-

7  based offerings. Indeed, on May 15, 2015, the Company's then project manager Jairam Ranganathan

8  revealed that "Cloudera was initially founded with the name Cloudera because it was the *expectation*

9  that we would be a cloud-based company."[19] He tellingly explained that the Company was "looking

10 into the ways in which we can adopt Hadoop to be more effective in the Cloud environment . . . the

11 data and architecture is a bit different." Hence, with the commencement of the Class Period, the

12 Company's name itself was a misnomer until Cloudera released CDP for the public cloud in September

13 2019 and for the private cloud in August 2020.

14      25.    Unlike on-premise Hadoop platforms, cloud services provide on-demand, elastic,

15 scalable and adaptable service models where processing and storage resources can be accessed from

16 any location via the internet. With cloud computing, companies avoid the upfront cost and complexity

17 of owning and maintaining their own "on-premise" IT infrastructure, and simply pay for what they

18 use and when they use it. Some of the largest publicly traded cloud vendors have benefitted from

19 massive scale and a significant developer ecosystem which has invariably led to faster innovation. The

20 cloud is even more viable for a range of data tasks Hadoop was itself once employed for, like

21 maintenance tasks of server scheduling and administrating tasks like file systems and file storage.

22 Companies can now effectively use the cloud as a database that is more efficient, secure, and less

---

[18]    Dana Blankenhorn, *Cloudera and the Problem with Open Source: Cloudera is for sale but is anyone buying?*, Investorplace.com (July 21, 2020), https://investorplace.com/2020/07/cloudera-cldr-stock-and-the-problem-with-open-source/ (last accessed June 17, 2021).

[19]    Strata+Hadoop World, *Cloudera's Jairam Ranganathan on the Rapidly Changing Hadoop Ecosystem*, YOUTUBE, (May 15, 2015), https://www.youtube.com/watch?v=26_-ogwxa3E at 07:50-54 and 09:25-32 (last accessed June 17, 2021).

1    expensive than Hadoop such that Hadoop's industry influence has been rendered virtually obsolete,

2    both in terms of cost and ease of use.

3        26.    By approximately 2015-2017, big data enterprise spending began rapidly moving away

4    from Hadoop-based offerings to cloud platforms. As reported by ADTMag in an article titled *Qubole*

5    *Launches Cloud Migration for Cloudera Big Data* dated July 12, 2016, "[t]he Big Data industry is

6    shifting from on-premise to cloud as the preferred deployment model, but many early Cloudera

7    customers are stuck with a system that ***wasn't designed for the cloud***."[20] The Company went public

8    the following year as its customers began aggressively moving their workload to public cloud vendors

9    like Amazon AWS.

10       27.    With industry marketplace and customer end demand shifting away from Cloudera's

11   on-premise offerings to the cloud, Cloudera and Hortonworks began preliminary discussions in June

12   2015 concerning a potential business combination. The Company began seeking a partner in 2015

13   because the Insider Defendants then knew that, individually, Cloudera lacked the scale and resources

14   to quickly and successfully replatform into cloud architecture. Indeed, the Company would not have

15   "need[ed]"[21] to replatform into cloud architecture if it had possessed, as Defendants represented since

16   Cloudera's April 2017 IPO and continuing throughout the Class Period, "cloud-native architecture."[22]

17   Given the rapid market shift to cloud, the Insider Defendants were each either aware of or recklessly

18   disregarded that Cloudera would be on the losing end of that market shift until and unless they were

19   able to develop and release a cloud-native product.

20       28.    In the meantime, the Insider Defendants actively misrepresented the Company's

21   product capabilities to investors by describing them as cloud services when they were anything but.

22   Specifically, with the Company's introduction of Altus in 2018, which Defendants repeatedly

23   _____

24   [20]    David Ramel, *Qubole Launches Cloud Migration for Cloudera Big Data*, ADTMag (July 12,

25   2016), https://adtmag.com/articles/2016/07/12/qubole-big-data-migration.aspx (last accessed June 22, 2021).

26   [21]    Cloudera, Inc., Q1 2019 Earnings Conference Call (June 5, 2019) (Defendant Reilly).

27   [22]    Cloudera, Inc., IPO Prospectus (Form 424B4) (April 28, 2017), https://www.sec.gov/Archives/
     edgar/data/0001535379/000162828017009498/cloudera424b4.htm, at 7.

28

described as a "cloud service,"[23] the Company was then engaged in "cloud washing." Cloud washing is the practice of taking legacy software like Altus and running it on cloud, while calling it cloud-native. Cloud washing is the purposeful and deceptive attempt by a vendor, like Cloudera with Altus here, to market an old product or service as a cloud product. Merely placing and running a software on a cloud platform, however, does not transform a technology into a cloud product as the software cannot dynamically expand or contract with a customer's needs.

29.    The advent of commercially viable cloud offerings quickly began undermining the quantitative value of Cloudera's Hadoop-focused software. In 2014, for instance, it had a $4.1 billion valuation after Intel invested approximately $740 million in the Company when Hadoop's hype had reached its apex. By the time of its IPO in April 2017, Cloudera was valued at $2.3 billion. After Cloudera announced its merger with and acquisition of Hortonworks (also a Hadoop-focused company) in early October 2018, the **combined** Company claimed a market capitalization of approximately **$5.2 billion**. The combined Company was purchased by two private equity firms four years later in June 2021 for only **$5.3 billion,** meaning "the combined Hortonworks-Cloudera didn't grow in the past two and a half years."[24]

30.    The fluid manner by which the Company has publicly marketed itself, too, corresponds with the rise of cloud computing. In 2015, for instance, Cloudera described itself as "the leader in enterprise analytic data management powered by Apache Hadoop."[25] By 2016, Cloudera began

---

[23]    *Id*. at 7, 94; *see also* Cloudera Inc., Registration Statement (Form S-1/A) (September 25, 2017), https://www.sec.gov/Archives/edgar/data/0001535379/000162828017009427/clouderas-1a.htm at 7, 95; Cloudera, Inc., Annual Report (Form 10-K) (April 4, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018004005/fy-18cldr10k.htm_at_6; Cloudera, Inc., Q3 2018 Earnings Conference Call (December 7, 2017) (Defendant Olson); Cloudera, Inc., Q4 2018 Earnings Conference Call (April 3, 2018) (Defendant Olson).

[24]    *Requiem for Cloudera and What It Means for Confluent IPO*, THE INFORMATION, June 1, 2021, https://www.theinformation.com/articles/requiem-for-cloudera-and-what-it-means-for-confluent-ipo (last accessed June 18, 2021).

[25]    Cloudera, Inc., Press Release *Cloudera's Leadership in the Apache Hadoop Community Drives Accelerated Enterprise Adoption and Strong Business Results in Fiscal 2015* (February 17, 2015), https://www.cloudera.com/about/news-and-blogs/press-releases/2015-02-17-cloudera-leadership-in-apache-hadoop-community-drives-accelerated-enterprise-adoption-strong-results.html.

publicly shedding its Hadoop identity, instead calling itself a "global provider of the fastest, easiest, and most secure data management and analytics platform built on the latest open source technologies."[26] By 2017, Cloudera dropped its reference to open source technologies and Hadoop altogether, again rebranding itself as a "leading modern platform for data management, machine learning and advanced analytics."[27] Since 2018, Cloudera has represented that it "deliver[s] the industry's first enterprise data cloud from the Edge to AI."[28] The Company's glossy "cloud" marketing materials, however, did not and could not change the simple indisputable fact that the Company's platform remained Hadoop-based until the release of CDP in September 2019.

31.    The Company's Class Period SEC filings similarly reflect the rapid industry transformation Cloudera was then trying to keep pace with while the Insider Defendant simultaneously misleadingly claiming it was leading. The Company's April 2017 IPO Prospectus "Overview", for instance, stated that the Company had "developed the leading modern platform for data management, machine learning and advanced analytics."[29] A year later, the "Overview" section of the Company's 2018 Annual Report, represented that Cloudera had "developed the modern platform for machine learning and analytics, optimized for the cloud."[30] The "Overview" section of the Company's Annual

---

[26]    Cloudera, Inc., Press Release *Cloudera Accelerates Momentum in Financial Services Sector* (December 6, 2016), https://www.cloudera.com/about/news-and-blogs/press-releases/2016-12-05-cloudera-continues-global-momentum-in-financial-services-sector.html.

[27]    Cloudera, Inc., Registration Statement (Form S-1) (March 31, 2017), https://www.sec.gov/Archives/edgar/data/1535379/000162828017003221/projectthunders-1.htm  at 1, 5, 55, 85, 90; *see also* Cloudera, Inc., Press Release *Cloudera Named Best Place to Work for Second Consecutive Year (April 20, 2017)*, https://www.cloudera.com/about/news-and-blogs/press-releases/2017-04-20-cloudera-named-best-place-to-work-for-second-consecutive-year.html;    Cloudera,    Inc.,    IPO Prospectus (Form 424B4) (April 27, 2017), https://www.sec.gov/Archives/edgar/data/0001535379/000162828017004450/cloudera424b4.htm, at 1, 5, 54, 84, 89.

[28]    Cloudera, Inc., Current Report (Form 8-K, Exhibit 99.1) (October 3, 2018), https://www.sec.gov/Archives/edgar/data/1535379/000162828018012254/cldr8-k10318ex991.htm.

[29]    Cloudera, Inc., IPO Prospectus (Form 424B4) (April 27, 2017), https://www.sec.gov/Archives/edgar/data/0001535379/000162828017004450/cloudera424b4.htm, at 1, 5, 54, 84, 89.

[30]    Cloudera, Inc., Annual Report (Form 10-K) (April 4, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018004005/fy-18cldr10k.htm, at 4, 48.

Report on Form 10-K filed with the SEC on March 29, 2019, simply called Cloudera an "enterprise data cloud company."[31] Indeed, just before announcing its planned IPO, Cloudera even changed the name of its popular annual user conference from "Strata+Hadoop World" to "Strata Data." While Cloudera actively sought to rebrand itself, cloud giants like Amazon, Google and Microsoft were simultaneously employing armies of engineers and unleashing their almost unlimited resources to not only dominate and revolutionize cloud computing but develop on-premise solutions to undermine Cloudera's position in the Hadoop market.

32.     After the Company announced its planned IPO, one industry observer questioned whether the Company's IPO rebranding efforts were, in actuality, a "bait and switch" designed to exploit the public capital markets since private Silicon Valley venture capital had begun to redirect their investments away from Hadoop-focused companies like Cloudera to cloud start-ups like Snowflake.[32,33] As alleged herein, by cloud washing its legacy software, the Insider Defendants were in fact engaged in such a bait and switch during the Class Period. The Company's own Chief Product Officer Arun Murthy acknowledged this changed reality, writing on September 10, 2020 that: "[f]or *several years now*, Cloudera has stopped *marketing* itself as a Hadoop company, but instead as a data enterprise company."[34] In the same post-Class Period article, Mr. Murthy also acknowledged "how hard it is" – even as late as September 2020 – for Cloudera's legacy Hadoop architecture to "work '*natively*' in the public cloud."[35] At the time Mr. Murthy made this concession in fall 2020, the phrase

---

[31]     Available at https://www.sec.gov/Archives/edgar/data/0001535379/000162828019003670/fy-19cldr10k.htm at 5, 49 (last accessed June 18, 2021).

[32]     Virginia Backaitis, *Risky Business? Cloudera's Forthcoming IPO through a Wider Lens*, SeekingAlpha.com (April 5, 2017), https://seekingalpha.com/article/4060607-risky-business-clouderas-forthcoming-ipo-through-wider-lens.

[33]     Snowflake, a genuine cloud computing company, consummated its IPO in September 2020 with an opening share price of $245 per share and a market capitalization of approximately *$70 billion*.

[34]     Arun C. Murthy, *Hadoop is Dead. Long live Hadoop*, Medium.com (September 10, 2020), https://medium.com/@acmurthy/hadoop-is-dead-long-live-hadoop-f22069b264ac (last accessed June 22, 2021). Mr. Murthy is not a named Defendant herein.

[35]     *Id.*

"work natively in the public cloud" had the same meaning to a reasonable investor as it did throughout the Class Period.

33.    Unbeknownst to investors, however, while Cloudera may have stopped *marketing* itself as Hadoop-focused, its technology remained throughout the entirety of the Class Period on-premise even though the Insider Defendants misrepresented the Company as one that offered cloud-native offerings.

## The Class Period Begins with Cloudera's "Down-Round IPO"[36] (April 28, 2017)

34.    Shares of Cloudera's common stock began trading on the NYSE on April 28, 2017 – the first day of the Class Period. A "down round" in Silicon Valley venture capital jargon refers to a private company offering additional shares for sale at a price lower than it had been sold for in a previous private financing round. A company forced to seek additional funding by tapping the public capital markets at a value *below* its private valuation, as Cloudera did, now even has a nickname – a "down-round IPO." Nevertheless, whatever Silicon Valley's tightly-knit venture capital networks may have known or suspected about Cloudera's prospects, the Company's materially misleading IPO roadshow presentations, marketing materials and SEC filings led the Company's new *public* investors to rely on Cloudera's bait-and-switch. On its first day of trading, the Company's share price closed above its $15 offering price at *$18.10*.

35.    On June 6, 2019—the day after the Company's Class Period-ending corrective disclosures—the Company's stock price closed at *$5.21* per share. Over the course of the next several days as investors had fully digested the Company's Class Period-ending corrective disclosures of June 5, 2019, however, the Company's share price hit lows of *$4.89* per share in the few days that followed, severely damaging investors.

36.    Starting with the Company's IPO Prospectus in April 2017, and continuing throughout the Class Period, the Company repeatedly and misleadingly assured investors that it possessed an

---

[36]    Katie Roof, *Are IPOs the New Down Round?,* Techcrunch.com (November 22, 2015), https://techcrunch.com/2015/11/22/ipos-the-new-down-rounds/ (last accessed June 22, 2021).

"*original cloud native architecture*" and "*cloud-native platform*".[37] The Company's June 8, 2017 press release announcing its first quarter 2018 results went ever further, misleadingly representing that "Cloudera offers the *leading cloud-native software platform* for machine learning and advanced analytics."[38] At that time, the terms "cloud-native" and "cloud architecture" meant to reasonable investors that such offerings or capabilities had specific material attributes such as the use of containers, ease-of-use, seamless scalability, security and elasticity, none of which the Company's Class Period product offerings provided.

37. By April 2018, Defendant Reilly, who was then being specifically pressured by analysts about the competitive viability of Cloudera's Hadoop-based platforms against actual cloud providers, stated that he saw: "[n]o changes in the competitive landscape nor end market demand," adding that the "cloud is turning out to be a *tremendous tailwind* for us."[39] These and other similar Class Period statements were materially misleading when made because Defendant Reilly either knew or was reckless in not knowing that end market demand had shifted away from Hadoop to cloud and had become a headwind. Indeed, as alleged in ¶¶ 267-268, *infra*, Defendant Reilly subsequently admitted on June 5, 2019 that the Company had suffered from "*headwinds in bookings* from existing customers" due to its competitors' cloud offerings during the Class Period. In other words, cloud had not been a "*tremendous tailwind*" as Defendant Reilly represented during the Class Period.[40] In making these and similar statements, therefore, Defendant Reilly either knew about or turned a blind eye to the indisputable fact that the Company's actual product capabilities were not then grounded in cloud architecture.

---

[37]    *See* Cloudera, Inc., IPO Prospectus (Form 424B4) (April 28, 2017), https://www.sec.gov/Archives/edgar/data/1535379/000162828017004450/cloudera424b4.htm, at 5, 7, 89, 91.

[38]    *See* Cloudera, Inc., Press Release (Form 8-K) (June 8, 2017), https://www.sec.gov/Archives/edgar/data/1535379/000162828017006322/q1fy18exhibit991.htm.

[39]    Cloudera, Inc., Q4 2018 Earnings Conference Call (April 3, 2018).

[40]    Cloudera, Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 3.

38.    On June 6, 2019, the day following the Class Period, Barclays analyst Raimo Lenschow was finally forced to conclude that, despite Defendants' repeated assurances to the contrary: "Cloudera *currently does not have a cloud solution*, which seems the favorite deployment mode for most customers. This means that the company suffers from weak renewals as *customers move to cloud native providers*."[41] Cloudera and the Insider Defendants knew or were reckless in not knowing that customers were rejecting their Hadoop-based offerings in favor of their competitors' cloud products as they specifically tracked cloud sales and customer churn as alleged in ¶¶ 52, 190, 220, 226-227, 290-291, *infra*.

39.    Nevertheless, at all relevant times, they misrepresented their competitive advantages against public cloud vendors, falsely pointing investors instead to internal sales strategy mishaps to obscure the negative impact that shifting market demand away from the Company's increasingly obsolete platform was then having on the Company. *See e.g.*, ¶ 201 ("we were just over-rotated"). After the Class Period, Deutsche Bank analyst Karl Keirsted confirmed the Company's actual Class Period state of affairs, noting that "Cloudera hasn't managed the architectural transition well from on-premise Hadoop-focused data analytics projects to cloud . . . and [ ] has fallen behind AWS [Amazon Web Services], Snowflake, Google and Microsoft in the analytics space."[42] He also (correctly) added that "Cloudera was late to launch a competitive cloud-hosted product . . . .,"[43] something the Company claimed to possess as early as April 2017.

40.    A few months later in September 2019, interim Cloudera CEO Defendant Martin I. Cole acknowledged that, contrary to Defendant Reilly's Class Period statements, the Company's Class Period offerings lacked "*pure public cloud capability*," and that Cloudera's "goal *now* is to compete more effectively with some of the public cloud capabilities" offered by "AWS [Amazon Web Services], [Microsoft] Azure and even on an increasing basis now, GCP [Google Cloud Platform].

---

[41]    Raimo Lenschow, *A Long & Painful Wait for CDP*, Barclays (June 6, 2019).

[42]    Karl Kierstead, *Now THAT was a Rough Quarter*, Deutsche Bank (June 5, 2019).

[43]    *Id.*

They [*i.e.*, Cloudera's customers] may go direct to – a Databricks or Snowflake, thus with an Azure or AWS. ***So that is a threat in terms of impacting growth rates*** . . . ."[44] Defendant Cole's reference to Cloudera's Class Period lack of "pure public cloud capability" was then synonymous with stating that the Company lacked "cloud-native" products.

41.    Prior to Defendants' release of CDP for the public cloud in September 2019, the Company's previous purported cloud offering, Altus (released in 2018), was widely acknowledged by Cloudera's existing and potential customers as lacking the key attributes of cloud products. Cloudera rushed Altus to market as, in effect, a crude cloud washing ploy to enable the Insider Defendants to misleadingly ***claim*** a competitive cloud offering to buy time to eventually be able to compete against actual public cloud vendors. Indeed, on May 24, 2017, industry website *ZDNet* noted the irony that Altus, in addition to not being "terribly fancy," "in many ways [ ] sounds like AWS' [Amazon Web Services] own ***Hadoop*** service, Elastic MapReduce (EMR)."[45] Altus, in other words, was not a cloud-native offering as Defendants had misrepresented during the Class Period. Furthermore, Cloudera's Senior Vice President of Engineering and Support, Daniel Sturman, who was responsible for developing Altus, left Cloudera shortly after the Merger given the Company's cloud washed offerings.[46]

42.    While the Company misleadingly touted Altus as a cloud offering during the Class Period, Defendants either knew or were reckless in not knowing that it lacked any of the key features of effective cloud computing. The Company's attempts to even ***release*** Altus repeatedly failed, and even when it was finally released, its known technological infirmities rendered it obsolete. On March 22, 2019, during the DataWorks Summit in Barcelona, the Company's Chief Marketing Officer, Mick Hollison, implicitly acknowledged Altus' commercial failure when he stated that the Company, with

---

[44]    Cloudera, Inc., Deutsche Bank Technology Conference Call (September 10, 2019).

[45]    Andrew Brust, *Cloudera introduces Altus, offering Hadoop jobs as a Service*, ZDNet.com (May 24, 2017), https://www.zdnet.com/article/cloudera-introduces-altus-offering-hadoop-jobs-as-a-service/ (last accessed June 22, 2021).

[46]    Mr. Sturman's Gmail account was among those destroyed as a result of Cloudera's failure to preserve evidence. *See* ECF Nos. 224 and 224-2.

the announcement of CDP, had harvested some of the functionality "that **was** offered by the Altus platform."[47]

43.    Similarly, in September 2019, interim Cloudera CEO Defendant Cole acknowledged that "neither company [*i.e.*, Cloudera and Hortonworks] was in a very strong position in the cloud" during the Class Period. He added that Altus was not "easy to use [because it] ***didn't have that same take-up as a pure public cloud capability***."[48] In other words, Altus was not a cloud offering. By the filing of the Company's post-Class Period Annual Report on Form 10-K for its fiscal year ended January 31, 2020 ("2019 Annual Report"), Cloudera had scrubbed any reference to its failed "Altus" product from the 2019 Annual Report altogether despite having repeatedly touted Altus as the Company's foundational "cloud service" during the Class Period as alleged in ¶ 28, *supra*.

## Company Insiders Unload Shares in the SPO (October 2, 2017)

44.    On September 27, 2017, while the Company's share price was artificially inflated, Cloudera announced an unexpected SPO of its common stock pursuant to a registration statement on Form S-1, under which the public would be able to purchase some 13,432,114 shares of Cloudera common stock at an artificially inflated price of ***$16.45*** per share. The Company itself offered 3,000,000 shares of Cloudera common stock in the SPO, while the remainder would come from selling stockholders (*i.e.* Company insiders) identified in the prospectus. Notably, while the Company's IPO offering materials contained a 180-day lock-up provision prohibiting Company insiders from selling any shares until October 25, 2017, they obtained an early release from IPO underwriter Morgan Stanley to sell their shares at both artificially inflated prices, and on the basis of negative non-public material information. The SPO closed on October 2, 2017 and Cloudera did not retain ***any*** of the much-needed proceeds from the SPO. To the contrary, the SPO was designed to (and did) exclusively enable

---

[47]    Mick Hollison, *Cloudera: Unlocking the Power of Data: From the Edge to AI*, YOUTUBE (March 22, 2019), https://www.youtube.com/watch?v=mmu0HZxPSFo at 23:26-28 (last accessed June 18, 2021).

[48]    Cloudera, Inc., Deutsche Bank Technology Conference Call (September 10, 2019).

the Company's insiders, as the selling stockholders of approximately 10.4 million shares, to pocket proceeds of nearly **_$165 million_**.

45.    The largest SPO seller was Cloudera's earliest venture capital backer – Defendant Ping Li and his venture capital firm, Accel – who initially invested $5 million when Cloudera first launched as a tech start-up. Defendant Li sold 6,528,862 Cloudera shares in the SPO at $15.79 per share for proceeds of over **_$103 million_**.[49] Together, Defendants Li (for himself and Accel) and Olson together sold over **_$112 million_** of Cloudera stock in the Company's SPO. Defendant Li abandoned his Board seat at the Company a short time later in July 2018. Defendant Olson's purported "retirement" from Cloudera was announced on June 5, 2019. That Defendants Li and Olson sold their artificially inflated Cloudera shares to unsuspecting public investors in the SPO before the truth about Cloudera's true prospects was disclosed and before the lock-up expired, is strong (and unseemly) evidence of wrongdoing. Had Defendant Li waited to sell the 6.5 million shares in the October 2017 SPO until after the truth was revealed after market close on June 5, 2019, he would have pocketed approximately $38.7 million (assuming an average sales price equivalent to the 90-day lookback value of $5.94 per share) – **_or $64.3 million less_** than he took home in the SPO. Had he sold his shares after the truth about the Company's operations was disclosed on June 5, 2019, Defendant Olson would have made **_$5.8 million less_**.

46.    Cloudera used the SPO's net proceeds exclusively to fund the "tax withholding obligations Cloudera incurred upon the net settlement of certain equity awards, the settlement of which was concurrent with the pricing" of the SPO at $16.45 per share.[50] The Company somehow apparently neglected to address these routine executive compensation awards in connection with the IPO when

---

[49]    Defendant Li and his venture capital firm Accel later sold an additional 2,675,710 shares of Cloudera common stock on December 12, 2017 for an additional $44.1 million in proceeds. _See_ ¶¶ 113, 187, _infra_.

[50]    Cloudera, Inc., Press Release _Cloudera Announces Closing of Follow-on Offering and Full Exercise of the Underwriters' Option to Purchase Additional Shares_ (October 2, 2017), https://www.cloudera.com/about/news-and-blogs/press-releases/2017-10-02-cloudera-announces-closing-of-follow-on-offering-and-full-exercise-of-the-underwriters-option-to-purchase-additional-shares.html.

the Company's shares were priced at $15 per share. Further, and like its prior SEC filings, the Company's September 28, 2017 SPO prospectus on Form 424B4 misleadingly represented, *inter alia*, that Cloudera possessed a "cloud-native" platform, and was "leading cloud innovation for big data, ***extending our original cloud-native architecture***."[51] At that time, the term "cloud architecture" meant to reasonable investors that such offerings or capabilities had specific material attributes such as the use of containers, ease-of-use, seamless scalability, security and elasticity, none of which the Company's Class Period product offerings provided.

47.    By describing its platform and competitive position to investors in this manner, Cloudera misled investors about its products' capabilities and, hence, ability to compete against actual cloud vendors. Even as late as March 2019, Defendant Reilly (who was ousted as the Company's CEO in June 2019), continued to tout the Company's competitive market position, stating: "***who's our #1 competitor? It's Amazon***."[52] At the time, Amazon's AWS cloud platform was the gold standard for public cloud computing. By September 2019, Defendant Reilly's replacement (interim CEO Cole) was forced to admit that, while Cloudera had strong on-premise Hadoop offerings during the Class Period: "[w]here we see challenges would be for those customers who are moving workloads to the ***cloud where there's never even a competition.***"[53]

48.    Defendant Cole then further acknowledged that the Company had in fact been unable to compete in cloud during the Class Period, explaining how with CDP: "[w]e ***now*** have a competing [cloud] product . . . . Previously, customers were bifurcating workloads and say, 'Okay, we've got to find another product to go into the public cloud. We like where you [Cloudera] guys are on-prem[ise], but you don't have the [public cloud] offering that we're looking for in terms of ease of use, consistency, security, governance, *et. cetera*.'"[54] In other words, Defendant Cole tacitly admitted that,

---

[51]    Cloudera, Inc., SPO Prospectus (Form 424B4) (September 27, 2017), https://www.sec.gov/Archives/edgar/data/0001535379/000162828017009498/cloudera424b4.htm at 5, 7, 88.

[52]    Cloudera, Inc., Q4 2019 Earnings Conference Call (March 13, 2019).

[53]    Cloudera, Inc., Deutsche Bank Technology Conference Call (September 10, 2019).

[54]    Cloudera, Inc., Q3 2020 Earnings Conference Call (December 5, 2019).

1   throughout the Class Period, Cloudera did not possess an actual cloud offering because Altus lacked

2   the basic attributes of a cloud-native product like ease of use, security and consistency. *See* ¶¶ 152-

3   154, *infra*. He further offered that, at the time of the Merger, "neither company [*i.e.*, Cloudera or

4   Hortonworks] was in a very strong position in the cloud. We both had offerings [*i.e.*, Altus] but they

5   ***weren't easy to use***. They didn't have that same take-up as a ***pure public cloud capability***."[55] In other

6   words, Altus was not a cloud service or a cloud-native product because such products, by definition,

7   do have such take-up. In September 2017, by contrast, Defendant Reilly publicly misrepresented that

8   "Altus . . . enables data engineering and data science workloads to ***run natively and easily in the***

9   ***public cloud***."[56] At that time, the phrase "run natively and easily in the public cloud" meant to

10   reasonable investors that such offerings or capabilities had specific material attributes such as the use

11   of containers, ease-of-use, seamless scalability, security and elasticity, none of which the Company's

12   Class Period product offerings provided.

13   <u>**Cloudera's "Match Made Underwater" Merger[57] (January 3, 2019)**</u>

14        49.     Given the undisclosed competitive pressure the Insider Defendants either knew or were

15   reckless in not knowing Cloudera was facing due to the market's rapid shift from on-premise analytics

16   to cloud, the Company announced in early October 2018 that it was merging with and acquiring its

17   main Hadoop-focused rival – Hortonworks. Unbeknownst to investors, however, the Merger was

18   consummated not to create "synergies," but because the Company's highest-ranking insiders knew

19   that Cloudera was then facing competitive industry forces so severe that they were simply incapable

20   of achieving organic growth. The Merger Registration Statement also materially downplayed the time

21   and expense necessary for the combined Company to make its Hadoop-focused offerings cloud-native.

22   Ultimately, as alleged herein, Cloudera failed to disclose that, to ***survive*** as a publicly traded Company,

---

55     *Id*.

56     Cloudera, Inc., Q2 2018 Earning Conference Call (September 7, 2017).

57     Shira Ovide, *Cloudera and Hortonworks Are a Match Made Underwater*, Bloomberg.com (October 4, 2018) Bloomberg.com, https://www.bloombergquint.com/onweb/cloudera-cldr-and-hortonworks-hdp-are-a-match-made-underwater (last accessed June 20, 2021).

it ***needed*** to consummate the Merger, and even that couldn't salvage its prospects. *See* ¶¶ 263-284, *infra*.

50.    Morgan Stanley served as the primary financial advisor for Cloudera, and Frank Quattrone's Qatalyst Partners was Hortonworks' lead financial advisor.[58] Defendant Reilly became CEO of the combined Cloudera in January 2019. To promote the Merger, Defendants Reilly and Frankola hosted an October 3, 2018 investor conference call where Defendant Reilly stated that the "primary motivation for this combination is to accelerate innovation" and "create[e] a larger, more competitive, more efficient entity."[59] Defendant Reilly added: "[b]eyond accelerating innovation in cloud technology, the transaction also produces significant financial benefits, including large cost synergies."[60] The same day, Defendant Frankola claimed the Merger would result in "scale and growth on day one."[61] He added that the "important point is that the day the merger closes[,] we will have significant scale and growth. This combination will unlock powerful synergies."[62]

51.    Asked whether the combined Company expected to lose any customers as a result of the Merger, Defendant Frankola assured investors that: "in terms of looking at our customers and anticipating that we will lose them because of the merger itself, ***no, we don't anticipate that will occur***."[63] Defendant Frankola's statement was materially misleading because at the time he made it he either knew or was reckless in not knowing as the Company's CFO that the Company's customers were then already moving their workloads to actual cloud providers like Amazon, Google and Microsoft. The Merger closed on January 3, 2019. Just five months later, on June 5, 2019, the

---

[58]    Mr. Quattrone was previously a prominent Morgan Stanley investment banker during the internet dot.com bubble of the late 1990's. In 2006, Mr. Quattrone reached a deferred prosecution agreement with New York federal prosecutors on witness tampering and obstruction of justice charges.

[59]    Cloudera, Inc., Cloudera and Hortonworks Merger Conference Call Transcript (Form 425) (October 3, 2018), https://www.sec.gov/Archives/edgar/data/1535379/000162828018012306/cldr425 calltranscript10318.htm, at 4.

[60]    *Id*. at 5.

[61]    *Id*. at 8.

[62]    *Id*.

[63]    *Id*. at 28.

combined Company reported, *inter alia*, a first-quarter *loss* of $103.1 million and drastically slashed fiscal year 2020 guidance. The same day, Defendant Frankola (who had previously assured investors of Merger "growth on day one" and "powerful synergies")[64] explained that the Company was "still operating somewhat blind" due to the Merger, and blamed the Company's poor results and deep guidance cut on the "*uncertainty*" it created.[65] The same day, Defendant Frankola also suggested that the Company's massive customer churn rate was "*certainly unanticipated*."[66]

52.     Previously, however, during a September 7, 2018 Citi Global Technology Conference, Defendant Reilly highlighted to investors the extent to which he and the Company's other executives closely monitored customer churn stating: "we're able now to *track all of our customers* through these phases, *what our churn rates are*, what our graduation rates are, what our average tenures are."[67] Defendant Frankola's subsequent June 5, 2019 suggestion that the Company's massive customer churn rate was "unanticipated" strains credulity. Indeed, on June 6, 2019, D.A. Davidson analyst Rishi Jaluria aptly noted: "[i]ts *truly difficult to believe* that customers delaying deployment until CDP, *increased churn*, merger disruption, and competitive headwinds – all legitimate concerns continually brough up by investors – *were not properly factored into guidance provided* [by Cloudera] *90 days ago*."

53.     The Merger Registration Statement also again misrepresented that Cloudera's "*original architecture was designed for the cloud*," and "*runs natively* on public cloud infrastructure,"[68] when, in truth, the Company's original architecture had been designed for on-premise applications. At the time of the Merger Registration Statement, the terms "cloud-native" and "cloud architecture" meant to reasonable investors that such offerings or capabilities had specific

---

[64]     *Id*. at 8.

[65]     Cloudera, Inc., Q1 2019 Earnings Conference Call (June 5, 2019), at 12.

[66]     *Id*.

[67]     Cloudera, Inc., Citi Global Technology Conference Call (September 7, 2018), at 2.

[68]     Cloudera, Inc., 2018 Annual Report (Form 10-K) (April 4, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018004005/fy-18cldr10k.htm, at 9.

material attributes such as the use of containers, ease-of-use, seamless scalability, security and elasticity, none of which the Company's Class Period product offerings provided. The Merger Registration Statement further claimed Cloudera's purported "Cloud Everywhere"[69] expertise buttressed its "land and expand" growth strategy such that Cloudera "use[d] the initial sale as a foothold to increase revenue per customer by increasing the amount of data and number of use cases each customer runs through our platform."[70]

54.     The Merger Registration Statement also portrayed Cloudera as a story of growing revenue and profitability that would continue and benefit from the synergies presented by Hortonworks' complementary business.[71] The Merger Registration Statement again specifically and misleadingly touted Altus as providing cloud-native services.[72] Cloudera's Senior Vice President of Engineering and Support, Daniel Sturman, who was responsible for developing Altus, left Cloudera shortly after the Merger given the Company's cloud washed offerings.

55.     One savvy industry observer presciently characterized the business combination as a "perfect seafaring union of two underwater companies."[73] Another industry expert and technologist compared the Merger to "Sears-K-Mart merger," adding that the combination "is the **only way for**

---

[69]     Cloudera, Inc., Cloudera and Hortonworks Merger Conference Call Transcript (Form 425) (October 3, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018012306/cldr425calltranscript10318.htm, at 5.

[70]     Cloudera, Inc., 2018 Annual Report (Form 10-K) (April 4, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018004005/fy-18cldr10k.htm, at 9.

[71]     *See* Cloudera, Inc., Cloudera and Hortonworks Merger Conference Call Transcript (Form 425) (October 3, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018012306/cldr425calltranscript10318.htm, at 2, 5, 8, 14, 18-19, 35-36.

[72]     *See* Cloudera, Inc., 2018 Annual Report (Form 10-K) (April 4, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018004005/fy-18cldr10k.htm, at 6, 9.

[73]     Shira Ovide, *Cloudera and Hortonworks Are a Match Made Underwater*, Bloomberg.com (October 4, 2018), https://www.bloombergquint.com/onweb/cloudera-cldr-and-hortonworks-hdp-are-a-match-made-underwater (last accessed June 20, 2021).

*them to survive this*. *Hadoop in itself has become irrelevant*."[74] In connection with the Merger, however, Cloudera and the Insider Defendants continued to intentionally or recklessly exaggerate the Company's then-existing product capabilities as cloud offerings, causing the two companies' respective share prices to rise dramatically. Cloudera's share price jumped by as much as 11.53% immediately after it announced the Merger on October 3, 2018, and shares of Hortonworks stock rose by as much as 11.88% the following day.

56.    In mid-March 2019, just two months after the Merger closed, Deutsche Bank analysts attended Gartner's annual analytics/BI event where customers and partners met to discuss their technology/choices for data analytics. The Deutsche Bank report issued following that event included comments from several Cloudera customers that concluded: "[t]he *feedback on Cloudera was negative . . . ."* A former Cloudera employee relayed to Deutsche Bank that "*Cloudera had to rush the launch of Altus to market* and as a result, it lacked a lot of [cloud] features which hurt them even more." In an article called *Hold Off on Cloudera and Hortonworks* by Virginia Backaitis dated October 15, 2018, she noted that the "next generation data platform that Cloudera wants investors and customers to bank on *is not yet built*," adding that "Arun Murthy announced that his company [Hortonworks] was embarking on the *creation* of a cloud-native data platform in September 2018."

57.    Had Hortonworks possessed a cloud-native offering, as Defendant Reilly represented *just twelve days* earlier during the Cloudera-Hortonworks joint conference call announcing the Merger (*see* ¶ 230), Hortonworks would have had no need to "embark[] on the creation of a cloud-native platform[.]" Ms. Bakaitis added that, in the meantime, Cloudera's "customers' eyes may wander."

58.    When Defendants' Class Period material misrepresentations were corrected during the Company's first quarter as a combined entity in June 2019, the price of Cloudera's common stock plummeted as Cloudera and the Insider Defendants acknowledged that prospective and existing customers had been rejecting Cloudera's Hadoop-focused on-premise platforms – including Altus.

---

[74]    Alex Woodie, *Is Hadoop Officially Dead*?, Datanami.com (October 18, 2018).), https://www.datanami.com/2018/10/18/is-hadoop-officially-dead/ (last accessed June 20, 2021). The combined Sears-K-Mart filed for Chapter 11 bankruptcy on October 15, 2018.

Cloudera and the Insider Defendants also either knew or deliberately disregarded that their "land and expand" growth strategy had faltered due to the Merger and competitive disadvantages as a result of their obsolete product offerings.

59.    Shortly after the Merger closed on January 3, 2019, in March 2019, Cloudera announced the development of CDP, which generated the long and well-established "Osborne Effect," where existing customers cancel or defer orders for a current soon-to-be-obsolete product as an unexpected drawback of announcing a future product prematurely.[75] *See e.g,* ¶¶ 143, 238, 276, *infra*. They knew or turned a blind eye to the obvious fact that the already-occurring shift in market demand would be compounded by Cloudera's customers moving to cloud vendors while Cloudera developed CDP, or waiting for CDP to be released prior to initiating or renewing their subscriptions with Cloudera. The Insider Defendants, however, failed to warn investors that, until CDP was released, customers would either delay bookings with Cloudera or move their existing workloads to actual cloud vendors.

60.    As noted in an article appearing on *Venture Beat*, throughout the Class Period: "[i]ronically, there has been no Cloud Era for Cloudera."[76]

**The Class Period Ends as the "Wheels Came Off the Bus"[77] (June 5, 2019)**

61.    On June 5, 2019 – the last day of the Class Period – the Company disclosed profoundly negative first quarter results for the period ended April 30, 2019, and drastically reduced fiscal year 2020 guidance. The Company's outlook and prospects had become so murky due to its obsolete product offerings during the Class Period that Defendants also altogether pulled Cloudera's fiscal year

---

[75]    The Osborne Effect is named after the planned replacement of the Osborne 1, an early personal computer first sold by the Osborne Computer Corp. in 1981. Sales of the Osborne 1 fell sharply as customers anticipated the more advanced Osborne 2 systems that Osborne pre-announced, leading to a sales decline from which Osborne Computer never recovered.

[76]    Matthew Lodge, *Cloudera and Hortonworks merger means Hadoop's influence is declining*, Venture Beat (October 6, 2018), https://venturebeat.com/2018/10/06/cloudera-and-hortonworks-merger-means-hadoops-influence-is-declining/ (last accessed June 22, 2021).

[77]    Wedbush Securities analyst Daniel Ives, The Clock Strikes Twelve for Cloudera; CEO Departure and Slash Guidance (June 6, 2019).

2021 guidance. The same day, the Company announced Defendant Reilly's removal as CEO who, in turn, subsequently announced Defendant Olson's unexpected ouster during the Company's June 5, 2019 earnings conference call. The following day, on June 6, 2019, the Company's share price closed at $5.21 per share, a single day drop of approximately 40.8% on unusually massive volume of 57.9 million shares traded. Only months earlier, in connection with the Merger, Cloudera assured investors that Defendants Olson and Reilly were part of forming the "best go-forward management team" for the combined Cloudera.[78] After their terminations, Cloudera's IT Department failed to suspend the routine operation of its electronic information system, which led to the destruction of Defendant Olson's Gmail account.[79] This destruction of evidence continued unabated until October 2020.

62.    Contrary to the Company's suggestion that their ousters were long planned retirements, the Company later revealed that it had: "mutually agreed with Tom [Reilly] that this is the right time for a leadership transition."[80]

63.    Cloudera also announced on June 5, 2019 that: (i) it had lost customers to public and private cloud vendors like Microsoft, Google and Amazon, and cloud tech start-ups like Snowflake; (ii) its highly touted "land and expand" growth strategy had stalled as existing and prospective customers moved their workloads to actual cloud providers; and (iii) the Company spent an astounding **$119 million** in marketing and sales expenditures during the quarter to promote the Company's obsolete products and salvage the Company's prospects; and (iv) Cloudera generated, essentially, no growth in the Company's customer base. Defendant Reilly further revealed that, contrary to his prior Class Period statements, Cloudera's platform was not "competitive against what the public cloud guys

---

[78]    Cloudera, Inc., Master Talking Points & FAQs (Form 425) (October 12, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018012509/a425101118mtpsfaqs.htm, at 3.

[79]    Defendant Priya Jain and at least 11 additional custodians' Gmail accounts were also destroyed. *See* ECF Nos. 224 and 224-2. Defendants refuse to disclose whether Defendant Reilly's Gmail account was among the impacted custodians. *See* ECF No. 224.

[80]    *See* Cloudera, Inc., Press Release *Cloudera Announces CEO Transition* (Form 8-K) (June 5, 2019), https://www.sec.gov/Archives/edgar/data/0001535379/000162828019007585/cloudera8-k6519xexhibit9901.htm.

are offering," which caused its customers to move their workloads to "public cloud vendor's **native house offerings.**"[81]

64. Defendant Reilly further revealed that Cloudera's competitive failures stemmed from its lack of a cloud-native architecture, and that the Company was only starting to address customer non-renewals by launching "CDP as a PaaS **native** cloud architecture offering . . . ."[82] The definition of "cloud-native architecture" as used by Defendant Reilly on June 5, 2019 was unchanged as he had previously used it throughout the entirety of the Class Period.

65. During the Company's June 5, 2019 earnings conference call, Defendants Reilly and Frankola provided, *inter alia*, the following contradictory justifications for their disastrous 1Q20 results and prospects, many of which squarely contradicted their prior Class Period statements: (i) "the announcement of our merger in October 2018 created **uncertainty** . . . . During this period of **uncertainty**, we saw **increased competition** from the public cloud vendors." [Defendant Reilly];[83] (ii) "our sales force was a bit handicapped without giving clarity of what the road map would be. And without that clarity, **we were at a competitive disadvantage,** and we saw a number of opportunities get **taken by the public cloud guys**."[.];[84] (iii) "we saw **increased competition from the public cloud vendors** . . . . And during that period of **uncertainty** we weren't very competitive with that during that period." [*id*.];[85] (iv) "we saw the need to get more resources, more scale so that we can deliver a competitive cloud offering and **replatform into cloud architecture,** and that's why we did the merger. And so Cloudera **now** has the resources, the scale, the employees, the engineers to very quickly replatform our business." [*id*.];[86] (v) "in the first half of the quarter, we were not generating much

---

[81]    Cloudera, Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 14-15.

[82]    *Id*. at 14.

[83]    *Id*. at 3.

[84]    *Id*. at 9.

[85]    *Id*. at 10.

[86]    *Id*. at 11.

pipeline because we hadn't trained the sales force. We didn't have our strategy aligned . . . ." [*id*.]; [87]

(vi) "after the two companies had merged . . . we were still *operating somewhat blind* . . . . So you had a general level of *uncertainty* . . . we *did not anticipate* that to the level extent that it was, the fact that our churn rate increased, that was certainly *unanticipated* . . . ." [Defendant Frankola].[88]

66.     Defendant Reilly's and Frankola's disclosures that Cloudera's customer churn was "unanticipated" was poorly received by analysts given Defendant Reilly's prior September 2018 boasts about the extent to which he and Defendant Frankola were hands-on managers that: "*track all of our customers through these phases*, *what our churn rates are*, what our graduation rates are, what our average tenures are."[89] Not surprisingly, market reaction to the Company's June 5, 2019 disclosures was scathing.

67.     Deutsche Bank downgraded the Company and lowered its price target from $13 per share to $7 per share in an analyst note called *Now THAT was a Rough Quarter*. There, Deutsche Bank analyst Karl Keirstead, *inter alia*, questioned the veracity of Defendants' explanation for Cloudera's June 5, 2019 disclosures, stating that Cloudera:

> [D]isclosed higher customer churn, postponed renewals and expansions, share losses to public cloud alternatives and the departure of the CEO. *While Cloudera attributed* this in large part to hesitation ahead of the late-summer launch of its new CDP (Cloudera Data Platform) product, *we conclude* based on our field checks that Cloudera hasn't managed the architectural transition well from on-premise Hadoop-focused data analytics projects to cloud/AWS-hosted workloads and that it has fallen behind AWS, Snowflake, Google and Microsoft in the analytics space." He added that: "[b]ased on our checks, we believe that demand for on-premise *Hadoop-focused technology has completely stalled* (rival MapR is also very challenged) and Cloudera was *late to launch a competitive cloud-hosted product* as AWS has made improvements to Redshift/EMR, as Google refines its world-class data analytics services and as privately-held and AWS-hosted Snowflake has taken share (we heard late last year that Snowflake was specifically targeting Hadoop/Cloudera customers coming up for renewals).

---

[87]     *Id*. at 15.

[88]     *Id*. at 12.

[89]     Cloudera, Inc., Citi Global Technology Conference Call (September 7, 2018), at 2.

68.     Raymond James analyst Michael Turits explained in a research note dated June 6, 2019 that Cloudera's earnings miss and deep guidance cut was due "primarily to customers moving workloads to cloud where they are choosing *cloud native* data management solutions (EMR, RedShift, Athena) absent the availability of Cloudera's new cloud focused CDP platform." He added, "CDP will provide benefits over Cloudera Altus *including a cloud-native experience*.'" CDP provided such benefits because, contrary to Defendants' Class Period claims that Altus was a cloud-native offering, it did not have any cloud-native functionality.

69.     Barclays analyst Raimo Lenschow more bluntly concluded that, as of June 6, 2019: "*Cloudera currently does not have a cloud solution*, which . . . means that the company suffers from weak renewals as customers move to cloud native providers." His conclusion that the Company lacked a "cloud solution" contradicted and undermined Defendants' repeated Class Period claims that Cloudera's "*original architecture was designed for the cloud*" as alleged in ¶¶ 158, 175, 185, 209, 216, 222-223, 233, *infra*.[90]

70.     D.A. Davidson analyst Rishi Jaluria went even further, suggesting that he had been misled during the Class Period by "rel[ying] too heavily on taking management at its word," and finding it "truly difficult to believe" Cloudera's reasons for the billings miss and reduced guidance, namely "that customers delaying deployment until CDP, increased churn, merger disruption, and competitive headwinds – all legitimate concerns *continually brought up by investors* – were not properly factored into guidance provided 90 days ago." Stifel analyst Brad Reback described the Company's June 5, 2019 disclosures as "'one of 'the deepest cuts we can remember in the software space since the dot.com meltdown.'" Wedbush analyst Daniel Ives aptly described the Company's June 5, 2019 disclosures as a "Nightmare on Elm Street situation" during a live television interview with *Bloomberg*.

**Post Class Period Developments**

---

[90]     Cloudera, Inc., 2018 Annual Report (Form 10-K) (April 4, 2018), https://www.secsecwww.sec.gov/Archives/edgar/data/0001535379/000162828018004005/fy-18cldr10k.htm, at 9.

71.     Following the Class Period, cloud industry experts and the Company's own executives made revelations confirming the falsity of Defendants' Class Period statements regarding the Company's true product capabilities. On June 9, 2020, for instance, *Bloomberg* reported that Cloudera "is exploring a potential sale after receiving takeover interest [and] is working with a financial adviser to evaluate its options, the people said, asking not to be identified because the matter is private. If Cloudera is sold, it would be the latest chapter for the once high-growth company that has long ***struggled to make money on products related to open-source software***, which is usually free to use."[91] Corporate raider Carl Icahn *via* his company, Icahn Enterprises, was reportedly behind the effort to sell Cloudera (*see* ¶ 79, *infra*). It wouldn't be the first time a Hadoop-based big data vendor faced financial difficulties so severe that it ended up being sold. MapR Technologies, Inc. announced in May 2019 that it could have to shut down its operations and was later sold to Hewlett Packard in August 2019. Finally, after each of the Insider Defendants had either left or been removed, on September 2, 2020, the Company finally fairly represented that: "[w]ith CDP, we are ***participating*** in the fastest growing segment of the market through cloud-native services."[92] Long gone were Defendant Reilly's Class Period boasts of Cloudera "leading" the cloud market.

72.     A post-Class Period article published by *ZDNet* on October 3, 2019 titled *Where does Cloudera go from here?* summed up many of the industry forces that Cloudera and the Insider Defendants either knew or deliberately disregarded had negatively impacted Cloudera's operations throughout the Class Period as follows:

> Cloudera has been through an eventful, some might say turbulent year, to say the least. While its been awhile since Cloudera branded itself as Hadoop, its fortunes have nonetheless been tied to the open source platform first codified by Doug Cutting and Mike Cafarella well over a decade ago.

---

[91]     Liana Baker, *Cloudera Said to Explore Sale After Receiving Interest*, Bloomberg.com (June 9, 2020), https://www.bloomberg.com/news/articles/2020-06-09/cloudera-said-to-explore-sale-after-receiving-takeover-interest (last accessed June 22, 2021).

[92]     Cloudera, Inc., Press Release *Cloudera Reports Second Quarter Fiscal Year 2021 Financial Results* (September 2, 2020), https://www.cloudera.com/about/news-and-blogs/press-releases/2020-09-02-cloudera-reports-second-quarter-fiscal-year-2021-financial-results.html.

*     *     *

> After a disastrous Q1, and with MapR on the ropes, the conventional wisdom was that Hadoop was dead, and with it, Cloudera and MapR becoming roadkill. . . . Back to our originally scheduled program, Cloudera was going through the familiar story of a company on the cusp of platform change (as Andrew [Brust] termed it, the Osborne effect); of course, customers are going to hold back until they know what's coming. As noted, ***Cloudera didn't adequately warn Wall Street***.[93]

73.    He added that the Company's replatforming effort "was a complete rethinking from the ground up, starting with refactoring of storage and compute that severed the ironclad connection between Cloudera's platform and HDFS [Hadoop Distributed File System]." As alleged herein, Mr, Baer's conclusion that the Company's material omissions about its Class Period product infirmities were not "adequately" disclosed to the market were subsequently corroborated by Company insiders and others.

74.    On October 4, 2019, cloud industry publication Datanami published an article titled *How Cloudera is Battling Shadow IT with CDP*, which emphasized the importance of CDP in addressing the undisclosed mounting competition from cloud vendors Cloudera faced during the Class Period, stating in relevant part:

> These are critical days for Cloudera, which has had a tough go of it ever since the disastrous second quarter results that led to the ***ousters of CEO Tom Reilly and Mike Olson***, who co-founded the company 11 years ago and was its chief strategy officer. The crux of the problem was this: the on-prem Hadoop business has been usurped by the cloud Hadoop business, as manifested by Amazon Elastic MapReduce, Microsoft Azure, HDInsight, and Google Cloud DataProc.
>
> Cloudera needed to recalibrate its bearings and adjust to the new world order – and quickly. In product terms, it meant ***nothing short of a complete architectural overhaul***, replacing the guts of its Hadoop distribution, namely HDFS and YARN, with cloud-friendly equivalents, namely an S3-compatible object store and Kubernetes.
>
> . . .
>
> With last week's launch of CDP on AWS, the company appears to have completed the first step in its journey to a ***new cloud architecture*** for Hadoop (or whatever you want to call it).

---

[93]    Tony Baer, *Where Does Cloudera Go from Here?*, ZDNet.com (October 3, 2019).), https://www.zdnet.com/article/where-does-cloudera-go-from-here/ (last accessed June 20, 2021.

75.    The complete architectural overhaul by Cloudera noted by Datanami above confirmed that the Company's replatforming efforts were designed to enable the Company to provide what it claimed to possess throughout the entirety of the Class Period – namely, cloud architecture. At the time it was used in the article above, the term "cloud architecture" meant to reasonable investors that such capabilities had specific material attributes such as the use of containers, ease-of-use, seamless scalability, security and elasticity, none of which the Company's Class Period product offerings provided.

76.    On December 13, 2019, Company insider Arun Murthy presented at the Company's StrataData Conference, where he acknowledged that the Company's prior Class Period products were not cloud-native as represented during the Class Period, stating: "what we've been working on *for the last nine months after the merger of Cloudera and Hortonworks*. It has been sort of a reimagination of everything we have done. It's a reimagination of the entire stack to make it *really cloud native*. Make it work across multiple clouds, make it work across edge and data center, have a consistent security and governance layer, schema, metadata, security, policies, governance, lineage, and migration."[94] His use of the term cloud-native was consistent with Defendants' use of that term throughout the Class Period as alleged in ¶¶ 8-9, 13-14, 36, 64, *supra* and in ¶ 138, *infra*.

77.    Murthy's statement that CDP provided the Company with a "really" cloud-native product was a tacit acknowledgement that, during the Class Period, the Company was engaged in "cloud washing," which is defined as the practice of taking legacy on-premise software like Altus and running it on the cloud, while calling it cloud-native. Cloud washing is the purposeful and deceptive attempt by a vendor, like Cloudera, to market an old product or service, as with Altus here, as a cloud product. However, merely placing and running a software on a cloud platform does not transform a technology into a cloud product as the software cannot dynamically expand or contract with a customer's needs.

---

[94]    Arun Murthy, *Delivering the Enterprise Data Cloud*, Strata Data Conference (December 13, 2019, https://www.youtube.com/watch?v=3E8yeDqd5Qo (last accessed May 28, 2021).

78.     In the case of Altus, customers were charged by Cloudera for reserving virtual machine resources to run a data analytics workload, though they may not have needed the entire amount allocated to them at any given moment.[95] By contrast, real or true cloud is multitenant software developed exclusively for and in the cloud. True cloud-based applications do not require specific hardware; they scale to the needs of the business, not the other way around.[96] With a true cloud product, containers spin up automatically to meet the requisite amount of processing power, then dynamically contract to use the minimal amount necessary once processing is complete.[97] As such, a customer is only using – and thus only charged for – the amount of cloud processing it needs at any given moment. Hadoop-based software needs to be refactored (*i.e.*, rearchitected) so its underlying architecture becomes cloud-based in order to perform these dynamic cloud functions.

79.     On June 1, 2021, the Company announced that it had entered a definitive agreement to be taken private by two private equity firms "likely under pressure from activist investor Carl Icahn, who took an 18% stake in the company in 2019 and now stands to gain from the sale . . . ."[98] The same day, *CNBC* reported that the acquisition was the "latest large tech acquisition by private equity firms, which are searching for software businesses that are struggling to keep up with their peers."[99] The June 2021 *CNBC* article written by Ari Levy titled *Private equity money keeps pouring into tech, as Cloudera becomes latest multibillion-dollar buyout* confirms the allegations alleged herein that

---

[95]     A virtual machine is software that emulates the functionality of a physical hardware or computing system, which runs on a hypervisor that replicates the functionality of the underlying physical hardware resources with a software environment.

[96]     CIO, *Cloudwashing: What it is and How to avoid it* (May 19, 2016).

[97]     Containers are software that bundles an application's code and dependencies, creating an abstract operating system, that allows individual workloads to dynamically operate easily and consistently from one computing environment to another.

[98]     Ron Miller, *Cloudera to go private as KKR & CD&R grab it for $5.3B*, TechCrunch.com (June 1, 2021), https://techcrunch.com/2021/06/01/cloudera-to-go-private-as-kkr-cdr-grab-it-for-5-3b/ (last accessed June 20, 2021).

[99]     Ari Levy, *Private equity money keeps pouring into tech, as Cloudera becomes latest multibillion-dollar buyout*, CNBC.com (June 1, 2021), https://www.cnbc.com/2021/06/01/cloudera-acquired-as-private-equity-money-keeps-pouring-into-tech.html#:~:text=It's%20the%20latest%20large%20tech,purchase%20of%20a%20cloud%20company. (last accessed June 20, 2021).

Cloudera was not a cloud company during the Class Period, stating: "Clayton, Dubilier & Rice and KKR said they're teaming up to buy Cloudera in part to help the data analytics company ***more rapidly transition to the cloud***. Cloudera has struggled as a public company since holding its IPO in 2017. The company, along with Hortonworks, came to the market as a leader commercializing the open-source analytics technology called Hadoop. Cloudera and Hortonworks merged at the beginning of 2019 in what ended up as a $3 billion deal, well below where the companies had been valued years earlier."

80.     Notably, the *CNBC* article referenced the Company's "transition to cloud" which confirms that the Insider Defendants' Class Period statements about the Company's cloud capabilities were false when made. At all relevant times, Cloudera failed to adequately warn, and affirmatively misled, shareholders about the Company's almost existential competitive industry challenges during the Class Period. And while the Company's highest-ranking insiders profited before the "wheels came off," with their impeccably timed exchange and sales of stock in the SPO and Merger, the Company's shareholders, who suffered substantial damages as a result of the conduct alleged herein, were not nearly as fortunate.

## III.   JURISDICTION AND VENUE

81.     The claims asserted herein arise under §§ 11(a), 12(a)(2), and 15 of the 1933 Act, 15 U.S.C. §§ 77k(a), 77l(a), and 77o(a) and §§ 10(b), 20(a) of the 1934 Act, 15 U.S.C. § 78j(b), § 78t(a) and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

82.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the 1933 Act, 15 U.S.C. § 77v, and Section 27 of the 1934 Act, 15 U.S.C. § 78aa, because this is a civil action arising under the laws of the United States.

83.     Venue is proper in this District pursuant to Section 22 of the 1933 Act, 15 U.S.C. § 77v, Section 27 of the 1934 Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Many of the acts alleged herein, including the preparation and dissemination of materially false and/or misleading information, were made or issued from this District. Further, Cloudera's principal executive offices are in this District.

84.     In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## IV.    PARTIES

### Plaintiffs

85.     Lead Plaintiff Mariusz J. Klin and the Mariusz J. Klin MD PA 401K Profit Sharing Plan, as set forth in the certification previously filed with the Court on September 22, 2020, and as incorporated by reference herein, purchased shares of Cloudera common stock during the Class Period and was damaged thereby.

86.     Plaintiff Robert Boguslawski, as set forth in the certification previously filed with the Court on September 22, 2020, and as incorporated by reference herein, owned shares of Hortonworks common stock at the time of the Merger. Upon the closing of the Merger, and pursuant to the Merger Registration Statement, Plaintiff Boguslawski's shares were exchanged for new Cloudera shares. Plaintiff Boguslawski was damaged thereby.

87.     Plaintiff Arthur P. Hoffman, as set forth in the certification previously filed with the court on September 22, 2020, and as incorporated by reference herein, owned shares of Hortonworks common stock at the time of the Merger. Upon the closing of the Merger, and pursuant to the Merger Registration Statement, Plaintiff Hoffman's shares were exchanged for new Cloudera shares. Plaintiff Hoffman was damaged thereby.

### Corporate Defendants

88.     Defendant Cloudera, Inc. is a Delaware corporation with its principal executive offices located at 395 Page Mill Road Palo Alto, California 94306. Cloudera's shares trade on the NYSE under the ticker symbol "CLDR." Cloudera has recently described itself in varying ways to the market. Prior to the IPO, the Company's original start-up company pitch deck described it in September 2008

as "Hadoop for the Enterprise."[100] For the IPO, the Company's registration statement filed with the SEC on Form S-1 on March 31, 2017 stated that the Company had "developed the leading modern platform for data management, machine learning and advanced analytics."[101] For the SPO, the Company's registration statement filed with the SEC on Form S-1 on September 15, 2017, stated that the Company had "developed the modern platform for machine learning and analytics, optimized for the cloud."[102] Its 2019 Annual Report filed with the SEC on Form 10-K on March 29, 2019 now simply provides that Cloudera is an "enterprise data cloud company."[103] Cloudera is named as a Defendant herein under the 1933 and 1934 Acts.

89.    The Company is liable for the acts of the Insider and Director Defendants (defined in ¶¶ 95-137, *infra*) and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

90.    Defendant Intel is a semiconductor technology company headquartered in Santa Clara, California. At the time of the Merger, Intel was a large controlling shareholder of Cloudera which held approximately 17.6% of Cloudera's outstanding common stock as of March 31, 2018. As described by Michael Olson in 2014, Intel saw its investment in Cloudera as a way for itself "to influence the open-source community" and "insisted on a meaningful ownership stake in Cloudera."[104] According to Cloudera's 2018 Proxy Statement filed with the SEC on Form 14A on May 16, 2018, Intel held,

---

[100]    *Cloudera: Hadoop for the Enterprise*, Slideshare.net (April 21, 2017), https://www.slideshare.net/AccelPartners/clouderas-original-pitch-deck-from-2008 (last accessed June 20, 2021).

[101]    Cloudera, Inc., IPO Registration Statement (Form S-1) (March 31, 2017), https://www.sec.gov/Archives/edgar/data/0001535379/000162828017003221/projectthunders-1.htm, at 1, 5.

[102]    Cloudera, Inc., SPO Registration Statement (Form S-1) (September 15, 2017), https://www.sec.gov/Archives/edgar/data/0001535379/000162828017009361/clouderas-1.htm, at 1, 5, 55, 85, 90.

[103]    Cloudera, Inc., 2019 Annual Report (Form 10-K) (March 29, 2019), https://www.sec.gov/Archives/edgar/data/0001535379/000162828019003670/fy-19cldr10k.htm, at 5, 49.

[104]    Michael Olson, *The Cloudera Story* (Hosted by FirstMark Capital), YouTube.com (December 18, 2014), https://www.youtube.com/watch?v=oUgouyfepSkhttps://www.youtube.com/watch?v=oUgouyfepSk (last accessed June 18, 2021).

through its employee Defendant Rosemary Schooler, 26,065,827 shares of Cloudera common stock.[105] Cloudera's public SEC filings acknowledged Intel's controlling position afforded it "considerable influence"[106] over Cloudera. Intel exercised this control, participating as an "affiliate" of the "directors and executive officers of Cloudera" at "the Cloudera special meeting" during which Intel, along with Cloudera's executives and directors: (i) voted to execute the Merger agreement; (ii) "entered into support agreements," pursuant to which they; (iii) "agreed, among other things, to vote their respective shares of common stock of Cloudera in favor" of the Merger, as well as "against any [countervailing] acquisition proposal and against any action or agreement that would reasonably be expected to impede, interfere with, postpone, prevent or delay the consummation of, the transactions contemplated by the merger agreement."[107]

91.    Prior to the Merger, Intel had "the right to designate a person that [Cloudera's] board of directors must nominate for election, or nominate for re-election, to [Cloudera's] board of directors."[108] This control enabled Intel to appoint an Intel employee, Defendant Schooler, to Cloudera's Board of Directors (the "Board"). The Merger Prospectus further highlighted Intel's influence over Cloudera's operations. During the Merger negotiations between Cloudera and Hortonworks in July 2018, Cloudera consistently raised the issue of Intel having a seat on the combined company's Board. Following the Merger, Intel continued to have an employee on the Board through Defendant Schooler.

92.    At all relevant times, Defendant Schooler, within the scope of her employment with Intel, served on the Cloudera Board and signed the Merger Registration Statement at the direction of

---

[105]    Available at https://www.sec.gov/Archives/edgar/data/0001535379/000162828018006839/cldr-2018proxystatement.htm, at 31.

[106]    Cloudera, Inc., IPO Registration Statement (Form S-1) (March 31, 2017), https://www.sec.gov/Archives/edgar/data/0001535379/000162828017003221/projectthunders-1.htm, at 38.

[107]    Cloudera, Inc., Notice of Special Meeting (Form 424B3) (November 27, 2018), https://www.sec.gov/Archives/edgar/data/1535379/000162828018014620/cloudera424.htm, at 38, 112.

[108]    Cloudera, Inc., SPO Registration Statement (Form S-1) (September 15, 2017), https://www.sec.gov/Archives/edgar/data/0001535379/000162828017009361/clouderas-1.htm, at F-39.

Intel in her capacity as an Intel employee and representative. Intel is thus strictly liable under *respondeat superior* for the materially inaccurate statements contained in the Merger Registration Statement and the failure of the Merger Registration Statement to be complete and accurate, unless Intel carries the burden of establishing an affirmative "due diligence" defense. Accordingly, Intel had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Merger Registration Statement and ensure that they were true and accurate, there were no omissions of material facts that would make the Merger Registration Statement misleading, and the document contained all facts required to be stated therein. In the exercise of reasonable care, Intel should have known of the material misstatements and omissions contained in the Merger Registration Statement and also should have known of the omissions of material facts necessary to make the statements made therein not misleading.

93.    The Prospectus further highlighted the extent of Intel's influence over Cloudera's affairs. During the Merger negotiations between Cloudera and Hortonworks in July 2018, Cloudera consistently raised the issue of Intel having a seat on the combined company's Board. After the Merger, Cloudera (as a combined company) still had an Intel employee on the combined Board. In the section titled "Share Ownership of Directors and Executive Officers of Cloudera," the Prospectus stated the beneficial ownership of Cloudera's "directors and executive officers . . . (together with certain of their respective affiliates, including Intel Corporation) . . . ."[109] Intel is the only "respective affiliate[]" mentioned. Accordingly, Intel is strictly liable to Plaintiffs and the Class.

94.    Defendant Intel is named as a Defendant exclusively under the 1933 Act. None of the claims against Intel include any allegations of fraud or scienter, and Plaintiffs disclaim any such allegations herein against it.

**Insider Defendants**

---

[109]    Cloudera, Inc., Merger Prospectus (Form 424B3) (November 27, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018014620/cloudera424.htm#s5add6320844f48c1952c26c5d0640a1f, at 38.

95.     Defendant Reilly was Cloudera's CEO and Chairman of the Board of Directors at the time of Cloudera's IPO. Defendant Reilly subsequently became CEO of the combined Cloudera on January 3, 2019.

96.     During the Class Period, Defendant Reilly signed and/or had ultimate authority over the Company's: (i) IPO Registration Statement filed with the SEC on Form S-1 on March 31, 2017 and Prospectus filed with the SEC on Form 424B on April 28, 2017 (together, "IPO Prospectus"); (ii) SPO Registration Statement filed with the SEC on Form S-1 on September 15, 2017 and Prospectus filed with the SEC on Form 424B on September 28, 2017 (together, "SPO Registration Statement"); (iii) June 9, 2017 quarterly report filed with the SEC on Form 10-Q ("1Q18 Quarterly Report"); (iv) September 12, 2017 quarterly report filed with the SEC on Form 10-Q ("2Q18 Quarterly Report"); (v) Merger Registration Statement filed with the SEC on Form S-4 on November 5, 2018 and Prospectus filed with the SEC on Form 424B3 on November 27, 2018 (together, "Merger Registration Statement"); (vi) December 8, 2017 quarterly report filed with the SEC on Form 10-Q ("3Q18 Quarterly Report"); (vii) April 4, 2018 annual report filed with the SEC on Form 10-K ("2018 Annual Report"); (viii) June 6, 2018 quarterly report filed with the SEC on Form 10-Q ("1Q19 Quarterly Report"); (ix) September 6, 2018 Quarterly Report on Form 10-Q ("2Q19 Quarterly Report"); (x) December 6, 2018 Quarterly Report on From 10-Q ("3Q19 Quarterly Report"); and (xi) June 5, 2019 Quarterly Report filed with the SEC on Form 10-Q ("1Q20 Quarterly Report").

97.     Defendant Reilly participated in and made statements during all the Company's Class Period earnings conference calls, as well as the Company's October 3, 2018 conference call with investors announcing the Merger. Because of his senior position with the Company, Defendant Reilly possessed the power and authority to control the contents of the Company's press releases, investor and media presentations, and all filings Cloudera made with the SEC during the Class Period. Defendant Reilly is named as a Defendant under the 1933 and 1934 Acts. Defendant Reilly *did not purchase a single share of Cloudera common stock* on the open market during the Class Period. His ouster was announced in June 2019.

98.     In April 2018, Defendant Reilly received a 6.25% increase in his base salary, from $400,000 to $425,000 as well as a time-based restricted stock unit ("RSU") award eligible to be settled for 330,000 shares of Cloudera common stock (amounting to an aggregate grant date fair value of $6,695,700).[110] Subsequently, in February 2019, only four months prior to his "retirement", Defendant Reilly received an 18% increase in his base pay (adjusting his salary from $425,000 to $500,000) in connection with the Hortonworks merger.[111] Just one month later, in March 2019, Defendant Reilly received a staggering $385,000 cash bonus for performance in fiscal year 2019, which equated to 90% of his target annual cash bonus opportunity.[112]

99.     Cloudera announced Defendant Reilly's abrupt and unexpected resignation on June 5, 2019, the last day of the Class Period, *via* a press release filed with the SEC on Form 8-K, stating in relevant part that the Company's Board and Defendant Reilly "mutually agreed that [Defendant Reilly] would retire from his position as CEO and member of the Board effective July 31, 2019."[113] Defendant Reilly, who was only 56 years old per Cloudera's April 30, 2019 Proxy Statement, did not retire but rather, went on to serve as a city council member for the City of Sausalito in California and as an advisor for a multitude of companies, including *inter alia*, OmniSci, Trusona, DataStax, Netography and Confidentiality.com.[114]

100.     On June 6, 2019, the day after his purported "retirement" was announced, Defendant Reilly exercised his employee stock options, causing him to acquire 5,113,329 shares of Cloudera

---

[110]     *See* Cloudera, Inc., Proxy Statement (Schedule 14A) (May 10, 2019), https://www.sec.gov/Archives/edgar/data/0001535379/000162828019006582/cloudera-2019proxystatemen.htm, at 32, 42-52.

[111]     *See id.* at 42. Defendant Reilly's February 2019 raise was retroactively effective as of January 3, 2019.

[112]     *See id.* at 46. Defendant Reilly's annual incentive award was prorated to reflect the adjustment of his annual base salary effective April 1, 2018 and the adjustment effective January 3, 2019.

[113]     Cloudera, Inc., Current Report (Form 8-K) (June 5, 2019), https://www.sec.gov/Archives/edgar/data/0001535379/000162828019007585/cloudera8-k6519.htm.

[114]     Tom Reilly LinkedIn Profile, https://www.linkedin.com/in/tjreilly/, (last accessed June 9, 2021).

Common Stock. The following day, Defendant Reilly exercised his remaining employee stock options, causing him to acquire an additional 2,191,426 shares of the Company's Stock. Between June 6 and 7, 2020, Defendant Reilly divested 5,905,597 shares of Common Stock purportedly as payment of exercise price or tax liability.

101.    Pursuant to his severance agreement with the Company, on the effective date of his "retirement" (*i.e.*, July 31, 2019), Defendant Reilly became entitled to: (i) a lump-sum payment equal to 12 months of his base salary, plus 100% of his target annual cash bonus; (ii) a lump-sum payment equal to his target annual cash bonus for Fiscal Year 2020, pro-rated for his partial year of service; (iii) premium payments to maintain his health care for 24 months; (iv) full accelerated vesting of his outstanding and unvested stock options and RSU awards; and (v) extended post-termination exercisability of his stock options until one year following his separation date or the original term of the stock option.[115]

102.    Subsequently, on August 5, 2019, Cloudera announced *via* a press release filed with the SEC on Form 8-K, that Defendant Reilly submitted his resignation letter and entered in a Share Acquisition and Restriction Agreement with the Company (the "Restriction Agreement"). Pursuant to the Restriction Agreement, Defendant Reilly agreed to purchase $5 million worth of shares of Cloudera's common stock through open market purchases. Defendant Reilly further agreed not to sell those shares "until at least one year has elapsed following the acquisition thereof."[116] Defendant Reilly also agreed to rescind his June 6 and 7, 2019 option exercises and to retain any shares obtained acquired from a future exercise of those options "until (a) in the case of a share acquired by payment of the exercise price under the Option in cash, June 30, 2020, or (b) in the case of a share acquired by

---

[115]    *See* Cloudera , Inc., Proxy Statement (Schedule 14A) (May 7, 2020), https://www.sec.gov/Archives/edgar/data/0001535379/000162828020007045/cldr-2020proxystatement.htm, at 40.

[116]    Cloudera, Inc., Share Acquisition and Restriction Agreement (Form 10-Q, Ex. 10.01) (September 4, 2019), https://sec.report/Document/1535379/000162828019011400/ex1001-shareacquisitio.htm, at 1.

net exercise of the Option, at least one year has elapsed following the acquisition thereof."[117]

Defendant Reilly further agreed "not [to] Dispose of any shares of Common Stock or other securities of the Company beneficially owned . . . by him as of the Effective Date or issued upon exercise, issuance or settlement of any such security . . . until January 31, 2020."[118]

103.    On May 7, 2020, Cloudera filed its Shareholder Proxy Statement with the SEC *via* Schedule 14-A, further explaining that the Company and Defendant Reilly "agreed . . . that [Defendant Reilly] would rescind his previous net exercise of stock options granted to him, such that he reimbursed [the Company] in cash for the exercise price and tax withholding and re-acquired the approximately 5.9 million shares that had previously been forfeited in connection with the net exercise."[119]

104.    Defendant Frankola has served as Cloudera's Chief Financial Officer ("CFO") since October 2012. During the Class Period, Defendant Frankola signed and/or had ultimate authority over the Company's: (i) IPO Prospectus; (ii) SPO Registration Statement; (iii) 1Q18 Quarterly Report; (iv) 2Q18 Quarterly Report; (v) Merger Registration Statement; (vi) 3Q18 Quarterly Report; (vii) 2018 Annual Report; (viii) 1Q19 Quarterly Report; (ix) 2Q19 Quarterly Report; (x) 3Q19 Quarterly Report; and (xi) 1Q20 Quarterly Report.

105.    Defendant Frankola participated on and made statements during all the Company's Class Period earnings conference calls, as well as the Company's October 3, 2018 conference call with investors announcing the Merger. Because of his senior position with the Company, Defendant Frankola possessed the power and authority to control the contents of the Company's press releases, investor and media presentations, and all filings Cloudera made with the SEC during the Class Period.

---

[117]    *See id.* at 2. Per the Restriction Agreement, "Option" means Defendant Reilly's "net exercises effective June 6 and 7, 2019 of the option for 7,304,755 shares at an exercise price of $3.21 per share originally granted on June 28, 2013."

[118]    *See id.* Per the Restriction Agreement, "Effective Date" means July 31, 2019 (*i.e.*, the date the Restriction Agreement was signed by Defendant Reilly and Cloudera).

[119]    Cloudera, Inc., Shareholder Proxy Statement (Form 14-A) (May 7, 2020), https://www.sec.gov/Archives/edgar/data/0001535379/000162828020007045/cldr-2020proxystatement.htm, at 40.

1    Defendant Frankola is a named Defendant under the 1933 and 1934 Acts. Defendant Frankola ***did not***

2    ***purchase a single share of Cloudera common stock*** on the open market during the Class Period.

3    106.    Unlike Defendants Reilly (*see* ¶ 98, *supra*) and Olson (*see* ¶ 110, *infra*), Defendant

4    Frankola did not receive an increase in his annual base salary for fiscal year 2019; though, he received

5    a time-based RSU award eligible to be settled for 170,000 shares of Cloudera common stock

6    (amounting to an aggregate grant date fair value of $3,449,300). In January 2019, Defendant Frankola

7    received an 11% increase in his base pay (adjusting his salary from $360,000 to $400,000) in

8    connection with the Hortonworks merger. Just three months later, in March 2019, Defendant Frankola

9    received a $293,884 cash bonus for performance in fiscal year 2019, which equated to 116% of his

10   target annual cash bonus opportunity.[120]

11   107.    Defendant Michael A. Olson ("Olson") was a co-founder of Cloudera and served as

12   Cloudera's Chief Strategy Officer from June 2013 until his "retirement" was announced on June 5,

13   2019.

14   108.    Defendant Olson signed and had ultimate authority over the Company's: (i) IPO

15   Registration Statement; (ii) SPO Registration Statement; (iii) Merger Registration Statement; and (iv)

16   2018 Annual Report. Defendant Olson participated on and made statements during the Company's

17   3Q18, 4Q18 and 2Q19 earnings conference calls with investors.

18   109.    On October 2, 2017, Defendant Olson sold 587,288 Cloudera shares at a price of

19   $15.792 per share in the SPO for proceeds of $9.27 million. Because of his senior position with the

20   Company, Defendant Olson possessed the power and authority to control the contents of the

21   Company's press releases, investor and media presentations, and all filings Cloudera made with the

22   SEC during the Class Period. Defendant Olson is a named Defendant under the 1933 and 1934 Acts.

23   Defendant Olson ***did not purchase a single share*** of Cloudera common stock on the open market

---

[120]    Defendant Frankola's annual incentive award was prorated to reflect the adjustment of his annual base salary effective January 3, 2019. *See* Cloudera, Inc., Proxy Statement (Schedule 14A) (May 10, 2019), https://www.sec.gov/Archives/edgar/data/0001535379/000162828019006582/cloudera-2019proxystatemen.htm, at 46.

during the Class Period. Prior to the SPO, Olson did not have any prior trading history because Cloudera had only just gone public in April 2017.

110.    In April 2018, Defendant Olson received a 3.27% increase in his base salary, from $275,000 to $284,000 as well as a time-based RSU award eligible to be settled for 100,000 shares of Cloudera common stock (amounting to an aggregate grant date fair value of $2,029,000). Subsequently, in January 2019, only four months prior to his "retirement", Defendant Olson received a 23% increase in his base pay (adjusting his salary from $284,000 to $350,000) in connection with the Hortonworks merger. Just one month later, in March 2019, Defendant Olson received a $142,000 cash bonus for performance in fiscal year 2019, which equated to 95% of his target annual cash bonus opportunity.[121] His ouster was announced in June 2019.

111.    On June 5, 2019, during the Company's earnings investor conference call, Defendant Reilly unexpectedly announced Defendant Olson's "retirement." Defendant Olson, who was only approximately 56 years old at the time of this announcement, did not retire but rather continued to serve as a Board Member of the Cloudera Foundation until April 2021 and as of March 2020 served as the Chairman of the Board of Cityside, a non-profit media organization.[122] Though Defendant Olson entered into a "Severance and Change in Control Agreement" with Cloudera in December of 2016, the Company did not report that Defendant Olson received a payment pursuant to this agreement as it did with Defendant Reilly. Pursuant to the Company's severance agreement, upon his "retirement", Defendant Olson would receive a lump sum equal to his base salary, annual target bonus, a prorated

---

[121]    *See id.* at 46. Defendant Olson's annual incentive award was prorated to reflect the adjustment of his annual base salary effective April 1, 2018 and the adjustment effective January 3, 2019.

[122]    *See* Cloudera, Inc., Proxy Statement (Schedule 14A) (May 16, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018006839/cldr-2018proxystatement.htm, at 15 (reporting Defendant Olson as 55 years old as of May 1, 2018); *see also* Mike Olson LinkedIn Profile, https://www.linkedin.com/in/mikeolson2/ (last accessed June 14, 2021).

portion of his annual target bonus, accelerated vesting of 100% of his outstanding equity awards, and a twelve-month post-termination exercise window for all outstanding non-qualified stock options.[123]

112.    Prior to leaving Cloudera, Defendant Ping Li ("Li") served as a member of Cloudera's board of directors since October 2008. Defendant Li is a Partner at Accel, a Silicon Valley venture capital firm, where he has worked since 2004. Defendant Li was an early venture capital investor in Cloudera. During the Class Period, Defendant Li signed and/or had ultimate authority over the Company's: (i) IPO Registration Statement: (ii) SPO Registration Statement; and (iii) the Company's 2018 Annual Report, which was incorporated by reference into the Merger Registration Statement.

113.    Defendant Li sold 6,528,862 shares of Cloudera common stock in the SPO at $15.79 per share pocketing nearly $103 million. On December 12, 2017, Defendant Li sold an additional 2,675,710 shares of Cloudera common stock on the open market at an average price of $16.50 per share, yielding proceeds exceeding $44.1 million. Defendant Li left the Company shortly thereafter in July 2018. Because of his senior position with the Company, Li possessed the power and authority to control the contents of the Company's press releases, investor and media presentations, and all filings Cloudera made with the SEC during the Class Period. In addition, at all relevant times, Defendant Li served as a member of the Board's compensation committee. The Company's filings with the SEC, including the SPO Prospectus, defined Defendant Li as a member of "Management." Defendant Li is a named Defendant under the 1933 and 1934 Acts. Defendant Li *did not purchase a single share* of Cloudera stock on the open market during the Class Period. Prior to the SPO, Defendants did not have any prior trading history because Cloudera had only just gone public in April 2017.

114.    Defendants Reilly, Frankola, Li and Olson are collectively referred to as the "Insider Defendants."

115.    Given the Insider Defendants' positions within the Company, they each had access to the adverse undisclosed information about Cloudera's business, operations, and practices through

---

[123]    *See* Cloudera, Inc., Proxy Statement (Form 14A) (May 10, 2019), https://www.sec.gov/Archives/edgar/daEta/0001535379/000162828019006582/cloudera-2019proxystatemen.htm, at 56-57.

access to internal corporate documents, conversations, and contact with other corporate officers and employees, attendance at meetings, and through reports and other information provided to them.

116.    Each of the Insider Defendants solicited the purchase of the common stock issued pursuant to the Merger Registration Statement, planned and participated in the preparation of the statements contained in the Merger Registration Statement and promoted the Merger to investors, including to Cloudera's and Hortonworks' shareholders.

117.    By virtue of their high-level positions, the Insider Defendants were each directly involved in Cloudera's day-to-day operations and were each privy to confidential information concerning the Company, its business, operations, and practices, including the misstatements alleged herein. Their positions of control and authority as officers or directors enabled the Insider Defendants to control the contents of the Company's SEC filings, press releases, presentations to securities analysts, and other public statements made to Cloudera shareholders during the Class Period. Accordingly, each of the Insider Defendants bear responsibility for the accuracy of the public reports and press releases detailed herein, and are therefore primarily liable for the material misrepresentations and omissions contained therein.

118.    During the Class Period, each of the Insider Defendants substantially participated in the creation of and had exclusive authority and control over the content of Cloudera's materially false and misleading statements and omissions, and how they were communicated to investors. The Insider Defendants also engaged in conduct, alleged solely under the 1934 Act herein, in furtherance of a fraudulent scheme and course of business, and were involved in the preparation and dissemination of Cloudera's misleading statements, all of which made it necessary or inevitable that material misrepresentations would be communicated to, and mislead, investors.

119.    The Insider Defendants were obliged to refrain from falsifying Cloudera's books and were prohibited from using the instrumentalities of interstate commerce or the mails and, as alleged under the 1934 Act, to: (i) employ any device, scheme, or artifice to defraud; (ii) knowingly or with deliberate recklessness make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were

made, not misleading; or (iii) engage in any act, practice, or course of business which operates or would operate as a fraud upon any person. The Insider Defendants' conduct in this regard violated the federal securities laws and SEC regulations promulgated thereunder in connection with the purchase or sale of Cloudera's common stock.

120.    Each of the Insider Defendants is liable under the 1934 Act as a participant in a fraudulent scheme and course of business whose primary purpose and effect was to operate as a fraud and deceit on purchases of Cloudera securities by disseminating materially false and misleading statements and/or concealing material adverse facts about Cloudera's operations. The Insider Defendants' scheme deceived the investing public regarding Cloudera's operations and the intrinsic value of Cloudera's common stock, and damaged Plaintiffs and other members of the Class as a result of their purchases of Cloudera common stock at artificially inflated prices.

121.    The Company's press releases, and SEC filings were group-published documents, representing the collective actions of the Company management. The Insider Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein under the 1934 Act and were aware, or recklessly disregarded, with respect to the statements at issue herein, that false and misleading statements were being issued regarding the Company. The Insider Defendants also approved or ratified these statements in violation of the 1934 Act.

122.    The scienter of the Insider Defendants and other employees and agents of Cloudera is imputed to Cloudera under *respondeat superior* and common law agency principles.

**Director Defendants**

123.    Defendant Martin I. Cole ("Cole") served as a director on Cloudera's Board at the time of the Merger. Defendant Cole participated in the preparation of and signed the Merger Registration Statement. Defendant Cole is named exclusively as a Defendant under the 1933 Act, and none of the claims against him include allegations of fraud or scienter. Because of his senior position at the Company, he possessed the power and authority to control the contents of the Merger Registration Statement. Defendant Cole became Cloudera's interim CEO in August 2019 after Defendant Reilly

was removed from that position effective July 31, 2019. On January 12, 2020, Defendant Cole resigned from his role as Interim CEO, Chairman of the Board, as a member of the Board, and from all committees of the Board, effective the following day.[124]

124.    Defendant Kimberly L. Hammonds ("Hammonds") served as a director on Cloudera's Board at the time of the Merger. Defendant Hammonds participated in the preparation of and signed the Merger Registration Statement. Defendant Hammonds is named exclusively as a Defendant under the 1933 Act, and none of the claims against her include allegations of fraud or scienter. Because of her senior position at the Company, she possessed the power and authority to control the contents of the Merger Registration Statement. On January 12, 2020, Defendant Hammonds resigned from the Board, as a member of the Board, and from all committees of the Board, effective the following day.[125]

125.    Defendant Schooler served as an employee of Defendant Intel and a director on Cloudera's Board at the time of the Merger. Defendant Schooler participated in the preparation of and signed the Merger Registration Statement. Defendant Schooler is named exclusively as a Defendant under the 1933 Act, and none of the claims against her include allegations of fraud or scienter. Because of her senior position at the Company, she possessed the power and authority to control the contents of the Merger Registration Statement.

126.    On May 10, 2019, Cloudera filed a Proxy Statement with the SEC on Form 14A acknowledging that Defendant Schooler was not an independent board member, stating: "[o]ur common stock is listed on the New York Stock Exchange ("NYSE"). The listing rules of this stock exchange generally require that a majority of the members of a listed company's board of directors be independent within specified periods following the completion of an initial public offering. . . . From

---

[124]    *See* Cloudera, Inc., Press Release (Form 8-K) (January 16, 2020), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001535379/000162828020000373/cloudera8-k11620.htm.  Defendant Cole was replaced by Nick Graziano – a Carl Icahn appointed board member – as Chairman of the Board. *See id*.

[125]    *See id*. "In connection with [Defendant] Hammond's resignation, the Board appointed Jesse Lynn [a Carl Icahn appointed board member] as the Chair of the Nominating Committee and [Defendant] Rosemary Schooler [an Intel appointed board member] as a member of the Nominating Committee." *Id.*

1   the period from February 1, 2018 until our merger with Hortonworks, Inc. ("Hortonworks") on January

2   3, 2019, our board of directors was comprised of eight directors until Mr. Ping Li's resignation in July

3   2018 and, following Mr. Li's resignation, seven directors. All of these directors were independent

4   except for Mr. Thomas J. Reilly, our Chief Executive Officer, Mr. Michael A. Olson, our Chief

5   Strategy Officer and former Chairman, and Ms. Rosemary Schooler, who was designated to our board

6   of directors by Intel Corporation ("Intel")."[126]

7        127.    The Proxy Statement added that, "[a]fter our merger with Hortonworks, our board of

8   directors was comprised of nine directors, all of whom were independent except for Mr. Reilly, Ms.

9   Schooler, and Mr. Robert Bearden, the former chief executive officer of Hortonworks. . . . Following

10   this review, our board of directors has determined that none of the members of our board of directors

11   other than Messrs. Reilly and Bearden and Ms. Schooler has a relationship that would interfere with

12   the exercise of independent judgment in carrying out the responsibilities of a director, and that each

13   of the members of our board of directors other than Messrs. Reilly and Bearden, and Ms. Schooler, is

14   "independent" under the applicable rules, regulations, and listing standards of NYSE and the

15   applicable rules and regulations promulgated by the SEC.[127]

16        128.    Cloudera also represented that Defendant Schooler "has served as a member of our

17   board of directors since December 2017. Ms. Schooler is Corporate Vice President and General

18   Manager of Data Center Sales for Intel. Ms. Schooler manages overall revenue across the various

19   sales, technical support, and channels capabilities to deliver IoT solutions to Intel customers and

20   partners. Previously, Ms. Schooler served as Intel's Vice President of the IoT Global Sales, IoT

21   Strategy and Integrated Products Division in the Internet of Things Group (IoTG). Prior to her role in

22   IoTG, Ms. Schooler was Vice President of the Data Center Group and General Manager of Intel's

23   Communications and Storage Infrastructure Group."[128]

---

[126]    Cloudera, Inc., Proxy Statement (Form 14A) (May 10, 2019), https://www.sec.gov/Archives/edgar/data/0001535379/000162828019006582/cloudera-2019proxystatemen.htm, at 12.

[127]    *Id*. at 12-13.

[128]    *Id*. at 19.

1

129.    Cloudera further stated that "[d]ue to Ms. Schooler's relationship with Intel, she did

2

not participate in our non-employee director compensation program for the period between February

3

1, 2018 and January 2, 2019, which applies only to directors who are not employees of Cloudera or

4

our subsidiaries and who do not serve as a director resulting from his or her relationship with an

5

investor in Cloudera. Following our merger with Hortonworks on January 3, 2019, Ms. Schooler

6

became a non-employee and non-affiliated director entitled to participate in our director compensation

7

program but has waived participation the program due to her existing relationship with Intel."[129]

8

130.    Defendant Steve J. Sordello ("Sordello") served as a director on Cloudera's Board at

9

the time of the Merger. Defendant Sordello participated in the preparation of and signed the Merger

10

Registration Statement. Defendant Sordello is named exclusively as a Defendant under the 1933 Act,

11

and none of the claims against him include allegations of fraud or scienter. Because of his senior

12

position at the Company, he possessed the power and authority to control the contents of the Merger

13

Registration Statement.

14

131.    Defendant Michael A. Stankey ("Stankey") served as a director on Cloudera's Board

15

at the time of the Merger. Defendant Stankey participated in the preparation of and signed the Merger

16

Registration Statement. Defendant Stankey is named exclusively as a Defendant under the 1933 Act,

17

and none of the claims against him include allegations of fraud or scienter. Because of his senior

18

position at the Company, he possessed the power and authority to control the contents of the Merger

19

Registration Statement.

20

132.    Defendant Priya Jain ("Jain") served, at the time of the Merger, as the Company's Vice

21

President, Corporate Controller and Principal Accounting Officer. Defendant Jain participated in the

22

preparation of and signed the Registration Statement. Defendant Jain is named exclusively as a

23

Defendant under the 1933 Act, and none of the claims against her include allegations of fraud or

24

scienter. Because of her senior position at the Company, she possessed the power and authority to

25

26

27

[129]    *Id*. at 22.

28

control the contents of the Merger Registration Statement. As of July 2019, Defendant was no longer employed by Cloudera.

133.    Defendant Robert Bearden ("Bearden") served as President and CEO of Hortonworks at the time of the Merger. Defendant Bearden participated in the preparation of the Merger Registration Statement as an incoming Cloudera Board member upon the close of the Merger. Defendant Bearden is named exclusively as a Defendant under the 1933 Act, and none of the claims against him include allegations of fraud or scienter. Because of his senior position at the Company, he possessed the power and authority to control the contents of the Merger Registration Statement. Defendant Bearden replaced Defendant Cole as Cloudera's CEO in January 2020.

134.    Defendant Paul Cormier ("Cormier") served as a director on the Hortonworks Board of Directors (the "Hortonworks Board") at the time of the Merger. Defendant Cormier participated in the preparation of the Merger Registration Statement as an incoming Cloudera Board member upon the close of the Merger. Defendant Cormier is named exclusively as a Defendant under the 1933 Act and none of the claims against him include allegations of fraud or scienter. Because of his senior position at the Company, he possessed the power and authority to control the contents of the Merger Registration Statement.

135.    Defendant Peter Fenton ("Fenton") served as a director on the Hortonworks Board at the time of the Merger. Defendant Fenton participated in the preparation of the Merger Registration Statement as an incoming Cloudera Board member upon the close of the Merger. Defendant Fenton is named exclusively as a Defendant under the 1933 Act, and none of the claims against him include allegations of fraud or scienter. Because of his senior position at the Company, he possessed the power and authority to control the contents of the Merger Registration Statement.

136.    Defendant Kevin Klausmeyer ("Klausmeyer") served as a director on the Hortonworks Board at the time of the Merger. Defendant Klausmeyer participated in the preparation of the Merger Registration Statement as an incoming Cloudera Board member upon the close of the Merger. Defendant Klausmeyer is named exclusively as a Defendant under the 1933 Act, and none of the claims against him include allegations of fraud or scienter. Because of his senior position at the

Company, he possessed the power and authority to control the contents of the Merger Registration Statement.

137.    Defendants Reilly, Frankola, Olson, Li, Cole, Hammonds, Schooler, Sordello, Stankey, Jain, Bearden, Cormier, Fenton and Klausmeyer are collectively referred to in §VI *infra* as the "Director Defendants." The Director Defendants each solicited the purchase of the common stock issued pursuant to the Merger Registration Statement, planned and participated in the preparation of the statements contained in the Merger Registration Statement, and promoted the Merger to investors, including to Cloudera's and Hortonworks' shareholders.

## V.    PLAINTIFFS' 1934 ACT CLAIMS ARE ACTIONABLE

138.    During the Class Period, and as alleged herein, the terms "cloud-native" and "cloud architecture" meant to reasonable investors that such offerings had specific material attributes such as the use of containers, seamless scalability, security and elasticity. The Insider Defendants, who made statements throughout the Class Period touting the Company's "cloud-native" products and "cloud architecture" to investors, knew or were reckless in not knowing this generally accepted meaning as none of the Company's Class Period offerings possessed cloud attributes. Cloudera did not have a "cloud-native" product until the Cloudera Data Platform for the public cloud in September 2019. The Company did not release CDP for the private cloud until August 18, 2020.

139.    Although its Altus product was primarily used on-premises during the Class Period, Cloudera misrepresented that it was a cloud product, which it promoted as simple, easy to use, and adaptable like a cloud product.

140.    Defendants also misleadingly claimed throughout the Class Period, that Cloudera's platforms and product offerings were "cloud-native" and grounded in "cloud architecture." Starting with its IPO Prospectus and continuing throughout the Class Period, Cloudera suggested that its Hadoop-based products could "compete favorably" against "public cloud providers who include proprietary data management, machine learning and analytics offerings, such as Amazon Web

Services, Google Cloud Platform and Microsoft Azure."[130] These and other related such statements created a materially misleading impression of Cloudera's business and prospects because Cloudera lacked any "cloud-native" products and its Hadoop-focused offerings were incapable of offering even remotely the same cloud performance that its competitors offered throughout the entirety of the Class Period.

141.    Further, Cloudera and the Insider Defendants obscured the extent to which the Company needed to consummate the Merger to obtain the scale and resources necessary to completely "replatform" the Company's technology from an outdated Hadoop on-premises platform to "cloud-native architecture," something Defendants professed to offer throughout the entirety of the Class Period. Indeed, starting with the Company's IPO Prospectus on April 28, 2017, the Company represented that a "key element" of its strategy was "***extending our original cloud native architecture***" and that its "solution" for enterprises that "require the ability to run natively on different public cloud platforms, or multi cloud capability, so that they can choose among competing public cloud platforms and move workloads among them to avoid cloud lock in" was to "***deliver our cloud-native platform***."[131]

142.    During the Company's 1Q18 earnings conference call following its June 8, 2017 press release announcing its first quarter 2018 results, Defendant Reilly went ever further, misleadingly representing that "Cloudera offers the leading cloud-native software platform for machine learning and advanced analytics."[132] In truth, Cloudera could not and did not offer and "cloud-native software platform," let alone the "leading" such market capability during the Class Period.

143.    On the last day of the Class Period during the Company's June 5, 2019 1Q 2020 earnings call, former CEO Defendant Reilly admitted that the Company consummated the Merger because: "[w]e saw the ***need*** to get more resources, more scale so that we ***can*** deliver a competitive

---

[130]    Cloudera, Inc., IPO Prospectus (Form 424B4) (April 28, 2017), https://www.sec.gov/Archives/edgar/data/0001535379/000162828017004450/cloudera424b4.htm, at 15, 99.

[131]    *Id*. at 4, 5, 12, 88, 89.

[132]    Cloudera, Inc., Q1 2018 Earnings Conference Call (June 8, 2017), at 3.

cloud offering and replatform into cloud architecture, and that's why we did the merger."[133] The Company needed to replatform into "cloud architecture" for the very reason that it lacked any "cloud architecture" during the Class Period. Nevertheless, the Company, since the time of the IPO in April 2017, repeatedly touted its "original cloud native architecture" though its original architecture was designed for on-premise applications.[134] During the same call, under pressure from analysts, Defendant Reilly added more detail about the Company's concealment of this material fact, admitting that Defendants "didn't share earlier, but the reason we prioritized CDP public cloud first is we want to close off that competitive disadvantage with our public cloud hybrid offering. CDP private cloud is what our largest customers are most demanding, but we wanted to close off those workloads that are moving to public cloud. So we want to control that with our customers."[135]

144.    In other words, Defendant Reilly knew, at all relevant times during the Class Period, that the Company was facing competitive disadvantages due to the Company lack of any cloud-native products and inability to provide such services to its largest customers who were, throughout the Class Period, moving their workloads to cloud providers.

145.    On June 5, 2019, following the Company's 1Q20 conference call, Barclays analyst Raimo Lenschow concluded that: "Cloudera currently ***does not have a cloud solution***, which . . . means that the company suffers from weak renewals as customers move to cloud native providers." Barclays highlighted that the Company's customers moved their work to cloud-native providers because, as any other reasonable investor would expect, Cloudera was not a cloud-native provider. The Company's outgoing CEO (Defendant Reilly) admitted that the Company had concealed that, during the Class Period, Cloudera was engaged in a surreptitious effort to "replatform into cloud

---

[133]    Cloudera, Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 11.

[134]    Cloudera, Inc., IPO Prospectus (Form 424B4) (April 28, 2017), https://www.sec.gov/Archives/edgar/data/0001535379/000162828017004450/cloudera424b4.htm, at 7; *see also* Cloudera, Inc., SPO Prospectus (Form 424B4) (September 27, 2017), https://www.sec.gov/Archives/edgar/data/0001535379/000162828017009498/cloudera424b4.htm,at 5, 7, 88.

[135]    Cloudera, Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 15.

architecture."[136] In doing so, Defendant Reilly acknowledged that his prior Class Period statements representing that Cloudera possessed "cloud-native" offerings and "cloud architecture" were false. The Company would have had no technological need to "replatform" its entire architecture into "cloud architecture" had either Cloudera or Hortonworks possessed "cloud architecture" as Defendants had represented during the Class Period.

146.    At the time Defendants made their misstatements about possessing cloud-native capabilities as alleged in ¶¶ 158, 163, 168, 175, 185, 193, 209, 233, 216, 222-223, 230, 240, *infra* "cloud-native" and "run natively and easily in the public cloud" meant to reasonable investors that such offerings and capabilities had specific material attributes such as the use of containers, seamless scalability, security and elasticity, which the Company lacked until it released CDP for the public cloud in September 2019 and for the private cloud in August 2020.

147.    On December 13, 2019, Arun Murthy presented at the Company's StrataData Conference, where he acknowledged that the Company's prior Class Period products were not cloud-native as the Insider Defendants had represented during the Class Period, stating: "what we've been working on for the last nine months after the merger of Cloudera and Hortonworks. It has been sort of a reimagination of everything we have done. It's a reimagination of the entire stack to make it ***really*** cloud native. Make it work across multiple clouds, make it work across edge and data center, have a consistent security and governance layer, schema, metadata, security, policies, governance, lineage, and migration."[137]

148.    In other words, until the Company's release of CDP, its products were not "really" cloud-native. Instead, they were cloud washed, which is the process of running a legacy software on the cloud and representing it as a cloud product rather than developing the software's architecture to run on the cloud from the outset. This process results in operational inefficiencies and increased costs because, unlike cloud, the legacy software cannot dynamically scale to meet the customer's resource

---

[136]    Cloudera, Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 11.

[137]    Arun Murthy, *Delivering the Enterprise Data Cloud*, Strata Data Conference (December 13, 2019, https://www.youtube.com/watch?v=3E8yeDqd5Qo (last accessed May 28, 2021).

needs. Rather, a customer pays for the same amount of processing resources regardless of whether it is utilized.

149.    The Company's platforms, contrary to the statements in the Merger Registration Statement, were therefore then technologically obsolete. Further, Cloudera's current customers, including significant numbers of its largest customers, were not "expanding"; rather, they were canceling and/or delaying renewals while their in-house engineering teams independently learned to perform the same or superior functions and services that Cloudera sold without paying Cloudera. As a result, by the time of the Merger, far from "land[ing] and expand[ing]," Cloudera's bookings were deteriorating and customer churn was swelling.

150.    And in the year leading up to the Merger, Cloudera's sales team and related management, reacting to the lack of management response to repeated internal reports of customer and sales losses due to the failures of Cloudera's products, including Altus, suffered from significant turnover, which included Cloudera's VP of Sales for the Americas, Head of Sales for Europe, the Middle East, and Africa, Senior Vice President of Worldwide Sales, and several other key management and executive sales positions (*e.g.*, Regional Directors of Sales). Furthermore, Cloudera's Senior Vice President of Engineering and Support, Daniel Sturman, who was responsible for developing Altus, left the Company shortly after the Merger.

151.    The loss of sales personnel in the middle of new sales cycles and sales expansion cycles hampered sales due to customer frustration, which was compounded due to the fact that Cloudera's replacement personnel lacked the necessary legacy information and experience to book sales. These omitted material facts were significant such that, the Company's earnings conference call for its first full quarter as combined entity Cloudera revealed "headwinds in bookings from existing customers," "roughly flat" and "softer" bookings of the "largest accounts," and "increased" churn rate with a loss of small customers and "weakness" in sales for midsize customers, as well as "slip[ing]" renewals,

1    even securities analysts with business ties to the Company reacted negatively and investors sold off,

2    driving Cloudera's share price down by 45%, to less than half the Merger offering price.[138]

3    152.    Similarly, following the Class Period, interim CEO Defendant Cole acknowledged the

4    existential Class Period issues that Cloudera faced during the Class Period during a September 10,

5    2019 Deutsche Bank Technology Conference. There, in response to an analyst question from Deutsche

6    Bank analyst Karl Keirstead about the market shift away from Hadoop to cloud platforms, Defendant

7    Cole stated, *inter alia*, that: "I'm the new guy here but appreciate that. No, the – I mean I think the –

8    some of our challenges were *self-inflicted*. . . . As it relates to sort of the competitive pressures, the

9    merger was very powerful to create the [Hadoop] market leader on-premise, right? There really isn't

10   a player who could do what we do on-premise, which is a good market. Where we see challenges

11   would be for those customers who are moving workloads to the cloud where ***there's never even a***

12   ***competition***. Where we compete [*i.e.*, on-premise], we've got a good game. Where they just move

13   because a line of business says, 'Okay, I want to spin up an analytic workload,' ***we may never see***

14   ***that.***"[139] Given his concession that Cloudera "may never see" cloud customers even after CDP was

15   released, the Company certainly cannot now claim to have had such capabilities during the Class

16   Period.

17   153.    Mr. Keirstead then followed up, asking whether: "[t]hat stuff might go direct [Amazon]

18   AWS or [Microsoft] Azure . . ." and Defendant Cole conceded that: "[y]es. AWS, Azure and even on

19   increasing basis now, GCP. They may go direct to – a Databricks or Snowflake, thus with an Azure

20   or AWS. So ***that is a threat in terms of impacting growth*** rates versus an absolute impact on the

21   business *per se*. . . . [A]nd one of the reasons we ***needed to do this merger*** is neither company was in

22   a very strong position in the cloud. We both had offerings but they weren't easy to use. ***They didn't***

23   ***have that same take-up as a pure public cloud capability***."[140]

24

25   _____

26   [138]    Cloudera, Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 3, 6, 12.

27   [139]    Cloudera, Inc., Deutsche Bank Technology Conference Call (September 10, 2019), at 4.

28   [140]    Cloudera, Inc., Deutsche Bank Technology Conference Call (September 10, 2019), at 4-5.

154.    Then, on December 5, 2019, Cloudera held a conference call to discuss the Company's results for the third fiscal quarter 2020 for the period ended October 31, 2019. During the call, Defendant Cole responded to an analyst question concerning Cloudera's Class Period inability to compete with cloud vendors, stating, *inter alia*, that with CDP: "***[w]e now have a competing product. . . .*** Previously, customers were bifurcating workloads and say, 'Okay, ***we've got to find another product to go into the public cloud***. We like where you guys are on-prem, but you don't have the offering that we're looking for in terms of ease of use, consistency, security, governance, *et cetera*.'"[141]

155.    Because Cloudera and the Insider Defendants made their materially false and misleading statements either knowingly or with deliberate recklessness, the Insider Defendants' scienter, which Defendant Cole's concessions above in ¶¶ 152-154, *supra* acknowledge, an inference of corporate scienter against Cloudera is also adequately alleged.

**Materially False and Misleading Class Period Statements and Omissions[142, 143]**

**April 28, 2017 (IPO Prospectus)**

156.    The Class Period commences on April 28, 2017 with the filing of Cloudera's IPO Prospectus, which touted Cloudera's purported competitive advantages and growth opportunities in the cloud market with its focus on the largest businesses in the world that the Company described as the "Global-8000."[144] The IPO Prospectus represented that the Company: "will further expand our customer opportunity through the continued growth in use cases and packaged solutions, the expansion of our partner ecosystem and the proliferation of skills, driven by ease of use and accelerating adoption

---

[141]    Cloudera, Inc., Q3 2020 Earnings Conference Call (December 5, 2019).

[142]    The "Background & Overview of the Action" alleged in § II, *supra*, is incorporated by reference in throughout herein in § V.

[143]    Attached hereto as Exhibit A is a summary chart that complies with the Court's "Guidelines for Securities Class Action Cases."

[144]    Cloudera, Inc., IPO Prospectus (Form 424B4) (April 28, 2017), https://www.sec.gov/Archives/edgar/data/0001535379/000162828017004450/cloudera424b4.htm, at 2, 18, 43-44, 55, 57-58, 70, 84-85, 91, 95.

of the cloud" and that the Company was "only beginning to penetrate market opportunity with Global 8000 companies . . . ."[145]

157.    The IPO Prospectus also emphasized the Company's "land and expand" sales strategy, which Cloudera claimed enabled it to "use the initial sale as a foothold to increase revenue per customer by increasing the amount of data and number of use cases each customer runs through our platform."[146] Then, "[a]fter an initial purchase of our platform, we work with our customers to identify new use cases that can be developed on or moved to our platform, ultimately increasing the amount of data managed on our platform as well as the number and size of our platform deployments."[147] The Company explained that: "[w]e believe that, over time, as our customer base grows and a relatively higher percentage of [Cloudera's] subscription revenue is attributable to renewals or greater usage among existing customers relative to new customers, associated sales and marketing expenses and other allocated upfront costs as a percentage of revenue will decrease . . . ."[148]

158.    In achieving these goals, the IPO Prospectus misrepresented that Cloudera possessed a "cloud-native" platform, stating that: "[b]uilding on the approach of web-scale consumer internet companies, we have collaborated with the global open source community to innovate and ***deliver our cloud-native platform.***"[149] The IPO Prospectus added that a key element of its strategy was "extending our ***original cloud-native architecture***."[150] In addition, the IPO Prospectus claimed that Cloudera's Hadoop-based products could "compete favorably" against "public cloud providers who include proprietary data management, machine learning and analytics offerings, such as Amazon Web Services, Google Cloud Platform and Microsoft Azure."[151]

---

[145]    *Id*. at 2, 85.

[146]    *Id*. at 56-57.

[147]    *Id*. at 56.

[148]    *Id*. at 57.

[149]    *Id*. at 5, 89.

[150]    *Id*. at 7.

[151]    *Id*. at 15.

159.    At the time the statements were made, the terms "cloud-native platform" and "cloud-native architecture" meant to a reasonable investor that, respectively, such offerings and capabilities had specific core material attributes such as the use of containers, seamless scalability, security and elasticity. In describing its products in this manner, the Company concealed that it was then engaged in cloud washing, which is defined as the practice of taking legacy software and running it on the cloud, while calling it cloud-native. Cloud washing is the purposeful and sometimes deceptive attempt by a vendor to market an old product or service as a cloud product. However, merely placing and running a software on a cloud platform does not transform a technology into a cloud product as the software cannot dynamically expand or contract with a customer's needs.

160.    The highlighted statements in ¶¶ 158, *supra* were materially false and misleading when made because: (i) Cloudera did not possess a "cloud-native platform" or "cloud-native architecture" until the Company launched CDP for the public cloud in September 2019 and for the private cloud in August 2020; (ii) Cloudera and the Insider Defendants concealed that Cloudera's competitors' cloud technologies were vastly outperforming the Company's Hadoop platform, which the Company represented was cloud based; and (iii) as a result, Cloudera and the Insider Defendants materially misrepresented not only the Company's offerings, but the ability of its products to compete against those of large public cloud vendors like Microsoft, Google and Amazon. As Cloudera and the Insider Defendants were later forced to acknowledge after the Class Period, Cloudera's products were not "cloud-native" and they launched the CDP product to address this "competitive disadvantage."[152]

161.    Further supporting these allegations, after the Class Period, Defendants Reilly, Frankola, Cole, and Bearden conceded after the Class Period that the materially false and misleading Class Period statements alleged herein were made with, at a minimum, deliberate recklessness because: (i) Cloudera had to completely "***replatform***" into cloud-native architecture to address its "competitive disadvantage" against cloud providers like Microsoft, Amazon and Google, which

---

[152]    Cloudera, Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 3.

"replatforming" Defendant Reilly admitted on June 5, 2019 the Company "*didn't share earlier*";[153] (ii) given Cloudera's lack of "cloud-native" offerings, Defendant Reilly admitted on June 5, 2019 that Cloudera was "[not] really competitive against what the public cloud guys [were] offering" during the Class Period;[154] (iii) in September 2019, Defendant Cole acknowledged that the Merger was consummated because "neither company was in a very strong position in the cloud. We both had offerings *but they weren't easy to use*. They didn't have that same take-up as a *pure public cloud capability*,"[155] and that the Company's Class Period "challenges were self-inflicted";[156] (iv) in December 2019, Defendant Cole similarly conceded that, with CDP, "we *now* have a competing cloud product" and that, during the Class Period, there was "never even a competition" against Amazon's and Microsoft's cloud offerings;[157] (v) Mr. Murthy's two post-Class Period articles on Cloudera admitted that the Company lacked cloud-native products until the release of CDP in September 2019; (vi) on December 3, 2020, Cloudera's current CEO Defendant Bearden admitted that the Company "launched [its] cloud-native services . . . this fiscal year";[158] and (vii) on March 10, 2021, Defendant Bearden stated that: "in fiscal '21 . . . we delivered the industry's first cloud-native *hybrid and multi-cloud* data and analytics platform that meets the needs of large enterprise customers[.]"[159]

### June 8, 2017 (1Q18)[160]

162.    After market close on June 8, 2017, Cloudera filed a press release on Form 8-K with the SEC announcing Cloudera's financial results for the first quarter fiscal year 2018 for the period

---

[153]    *Id*. at 15.

[154]    *Id*. at 14.

[155]    Cloudera, Inc., Deutsche Bank Technology Conference Call (September 10, 2019), at 4-5.

[156]    *Id*. at 4.

[157]    Cloudera, Inc., Q3 2020 Earnings Conference Call (December 5, 2019).

[158]    Cloudera, Inc., Q3 2021 Earnings Conference Call (December 3, 2020), at 7.

[159]    Cloudera, Inc., Q4 2021 Earnings Conference Call (March 10, 2021), at 3.

[160]    Cloudera's fiscal year ends on January 31.

ended April 30, 2017. The following day, on June 9, 2017, the Company filed its 1Q18 results with the SEC on Form 10-Q, which Defendants Reilly and Frankola signed.

163.    The 1Q18 Quarterly Report represented that the Company's "competition" included "public cloud providers who include proprietary data management, machine learning and analytics offerings, such as Amazon Web Services, Google Cloud Platform and Microsoft Azure."[161] The 1Q18 press release also announced Altus during the quarter, highlighting that it is "our first Platform-as-a-Service offering – designed to deliver the speed, convenience and elasticity of public cloud infrastructure, easing the creation for Cloudera customers of new cloud workloads and accelerating the migration of existing workloads to Cloudera's platform running in the cloud."[162] Later that same day, Cloudera held its earnings conference call to discuss its quarterly results with the analysts during which Defendant Reilly stated that "Cloudera offers the *leading cloud native software platform* for machine learning and advanced analytics."[163]

164.    At the time the statements were made, the terms "cloud-native" and "cloud architecture" meant to a reasonable investor that, respectively, such offerings and capabilities had specific core material attributes such as the use of containers, seamless scalability, security and elasticity. In describing its products in this manner, the Company concealed that it was then engaged in cloud washing, which is defined as the practice of taking legacy software like Altus and running it on a cloud, while calling it cloud-native. Cloud washing is the purposeful and sometimes deceptive attempt by a vendor to market an old product or service as a cloud product. However, merely placing and running a software on a cloud platform does not transform a technology into a cloud product as the software cannot dynamically expand or contract with a customers' needs.

---

[161]    Cloudera, Inc., Q1 2018 Quarterly Report (Form 10-Q) (June 8, 2017), https://www.sec.gov/Archives/edgar/data/0001535379/000162828017006344/q1-18cldr10q.htm, at 40.

[162]    Cloudera, Inc., Press Release (Form 8-K, Ex. 99.1) (June 8, 2017), https://www.sec.gov/Archives/edgar/data/1535379/000162828017006322/q1fy18exhibit991.htm.

[163]    Cloudera, Inc., Q1 2018 earnings conference call (June 8, 2017), at 3.

165.    The highlighted statements in ¶ 163, *supra* were materially false and misleading when made for the added reasons that: (i) customers were rejecting Altus because it did not deliver the scalability, elasticity or ease of use of true cloud computing offerings; (ii) by describing it as "cloud-native software[,]" Cloudera and the Insider Defendants "cloud washed Altus"; (iii) Cloudera and the Insider Defendants concealed that Cloudera's competitors' cloud technologies were vastly outperforming the Company's Hadoop-focused platform; (iv) as Defendant Cole admitted in September 2019, Altus was not "easy to use" and lacked "pure public cloud capability";[164] (v) Cloudera did not possess any "cloud native software platform," let alone a "leading" one, until the Company launched CDP for the public cloud in September 2019; (vi) Cloudera and the Insider Defendants materially misrepresented the Company's product offerings and, therefore, ability to compete against the largest public cloud vendors such as Google, Amazon and Microsoft; and (vii) as a result, Cloudera and the Insider Defendants materially misrepresented Cloudera's operations and ability to compete against Amazon, Google and Microsoft. Further, Defendants were subsequently forced to acknowledge following the Class Period that their Class Period material misstatements and omissions were made, at a minimum, with deliberate disregard for the truth as alleged in ¶¶ 47-48, 52, 61-66, 76-80, 143-145, 147, 150-154, *supra*; *see also* 290-311, *infra*.

166.    Effective cloud computing features like elasticity, security and integrated support for streams and containerized applications were not competently built into Altus, rendering it almost immediately obsolete. As a result, the Company's attempts to release Altus repeatedly failed and even when it was finally released, the Company did not deploy any adequate sales engine behind it because Altus was recognized internally and by prospective customers who rejected it as extremely limited in functionality given its inability to dynamically scale to meet customers' needs or to compatibly scale in the infrastructure frameworks of cloud providers. As Cloudera's Chief Customer Officer – Anupam Singh – admitted after the Class Period, "[t]he customer experience with the second-generation

---

[164]    Cloudera, Inc., Deutsche Bank Technology Conference Call (September 10, 2019), at 4-5.

Hadoop [*i.e.*, Altus] solutions wasn't great."[165] In fact, Cloudera's own customers in critical markets were so dissatisfied with Cloudera's products, service and cost, they were building out their own data management solutions superior to what Cloudera offered. Furthermore, Cloudera's Senior Vice President of Engineering and Support, Daniel Sturman, who was responsible for developing Altus, left Cloudera shortly after the Merger given the Company's cloud washed offerings.[166] With no cloud offering to "complement" Hortonworks, the Company had to completely replatform into CDP, creating a new product with cloud architecture. In the meantime, customers did not renew but instead "mov[ed] to public cloud vendor's native house offerings."[167] Cloudera did not possess a cloud-native product during the Class Period, and it would not have one until it released CDP for the public cloud in September 2019.

**September 7 & 12, 2017 (2Q18)**

167.   After market close on September 7, 2017, Cloudera filed a press release with the SEC on Form 8-K announcing Cloudera's financial results for the second quarter fiscal year 2018 for the period ended July 31, 2017 ("2Q18"). On September 12, 2017, Cloudera filed its 2Q18 quarterly report on Form 10-Q with the SEC, which Defendants Reilly and Frankola signed.

168.   The 2Q18 Quarterly Report stated that its "competition" included "public cloud providers who include proprietary data management, machine learning and analytics offerings, such as Amazon Web Services, Google Cloud Platform and Microsoft Azure." In the 2Q18 press release, Defendant Reilly stated that: "[i]n Q2, we exhibited strong momentum in the areas that drive sustained growth for Cloudera: machine learning, analytics and the cloud." Later that same day, Cloudera held its earnings conference call to discuss its quarterly results with analysts where Defendant Reilly represented in pertinent part that:

---

[165]   Alex Woodie, *How Cloudera is Battling Shadow IT with CDP*, Datanami (October 4, 2019), https://www.datanami.com/2019/10/04/how-cloudera-is-battling-shadow-it-with-cdp/ (last accessed June 21, 2021).

[166]   Mr. Sturman's Gmail account was among those destroyed as a result of Cloudera's failure to preserve evidence. *See* ECF Nos. 224 and 224-2.

[167]   Cloudera, Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 15.

Our modern platform for machine learning and analytics is optimized for the cloud. We've invested substantially to allow customers to run on-premises or in the public cloud of their choice. Amazon, Microsoft and Google are all important platforms and partners. ***Having a cloud-native platform fits nicely with enterprises' desire to shift data and workloads to the cloud***, particularly analytic workloads because those workloads are elastic and transient in nature and because much of the new data that enterprises want to analyze is increasingly generated in the cloud.

The second quarter also ***saw growth in the adoption of Cloudera Altus***, our Platform-as-a-Service offering that enables data engineering and data science workloads ***to run natively and easily in the public cloud***. We handle deployment, management and operations. Customers concentrate on their data processing and analytic work. With Altus managed service and our unique cloud orchestration and operation software, we're now addressing a new set of elastic and transient jobs that would otherwise be impractical to run in the data center.

169.    At the time Defendants made these statements, "run natively and easily in the public cloud" meant to a reasonable investor that such an offering has specific material attributes such as the use of containers, seamless scalability, security and elasticity, which the Company lacked until it released CDP for the public cloud in September 2019 and for the private cloud in August 2020.[168] By describing its products in this manner, the Company concealed that it was then engaged in cloud-washing, which is defined as the practice of taking legacy software like Altus and running it on a cloud, while calling it cloud-native. Cloud washing is the purposeful and sometimes deceptive attempt by a vendor to market an old product or service as a cloud product. However, merely placing and running a software on a cloud platform does not transform a technology into a cloud product as the software cannot dynamically expand or contract with a customer's needs.

---

[168]    *See* Cloudera, Inc., Press Release *Cloudera Data Platform for Private Cloud is Now Available* (August 18, 2020), stating that: Cloudera, (NYSE: CLDR), the enterprise data cloud company, today announced the general availability of Cloudera Data Platform Private Cloud (CDP Private Cloud), https://www.cloudera.com/about/news-and-blogs/press-releases/2020-08-18-cloudera-data-platform-for-private-cloud-is-now-available.html, stating that: Cloudera, (NYSE: CLDR), the enterprise data cloud company, today announced the general availability of Cloudera Data Platform Private Cloud (CDP Private Cloud). CDP Private Cloud extends cloud-native speed, simplicity and economics for the connected data lifecycle to the data center, enabling IT to respond to business needs faster and deliver rock-solid service levels so people can be more productive with data."

170.    The highlighted statements in ¶ 168, *supra* were materially false and misleading when made for the added reasons that: (i) Cloudera lacked a "cloud native platform" and its products were not "optimized for the cloud" or "cloud orchestrat[ed]"; (ii) Altus was not cloud-native as it lacked the capabilities of "cloud-native architecture" and did not "run natively and easily in the public cloud"; (iii) Cloudera and the Insider Defendants concealed that Altus was cloud washed in order to claim that it enabled workloads to "run natively and easily in the public cloud"; and (iv) as a result, Cloudera and the Insider Defendants materially misrepresented Cloudera's offerings' ability to compete against those of the largest public cloud vendors such as Microsoft, Google and Amazon. Further, Defendants were subsequently forced to acknowledge following the Class Period that their Class Period material misstatements and omissions were made, at a minimum, with deliberate disregard for the truth as alleged in ¶ 47-48, 52, 61-66, 76-80, 143-145, 147, 150-154, *supra*; 290-311, *infra*.

171.    In addition, effective cloud computing features like elasticity, security and integrated support for streams and containerized applications were not competently built into Altus, rendering it almost immediately obsolete. As a result, contrary to Defendants' statement that customers were adopting Altus, attempts to release Altus repeatedly failed and even when it was finally released, the Company did not deploy any adequate sales engine behind it because Altus was recognized internally and by prospective customers who rejected it as extremely limited in functionality given its inability to dynamically scale to meet customer's needs or to compatibly scale in the infrastructure frameworks of cloud providers. As Cloudera's Chief Customer Officer – Anupam Singh – admitted after the Class Period, [t]he customer experience with the second-generation Hadoop [*i.e.*, Altus] solutions wasn't great."[169] In fact, Cloudera's own customers in critical markets were so dissatisfied with Cloudera's products, service and cost, they were building out their own data management solutions superior to what Cloudera offered. Furthermore, Cloudera's Senior Vice President of Engineering and Support, Daniel Sturman, who was responsible for developing Altus, left the Company shortly after the Merger.

---

[169]    Alex Woodie, *How Cloudera is Battling Shadow IT with CDP*, Datanami (October 4, 2019), https://www.datanami.com/2019/10/04/how-cloudera-is-battling-shadow-it-with-cdp/ (last accessed June 21, 2021).

When Cloudera revealed in its first full quarter as a combined Company that customers that were not renewing included a significant portion of customers "moving to public cloud vendors' native house offerings,"[170] Cloudera's stock price fell dramatically.

172.    Furthermore, contrary to Defendants' 2Q18 claim that Altus ran "natively and easily in the public cloud,"[171] Defendant Cole acknowledged in September 2019 that the Merger was consummated because "neither company was in a very strong position in the cloud. We both had offerings *but they weren't easy to use*. They didn't have that same take-up as a *pure public cloud capability* . . . ."[172] Thus, Cloudera did not have a cloud-native product during the Class Period, and it would not have a cloud-native product until it launched CDP in September 2019.

173.    Defendant Reilly also touted to investors in 2Q18 the fact that "[w]e analyze – we use big data ourselves to understand what drives expansions. *We know* which partners have the greatest impact. *We know* which applications drive the greatest use in key verticals. We train and go after those use cases."[173] During the same 2Q18 earnings call, Defendant Frankola added that:

> I'll reemphasize, one of the big things that we have been focusing on at Cloudera is Cloudera-on-Cloudera, using our own technology. So we have an internal data hub that is approaching a petabyte in size. We bring in all sorts of internal and external information, *which gives us insight in terms of what drives customer expansion*. We use the information literally to understand our cost of sales at an opportunity level. Therefore, it allows us to focus our energies in the right place, and where there are inefficiencies in our business, try to modify them pretty quickly.[174]

174.    Given this insight, Cloudera and the Insider Defendants made their materially false and misleading Class Period statements and omissions in ¶ 168, *supra* either knowingly or with deliberate recklessness as to the truth.

**September 15 & 28, 2017 (SPO)**

---

[170]    Cloudera, Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 15.

[171]    Cloudera, Inc., Q2 2018 Earning Conference Call (September 7, 2017), at 4.

[172]    Cloudera, Inc., Deutsche Bank Technology Conference Call (September 10, 2019), at 4-5.

[173]    Cloudera, Inc., Q2 2018 Earning Conference Call (September 7, 2017), at 11.

[174]    *Id*.

175.    On September 28, 2017, Cloudera filed its prospectus on Form 424B4 for the SPO, which represented that Cloudera possessed a "***cloud-native***" platform, stating in pertinent part: "[b]uilding on the approach of web-scale consumer internet companies, we have collaborated with the global open source community to innovate and ***deliver our cloud-native platform.***"[175] In discussing, its business strategy in the SPO Prospectus, Cloudera further stated that a key element of its strategy included "***extending our original cloud-native architecture*** . . . ."[176] The SPO Prospectus also stated that "[s]ince our initial public offering, we have continued to innovate and develop new technologies and solutions to extend our market leadership and enhance our platform for machine learning and analytics, optimized for the cloud. . . . Cloudera Altus is our platform-as-a-service (PaaS) offering. ***Altus is a cloud service*** . . . ."[177]

176.    At the time Defendants made this statement, "cloud-native" meant to a reasonable investor that such an offering has specific material attributes such as the use of containers, seamless scalability, security and elasticity. By describing its products in this manner, the Company concealed that it was then engaged in cloud washing, which is defined as the practice of taking legacy software like Altus and running it on a cloud, while calling it cloud-native. Cloud washing is the purposeful and sometimes deceptive attempt by a vendor to market an old product or service as a cloud product. However, merely placing and running a software on a cloud platform does not transform a technology into a cloud product as the software cannot dynamically expand or contract with a customer's needs.

177.    The statements highlighted in ¶ 175, *supra* were materially false and misleading for the added reasons that: (i) Cloudera lacked a "cloud native platform" or "cloud-native architecture" until its release of CDP in September 2019; (ii) Cloudera and the Insider Defendants concealed that Cloudera's competitors' cloud technologies were vastly outperforming the Company's Hadoop-based products; (iii) Altus was not a "cloud service" because it was not cloud-native and it lacked the ability

---

[175]    Cloudera, Inc., SPO Prospectus (Form 424B4) (September 28, 2017), https://www.sec.gov/Archives/edgar/data/0001535379/000162828017009498/cloudera424b4.htm, at 5, 88.

[176]    *Id*. at 7.

[177]    *Id*. at 7, 94.

to dynamically scale to meet customers' needs or to compatibly scale in the infrastructure frameworks of cloud providers; (iv) by describing it as a "cloud-native platform[,]" "cloud service[,]" and claiming it had "cloud-native architecture[,]" Cloudera and the Insider Defendants failed to disclose that Altus was cloud washed; and (iv) as a result, Cloudera and the Insider Defendants materially misrepresented Cloudera's product offerings and their ability to compete against the largest public cloud vendors such as Microsoft, Google and Amazon. Further, Defendants were subsequently forced to acknowledge following the Class Period that their Class Period material misstatements and omissions were made, at a minimum, with deliberate disregard for the truth as alleged in ¶¶ 47-48, 52, 61-66, 76-80, 143-145, 147, 150-154, *supra*; *see also* 290-311, *infra*.

178.    In addition, effective cloud computing features like elasticity, security and integrated support for streams and containerized applications were not competently built into Altus, rendering it almost immediately obsolete. As a result, attempts to release Altus repeatedly failed and even when it was finally released, the Company did not deploy any adequate sales engine behind it because Altus was recognized internally and by prospective customers who rejected it as extremely limited in functionality given its inability to dynamically scale to meet customers' needs or to compatibly scale in the infrastructure frameworks of cloud providers. As Cloudera's Chief Customer Officer – Anupam Singh – admitted after the Class Period, [t]he customer experience with the second-generation Hadoop [*i.e.*, Altus] solutions wasn't great."[178] In fact, Cloudera's own customers in critical markets were so dissatisfied with Cloudera's products, service and cost, they were building out their own data management solutions superior to what Cloudera offered. Furthermore, Cloudera's Senior Vice President of Engineering and Support, Daniel Sturman, who was responsible for developing Altus, left the Company shortly after the Merger. Cloudera had no cloud-native product during the Class Period, and it would not have a cloud-native product until it launched CDP in September 2019. Indeed, when Cloudera revealed in its first full quarter as a combined Company that customers that were not

---

[178]    Alex Woodie, *How Cloudera is Battling Shadow IT with CDP*, Datanami (October 4, 2019), https://www.datanami.com/2019/10/04/how-cloudera-is-battling-shadow-it-with-cdp/ (last accessed June 21, 2021).

renewing included a significant portion of customers "moving to public cloud vendors' native house offerings,"[179] Cloudera's stock price fell dramatically.

179.    The SPO was also suspiciously timed. The lock-up agreement in the IPO offering materials stated that: "[o]ur directors, executive officers, the holders of substantially all of our common stock and securities convertible into or exchangeable for our common stock have entered into lock-up agreements with the underwriters prior to the commencement of this offering pursuant to which each of these persons or entities, with limited exceptions, for a period of *180* days after the date of this prospectus, may not, without the prior written consent of Morgan Stanley & Co. LLC, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend or otherwise transfer or dispose of, directly or indirectly, any shares of our common stock or any securities convertible into or exercisable or exchangeable for our common stock."[180]

180.    The SPO offering materials further revealed that: "[i]n connection with our initial public offering, we, all of our directors and officers, and the holders of substantially all of our outstanding equity securities have agreed that, subject to certain exceptions, without the prior written notice of Morgan Stanley & Co. LLC ("Morgan Stanley") on behalf of the underwriters, we and they will not offer, sell, or agree to sell, transfer or dispose of, directly or indirectly, any shares of common stock without the permission of Morgan Stanley until *October 25, 2017*. Morgan Stanley, on behalf of the underwriters, has consented to the release of these lock-up restrictions with respect to 12,446,930 shares of common stock to be sold by the selling stockholders . . . ."[181]

---

[179]    Cloudera Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 15.

[180]    Cloudera, Inc., IPO Registration Statement (Form S-1) (March 31, 2017), https://www.sec.gov/Archives/edgar/data/0001535379/000162828017003221/projectthunders-1.htm, at 135. Lock-up agreements are designed to prevent company insiders from dumping their shares in the weeks and months following an IPO. Early investors, like Defendant Li, who bought into the Company early have a particularly strong incentive to sell their shares and realize a gain on their initial investment as quickly as possible after a "down round IPO" like Cloudera's.

[181]    Cloudera, Inc., SPO Prospectus (Form 424B4) (September 28, 2017), https://www.sec.gov/Archives/edgar/data/0001535379/000162828017009498/cloudera424b4.htm, at 141.

181.    The justification Cloudera provided for the early lock-up release was also suspicious – namely, that the Company wanted to use the proceeds from the SPO to pay taxes on employee stock incentive payments. As one industry observer aptly noted at the time, "[c]ouldn't they have anticipated the need for this when they filed for their IPO five months ago?" The answer is yes. The same article, titled *Cloudera stock drops as it files for follow-on offering and unveils new product* by Virginia Backaitis dated September 18, 2017, added that "[i]nvestors aren't keen on the news, ***Cloudera's stock price [ ] dropped below its IPO level***, despite the fact that its quarterly report indicated better than anticipated earnings . . . ."

182.    The SPO closed on October 2, 2017. In a press release that same day, the Company stated that "Cloudera sold 3,000,000 shares of common stock and the selling stockholders sold 12,446,930 shares of common stock upon full exercise of the underwriters' option to purchase additional shares of common stock. ***Cloudera did not receive any proceeds*** from the shares sold by existing stockholders."[182] The same press release added that "Cloudera intends to use the net proceeds from its sale in this offering to replace funds used to pay the tax withholding obligations Cloudera incurred upon the net settlement of certain equity awards, the settlement of which was concurrent with the pricing of this offering. In addition, this offering was intended to facilitate an orderly distribution of shares for the selling stockholders in this offering, including certain employees and investors."[183]

183.    In the SPO, Defendant Li sold a total of 6,528,862 shares of Company common stock for proceeds of approximately ***$103.1 million***. Defendant Li left the Company the following year. The SPO was designed to, and did, give the Company's insider a quick way to cash out before the bottom fell out. Defendant Olson sold 587,288 shares at $15.79 per share in the SPO, pocketing over ***$9.2***

---

[182]    Cloudera, Inc., Press Release *Cloudera Announces Closing of Follow-on Offering and Full Exercise of the Underwriters' Option to Purchase Additional Shares* (October 2, 2017), https://www.cloudera.com/about/news-and-blogs/press-releases/2017-10-02-cloudera-announces-closing-of-follow-on-offering-and-full-exercise-of-the-underwriters-option-to-purchase-additional-shares.html

[183]    *Id.*

*million*. Prior to the SPO, Defendants did not have any prior trading history because Cloudera had only just gone public in April 2017.

**December 7, 2017 (3Q18)**

184.    On December 7, 2017, Cloudera filed a press release with the SEC on Form 8-K announcing Cloudera's financial results for the third quarter fiscal year 2018 for the period ended October 31, 2017 ("3Q18"). On December 8, 2017, the Company filed its quarterly report on Form 10-Q with the SEC, which was signed by Defendants Reilly and Frankola.

185.    The 3Q18 Quarterly Report stated that Cloudera's "competition" included "public cloud providers who include proprietary data management, machine learning and analytics offerings, such as Amazon Web Services, Google Cloud Platform and Microsoft Azure."[184] During the Company's December 7, 2017 earnings conference call, Defendants Reilly and Olson discussed the strength and success of their claimed cloud-native platform, Altus. During the call, Defendant Reilly touted the Company's "***cloud-native platform***" which Defendant Olson reiterated, stating in relevant part: "Cloudera Altus Analytic DB is the first data warehouse cloud service that brings the warehouse to the data through a unique ***cloud-scale architecture*** that eliminates complex and costly data movement."[185]

186.    At the time Defendants made this statement, "cloud-native" and "cloud-scale architecture" meant to reasonable investors that such offerings had specific material attributes such as the use of containers, seamless scalability, security and elasticity. By describing its products in this manner, the Company concealed that it was then engaged in cloud washing, which is defined as the practice of taking legacy software like Altus and running it on a cloud, while calling it cloud-native. Cloud washing is the purposeful and sometimes deceptive attempt by a vendor to market an old product or service as a cloud product. However, merely placing and running a software on a cloud

---

[184]    Cloudera, Inc., Q3 2018 Quarterly Report (Form 10-Q) (December 8, 2017), https://www.sec.gov/Archives/edgar/data/0001535379/000162828017012249/q3-18cldr10q.htm, at 40.

[185]    Cloudera, Inc., Q3 2018 Earning Conference Call (December 7, 2017), at 4-5.

1  platform does not transform a technology into a cloud product as the software cannot dynamically

2  expand or contract with a customer's needs.

3      187.    In the days following the Company's 3Q2018 earnings announcements of December

4  7, 2017—during which Defendant Reilly touted, *inter alia*, its "cloud-native platform", Cloudera's

5  share price rose 4.3% between December 6 and December 12, 2017. On December 6, 2017, the stock

6  closed at $15.73, but buoyed by the earnings announcements reached highs of $17.25 before December

7  12, 2017. On December 12, 2017, Defendant Li and his venture capital firm Accel sold an additional

8  ***2,675,710*** shares of Cloudera common stock on the open market at an average price of ***$16.50 per***

9  ***share***, for proceeds exceeding ***$44.1 million***.

10      188.    The statements highlighted in ¶ 185, *supra* were materially false and misleading

11  because: (i) Cloudera lacked any "cloud-native platform" or "cloud-scale architecture" until its release

12  of CDP in September 2019; (ii) Cloudera's Hadoop-based products could not provide performance

13  comparable to its competitors' cloud offerings; (iii) by describing them as a "cloud-native platform"

14  and claiming they had "cloud-scale architecture[,]" Cloudera and the Insider Defendants concealed

15  that Altus was cloud washed; (iv) Cloudera and the Insider Defendants concealed that Cloudera's

16  competitors' cloud technologies were vastly outperforming the Company's Hadoop-focused platform;

17  and (v) as a result, Cloudera and the Insider Defendants materially misrepresented Cloudera's ability

18  to compete against the largest public cloud vendors such as Microsoft, Google and Amazon. Further,

19  Defendants were subsequently forced to acknowledge following the Class Period that their Class

20  Period material misstatements and omissions were made, at a minimum, with deliberate disregard for

21  the truth as alleged in ¶¶ 47-48, 52, 61-66, 76-80, 143-145, 147, 150-154, *supra*; 290-311, *infra*.

22      189.    In addition, effective cloud computing features like elasticity, security and integrated

23  support for streams and containerized applications were not competently built into Altus, rendering it

24  almost immediately obsolete. As a result, attempts to release Altus repeatedly failed and even when it

25  was finally released, the Company did not deploy any adequate sales engine behind it because Altus

26  was recognized internally and by prospective customers who rejected it as extremely limited in

27  functionality given its inability to dynamically scale to meet customers' needs or to compatibly scale

28

in the infrastructure frameworks of cloud providers. As Cloudera's Chief Customer Officer – Anupam Singh – admitted after the Class Period, [t]he customer experience with the second-generation Hadoop [*i.e.*, Altus] solutions wasn't great."[186] In fact, Cloudera's own customers in critical markets were so dissatisfied with Cloudera's products, service and cost, they were building out their own data management solutions superior to what Cloudera offered. Furthermore, Cloudera's Senior Vice President of Engineering and Support, Daniel Sturman, who was responsible for developing Altus, left the Company shortly after the Merger. Cloudera had no cloud offering during the Class Period, and it would not have a cloud-native product until it launched CDP in September 2019. Indeed, when Cloudera revealed in its first full quarter as a combined Company that customers that were not renewing included a significant portion of customers "moving to public cloud vendors' native house offerings,"[187] Cloudera's stock price fell dramatically.

190.    A short time later during the January 10, 2018 Citi Global TMT West Conference, Defendant Reilly again confirmed the extent to which he was a hands on manager, stating: (i) "I can actually determine or predict how much time we're spending on pursuing new opportunities versus expansions"; and (ii) "we are becoming very laser-focused on who are the new customers that we want to capture that have the greatest propensity not only to buy but to expand, and who are existing customers we want to apply our resources against because they should expand because we've seen other customers like them expand in the past."[188] Given these assurances, Defendant Reilly's materially false and misleading Class Period statements and omissions were made either knowingly or with deliberate recklessness as to the truth.

**April 3, 2018 (4Q18 and Fiscal Year 2018)**

---

[186]    Alex Woodie, *How Cloudera is Battling Shadow IT with CDP*, Datanami (October 4, 2019), https://www.datanami.com/2019/10/04/how-cloudera-is-battling-shadow-it-with-cdp/ (last accessed June 21, 2021).

[187]    Cloudera Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 15.

[188]    Cloudera, Inc., 2018 Citi Global TMT West Conference (January 10, 2018), at 6.

191.    After market close on April 3, 2018, Cloudera filed a press release with the SEC on Form 8-K announcing its fourth quarter and fiscal year 2018 results for the periods ended January 31, 2018. The FY 2018 press release announced disappointing revenue guidance for the first fiscal quarter of 2019 that was well below the consensus. Specifically, Cloudera forecasted total revenue in the range of $101 million to $102 million, $85 million to $86 million in subscription revenue, and a non-GAAP net loss per share in the range of $0.19 to $0.17 per share.

192.    On this news, the price of Cloudera's common stock fell $8.95 on unusually high trading volume from a closing price on April 3, 2018 of $22.24 to close on April 4, 2018 at $13.29 as the truth about the Company's competitive disadvantages in cloud began to emerge. The fiscal year 2018 press release further announced revenue guidance for fiscal year 2019. Specifically, Cloudera was forecasting total revenue in the range of $435 million to $445 million, $370 million to $375 million in subscription revenue, and negative $40 million to $35 million in operating cash flow. This was materially less than FY 2019 total revenue consensus of $460 million (27% year-over-year) and $388 million of subscription revenue (30% year-over-year).

193.    Cloudera held a conference call that same day to discuss its fourth quarter and full-year 2018 fiscal year results, during which Defendants Reilly and Olson reaffirmed Cloudera's fiscal performance and provided their outlook for the first quarter and full fiscal year 2019. Defendant Olson went on to suggest that the Company's Altus offering "***delivers the speed, convenience, elasticity and ease-of-use expected in native public cloud services. Altus is uniquely multicloud*** and multifunction, running on both AWS and Azure for data engineering and analytics."[189] In addition, Defendant Reilly suggested that the Company's weak guidance and results were due to "mistakes from where we directed our sales resources" and being "over-rotated."[190]

194.    At the time Defendants made this statement, "native public cloud" meant to reasonable investors that such offerings had specific material attributes such as the use of containers, seamless

---

[189]    Cloudera Inc., Q4 2018 Earnings Conference Call (April 3, 2018), at 4.

[190]    *Id.* at 15.

scalability, security and elasticity. Altus did not possess these attributes nor could Altus dynamically scale to meet customers' needs or compatibly scale in the infrastructure frameworks of cloud providers. Furthermore, Altus was not multicloud because it did not run easily and seamlessly across different public cloud service providers. A multi-cloud offering features cloud-based architecture that is engineered specifically to operate and scale dynamically to meet a customer's resource needs within each public cloud offering's architecture. By contrast, any software that supported virtual machines, unlike Altus, could operate across public cloud platforms. Altus could not provide the efficiency or cost benefits of dynamically scaling to meet resource needs.

195.    By describing its products in this manner, the Company concealed that it was then engaged in cloud washing, which is defined as the practice of taking legacy software like Altus and running it on a cloud, while calling it cloud-native. Cloud washing is the purposeful and sometimes deceptive attempt by a vendor to market an old product or service as a cloud product. However, merely placing and running a software on a cloud platform does not transform a technology into a cloud product as the software cannot dynamically expand or contract with a customer's needs.

196.    As a result, effective cloud computing features like elasticity, security and integrated support for streams and containerized applications were not competently built into Altus, rendering it almost immediately obsolete. As a result, attempts to release Altus repeatedly failed and even when it was finally released, the Company did not deploy any adequate sales engine behind it because Altus was recognized internally and by prospective customers who rejected it as extremely limited in functionality given its inability to dynamically scale to meet customers' needs or to compatibly scale in the infrastructure frameworks of cloud providers. As Cloudera's Chief Customer Officer – Anupam Singh – admitted after the Class Period, [t]he customer experience with the second-generation Hadoop [*i.e.*, Altus] solutions wasn't great."[191]

---

[191]    Alex Woodie, *How Cloudera is Battling Shadow IT with CDP*, Datanami (October 4, 2019), https://www.datanami.com/2019/10/04/how-cloudera-is-battling-shadow-it-with-cdp/ (last accessed June 21, 2021).

197.     In fact, Cloudera's own customers in critical markets were so dissatisfied with Cloudera's products, service and cost, they were building out their own data management solutions superior to what Cloudera offered. Furthermore, Cloudera's Senior Vice President of Engineering and Support, Daniel Sturman, who was responsible for developing Altus, left the Company shortly after the Merger. Cloudera had no cloud offering during the Class Period, and it would not have a cloud-native product until it launched CDP in September 2019. Indeed, when Cloudera revealed in its first full quarter as a combined Company that customers that were not renewing included a significant portion of customers "moving to public cloud vendors' native house offerings,"[192] Cloudera's stock price fell dramatically.

198.     In an effort to seek clarity about Defendant Reilly's attribution of Cloudera's poor guidance on sales resources "mistakes," Deutsche Bank analyst Karl Keirstead asked whether it was actually the result of end-market demand deterioration: "[a]re there emergence of any new rivals? Are old Cloudera use cases becoming less relevant?" Defendant Reilly quickly dismissed the questions, stating that:

> [T]he cloud is turning out to be a ***tremendous tailwind*** for us. While it introduces new competitors because each of the cloud guys has their own house offering, we have figured out how to win in that market and then stay focused on large enterprises who value our enterprise features around security, governance, [inaudible] you can't find in the public cloud house offerings who value our hybrid approach, our multi-cloud and, more importantly, our multi-function integrated capability. What I like to say to customers all the time is we are better than Amazon on Amazon. Our products on Amazon are integrated better and operate better than Amazon's own offerings. So – and we're seeing the move to the cloud take shape unlike it did 2 years ago. ***So I see nothing that gives me concern about the market.*** I just think we need – there's high expectations for us to be a high-growth company. And for us, we just had to be very facile on how we attack that market. ***No changes in the competitive landscape nor end market demand.***[193]

199.     By attributing the Company's poor quarterly results to a simple misalignment of sales resources, as opposed to the market's movement away from Cloudera's original Hadoop-based

---

[192]     Cloudera Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 15.

[193]     Cloudera Inc., Q4 2018 Earnings Conference Call (April 3, 2018), at 11.

architecture to cloud, Defendant Reilly's statements maintained the artificial inflation in the Company's share price.

200.    At the time he made this statement, Defendant Reilly was concerned about but turned a blind eye to the fact that end market demand was shifting away from Hadoop on-premise offerings to cloud because Cloudera had put in place cloud specialists, who solely focused on competing on the cloud. Indeed, Defendant Reilly later acknowledged during the Company's September 9, 2018 Citi Global Technology Conference that the Company incentivized its sales force to pursue cloud workloads in an attempt to prevent cloud vendors from "chipping away" at their customers.[194]

201.    Mizuho Securities analyst Abhey Lamba then asked Defendant Reilly about Cloudera's poor financial results who again blamed the Company's performance on sales strategy rather than Cloudera's products' positioning and competitive position in the marketplace, stating in relevant part that: "in Q4, to peel back, we fell short of our overall bookings goal. However, if you now peel that, we were satisfied with our new customer acquisition. It was in the expansion number where we fell short. And expansion is the larger part of our business because new customers start small, our expansion deals are more sizable. ***So we were just over-rotated.***"[195] By attributing the Company's lackluster results to being "over-rotated," as opposed to the market's shift to cloud offerings which the Company then lacked, Defendant Reilly's statements maintained the artificial inflation in the Company's share price.

202.    Defendant Reilly's and Olson's statements highlighted in ¶¶ 193, 198, 201 *supra* were materially false and misleading because: (i) Cloudera lacked any cloud-native architecture and thus, was not "multicloud" until its release of CDP in September 2019 and expanded it to Azure in November 2019 and Google Cloud in March 2021; [196] (ii) Altus could not "deliver the speed,

---

[194]    Cloudera, Inc., Citi Global Technology Conference (Sept. 9, 2018), at 4.

[195]    Cloudera, Inc., Q4 2018 Earnings Conference Call (April 3, 2018), at 15.

[196]    *See* Cloudera, Inc., Citi Global Technology Conference (Sept. 5, 2019) (Defendant Cole: "So we consciously made the decision saying they're the largest provider of public cloud services. Let's create this first release [of CDP] around the Amazon. We will then go to Azure, and then follow that

convenience, elasticity and ease-of use expected in native public cloud services" because as Defendant Cole admitted in September 2019, Altus was not "easy to use" and lacked "pure public cloud capability";[197,198] (iii) as a result, Cloudera's Hadoop-based products could not provide performance comparable to its competitors' cloud offerings; (iv) Cloudera did not compete in the public cloud market; (v) by describing it as "mutli-cloud" and claiming it operated with functions "expected in native public cloud services[,]"[199] Cloudera and the Insider Defendants cloud washed Altus; (vi) Cloudera and the Insider Defendants concealed that Cloudera's competitors' cloud technologies were vastly outperforming the Company's Hadoop-focused platform; (vii) Cloudera "replatformed" to launch CDP in September 2019 to compete with public cloud vendors' cloud-native products because there had been "changes in the competitive landscape [and] end market demand"[200]; (viii) the Company's disappointing guidance was not due to Cloudera being "over-rotated," but rather stemmed from Cloudera's products' weak competitive position against public cloud vendors, which, unbeknownst to investors, was why the Company was then engaged in an effort to replatform its operations into "cloud architecture"; and (ix) as a result, Cloudera and Defendants Reilly and Olson materially misrepresented Cloudera's offerings' ability to compete in the cloud market, including by claiming that "cloud is turning out to be a tremendous tailwind for us."[201] Further, Defendants were subsequently forced to acknowledge following the Class Period that their Class Period material

---

with Google."); *see also* Cloudera, Inc., Press Release "Cloudera Data Platform Available on Microsoft Azure" (Nov. 6, 2019), https://www.cloudera.com/about/news-and-blogs/press-releases/2019-11-06-cloudera-data-platform-available-on-microsoft-azure.html; Cloudera, Inc., Press Release "Cloudera Data Platform Available on Google Cloud" (March 31, 2021), https://www.cloudera.com/about/news-and-blogs/press-releases/2021-03-31-cloudera-data-platform-available-on-google-cloud.html.

[197]    Cloudera, Inc., Q4 2018 Earnings Conference Call (April 3, 2018), at 4; Cloudera, Inc., Deutsche Bank Technology Conference (Sept. 10, 2019), at 5.

[198]    Cloudera, Inc., Deutsche Bank Technology Conference Call (September 10, 2019), at 4-5.

[199]    Cloudera, Inc., Q4 2018 Earnings Conference Call (April 3, 2018), at 4.

[200]    *Id*.

[201]    *Id*.

misstatements and omissions were made, at a minimum, with deliberate disregard for the truth as alleged in ¶¶ 47-48, 52, 61-66, 76-80, 143-145, 147, 150-154, *supra*; 290-311, *infra*.

203.    Additionally, effective cloud computing features like elasticity, security and integrated support for streams and containerized applications were not competently built into Altus, rendering it almost immediately obsolete. As a result, attempts to release Altus repeatedly failed and even when it was finally released, the Company did not deploy any adequate sales engine behind it because Altus was recognized internally and by prospective customers who rejected it as extremely limited in functionality given its inability to dynamically scale to meet customers' needs or to compatibly scale in the infrastructure frameworks of cloud providers. As Cloudera's Chief Customer Officer – Anupam Singh – admitted after the Class Period, [t]he customer experience with the second-generation Hadoop [*i.e.*, Altus] solutions wasn't great."[202]

204.    Cloudera's own customers were so dissatisfied with Cloudera's products, service and cost, they were building out their own data management solutions superior to what Cloudera offered. Furthermore, Cloudera's Senior Vice President of Engineering and Support, Daniel Sturman, who was responsible for developing Altus, left the Company shortly after the Merger. With no cloud offering to "complement" Hortonworks, the Company had to completely replatform its core technology by creating a new product with cloud architecture. In the meantime, customers did not renew but instead "mov[ed] to public cloud vendor's native house offerings."[203] Cloudera did not possess a cloud-native product during the Class Period, and it would not have one until it released CDP for the public cloud in September 2019.

205.    Analysts subsequently downgraded Cloudera and lowered their price targets. In a published report titled, *More Questions than Answers as FY19 Guidance Weighs; Moving to Neutral*, J.P Morgan explained that Cloudera's FY 2019 guidance was "disappointing" and that "the changes

---

[202]    Alex Woodie, *How Cloudera is Battling Shadow IT with CDP*, Datanami (October 4, 2019), https://www.datanami.com/2019/10/04/how-cloudera-is-battling-shadow-it-with-cdp/ (last accessed June 21, 2021).

[203]    Cloudera Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 15.

Cloudera plans to implement in its go-to-market approach will take some time to bear fruit, while the slowdown in its [e]xpansion bookings will impact the narrative against a backdrop of solid recent results from software peers including MuleSoft and Red Hat."[204] Moreover, J.P. highlighted its "Key Takeaways" from the Company's announcements, including, *inter alia*: "1) P&L Results and Billings Fine in FQ4, But Expansion Bookings Softened . . . 2) Sales Execution Cited as the Issue, Rather than Competition or Technological Change . . . 3) FY19 Revenue Guidance Below Consensus as Planned Go-to-Market Changes are Expected to Produce Uneven 1H:19 Bookings . . . 4) Questions that may Linger Include: How Quickly is the Hadoop market moving to public clouds such as Amazon AWS? Are CLDR deployments reaching a new level of size & complexity (large-scale AI/ML etc) which is bogging down renewals? And has the IBM-HortonWorks agreement caused competitive ripples in the landscape? Bottom Line: After a period of YTD outperformance, we think CLDR shares will head back toward where they entered the year, and that it will take time for the investment narrative and sales execution to regain its footing. Neutral, $16 PT."[205]

206.    Deutsche Bank similarly downgraded Cloudera and lowered its price target from $23 to $18: "***on the risk that the culprit is not in fact sales focus*** (***as Cloudera explained***, that reps were too focused on new logos and not expansion opportunities) ***but rather an end market or demand shift that will take more time to recover from***."[206] Deutsche Bank explained that downside risks for Cloudera "include share losses to cloud vendors and other technologies and price pressure," noting that:

> Cloudera blamed 'mistakes in directing sales resources' to new logo adds rather than expansions of existing deals (Cloudera gave added new logo incentives and reps over-rotated) and to opportunities outside their target accounts. This has been brewing for a few quarters but we assumed Cloudera had it under control. This explanation seems reasonable, ***but the severity of the impact*** (the global Sales Head Vishal Rao is leaving, new ML/Cloud expertise to be added, FY19 deceleration to 24% subscription revs

---

[204]    See Mark R Murphy, *More Questions than Answers as FY19 Guidance Weighs; Moving to Neutral*, J.P. Morgan (April 4, 2018).

[205]    *Id.* (emphasis removed).

[206]    *See* Karl Keirstead, *Downgrade to a HOLD, Potential End Market Shifts*, Deutsche Bank Markets Research (April 4, 2018).

growth and just 14% billings growth) *hints at something bigger than sales rep focus*. We wonder if 'traditional' use case demand is flattening out or seeing price pressure and analytics workloads are moving to cheap AWS/Cloud options as new workload types such as machine learning (ML) take time to ramp. We'd rather not bank on a 2HF19 recovery until we get over these concerns. Near-term, note that the lockup on the next/last tranche of VC share distributions comes off in a few days (releasing 16m shares).[207]

207. In response to this news, and despite Defendants' misrepresentations which maintained the artificial inflation in the Company's share price, on April 4, 2018, Cloudera's stock price fell by $8.95 per share, or 40.24%, from its previous closing price of $22.24 per share on April 3, 2018 to close at $13.29 per share on extremely high trading volume that was in excess of 27.9 million shares.

**April 4, 2018 (2018 Annual Report)**

208. On April 4, 2018, Cloudera filed its 2018 Annual Report, which each of the Insider Defendants signed. The 2018 Annual Report represented that the Company has "developed the modern platform for machine learning and analytics, optimized for the cloud" and touted the Company's ability to: "continuously innovate in data management technologies and leverage the latest advances in infrastructure including the public cloud for 'big data' applications."[208] The Company also touted its ability to "enable enterprises' 'multi-cloud' strategies, allowing them to move workloads from the data center to the public cloud, among public cloud vendors, and back again, thus avoiding cloud lock-in. This flexibility allows customers to continually determine and implement the most cost-efficient strategies."[209]

209. The 2018 Annual Report also described the "Key elements" of Cloudera's strategy, including that the Company's "*original architecture was designed for the cloud. Our software platform runs natively on public cloud infrastructure* . . . " and that the Company's "competition" included "public cloud providers who include proprietary data management, machine learning and

---

[207]     *Id*.

[208]     Cloudera, Inc., 2018 Annual Report (Form 10-K) (April 4, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018004005/fy-18cldr10k.htm, at 4, 48.

[209]     *Id*. at 4.

analytics offerings, such as Amazon Web Services, Google Cloud Platform and Microsoft Azure."[210] The 2018 Annual Report also stated that: "[w]e continue to innovate and develop new technologies and solutions to extend our market leadership and enhance our platform for machine learning and analytics optimized for the cloud. Cloudera Altus is our platform-as-a-service (PaaS) offering. ***Altus is a cloud service*** . . . ."[211]

210.    The 2018 Annual Report made numerous other misstatements about the Company's offerings, including that: (i) provided "***[c]loud and*** on-premises deployment at scale and across hybrid cloud environments";[212] and (ii) permitted customers to "deploy, configure and monitor their clusters and workloads at scale from a centralized interface across any mix of public cloud or on-premises environments."[213] It further touted that Cloudera's product "***Altus is a cloud service*** that . . . enable[s] customers to address a new set of elastic and transient workloads that would otherwise be impractical to run in the datacenter," and highlighted its purportedly "ongoing performance in the areas of cloud," and commitment to "deliver the industry's first enterprise data cloud" and "[c]loud . . . deployment at scale."[214]

211.    At the time Defendants made these statements, "runs natively on public cloud infrastructure" and "cloud service" meant to a reasonable investor that such offerings had specific material attributes such as the use of containers, seamless scalability, security and elasticity. Cloudera's offerings including Altus did not possess any of the specific material attributes such as the use of containers, seamless scalability, security and elasticity. Moreover, contrary to the 2018 Annual Report's statements, the Company's original architecture was designed for Hadoop-based applications, not for the cloud. As a result, Altus was not a cloud service but was cloud washed (*i.e.*,

---

[210]    *Id*. at 9, 16.

[211]    *Id*. at 6.

[212]    *Id*. at 8.

[213]    *Id*.

[214]    *Id*. at 6, 8, 12.

1  legacy Hadoop-based software running on the cloud and not a cloud-native software designed to run

2  in the cloud).

3       212.   The statements highlighted in ¶¶ 208-211, *supra* were materially false and misleading

4  because: (i) Cloudera lacked any "cloud-native architecture" or "cloud-native infrastructure"; (ii)

5  Altus was not a "cloud service" nor was its "original architecture designed for the cloud" or "optimized

6  for the cloud" and by describing it as such, Cloudera and the Insider Defendants engaged in cloud

7  washing; (iii) Cloudera's Class Period offerings, including Altus, could not "deploy at scale" or allow

8  customers to "deploy, configure and monitor their clusters and workloads at scale" because as

9  Defendant Cole admitted in September 2019, Altus was not "easy to use" and lacked "pure public

10 cloud capability";[215] (iv) Cloudera would not have a "multicloud" offering until it released CDP in

11 September 2019 and expanded it to Azure in November 2019 and Google Cloud in March 2021; (v)

12 Cloudera's Hadoop-based products could not provide performance comparable to its competitors'

13 cloud offerings; (vi) Cloudera and the Insider Defendants concealed that Cloudera's competitors'

14 cloud technologies were vastly outperforming the Company's Hadoop-focused platforms; and (vii) as

15 a result, Cloudera and the Insider Defendants materially misrepresented Cloudera's ability to compete

16 against public cloud vendors such as Microsoft, Google and Amazon. As the Insider Defendants were

17 later forced to acknowledge on June 5, 2019, Cloudera's products were not "cloud-native" and they

18 launched CDP to address this "competitive disadvantage."[216] Further, Defendants were subsequently

19 forced to acknowledge following the Class Period that its Class Period material misstatements and

20 omissions were made, at a minimum, with deliberate disregard for the truth for the reasons set forth in

21 ¶¶ 47-48, 52, 61-66, 76-80, 143-145, 147, 150-154, *supra*; 290-311, *infra*.

22      213.   In addition, effective cloud computing features like elasticity, security and integrated

23 support for streams and containerized applications were not competently built into Altus, rendering it

24 almost immediately obsolete. As a result, attempts to release Altus repeatedly failed and even when it

25

26

---

27 [215]   Cloudera, Inc., Deutsche Bank Technology Conference Call (September 10, 2019), at 4-5.

28 [216]   Cloudera Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 14-15.

was finally released, the Company did not deploy any adequate sales engine behind it because Altus was recognized internally and by prospective customers who rejected it as extremely limited in functionality given its inability to dynamically scale to meet customers' needs or to compatibly scale in the infrastructure frameworks of cloud providers. As Cloudera's Chief Customer Officer – Anupam Singh – admitted after the Class Period, [t]he customer experience with the second-generation Hadoop [*i.e.*, Altus] solutions wasn't great."[217] In fact, Cloudera's own customers in critical markets were so dissatisfied with Cloudera's products, service and cost, they were building out their own data management solutions superior to what Cloudera offered. Furthermore, Cloudera's Senior Vice President of Engineering and Support, Daniel Sturman, who was responsible for developing Altus, left the Company shortly after the Merger. Cloudera had no cloud offering during the Class Period, and it would not have a cloud-native product until it launched CDP in September 2019. Indeed, when Cloudera revealed in its first full quarter as a combined Company that customers that were not renewing included a significant portion of customers "moving to public cloud vendors' native house offerings,"[218] Cloudera's stock price fell precipitously.

**June 6, 2018 (1Q19)**

214.    After market close on June 6, 2018, Cloudera filed a press release on Form 8-K[219] with the SEC announcing Cloudera's financial results for the first quarter of fiscal year 2019 for the period ended April 30, 2018, and its quarterly report filed with the SEC on Form 10-Q, which Defendants Reilly and Frankola signed.[220]

---

[217]    Alex Woodie, *How Cloudera is Battling Shadow IT with CDP*, Datanami (October 4, 2019), https://www.datanami.com/2019/10/04/how-cloudera-is-battling-shadow-it-with-cdp/ (last accessed June 21, 2021).

[218]    Cloudera Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 15.

[219]    Cloudera, Inc., Press Release (Form 8-K, Ex. 99.1) (June 6, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018007647/q1-19cldrexhibit991.htm.

[220]    Cloudera, Inc., Q1 2019 Quarterly Report (Form 10-Q) (June 6, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018007661/q1-19cldr10q.htm.

215.    The 1Q19 Quarterly Report identified Cloudera's "competition" as including "public cloud providers who include proprietary data management, machine learning and analytics such as Amazon Web Services, Google Cloud Platform and Microsoft Azure." The 1Q19 press release announced disappointing revenue guidance for the second quarter of fiscal 2019. Specifically, Cloudera forecasted total revenue in the range of $107 million to $108 million, $90 million to $91 million in subscription revenue, and a non-GAAP net loss per share in the range of $0.15 to $0.13 per share.

216.    Later that same day, Cloudera held its earnings conference call to discuss its quarterly results with analysts. During the call, Defendant Reilly misrepresented that "[i]n many respects, we've led this market. We've continued to mature our innovative technology into a platform that is highly performing and operates in a hybrid and multi-cloud world. As a result, today we have hundreds of large enterprise customers managing many petabytes of structured and unstructured data on-premises and in the cloud."[221] Defendant Reilly again boasted that a client was "taking advantage *of our cloud-native architecture* to improve agility to respond to ever-changing data volume and business needs."[222] At the time Defendants made these statements, "cloud-native architecture" meant to a reasonable investor the use of containers, seamless scalability, security and elasticity.

217.    During the call, Defendant Reilly fielded a question from Deutsche Bank analyst Karl Keirstead regarding Cloudera's ability to compete with public cloud vendors: "you mentioned that you'd like to improve your win rates against the house offerings of the cloud vendors. I presume you're referring to services like EMR and Redshift on AWS and maybe BigQuery on GCP. I'm just wondering if you could summarize – maybe this is partly a question for Mike as well. What are the *functionality gaps* against – that those house offerings have that Cloudera can sort of take advantage of and move up the stack and improve your win rates over time?" Defendant Reilly misleadingly responded that: "[w]hen we are competing in the cloud, we have so many advantages. Our #1

---

[221]    Cloudera, Inc., Q1 2019 Earnings Conference Call (June 6, 2018), at 3, 5.

[222]    *Id*. at 3, 5.

1    disadvantage is awareness of our capabilities, and that's what we're ramping up with our general

2    manager machine learning, our marketing team to create awareness. And we think we'll compete very

3    effectively."[223]

4        218.    The statements highlighted above in ¶¶ 215-217, *supra* were materially false and

5    misleading because: (i) Cloudera lacked any "cloud-native architecture" and would not have such an

6    offering until the Company launched CDP in September 2019; (ii) by claiming its offerings had

7    "cloud-native architecture[,]" Cloudera and the Insider Defendants were engaging in cloud washing

8    (*i.e.*, obscuring that the Company was running its Hadoop-based technology on the cloud); (iii)

9    Cloudera did not have advantages "when competing in the cloud" or over public cloud vendors'

10    offerings, and failed to disclose that its largest disadvantage was that the Company lacked cloud-native

11    capabilities such as the use of containers, seamless scalability, security and elasticity; (iv) Defendant

12    Reilly knew or was reckless in not knowing that Cloudera's products lacked cloud-native capabilities

13    as he was then leading negotiations with Hortonworks regarding a potential combination to gain the

14    scale and resources to launch a cloud-native product to effectively compete with the public cloud

15    vendors, which he finally revealed on the last day of the Class Period; (v) the Company's "#1

16    disadvantage" was not "its awareness of [its] capabilities"; (vi) Cloudera did not compete in the public

17    cloud market; and (vii) as a result, Cloudera and the Insider Defendants materially misrepresented

18    Cloudera's ability to compete against cloud vendors such as Microsoft, Google and Amazon. Further,

19    Defendants were subsequently forced to acknowledge following the Class Period that their Class

20    Period material misstatements and omissions were made, at a minimum, with deliberate disregard for

21    the truth for the reasons set forth in ¶¶ 47-48, 52, 61-66, 76-80, 143-145, 147, 150-154, *supra*; 290-

22    311, *infra*.

23        219.    In a research report issued following the Company's June 6, 2018 announcements,

24    Deutsche Bank noted that: "[a]fter the big guidance reset last quarter that weighed on the stock,

25    expectations were low heading into this print as most investors concluded that ***the culprit was not a***

---

[223]    *Id*. at 11.

*short-term sales issue but rather an end market shift that will take time to recover from*. This print reinforced that view, as Cloudera focused less on sales execution and more on the demand shifts (primarily customer interest in analytics alternatives from AWS and other cloud vendors) . . . ."

220.    On June 6, 2018, Defendant Reilly, who at the time was also serving as acting head of sales,[224] again publicly reaffirmed that he and Cloudera management: "track every compete, and then we evaluate win-loss, no-decision type things. So we're tracking our cloud win rates relative to our on-prem traditional win rates."[225] Notably, based on this internal data, Cloudera altered its marketing and sales strategy to refocus their "land and expand" sales strategy. Specifically, Defendant Reilly stated in April that the Company "still expended too much of our valuable selling resources pursuing customers outside that market. *I know* because we use our own technology to analyze sales activity."[226]

**September 5, 2018 (2Q19)**

221.    After market close on September 5, 2018, Cloudera filed a press release with the SEC on Form 8-K announcing Cloudera's financial results for the second quarter fiscal year 2019 for the period ended July 31, 2018 ("2Q19"). Later that same day, Cloudera held its earnings conference call to discuss its quarterly results with analysts. The following day, on September 6, 2018, the Company filed its quarterly report on Form 10-Q with the SEC, which Defendants Reilly and Frankola signed.

222.    The 2Q19 Quarterly Report identified Cloudera's "competition" as including "public cloud providers who include proprietary data management, machine learning and analytics offerings, such as Amazon Web Services, Google Cloud Platform and Microsoft Azure."[227] The 2Q19 press release announced that Cloudera had introduced Cloudera Data Warehouse which it represented as "a

---

[224]    *See* Cloudera, Inc., Q4 2018 Earnings Conference Call (April 4, 2018); *see also* Cloudera, Inc., Citi Global Technology Conference Call (September 9, 2018).

[225]    Cloudera, Inc., Q1 2019 Earnings Conference Call (June 6, 2018), at 12.

[226]    Cloudera, Inc., Q4 2018 Earnings Conference Call (April 3, 2018), at 5.

[227]    Cloudera, Inc., Q2 2019 Quarterly Report (Form 10-Q) (September 6, 2019), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018011639/q2-19cldr10q.htm, at 40.

modern data warehouse for self-service analytics, built with a hybrid ***cloud-native architecture*** that handles 50PB data workloads and enables hybrid compute, storage, and control for workload portability across public clouds and enterprise data centers."[228]

223.    During the call, Defendant Olson stated that Cloudera's offerings were "tailored to compete directly in this major market shift" in data warehousing, representing: "[h]ere's what we're introducing. Cloudera Data Warehouse is a modern data warehouse for self-service analytics. Let me define modern data warehouse and why it's important in this world of exploding data and the Internet of Things. ***It's a cloud-native architecture.***"[229] Defendant Olson further represented that the Company's data warehousing offerings run natively across public cloud platforms and on-premise and as such, were more competitive than public cloud vendors. Olson did so in responding to Deutsche Bank analyst Karl Keirstead's question regarding Cloudera's competitive standing against Snowflake, a cloud-based platform also seeking to disrupt legacy data warehouse industry, stating in relevant part: "So, No. 1, Cloudera is hybrid. Our customers want to run on-prem and in the public cloud. We let them do that. Cloud-only vendors like Snowflake don't. We're zero copy . . . . [I]f you've got data in the public cloud, you're storing it in Amazon S3 buckets or in ADLS. You don't want to copy it into a proprietary store where it's locked up and only available to Snowflake. ***We operate natively on those stores***, so you don't need to make multiple copies of your data."[230] During the same call, Defendant Reilly added that Cloudera's cloud-native data warehousing products were able to run-natively across public cloud vendors' offerings , stating: "[w]ith a modern architecture for on-premises deployments and ***being cloud-native for public cloud infrastructure*** and platforms with service implementations, we believe we have the right set of solutions for the next phase of the data warehouse industry."[231]

---

[228]    Cloudera, Inc., Press Release (Form 8-K, Ex. 99.1) (September 5, 2018), https://www.sec.gov/Archives/edgar/data/1535379/000162828018011619/q2-19cldrexhibit991.htm.

[229]    Cloudera, Inc., Q2 2019 Earnings Conference Call ( Sept. 5, 2018), at 7.

[230]    *Id*. at 18.

[231]    *Id*. at 10.

224.    At the time Defendants made these statements, "cloud-native" and "cloud-native architecture" meant to reasonable investors that such offerings had specific material attributes such as the use of containers, seamless scalability, security and elasticity. By describing its products as such, the Company was then engaged in "cloud washing," which is defined as the practice of taking legacy software like Altus and Cloud Data Warehouse and running it on a cloud, while calling it cloud-native. Cloud washing is the purposeful and sometimes deceptive attempt by a vendor to market an old product or service as a cloud product. However, merely placing and running a software on a cloud platform as Cloudera did with Altus does not transform a technology into a cloud product as the software cannot dynamically expand or contract with a customer's needs.

225.    The statements highlighted in ¶¶ 222-223, *supra* were materially false and misleading for the added reasons that: (i) Cloudera lacked any "cloud-native architecture" and was not "cloud-native for public cloud infrastructure" until its release of CDP in September 2019; (ii) by claiming that its platform "operate[d] natively on those [public cloud] stores[,]" Defendants were engaging in cloud washing; (iii) Cloudera's Hadoop-based products could not provide performance comparable to its competitors' cloud offerings; (iv) Cloudera and the Insider Defendants concealed that Cloudera's competitors' cloud offerings were vastly outperforming the Company's Hadoop-focused platforms; and (vi) as a result, the Insider Defendants materially misrepresented Cloudera's ability to compete against the largest public cloud vendors such as Microsoft, Google and Amazon. Further, Defendants were subsequently forced to acknowledge following the Class Period that their Class Period material misstatements and omissions were made, at a minimum, with deliberate disregard for the truth for the reasons set forth in ¶¶ 47-48, 52, 61-66, 76-80, 143-145, 147, 150-154, *supra*; 290-311, *infra*.

226.    During the Company's September 7, 2018 Citi Global Technology Conference, Defendant Reilly acknowledged that the Company was plagued with sales turnover and that he was serving as acting head of sales given the disruption. Such turnover in 2018 included Cloudera's Chief Revenue Officer, VP of Sales for the Americas, Head of Sales for Europe, the Middle East, and Africa, Senior Vice President of Worldwide Sales, and several other key management and executive sales positions (*e.g.*, Regional Directors of Sales). Nevertheless, Defendant Reilly misleadingly represented

that the disruption was "behind us."[232] Defendant Reilly, however, knew or recklessly disregarded that the Company was in the midst of merger discussions with Hortonworks and that the impetus for the Merger was to "get more resources, more scale so that we can deliver a competitive cloud offering and replatform into cloud architecture[.]"[233]

227.    During the same conference, Defendant Reilly further highlighted the extent to which they closely monitored customer churn stating in relevant part that: "we're able now to track all of our customers through these phases, what our churn rates are, what our graduation rates are, what our average tenures are."[234] Defendant Reilly added that he was deeply involved as a hands on manager in Cloudera's attempts to provide a cloud product because Cloudera: "put[s] in place cloud specialists, who solely focus on competing on the cloud" such that "[they] are learning how to go up against the cloud vendors head on against their house offerings."[235] Given these assurances and Defendant Reilly's role as acting head of sales, Defendant Reilly's materially false and misleading Class Period statements and omissions were made either knowingly or with deliberate recklessness at to the truth.

**October 3, 2018 (Merger Registration Statement)**

228.    At the time of the Merger, Cloudera was suffering from material adverse facts that were omitted from the Merger Registration Statement and Prospectus for the Merger. The Company's platforms were technologically deficient and obsolete because Cloudera in fact had no cloud product. In the year prior to the Merger, the Company's sales force repeatedly raised these issues in internal business review meetings. The discussions included customer non-renewals due to the Company's failure to provide a cloud product or due to customers simply taking their needs in-house since Cloudera's product was inferior, irrelevant and/or more costly than in-house solutions, and the inability to sell a cloud product because the Company's purported cloud product, "Altus," was so poor it was rejected by all but a small fraction of customers. As Cloudera's Chief Customer Officer –

---

[232]    Cloudera, Inc., Citi Global Technology Conference Call (September 7, 2018), at 3.

[233]    Cloudera, Inc., Q1 2020 Cloudera Inc. Earnings Conference Call ( June 5, 2019), at 11.

[234]    Cloudera, Inc., Citi Global Technology Conference Call (September 7, 2018), at 2.

[235]    *Id*. at 4.

Anupam Singh – admitted after the Class Period, [t]he customer experience with the second-generation Hadoop [*i.e.*, Altus] solutions wasn't great."[236]

229.    Hobbled from lack of a management response to issues repeatedly discussed in the internal business reviews, the Company's sales force and related management suffered from 50% turnover in the year leading up to the Merger. Because Cloudera's sales cycle was complicated and often required costly workarounds to adapt the Company's cloud washed Altus product, Cloudera's sales cycles lasted at least 4 months and commonly a year to 18 months, or longer. The loss of sales personnel in the middle of new sales cycles and sales expansion cycles hampered sales due to customer frustration with the Company's non-cloud offerings. This was compounded by virtue of the fact that Cloudera's replacement sales personnel lacked the necessary legacy information and experience to finalize sales. With no cloud product to "complement" those of Hortonworks, significant customer churn and lengthy sales cycles occurred. The touted Merger "synergies" were nonexistent, and the consequences of these omitted material adverse trends began to emerge within the shortest length of Cloudera's sales cycle – just three to six months after the Merger.

230.    On October 3, 2018, Cloudera and Hortonworks held a joint conference call to announce the Merger, during which Defendant Reilly represented that:

> We expect and I expect 100% of our customers to take advantage of cloud technology, both on-prem and in the public cloud. Today, Cloudera has 26% of our customers who are already working in that hybrid-type environment, and we expect that to go to 100% of our combined entity. A cloud technology brings significant advantages. ***Our underlying platform, both what Hortonworks is delivering and ours is cloud native technology,*** and it flourishes in cloud compute environments so we're very excited about accelerating our capabilities there.[237]

---

[236]    Alex Woodie, *How Cloudera is Battling Shadow IT with CDP*, Datanami (October 4, 2019), https://www.datanami.com/2019/10/04/how-cloudera-is-battling-shadow-it-with-cdp/ (last accessed June 21, 2021).

[237]    Cloudera, Inc., Cloudera and Hortonworks Merger Conference Call Transcript (Form 425) (October 3, 2018), https://www.sec.gov/Archives/edgar/data/1535379/000162828018012306/cldr425calltranscript10318.htm, at 14.

231.    At that time, the terms "cloud-native" meant to reasonable investors that such offerings or capabilities had specific material attributes such as the use of containers, ease-of-use, seamless scalability, security and elasticity, none of which the Company's Class Period product offerings provided.

232.    During the same conference call, Defendant Frankola touted the business combination, stating that it would create "sales and growth on day one."[238] He added that the Merger would "unlock powerful synergies," and assured investors that the "important point is that the day the merger closes, we will have significant scale and growth."[239] To further promote the Merger, Defendant Reilly appeared on a live interview with *CNBC's* Jim Cramer for his show "Mad Money" on October 5, 2018, where he went so far as to suggest that the Merger would transform Cloudera into the "next Oracle of the future."[240] Instead, as alleged in ¶¶ 29, 32, 79, *supra* it transformed Cloudera into the latest fraudulent Silicon Valley "unicorn" who went public at shareholder expense and to benefit the Company's insiders, only to be taken private a short time later again in disgrace. An article published on The Information titled *Requiem for Cloudera and What It Means for Confluent IPO* and dated June 1, 2021, reported that the ***"[n]ext time you feel the urge to buy stock of a fast-growing enterprise software company, remember Cloudera."***

233.    The Company's Annual Report for its fiscal year ending January 31, 2018, which was incorporated by the Merger Registration Statement similarly made numerous material misstatements about the Company's product offerings and current prospects, including that: (i) its "***original architecture was designed for the cloud***"; (ii) "***run[] natively on public cloud*** infrastructure"; and (iii) Cloudera could "leverage the latest advances in infrastructure ***including the public cloud*** for 'big

---

[238]    *Id*. at 8.

[239]    *Id*.

[240]    Mad Money, *Cloudera CEO: Next Oracle?*, CNBC TV, https://www.youtube.com/watch?v=kioFA8V8KtE, at 05:12 (last accessed June 21, 2021). Oracle consummated its IPO in 1986.

data' applications."[241] The Annual Report also represented that Cloudera's platform: (i) provided "*[c]loud and* on-premises deployment at scale and across hybrid cloud environments"; and (ii) permitted customers to "deploy, configure and monitor their clusters and workloads at scale from a centralized interface across any mix of public cloud or on-premises environments."[242] The Merger Registration Statement further touted that "*Altus is a cloud service* that . . . *enable[s] customers to address a new set of elastic and transient workloads* that would otherwise be impractical to run in the datacenter," and highlighted its purportedly "ongoing performance in the areas of cloud," and commitment to "deliver the industry's first enterprise data cloud" and "[c]loud . . . deployment at scale."[243]

234.    At the time Defendants made these statements, "run natively on public cloud" and "cloud architecture" meant to reasonable investors that such offerings had specific material attributes such as the use of containers, seamless scalability, security and elasticity. By describing its products in this manner, the Company concealed that it was then engaged in cloud washing, which is defined as the practice of taking legacy software and running it on the cloud, while calling it cloud-native. Cloud washing is the purposeful and sometimes deceptive attempt by a vendor to market an old product or service as a cloud product. However, merely placing and running a software on a cloud platform as Cloudera did with its Class Period offerings does not transform a technology into a cloud product as the software cannot dynamically expand or contract with a customer's needs.

235.    The statements highlighted above in ¶ 233, *supra* were materially false and misleading because: (i) Cloudera's "original architecture was [not] designed for the cloud" or "run natively on public cloud infrastructure" nor would it until the Company launched CDP in September 2019; (ii) Cloudera's Hadoop-based products did not provide public cloud performance comparable to its competitors' offerings or "leverage the latest advances" in public cloud infrastructure; (iii) Cloudera's

---

[241]    Cloudera, Inc., 2018 Annual Report (Form 10-K) (April 4, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018004005/fy-18cldr10k.htm, at 4, 9, 48.

[242]    *Id*. at 8.

[243]    *Id*. at 6, 12.

Class Period offerings, including Altus, could not "deploy[] at scale" or allow customers to "deploy, configure and monitor their clusters and workloads at scale" because as Defendant Cole admitted in September 2019, Altus was not "easy to use" and lacked "pure public cloud capability;[244] (iv) by claiming that its offerings possessed such attributes, Cloudera and Insider Defendants were engaged in cloud washing (*i.e.*, obscuring that the Company was running its Hadoop-based technology on the cloud); (v) Cloudera and the Insider Defendants concealed that Cloudera's competitors' cloud offerings were vastly outperforming the Company's Hadoop-based platforms; (vi) as a result, Cloudera and the Insider Defendants materially misrepresented Cloudera's ability to compete against the largest public cloud vendors such as Microsoft, Google and Amazon; (vii) the primary reason for the Merger was that Cloudera was then having difficulty generating organic growth; and (viii) the touted benefits of the Merger were materially overstated.

236.    Defendants later tacitly admitted in June 2019 that Cloudera's products were not "cloud-native" and that they belatedly designed CDP to address this "competitive disadvantage."[245] Further, Defendants were subsequently forced to acknowledge following the Class Period that their Class Period material misstatements and omissions were made, at a minimum, with deliberate disregard for the truth as alleged in ¶¶ 264-311, *supra*. In addition, effective cloud computing features like elasticity, security and integrated support for streams and containerized applications were not competently built into Altus, rendering it almost immediately obsolete. As a result, attempts to release Altus repeatedly failed and even when it was finally released, the Company did not deploy any adequate sales engine behind it because Altus was recognized internally and by prospective customers who rejected it as extremely limited in functionality given its inability to dynamically scale to meet customers' needs or to compatibly scale in the infrastructure frameworks of cloud providers. As Cloudera's Chief Customer Officer – Anupam Singh – admitted after the Class Period, [t]he customer

---

[244]    Cloudera, Inc., Deutsche Bank Technology Conference Call (September 10, 2019), at 4-5.

[245]    Cloudera, Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 15.

experience with the second-generation Hadoop [*i.e.*, Altus] solutions wasn't great."[246] In fact, Cloudera's own customers in critical markets were so dissatisfied with Cloudera's products, service and cost, they were building out their own data management solutions superior to what Cloudera offered. Furthermore, Cloudera's Senior Vice President of Engineering and Support, Daniel Sturman, who was responsible for developing Altus, left the Company shortly after the Merger. With no cloud offering to "complement" Hortonworks, the Company had to completely replatform by creating a new product with cloud architecture. In the meantime, Customers did not renew but instead moved to public cloud vendors' offerings. Cloudera did not possess a cloud-native product during the Class Period, and it would not have one until it released CDP for the public cloud in September 2019.

237.    The Merger Registration Statement further asserted that Cloudera's purported cloud expertise buttressed its "land and expand" sales and growth strategy, stating: "[a]fter an initial purchase of our platform, we work with our customers to identify new use cases that can be developed on or moved to our platform, ultimately increasing the amount of data managed on our platform as well as the number and size of our platform deployments."[247] The Merger Registration Statement claimed that the Merger would: (i) "create a major cross-selling opportunity in the near term";[248] (ii) "expand[] addressable market";[249] and (iii) "improve Cloudera's . . . existing ability to expand customer relationships and increase the penetration of new customer accounts,"[250] such that Cloudera

---

[246]    Alex Woodie, *How Cloudera is Battling Shadow IT with CDP*, Datanami (October 4, 2019), https://www.datanami.com/2019/10/04/how-cloudera-is-battling-shadow-it-with-cdp/ (last accessed June 21, 2021).

[247]    Cloudera, Inc., 2018 Annual Report (Form 10-K) (April 4, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018004005/fy-18cldr10k.htm, at 49.

[248]    Cloudera, Inc., Cloudera and Hortonworks Merger Conference Call Transcript (Form 425) (October 3, 2018), https://www.sec.gov/Archives/edgar/data/1535379/000162828018012306/cldr425calltranscript10318.htm, at 7.

[249]    Cloudera, Inc., Q3 2019 Earnings Conference Call (Form 425) (December 5, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018014834/cldr42512618.htm, at 5.

[250]    Cloudera, Inc., Merger Prospectus (Form 424B3) (November 27, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018014620/cloudera424.htm, at 2, 64.

1    would "use the initial sale as a foothold to increase revenue per customer by increasing the amount of

2    data and number of use cases each customer runs through our platform."[251]

3        238.    Defendants knew going into the Merger that they lacked cloud products and that end

4    market demand was shifting away from their Hadoop-based products to public cloud offerings (*see*

5    *e.g.*, ¶¶ 271-278, *supra*). Defendants nevertheless touted these purported benefits though they knew

6    the underlying reason for the Merger was to allow the Company to garner enough resources to quickly

7    build a product with cloud-architecture and attempt to slow customer migration to competitors' cloud

8    products. As Defendant Reilly would later admit, on the last day of the Class Period, the impetus for

9    the merger was for Cloudera "to get more resources, more scale so that we can deliver a competitive

10   cloud offering and ***replatform into cloud architecture, and that's why we did the merger.***"[252]

11       239.    The statements highlighted in ¶¶ 230, 233, 237, *supra* were materially false and

12   misleading because: (i) the Company's Hadoop-based platforms were technologically uncompetitive

13   against cloud products; (ii) Cloudera's customers, including its largest customers, were not

14   "expanding" but were canceling and/or delaying renewals while their in-house engineering teams

15   independently learned to perform the same functions and provide the same services that Cloudera

16   offered; (iii) as a result, by the time of the Merger on January 3, 2019, Cloudera's bookings were

17   already deteriorating, and customer churn was swelling. Indeed, Cloudera revealed on June 5, 2019

18   that the Company was suffering from "headwinds in bookings from existing customers," "roughly

19   flat" and "softer" bookings of "large accounts," and "increased" churn rate with a loss of small

20   customers and "weakness" in sales for midsize customers, as well as "slip[ing]" renewals, driving

21   Cloudera's stock price downward by 40.8%, to less than half the Merger price.[253]

22       240.    The Merger Registration Statement similarly represented that Cloudera's existing

23   technology as part of the "combined company" could "create the leading enterprise data platform built

---

[251]    Cloudera, Inc., 2018 Annual Report (Form 10-K) (April 4, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018004005/fy-18cldr10k.htm, at 48.

[252]    Cloudera, Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 11.

[253]    *Id*. at 3, 6, 12.

on modern open source data management, data warehousing, machine learning, advanced analytics and IoT markets across hybrid, public, private and multi-cloud environments."[254] In a call discussing the merger incorporated into the Merger Registration Statement, Cloudera and characterized "Altus" as a "complementary" "Cloud" product and asserted the "complementary product[]" would create "Powerful Synergies" for "Revenue."[255] Defendant Reilly further stated Cloudera's "cloud technology bring[s] significant advantages," had "tremendous capabilities," and the Company's "underlying platform" consisting of "***cloud native technology*** . . . flourishes in cloud compute environments so we're very excited."[256]

241.    At the time Defendants made this statement, "cloud native technology" meant to reasonable investors that such offerings had specific material attributes such as the use of containers, seamless scalability, security and elasticity. By describing its products as such, the Company was then engaged in "cloud washing," which is defined as the practice of taking legacy software and running it on the cloud, while calling it cloud-native. Cloud washing is the purposeful and sometimes deceptive attempt by a vendor to market an old product or service as a cloud product. However, merely placing and running a software on a cloud platform as Cloudera did with its Class Period offerings does not transform a technology into a cloud product as the software cannot dynamically expand or contract with a customer's needs.

242.    The statements highlighted in ¶ 240, *supra* were materially false and misleading because: (i) Cloudera lacked cloud-native technology, and Cloudera was losing existing and prospective customers because Cloudera's Hadoop-focused platforms were neither scalable, elastic nor cost-effective; (ii) by describing its offerings to investors in this manner, Cloudera and the Insider Defendants were engaged in cloud washing (*i.e.*, obscuring that the Company was running its Hadoop-

---

[254]    Cloudera, Inc., Amendment No. 1 (Form S-4/A) (November 16, 2018), https://www.sec.gov/Archives/edgar/data/1535379/000162828018014468/clouderas-4a1full.htm, at 65.

[255]    Cloudera, Inc., Cloudera and Hortonworks Merger Conference Call Transcript (Form 425) (October 3, 2018), https://www.sec.gov/Archives/edgar/data/1535379/000162828018012306/cldr425calltranscript10318.htm, at 14, 24.

[256]    *Id*. at 14.

based technology on the cloud); and (iii) Cloudera's customers, including its largest customers, were refusing to renew contracts because they could perform the same or superior functionality at lower prices. Finally, while the Merger Registration Statement stated that the Company's "original architecture was designed for cloud," in truth its Hadoop-focused architecture was originally designed for on-premise data warehousing and management that was not "optimized for the cloud."[257] Further, Defendants were subsequently forced to acknowledge following the Class Period that their Class Period material misstatements and omissions were made, at a minimum, with deliberate disregard for the truth for the reasons set forth in ¶¶ 47-48, 52, 61-66, 76-80, 143-145, 147, 150-154, *supra*; 290-311, *infra*.

243.    An October 6, 2018 article by Matthew Lodge on *VentureBeat.com* called *Cloudera and Hortonworks Merger Means Hadoop's influence is declining* reported that the new "megatrend is the shift to public cloud" and away from Hadoop because "cloud storage economics are crushing Hadoop storage costs." He added that "[c]ompanies of all sizes are increasing their adoption of AWS [Amazon Web Services], [Microsoft] Azure and Google cloud services at the expense of on-premises infrastructure and software" provided by companies like Hortonworks and Cloudera. As a result, according to Mr. Lodge, "[i]ronically, there has been no Cloud Era for Cloudera."

244.    On October 8, 2018, Defendant Olson sent Cloudera employees an internal email about the Merger where he acknowledged that: "what drives this transaction more than anything else – is that our ***main competition to displace legacy solutions has shifted to the cloud vendors***."[258] Defendant Olson also detailed how Amazon, Microsoft, and Google were each then increasing their "aim to win business from large enterprise buyers," and the level of competition had already increased as other vendors, such as Snowflake, "are also increasingly important in our competitive battles."[259] This fact

---

[257]    Cloudera, Inc., 2018 Annual Report (Form 10-K) (April 4, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018004005/fy-18cldr10k.htm, at 4-6, 8-9, 48.

[258]    Cloudera, Inc., Olson Internal Email (Form 425) (October 9, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018012368/cldr42510918.htm.

[259]    *Id.*

further substantiates that Cloudera and the Insider Defendants knew, or turned a blind eye to the fact, that the Company was already facing a severe threat from public cloud vendors no later than October 2018 due to Cloudera's complete lack of any cloud offerings. Just six months prior, Defendant Reilly assured investors on April 3, 2018, that he then saw "nothing" that gave him "concern about the market."[260] No wonder he got canned.

245.    On June 5, 2019, by contrast, Defendant Reilly finally disclosed that Cloudera consummated the Merger because, in truth, it **_needed_** to, stating: "[w]e saw the **_need_** to get more resources, more scale **_so that we can_** deliver a competitive cloud offering and **_replatform_** into cloud architecture, and that's why we did the merger. And so Cloudera now has the resources, the scale, the employees, the engineers to **_very quickly replatform_** our business."[261] Further, and again, while the Osborne Effect provides that prematurely discussing future, unavailable products damages sales of existing products, Defendants nevertheless tried to suggest that the Company's announcement of CDP in March 2019 somehow "unexpectedly" "caused some customers to wait until [CDP's] release to renew and expand their agreements."[262] An incredulous Craig-Hallum analyst then asked Defendant Reilly on June 5, 2019: "I can't imagine their data growth is slowing, their workload expansion is slowing, their analytics investment is slowing. How can they afford to wait [for CDP] . . . ? Are they just shifting those workloads off your platform? Is that what's **_really_** going on?" Defendant Reilly simply responded that: "we saw a number of opportunities get taken by the public cloud guys."[263]

**December 5, 2018 (3Q19)**

246.    After market close on December 5, 2018, Cloudera filed a press release with the SEC on Form 8-K announcing its third quarter fiscal year results for the period ended October 31, 2018. On December 6, 2018, the Company filed its quarterly report on Form 10-Q with the SEC, which Defendants Reilly and Frankola signed.

---

[260]    Cloudera, Inc., Q4 2018 Earnings Conference Call (April 3, 2018), at 11.

[261]    Cloudera, Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 11.

[262]    *Id*. at 3-4.

[263]    *Id*. at 9.

247.    The 3Q19 quarterly report identified Cloudera's "competition" as including "public cloud providers who include proprietary data management, machine learning and analytics offerings, such as Amazon Web Services, Google Cloud Platform and Microsoft Azure."[264] Cloudera held a conference call later that day to discuss its financial results and, during the call, Needham analyst Jon Andrews inquired whether Cloudera's data warehouse "strategy is still intact in terms of the combined company or how you're thinking about that particular initiative that you'd outlined several months ago." Defendant Reilly responded that the "strategy and initiative is alive, well and growing extremely well . . . . Our Altus Data Warehouse is particularly designed to capture these migrations that want to move to the cloud, where you see a company like Snowflake or Amazon's Redshift traditionally serving those cloud markets, but we have strong competitive advantages in data warehousing. So first and foremost, we offer the only data warehouse that combines both SQL and machine learning against a shared data experience. None of the other players are doing that today. Secondly, we offer it in a hybrid fashion so you can do it both on-premise or in the public cloud . . . . We believe data warehouse workloads are naturally going to land on our platform, and we're well positioned to capture those."[265]

248.    Later during the same call, Craig Hallum analyst Chad Bennett sought further clarity about Cloudera's competitive position against public cloud vendors, asking: "[c]an you just provide more color on how – I think the big trepidation here is net new is going to kind of fall off a map because they're just going to bypass you and move straight to the cloud guys. Just kind of any color on how you're winning deals and how the hybrid pitch is resonating, more detail?" Defendant Reilly responded that:

> If you look 2 years ago, enterprises were trying to figure out what this public cloud thing was, and they were spending time with the AWS' of the world, understanding those platforms and going right to public cloud. Large enterprises that moved to the public cloud just 2 years ago are wanting to move off public cloud. They do not like the cost. They do not like the lock-in that it poses. They suddenly are stuck with one public cloud provider, and all it has to offer. And so they're moving workloads back into private cloud or across multiple clouds to avoid that lock-in and have leverage over

---

[264]    Cloudera, Inc., Q3 2019 (Form 10-Q) (December 6, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018014845/q3-19cldr10q.htm, at 40.

[265]    Cloudera, Inc., Q3 2019 Earnings Conference Call (December 5, 2018), at 17.

those infrastructure costs. What we hear from customers, public cloud is just the new hardware for them. If a complete stack was going to win the market, then Oracle plus Sun would have won a long time ago in the data center. It's not what customers want. They want the flexibility and they want this hybrid enterprise cloud capability. Now I'll talk – in the quarter, we won 63 new customers. ***Customers are coming to our platform, all of them are evaluating cloud,*** and ***it's our hybrid cloud capabilities are winning*** . . . . ***And so it is – we are uniquely positioned to run where our customers want to run and give them a lot of flexibility.***[266]

249.    Contrary to Defendant Reilly's statements during the December 5, 2018 earnings call, Cloudera lacked true-hybrid cloud offering. A hybrid cloud offering is a cloud-native offering available for the public and private cloud over the internet and on-premises. Rather, Cloudera's offerings were legacy Hadoop-based software running on the cloud, incapable of providing the ease of use and dynamic scalability of a true cloud product. Indeed, Cloudera revealed that the Company only recently introduced a hybrid cloud offering during its March 10, 2021 fourth quarter fiscal year 2021 ("4Q21") earnings conference call wherein the Company's current CEO Defendant Bearden stated: "please note that there's no year-over-year growth comparison for CDP ***as we've only had hybrid cloud offerings in the market for a few months***."[267] Accordingly, Defendants' statements that Cloudera possessed "cloud-native" and "hybrid offerings" years earlier through the Class Period between April 2017 and June 2019 were therefore verifiably false given that the Company acknowledged that, as of 4Q21 on March 10, 2021, the Company only had hybrid cloud offerings in the market "for a few months" now.[268]

250.    The statements highlighted in ¶¶ 247-248, *supra* were materially false and misleading because: (i) Cloudera lacked "hybrid cloud capabilities" and as a result, did not have any "strong competitive advantages" in cloud; (ii) by describing its offerings to investors in this manner, Cloudera and the Insider Defendants were engaged in cloud washing (*i.e.*, obscuring that the Company was running its Hadoop-based technology on the cloud); (iii) as Defendant Cole admitted after the Class

---

[266]    *Id*. at 19.

[267]    Cloudera, Inc., Q4 2021 Earnings Conference Call (March 10, 2021), at 2.

[268]    *Id*.

Period, Cloudera's Hadoop-based products lacked the capability to provide cloud functions; (iv) the primary reason for the Merger was that Cloudera was then having difficulty generating organic growth; (v) the touted benefits of the Merger were materially overstated and the necessity of the Merger was concealed; and (vi) as a result, the Insider Defendants materially misrepresented Cloudera's Hadoop-based products' ability to compete in the cloud market. Further, Defendants were subsequently forced to acknowledge following the Class Period that their Class Period material misstatements and omissions were made, at a minimum, with deliberate disregard for the truth as alleged in ¶¶ 47-48, 52, 61-66, 76-80, 143-145, 147, 150-154, *supra*; 290-311, *infra*.

251.    On December 6, 2018, Cloudera participated in the Barclays Global Technology, Media and Telecommunications Conference. During the conference question and answer portion, cloud industry experts repeatedly asked about Cloudera's Hadoop-platform and origins. In response, an exasperated and frustrated Defendant Reilly misleadingly explained that momentum for Cloudera's offerings had increased, and even relied on the Company's ***name*** itself to deflect criticism about the Company's offerings, stating in relevant part:

> This is a 10-year story, so Cloudera is 10 years old. ***We're called Cloudera*** because when we started, we started with the original Hadoop project, we offered it as a cloud service on Amazon Web Services in 2008 and software, okay? ***That's why we're called Cloudera***. In 2008, there were no buyers in the cloud. And so we spent the next few years making this cloud software fit into data centers, okay? Along comes Amazon and takes our open-source bids and offers a thing called Elastic MapReduce, and that was the public cloud in our space. And they were just cheaper, faster, but they weren't innovating. They were just offering it cheaper and pre-provisioned. So that was a tough battle for us, right, because we had to, kind, of cover that flank off. ***The market has now moved to us because we offer a hybrid capability***, right, so we run on-prem, bare metal, we run increasingly on private cloud, which we think customers are really driving and ***we're hybrid and multi-cloud***, okay? Now what's the proof? What did Amazon announce this week? Amazon Outpost. Amazon is now offering its on-premise capability to close off their weakness in hybrid, and it's a validation of our strategy. And we already have hybrid capabilities that they have to develop, they've never really innovated in their space. And then, we're going to have multi-cloud. So we're taking it to them, ***momentum has shifted in our favor*** and increasingly will go that way.[269]

---

[269]    Cloudera Inc., Barclays Global Technology, Media and Telecommunications Conference, (December 6, 2018), at 3-4.

252.    The statements highlighted in ¶ 251, *supra* were materially false and misleading because: (i) momentum had not shifted to Cloudera's favor at this time because Altus was uncompetitive against the public cloud vendors' offerings; (ii) the market was abandoning Cloudera due to the limitations of its legacy-Hadoop platform; and (iii) as a result, the Insider Defendants materially misrepresented Cloudera's ability to compete against the largest public cloud vendors such as Microsoft, Google and Amazon. Defendants were subsequently forced to acknowledge following the Class Period that their Class Period material misstatements and omissions were made, at a minimum, with deliberate disregard for the truth as alleged in ¶¶ 47-48, 52, 61-66, 76-80, 143-145, 147, 150-154, *supra*; 290-311, *infra*.

253.    Furthermore, contrary to Defendant Reilly's representation, Cloudera did not have a true hybrid-cloud or multi-cloud offering because its platform was not cloud-native or based in cloud-architecture. In fact, contrary to Reilly's assertion the Company was "called Cloudera" because it offered Hadoop "as a cloud service," Cloudera Product Manager Jairam Rananathan described that "Cloudera was initially founded with the name Cloudera because it was the ***expectation that we would be a cloud based company,***" and that "[w]e changed our mind in 2009 because apparently ***the Cloud business was not quite there yet.***"[270] Further, Defendant Bearden admitted during the March 10, 2021 earnings conference call that Cloudera only recently began offering hybrid and multi-cloud with its introduction of CDP: "[I]n fiscal '21 . . . ***we delivered the industry's first cloud-native hybrid and multi-cloud data and analytics platform*** that meets the needs of large enterprise customers."[271] In other words, Cloudera's Class Period offerings were merely cloud washed (*i.e.*, legacy Hadoop based software running on the cloud unable to dynamically scale to the needs of the Company's customers).

**March 13, 2019 (4Q19 and Fiscal Year 2019)**

---

[270]    Strata+Hadoop World, *Cloudera's Jairam Ranganathan on the Rapidly Changing Hadoop Ecosystem*, YOUTUBE (May 15, 2015, available), https://www.youtube.com/watch?v=26_-ogwxa3E. 07:50-08:00 (last accessed June 17, 2021).

[271]    Cloudera, Inc., Q4 2021 Earnings Conference Call (March 10, 2021), at 3.

254.    After market close on March 13, 2019, Cloudera filed a press release filed with the SEC on Form 8-K announcing its fourth quarter and fiscal year 2019 results for the periods ended January 31, 2019. The fiscal year 2019 press release announced revenue guidance for the first quarter 2020, forecasting total revenue in the range of $187 million to $190 million, $154 million to $156 million in subscription revenue, and a non-GAAP net loss per share in the range of $0.25 to $0.22 per share. This was significantly lower than the first quarter 2020 consensus of $223 million for total revenue and $184 million of subscription revenue. On this news, the price of Cloudera's common stock fell $2.90 on unusually heavy trading volume from its March 13, 2019 closing price of $14.61 to a closing price on March 14, 2019 of $11.71, as the truth about the Company's operations continued to emerge.

255.    The fiscal year 2019 press release further announced revenue guidance for fiscal year 2020, forecasting total revenue in the range of $835 million to $855 million, $695 million to $705 million in subscription revenue, and negative $40 million to negative $30 million in operating cash flow. This was vastly lower than the consensus of $968 million for total revenue and $801 million of subscription revenue. Specifically, the fiscal year 2019 press release stated:

The outlook for fiscal 2020, ending January 31, 2020, is:

- Total revenue in the range of $835 million to $855 million, representing approximately 76% year-over-year growth
- Subscription revenue in the range of $695 million to $705 million, representing approximately 72% year-over-year growth[272]

256.    Cloudera held a conference call later that day to discuss its fourth quarter and full-year 2019 fiscal year results, during which Defendants reaffirmed Cloudera's fiscal performance during these periods and discussed their outlook for the first quarter and full fiscal year 2020. Cloudera also announced CDP, which Defendant Reilly explained would be launched for the public cloud in the

---

[272]    Cloudera, Inc., Press Release *Cloudera Reports First Quarter Fiscal 2021 Financial Results* (Form 8-K, Ex. 99.1) (June 3, 2020), https://www.sec.gov/Archives/edgar/data/1535379/000162 828019002873/q4-19cldrexhibit991.htm.

second half of 2019 and the private cloud in 2020. Defendant Frankola further announced Cloudera's

disappointing guidance for the merged company for the first-fiscal quarter and full-year 2020:

> I will conclude by providing initial guidance for fiscal Q1 and for fiscal 2020 as well as an update on our near-term model. Before getting into numbers, I want to share some longer-term perspective on how the merger is incorporated in our projections and how we are handling merger-related uncertainty. As reflected in our strong results, the merger did not significantly impact Hortonworks or Cloudera businesses in the fourth quarter. However, as expected, we do see the merger impacting the first half of fiscal year '20, as we integrate the field and roll out new products. We are pleased that despite the effects of this merger, we believe that adjusted ARR growth for Q4 2020 will be in the range of 18% to 21%. ARR growth in Q2 and Q3 may be slightly lower due to the actions we are taking in the first half of the year to integrate the 2 companies.

> We expect Q1 total revenue to be between $187 million and $190 million and subscription revenue to be between $154 million and $156 million. Net loss per share is projected to be $0.25 to $0.22 based on 271 million weighted average shares outstanding.

> For fiscal year 2020, we expect total revenue to be between $835 million and $855 million, representing approximately 76% growth, with subscription software revenue in the range of $695 million to $705 million, up approximately 72% year-over-year. Again, we expect Q4 fiscal year '20 ARR growth of 18% to 21%.[273]

257.    In a research note issued that day, D.A. Davidson noted that, despite the negative news, it remained optimistic because: "[i]mportantly, Cloudera has not seen any major changes in the competitive environment, which we know remains a concern for investors." At the time, Cloudera had already consummated the Merger and announced CDP to try to limit its "competitive disadvantage" against legitimate cloud vendors' cloud-native offerings. In addition, Cloudera and the Insider Defendants either knew or were deliberately reckless in not knowing that, with the announcement of CDP, the Osborne Effect would accelerate the already negative impact the Company's operations was experiencing in its first quarter as a combined Company.

258.    During the March 13, 2019 conference call, Barclays analyst David Rainville asked who Defendant Reilly saw as Cloudera's main competitors. Defendant Reilly baselessly claimed that, as a result of the Merger, its "#1 competitor" was Amazon, stating:

---

[273]    Cloudera, Inc., Q4 2019 Earnings Conference Call (March 13, 2019), at 8.

And now, who's our #1 competitor? It's Amazon. And we quickly – just even in Q1 as we look at our competitive road map, it's – not Amazon the company. Amazon is a partner, but it's Amazon's house offerings in the data management analytics space. And we believe we are well positioned to compete against them because our value proposition is to be a enterprise data cloud company, giving our customers a multi-cloud, hybrid cloud fashion is one enduring differentiator and then our capabilities from Edge – our capabilities – our integrated capabilities from the Edge to AI, we're the only company that's offering that today, and so ***we feel very strong that market is moving in our direction around the hybrid multi-cloud, and then our functionality is best-in-class***.[274]

259.    The statements highlighted in ¶¶ 256-258, *supra* were materially false and misleading because: (i) Cloudera's Hadoop-based platform could not provide public cloud performance comparable to its competitors' offerings; (ii) Cloudera did not offer a cloud offering because its platform was not cloud-native or based in cloud-architecture; (iii) Cloudera and the Insider Defendants concealed that Cloudera's competitors' cloud technologies were vastly outperforming the Company's Hadoop-focused platform; (iv) momentum had not shifted to Cloudera's favor at this time because CDP would not be launched until the second half of 2019; and (v) as a result, Cloudera and the Insider Defendants materially misrepresented Cloudera's ability to compete in the cloud market, let alone accurately claim Amazon was its "#1 competitor." Further, Defendants were subsequently forced to acknowledge following the Class Period that their Class Period material misstatements and omissions were made, at a minimum, with deliberate disregard for the truth as alleged in ¶¶ 47-48, 52, 61-66, 76-80, 143-145, 147, 150-154, *supra*; 290-311, *infra*.

260.    Cloudera's products were so deficient and obsolete that existing and prospective customers were rejecting them. Indeed, as Cloudera's Chief Customer Officer – Anupam Singh – admitted after the Class Period, "[t]he customer experience with the second-generation Hadoop [i.e., Altus] solutions wasn't great."[275] In truth, Cloudera had no cloud offering to "complement" Hortonworks. In fact, Cloudera's own customers in critical markets were so dissatisfied with

---

[274]    Cloudera, Inc., Q4 2019 Earnings Conference Call (March 13, 2019), at 11.

[275]    Alex Woodie, *How Cloudera is Battling Shadow IT with CDP*, Datanami (October 4, 2019), https://www.datanami.com/2019/10/04/how-cloudera-is-battling-shadow-it-with-cdp/ (last accessed June 21, 2021).

Cloudera's products, service and cost, they were building out their own data management solutions superior to what Cloudera offered. With no cloud product to "complement" the products of Cloudera's merger partner, the Company had to reinvent a new cloud product. In the meantime, customers did not renew because there was no cloud product and prospective customers rejected the Company. Indeed, when the Company announced it was working on a new cloud product in its March 2019 earnings call, and deficiencies in Cloudera's platform were thereafter revealed by customers to securities analysts just two months after the Merger, Cloudera's stock price dropped as Cloudera investors sold the Company's shares in droves.

261. In mid-March 2019, Deutsche Bank analysts attended Gartner's annual analytics/BI event in Orlando, Florida where customers and partners met to discuss their technology/choices for data analytics. The Deutsche Bank report issued following that event included comments from several Cloudera customers concluding that "[t]he ***feedback on Cloudera was negative . . . .***" Specifically, the Deutsche Bank report quoted the customers they spoke to about Cloudera's products – including Altus – who stated (a) that Cloudera's products were "not useful. We call it our ***data swamp***"; (b) "[w]e have a commercial distribution of Cloudera [ ] we're going to ***shut it down***"; (c) "[w]e did have Cloudera on-premise. We technically still do have Cloudera. But we're doing all the net new in AWS [Amazon Web Services] EMR . . . . Our goal is to actually mov[e] everything ***out of Cloudera*** and into AWS EMR. Cloudera is expensive. Every time we added a node, our licensing costs would just go up"; (d) "[o]ur Cloudera footprint is on-premise . . . . We're already doing some work in other departments with Azure, so we're sort of looking at Azure and looking at AWS for alternatives right now"; (d) "[w]e had Cloudera but it just didn't turn out to be what we thought it'd be. It's expensive too . . . ."; and (e) "I used to work at Cloudera. ***They were late to come out with a cloud strategy***. That's the reason why they've been struggling . . . . Cloudera had to ***rush the launch of Altus*** to market, and as a result, it lacked a lot of features, which then hurt them more."

262. On March 29, 2019, the Company filed its Annual Report on Form 10-K with the SEC for its fiscal year ended January 31, 2019 ("2019 Annual Report"), which Defendants Reilly and Frankola signed. The 2019 Annual Report represented that: "[u]nderpinning the enterprise data cloud

vision is our next generation platform, Cloudera Data Platform (CDP), which once released, will combine the best of Hortonworks' and Cloudera's offerings in a public cloud, hybrid cloud service. CDP will enable customers to easily extend their datacenter implementations to the public cloud. ***CDP is expected to be 'cloud-native'*** with separate compute and storage and the ease-of-use, self-service and user experience typically associated with public cloud services."[276]

**June 5, 2019 – The Class Period Ends (1Q20)**

263.    After market close on June 5, 2019, Cloudera issued a press release filed with the SEC on Form 8-K announcing its first quarter fiscal year 2020 results for the period ended April 30, 2020. The following day, on June 6, 2019, the Company filed its quarterly report on Form 10-Q with the SEC, which Defendants Reilly and Frankola signed.

264.    The 1Q20 press release announced total revenues of $187.5 million of which $154.8 million originated from subscriptions. Cloudera's quarterly total revenue was far below analyst consensus of $188.3 million. Annualized recurring revenue was $672 million at the conclusion of the quarter, representing 21% year-over-year growth. The 1Q20 press release also announced reduced guidance for fiscal year 2020 which forecasted total revenue in the range of $745 million to $765 million, $635 million to $645 million in subscription revenue, and ARR to 0% to 10% for 4Q20, which was significantly lower than the previous guidance in the range of $835 million to $855 million, $695 million to $705 million in subscription revenue, and ARR of 18% to 21% for the fourth fiscal quarter 2020.[277]

265.    The 1Q20 press release further disclosed profoundly meager revenue guidance for 2Q20, stating that Cloudera was forecasting total revenue in the range of $180 million to $183 million, $155 million to $157 million in subscription revenue. Again, this was vastly lower than the consensus of $203 million for total revenue and $167 million for subscription revenue. The Company's fiscal

---

[276]    Cloudera, Inc., 2019 Annual Report (Form 8-K) (March 29, 2019), https://www.sec. gov/Archives/edgar/data/0001535379/000162828019003670/fy-19cldr10k.htm, at 6.

[277]    Cloudera, Inc., Q1 2020 Quarterly Results (Form 8-K, Ex. 99.1) (June 5, 2019), https://www. sec.gov/Archives/edgar/data/1535379/000162828019007582/q1-20cldrexhibit991.htm.

year 2021 guidance was altogether withdrawn. The 1Q20 press release further disclosed the challenges that Cloudera faced, but failed to disclose to investors, during the quarter: "[w]hile some customers in the first quarter elected to postpone renewal and expansion of their agreements in anticipation of the new platform's [CDP's] release, affecting our full year outlook, this customer feedback and enthusiasm validates demand for enterprise data cloud solutions in our target market."[278]

266.    Moreover, the 1Q20 press release announced the purported "planned retirement of Chief Executive Officer, Tom Reilly, and the appointment of Martin Cole, Chairman of the Board, as interim Chief Executive Officer." Defendant Reilly "retired" as Cloudera's CEO effective July 31, 2019. Cloudera later held a conference call that day to discuss its first quarter fiscal year 2020 results. During the call, Cloudera addressed its first quarter 39% billings miss, reduced guidance for the second quarter and full fiscal year 2020, and Defendants Reilly's and Olson's sudden and unexpected departures.[279]

267.    Contrary to his April 3, 2018 Class Period representation that cloud was then a "tremendous tailwind," Defendant Reilly explained during the 1Q20 investor call that the Company faced "**headwinds in bookings from existing customers**" who represented over 90% of Cloudera's growth.[280] Defendant Reilly sought to blame the bookings miss on "uncertainty" from the combined Company's road map, which was announced in March 2019, and "**increased competition from public cloud vendors.**"[281] Defendant Reilly further attributed the billings miss and slashed guidance to Cloudera's announcement of CDP, stating that the: "**cloud-native platform has caused some customers to wait until its release to renew and expand their agreements.**"[282]

268.    Defendant Reilly also attributed the Company's billings miss and reduced guidance on "headwinds" in bookings from 90% of Cloudera's customer growth base, stating:

---

[278]    *Id*.

[279]    *Id*.

[280]    Cloudera Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 3-5.

[281]    *Id*. at 10.

[282]    *Id*. at 3-4.

All right. Let's turn to a discussion of our first quarter fiscal year 2020 results. With respect to Q1, we'll cover 3 topics in addition to providing detailed financial information: First, we'll offer a quick update on the merger with Hortonworks; second, *we'll discuss the factors that are affecting customer buying behavior and its impact on our full year outlook*; and lastly, we'll update our progress in delivering the Cloudera Data Platform, CDP, our next-generation cloud offering.

\*       \*       \*

Now let me share what did not go well in Q1 and what our plans are for addressing it. In our first quarter as a merged company, *we experienced headwinds in bookings from existing customers. These customers generally represent more than 90% of our growth and were the focus of the quarter's activities.* We've analyzed the challenges we encountered in the quarter and believe that 2 factors primarily contributed to the bookings impact. *First, the announcement of our merger in October 2018 created uncertainty, particularly regarding the combined company road map, which we rolled out in March of this year. During this period of uncertainty, we saw increased competition from the public cloud vendors*.

Second, the announcement in March of Cloudera Data Platform, our new hybrid and multi-cloud offering, created significant excitement within our customer base. CDP is compelling as it addresses many of our customers' most pressing needs. *However, our rapid execution on a cloud-native platform has caused some customers to wait until its release to renew and expand their agreements.*[283]

269.    Notably, in his prepared remarks, Defendant Reilly revealed that the "new Cloudera has the resources, scale, customer base and partnerships to compete extremely well in the modern era of data and analytics. We have a road map that is not only exciting to our customers but is significantly accelerated as compared to what either company could have achieved independently. We believe that we are well positioned for the second half with merger integration behind us *and a competitive cloud offering in market very soon*."[284] These statements directly contradicted Defendant Reilly's Class Period statements representing that Altus and Cloudera Data Warehouse were cloud-native architecture (*see e.g.*, ¶¶ 168, 175, 185, 193, 209-210, 222-223, 230, 233, *supra*) and competitive against cloud offerings of the largest public cloud vendors such as Microsoft, Google and Amazon (*see e.g.*, ¶¶ 158, 163, 168, 185, 209, 215, 222, 247, *supra*).

---

[283]    *Id*. at 3.

[284]    *Id*. at 8.

270.    During the same call, Defendant Frankola discussed the Company's reduced guidance and prospects, stating:

We concluded Q1 with 929 customers who started at or have grown to more than $100,000 of ARR. The number of customers spending more than $1 million is in excess of 140. ***Both of these numbers are roughly flat with Q4 and are reflective of the customer wait-and-see attitude that Tom described***. It is important to note that our largest customers continue bring workloads to the platform. Annualized Q1 dollar-based churn for this cohort is substantially better than average at approximately 6%, and these customers continue to expand.

I will conclude by providing initial guidance for fiscal Q2 and updated guidance for fiscal year 2020. We expect Q2 total revenue to be between $180 million and $183 million and subscription revenue in the range of $155 million to $157 million. Net loss per share is projected to be $0.11 to $0.08 based on 274 million weighted average shares outstanding. For fiscal year 2020, we expect total revenue to be between $745 million and $765 million and subscription revenue in the range of $635 million to $645 million.

As you will recall from our discussion last quarter, our intention is to show Cloudera's organic quarterly performance and top line momentum in the most transparent way possible. Annualized recurring revenue based on the book of business at the end of the quarter removes the effects of the merger, including accounting changes, billings duration and licensing convention and is the best representation of underlying economic activity.

Based on our sales pipeline and the typical lift of an enterprise software sales cycle, we believe that Q2 will be the trough for bookings growth. Coupled with soft Q1 bookings, first half bookings performance will weigh on growth rates through the balance of the year. We expect ARR growth in Q2 to be between 10% and 12%, declining to 0% to 10% in Q4. We continue to believe that modest improvements in subscription gross margin can be achieved by Q4 as we integrate customer support. Services margins will trend down over the next couple of quarters as we apply more technical resources to support customer success. Total operating expenses will continue to decline over the course of the year as merger-related expenses moderate. Non-merger-related operating expenses will be roughly flat. Our investments are in place, allowing us to deliver on the CDP road map and position us for sustained growth.

For fiscal year 2020, net loss per share is projected to be $0.32 to $0.28 based on 280 million weighted average shares outstanding. We expect operating cash flow for fiscal year 2020 to be negative $95 million to negative $75 million. While merger cost synergies are coming in greater than planned, operating cash flow will be impacted by the booking softness that we are now forecasting for the first half.

\*        \*        \*

Although CDP will be available in the second half [of 2019], we do not have adequate data or pipeline to model its rate of adoption. And given the nature of the subscription

business, we believe that the revenue impact from CDP bookings and deferred customers' expansions will take several quarters to appear in GAAP revenue. Until the trajectory of that growth and the investment levels necessary to support it become clearer, *we will not attempt to project an intermediate-term operating model for the combined company*.[285]

271.    Analysts then asked Defendants Reilly and Frankola pointed questions about the Company's 1Q20 corrective disclosures. Craig-Hallum analyst Chad Bennett questioned whether Cloudera's claim that the missed billings and guidance reduction was due to customers actually wanting to wait for CPD or increased competition by public cloud vendors, asking: "[s]o I'm just trying to understand, I guess, the logic behind customers effectively waiting, and maybe it ties into, Tom, your comment about the public cloud vendors being more competitive. If you could define that, that would be great – after you guys made the merger announcement. I can't imagine their data growth is slowing, their workload expansion is slowing, their analytics investment is slowing. How can they afford to wait? Or are they actually – and maybe it's evident in the churn dollar rate you just gave. ***Are they just shifting those workloads off your platform? Is that what's really going on***?" Defendant Reilly responded that:

> From the time we announced the merger to where we got our road map out, it was about a 5-month period. In that period, our sales force was a bit handicapped without giving clarity of what the road map would be. And without that clarity, we were at a competitive disadvantage, and ***we saw a number of opportunities get taken by the public cloud guys.*** We're already turning that around because we've trained on our road map but now – let's say now the customer sees our road map, what causes them to pause yet again? They're trying to understand how they will take advantage of CDP, both public and private. They're trying to understand how we're going to move those workloads. It's just a different motion than traditionally, just buying more of what they had on-prem. ***We're trying to encourage all of our customers to move to a cloud architecture, both in the data center and public cloud, and so that's just an education process***.[286]

272.    Defendant Reilly's statement that the Company was "trying to encourage its customers to move to a cloud architecture" and that "that's just an education process" with the introduction of CDP is an admission that the Company did not possess cloud architecture as the Insider Defendants

---

[285]    *Id*. at 7, 12.

[286]    *Id*. at 9.

repeatedly represented during the Class Period. The Company would have no need to encourage its customers "to move to a cloud architecture" with the introduction of CDP had Cloudera, Hortonworks or the combined Company's offerings been cloud-native or based in cloud architecture throughout the Class Period as Defendants represented.

273.    Mr. Bennett subsequently asked: "I know you're seeing some synergies from the merger, but your sales and marketing as a percent of revenue is still fairly high for a company that, well, effectively is not growing this year. But even if you were to grow, let's just say, 10% to 20%, I would say that line item is still egregiously high. Just care to comment on that?" In response, Defendant Frankola tried to explain that: "[t]he growth that is happening this year is not what we initially anticipated. We have curtailed the rate of future expense growth in the short run through the balance of the year, and the guidance that we put in front of you reflects a lower level of spending than 90 days ago. So we do understand the top line dynamic and how it will impact expenses. With that said though, we believe that it is critical to get CDP out and we've retained the level of investment that would allow us to develop CDP, public cloud, private cloud and be able to sell it and build pipeline over the course of this year. We think the benefits of that will start accruing in bookings later this year, and you'll start seeing it in accelerated revenue ***growth next year***."[287] So much for Defendant Frankola's previous October 3, 2018 assurance that the Merger would create "***growth on day one***."[288]

274.    Citigroup analyst Tyler Radke sought further clarification about the Company's 1Q20 corrective disclosures and, in response, Defendant Reilly again blamed the Company's problems on "increased competition from public cloud vendors," "uncertainty" stemming from the Merger, and customers waiting to renew until CDP was released. He also disclosed that this included increased demand for cloud-native products by customers. Mr. Radke then asked: "[o]bviously, the outlook for the rest of the year is coming down pretty substantially but maybe just order of magnitude, what

---

[287]    *Id*.

[288]    Cloudera, Inc., Cloudera and Hortonworks Merger Conference Call Transcript (Form 425) (October 3, 2018), https://www.sec.gov/Archives/edgar/data/1535379/000162828018012306/cldr425calltranscript10318.htm, at 8.

surprised you more? Was it the weakness in bookings? Was it the higher churn rate? Was it the competitive environment? Maybe just talk about those 3 dynamics independently." In response, Defendant Reilly admitted what he either knew or deliberately disregarded throughout the Class Period:

> We saw **increased competition from the public cloud vendors** and so just increased desire for customers to understand how they can move workloads into the public cloud environment. And during that period of uncertainty, **we weren't very competitive** with that, during that period.
>
> Secondly, and we – with respect to the merger, we got on things like pursuing our renewals later in the quarter than we traditionally would. But that was just the complexities of bringing together 2 sales force systems, pursuing hundreds of renewals. And so some of those slipped out of the quarter. And then our customers that would normally expand would ask us many questions around CDP. And if they expand now, what does it mean to migrate later? And so some of those caused some of the challenges in the quarter. All of those things, we think we have addressed and we resolved and we're seeing the improvements. So – but that's I think the best assessment I have for you, Tyler.[289]

275.    Defendant Reilly's response revealed that, contrary to their Class Period statements, customers were not moving in the direction of the Company's purported hybrid or multi-cloud offerings. Rather, a significant portion of Cloudera's customers were "moving [their workloads] to public cloud vendors' native house offerings" given the limited functionality of the Company's Hadoop-based offerings, including the inability to dynamically scale to meet customers' needs or to compatibly scale in the infrastructure frameworks of cloud providers.[290]

276.    Barclays analyst Preetam Gadey then asked about another Hadoop company then facing financial difficulties. Defendant Reilly responded that he knew that the name of the company was MapR, and admitted that the Merger was, in fact, designed to "replatform" Cloudera's existing product platforms, such as Altus, into "cloud architecture" so that Cloudera would have a "competitive cloud offering." Specifically, Defendant Reilly stated:

> Yes. So basically, here's the backdrop. We saw the need to get more resources, more scale so that we can deliver a competitive cloud offering and **replatform into cloud**

---

[289]    Cloudera Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 10-11.

[290]    *Id*. at 15.

***architecture, and that's why we did the merger. And so Cloudera now has the resources, the scale, the employees, the engineers to very quickly replatform our business***. Our competitor, in this case, it's MapR, could not match the resources or the scale to make a similar transition, and I think they have some challenges. We view their customer base as an opportunity for us, and it is part of our growing pipeline.[291]

277.    An earlier May 2019 report by Paul Gillin on *SiliconAngle.com* confirmed that:

MapR was one of three well-funded startups – along with Cloudera Inc. and Hortonworks Inc. — that emerged a decade ago to commercialize products and services in the open-source ecosystem around Hadoop, a popular software framework for processing huge amounts of data. The hype peaked in early 2014 when Cloudera raised a massive $900 million funding round, valuing it at $4.1 billion.

Hortonworks went public in 2014 and Cloudera followed in 2017, but both saw shares tumble as market competition intensified and ***customers began moving rapidly to the cloud***. Cloudera and Hortonworks merged last fall, but the stock of the combined entity has continued to fall, slicing market value by half over the last seven months. MapR announced its intentions to go public more than four years ago, but never followed through, opting instead to raise two more rounds of venture funding in 2016 and 2017.[292]

278.    Defendant Reilly's response not only elucidated the impetus for the merger (*i.e.*, Cloudera "need[ed] to get more resources, more scale so that [the Company could] deliver a competitive cloud offering and ***replatform into cloud architecture***"),[293] but also revealed that his prior Class Period statements representing that Cloudera possessed "cloud-native" offerings and "cloud architecture" were false. Indeed, the Company would have no need to "replatform" its entire technological architecture into "cloud architecture" if Cloudera, Hortonworks or the combined Company possessed "cloud architecture" all along as Defendants represented they did during the Class Period.

279.    D.A. Davidson analyst Rishi Jaluria then sought clarification about Cloudera's large guidance reduction: "[j]ust help me understand what was it that you did not anticipate in that and

---

[291]    *Id*. at 11.

[292]    Paul Gillin, *Big-data bombshell: MapR may shut down as investor pulls out after "extremely poor results"*, Silicon Angle.com (May 30, 2019, https://siliconangle.com/2019/05/30/mapr-may-shut-investor-pulls-following-extremely-poor-results/ (last accessed June 18, 2021).

[293]    Cloudera Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 11.

putting aside the competition from cloud vendors? But besides that, ***what was it that you didn't anticipate***? Because it seemed like you understood and acknowledged that there was going to be a potential wait-and-see dynamic from customers. ***Was it just more intense than you expected or what?***" Defendant Frankola's response merits quoting at length:

> Yes. There's a lot there, so hopefully, I can unpack it. So relative to expectations 90 days ago, first of all, that was shortly after the 2 companies had merged. We were still ***operating somewhat blind*** in terms of pulling in pipeline from both sides, scrubbing the numbers, putting together predictive models. So you had a general level of ***uncertainty***. And then the new news in the quarter, certainly what Tom described in terms of cloud, certainly the fact that our customers are taking a wait-and-see attitude, ***we did not anticipate that to the level of extent that it was. The fact that our churn rate increased, that was certainly unanticipated***. And those 3 things are all interrelated.

> Now very specifically, the way a subscription model works is that resulted in bookings that were very light for Q1 relative to expectations. ***We now have much greater confidence*** in our pipeline and visibility, and that pipeline for Q2 is pointing to another soft quarter. So essentially, we're factoring in 2 quarters in a row of soft bookings. Now we are seeing pipeline growth that is – has resumed, several weeks' worth, a couple of months' worth. We hope that remains a good trend, but the pipeline that we're building today isn't going to be delivered in Q2. It's going to be delivered in Q3, Q4 and a little bit in Q1. So the nature of the subscription model means that we're going to have a trough in bookings in the first half of the year; that will show up as a trough in ARR growth rates in Q4 and then acceleration beyond.

> You'll see the resumption of underlying bookings growth most clearly in sequential dollar ARR growth. That's one reason why we're disclosing ARR. So as we execute in Q3 and especially Q4, we hope to put a lot of ARR dollars on the books, and that will be reflective of the success of this strategy.

> Your second question, customer count less than $100,000 – or over $100,000, that is all part and parcel of the same thing. So where we saw relative weakness was in our customers that caught $100,000 of revenue up to $500,000 or so. So post-merger, as you'd expect, we put our resources, first and foremost, on our large accounts. That was a little bit softer than we would like, but we still saw really good expansion rates, pretty good churn rates in our largest accounts. We saw a relative weakness in our smaller accounts, and unfortunately, more of them churned out this quarter than we brought on. ***So that's the other artifact of the cloud competition, high churn and merger execution***.[294]

---

[294]    *Id*. at 12.

280.    Defendant Frankola's representation that the company did not anticipate the level of customer churn (*i.e.*, loss of customers to public cloud competitors) was particularly dubious in light of Defendant Reilly's representations that he and Cloudera management were "***tracking our cloud win rates relative to our on-prem traditional win rates***" and were "able . . . to track all of our customers through these phases, ***what our churn rates are***, what our graduation rates are, what our average tenures are."[295] Such statements were even more egregious given that the Company represented that they specifically "put in place cloud specialists, who solely focus on competing on the cloud" such that "[they] are learning how to go up against the cloud vendors head on against their house offerings."[296] In reality, during the Class Period, Defendants obscured that the Company was losing customers to public cloud vendors by blaming the Company's performance on misdirected sales strategy rather than Cloudera's products' uncompetitive positioning in the marketplace (*see e.g.*, ¶ 201, *supra*).

281.    Raymond James analyst Michael Turits then pressed Defendants further about the Company's severe customer churn, including whether it was due to customers moving their workloads on-premise, or because they had abandoned the Hadoop ecosystem altogether, asking: "I just want to make sure that I understand the churn well enough. The customers who did not renew, did they take their on-premise workloads and move those workloads to cloud? Or did they move to a community, nonpaid version? Or did they simply move off of, let's just broadly call it, the Hadoop ecosystem?" Defendant Reilly explained that Cloudera was not "***really competitive against what the public cloud guys are offering . . . .***":

> I'm pretty familiar with all those scenarios . . . . So we do see a class of customers that want to move workloads to take them into a public cloud, and so ***that's where we saw some of the churn because we weren't really competitive against what the public cloud guys are offering, and we had this period of uncertainty***. So that's one scenario. And that renewal – the whole renewal will not go away but a portion of that renewal will go away. And then we saw some workload go to self-support predominantly in the tech industry, and that's the combination. And then we had a number of renewals that

---

[295]    *Id*.

[296]    Cloudera Inc., Citi Global Technology Conference (September 7, 2018), at 4.

just didn't close in the quarter because of the merger execution and our kind of delays in getting to that.

And then finally, the CDP cloud, some people just took pause and whether – especially if we have a renewal that we're working on, an expansion and they were just asking questions about do they make that investment and how does it migrate to CDP; that caused some delays.[297]

282.    Mr. Turtis again pushed Defendant Reilly, asking: "[s]o you think it's not the last thing that I asked? And obviously, I ask it also because of the troubles that MapR had versus the similar types of solutions to yours, let's broadly call it Hadoop. So is there any sense that the customers are simply migrating to a different form of data architecture?" Defendant Reilly replied, further admitting that Cloudera lacked a cloud architecture product during the Class Period, adding that: "[n]o. The only different architecture is the cloud architecture, **which we are addressing with CDP** as a PaaS **native cloud** architecture offering . . . ."[298] Defendant Reilly's response starkly contradicted his Class Period representations that both Cloudera's and Hortonworks' offerings were cloud-native architecture. Furthermore, while investors expected the combined Company to introduce a unity platform, Defendants obscured that such a platform needed to be rearchitected from Hadoop-based to cloud-based architecture by misrepresenting that each company's Class Period offerings were cloud-native.

283.    In addition to conceding earlier in the call that the Merger was consummated to enable Cloudera to "replatform into cloud architecture[,]"[299] in his discussion with Mr. Turits, Defendant Reilly further admitted Cloudera's competitive disadvantage prior to the Merger, stating:

 "[s]o the bulk of it is delays – so the bulk of it is the delays, followed by workloads moving to public cloud vendors' **native house offerings**. And that's why we also – **we didn't share earlier**, but the reason we prioritized CDP public cloud first is we want to close off that competitive disadvantage with our public cloud hybrid offering. CDP private cloud is what our largest customers are most demanding, but we wanted to close off those workloads that are moving to public cloud. So we want to control that with our customers."[300]

---

[297]  Cloudera Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 14.

[298]  *Id.*

[299]  *Id.* at 11.

[300]  *Id.* at 15.

284.    Mr. Turtis then sought further clarification from Defendant Reilly, asking: "[b]ut sorry, I'll try to just squeeze this last clarification in. But if they're delaying, but they're PaaS renewal, are they – is that just saying they're simply willing to go unsupported whether – whatever the reason, whether it's because of the CDP or whatever – or missed execution on your part?" Defendant Reilly finally admitted that: "[y]es. So we have a number of renewals that we didn't include in the quarter because we didn't execute against them. And that was just we got a *late start due to the merger*. Secondly, when a renewal has an expansion, we are better off closing them together, and *we'll let a customer slip* while we're answering their questions or addressing their concerns versus trying to do 2 transactions."[301]

285.    Deutsche Bank's research note about Cloudera's 1Q20 disclosures called, *Now THAT Was a Rough Quarter*, summarized that:

> Cloudera shares are indicated down 30%+ off a quarter in which the company reset guidance well below our estimates (to ARR growth of 0-10% compared with our 17% estimate, and to revs of $755m at the midpoint compared with our $835m estimate), and disclosed **higher customer churn**, **postponed renewals and expansions**, **share losses to public cloud alternatives** and the departure of the CEO. **While Cloudera attributed** this in large part to hesitation ahead of the late-summer launch of its new CDP (Cloudera Data Platform) product, **we conclude** based on our field checks that Cloudera hasn't managed the architectural transition well from on-premise Hadoop-focused data analytics projects to cloud/AWS-hosted workloads and that it has fallen behind AWS, Snowflake, Google and Microsoft in the analytics space. We reaffirm our cautious call.
>
> What Happened?
>
> **Cloudera argues** that new bookings in the 1QF20/April quarter were quite soft and that this will extend into the 2QF20/July quarter. One can see this in the RPO figure of $720m, down a full 10% sequentially. Cloudera cited sales disruption from the Cloudera-HDP merger and a 'wait and see' attitude ahead of the new CDP product that left Cloudera vulnerable to share losses to the public cloud analytics rivals. Based on our checks, **we believe that demand for on-premise Hadoop-focused technology has completely stalled** (rival MapR is also very challenged) and Cloudera was late to launch a competitive cloud-hosted product **as AWS has made improvements to Redshift/EMR, as Google refines its world-class data analytics services and as privately-held and AWS-hosted Snowflake has taken share** (we heard late last year that Snowflake was specifically targeting Hadoop/Cloudera customers coming up for

---

[301]    *Id.*

renewals). We simply have no visibility into whether the new CDP product will be competitive and the CEO departure and stock fall could trigger employee turnover. In a nutshell, the risk profile (including the potential for further cuts to Street numbers) still seems too high.

286.    CNBC quoted Wedbush analyst Daniel Ives as saying that: "[l]ast night will be the straw that broke the camel's back for many investors and core believers in the Cloudera story, as the company delivered the dreaded trifecta of bad news: soft April results, a jaw dropping weak guidance, and a CEO departure."[302] Similarly, Yahoo!News reported that Ives said that the: "'wheels came off the bus' this quarter with sales execution issues, secular *headwinds* on the Hadoop market, and cultural challenges creating a very difficult environment for the Cloudera team,' such that, 'it's clear the story is broken,'" leaving only questions as to Cloudera's valuation and its "next strategic move," and lowered his price target on Cloudera from $16 to $7.[303]

287.    Barclays lowered its price target to $7 from $14, noting that the "***Cloudera currently does not have a cloud solution, which seems the favorite deployment mode for most customers***" and as such it "suffers from weak renewals as customers move to cloud native providers." Barclays noted that the only apparent parachute for Cloudera is CDP – which was only moving into *Beta* in July 2019 – and thus investors would not have any real visibility into Cloudera until later in 2019 at earliest. Barclays noted that Cloudera's lack of a cloud product was causing "a pause in spending" with "a majority of the churned customers . . . adopting public cloud products." D.A. Davidson piled on, highlighting that:

> ***We have stubbornly stuck with Cloudera***, as we felt concerns around competition were too severe. In retrospect, we were very wrong, and perhaps ***relied too heavily on taking management at its word***, especially since Cloudera has had sales execution issues in the past. ***It's truly difficult to believe*** that customers delaying deployment until CDP, increased churn, merger disruption, and competitive headwinds – all legitimate

---

[302]    Ari Levi, "*Cloudera plummets 43% after CEO abruptly departs and company cuts forecast*," CNBC.com (June 5, 2019), https://www.cnbc.com/2019/06/06/cloudera-drops-40percent-after-ceo-tom-reilly-leaves-forecast-cut.html (last accessed June 18, 2018).

[303]    Jayson Derrick, *Analyst On Cloudera:* "*Straw That Broke The Camel's Back*", Yahoo! (June 6, 2019), https://news.yahoo.com/analyst-cloudera-straw-broke-camels-172809348.html (last accessed June 18, 2021).

concerns continually brought up by investors – were not properly factored into guidance provided 90 days ago.

288.    In its report titled, *Downgrade to Market Perform; F1Q Bookings Miss, Big FY20 Guide Down, CEO Out*, Raymond James also downgraded Cloudera, noting:

We are downgrading CLDR to Market Perform from Outperform following a 39% F1Q billings miss and a 12% FY20 revenue guide down. Churn was up, particularly among small- to midsized customers, and **both land and expand bookings missed**. Cloudera also announced its CEO, Tom Reilly, will retire 7/31/19, with board chair Martin Cole interim CEO during the search for a replacement.

Cloudera attributed the miss primarily to customers moving workloads to cloud where they are choosing cloud native data management solutions (EMR, RedShift, Athena) absent the availability of Cloudera's new cloud focused CDP platform to be generally available (GA) this summer, which they believe will allow them to better compete for cloud workloads, as well as to poor execution around the merger.

Cloudera lowered FY20 ARR growth guidance to 0-5% from 17-21%, revenue growth to 5% pro forma by our calculation, and CFFO guide to a range of $(95)-(75)M from $(40)-(30)M. No impact from CDP anticipated until FY21.

*    *    *

That said, **there could be considerable time before Cloudera regains the business momentum it has lost to cloud migration** and gives investors sufficient visibility into reacceleration from 5% PF growth in FY20. Absent a sense for that timeframe, and with Cloudera having withdrawn its FY21 targets, we are stepping aside from recommending the stock.

Big F1Q Billings Miss. Revenue $187M (+14% y/y on a proforma basis by our calculation) was about in-line with consensus $188M; however, billings of $98M missed consensus by $63M or 39%. Subscription revenue $155M (+18% y/y proforma) was in-line with consensus. EBIT loss of $35 million (-19% margin) beat consensus loss of $62 million (-33% margin) on faster realization of cost synergies and leverage since the merger. EPS of $(0.11) beat consensus $(0.23). Customers with >$100K ARR declined sequentially to 929 from 943 given the uptick in churn, while the >$1M ARR customers was flat sequentially at ~145 as this cohort experienced a more muted uptick in churn.

F2Q & FY20 Significant Guide Below. F2Q revenue guidance $180-183 million is below consensus estimates of $203 million. Subscription revenue guide $155-157 million is below consensus estimates $167 million. EPS guide of $(0.11) to $(0.08) was in-line with consensus $(0.10) at the midpoint. FY20 revenue guide of $745-765 million (+5% y/y at the midpoint on a pro forma basis by our calculation) was lowered $90M at the midpoint and is well below consensus estimates $844 million. The shortfall comes on higher than expected churn, customers pausing before the release of CDP, and increased competition from public cloud vendors. Subscription revenue guide of

$635-645M was well below consensus $700 million. Management also lowered its FY20 Annual Recurring Revenue (ARR) guidance to 0-10% ($659-725M) from 18-21% ($800-825M). EPS guide of $(0.32) to $(0.28) was ahead of consensus $(0.35). CFFO loss guidance of $75-95 million was increased by $50M from a loss of $40-30M and is greater than consensus loss of $33 million. Additionally, management pulled its guidance for FY21, which was >$1B in revenue, >20% revenue growth, and 17% Adjusted CFFO margin.

\*     \*     \*

CDP release this summer. Management expects CDP to reaccelerate revenue growth in the second half and FY21. ***CDP will provide benefits over Cloudera Altus including a cloud-native experience*** for ease of use, improved security, managing workloads over multi-cloud, hybrid and on-premise environments. Relative to public cloud offerings, CDP will have native security/governance, multi-cloud/hybrid/on-premise, and data migration. Although the first iteration of CDP is for public cloud and should improve its competitive position vs. the public cloud vendors, Cloudera's largest customers are demanding CDP for the private cloud, which is to be released towards the end of the year.

289.    In a subsequent note, Raymond James relayed that: "Cloudera attributed the miss primarily to customers moving workloads to cloud, where they are choosing cloud native data management solutions (EMR, RedShift, Athena) absent the availability of Cloudera's new cloud-focused CDP platform to be generally available 2H19[.]" In response to this news, shares of Cloudera's common stock fell by $3.59 per share, or 40.8%, from its previous closing price of $8.80 per share on June 5, 2019 to close at $5.21 per share on June 6, 2019 on extremely high trading volume of more than 57.9 million shares traded.

**Relevant Post-Class Period Developments**

290.    On September 5, 2019, then interim CEO Defendant Cole participated in the Citi Global Technology Conference wherein he confirmed that Cloudera's management had insight into customer churn far before the effects of that churn were revealed to investors, stating in relevant part:

> **[T]here is a lead time on churn. *So customers don't call us on Friday and say, we're going to shut it off on Monday, right? We have these conversations well in advance***, and there's also the opportunity to start changing some of that discussion. Some of our customers that churned was not because they were going to a competitor, but they believe they can do the self-support themselves, okay? We've got enough capability. Open source, we can do this.

\*     \*     \*

*Because again, you have visibility.* So there will be some customers and maybe smaller customers who don't give us the forward visibility, and actually, they have a relatively small workload, probably less than 100,000 that may go away. *But the bigger ones, these are long lead times because you have to migrate off or they have to determine, okay, we're going to do this ourselves. They got to build a team to do that. And so yes, we do have forward visibility.[304]*

291.    Defendant Cole's statements confirmed what Defendant Reilly stated throughout the Class Period – namely that the Company was "*tracking our cloud win rates relative to our on-prem traditional win rates*" and were "able . . . to track all of our customers through these phases, *what our churn rates are*, what our graduation rates are, what our average tenures are" – and directly contradicted Defendant Frankola's representation that the Company did not anticipate the level of customer churn (*i.e.*, loss of customers to public cloud competitors).[305]

292.    During that same conference, Defendant Cole explained that with CDP, the Company would be moving away from its Hadoop-based subscription pricing model, stating:

There are others who are creating new workloads where the line of business is pulling IT that say, I need to do this faster. I need to do this easier. And that's the experience that we're going to create for them through our public cloud offering, this whole notion of it's got to be easier to use.  . . . But if you're a line of business, you're a particular user, you're an analyst, you want to set something up and you want to get it operational within 15 minutes. You don't want to have to provision a cluster. *You don't want to have to go figure out with IT how many nodes do I need. You just want to like sort of the classic, pull out your credit card and sign up and do that. That's the experience that we're targeting with the public cloud version.[306]*

293.    Subsequently, during the September 10, 2019 Deutsche Bank Technology Conference, Defendant Cole explicitly noted that the Company would be transitioning to consumption based pricing (*i.e.*, a cloud-based pricing model) with CDP: "So there will be a new pricing model that we will reveal at Strata around CDP, it being on a consumption model [rather] than an upfront license fee."[307]

---

[304]    Cloudera Inc., Citi Global Technology Conference Call (September 7, 2018), at 5-6.

[305]    Cloudera, Inc., Q4 2018 Earnings Conference Call (April 3, 2018), at 5, 12.

[306]    Cloudera Inc., Citi Global Technology Conference Call (September 7, 2018), at 4.

[307]    Cloudera Inc., Deutsche Bank Technology Conference Call (September 10, 2019), at 8.

294.    During that same conference interim CEO Defendant Cole confirmed that Cloudera had not been competitive against the public cloud vendors during the Class Period. Defendant Cole explained that the reason Cloudera consummated the Merger was because "neither company was in a very strong position in the cloud. We both [*i.e.*, Cloudera and Hortonworks] had offerings but they weren't easy to use. They didn't have that same take-up as a pure public cloud capability."[308] One of those offerings was, of course, Altus, which Defendants touted as a cloud-native product throughout the Class Period. During the call, Defendant Cole admitted that "***some of our challenges were self-inflicted***" and what the Insider Defendants and Cloudera knew since the IPO over two years prior:

> Yes. AWS, Azure and even on increasing basis now, GCP. They may go direct to – a Databricks or Snowflake, thus with an Azure or AWS. ***So that is a threat in terms of impacting growth rates*** versus an absolute impact on the business per se . . . . [O]ur view is we want to capture a greater percentage of that than we have historically, and one of the reasons we needed to do this merger is ***neither company was in a very strong position in the cloud***. We both had offerings but they weren't easy to use. They didn't have that same take-up as a ***pure public cloud capability***. And so we came together, developed – we're developing a product, releasing it into the marketplace and our goal now is to compete more effectively with some of the public cloud capabilities. The thing is that we're going to differentiate is for those customers who want to be in the cloud, across clouds, hybrid -- as well hybrid that is in on-prem and in public. So multi-cloud, hybrid cloud and on-prem. We're -- our view is that what we're building will be one-of-a-kind ***and it will enable us*** to compete there.[309]

295.    The same day, Cloudera's current Chief Product Officer, Arun Murthy, published a Class Period article over *Medium.com* called *Hadoop is Dead. Long Live Hadoop*,[310] which aptly summarized the movement away from Hadoop to cloud, and the concomitant challenges the Company faced to keep up with these Class Period developments:

> The public cloud (along with private cloud) is clearly going to be an integral part of the deployment architecture for enterprises from this time forward.
>
> *                *                *

---

[308]    *Id*. at 4-5.

[309]    *Id*.

[310]    Arun Murthy, *Hadoop is Dead. Long Live Hadoop*, Medium.com (September 10, 2019), https://medium.com/@acmurthy/hadoop-is-dead-long-live-hadoop-f22069b264ac (last accessed June 18, 2021).

Some things have definitely changed for us [Cloudera]— things we need to heed. ***Five years ago*** [in 2014], when we were the "***it***" technology, we got a hall pass. All the cool kids wanted to hang with us, and brought us all the use-cases they could find, and showed us off to their friends. To some extent, *'the answer is Hadoop — what's the question?'* was the prevailing sentiment. This led to some unreasonable expectations which were unrealistic, or too early in the product life-cycle. Now we have to work a little harder to convince customers to use what we bring to market . . . . We also need to convince customers to use these technologies from us such as CDP [Cloud Data Platform].

296.    Murthy's article tellingly identified that Cloudera set false expectations for the Company's product offerings as the market shifted towards cloud-native offerings and away from those that were Hadoop-based. Nevertheless, Cloudera and the Insider Defendants touted the Company's Hadoop-based offerings as cloud-native and grounded in cloud architecture throughout the Class Period when those products did not and could not provide the functions endemic to cloud-native offerings. When the Company revealed that it overstated its Hadoop-based products' capabilities and ability to compete against public cloud vendors, it faced severe backlash from and an erosion of trust with analysts who explicitly reported that the market had been misled by Cloudera (*see e.g.*, ¶¶ 285-289, *infra*). Not only did Cloudera "have to work a little harder to convince customers to use what [they] bring to the market"[311] but the Company also had to distance themselves from the materially misleading representations by the Company's former CEO Defendant Reilly (*see e.g.*, ¶¶ 152, *supra*) about its then product offerings.

297.    On October 13, 2019, *ZD Net* published an article by Tony Baer titled, *Where does Cloudera go from here?* highlighting how CDP was a: "complete rethinking from the ground up," the vast improvements in speed and elasticity over Altus and the fact that Cloudera "didn't adequately warn Wall Street" about these material facts. The article commented, in relevant part, that: "Cloudera has been through an eventful, some might say turbulent year, to say the least. While its been awhile since Cloudera branded itself as Hadoop, its fortunes have nonetheless been tied to the open source platform first codified by Doug Cutting and Mike Cafarella well over a decade ago . . . . In a recent

---

[311]    *Id*.

post in *Medium*, Cloudera chief product officer Arun Murthy best summed the whole 2019 saga in one elegant title, *Hadoop is Dead. Long Live Hadoop* . . . . Last week, Big on Data bro Andrew Brust provided an exhaustive account of Cloudera's new generational product change, Cloudera Data Platform (CDP). To its credit, Cloudera didn't simply do a cut and paste job with the new offering, which was the long-awaited converged platform coming out of its merger with Hortonworks. It was a complete rethinking from the ground up, starting with refactoring of storage and compute that severed the ironclad connection between Cloudera's platform and HDFS [Hadoop Distributed File System]."

298.    On December 5, 2019, Cloudera held a conference call to discuss the Company's results for the third fiscal quarter 2020 for the period ended October 31, 2019 where Defendant Cole addressed lingering analyst concern about Cloudera's ability to compete with public cloud vendors. Defendant Cole explained how Cloudera's product offerings were, in fact, not competitive with public cloud vendors during the Class Period because its products were not "cloud-native," and couldn't offer the same cloud performance offered by its competitors until it introduced its first genuinely cloud-native product, CDP. Again, Defendant Cole admitted that, prior to the Company's release of CDP after the Class Period, the Company could not legitimately compete in cloud, stating in relevant part: *"[w]e now have a competing product*. The competitive dynamic has improved certainly with CDP Public Cloud. Previously, customers were bifurcating workloads and say, 'Okay, we've got to find another product to go into the public cloud. *We like where you guys are on-prem, but you don't have the offering that we're looking for in terms of ease of use, consistency, security, governance, et cetera.* [*i.e.*, not cloud-native]'"[312]

299.    On December 13, 2019, Arun Murthy presented at the Company's StrataData Conference, where he acknowledged that the Company's prior Class Period products were not cloud-native as represented during the Class Period, stating: "what we've been working on for the last nine months after the merger of Cloudera and Hortonworks. It has been sort of a reimagination of everything we have done. It's a reimagination of the entire stack to make it *really cloud native*. Make

---

[312]    Cloudera, Inc., Q3 2020 Earnings Conference Call (December 5, 2019).

it work across multiple clouds, make it work across edge and data center, have a consistent security and governance layer, schema, metadata, security, policies, governance, lineage, and migration."[313] At that time, the term "cloud-native" meant to reasonable investors that such offerings or capabilities had specific material attributes such as the use of containers, ease-of-use, seamless scalability, security and elasticity, none of which the Company's Class Period product offerings provided. The term cloud-native had the same meaning when Murthy used it December 2019 as it did when Defendants used that term throughout the Class Period.

300.    On February 6, 2020, Mr. Murthy, published a second article on *Medium.com* called *Hadoop: Decade Two, Day Zero*, where he distinguished Cloudera's Class Period non-cloud-native product offerings from its post-Class Period CDP offering, which he described as a genuine "data architecture for cloud."[314] According to Mr. Murthy, Cloudera's Class Period products were not cloud-native but what he described as "Hadoop in the Public Cloud." His distinction between "Hadoop in the Public Cloud" (Class Period) and "Hadoop Powered Data Clouds" (post-Class Period) is critical because simply placing software on the cloud or using a cloud-based server as the Company did throughout the Class Period does not somehow magically render it "cloud-native." As described by Mr. Murthy, the terms "cloud-native" and "cloud architecture" mean that an offering has specific material attributes such as the use of containers and Kubernetes, seamless scalability, security and elasticity. None of the Company's Class Period offerings possessed these attributes. Cloudera did not have a "cloud-native" product until Cloudera's announcement of CDP in March 2019. Even then, CDP was merely a beta product or more colloquially – vaporware – until its release for the public cloud in September 2019.

---

[313]    Arun Murthy, *Delivering the Enterprise Data Cloud*, Strata Data Conference (December 13, 2019, https://www.youtube.com/watch?v=3E8yeDqd5Qo (last accessed May 28, 2021).

[314]    Arun Murthy, *Hadoop: Decade Two, Day Zero*, Medium.com (February 6, 2020), https://medium.com/swlh/hadoop-evolution-decade2-ca46e5514713 (last accessed June 21, 2021).

301.    Murthy also provided a chart which further distinguishes Cloudera's products between Decade 1 and Decade 2, and confirms that Cloudera did not have a "cloud-native" product with cloud architecture during the Class Period until the launch of CDP after the Class Period:

| Architecture | Decade 1<br>Hadoop on-prem and on the cloud | Decade 2<br>Hadoop powered data clouds |
|---|---|---|
| Use-Cases | • Data growing faster than ever<br>• Need a cost effective way to store and process data<br>• Open source to avoid lock-in<br>• Businesses use "big data" a competitive advantage | • Data continues to grow exponentially<br>• Need a cost effective way to integrate the data lifecycle<br>• Open source for continuous innovation<br>• Businesses master the data lifecycle to fundamentally change their business |
| Technology Infrastructure | • Magnetic hard drives getting cheaper and cheaper<br>• Networking is expensive and the public cloud is not always a cost effective option<br>• Hadoop co-locates compute and storage to leverage commodity hardware and avoid costly network transfers | • Object stores like S3 are cost effective for storing large volumes of data<br>• Buying compute on-demand can be more efficient than purchasing datacenter capacity<br>• Hadoop enables high performance analytics with remote disaggregated storage, sometimes using locally-attached SSDs for cost-effective caching |
| User Experience | • Software is sold, downloaded, installed, and upgraded on a periodic basis by centralized IT teams<br>• Capacity expansion requires planning and funding over a multiple quarter time horizon<br>• Deployment time is measured in months and quarters | • Large-scale shift from shrink-wrapped downloadable artifacts to SaaS with consumption-based pricing has changed customer expectations<br>• Business users won't wait months to provision capacity, install software, or upgrade to the latest features<br>• Public clouds and Kubernetes spin up workloads in minutes |
| Privacy & Security | • Network perimeter security and physical access controls<br>• Simplistic enforcement was often sufficient<br>• Deployment simplicity favored over more robust mechanisms | • Security at the workload, data and metadata layer becomes the norm<br>• All data access is secured, encrypted, and audited by default<br>• Businesses have viable options to comply with new compliance regulations such as GDPR |

302.    On July 31, 2020, August 27, 2020, and again on September 28, 2020, at approximately the same time the Company first became an actual multi-cloud (*i.e.*, public and private cloud) provider, the SEC sent the Company three letters questioning the Company about "Item 7: Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Company's Annual Report on Form 10-K for the fiscal year ended January 31, 2020.[315]

---

[315]    *See* SEC Staff Comment Letter to Cloudera, Inc. (July 31, 2020), Cloudera, Inc. 10-K Letter.pdf (sec.gov); SEC Staff Comment Letter to Cloudera, Inc. (August 27, 2020), Cloudera, Inc. CORRESP Letter.pdf (sec.gov); SEC Staff Comment Letter to Cloudera, Inc. (September 28, 2020), Cloudera, Inc. CORRESP Letter.pdf (sec.gov).

303.    On July 31, 2020, the SEC sought clarification about the Company's recently filed Annual Report on Form 10-K dated March 27, 2020, for the Company's fiscal year ended January 31, 2020. The SEC sought clarification of Item 7 in the Company's 10-K stating: "[y]ou indicate that the success of your business depends, in part, on your ability to sell renewals of subscriptions and expand the deployment of your platform to existing customers. Tell us, and revise to disclose, the renewal rate of your subscriptions or explain what other measure management uses to monitor customer retention. Further, tell us what measure(s) management uses to monitor the expansion of your platform to existing customers, or the "land and expand" strategy as explained here, and revise to disclose and discuss these measures for each period presented."[316]

304.    On August 20, 2020, the Company responded to the SEC in a letter signed by Defendant Frankola, which stated *inter alia* that "[w]e believe that disclosing a discrete renewal rate would not be useful to our investors and could be misleading, since it is an evolving metric. Cloudera's business is in transition across a number of dimensions, as a result of the recent merger with Hortonworks and the ***roll-out of a new cloud offering*** with new pricing models. Given the nature of a subscription business, coupled with such transitions, we evaluate renewals using different measures that are not always calculated or presented to senior management on a consistent basis."[317]

305.    On August 27, 2020, the SEC again followed up Regarding Item 7 of the Company's 10-K, stating:

> You indicate in your response to prior comment 1 that renewal rate is an evolving metric. You further state that management evaluates renewals using different measures that are not calculated on a consistent basis. Please clarify what makes this an evolving metric. Also, explain further the different measures that management uses to evaluate renewals and how the calculations differ. In this regard, in your April 30, 2020 Form 10-Q, you disclose that revenue increased from the three months ended April 30, 2019 to the three months ended April 30, 2020 due, in part, to a higher renewal rate. Please tell us the renewal rates for these two periods and, if not calculated consistently, explain why such reference is an appropriate explanation for the increase in your revenue.

---

[316]    SEC Staff Comment Letter to Cloudera, Inc. (July 31, 2020),Cloudera, Inc. 10-K Letter.pdf (sec.gov), at 1-2.

[317]    Cloudera, Inc., Response to the SEC's July 31, 2020 Staff Comment Letter (August 20, 2020), https://www.sec.gov/Archives/edgar/data/0001535379/000162828020012941/filename1.htm, at 2.

Alternatively, if the renewal rates are calculated consistently, please further explain why you believe disclosing such rates is not useful information for investors.[318]

306.    On September 11, 2020, Defendant Frankola again responded by letter to the SEC, further expounding on the Company's inability to meaningfully calculate renewal rate, in part because the Company only "recently introduced a consumption-based cloud pricing model[:]"

> Our renewal rate is an evolving metric given we have changing pricing and usage models and we may measure renewal rates in multiple ways. In addition, prior to our merger with Hortonworks in January 2019, Hortonworks did not consistently calculate and disclose renewal rates, and therefore we have limited history with a significant portion of our business, which makes renewal rate comparisons of year-over-year periods difficult. For these reasons, we have not disclosed a renewal rate metric historically. We recently introduced Annualized Recurring Revenue (ARR) as our primary metric to monitor customer retention and growth. Our focus of analysis has been on ARR, and we have not devoted as much time to analyzing separately renewal rates or other metrics for understanding customer retention and growth. We are continuing to develop our thoughts on renewal rate metrics, including how best to systematize and present such a metric to investors.
>
> ***We have recently introduced a consumption-based cloud pricing model***, which enables our customers to purchase and use our software in a consumption-based manner (for example, hourly) rather than on a subscription basis. This shift in pricing and usage adds complexity to calculating and determining renewal rates on a consistent basis, as noted above.[319]

307.    The SEC sent the Company yet another comment letter regarding Item 7, stating, "In your Form 10-Q for the quarter ended July 31, 2020, you disclose Annualized Recurring Revenue (ARR) equals the annualized value of all recurring subscription contracts with active entitlements as of the end of the applicable period. In your response to prior comment 1, you indicate you have introduced a consumption-based cloud pricing model, which enables customers to purchase and use

---

[318]    SEC Staff Comment Letter to Cloudera, Inc. (August 27, 2020), Cloudera, Inc. CORRESP Letter.pdf (sec.gov), at 1.

[319]    Cloudera, Inc., Response to the SEC's August 27, 2020 Staff Comment Letter (September 11, 2020), https://www.sec.gov/Archives/edgar/data/0001535379/000162828020013491/filename1.htm, at 2.

your software on a consumption basis rather than on a subscription basis. Tell us how you considered these arrangements in your calculation of ARR and revise your disclosures as necessary."[320]

308.    On October 9, 2020, Defendant Frankola again responded stating: "In the Company's fiscal year ended January 31, 2020 and through the first six months of the Company's fiscal 2021, our contracts with customers that utilize consumption-based cloud pricing as well as the amount of ARR associated with consumption-based cloud pricing was immaterial, as this model is relatively new for the Company. . . . Once consumption-based cloud pricing becomes a material portion of the Company's revenue, we will disclose the method of our calculation of consumption-based cloud ARR."[321] In other words, the Company's cloud pricing was new and not material because it was only with CDP in September 2019 and August 2020 that the Company had a cloud product with which to use such pricing.

309.    As late as Cloudera's December 3, 2020 conference call for its third quarter 2021 fiscal year earnings ("3Q21"), the Company's highest ranking executives and insiders again admitted that the Company lacked a "cloud-native" offering during the Class Period stating that: (i) "We [benefited] at a remarkable rate, ***having launched cloud-native services***, as well as private cloud offerings ***this fiscal year***."; and (ii) "We now have a compelling set of cloud-native services that support multiple analytics functions."[322]

310.    Then, on March 1, 2021, technology publication *The Next Platform* issued a report titled *Cloudera Pivots to Data Management as Hadoop Fades*. There, The Next Platform (which interviewed and quoted Cloudera, Inc.'s Senior Director of Product Management, Krishna Maheshwari) confirmed Plaintiffs' allegations that, despite Defendants' statements to the contrary between April 28, 2017 and June 5, 2019: (i) Cloudera lacked a "cloud-native" platform during the

---

[320]    SEC Staff Comment Letter to Cloudera, Inc. (September 28, 2020), Cloudera, Inc. CORRESP Letter.pdf (sec.gov), at 1.

[321]    Cloudera, Inc., Response to the SEC's September 28, 2020 Staff Comment Letter (October 9, 2020), https://www.sec.gov/Archives/edgar/data/0001535379/000162828020014417/filename1.htm, at 2.

[322]    Cloudera, Inc., Q3 2021 Earnings Conference Call (December 3, 2020), at 4, 7.

1  Class Period; and (ii) Cloudera was unable to compete against public cloud vendors like Amazon Web

2  Services, Microsoft Azure and Google Cloud until the release of its first cloud-native product CDP

3  ("Cloudera Data Platform") in September 2019. The article stated that "CDP enterprise data cloud

4  now offers cloud-native analytics . . . " and that "It was only two years ago that Cloudera . . . found

5  itself fighting for survival. Hadoop . . . was being batted about in a fast-evolving market that saw

6  public cloud providers like Amazon Web Services, Microsoft Azure, and Google Cloud increasingly

7  becoming the destination of choice for such workloads."

8      311.    Finally, during Cloudera's March 10, 2021 fourth quarter fiscal year 2021 ("4Q21")

9  earnings conference call, the Company's current CEO, Defendant Bearden stated that: "in fiscal '21

10  . . . we delivered the industry's first cloud-native **hybrid and multi-cloud** data and analytics platform

11  that meets the needs of large enterprise customers[.]"[323] On April 3, 2018, by contrast, Defendant

12  Reilly stated during an earnings conference call with investors that "**Altus is uniquely multicloud**

13  . . . ." Mr. Bearden's March 10, 2021 statements further represented that CDP "deliver[s] **true hybrid**

14  cloud functionality[,]"[324] and stated: "please note that there's no year-over-year growth comparison

15  for CDP as we've **only had hybrid cloud offerings in the market for a few months now**."[325] By

16  contrast, far earlier, on December 5, 2018 Defendant Reilly misrepresented that "[c]ustomers are

17  coming to our platform, all of them are evaluating cloud, and it's **our hybrid cloud capabilities are**

18  **winning** . . . ."[326]

19  **VI.    DEFENDANTS' VIOLATIONS OF THE 1933 ACT**

20      312.    Plaintiffs assert strict liability claims under §§ 11, 12 and 15 of the 1933 Act against

21  Cloudera, Intel, and each of the Insider Defendants and Director Defendants who signed and/or had

22  authority over the contents of the Merger Registration Statement (hereinafter, the "1933 Act

23  Defendants"). Plaintiffs' 1933 Act claims are not based on any allegations of knowing or reckless

24

25  [323]    Cloudera Inc., Q4 2021 Earnings Conference Call (March 10, 2021), at 3.

26  [324]    *Id*.

27  [325]    *Id*.

28  [326]    Cloudera, Inc., Q3 2019 Earnings Conference Call (December 5, 2018), at 19.

misconduct and do not allege, and do not sound in, fraud. Plaintiffs further specifically disclaim any reference to or reliance upon allegations of fraud for these non-fraud 1933 Act allegations.

**Background to the Merger**

313.    Cloudera and Hortonworks first started to have preliminary discussions concerning a potential business combination as early as June 2015, which continued off and on between June 2015 and April 2016.

314.    In April 2018, a private equity firm approached Hortonworks Chief Operations Officer and Chief Financial Officer, Scot Davidson ("Davidson"), about their interest in facilitating a potential business combination between Cloudera and Hortonworks. Following weeks of further discussions, on May 25, 2018, the Strategic Transactions Committee of the Hortonworks board determined that the private investors' proposed terms were not acceptable and authorized Hortonworks CEO, Defendant Robert Bearden to open a direct discussion with Cloudera concerning a potential strategic transaction.

315.    On June 14, 2018, Cloudera and Hortonworks entered into a reciprocal confidentiality agreement and Cloudera sent a list of initial information requests largely focused on material contract summaries, customer data, and historical financial information. This information was made available in an electronic data room on June 19, 2018. On June 27, 2018, Cloudera formed an M&A Committee consisting of Defendants Cole, Hammonds, Sordello, and Stankey ("Cloudera M&A Committee"). From an independent director meeting consisting of the same members of the Cloudera M&A Committee, management was instructed to retain a financial advisor and, on July 2, 2018, Cloudera's Board and management representatives met with its financial advisor, Morgan Stanley.

316.    In early July 2018, Defendant Frankola and Davidson met to discuss certain assumptions that may be used when forecasting their respective businesses. Throughout the remainder of July 2018, discussions between Cloudera and Hortonworks continued negotiating exchange ratios for a potential merger, with negotiations breaking down. The parties ultimately agreed to revive discussions after Hortonworks announced its financial results for the second quarter 2018 on August 7, 2018.

317.    In August 2018, Defendant Frankola and Davidson continued merger discussions along with representatives of Cloudera's and Hortonworks' financial advisors for the potential strategic combination. Throughout August, negotiations and discussions continued between Cloudera, Hortonworks, and their financial advisors.

318.    Cloudera announced its financial results for the second quarter of fiscal year 2019 on September 5, 2018. Thereafter, Defendant Reilly requested, and the Cloudera M&A Committee received, an updated financial analysis of the proposed strategic combination due to the 13% increase in Cloudera's stock price at that time. A few days later, the Cloudera M&A Committee authorized its counsel to prepare a draft merger agreement in line with a revised non-binding term sheet sent on behalf of Cloudera to Hortonworks reflecting an "at market" exchange ratio that would not be greater than 1.30 and no less than 1.20 shares of Cloudera common stock per Hortonworks share. Additional negotiations amongst the parties concerning the exchange ratio ensued.

319.    On September 20, 2018, Cloudera and Hortonworks entered into an agreement providing for exclusive negotiations in order to begin mutual due diligence and negotiate the definitive terms of the transaction. Between September 21, 2018 and October 3, 2018, the parties conducted mutual due diligence. On September 25, 2018, Cloudera's Board reviewed and approved, with certain modifications discussed by the Cloudera Board, "the long-term financial model prepared by management reflecting certain financial forecasts for Cloudera as a stand-alone company" contained in the Prospectus's section titled Certain Financial Projections Utilized in Connection with the Merger.[327] These financial forecasts were then provided to Hortonworks.

320.    The next day, the Hortonworks Board reviewed and approved "the long-term financial model prepared by management reflecting certain financial forecasts for Cloudera as a stand-alone

---

[327]    Cloudera, Inc., Notice of Special Meeting of Cloudera Stockholders (Form 424B3) (Nov. 27, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018014620/cloudera424.htm#s535f537ae9d44cd0ab9b35aa71951715, at 61.

1    company" contained in the Prospectus's section titled Certain Financial Projections Utilized in

2    Connection with the Merger. These financials were then shared with Cloudera.[328]

3        321.    On September 27, 2018, Davidson and Defendant Frankola, together with

4    representatives of their financial advisors in the transaction, met to discuss the long-term financial

5    models exchanged between the companies and to discuss a framework for a long-term financial model

6    for the combined company based on the combined company's projections. On September 30, 2018,

7    Hortonworks and Cloudera engaged in a technical discussion regarding each company's product

8    offerings and the potential compatibility of the companies' products.

9        322.    On October 1, 2018, representatives of Hortonworks' management reviewed with the

10    Hortonworks Board the combined company financial forecasts with Hortonworks' financial advisor

11    also presenting preliminary financial analyses on the proposed business combination with Cloudera

12    based on Hortonworks' financial forecasts and the combined company financial forecasts provided by

13    Hortonworks management. That same day at a meeting of Cloudera's Board, Morgan Stanley

14    presented its preliminary financial analysis with respect to the proposed merger with Hortonworks

15    based on the Cloudera financial forecasts, the Hortonworks financial forecasts, and the combined

16    company financial forecasts provided by Cloudera management. Cloudera's management also updated

17    the Cloudera Board on their due diligence investigation of Hortonworks.

18        323.    On October 3, 2018, Cloudera's Board and Hortonworks' Board each held separate

19    meetings where their respective financial advisers provided their respective financial analyses

20    concerning the proposed business combination and their oral opinions that the merger was fair from a

21    financial point of view to their respective clients. Cloudera's Board and Hortonworks' Board also each

22    reviewed the final terms of the proposed merger agreement before approving it and found the proposed

23    merger was fair and in the best interests of their respective companies and their shareholders.

24    Cloudera's Board also unanimously approved that the proposal for Cloudera's authority to issue shares

25

26

27    _____

28    [328]    *Id.*

in connection with the merger be submitted to the Cloudera stockholders at the Cloudera stockholder meeting and recommended that Cloudera stockholders approve the proposal.

324.    In doing so, Cloudera and the Insider Defendants failed to disclose to investors that the Company needed to consummate the merger with Hortonworks to acquire the scale and resources necessary to "replatform" the Company's technology from on-premises to cloud-native offerings, something Defendants knew throughout the Class Period that the Company lacked until it released Cloud Data Platform for the public cloud in September 2019. In fact, on the last day of the Class Period during the Company's June 5, 2019 earnings call, former CEO Defendant Reilly admitted that the Company did the Merger because: "[w]e saw the need to get more resources, more scale so that we can deliver a competitive cloud offering and replatform into cloud architecture, and that's why we did the merger. And so Cloudera now has the resources, the scale, the employees, the engineers to very quickly replatform our business."[329]

325.    Throughout the Class Period, starting with the IPO, however, the Company repeatedly touted its then existing "cloud architecture." Indeed, during the Cloudera-Hortonworks joint conference call announcing the merger, Defendant Reilly represented that Cloudera's and Hortonworks' underlying platforms were cloud-native, stating in relevant part: "Our underlying platform, both what Hortonworks is delivering and ours is cloud native technology[.]"[330]

326.    The Company, however, would not have needed to replatform its entire business into cloud architecture if Cloudera, Hortonworks or the combined Company possessed cloud architecture all along. While investors expected the combined Company to introduce a unity platform, Defendants obscured that such a platform needed to be rearchitectured from Hadoop-based to cloud-based architecture by misrepresenting that each company's Class Period offerings were cloud-native. Notwithstanding the Company's lack of cloud-native offerings, at no point during the Class Period or

---

[329]    Cloudera Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 11.

[330]    Cloudera, Inc., Cloudera and Hortonworks Merger Conference Call Transcript (Form 425) (October    3,    2018),    https://www.sec.gov/Archives/edgar/data/1535379/000162828018012306/cldr425calltranscript10318.htm, at 14.

prior to June 5, 2019, did the Company ever reveal to investors that it needed to replatform its business into cloud architecture because it was at a competitive disadvantage against cloud vendors like Amazon and Microsoft.

327.    On October 3, 2018, Cloudera issued a press release announcing the proposed Merger with Hortonworks, which also exclusively offered Hadoop-based software products. The stock-for-stock deal was then valued at $5.2 billion. At the close of trading on January 2, 2019, shares of Cloudera common stock closed at $11.25 per share and Hortonworks closed at $14.68 per share. After completion of the Merger on January 3, 2019, Hortonworks shareholders would own 40% of the combined Company and received 1.305 newly issued shares of Cloudera common stock in exchange for each Hortonworks share they held.

328.    On November 5, 2018, the 1933 Act Defendants filed a Form S-4 draft registration statement with the SEC to register the Cloudera shares to be issued and exchanged in the Merger. On November 16, 2018, the 1933 Act Defendants filed a final amendment to the registration statement, which specifically instructed Cloudera and Hortonworks shareholders to "rely only on the information contained in[the Registration Statement] and in the documents . . . incorporated by reference," including, *inter alia*: (i) Cloudera's 2018 Annual Report; and (ii) 2Q19 Quarterly Report. On November 20, 2018, the SEC declared the Merger Registration Statement effective.[331] On November 27, 2018, the 1933 Act Defendants filed a Prospectus on Form 424B3 with the SEC for the Cloudera shares ultimately issued and exchanged in the Merger, which Prospectus forms part of the Registration Statement.

329.    On January 3, 2019, Defendants completed the Merger, issuing millions of shares of new Cloudera common stock directly to former shareholders of Hortonworks, including Plaintiffs. Each of these new shares of Cloudera common stock was issued pursuant to the Merger Registration

---

[331]    Cloudera, Inc., Amendment to Merger Registration Statement (Form S-4/A ) (November 16, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018014468/clouderas-4a1full.htm, at 139-140.

1    Statement. The price of Cloudera common stock closed at $10.37 per share on January 3, 2019, the

2    day the Merger closed.

3    330.    Shares of Cloudera common stock closed at $17.08 per share and shares of

4    Hortonworks common stock closed at $21.88 per share the day the Merger was announced. Cloudera's

5    share price jumped by as much as 11.53% immediately after it announced the Merger and shares of

6    Hortonworks stock rose by as much as 11.88% the following day. The Merger Registration Statement

7    provided investors with representations concerning the resulting combined Company, including its

8    strategy and outlook. The Merger Registration Statement also included a proposal seeking Cloudera's

9    and Hortonworks' stockholder approval for the issuance of Cloudera common stock shares in

10    connection with the Merger which pursuant to the Merger agreement, the approval of this proposal

11    was a condition to the consummation of the Merger. Cloudera's and Hortonworks' respective Boards

12    each "unanimously" recommended that their stockholders vote in favor of the stock issuance

13    proposal.[332]

14    331.    The 1933 Act Defendants highlighted the purported benefits of the Merger in an

15    October 2, 2018 press release and conference call with investors. Defendant Reilly stated that the

16    businesses are "highly complementary" and "strategic" and would "develop the industry's first

17    enterprise data cloud from the Edge to AI." [333] He also stated that the "combined company will have

18    substantial scale, resources and talent to do more faster" and that the Merger "also produces significant

19    financial benefits including large cost synergies."[334] Defendant Frankola echoed these claims, stating

20    that "[t]his combination will unlock powerful synergies," including "more than $125 million of cost

21

22

23
_____

24    [332]    Cloudera, Inc., Notice of Special Meeting of Cloudera Stockholders (Form 424B3) (November

25    27, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018014620/cloudera
424.htm#s535f537ae9d44cd0ab9b35aa71951715, at 1.

26    [333]    Cloudera, Inc., Cloudera and Hortonworks Merger Conference Call Transcript (Form 425)
(October 3, 2018), https://www.sec.gov/Archives/edgar/data/1535379/000162828018012306/cldr425
27    calltranscript10318.htm, at 9-10.

28    [334]    Id. at 4-5.

synergies per year."[335] Defendant Frankola also represented that the Merger would generate "scale and growth on day one," and that "the day the merger closes, we will have significant scale and growth."[336]

332.    At the time of the Merger, however, Cloudera was suffering from material adverse facts that were omitted from the Merger Registration Statement. The Company's offerings, including Altus, were technologically deficient and obsolete. With no cloud product to "complement" Hortonworks' products, the combined Company faced significant customer churn. These omitted material adverse trends in the Merger Registration Statement began to emerge almost immediately after the Merger in March 2019. In sum, as alleged herein, the Merger Registration Statement contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading, thereby rendering the 1933 Act Defendants liable pursuant to the federal securities laws.

**Materially False and Misleading Statements and Omissions in the Merger Registration Statement[337]**

333.    The Merger Registration Statement contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading.

334.    The Merger Registration Statement contained numerous references to Cloudera's purported "cloud" expertise, that the Company's "*original architecture was designed for the cloud*,"[338] "*runs natively on public cloud infrastructure*,"[339] and that Cloudera could "leverage the latest advances in infrastructure including the public cloud for 'big data' applications."[340] The Merger Registration Statement also stated Cloudera's platform provided "[c]loud and on-premises deployment at scale and across hybrid cloud environments," and "allows enterprises to manage both long-lived

---

[335]    *Id*. at 8-9.

[336]    *Id*. at 8.

[337]    Attached hereto as Exhibit B is a summary chart that complies with the Court's "Guidelines for Securities Class Action Cases."

[338]    Cloudera, Inc., 2018 Annual Report (Form 10-K) (April 4, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018004005/fy-18cldr10k.htm, at 9.

[339]    *Id*.

[340]    *Id*. at 48.

and transient workloads across environments, mixing on-premises and public cloud infrastructure, including all major public cloud vendors – Amazon Web Services, Microsoft Azure and Google Cloud Platform" and "across any mix of public cloud or on-premises." [341] It further touted that Cloudera's product "Altus is a cloud service that . . . enable[s] customers to address a new set of elastic and transient workloads that would otherwise be impractical to run in the datacenter"[342] and highlighted its purportedly "ongoing performance in the areas of cloud,"[343] and commitment to "deliver the industry's first enterprise data cloud"[344] and "[c]loud . . . deployment at scale."[345]

335.    The Merger Registration Statement also promoted Cloudera's products by touting the capabilities of Cloudera's platform, giving the impression that the Company's cloud washed products were highly desirable to existing and prospective customers. It stated Cloudera's "platform delivers an integrated suite of capabilities for data management, machine learning and advanced analytics, affording customers an agile, scalable and cost-effective solution for transforming their businesses,"[346] and "enables organizations to use vast amounts of data from a variety of sources, including the Internet of Things (IoT), to better serve and market to their customers, design connected products and services and reduce risk through greater insight from data."[347]

336.    The highlighted representations in ¶¶ 334-335 above were materially false and misleading and omitted material facts because Cloudera had no cloud offering, and the purported

---

[341]    *Id.* at 8.

[342]    *Id.* at 6.

[343]    *Id.* at 4.

[344]    Cloudera, Inc., Cloudera and Hortonworks Merger Conference Call Transcript (Form 425) (October    3,    2018),    https://www.sec.gov/Archives/edgar/data/1535379/000162828018012306/cldr425calltranscript10318.htm, at 37.

[345]    Cloudera, Inc., 2018 Annual Report (Form 10-K) (April 4, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018004005/fy-18cldr10k.htm, at 8.

[346]    Cloudera, Inc., Notice of Special Meeting of Cloudera Stockholders (Form 424B3) (November 27,    2018),    https://www.sec.gov/Archives/edgar/data/0001535379/000162828018014620/cloudera424.htm#s535f537ae9d44cd0ab9b35aa71951715, at 10.

[347]    *Id.* at 4.

capabilities of the Company's products were so overstated that Cloudera was losing existing and prospective customers exactly because Cloudera's products were not agile, scalable or cost-effective. Cloudera's current customers, including significant numbers of its largest customers, were refusing to renew contracts because their own IT resources could program and perform the same or superior functionality for less cost, or because they otherwise decided Cloudera's products and services were not worth the cost. These adverse undisclosed facts were significant. Indeed, when deficiencies in Cloudera's platform were revealed by customers to securities analysts just two months after the Merger, Cloudera's stock price plummeted.

337.    Further, Altus had already proven to be a commercial failure that had already been rejected by Cloudera's existing and potential customers. Indeed, features core to effective cloud computing as alleged in ¶¶ 334-335, *supra* had not been competently built into the system, leaving Altus rife with holes and thus dependent on expensive, time-consuming workarounds.

338.    The Company's efforts to release Altus repeatedly failed and, even when it was finally released in 2018, Cloudera failed to deploy any adequate sales force behind it. Altus was recognized internally and by prospective customers as extremely limited in functionality, particularly its inability to dynamically scale to meet customers' needs or to compatibly scale in the infrastructure frameworks of cloud providers. Significant internal controversy surrounded the development of the product, with questions over the adequacy of how input from the Company's product management groups was addressed. Indeed, Cloudera's Senior Vice President of Engineering and Support, Daniel Sturman, who was responsible for developing Altus, left Cloudera shortly after the Merger given the Company's cloud washed offerings.

339.    Effective cloud computing features like elasticity, security and integrated support for streams and containerized applications were not competently built into Altus, rendering it almost immediately obsolete. Cloudera's attempts to even release Altus were unsuccessful as customers found its functionality limited. Cloudera's products were so deficient, obsolete, or irrelevant that existing and prospective customers were rejecting them. In fact, Cloudera's own customers in critical markets were so dissatisfied with Cloudera's products, service and cost, they were building out their own data

management solutions superior to what Cloudera offered. With no cloud offering to "complement" Hortonworks, the Company had to completely replatform by creating a new product with cloud architecture in CDP. In the meantime, customers did not renew but instead "mov[ed] to public cloud vendor's native house offerings."[348] Indeed, Cloudera had no cloud product before or after the Merger until it released CDP for the public cloud in September 2019.

340.    Nevertheless, the Merger Registration Statement further touted that Cloudera's product "***Altus is a cloud service*** that . . . enable[s] customers to address a new set of elastic and transient workloads that would otherwise be impractical to run in the datacenter,"[349] highlighting its purported "ongoing performance in the areas of cloud,"[350] and ability to provide "[c]loud . . . deployment at scale."[351]

341.    The statements above in ¶ 340, *supra* contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading because, at the time of the Merger: (i) Cloudera had no cloud offering, and the Company's products were not scalable, agile, elastic or cost-effective; and (ii) Cloudera's customers were not renewing their contracts with the Company because they could perform the same functions that Cloudera was offering, including Altus, at lower prices. Finally, while the Merger Registration Statement stated that that its "original architecture was designed for cloud,"[352] in truth its Hadoop-focused architecture was originally designed for on-premise data warehousing and management that was never "optimized for the cloud"[353] until the Company's release of CDP in September 2019.

---

[348]    Cloudera Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 15.

[349]    Cloudera, Inc., 2018 Annual Report (Form 10-K) (April 4, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018004005/fy-18cldr10k.htm, at 6.

[350]    *Id*. at 12.

[351]    *Id*. at 8.

[352]    *Id*. at 9.

[353]    *Id*. at 48.

342.    The Company's platforms, contrary to the statements in the Merger Registration Statement, were technologically obsolete such that Cloudera's current customers, including significant numbers of its largest customers, were not "expanding"; rather, they were canceling and/or delaying renewals while their in-house engineering teams independently learned to perform the same or superior functions and services that Cloudera sold without paying Cloudera. As a result, by the time of the Merger, far from "land[ing] and expand[ing]," Cloudera's bookings were deteriorating and customer churn was swelling. And in the year leading up to the Merger, Cloudera's sales team and related management, demoralized from the lack of management response to repeated internal reports of customer and sales losses due to the failures of Cloudera's products, hemorrhaged with massive turnover. Such turnover in 2018 included Cloudera's Chief Revenue Officer, VP of Sales for the Americas, Head of Sales for Europe, the Middle East, and Africa, Senior Vice President of Worldwide Sales, and several other key management and executive sales positions (*e.g.*, Regional Directors of Sales).

343.    The loss of sales personnel in the middle of new sales cycles and sales expansion cycles hampered the Company's sales efforts due to customer dissatisfaction with Cloudera's products and services. This was compounded by virtue of the fact that Cloudera's replacement personnel lacked the necessary legacy information and experience to finalize customer sales. The omitted material facts were significant. Indeed, when in its earnings conference call for its first full quarter Cloudera revealed "headwinds in bookings from existing customers," "roughly flat" and "softer" bookings of "large accounts," and "increased" churn rate with a loss of small customer sand "weakness" in sales for midsize customers, as well as "slip[ing]" renewals, even securities analysts with business ties to the Company reacted negatively and investors sold off, driving Cloudera's stock price downward by 45%, to less than half the Merger price investors paid.[354]

344.    Deficiencies in Cloudera's platform were later publicly revealed by Cloudera's customers and a former Cloudera employee to Deutsche Bank securities analysts in March 2019 – just

---

[354]    Cloudera, Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 3, 6, 12.

two months after the Merger closed. The Deutsche Bank report included comments from several Cloudera customers which concluded that "[t]he **feedback on Cloudera was negative . . . .**"[355] More specifically, the Deutsche Bank report quoted the customers they spoke to about Cloudera's products – including Altus – who stated (a) that Cloudera's products were "not useful. We call it our **data swamp**"[356]; (b) "[w]e have a commercial distribution of Cloudera [ ] we're going to **shut it down**"[357]; (c) "[w]e did have Cloudera on-premise. We technically still do have Cloudera. But we're doing all the net new in AWS [Amazon Web Services] EMR . . . . Our goal is to actually mov[e] everything **out of Cloudera** and into AWS EMR. Cloudera is expensive. Every time we added a node, our licensing costs would just go up"[358]; (d) "[o]ur Cloudera footprint is on-premise . . . . We're already doing some work in other departments with Azure, so we're sort of looking at Azure and looking at AWS for alternatives right now"[359]; (e) "[w]e had Cloudera but it just didn't turn out to be what we thought it'd be. It's expensive too . . . ."[360]; and (f) "I used to work at Cloudera. **They were late to come out with a cloud strategy**. That's the reason why they've been struggling . . . . Cloudera had to **rush the launch of Altus** to market, and as a result, it lacked a lot of features, which then hurt them more."[361]

345. When the Company announced it was working on a new cloud product in its March 2019 earnings call – CDP – and deficiencies in Cloudera's platform were thereafter revealed by customers to securities analysts just two months after the Merger, Cloudera's stock price dropped as Cloudera investors unloaded the Company's shares. And, when in its earnings conference call for its first full quarter as a combined Company Cloudera revealed it did not have "data or pipeline" to show any adoption of its cloud product, and that customers that were not renewing included a significant

---

[355]    Deutsche Bank Research's March 21, 20219 Industry Update "New Checks on Tableau, Teradata and Cloudera" at 1.

[356]    *Id*. at 6.

[357]    *Id*. at 5.

[358]    *Id*.

[359]    *Id*. at 6.

[360]    *Id*.

[361]    *Id*.

portion of customers "moving to public cloud vendors' native house offerings"[362], Cloudera's stock price fell 45% the following day (June 6, 2019), to less than half the Merger price.[363]

346.    The Merger Registration Statement further misleadingly touted that Cloudera's purported "cloud" capabilities buttressed its "land and expand" strategy, stating: "[a]fter an initial purchase of our platform, we work with our customers to identify new use cases that can be developed on or moved to our platform, ultimately increasing the amount of data managed on our platform as well as the number and size of our platform deployments."[364] The Merger Registration Statement claimed that the Merger would further this strategy and: (i) "create a major cross-selling opportunity in the near term"[365]; (ii) "expand[] addressable market"[366]; and (iii) "improve Cloudera's . . . existing ability to expand customer relationships and increase the penetration of new customer accounts," such that Cloudera would "use the initial sale as a foothold to increase revenue per customer by increasing the amount of data and number of use cases each customer runs through our platform."[367]

347.    The representations in ¶ 346, *supra* were materially false and misleading because the Company's platforms, contrary to the representations in the Merger Registration Statement, were technologically obsolete. Cloudera's current customers, including its largest customers, were not "expanding" but were canceling and/or delaying renewals. Hence, at the time of the Merger, Cloudera's bookings had stalled and customer churn was increasing such that Defendants' "land and expand" growth prospects had diminished. Further, prior to the Merger, Cloudera's sales employees were experiencing significant churn leading to customer frustration with having new sales

---

[362]    Cloudera, Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 15.

[363]    *Id.*

[364]    Cloudera, Inc., 2018 Annual Report (Form 10-K) (April 4, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018004005/fy-18cldr10k.htm, at 49.

[365]    Cloudera, Inc., Notice of Special Meeting (Form 424B3) (November 27, 2018), https://www.sec.gov/Archives/edgar/data/1535379/000162828018014620/cloudera424.htm, at 66.

[366]    Cloudera, Inc., Q3 Earnings Conference Call (Form 425) (December 5, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018014834/cldr42512618.htm, at 5.

[367]    Cloudera, Inc., 2018 Annual Report (Form 10-K) (April 4, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018004005/fy-18cldr10k.htm, at 49.

representatives that lacked the necessary experience to close sales. Indeed, Cloudera revealed on June 5, 2019 that the Company was suffering from "headwinds in bookings from existing customers," "roughly flat" and "softer" bookings for "*large[ ] accounts*," and "increased" churn rate with a loss of small customers and "weakness" in sales for midsize customers, as well as "slip[ing]" renewals, driving Cloudera's stock price downward by 45% – *i.e.*, less than half the Company's Merger share price.[368]

348.    Further, in an investor Power Point presentation incorporated into the Merger Registration Statement, Cloudera characterized "Altus" as a "cloud" offering and asserted the "complementary product[]" would create "[p]owerful [s]ynergies" for "[r]evenue."[369] This statement was materially false and misleading and/or omitted material information to render the statements not misleading because Altus was not a "cloud product." The Company was thereby forced to develop CDP but, consistent with the Osborne Effect, customers waited to renew their contracts with the Company until CDP was released and/or simply moved their spending to cloud providers like Microsoft, Amazon, Snowflake and Google. When Cloudera revealed in its earnings conference call for 1Q20 that it did not yet have "pipeline" for CDP, and that customers that were not renewing included a significant portion of customers "moving to public cloud vendors' native house offerings,"[370] Cloudera's stock price fell over 40% in a single day on June 6, 2019.[371]

### Materially Misleading Risk Factor Statements

349.    The Merger Registration Statement provided investors with generalized "possible" "Risk Factors" related to the Merger, stating that "*if*" a "risk" occurred it "*could*" or "*may*" possibly negatively impact the Company.[372] These statements were materially false and misleading because the

---

[368]    Cloudera Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 3, 6, 12.

[369]    Cloudera, Inc., Current Report (Form 8-K, Ex. 99.2) (October 3, 2018), https://www.sec.gov/Archives/edgar/data/1535379/000162828018012255/cldr8k10318ex992.htm.

[370]    Cloudera Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 15.

[371]    *Id*.

[372]    Cloudera, Inc., 2018 Annual Report (Form 10-K) (April 4, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018004005/fy-18cldr10k.htm, at 15-16, 19-20, 36, 48.

risks warned of had, in fact, already materialized at the time of the Merger. The Merger Registration Statement also provided that investors "should rely" on the Merger Registration Statement and on documents "incorporated by reference," including a Power Point presentation that promoted the Merger and the 2018 Annual Report, which contained additional purported "risk factors."[373] Cloudera's lack of a cloud solution, the profound shortcomings of its Hadoop-focused platforms and commercial failure of its only purported "cloud" product – Altus – had already adversely affected Cloudera's operations and prospects at the time of the Merger.

350.    The Merger Registration Statement's risk factors omitted any discussion of the key material facts related to the Merger, including that: (i) Altus and the Company's other Hadoop-based products were not cloud offerings as they were not scalable, agile, elastic or cost-effective; (ii) Altus was technologically obsolete; (iii) customers for Cloudera's on-premises Hadoop-focused platforms were taking their business to cloud providers like Snowflake, Google, Amazon and Microsoft; (iv) Cloudera was unable to land "cloud" customers because Altus had been rushed to market and was technologically inferior compared to legitimate cloud vendors' offerings; and (v) churn in Cloudera's sales force was decimating the Company's ability to expand contracts with existing customers and/or acquire new customers.

351.    Further, while Microsoft, Google and Amazon had a vast commercial advantage in cloud computing, and the scale to render Cloudera's mundane Altus offering effectively irrelevant at the time of the Merger, the Company's relevant SEC filing "Risk Factors" meagerly suggested that the Company "*could* lose market share to our competitors, which *could* adversely affect our business, financial condition and results of operations."[374] In truth, the Company's market share in cloud was

---

[373]    *Id.*; Cloudera, Inc., Amendment to Merger Registration Statement (Form S-4/A ) (November 16, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018014468/clouderas-4a1full.htm, at 139-140; Cloudera, Inc., Current Report (Form 8-K, Ex. 99.2) (October 3, 2018), https://www.sec.gov/Archives/edgar/data/1535379/000162828018012255/cldr8k10318ex992.htm.

[374]    Cloudera, Inc., 2018 Annual Report (Form 10-K) (April 4, 2018), https://www.sec.gov/Archives/edgar/data/0001535379/000162828018004005/fy-18cldr10k.htm, at 16.

virtually nonexistent at the time of the Merger, and the Company's cloud competitors had already, at the time of the Merger, adversely affected the Company's business, financial condition and operations.

352.    The risk factors listed deep in the Merger Registration Statement did not disclose the risk posed by: (i) Cloudera's lack of a cloud solution; (ii) the technical shortcomings of its Hadoop-focused platforms or the commercial failure of its Altus product; (iii) the adverse material impacts these deficiencies were having on the Company's then-existing operations. The highly negative response by analysts and the market generally further demonstrates the importance of these facts as the adverse information began to be revealed in March 2019 shortly after the Merger closed.

353.    During Cloudera's March 13, 2019 earnings conference call, the Insider Defendants admitted that they would be focusing its cloud product sales on CDP, thereby starting to reveal the Company's lack of any existing cloud product. Cloudera also revised its prior Merger revenue guidance well below analyst consensus expectations. Cloudera's share price fell from a closing price of $14.61 per share on March 13, 2019 to close at $11.71 per share on March 14, 2019, or nearly 20% on unusually heavy trading volume on March 14, 2019 of over 37.5 million shares traded in response to the news. On June 5, 2019, Cloudera's stock price plummeted over 40% to close at $5.10 per share on June 7, 2019, thereby demonstrating the materiality of the previously undisclosed facts in the Merger Registration Statement. By virtue of the foregoing, the 1933 Act Defendants violated §§ 11, 12, and 15 of the Securities Act, 15 U.S.C. §§ 77k(a), 77l(a), and 77o(a).

## VII.    LOSS CAUSATION

354.    The three declines in Cloudera's common stock share price during the Class Period as alleged herein are actionable. The timing and magnitude of the Company's common stock price declines on each of those days negates any inference that the losses suffered by Plaintiffs and the Class was caused by changed market conditions, macroeconomic or industry factors or Cloudera-specific facts unrelated to Cloudera and the Insider Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and other Class members was a direct result of Cloudera and the Insider Defendants' fraudulent statements and the corresponding artificial inflation in Cloudera's securities

1  prices and the subsequent significant decline in the value of Cloudera's common stock when Cloudera

2  and the Insider Defendants' prior acts of misconduct were revealed.

3  355.    At all relevant times, Cloudera and the Insider Defendants' materially false and

4  misleading statements or omissions alleged herein directly or proximately caused the damages

5  suffered by the Plaintiffs and the putative Class. Those statements were materially false and misleading

6  by their failure to disclose a true and accurate picture of Cloudera's products, their capabilities, and

7  ability to compete against public cloud vendors, as alleged herein. Throughout the Class Period,

8  Defendants publicly issued materially false and misleading statements and omitted material facts

9  necessary to make Defendants' statements not false or misleading, causing Cloudera common stock

10 to be artificially inflated. Plaintiffs and other Class members purchased and/or acquired Cloudera

11 common stock at those artificially inflated prices, causing them to suffer the damages complained of

12 herein.

13 356.    Cloudera and the Insider Defendants were deliberately reckless in not knowing or

14 turned a blind eye to the fact that the Company was struggling to compete, let alone survive with the

15 advent of commercially viable cloud computing services and products. Nonetheless, Cloudera and the

16 Insider Defendants made materially false and misleading public statements that provided false

17 information to investors about the Company's capabilities and market position. Thus, shares of the

18 Company's common stock continued to trade at levels artificially inflated by Cloudera and the Insider

19 Defendants' misleading justifications for the negative information they revealed on April 3, 2018 and

20 March 13, 2019, which maintained the artificial inflation in the Company's share price until it was

21 finally fully removed on June 6, 2019.

22 **Cloudera's April 3, 2018 Partial Disclosure**

23 357.    After market close on April 3, 2018, Cloudera disclosed information partially

24 correcting the Insider Defendants' prior misrepresentations and material omissions concerning

25 Cloudera's products, capabilities and ability to compete against public cloud vendors by announcing

26 significantly and materially lowered guidance for the first quarter 2019 and full-fiscal year 2019. In

27 response, Cloudera's share price fell precipitously from a closing price of $22.24 per share on April

28

3, 2018 to close at $13.29 per share on April 4, 2019, or 40.24%, on unusually heavy trading volume of over 27.9 million shares traded. Specifically, Cloudera and the Insider Defendants represented that the Company's "land and expand" business model was working, and succeeding, and that Cloudera was on its way to consistent positive cash flow and claimed that Cloudera was a growing, successful software company that would reach a larger customer base and become more profitable. At the same time, Cloudera revealed disappointing financial results for its fourth quarter and fiscal year 2018. While Defendant Reilly claimed that "Cloudera is well positioned to continue to grow" and saw "nothing that gives us concern about the market[,]" the market still reacted negatively to the partial disclosures.[375]

358.    During the 4Q18 and full year 2018 earnings call, Defendant Frankola stated that the Company was confident that it would be "cash flow positive in 2020."[376] This suggested that Cloudera would see significant billings growth and have proportionately lower spending in the near future. Further, while analysts specifically questioned Defendants Frankola and Reilly about the real reasons for the disappointing outlook, they claimed that: "the cloud is turning out to be a tremendous tailwind for us. . . . So I see nothing that gives me concern about the market. I just think we need – there's high expectations for us to be a high-growth company. And for us, we just had to be very facile on how we attack that market. No changes in the competitive landscape nor end market demand."[377]

359.    These and other related statements maintained the artificial inflation in the Company's share price.

**Cloudera's March 13, 2019 Partial Disclosure**

360.    After market close on March 13, 2019, Cloudera disclosed information partially correcting Defendants' prior misrepresentations and material omissions concerning Cloudera's product capabilities and ability to compete in cloud by announcing significantly and materially lower

---

[375]    Cloudera, Inc., Q4 2018 Earnings Conference Call (April 3, 2018), at 11.

[376]    *Id*. at 7.

[377]    *Id*. at 11.

than expected guidance for 1Q20 and fiscal year 2020. In response, Cloudera's share price fell from a closing price of $14.61 per share on March 13, 2019 to close at $11.71 per share on March 14, 2019, or nearly 20%, on unusually heavy trading volume on March 14, 2019 of over 37.7 million shares traded.

361.    The Company filed a press release reporting Cloudera's 4Q19 and full year financial results for fiscal year 2019 for the year ended January 31, 2019, which claimed, for 4Q19, total revenues of $144.5 million and subscription revenues were $123 million. Nevertheless, the press release issued weak outlook for the first quarter of the 2020 fiscal year for the period ended April 30, 2019 (1Q20), which was the first fiscal quarter after the Merger. For 1Q20, the Company only expected total revenue in the range of $187 million to $190 million and subscription revenues in the range of $154 million to $156 million. Additionally, the Company's full year 2020 outlook was disappointing. The total revenue prediction for the full 2020 fiscal year was between $835 million and $855 million and subscription revenues to be between $695 million to $705 million. Further, the press release revealed anticipated negative operation cash flow in the range of $30 million to $40 million for the year. Nevertheless, Defendant Frankola stated that "we feel very strong the market is moving in our direction around the hybrid multi-cloud, and then our functionality is best-in-class" and Defendant Reilly disclosed CDP that day to offset any further decline on the Company's share price which remained artificially inflated until the end of the Class Period.[378]

**Cloudera's June 5, 2019 Class Period Ending Disclosure**

362.    After market close on June 5, 2019, Cloudera disclosed information that was fully corrected Defendants' prior misrepresentations and material omissions concerning Cloudera's products' capabilities and ability to compete in cloud. In response, Cloudera's share price fell dramatically from a closing price of $8.80 per share on June 5, 2019 to close at $5.21 per share on June 6, 2019, or 40.80%, on unusually heaving trading volume on June 6, 2019 of over 57.9 million shares traded.

---

[378]    Cloudera, Inc., Q4 2019 Earnings Conference Call (March 13, 2019), at 11.

363.    The Insider Defendants revealed severely diminished quarterly and financial results and reduced full-year guidance for Cloudera, which they attributed to customers electing to "postpone renewal and expansion" of their subscription agreements, and increased customer churn due to Cloudera's inability to provide a cloud solution to the market.[379] The Insider Defendants also announced that Cloudera's losses from operations had ballooned to $103.8 million, roughly double the year-over-year period and further revealed that Cloudera's largest customers were essentially flat for the quarter, middle-spending customers had declined sequentially, and the Company was suffering from 15% dollar churn rate.

364.    Defendants Reilly and Frankola also disclosed that Cloudera had been: (i) experiencing "***headwinds in bookings from existing customers***"; (ii) "roughly flat" and "softer" bookings of "large accounts"; (iii) an "increased" churn rate with a loss of small customers; and (iv) "weakness" in sales for midsize customers, as well as "slip[ing]" renewals.[380] And, revealing the further materialization of the risk of the Company's lack of a cloud product at the time of the Merger, Cloudera admitted it did not have "data or pipeline" to show any "adoption" of its forthcoming CDP product.

365.    The Company also slashed its full-year outlook on June 5, 2019, reducing total revenue guidance by $90 million and stating that it expected recurring revenue growth of only 0% to 10% for the year (compared to 18% to 21% in the prior-issued guidance). The same day, Defendants Reilly and Olson were removed from the Company. In response to all this news, analysts thereafter downgraded Cloudera and questioned management's credibility as alleged in detail in ¶¶ 167-187, *supra*.

## VIII.    APPLICABILITY OF PRESUMPTION OF RELIANCE

366.    At all relevant times, the market for Cloudera's securities was efficient for the following reasons: (a) Cloudera's common stock met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market; (b) during the Class Period, shares of

---

[379]    Cloudera, Inc., Q1 2020 Quarterly Results (Form 8-K, Ex. 99.1) (June 5, 2019), https://www.sec.gov/Archives/edgar/data/1535379/000162828019007582/q1-20cldrexhibit991.htm

[380]    Cloudera, Inc., Q1 2020 Earnings Conference Call (June 5, 2019), at 3, 6, 12.

1   Cloudera's common stock were actively traded, demonstrating a strong presumption of efficiency; (c)

2   as an SEC regulated issuer, Cloudera filed with the SEC periodic public reports; (d) Cloudera regularly

3   communicated with public investors, including through regular disseminations of press releases on the

4   major newswire services and other wide-ranging public disclosures, such as communications with the

5   financial press and other similar reporting services; (e) Cloudera was followed by numerous securities

6   analysts employed by major brokerage firms who wrote reports that were distributed to the sales force

7   and certain customers of brokerage firms during the Class Period. Each of these reports was publicly

8   available and entered the public marketplace; and (f) unexpected material news about Cloudera was

9   rapidly reflected in and incorporated into Cloudera's stock price during the Class Period.

10      367.    As a result of the foregoing, the market for shares of Cloudera's common stock

11  promptly digested current information regarding the Company from all publicly available sources and

12  reflected such information in the prices of Cloudera's stock. Under these circumstances, all purchasers

13  or acquirers of Cloudera's common stock during the Class Period suffered similar injury through their

14  purchase or acquisition of those shares at artificially inflated prices such that the *Basic* and *Affiliated*

15  *Ute* presumptions of reliance apply.

16  **IX.    INAPPLICABILITY OF SAFE HARBOR**

17      368.    The statutory safe harbor provided for forward-looking statements under certain

18  circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. All

19  of the specific statements pleaded herein were not identified as, and/or were not "forward-looking

20  statements" when made. To the extent there were any forward-looking statements, there were no

21  meaningful cautionary statements identifying important factors that could cause actual results to differ

22  materially from those in the purportedly forward-looking statements. Alternatively, to the extent that

23  the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Company

24  and the Insider Defendants are liable for those false forward-looking statements because at the time

25  each of those forward-looking statements were made, the particular speaker knew that the particular

26  forward-looking statement was false, and/or the forward-looking statement was authorized and/or

27

28

approved by an executive officer of Cloudera named under the 1934 Act who knew that those statements were materially false and misleading when made.

## X.    CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 11 of the 1933 Act
### (Against Cloudera, Intel, the Director Defendants
### and the Insider Defendants)

369.    Plaintiffs repeat and reallege each and every allegation in § VI above as if fully set forth herein. Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct. This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. Plaintiffs do not allege that liability under this Count arises from any scienter or fraudulent intent, which are not elements of a § 11 claim. This claim is brought pursuant to § 11 against Cloudera, Intel and the Insider Defendants and the Director Defendants on behalf of Plaintiffs and putative class members who purchased and/or otherwise acquired Cloudera common stock pursuant and/or traceable to the Merger Registration Statement, and were damaged by the acts alleged herein.

370.    As part of the Merger Registration Statement, Cloudera registered and offered up to the aggregate of 174,508,291 shares of its common stock and sold to Hortonworks shareholders approximately 111.7 million of these shares in the closing of the Merger. Cloudera was the issuer of its common stock pursuant to the Merger Registration Statement within the meaning of § 11 of the Securities Act.

371.    The Insider Defendants and the Director Defendants each either signed and/or had ultimate control and authority over the contents of the Merger Registration Statement.

372.    Shares of Cloudera common stock were issued and sold pursuant to the Merger Registration Statement. All purchases or acquisitions of Cloudera common stock by the shareholders of Hortonworks in the Merger were a result of the issuance of the Merger Registration Statement and the shares registered thereunder. As a result, each share sold to Hortonworks' shareholders by Cloudera at the time of the closing of the Merger is traceable to the Merger Registration Statement,

which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. The facts misstated and omitted in the Merger Registration Statement were material.

373.    As the issuer and registrant, Cloudera is strictly liable for the untrue statements of material fact. The Defendants named in this Count owed to Plaintiffs and putative class members the duty to make a reasonable and diligent investigation of the statements contained in the Merger Registration Statement to ensure that the statements contained or incorporated by reference therein were true, and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. None of the Defendants named under this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Merger Registration Statement were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

374.    Intel designated an Intel employee representative, defendant Schooler, to serve on the Cloudera Board, who, within the scope of her employment with Intel, served on the Cloudera Board and signed the Registration Statement at the direction of Intel, in her capacity as an Intel employee and representative. Intel is thus strictly liable under *respondeat superior* for the materially inaccurate statements contained in the Merger Registration Statement and the failure of the Registration Statement to be complete and accurate, unless Intel carries the burden of establishing an affirmative "due diligence" defense. Intel had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Merger Registration Statement and ensure that they were true and accurate, there were no omissions of material facts that would make the Registration Statement misleading, and the document contained all facts required to be stated therein. In the exercise of reasonable care, Intel should have known of the material misstatements and omissions contained in the Merger Registration Statement and also should have known of the omissions of material facts necessary to make the statements made therein not misleading.

375.    Plaintiffs and the class purchased and/or acquired Cloudera common stock pursuant or traceable to the Merger Registration Statement and were damaged thereby. Plaintiffs and the putative class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material facts or omissions of material facts in the Merger Registration Statement when they purchased and/or acquired their Cloudera common stock.

376.    Less than one year has elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based and the time this action was filed. Less than three years elapsed since the stock upon which this Count is brought was *bona fide* offered to Plaintiffs and the putative class. By reason of the foregoing, Cloudera, Intel, the Insider Defendants and Director Defendants are liable to Plaintiffs and the class under § 11 of the 1933 Act.

**COUNT II**
**Violations of Section 12(a)(2) of the 1933 Act**
**(Against Cloudera)**

377.    Plaintiffs repeat and reallege each and every allegation in § VI above as if fully set forth herein. For the purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct. This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. Plaintiffs do not allege that liability under this Count arises from any scienter or fraudulent intent, which are not elements of a § 12 claim.

378.    This claim is brought against Cloudera on behalf of Plaintiffs and putative class members who purchased or acquired Cloudera common stock pursuant and/or traceable to false and/or misleading prospectuses issued by Cloudera as part of an offer and sale of Cloudera common stock in the Merger, and were damaged by the acts alleged herein.

379.    Cloudera offered and/or sold Cloudera common stock using the means or instruments of transportation or communication in interstate commerce or the mails.

380.    As part of the Merger, Cloudera registered and offered up to the aggregate of 174,508,291 shares of its common stock, and thereafter sold at least 111.7 million of these shares to the shareholders of Hortonworks at the closing of the Merger. Cloudera was the issuer, offeror, and

1    seller of these shares of common stock and did such through prospectuses that included untrue

2    statements of a material fact or omits to state a material fact or facts necessary in order to make the

3    statements, in the light of the circumstances under which they were made, not misleading.

4    381.    Shares of Cloudera common stock were issued and sold pursuant to the Merger

5    Registration Statement. All purchases and/or acquisitions of Cloudera common stock by Hortonworks

6    shareholders in the Merger were a result of the issuance of the Merger Registration Statement and the

7    shares registered thereunder. Each share sold to Hortonworks shareholders by Cloudera at the time of

8    the closing of the Merger is traceable to the Merger Registration Statement.

9    382.    As the offeror and seller of Cloudera common stock issued by Cloudera, registered by

10   Cloudera under the Registration Statement, and then sold to each Hortonworks shareholder at the time

11   the Merger was completed, Cloudera is strictly liable for the untrue statements of material fact in the

12   prospectuses issued in support of the Merger Registration Statement. The Insider and Director

13   Defendants owed to Plaintiffs and the putative class the duty to make a reasonable and diligent

14   investigation of the statements contained in the Merger Registration Statement to ensure that the

15   statements contained or incorporated by reference therein were true, and that there was no omission

16   to state a material fact required to be stated in order to make the statements contained therein not

17   misleading.

18   383.    Cloudera never made a reasonable investigation or possessed reasonable grounds for

19   the belief that the statements contained in the prospectuses were accurate and complete in all material

20   respects.

21   384.    Plaintiffs and putative class members who were offered and sold Cloudera common

22   stock in the Merger that is pursuant to and traceable to the Merger Registration Statement that

23   contained untrue statements of material facts or omissions of material facts therein and were damaged

24   thereby. Plaintiffs and members of the class did not know, nor in the exercise of reasonable diligence

25   could they have known, of the untrue statements of material facts or omissions of material facts in the

26   Merger Registration Statement when they purchased or acquired their Cloudera common stock.

27   Plaintiffs and the other members of the class who purchased or otherwise acquired Cloudera common

28

stock in the Merger from Cloudera have sustained damages as a result of the untrue statements of material facts and omissions in the Merger Registration Statement.

385.    Less than one year has elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based and the time this action was filed. Less than three years elapsed since the stock upon which this Count is brought was bona fide offered to Plaintiffs and the class.

386.    By reason of the foregoing, Cloudera is liable to Plaintiffs and putative class members under § 12(a)(2) of the 1933 Act.

### COUNT III
### Violations of Section 15 of the 1933 Act
### (Against Intel, the Director Defendants and the Insider Defendants)

387.    Plaintiffs repeat and reallege each and every allegation in § VI above as if fully set forth herein. For the purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct. This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. For purposes of this Count, Lead Plaintiff does not allege that liability under this Count arises from any scienter or fraudulent intent, which are not elements of a § 15 claim.

388.    At all relevant times, Defendants named under this Count were "controlling persons" of Cloudera within the meaning of § 15 of the Securities Act.

389.    This claim is brought pursuant to § 15 of the 1933 Act against Intel, the Individual Defendants and the Director Defendants on behalf of Plaintiffs and putative class members who purchased or acquired Cloudera common stock pursuant and/or traceable to the Merger Registration Statement, and were damaged by the acts alleged herein, including putative class members who purchased Cloudera common stock it issued by Cloudera that was registered through the Merger Registration Statement, and was then sold by Cloudera to Hortonworks's shareholders.

390.    The Defendants named under this Count violated § 11 by issuing the Merger Registration Statement, which included materially untrue statements of fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

Each of the Defendants named under this Count were controlling persons of Cloudera and/or Hortonworks when the Merger Registration Statement was filed and became effective due to their: (i) senior executive positions; (ii) positions on Cloudera's Board; (iii) direct involvement in Cloudera's day-to-day operations and in the review and approval of the proposed Merger; (iv) solicitation of Cloudera's stockholders' votes in favor of the issuance of Cloudera's common stock; and (v) participation in and preparation of the Merger Registration Statement.

391.    By virtue of their exercise of control over Cloudera, the Defendants named under the Count had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Cloudera, including the content of Cloudera's prospectuses and the Merger Registration Statement and did not make a reasonable investigation or possess reasonable grounds for the belief that the Merger Registration Statement was accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

392.    Less than one year has elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based and the time this action was filed. Less than three years elapsed since the stock upon which this Count is brought was bona fide offered to Plaintiffs and the Class.

393.    By reason of the foregoing, Intel, the Director and the Insider Defendants are liable to Plaintiffs and the members of the Class under § 15 of the 1933 Act.

**COUNT IV**
**Violations of Section 10(b) of the 1934 Act and Rule 10b-5(b)**
**Promulgated Thereunder**
**(Against Cloudera and the Insider Defendants)**

394.    Plaintiffs repeat and reallege each and every allegation contained above in § V as if fully set forth herein.

395.    During the Class Period, Cloudera and the Insider Defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they deliberately disregarded as or turned a blind eye to being misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Cloudera and the Insider Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

396.    Cloudera and the Insider Defendants, individually and together, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations, and future prospects of Cloudera as specified herein. Cloudera and the Insider Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded or turned a blind eye toward the true facts that were available to them. Defendants engaged in misconduct with at least reckless disregard for the truth, and for the purpose and effect of concealing Cloudera's true prospects from the investing public and supporting the artificially inflated price of Cloudera's common stock.

397.    Cloudera and the Insider Defendants had motive and opportunity to perpetrate the fraudulent scheme and course of business described herein. The Insider Defendants were the most senior officers of Cloudera, issued statements and press releases on behalf of the Company, and each made false statements concerning the Company's abilities and had the opportunity to commit fraud alleged. Cloudera and the Insider Defendants were motivated to inflate the price of Cloudera common stock to sell those shares at inflated prices. Plaintiffs and the putative class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for shares of Cloudera's publicly traded common stock. Plaintiffs and the putative class would not have purchased or acquired shares of Cloudera's publicly traded common stock at the prices they paid, or at all, had they been aware that the market price for Cloudera's common stock had been artificially inflated by the Company's and the Insider Defendants' materially false and misleading statements.

398.    As a direct and proximate result of Cloudera and the Insider Defendants' wrongful conduct, Plaintiffs and other putative class members suffered damages in connection with their purchases of Cloudera common stock during the Class Period.

### COUNT V
### Violations of Section 20(a) under the 1934 Act
### (Against the Insider Defendants)

399.    Plaintiffs repeat and reallege each and every allegation contained in § V above as if fully set forth herein. As members of Cloudera's executive team and/or the Company's Board, the Insider Defendants acted as controlling persons of Cloudera within the meaning of § 20(a) of the 1934 Act.

400.    By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of Cloudera's operations and/or intimate knowledge of the false information and disseminated to the investing public, the Insider Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Cloudera, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. The Insider Defendants were provided with, or had unlimited access to Cloudera's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

401.    Cloudera and the Insider Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint and the Class was damaged thereby. By virtue of their positions as controlling persons, the Insider Defendants are liable pursuant to § 20(a) of the 1934 Act.

## XI.    CLASS ACTION ALLEGATIONS

402.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired shares of Cloudera's publicly traded common stock during the Class Period, and were damaged by the conduct asserted herein. Defendants and their immediate families and legal representatives, heirs, successors or assigns

and any entity in which the Defendants named herein have, or had, a controlling interest are excluded from the Class.

403.    The members of the class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. At all relevant times, Cloudera had between approximately 128 and 290 million shares of stock outstanding, owned by hundreds if not thousands of persons.

404.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the class that predominate over questions that may affect individual class members include whether: (a) Defendants violated the federal securities laws; (b) Defendants omitted and/or misrepresented material facts; (c) Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; (d) with respect to Plaintiffs' 1934 Act claims, the Company and the Insider Defendants with deliberate recklessness disregarded or turned a blind eye toward the fact that their Class Period statements were false and misleading; (e) the price of Cloudera common stock was artificially inflated; and (f) the extent of damage sustained by class members and the appropriate measure of damages.

405.    Plaintiffs' claims are typical of those of the putative class because they each were similarly damaged from Defendants' statements and acts.

406.    Plaintiffs will adequately protect the interests of the class and have retained counsel who are experienced in securities class action litigation. Plaintiffs have no interests that conflict with those of the Class.

407.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulties in the management of this action that would preclude its maintenance as a class action.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23(a) and Rule

23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

       B.    Awarding Plaintiffs and the members of the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained due to Defendants' conduct, in an amount to be proven at trial, including interest thereon;

       C.    Awarding Plaintiffs and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

       D.    Awarding such other equitable/injunctive or further relief as this Court may deem just and proper.

## XIII.    JURY TRIAL DEMANDED

       Plaintiffs hereby demand a trial by jury in this action for all issues so triable.

Respectfully submitted,

Dated: June 24, 2021           KAHN SWICK & FOTI, LLP

By:   *s/ Ramzi Abadou*
Ramzi Abadou (SBN 222567)
KAHN SWICK & FOTI, LLP
912 Cole Street, # 251
San Francisco, California 94117
Telephone: (415) 459-6900
Facsimile: (504) 455-1498
ramzi.abadou@ksfcounsel.com

-and-

Lewis S. Kahn (*pro hac vice* to be submitted)
Alexander L. Burns (admitted *pro hac vice*)
Alayne K. Gobeille (admitted *pro hac vice*)
Morgan M. Embleton (admitted *pro hac vice*)
KAHN SWICK & FOTI, LLC
1100 Poydras Street, Suite 3200
New Orleans, Louisiana 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
lewis.kahn@ksfcounsel.com
alexander.burns@ksfcounsel.com
alayne.gobeille@ksfcounsel.com
morgan.embleton@ksfcounsel.com

*Lead Counsel for Lead Plaintiff Mariusz J. Klin*

1

2

*& The Mariusz J. Klin MD PA 401K Profit
Sharing Plan and Plaintiffs Robert Boguslawski
and Arthur P. Hoffman*

3

## CERTIFICATE OF SERVICE

4

I hereby certify that on **June 24, 2021**, I electronically filed the foregoing with the Clerk of the

5

Court using the CM/ECF system which will send notification of such filing to the e-mail addresses

6

7

registered, as denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

8

participants indicated on the attached Manual Notice List.

9

10

*s/ Ramzi Abadou*

11

RAMZI ABADOU

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Mailing Information for a Case 5:19-cv-03221-LHK In re Cloudera, Inc. Securities Litigation

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzi.abadou@ksfcounsel.com,Ashley.Errington@ksfcounsel.com

- **Samuel H. Allen**
  samuel.allen@mto.com

- **Adam Marc Apton**
  aapton@zlk.com,Files@zlk.com

- **Lauren Claire Barnett**
  lauren.barnett@mto.com

- **Peter E. Borkon**
  pborkon@bfalaw.com

- **Alexander Louis Burns**
  alexander.burns@ksfcounsel.com

- **Robert Leo Dell Angelo**
  robert.dellangelo@mto.com,camille.parker@mto.com,denise.olguin@mto.com

- **Gina F. Elliott**
  gina.elliott@mto.com,Vivian.Rodriguez@mto.com

- **Morgan Michelle Embleton**
  Morgan.Embleton@ksfcounsel.com

- **Derek Francis Foran**
  dforan@mofo.com,npan@mofo.com,derek-f-foran-1000@ecf.pacerpro.com,noanoa-pan-2750@ecf.pacerpro.com

- **Alayne K Gobeille**
  alayne.gobeille@ksfcounsel.com

- **Robert S. Green**
  gnecf@classcounsel.com

- **Benjamin Heikali**
  Bheikali@faruqilaw.com,mperetz@faruqilaw.com,rglezakos@faruqilaw.com,ecf@faruqilaw.com,tpeter@faruqilaw.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,tcrockett@pomlaw.com,abarbosa@pomlaw.com

- **Ryan M. Keats**
  rkeats@mofo.com,ryan-keats-5852@ecf.pacerpro.com,andrea-vickery-5658@ecf.pacerpro.com,avickery@mofo.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,asoto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Charles Henry Linehan**
  clinehan@glancylaw.com,charles-linehan-8383@ecf.pacerpro.com

- **Adam Christopher McCall**
  amccall@zlk.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,egoodman@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,jalieberman@pomlaw.com,asoto@pomlaw.c

- **Lesley F. Portnoy**
  LPortnoy@glancylaw.com,info@glancylaw.com,clinehan@glancylaw.com,lesley-portnoy-3007@ecf.pacerpro.com,charles-linehan-8383@ecf.pacerpro.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net,lrosen@ecf.courtdrive.com

- **Jonathan Daniel Uslaner**
  jonathanu@blbglaw.com,MichaelB@blbglaw.com,Rebecca.Kim@blbglaw.com,Avi@blbglaw.com,garyw@blbglaw.com

- **Anna Erickson White**
  awhite@mofo.com,anna-erickson-white-9788@ecf.pacerpro.com,andrea-vickery-5658@ecf.pacerpro.com,avickery@mofo.com

- **Jeffrey Y. Wu**
  Jeffrey.Wu@mto.com,Denise.Olguin@mto.com,Dkt-filings@mto.com,Michael.Lamb@mto.com,Lauren.Barnett@mto.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)