IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE CLOUDERA, INC.
SECURITIES LITIGATION

Case No.  19-cv-03221-MMC

This Document Relates To:

ALL ACTIONS

**ORDER DISMISSING SECOND
AMENDED COMPLAINT**

Re: Dkt. No. 234

Before the Court is defendants Cloudera, Inc. ("Cloudera" or "the Company"), Intel Corporation ("Intel"), Thomas J. Reilly ("Reilly"), Jim Frankola ("Frankola"), Michael A. Olson ("Olson"), Ping Li ("Li"), Martin I. Cole ("Cole"), Kimberly L. Hammonds ("Hammonds"),[1] Rosemary Schooler ("Schooler"), Steve J. Sordello ("Sordello"), Michael A. Stankey ("Stankey"), Priya Jain ("Jain"), Robert Bearden ("Bearden"), Paul Cormier ("Cormier"), Peter Fenton ("Fenton"), and Kevin Klausmeyer's ("Klausmeyer") Motion, filed August 5, 2021, to "Dismiss Consolidated Second Amended Class Action Complaint ('SAC')."  Plaintiffs Mariusz J. Klin and the Mariusz J. Klin MD PA 401K Profit Sharing Plan, Robert Boguslawski, and Arthur P. Hoffman have filed opposition, to which defendants have replied.  In addition, plaintiffs have filed, on four occasions, statements of recent decision, the last on September 9, 2022.  The Court, having read and considered the papers filed in support of and in opposition to the motion, rules as follows.[2]

---

[1] On August 16, 2022, defendants' counsel filed a statement of death, giving notice that Hammonds had passed away.

[2] By clerk's notice issued December 3, 2021, the Honorable Lucy H. Koh, to whom

United States District Court
Northern District of California

## BACKGROUND[3]

In 2005, Cloudera co-founder Doug Cutting created a "data storage and processing platform" called Hadoop, which "was considered revolutionary" and "quickly became an important technological tool for analyzing enormous amounts of unstructured data." (See SAC ¶¶ 21-22.)  In 2008, Cutting, Olson, and others founded Cloudera, and in 2009, the Company released its own version of Hadoop, which peaked in popularity by 2015 as "user demand shifted to cloud." (See SAC ¶¶ 21, 23.)  According to plaintiffs, "[u]nlike on-premise Hadoop platforms, cloud services provide on-demand, elastic, scalable and adaptable service models where processing and storage resources can be accessed from any location via the internet." (See SAC ¶ 25.)

In April 2017, Cloudera announced an initial public offering ("IPO"), and the Company's share price closed on April 28, 2017, the first day of trading, at $18.10. (See SAC ¶ 34.)  Plaintiffs allege that between April 28, 2017, and June 5, 2019 (the "Class Period"), "the Company repeatedly and misleadingly assured investors that it possessed an 'original cloud native architecture' and 'cloud-native platform.'" (See SAC ¶ 36.) Specifically, in 2018, Cloudera released Altus, which, according to plaintiffs, it "misleadingly touted . . . as a cloud offering," even though "it lacked any of the key features of effective cloud computing." (See SAC ¶ 42.)

On September 27, 2017, Cloudera announced a secondary public offering ("SPO"), which closed on October 2, 2017, and in which Li, "Cloudera's earliest venture capital backer," Accel, Li's venture capital firm, and Olson, Cloudera's co-founder and Chief Strategy Officer, "together sold over $112 million of Cloudera stock" at $15.79 per share. (See SAC ¶¶ 44, 45, 109.)

Over a year later, on October 3, 2018, Cloudera announced it was merging with Hortonworks, Inc. (the "Merger") (see SAC ¶ 55), and, that same day, Reilly, at that time

the above-titled action previously was assigned, took the matter under submission.

[3] The following facts are taken from the SAC, the operative complaint.

Cloudera's Chief Executive Officer and Chairman of its Board of Directors, along with Frankola, Cloudera's Chief Financial Officer, hosted an investor conference call, in which they promoted the Merger as one that would "unlock powerful synergies" (see SAC ¶ 50). According to plaintiffs, however, "the Merger was consummated not to create 'synergies,' but because the Company's highest-ranking insiders knew that Cloudera was then facing competitive industry forces so severe that they were simply incapable of achieving organic growth," (see SAC ¶ 49), specifically, "the Company's customers were then already moving their workloads to actual cloud providers like Amazon, Google and Microsoft" (see ¶ SAC 51).

In addition, plaintiffs allege, Reilly, Frankola, Olson, and Li (collectively, "Insider Defendants"), along with Cole, Hammonds, Schooler, Sordello, Stankey, Jain, Bearden, Cormier, Fenton, and Klausmeyer (collectively, "Director Defendants"), "planned and participated in the preparation of the statements contained in the Merger Registration Statement" (see SAC ¶¶ 116, 137), effective November 20, 2018 (see SAC ¶ 10 n.7), which contained material misrepresentations and omissions. Plaintiffs further allege that Intel, "a semiconductor technology company[,] . . . held approximately 17.6% of Cloudera's outstanding common stock as of March 31, 2018," (see SAC ¶ 90), and is "thus strictly liable . . . for the materially inaccurate statements contained in the Merger Registration Statement and the failure of the Merger Registration Statement to be complete and accurate" (see SAC ¶ 92).

On January 3, 2019, the Merger closed. (See SAC ¶ 51.) Thereafter, in March 2019, Cloudera announced it was developing a product called Cloudera Data Platform ("CDP") (see SAC ¶¶ 9, 59), which it later released "for the public cloud in September 2019 and for the private cloud in August 2020" (see SAC ¶ 24).[4] According to plaintiffs,

_____

[4] Plaintiffs explain that "[a] company seeking to use cloud computing services can elect between a private cloud (where cloud services are exclusive to the company) and/or a public cloud (where cloud services are owned and managed by a provider who also hosts other tenants), or a combination of the two." (See SAC ¶ 16.)

1    "CDP was the Company's first ever cloud-native product."  (See SAC ¶ 20.)

2          On June 5, 2019, the last day of the Class Period, Cloudera disclosed what

3    plaintiffs describe as "profoundly negative first quarter results for the period ended April

4    30, 2019, and drastically reduced fiscal year 2020 guidance," and further announced the

5    departures of Reilly and Olson from the Company.  (See SAC ¶ 61.)  Also on June 5,

6    2019, during the Company's earnings call, Reilly stated that "the announcement of [the]

7    [M]erger in October 2018 created uncertainty," and that "[d]uring this period of

8    uncertainty, [Cloudera] saw increased competition from the public cloud vendors."  (See

9    SAC ¶ 65.)  "The following day, on June 6, 2019, the Company's share price closed at

10   $5.21 per share, a single day drop of approximately 40.8% on unusually massive volume

11   of 57.9 million shares traded."  (See SAC ¶ 61.)

12         Based on the above allegations, plaintiffs assert the following five Claims for

13   Relief: (1) a claim alleging, as against Cloudera, Intel, the Director Defendants, and the

14   Insider Defendants, violations of § 11 of the Securities Act of 1933 ("Securities Act")

15   (Count I), (2) a claim alleging, as against Cloudera, violations of § 12(a)(2) of the

16   Securities Act (Count II), (3) a claim alleging, as against Intel, the Director Defendants,

17   and the Insider Defendants, violations of § 15 of the Securities Act (Count III), (4) a claim

18   alleging, as against Cloudera and the Insider Defendants, violations of § 10(b) of the

19   Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated

20   thereunder (Count IV), and (5) a claim alleging, as against the Insider Defendants,

21   violations of § 20(a) of the Exchange Act (Count V).

22                              **LEGAL STANDARD**

23         Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure "can be

24   based on the lack of a cognizable legal theory or the absence of sufficient facts alleged

25   under a cognizable legal theory."  See Balistreri v. Pacifica Police Dep't, 901 F.2d 696,

26   699 (9th Cir. 1990.  In analyzing a motion to dismiss, a district court must accept as true

27   all material allegations in the complaint and construe them in the light most favorable to

28   the nonmoving party.  See NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).

1   "To survive a motion to dismiss, a complaint must contain sufficient factual material,

2   accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal,

3   556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

4   "Factual allegations must be enough to raise a right to relief above the speculative

5   level[.]" Twombly, 550 U.S. at 555.  Courts "are not bound to accept as true a legal

6   conclusion couched as a factual allegation."  See Iqbal, 556 U.S. at 678 (internal

7   quotation and citation omitted).

8           Generally, a district court, in ruling on a Rule 12(b)(6) motion, may not consider

9   any material beyond the complaint.  See Hal Roach Studios, Inc. v. Richard Feiner & Co.,

10  Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).  Documents whose contents are alleged

11  in the complaint, and whose authenticity no party questions, but which are not physically

12  attached to the pleading, however, may be considered.  See Branch v. Tunnell, 14 F.3d

13  449, 454 (9th Cir. 1994).  In addition, a district court may consider matters that are

14  subject to judicial notice, i.e., facts "not subject to reasonable dispute," and the court

15  "must take judicial notice" of such facts "if a party requests it and the court is supplied

16  with the necessary information."  See Fed. R. Evid. 201(b)-(c).

17                                    **DISCUSSION**

18          At the outset, defendants request the Court "consider documents incorporated by

19  reference in the SAC and take judicial notice of certain documents," altogether, thirty-

20  seven exhibits submitted in connection with their motion to dismiss.  (See Decl. of Ryan

21  M. Keats, Dkt. No. 234-3; Defs.' Req. for Consideration of Documents Incorporated into

22  Compl. and for Judicial Notice ("RJN"), Dkt. No. 235.)  Plaintiffs oppose defendants'

23  request as to Exhibits 2, 10, 19, 24, 26, 28, 31, and 36, and further oppose the request to

24  the extent any exhibit is offered for the truth of the matters stated therein.  (See Pls.'

25  Resp. to Defs.' Req. for Consideration of Documents Incorporated into Compl. and for

26  Judicial Notice ("Pls.' Resp.") at 8:19-22, Dkt. No. 242.)

27          As to the opposed exhibits, although defendants request the Court take judicial

28  notice of Exhibit 10, a "Form 4 filed on behalf of Ping Li with the SEC on December 14,

United States District Court
Northern District of California

5

1    2017," and Exhibit 24, a "Form 8-K as filed with the SEC on December 6, 2018," (see

2    RJN at 6:25-26), neither is mentioned in their motion to dismiss, and defendants fail to

3    otherwise identify the facts therein on which they seek to rely.  Accordingly, the Court

4    denies defendants' request with respect to Exhibits 10 and 24.  See Synopsys, Inc. v.

5    InnoGrit, Corp., 2019 WL 4848387, at *6 (N.D. Cal. Oct. 1, 2019) (noting court "may deny

6    a request to take judicial notice of facts that are irrelevant to the . . . motion") (collecting

7    cases).

8         Next, although defendants request judicial notice of Exhibit 36, "a chart listing

9    Cloudera's stock prices from April 28, 2017[,] through January 31, 2020, which was

10   obtained from the Yahoo! Finance website" (see RJN at 7:8-9), to establish "Cloudera's

11   stock price rose in the months following [a] sale" of stock by Olson (see Defs.' Mot. to

12   Dismiss SAC ("Defs.' Mot.") at 15:1-2, Dkt. No. 234), the Court agrees with plaintiffs'

13   argument that "such characterization is subject to reasonable dispute when viewed in

14   context" (see Pls.' Resp. at 8:5).  Accordingly, the Court takes judicial notice of Exhibit 36

15   only to the extent it establishes Cloudera's historical stock prices.  See Lee v. City of Los

16   Angeles, 250 F.3d 668, 689 (9th Cir. 2001) (holding "a court may not take judicial notice

17   of a fact that is 'subject to reasonable dispute'" (citing Fed. R. Evid. 201(b))); see also

18   ScripsAmerica, Inc. v. Ironridge Glob. LLC, 119 F. Supp. 3d 1213, 1232 (C.D. Cal. 2015)

19   (noting "[b]ecause publically traded companies['] historical stock prices can be readily

20   ascertained and those prices are not subject to reasonable dispute, courts routinely take

21   judicial notice of them").[5]

22        As to the unopposed exhibits, many are documents that are referenced and

23   quoted in the SAC, namely, SEC filings or transcripts of investor conference calls, and

24   plaintiffs do not dispute their authenticity.  Accordingly, the Court grants defendants'

25   request as to those exhibits, specifically, Exhibits 1, 3-9, 12-18, 20-23, 25, 27, 29, and 30.

26

27        _____

28        [5] As to the remaining opposed exhibits, the Court has not relied on them in reaching its decision, and, consequently, does not further address them herein.

United States District Court
Northern District of California

1    Further, as to Exhibit 34, a "Voting and Standstill Agreement dated March 28, 2017[,]

2    between Intel Corporation and Cloudera, Inc." (<u>see</u> RJN at 6:27-28), the Court grants

3    defendants' unopposed request for judicial notice of the fact that said agreement

4    "prohibited Intel from increasing its holding above 20%" (<u>see</u> Defs.' Mot. at 21 n.14), and,

5    as to Exhibit 37, "a copy of [the New York Stock Exchange's ("NYSE")] Listed Company

6    Manual sections 303A.01 and 303A.02, as accessed from the NYSE's website on August

7    3, 2021," (<u>see</u> RJN at 7:25-8:1), the Court grants defendants' unopposed request for

8    judicial notice that said manual establishes what "[t]hose rules provide" (<u>see</u> Defs.' Mot.

9    at 23:10).  None of the above-noticed facts in Exhibits 34 and 37 is subject to reasonable

10   dispute.  <u>See</u> <u>Khoja v. Orexigen Therapeutics, Inc.</u>, 899 F.3d 988, 999 (9th Cir. 2018)

11   (noting "[a] fact is 'not subject to reasonable dispute' if it is 'generally known,' or 'can be

12   accurately and readily determined from sources whose accuracy cannot reasonably be

13   questioned'" (citing Fed. R. Evid. 201(b)(1)–(2))).

14        The Court next turns to plaintiffs' claims.  In the SAC, plaintiffs challenge forty-two

15   statements, comprising thirty-two under the Exchange Act (<u>see</u> SAC Ex. A) and ten under

16   the Securities Act (<u>see</u> SAC Ex. B).[6]  The Court considers first plaintiffs' Exchange Act

17   claims, then proceeds to their Securities Act claims.

18      **A. Count IV – § 10(b) of the Exchange Act and Rule 10b-5**

19        Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in

20   connection with the purchase or sale of any security . . . any manipulative or deceptive

21   device or contrivance in contravention of such rules and regulations as the Commission

22   may prescribe."  <u>See</u> 15 U.S.C. § 78j(b).  Additionally, Rule 10b–5, promulgated pursuant

23   to § 10(b), makes it unlawful, <u>inter alia</u>, "[t]o make any untrue statement of a material fact

24   or to omit to state a material fact necessary in order to make the statements made, in the

25   light of the circumstances under which they were made, not misleading."  <u>See</u> 17 C.F.R.

26

27        [6] As noted later herein, seven of these statements are challenged under both Acts.
28   <u>See</u> <u>infra</u> Section C.1.

§ 240.10b–5(b).

To plead a claim under § 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."  See Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 603 (9th Cir. 2014).  Claims brought under § 10(b) and Rule 10b-5 must also meet the particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure, see Fed. R. Civ. P. 9(b) (providing, "[i]n alleging fraud . . . , a party must state with particularity the circumstances constituting fraud . . ."); Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985) (applying Rule 9(b) to claim made under § 10(b) and Rule 10b-5) and, in addition to alleging Rule 9(b)'s requirements as to the "time, place and nature of the alleged fraudulent activities," a plaintiff must "plead evidentiary facts" sufficient to establish any allegedly false statement "was untrue or misleading when made," see Fecht v. Price Co., 70 F.3d 1078, 1082 (9th Cir. 1995) (emphasis omitted) (internal quotations and citations omitted).

Further, such plaintiff must meet the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which requires the plaintiff to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," see 15 U.S.C. § 78u-4(b)(1), and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," see § 78u-4(b)(2).

By order filed May 25, 2021, Judge Koh dismissed all forty-one statements alleged in the Consolidated Amended Complaint ("CAC") to have been made in violation of § 10(b) and Rule 10b-5, finding they were "either (1) forward-looking statements accompanied by meaningful cautionary language, and therefore immunized under the PSLRA's Safe Harbor provision; (2) not actionable as statements of corporate optimism; or (3) because [p]laintiffs ha[d] failed to adequately allege that the statements were false when made."  (See Order Granting Mots. to Dismiss Consol. Am. Class Action Compl.

8

1  ("May 25 Order") at 18:14-17, Dkt. No. 220.)

2      In the SAC, plaintiffs, as noted, now allege Cloudera and the Insider Defendants

3  made thirty-two false and misleading statements in violation of § 10(b) and Rule 10b-5.

4  (See SAC Ex. A.)  In the instant motion, defendants argue "none of the challenged

5  statements were false or misleading at the time they were made or [they] are inactionable

6  as a matter of law."  (See Defs.' Mot. at 5:20-22.)  As set forth below, the Court agrees.[7]

7          **1.  General Statements of Fact**

8      "The PSLRA has exacting requirements for pleading falsity."  See Metzler Inv.

9  GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1070 (9th Cir. 2008) (internal

10  quotation and citation omitted).  To satisfy those "exacting requirements," a plaintiff must

11  plead "specific facts indicating why" the statements at issue were false.  See id.

12  Consistent therewith, a plaintiff must allege "specific contemporaneous statements or

13  conditions that demonstrate the . . . false or misleading nature of the statements when

14  made."  See Ronconi v. Larkin, 253 F.3d 423, 432 (9th Cir. 2001) (internal quotation and

15  citation omitted); see also Norfolk Cnty. Ret. Sys. v. Solazyme, Inc., 2016 WL 7475555,

16  at *3 (N.D. Cal. Dec. 29, 2016) (dismissing claim brought under § 10(b) and Rule 10b-5;

17  finding complaint's "allegations omit[ted] contemporaneous facts that would establish a

18  contradiction between the alleged materially misleading statements and reality").

19      By the May 25 Order, Judge Koh found plaintiffs had "failed to adequately plead

20  falsity" as to thirty-two of the forty-one statements then alleged to be in violation of

21  § 10(b) and Rule 10b-5, twenty-seven of which "concern[ed] Cloudera's cloud product

22  offerings."  (See May 25 Order at 19:14-20.)

23          **a.  Statements Regarding Cloud Products**

24      In the SAC, plaintiffs now allege thirty-two statements were false and misleading in

25  _____

26      [7] In light thereof, the Court does not address herein the question of whether plaintiffs have sufficiently alleged facts that raise a "strong inference" that defendants

27  acted with scienter, i.e., were "deliberately reckless" or engaged in "conscious misconduct."  See DSAM Glob. Value Fund v. Altris Software, Inc., 288 F.3d 385, 388–89

28  (9th Cir. 2002).

United States District Court
Northern District of California

1    violation of § 10(b) and Rule 10b-5, twenty-four of which concern Cloudera's cloud

2    products. Of those twenty-four statements, twenty were previously dismissed by Judge

3    Koh and four, specifically, Statements 4, 12, 19, and 22, are new. The Court discusses

4    below the twenty-four statements in chronological order, setting forth their content, along

5    with the context, exactly as plaintiffs allege in the SAC, but omitting any emphases added

6    by plaintiffs.

7    **April 28, 2017, IPO Prospectus**
**Statement 1** (by Cloudera and the Insider Defendants)

8    "Building on the approach of web-scale consumer internet companies, we
have collaborated with the global open source community to innovate and

9    deliver our cloud-native platform."

10    **Statement 2** (by Cloudera and the Insider Defendants)

11    A key element of its strategy was "extending our original cloud-native
architecture."

12

13    **June 8, 2017, Earnings Call**
**Statement 3** (by Reilly)

14    "Cloudera offers a leading cloud native software platform for machine
learning and advanced analytics."[8]

15

16    **September 7, 2017, Earnings Call**
**Statement 4** (by Reilly)

17    "Having a cloud-native platform fits nicely with enterprises' desire to shift
data and workloads to the cloud . . ."

18

19    **Statement 5** (by Reilly)
"The second quarter also saw growth in the adoption of Cloudera Altus, our

20    Platform-as-a-Service offering that enables data engineering and data
science workloads to run natively and easily in the public cloud."

21

22    **September 28, 2017, SPO Prospectus**
**Statement 6** (by Cloudera and the Insider Defendants)

23    "Building on the approach of web-scale consumer internet companies, we
have collaborated with the global open source community to innovate and

24    deliver our cloud-native platform."

25    _____

26         [8] Although plaintiffs allege Reilly stated "Cloudera offers the leading cloud native
software platform for machine learning and advanced analytics" (see SAC ¶ 163

27    (emphasis added)), the Court notes the earnings call transcript reflects he stated
"Cloudera offers a leading cloud native software platform . . ." (see Defs.' Mot. Ex. 3 at 5

28    (emphasis added)), and, accordingly, considers the statement as actually made.

**Statement 7** (by Cloudera and the Insider Defendants)
A key element of its strategy included "extending our original cloud-native
architecture . . . ."

**Statement 8a** (by Cloudera and the Insider Defendants)
"Cloudera Altus is our platform-as-a-service (PaaS) offering.  Altus is a
cloud service . . . ."

**December 7, 2017, Earnings Call**
**Statement 9** (by Reilly)
Defendant Reilly touted the Company's "cloud-native data platform[.]"[9]

**Statement 10** (by Olson)
"Cloudera Altus Analytic DB is the first data warehouse cloud service that
brings the warehouse to the data through a unique cloud-scale architecture
that eliminates complex and costly data movement."

**April 3, 2018, Earnings Call**
**Statement 11** (by Olson)
The Company's Altus offering "delivers the speed, convenience, elasticity
and ease-of-use expected in native public cloud services."

**Statement 12** (by Olson)
"Altus is uniquely multicloud[.]"

**April 4, 2018, Annual Report**
**Statement 8b** (by Cloudera and the Insider Defendants)
"Altus is a cloud service that . . . enable[s] customers to address a new set
of elastic and transient workloads that would otherwise be impractical to run
in the datacenter[.]"

**Statement 17a** (by Cloudera and the Insider Defendants)
The "Key elements" of Cloudera's strategy include that the Company's
"original architecture was designed for the cloud.  Our software platform
runs natively on public cloud infrastructure . . ."

**Statement 18a** (by Cloudera and the Insider Defendants)
Cloudera's offerings provided "[c]loud and on-premises deployment at scale
and across hybrid cloud environments[.]"

**June 6, 2018, Earnings Call**
**Statement 19** (by Cloudera and Reilly)
Defendant Reilly again boasted that a client was "taking advantage of our
cloud-native architecture to improve agility to respond to ever-changing data

---

[9] The Court notes plaintiffs omit the word "data" from Statement 9 (see Defs.' Mot.
Ex. 8 at 5), which the Court has included herein.

volume and business needs."

**September 5, 2018, Press Release**
**Statement 20** (by Reilly and Frankola)
Cloudera had introduced Cloudera Data Warehouse which it represented as "a modern data warehouse for self-service analytics, built with a hybrid cloud-native architecture that handles 50 PB data workloads and enables hybrid compute, storage, and control for workload portability across public clouds and enterprise data centers."

**September 5, 2018, Earnings Call**
**Statement 21** (by Cloudera and Olson)
"Cloudera Data Warehouse is a modern data warehouse for self-service analytics.  Let me define modern data warehouse and why it's important in this world of exploding data and the Internet of Things.  It's a cloud-native architecture."

**Statement 22** (by Cloudera and Olson)
"We operate natively on those stores."

**Statement 23** (by Cloudera and Reilly)
"With a modern architecture for on-premises deployments and being cloud-native for public cloud infrastructure and Platform-as-a-Service implementations, we believe we have the right set of solutions for the next phase of the data warehouse industry."

**October 3, 2018, Merger Conference Call**
**Statement 24** (by Cloudera and Reilly)
"Our underlying platform, both what Hortonworks is delivering and ours is cloud-native technology, and it flourishes in cloud compute environments so we're very excited about accelerating our capabilities there."

**October 3, 2018, Merger Registration Statement (or incorporated therein)**
**Statement 8c** (by Cloudera and the Insider Defendants)
Same as Statement 8b

**Statement 17b** (by Cloudera and the Insider Defendants)
Same as Statement 17a

**Statement 18b** (by Cloudera and the Insider Defendants)
Same as Statement 18a

**Statement 25** (by Cloudera and the Insider Defendants)
Cloudera could "leverage the latest advances in infrastructure including the public cloud for 'big data' applications."

**Statement 29** (by Cloudera and the Insider Defendants)
The Company's "underlying platform" consisting of "cloud-native technology

. . . flourishes in cloud compute environments so we're very excited."

**December 5, 2018, Earnings Call**
**Statement 30** (by Cloudera and Reilly)
"Customers are coming to our platform, all of them are evaluating cloud, and it's our hybrid cloud capabilities are winning . . .  And so it is – we are uniquely positioned to run where our customers want to run and give them a lot of flexibility."

**December 6, 2018, Barclays Conference**
**Statement 31** (by Cloudera and Reilly)
". . . We're called Cloudera because when we started, we started with the original Hadoop project, we offered it as a cloud service on Amazon Web Services in 2008 and software, okay?  That's why we're called Cloudera . . . The market has now moved to us because we offer a hybrid capability, right, so we run on-prem, bare metal, we run increasingly on private cloud, which we think customers are really driving and we're hybrid and multi-cloud, okay? . . . .  And we already have hybrid capabilities that they have to develop, they've never really innovated in their space.  And then, we're going to have multi-cloud.  So we're taking it to them, momentum has shifted in our favor and increasingly will go that way."

(See SAC Ex. A at 1-28, 39-59, 76-83.)

Plaintiffs allege the above-referenced twenty-four statements were false and misleading when made because, at the time, Cloudera's "products were not 'cloud-native'" (see, e.g., SAC Ex. A at 1) and "were not 'cloud-native architecture'" (see, e.g., SAC Ex. A at 15).  Plaintiffs allege "Cloudera did not possess a 'cloud-native' offering until the Company released CDP for the public cloud in September 2019 and for the private cloud in August 2020."  (See SAC ¶ 18.)

By the May 25 Order, Judge Koh dismissed plaintiffs' claims to the extent based on the twenty-seven statements that concerned Cloudera's cloud products as alleged in the CAC, finding its "allegations . . . deficient because [p]laintiffs d[id] not explain what it meant to have 'cloud-native' products or 'cloud-native architecture' at the time Cloudera Defendants[10] made the challenged statements," and "[w]ithout a contemporaneous definition or explanation for what 'cloud-native' technology meant when Cloudera

---

[10] In said order, Judge Koh refers to Cloudera, along with the Insider Defendants and Director Defendants, collectively, as "Cloudera Defendants."  (See May 25 Order at 2:20-21.)

United States District Court
Northern District of California

Defendants made the challenged statements, the Court ha[d] no basis to find that [p]laintiffs ha[d] adequately pled that Cloudera Defendants' statements were false." (See May 25 Order at 20:26-21:6.)  In particular, Judge Koh found plaintiffs' reliance on a "post-Class Period definition of 'cloud native' or 'cloud architecture'" taken from "an article published by Cloudera's Chief Product Officer Arun Murthy [("Murthy")] on February 6, 2020, seven months after the close of the Class Period and one to two years after most of the challenged statements were made," specifically, plaintiffs' characterization of the article as stating that "'cloud native' and 'cloud architecture' mean that an offering has specific material attributes such as the use of containers and Kubernetes, seamless scalability, security and elasticity," was "insufficient to demonstrate that 'cloud native' or 'cloud-native architecture' was understood to include those particular attributes when Cloudera Defendants made the challenged statements during the Class Period."  (See id. at 21:9-14 (quoting CAC ¶ 192), 21:20-23.)  To the extent plaintiffs rely on the same post-Class Period definition taken from the Murthy article (see SAC ¶ 300), this Court, as discussed below, finds the same problem persists.

First, as defendants point out, the Murthy article never uses the term "cloud native" or "cloud architecture."  See Wochos v. Tesla, Inc., 985 F.3d 1180, 1193 (9th Cir. 2021) (citing 15 U.S.C. § 78u-4(b)(1)) (alterations omitted) (holding "[w]here . . . a plaintiff claims that the words used in a statement have some special or nuanced meaning . . . , the plaintiff must plead facts that will support [such] crucial premise in order to satisfy the PSLRA's requirement that a private securities plaintiff adequately plead 'the reason or reasons why a statement is misleading'").  Second, even if the article could be read in the manner described by plaintiffs, their reliance thereon is unavailing for the reason that, as Judge Koh found, any such statement is too remote in time from any of the challenged statements.  See Ronconi, 253 F.3d at 432 (requiring "contemporaneous statements" that demonstrate falsity "when made").

Similarly unavailing are plaintiffs' new allegations, without any supporting facts, that "reasonable investors" understood "cloud-native" and "cloud architecture" to mean

"that such offerings or capabilities had specific material attributes such as the use of containers, ease-of-use, seamless scalability, security and elasticity" (see SAC ¶ 36),[11][12] and that those terms "had the same meaning in 2017 . . . as [they] do[] presently" (see SAC ¶¶ 14-15).  Such conclusory allegations do not constitute the requisite "contemporaneous," see Ronconi, 253 F.3d at 432, facts sufficient to establish "cloud-native" or "cloud architecture" had "the distinctive . . . meaning that [p]laintiffs claim," see Wochos, 985 F.3d at 1194 (noting challenged "statement would not be false unless the term [therein] actually mean[t]" what plaintiffs alleged).  Indeed, plaintiffs plead no evidentiary facts to support such additional assertion, whether from a knowledgeable witness, any of the above-referenced documents that used the term "cloud-native" or "cloud architecture," or any other source.[13]  See City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp., 963 F. Supp. 2d 1092, 1121 (E.D. Wash. 2013), aff'd, 691 F. App'x 393 (9th Cir. 2017) (finding plaintiff's asserted definition, "[a]bsent any support,"

---

[11] Plaintiffs rely on similar definitions to define "run natively and easily in the public cloud" (see SAC ¶ 169 (explaining phrase "meant to a reasonable investor that such an offering has specific material attributes such as the use of containers, seamless scalability, security and elasticity")), "cloud-scale architecture" (see SAC ¶ 186 (same)), "native public cloud" (see SAC ¶ 194 (same)), "cloud service" (see SAC ¶ 211 (same)), "multi-cloud" (see SAC ¶ 194 (explaining "[a] multi-cloud offering features cloud-based architecture . . . .")), and "hybrid cloud" (see SAC ¶ 249 (explaining "[a] hybrid cloud offering is a cloud-native offering")).

[12] In their opposition, plaintiffs appear to rely on a slightly different definition, namely that "the term cloud-native has an industry-specific meaning understood by reasonable investors to mean a software offering that 'provide[s] on-demand, elastic, scalable and adaptable service models where processing and storage resources can be accessed from any location via the internet[.]'" (See Pls.' Opp'n at 7:15-17.)  Irrespective of whether this definition is intended to supplement or supplant the definition discussed above, it exemplifies the same deficiency, namely, a lack of supporting facts.  Cf. Spitzberg v. Houston Am. Energy Corp., 758 F.3d 676, 689 (5th Cir. 2014) (finding where term was contained in "a definitional system of 'common reference' for participants in the international petroleum industry," plaintiffs plausibly alleged term had "widely accepted" meaning in said industry); In re Terayon Commc'ns Sys., Inc., 2002 WL 989480, at *1, *4 (N.D. Cal. Mar. 29, 2002) (finding "industry standard" was "term of art" in cable industry where "cable industry consortium [was] charged with enforcing . . . industry standard known as . . . 'DOCSIS'").

[13] Without an adequately alleged definition of "cloud-native" or "cloud architecture," plaintiffs' new allegations as to "consumption-based pricing" (see SAC ¶ 18) and "cloud washing" (see SAC ¶ 186) provide no additional support for their assertion of falsity.

insufficient to establish term had "specific and well-understood meaning by investors").

Cf. In re QuantumScape Sec. Class Action Litig., 580 F. Supp. 3d 714, 732 (N.D. Cal.

2022) (finding report sufficient to support allegations of falsity as to attributes of

defendant's product where nine former employees of defendant and four experts were

"interviewed . . . about [defendant's] testing").

Accordingly, to the extent plaintiffs' claims are based on any of the above-

referenced twenty-four statements, such claims are subject to dismissal.

### b. Other Statements for Which Plaintiffs Have Failed to Plead Falsity

In the SAC, plaintiffs again challenge the below three statements, which they

allege were made during Cloudera's April 3, 2018, earnings call after the Company

"announced its fourth quarter and fiscal year 2018 results for the periods ended January

31, 2018," and "revenue guidance for the first fiscal quarter of 2019" (see SAC ¶ 191),

both of which were below Cloudera's previous projections.  According to plaintiffs, Reilly,

during the call, "suggested that the Company's weak guidance and results were due to

'mistakes from where [they] directed [their] sales resources' and being 'over-rotated'"

(see SAC ¶ 193), "as opposed to the market's shift to cloud offerings which the Company

then lacked" (see SAC ¶ 201).

> **April 3, 2018, Earnings Call**
> **Statement 13** (by Reilly)
> "And expansion is the larger part of our business, because new customers start small, our expansion deals are more sizable.  So we were just over-rotated."
>
> **Statement 15** (by Reilly)
> "So – and we're seeing the move to the cloud take shape unlike it did 2 years ago.  So I see nothing that gives me concern about the market."
>
> **Statement 16** (by Reilly)
> "No changes in the competitive landscape nor end market demand."

(See SAC Ex. A at 31, 34-37.)

By the May 25 Order, Judge Koh dismissed plaintiffs' claims to the extent based

on Statement 13, finding the allegation that the statement "was false when made

16

because Cloudera was not 'over-rotated' in its customer sales, but rather . . . had weak products that could not compete against competitors' offerings," was not factually supported, in that "[t]he only specific allegation that [p]laintiffs provide[d] to support the falsity of [Statement 13] [wa]s that in September of 2019 Cloudera was forced to launch its new cloud product CDP in order to compete with other cloud providers." (See May 25 Order at 25:20-24.) In particular, Judge Koh found "the fact that Cloudera later launched a new cloud product to compete with competitors d[id] not establish that its previous product was weak or inadequate." (See id. at 25:25-26.)

In the SAC, plaintiffs again allege Statement 13 was false when made because "the Company's disappointing guidance was not due to Cloudera being 'over-rotated,'[14] but rather stemmed from Cloudera's products' weak competitive position." (See SAC ¶ 202.) In support thereof, plaintiffs again rely on Cloudera's subsequent launch of CDP (see SAC ¶ 202), which allegation, as Judge Koh previously found, "does not demonstrate the falsity of [Statement 13]" (see May 25 Order at 26:3), and, plaintiffs' continued allegations that Cloudera "lacked any cloud-native architecture" and "did not compete in the cloud market" (see SAC ¶ 202) are, as discussed earlier herein, see supra Section A.1.a, inadequate to establish falsity.

Likewise unavailing are plaintiffs' newly added allegations that "Altus could not 'deliver the speed, convenience, elasticity and ease of use expected in native public cloud services' because as Defendant Cole admitted in September 2019, Altus was not 'easy to use' and lacked 'pure public cloud capability.'" (See SAC ¶ 202.) Although the Ninth Circuit has held falsity can be established "by means of a later statement by the defendant" where the later statement is "similar to 'I knew it all along,'" see Yourish v. Cal. Amplifier, 191 F.3d 983, 996 (9th Cir. 1999), plaintiffs here have not provided the complete sentence(s) to which they cite, nor do they explain the meaning of "pure," and, in any event, even if Cole had said in September 2019 that Altus was not easy to use,

_____

[14] Neither party endeavors to explain what Reilly meant by "over-rotated."

United States District Court
Northern District of California

1   there is no indication that Reilly had any knowledge or concerns regarding that aspect of

2   the product nearly one and a half years earlier.  Accordingly, neither of Cole's alleged

3   "admissions" can reasonably be said to resemble an "'I knew it all along' admission."  See

4   id.; see also In re Siebel Sys., Inc. Sec. Litig., 2005 WL 3555718, at *4 (N.D. Cal. Dec.

5   28, 2005) (finding defendant's post-class-period statement that a product had "kinks" did

6   not make earlier positive statement about product false; noting "[i]f that were the case,

7   the federal securities laws would prevent software companies from making any positive

8   statements about new software").

9        Next, by the May 25 Order, Judge Koh dismissed plaintiffs' claims to the extent

10   based on Statement 15, finding plaintiffs' allegation that the statement "was false

11   because Cloudera lacked cloud-native services and Cloudera could not provide public

12   cloud services comparable to its competitors" lacked factual support, in that, as

13   discussed above, plaintiffs "ha[d] failed to adequately plead falsity with respect to

14   Cloudera's lack of cloud-native products" and, further, had "fail[ed] to allege any

15   contemporaneous factual allegations to support" their allegation "that 'Cloudera's

16   competitors' cloud technologies were vastly outperforming the Company's Hadoop-

17   focused platform.'"  (See May 25 Order at 26:13-20.)

18        In the SAC, plaintiffs again allege Statement 15 was false "because . . . Cloudera

19   lacked any cloud-native architecture and . . . Cloudera's Hadoop-based products could

20   not provide performance comparable to its competitors' cloud offerings" (see SAC ¶ 202),

21   which allegations remain insufficient, in that plaintiffs have cured neither of the

22   deficiencies identified earlier by Judge Koh.

23        Although plaintiffs now allege that at the time Reilly made Statement 15, "Cloudera

24   had put in place cloud specialists, who solely focused on competing on the cloud," and

25   that Reilly "later acknowledged [on] September 9, 2018[,] . . . that the Company

26   incentivized its sales force to pursue cloud workloads in an attempt to prevent cloud

27   vendors from 'chipping away' at their customers" (see SAC ¶ 200), neither allegation sets

28   forth "contemporaneous facts that would establish a contradiction between the alleged

18

1   materially misleading statement[] and reality," see Norfolk, 2016 WL 7475555, at *3.[15]

2   Further, although plaintiffs now assert "[d]efendants later admitted their lack of

3   cloud-native products drove customers elsewhere" (see Pls.' Opp'n at 13 (citing SAC

4   ¶¶ 276, 299)), such assertion is not supported by the record.  In particular, plaintiffs

5   allege that on June 5, 2019, Reilly stated "basically, here's the backdrop[;] [w]e saw the

6   need to get more resources, more scale so that we can deliver a competitive cloud

7   offering and replatform into cloud architecture, and that's why we did the [M]erger" (see

8   SAC ¶ 276), and that on December 13, 2019, Murthy stated "what we've been working on

9   for the last nine months after the merger of Cloudera and Hortonworks[] has been sort of

10  a reimagination of everything we have done[;] [i]t's a reimagination of the entire stack to

11  make it really cloud native" (see SAC ¶ 299).  Neither of those statements, however,

12  constitutes an admission that Cloudera's "lack of cloud-native products drove customers

13  elsewhere" or otherwise contradicts Reilly's statement, made more than a year earlier,

14  that he had no "concern[s] about the market."  Similarly, Reilly's statements, in June

15  2019, that Cloudera "saw increased competition" and was "at a competitive

16  disadvantage" during a period that "began with 'the announcement of [the] [M]erger in

17  October 2018'" (see Pls.' Opp'n at 13:22-27), do not serve to establish such

18  circumstances existed in April 2018, when Statement 15 was made, nor does plaintiffs'

19  reliance on the same allegations discussed above in connection with Statement 13

20  provide any better support for Statement 15.

21  Lastly, by the May 25 Order, Judge Koh dismissed plaintiffs' claims to the extent

22  based on Statement 16, finding, contrary to plaintiffs' allegation, two later statements by

23  defendant (see May 25 Order at 27:6-8 (citing CAC ¶¶ 95, 122)) failed to demonstrate its

24  falsity (see id. at 27:12-13 (noting neither statement "resembled an 'I knew it all along'

25

26      [15] Indeed, Reilly's statement that Cloudera "incentivized its sales force to pursue

27  cloud workloads" is consistent with defendants' earlier statements that they had a cloud
    product to sell, and consequently, as defendants point out, "undermines rather than

28  supports [plaintiffs'] theory."  (See Defs.' Mot. at 3:26-4:2.)

United States District Court
Northern District of California

admission") (citing <u>Yourish</u>, 191 F.3d 983 at 996)).

In response to the instant motion, plaintiffs no longer rely on those two statements, and, instead, rely on the same allegations discussed above in connection with Statements 13 and 15, which allegations fare no better at this juncture.

Accordingly, to the extent plaintiffs' claims are based on Statement 13, 15, or 16, such claims are subject to dismissal.

### 2.  Corporate Puffery and Optimism

"Statements of mere corporate puffery, 'vague statements of optimism like "good," "well-regarded," or other feel good monikers,' are not actionable because 'professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives.'"  <u>Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.</u>, 759 F.3d 1051, 1060 (9th Cir. 2014) (quoting <u>In re Cutera Sec. Litig.</u>, 610 F.3d 1103, 1111 (9th Cir. 2010)).

"The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions."  <u>City of Sunrise Firefighters' Pension Fund v. Oracle Corp.</u>, 2019 WL 6877195, at *9 (N.D. Cal. Dec. 17, 2019) (internal quotation and citation omitted).  Consequently, courts have characterized as non-actionable puffery such statements as "[w]e continue to see tremendous growth across our cloud business," "[c]ustomer adoption of our cloud products and services continues to be very strong," and "what we have called our on-premise business remains robust."  <u>See id.</u> (alterations in original).

In the SAC, plaintiffs again challenge the below two statements.

**April 3, 2018, Earnings Call**
**Statement 14** (by Reilly)
"[T]he cloud is turning out to be a tremendous tailwind for us."

**March 13, 2019, Earnings Call**
**Statement 32** (by Cloudera and Reilly)
"[W]e feel very strong that market is moving in our direction around the hybrid multi-cloud, and then our functionality is best-in-class."

(<u>See</u> SAC Ex. A at 32-22, 84.)

20

1    By the May 25 Order, Judge Koh dismissed plaintiffs' claims to the extent based

2    on Statements 14 and 32, finding, as discussed earlier herein, plaintiffs had failed to

3    show falsity based on Cloudera's lack of cloud products, and that the balance of the

4    statements constituted "non-actionable corporate puffery."  (See May 25 Order at 29:26-

5    30:1.)

6    In the SAC, plaintiffs again plead the above statements were false, alleging

7    "Cloudera did not offer a cloud offering because its platform was not cloud-native or

8    based in cloud-architecture" (see SAC ¶ 259), which allegation, as discussed above, is

9    unaccompanied by supporting facts.  Consequently, although there may be

10   circumstances where, as plaintiffs argue, "[c]ontext is key" (see Pls.' Opp'n at 10:22), the

11   cases on which plaintiffs rely are readily distinguishable, as all involved an essentially

12   indisputable actuality, known to the defendants at the time the challenged statements

13   were made, that was diametrically opposed to that described in the challenged

14   statements.  See, e.g., In re Petrobras Sec. Litig., 116 F. Supp. 3d 368, 372, 381

15   (S.D.N.Y. 2015) (finding, in context of defendants' "multi-year, multi-billion dollar bribery

16   and kickback scheme," statements that defendant company "undertook to 'conduct its

17   business with transparency and integrity' and to 'refuse any corrupt and bribery

18   practices'" was not "mere puffery"); see also Mulderrig v. Amyris, Inc., 492 F. Supp. 3d

19   999, 1019-21 (N.D. Cal. 2020); In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130, 1143

20   (9th Cir. 2017); In re Rocket Fuel, Inc. Sec. Litig., 2015 U.S. Dist. LEXIS 171552, at *16-

21   19 (N.D. Cal. 2015); and Arkansas Tchr. Ret. Sys. v. Bankrate, Inc., 18 F. Supp. 3d 482,

22   485 (S.D.N.Y. 2014).

23   Here, in contrast, as defendants point out, "the context . . . is that [p]laintiffs have

24   failed to plead that 'cloud native' had any verifiable or established definition" (see Defs.'

25   Reply at 7:14-16), and, as Judge Koh found, Statements 14 and 32 "echo statements . . .

26   courts . . . have previously found to be non-actionable statements of corporate puffery"

27   (see May 25 Order at 29:16-17); see also In re Pivotal Sec. Litig., 2020 WL 4193384, at

28   *7 (N.D. Cal. July 21, 2020) (finding "[s]tatements classifying [defendant's product] as

United States District Court
Northern District of California

21

1    providing a 'cutting-edge,' 'leading,' and 'turnkey cloud-native platform'" not actionable;

2    characterizing statements as "vague assessments that 'represent the "feel good" speak

3    that characterizes "non-actionable puffing"'").

4        Accordingly, to the extent plaintiffs' claims are based on Statement 14 or 32, such

5    claims are subject to dismissal.

6        ### 3.  Forward-Looking Statements

7        A forward-looking statement is "any statement regarding (1) financial projections,

8    (2) plans and objectives of management for future operations, (3) future economic

9    performance, or (4) the assumptions 'underlying or related to' any of these issues." No.

10   84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp., 320

11   F.3d 920, 936 (9th Cir. 2003) (citing 15 U.S.C. § 78u-5(i)).  Under the PSLRA, a person

12   may not be held liable for a forward-looking statement, provided the statement is (1)

13   "identified as a forward-looking statement and accompanied by meaningful cautionary

14   statements identifying important factors that could cause actual results to differ materially

15   from those in the forward-looking statement" or (2) "immaterial." See 15 U.S.C. § 78u-

16   5(c)(1)(A).  On the other hand, if such statement is neither immaterial nor identified as

17   forward-looking and unaccompanied by meaningful cautionary language, such statement

18   falls outside the safe harbor if the plaintiff can show it "was made with actual knowledge

19   by [the speaker] that the statement was false or misleading." See § 78u-5(c)(1)(B).  "The

20   fact that [a] prediction proves to be wrong in hindsight," however, "does not render the

21   statement untrue when made." See In re VeriFone Sec. Litig., 11 F.3d 865, 871 (9th Cir.

22   1993).

23       In the SAC, plaintiffs again challenge the below three statements.

24   **October 3, 2018, Merger Registration Statement (or incorporated therein)**
     **Statement 26** (by Cloudera and the Insider Defendants)

25   The Merger would "create a major cross-selling opportunity in the near

26   term[.]"

27

28   **Statement 27** (by Reilly)
     The Merger would "expand[] our addressable market[.]"

United States District Court
Northern District of California

**Statement 28** (by Cloudera and the Insider Defendants)
The Merger would "improve Cloudera's . . . existing ability to expand customer relationships and increase the penetration of new customer accounts," such that Cloudera would "use the initial sale as a foothold to increase revenue per customer by increasing the amount of data and number of use cases each customer runs through our platform."

(See SAC Ex. A at 66, 70, 73.)

By the May 25 Order, Judge Koh dismissed plaintiffs' claims to the extent based on Statement 28, and also dismissed those claims to the extent based on statements identical in substance to Statements 26 and 27,[16] finding they constituted non-actionable forward-looking statements protected under the PSLRA's safe harbor. (See May 25 Order at 31:3-5.) Specifically, Judge Koh, noting those statements "all concern[ed] future operational expectations or future economic performance and opportunities after the [M]erger" (see id. at 31:8-9), found them to be "forward-looking on their face" (see id. at 31:17), and further found they were accompanied by "comprehensive language identifying the[m] [as] forward-looking statements" (see id. at 31:26-32:1) as well as "'meaningful cautionary statements' as required by the PSLRA" (see id. at 31:23-24).

In opposition to the instant motion, plaintiffs, citing Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 986 (9th Cir. 2008), now argue that "nothing in Cloudera's alleged cautionary language 'alerts the reader that some of these risks may have already come to fruition.'" (See Pls.' Opp'n at 12 n.13.) Berson, however, did not involve a forward-looking statement, see Berson, 527 F.3d at 990 (finding challenged statement "doesn't look forward"), and, as the Ninth Circuit has made clear, "if a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter," see Cutera, 610 F.3d at 1112.

---

[16] Statement 26 is essentially the same as the CAC's Statement 30, "The Merger would 'increase cross-sell opportunities,'" and, Statement 27 is essentially the same as the CAC's Statement 31, "The Merger would 'enlarge addressable market.'" (See CAC Ex. D at 26-27.)

United States District Court
Northern District of California

Accordingly, to the extent plaintiffs' claims are based on Statement 26, 27, or 28, such claims are subject to dismissal.

### B. Count V – § 20(a) of the Exchange Act

As noted, plaintiffs assert, as against the Insider Defendants, violations of § 20(a) of the Exchange Act.

Under § 20(a) of the Exchange Act, any person who controls a person liable for violating § 10(b) is jointly or severally liable for the violation.  See 15 U.S.C. § 78t(a). "[T]o prevail on . . . claims for violations of § 20(a)," however, "plaintiffs must first allege a violation of § 10(b) or Rule 10b-5."  See Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1035 n.15 (9th Cir. 2002).

Here, as discussed above, plaintiffs have failed to state a claim under § 10(b) or Rule 10b-5, and, consequently, such failure precludes plaintiffs from stating a claim under § 20(a).

### C. Counts I & II – §§ 11 and 12(a)(2) of the Securities Act

As noted, plaintiffs assert, as against Cloudera, Intel, the Director Defendants, and the Insider Defendants, violations of § 11 of the Securities Act (Count I) and, as against Cloudera, violations of § 12(a)(2) of the Securities Act (Count II).

Section 11 creates a private remedy for a purchaser of a security if "any part of [a] registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).

Similarly, § 12 allows a purchaser of a security to sue "[a]ny person who . . . offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading."  15 U.S.C.A. § 77l(a)(2).

To plead a claim under § 11, a plaintiff "must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or

1    misrepresentation was material, that is, it would have misled a reasonable investor about

2    the nature of his or her investment."  See In re Daou Sys., Inc., 411 F.3d 1006, 1027 (9th

3    Cir. 2005) (internal quotation and citation omitted).  "The same standard applies for

4    pleading a violation of Section 12(a)(2)."  See Pivotal, 2020 WL 4193384, at *5.

5         Further, although neither § 11 nor § 12 contains an element of fraud, a plaintiff

6    nonetheless is "subject to Rule 9(b)'s particularity mandate if his complaint 'sounds in

7    fraud.'"  See Daou, 411 F.3d 1006, 1027 (9th Cir. 2005); see also In re Charles Schwab

8    Corp. Sec. Litig., 257 F.R.D. 534, 548 (N.D. Cal. 2009) (noting although "[a]s with Section

9    11, fraud is not an element of a Section 12(a)(2) claim[,] . . . Section 12(a)(2) claim must

10   satisfy Rule 9(b) . . . to the extent that the factual allegations sound in fraud").

11        By the May 25 Order, Judge Koh, noting "[p]laintiffs' Securities Act and Exchange

12   Act allegations are almost identical," found "the heightened pleading standards of Rule

13   9(b) appl[ied] to [p]laintiffs' Securities Act claims."  (See May 25 Order at 36:7-10.)

14        Plaintiffs, in the SAC, again "make only a nominal effort to disclaim allegations of

15   fraud" (see May 25 Order at 35:23-24) with respect to their Securities Act claims (see

16   CAC ¶ 193 (alleging Securities Act claims "are not based on any allegations of knowing

17   or reckless misconduct and do not allege, and do not sound in, fraud"); SAC ¶ 312

18   (same).  In their opposition, plaintiffs make no argument as to why Rule 9(b) does not

19   apply, and as before, plaintiffs' Securities Act and Exchange Act allegations remain, in

20   essence, identical.  Consequently, the heightened pleading standards of Rule 9(b) apply

21   to plaintiffs' Securities Act claims.  See Rubke v. Capitol Bancorp Ltd, 551 F.3d 1156,

22   1161 (9th Cir. 2009) (citing Daou, 411 F.3d at 1028) (holding where "complaint employs

23   the exact same factual allegations to allege violations of section 11 as it uses to allege

24   fraudulent conduct under section 10(b) of the Exchange Act, we can assume that it

25   sounds in fraud").

26        By the May 25 Order, Judge Koh dismissed plaintiffs' Securities Act claims, which

27   were based on fourteen statements alleged in the CAC, finding either that plaintiffs had

28   "failed to adequately plead falsity" or that the statements were non-actionable forward-

1  looking statements protected under the PSLRA's safe harbor.  (See May 25 Order at

2  39:17, 41:23-24.)

3      In the SAC, plaintiffs now allege defendants made ten false and misleading

4  statements in violation of §§ 11 and 12(a)(2) of the Securities Act.  In the instant motion,

5  defendants argue the statements should again be dismissed for the same reasons Judge

6  Koh previously found.  (See Defs.' Mot. at 10:25-11:9.)  As set forth below, the Court

7  agrees.[17]

8          **1.  General Statements of Fact**

9              **a.  Statements Regarding Cloud Products**

10  In the SAC, plaintiffs again challenge the below five statements.

11  **October 3, 2018, Merger Registration Statement (or incorporated**
    **therein)**

12
    **Statement 33** (by all defendants)

13  The Company's product offerings' "original architecture was designed for
    the cloud."

14
    **Statement 34** (by all defendants)

15  The Company's product offerings "run[] natively on public cloud
    infrastructure[.]"

16
    **Statement 35** (by all defendants)

17  Cloudera's offerings provided "[c]loud and on-premises deployment at scale

18  and across hybrid cloud environments[.]"

19
    **Statement 36** (by all defendants)

20  Cloudera's product "Altus is a cloud service . . . that enable[s] customers to
    address a new set of elastic and transient workloads that would otherwise

21  be impractical to run in the datacenter," highlighting its purportedly "ongoing

22  performance in the areas of cloud," and ability to provide "[c]loud . . .
    deployment at scale."

23

24      [17] Although plaintiffs, citing In re Cloudera Secs. Litig., 2020 Cal. Super. LEXIS 98
25  (Santa Clara Super. Ct. July 1, 2020), assert "a California Superior Court has already
    determined that [d]efendants' statements about their Class Period technological
26  capabilities were actionable" (see Pls.' Opp'n at 2:8-10), the "Superior Court applied a
    pleading standard that requires far less than the standards applicable here" (see Defs.'
27  Reply at 7:9-10); see also In re Cloudera Secs. Litig., 2020 Cal. Super. LEXIS 98, at *15
    (explaining "the facts alleged in the pleading are deemed to be true, however improbable
28  they may be").

United States District Court
Northern District of California

**Statement 40** (by all defendants)
Cloudera characterized "Altus" as a "cloud" offering and asserted the "complementary product[]" would create "[p]owerful [s]ynergies" for "[r]evenue."

(See SAC Ex. B at 1-3, 7.)  Statements 33 and 34 are portions of Statement 17; Statement 35 is the same as Statement 18; and Statement 36, with the exception of the phrase "ongoing performance in the areas of cloud," constitutes a combination of Statements 8b, 8c, and 18a.

In support of their Securities Act claims, plaintiffs proffer essentially the same allegations of falsity as they offered in support of their Exchange Act claims (see, e.g., SAC ¶ 336 (alleging "Cloudera had no cloud offering"), ¶ 338 (alleging "Daniel Sturman who was responsible for developing Altus, left Cloudera shortly after the Merger given the Company's cloud washed offerings"), ¶ 342 (alleging "Company's platforms . . . were technologically obsolete such that Cloudera's . . . customers . . . were canceling and/or delaying renewals while their in-house engineering teams independently learned to perform the same or superior functions and services that Cloudera sold without paying Cloudera")),[18] and, the Court, having found such allegations inadequate, likewise finds so here.

Statement 40, although not alleged earlier in the SAC, is the same as Statement 53 in the CAC (see CAC ¶ 205), which by the May 25 Order, Judge Koh found insufficient to support plaintiffs' claims.  In particular, Judge Koh found plaintiffs' allegation that the statement was false because Altus was "not a 'viable cloud product'" was unavailing, as plaintiffs "acknowledge[d] that Altus was a cloud product and d[id] not explain specifically why it was not viable."  (See May 25 Order at 37:16-18.)  In the SAC, plaintiffs, striking

---

[18] Although this allegation (see SAC ¶ 342) is arguably more specific than a similar allegation offered earlier with respect to plaintiffs' Exchange Act claims (see SAC ¶ 189 (alleging "Cloudera's own customers in critical markets were so dissatisfied with Cloudera's products, service and cost, they were building out their own data management solutions superior to what Cloudera offered")), plaintiffs again fail to provide supporting factual allegations.

the word "viable," now allege Statement 40 was false and misleading "because Altus was not a 'cloud product'" (see SAC ¶ 348), which allegation, as discussed earlier herein, see supra Section A.1.a, is inadequate to establish falsity of the challenged statement.

Accordingly, to the extent plaintiffs' claims are based on Statement 33, 34, 35, 36, or 40, such claims are subject to dismissal.

**b. Risk Disclosures**

In the SAC, plaintiffs again challenge the below two statements.

**Statement 41** (by all defendants)
The Merger Registration Statement provided investors with generalized "possible" "Risk Factors" related to the Merger, stating that "if" a "risk" occurred it "could" or "may" possibly negatively impact the Company.

**Statement 42** (by all defendants)
While Microsoft, Google and Amazon had a vast commercial advantage in cloud computing, and the scale to render Cloudera's mundane Altus offering effectively irrelevant at the time of the Merger, the Company's relevant SEC filing "Risk Factors" meagerly suggested that the Company "could lose market share to our competitors, which could adversely affect our business, financial condition and results of operations."

(See SAC Ex. B at 8, 10.)

By the May 25 Order, Judge Koh dismissed plaintiffs' claims to the extent based on these two statements, finding plaintiffs failed to plead sufficient factual allegations to support their allegation that "the risks warned of had, in fact, already materialized at the time of the Merger." (See May 25 Order at 40:9-10.) In particular, as to Statement 42, Judge Koh found plaintiffs' allegation that the risks referenced therein "had already come to pass because Cloudera's 'market share in cloud was virtually nonexistent at the time of the Merger' . . . lack[ed] merit," in that "Cloudera Defendants did not claim to have a particular share of the market" but rather "simply acknowledged . . . they could lose market share to competitors going forward" (see id. at 40:16-21); further, as to both statements, Judge Koh found plaintiffs relied on "the same inadequate allegations regarding Cloudera's lack of a viable cloud product, which the Court ha[d] already found insufficient" (see id. at 40:25-41:1).

28

In opposition to the instant motion, plaintiffs offer no new allegations or arguments in support of their assertion that the above-referenced statements were false when made.

Accordingly, to the extent plaintiffs' claims are based on Statement 41 or 42, such claims are subject to dismissal.

### 2. Forward-Looking Statements

In the SAC, plaintiffs again challenge the below three statements.

**Statement 37** (by all defendants)
The Merger would "create a major cross-selling opportunity in the near term."

**Statement 38** (by all defendants)
The Merger would "expand[] our addressable market[.]"

**Statement 39** (by all defendants)
The Merger would "improve Cloudera's . . . existing ability to expand customer relationships and increase the penetration of new customer accounts," such that Cloudera would "use the initial sale as a foothold to increase revenue per customer by increasing the amount of data and number of use cases each customer runs through our platform."

(See SAC Ex. B at 4-6.)  Statement 37 is the same as Statement 26; Statement 38 is the same as Statement 27; and Statement 39 is the same as Statement 28.

By the May 25 Order, Judge Koh dismissed plaintiffs' Securities Act claims to the extent based on these statements for the same reasons as she dismissed their Exchange Act claims, and as discussed above, this Court likewise has dismissed the Exchange Act claims.  See supra Section A.3.

In opposition to the instant motion, plaintiffs offer no new allegations or arguments in support of their assertion that the above-referenced statements were false when made nor as to why they were not forward-looking statements protected under the PSLRA's safe harbor.

Accordingly, to the extent plaintiffs' claims are based on Statement 37, 38, or 39, such claims are subject to dismissal.

### D. Count III – § 15 of the Securities Act

As noted, plaintiffs assert, as against Intel, the Director Defendants, and the

1    Insider Defendants, violations of § 15 of the Securities Act.

2        Under § 15 of the Securities Act, any person who controls a person liable for

3    violating § 11 or § 12 is jointly or severally liable for the violation.  See 15 U.S.C.

4    § 77o(a).  "To state a claim against a control person under Section 15 of the Securities

5    Act, [p]laintiffs must plausibly allege (1) an underlying violation of Section 11 or 12, and

6    (2) control."  See Pivotal, 2020 WL 4193384, at *9.

7        Here, as discussed above, plaintiffs have failed to state a claim under § 11 or § 12,

8    and, consequently, such failure precludes plaintiffs from stating a claim under § 15.

9                                    **CONCLUSION**

10       For the reasons set forth above, defendants' motion to dismiss the SAC is hereby

11   GRANTED, and the SAC is hereby DISMISSED without further leave to amend.  (See

12   May 25 Order at 43:15-17 (warning "failure to cure the deficiencies identified in this Order

13   and in [d]efendants' motions to dismiss, will result in dismissal of [p]laintiffs' deficient

14   claims with prejudice").)[19]

15

16       **IT IS SO ORDERED.**

17

18   Dated: October 25, 2022

19                                                    MAXINE M. CHESNEY
                                                      United States District Judge

20

21

22

23

24

25

─────────────────────────

26       [19] As to defendant Hammonds, although, under Rule 25 of the Federal Rules of
     Civil Procedure, a motion for substitution may be made within 90 days after service of "a
27   statement noting the death," see Fed. R. Civ. P. 25(a)(1), in the instant case, such
     substitution would be futile, as plaintiffs' claims against any successor-in-interest would
28   be dismissed on the grounds set forth herein.